1  James E. Cecchi (NJ 030861989)
   *Admitted Pro hac Vice*
2  **CARELLA, BYRNE, CECCHI,**
   **OLSTEIN, BRODY & AGNELLO, P.C.**
3  5 Becker Farm Road
   Roseland, New Jersey 07068
4  Tel: (973) 994-1700
   Email: jcecchi@carellabyrne.com
5
   *Lead Counsel for Plaintiff and the*
6  *Proposed School District Class*
7  [*Additional Counsel on Signature Page*]
8
9            **UNITED STATES DISTRICT COURT**
10          **SOUTHERN DISTRICT OF CALIFORNIA**
11
12  IN RE: POWERSCHOOL HOLDINGS,      ⟩   CASE NO. 25-md-3149-BEN-MSB
    INC. AND POWERSCHOOL GROUP,      ⟩
13  LLC CUSTOMER SECURITY            ⟩
    BREACH                           ⟩   MDL NO. 3149
14  LITIGATION,                      ⟩
                                     ⟩
15  *This Document Relates to the School*  ⟩   CONSOLIDATED MDL DOCKET
    *District Class Action Track*        ⟩
16                                   ⟩
17
18          **SCHOOL DISTRICT CLASS ACTION COMPLAINT**
19
20              **DEMAND FOR JURY TRIAL**
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Section**                                                                          **Page**

INTRODUCTION..................................................................................................1

JURISDICTION AND VENUE ...........................................................................5

PARTIES………..................................................................................................6

   A.   Defendants ...................................................................................6

   B.   Plaintiff .......................................................................................7

FACTUAL BACKGROUND ................................................................................7

   A.   Powerschool Collected and Enabled Access to School Districts' Highly-Sensitive Protected Information...........................7

   B.   PowerSchool Laid Off 5% of Its Workforce and Outsourced Backend Operations Offshore ...............................16

     1.   Bain Capital Acquires PowerSchool, Saddling the Company with Significant Debt ..............................16

     2.   Bain Capital Lays off Approximately 5% of the PowerSchool Workforce .......................................19

     3.   Bain Capital Outsources Operations .............................................20

     4.   This follows a Pattern for Bain Capital..........................................25

   C.   PowerSchool Failed to Protect Former and Current Customers' Sensitive Personal Information...............................27

     1.   PowerSchool's Systems Were Compromised, and Personal Identifying Information of Thousands of School Districts Was Exfiltrated and Is Now Being Used in Ransom Attacks........27

     2.   A Criminal Indictment and Subsequent Guilty Plea.....................35

     3.   The Information is Reportedly Still Circulating and Being Utilized in Ransom Attacks Against Class Members ...................37

     4.   PowerSchool Could Have (and Should Have) Secured Its Systems Against an Attack ..............................41

   D.   PowerSchool Had a Duty to Follow Guidance and Industry-Standard Cybersecurity Practices ......................44

     1.   PowerSchool Must Comply with COPPA to Secure Plaintiff's and Class Members' Information.................44

     2.   PowerSchool Is a Business Associate and Must Comply with HIPAA Security Standards .........................45

i

      3.     FTC Guidance Regarding Safeguarding Customer Data ...............48

      4.     Industry Standards Regarding Network Security .........................50

  E.    Plainttiff and Class Members Have Been Harmed...............................57

CLASS ALLEGATIONS ..........................................................................61

CAUSES OF ACTION .............................................................................66

COUNT 1
BREACH OF EXPRESS CONTRACT .......................................................66

COUNT 2
INTENTIONAL TORTIOUS INTERFERENCE WITH CONTRACT.......78

COUNT 3
NEGLIGENCE ..........................................................................................79

COUNT 4
VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT............84

COUNT 5
CALIFORNIA'S COMPREHENSIVE DATA ACCESS AND
FRAUD ACT.............................................................................................87

COUNT 6
CALIFORNIA'S UNFAIR COMPETITION LAW ....................................90

COUNT 7
UNJUST ENRICHMENT ..........................................................................93

COUNT 8
DECLARATORY AND INJUNCTIVE RELIEF.........................................94

PRAYER FOR RELIEF.............................................................................95

JURY TRIAL DEMANDED ......................................................................96

Plaintiff Irvington Public Schools ("Plaintiff"), individually and on behalf of the below-defined Nationwide Class and Alternative Statewide Subclasses ("Classes," and Members of the Classes, including Plaintiff, are referred to as "Class Members" or "School Districts") allege the following against Defendants Bain Capital, LP ("Bain Capital"), PowerSchool Holdings, Inc., and PowerSchool Group LLC    (together "PowerSchool" and with Bain Capital, "Defendants"), based upon personal knowledge, the investigation of counsel, and on information and belief as to all other matters.

## INTRODUCTION

1.    This nationwide class action arises out of PowerSchool's failure to take basic precautions to secure highly sensitive information provided by thousands of School Districts. The School Districts provided this information relying on PowerSchool's contractual promise to provide industry standard data security—an essential element for which the schools paid valuable consideration. As a result of PowerSchool's disregard for its contractual and legal data privacy obligations, PowerSchool was hacked by cyber-criminals who are unlawfully using that data for their own financial gain.  As a result, Plaintiff and Class Members seek relief in the form of overpayment damages, and other consequential damages, to remedy their harm and recover the benefit of their bargain.

2.    The facts regarding PowerSchool's conduct are seriously troubling. In September 2024, hackers gained backdoor access to the School Districts' information security systems ("SIS") enabling them to steal highly sensitive data for thousands of School Districts across the country. This data for the School Districts included sensitive personally identifiable information ("PII"), protected health information ("PHI"), and other confidential records ("Data Breach" or "Breach").  PowerSchool's systems failed to detect the intrusion for approximately four months.  And this was not a dataset containing innocuous, publicly available information. To the contrary, PowerSchool has confirmed stolen information includes names, addresses, Social Security numbers, medical information and other unspecified PII and PHI.

1

3.     Recognizing the severity of the intrusion and the damage it caused to Plaintiff and Class Members, PowerSchool engaged in a number of half-baked efforts to contain the damage flowing from the Breach. In the days following the Breach, PowerSchool paid a ransom to the hackers who committed to "deleting" the stolen data. Of course, such commitments from criminals are worthless and there is every indication that the data remains in the hands of bad actors, including the notorious cybercriminal group, ShinyHunters. The ransom payment was also made in direct contravention of PowerSchool's own educational materials which correctly note that "even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify that copies of the data are destroyed."[1]

4.     Ultimately, law enforcement arrested and prosecuted one individual, but his alleged accomplice based in Illinois is still on the run. And, unsurprisingly, despite the ransom payment, several School Districts were subsequently extorted by ShinyHunters.[2] In other words, the sensitive data remains in the hands of bad actors and the threat of extortion to School Districts is ongoing.

5.     The facts presently known regarding how hackers gained entry into the affected systems also reveals PowerSchool's gross negligence and breaches of contract. It is currently believed that the Breach was the result of hackers obtaining a single stolen login credential that had been assigned to a contractor who worked for PowerSchool. As noted by Michael Klein, senior director at the Institute for Security and Technology, first, "the fact that someone could log into a support portal that has access to everything with just [a] username and password is terrifying[.]"[3]

---

[1] *PowerSchool: A Leader in Responsible AI for Education*, at 14, PowerSchool (Jun. 14, 2024), https://go.powerschool.com/rs/861-RMI-846/images/Responsible_AI_Cybersecurity_Report.pdf?version=0

[2] Matt Kapko, *PowerSchool Customers Hit by Downstream Extortion Threats*, CYBERSCOOP (May 7, 2025), available at https://cyberscoop.com/powerschool-customers-hit-by-downstream-extortion-threats (last visited June 19, 2025)

[3] Mark Racine & Michael Klein, Statement at 31:10-31:41, in *Episode 215 – PowerSchool Hacker Has Been Caught!*, K12 TECH TALK PODCAST (May 22, 2025), https://k12techtalkpodcast.com/e/unmasking-the-powerschool-hacker-an-inside-job/;

6.      Equally concerning is the fact that PowerSchool claimed it had secure endpoint protection to alert its personnel of a suspicious event—that would have alerted the company to an employee accessing information from an unfamiliar location—but the compromised credentials were used from a server based in Ukraine without triggering any alert.[4] Simply put, PowerSchool did not have in place endpoint protection for its contractors.[5] Without endpoint detection, the contractor had the full ability to download all School District data without triggering a red flag in PowerSchool's system. All these failures directly violated and breached PowerSchool's contractual commitments to Plaintiff and Class Members.

7.      The Data Breach was completely foreseeable to PowerSchool. PowerSchool's CEO, Hardeep Gulati, has publicly acknowledged the extraordinary target school records represent for cyber criminals. On September 21, 2023, he wrote:

> Data security challenges continue to escalate in our schools, and K-12 institutions are vulnerable for a variety of reasons. In the last year, cyberattacks have increased by 84% in education, and 80% of U.S. K-12 schools suffered ransomware attacks in 2022, making education the No. 1 target for cybergangs.
>
> When looking at costs, ransomware attacks can hold a district's data hostage until paying exorbitant sums of money (the average is $268,000). A student's personally identifiable information (PII) is valuable to cyber criminals; the price of a student record on the black market is between $250 and $300, according to the U.S. Dept. of Education.[6]

---

*see also* Mishka McCowan, Statement at 10:03 - 10:37, in *Special Episode: PowerSchool CISO Mishka McCowan,* K12 TECH TALK PODCAST (Apr. 8, 2025), https://k12techtalkpodcast.com/e/surviving-a-cyber-nightmare-inside-powerschools-response-strategy/ (Discussing the indefinite access the compromised account had to the administrative support portal and changes implemented by PowerSchool following the Data Breach).

[4] Reuters, Massachusetts Hacker to Plead Guilty to PowerSchool Data Breach, May 20, 2025, https://www.reuters.com/legal/massachusetts-hacker-plead-guilty-powerschool-data-breach-2025-05-20/.

[5]      Michael Klein, Statement at 38:29 - 39:29, in *Episode 215 – PowerSchool Hacker Has Been Caught!,* K12 TECH TALK PODCAST (May 22, 2025), https://k12techtalkpodcast.com/e/unmasking-the-powerschool-hacker-an-inside-job/.

[6] *PowerSchool Presents Cybersecurity Commitments at White House K–12 Cybersecurity & Data Privacy Event* (Sept. 28, 2023), https://www.powerschool.com/blog/powerschool-presents-cybersecurity-commitments-at-white-house-k-12-cybersecurity-data-privacy-event/.

3

8.      Despite PowerSchool's knowledge of the data security challenges posed by agreeing to collect and store sensitive information, and that such information was highly sought-after by cyber criminals, it failed to take the most basic steps to fulfill its contractual promises. And, because of the highly sensitive nature of the data at issue, the breach drew national attention, prompting a February 21, 2025 letter from United States Senators Margaret Wood Hassan, Jim Banks, and James Lankford, who expressed "significant concern" that PowerSchool "failed to put in place basic cybersecurity safeguards—such as multi-factor authentication—that could have helped to prevent the breach."[7]

9.      PowerSchool's failure to detect or contain the Breach followed a series of cost-cutting measures, including reductions to its internal security team and the outsourcing of backend operations.[8] Full administrative access was granted to contractors without adequate oversight or enforcement of promised security protocols. These decisions compromised PowerSchool's cybersecurity and were solely taken to enhance its bottom line.

10.     This action seeks not only injunctive relief requiring PowerSchool to rectify its systemic cyber security failures, but also seeks economic damages suffered by Plaintiff and Class Members as a consequence of the Data Breach. Those economic damages include the School Districts' loss of the benefit of their bargain with PowerSchool, as all Class Members explicitly paid for industry leading data security but received nothing of the sort. In addition, Plaintiff and Class Members seek damages due to the diversion of School District resources in responding to the Data Breach, communicating with affected individuals, and understanding the scope and consequences of the Data Breach, as well as all other available economic and injunctive relief available as a result of the harm caused by Defendants.

---

[7] Sen. Maggie Hassan, *Letter to PowerSchool* (Feb. 21, 2025) (on file with U.S. Senate), https://www.hassan.senate.gov/imo/media/doc/powerschool_letter.pdf.
[8] Indeed, an earlier incident of unauthorized access is reported to have occurred on August 16, 2024, only three days after mass domestic layoffs at PowerSchool.

1

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*, thus implicating federal questions.

12.    This Court also has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members. Minimal diversity exists, as Defendants are citizens of States different from that of at least one Class Member. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

13.    This Court has personal jurisdiction over PowerSchool because it is headquartered and regularly conducts business in the state of California.

14.    This Court also has personal jurisdiction over Bain Capital, as Bain Capital has both continuous and systematic contacts with California and this lawsuit arises from Bain Capital's contacts with California. Bain Capital exercises dominion and control over PowerSchool, and as set for below, directed and was responsible for many of the decisions that ultimately gave rise to this action. When Bain Capital acquired PowerSchool, it knew it was acquiring a California company, and in fact disclosed litigation due to a data breach as being one of the risk factors in its acquisition of PowerSchool. Bain Capital accepted the risk of litigation in the state where its target company was headquartered when its executives approved the merger agreement with PowerSchool.

15.    As admitted by PowerSchool and Bain Capital, many of the relevant witnesses and evidence related to the cybersecurity incident are located in California. *See In Re: PowerSchool Holdings, Inc., and PowerSchool Group, LLC Customer Data Security Breach Litigation*, MDL No. 3149, Docket No. 97 at 8, 10 (J.P.M.L. Feb. 20, 2025). Accordingly, the tortious conduct by Defendants giving rise to Plaintiff and Class Members injuries emanated from California.

5

16.     Moreover, this Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. §1407, Rule 7.1 of the Rules of Procedure of the JPML, and the Transfer Order of the JPML in MDL 3149, ECF No. 152 ("Transfer Order"), transferring any actions related to this matter to this Court, as well as any future Transfer Orders that the JPML may enter.

17.     Venue is proper in this District under 28 U.S.C. §1407, Rule 7.1 of the Rules of Procedure of the JPML, and the Transfer Order related to this matter and any future Transfer Orders as the JPML may issue. In the alternative, venue is proper in this District pursuant to 28 U.S.C. § 1391, because PowerSchool's principal place of business is in the state of California.

## PARTIES

### A.     DEFENDANTS

### PowerSchool Group LLC

18.     PowerSchool Group LLC, a Delaware company, is based in Folsom, California. PowerSchool provides a suite of solutions that includes a software suite for records used by state departments of education, districts, and schools. As of June 30, 2024, PowerSchool served more than 18,000 customers, including over 90 of the 100 largest school districts by student enrollment in the United States, has over 30 state-, province-, and territory-wide contracts in North America, and sold solutions in over 90 countries globally. PowerSchool's principal executive offices are located at 150 Parkshore Drive, Folsom, California 95630.

### PowerSchool Holdings, Inc.

19.     Defendant PowerSchool Holdings, Inc., is a Delaware corporation headquartered at 150 Parkshore Drive, Folsom, California 95630.

### Bain Capital, LP

20.     Defendant Bain Capital, LP, a Delaware company, maintains its headquarters at 200 Clarendon St., Boston, Massachusetts. Bain Capital is one of the world's leading private multi-asset alternative investment firms. Since 1984, it has

expanded into numerous asset classes, including private equity, credit, public equity, venture capital, real estate, life sciences, insurance, and other strategic areas of focus. The firm has offices on four continents, more than 1,800 employees, and approximately $185 billion in assets under management. Bain Capital, through its agents/alter egos, consummated the acquisition of PowerSchool in October 2024. Bain Capital dictates PowerSchool's strategic directives and uses PowerSchool's operations to further Bain Capital's private investment purposes.

### B.    PLAINTIFF

21.    Plaintiff Irvington Public Schools ("Plaintiff") is a school district serving 7,675 students. It includes twelve schools, with education spanning from pre-kindergarten through twelfth grade. Plaintiff is located in Irvington, New Jersey with a population of approximately 61,176 residents. As a result of the Data Breach, Plaintiff did not, among other things, receive the benefit of its bargain, has lost time and money responding to the Data Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Data Breach. Transferring from PowerSchool to another platform is highly time-consuming and expensive, and the options available to Plaintiff and Class Members are both unattractive and highly limited. Specifically, Plaintiff paid $47,902.00 for the contract year ending June 30, 2021, for SIS Maintenance and Support, and made recurring payments in each subsequent year.

### FACTUAL BACKGROUND

### A.    POWERSCHOOL COLLECTED AND ENABLED ACCESS TO SCHOOL DISTRICTS' HIGHLY-SENSITIVE PROTECTED INFORMATION

22.    PowerSchool is a software company that provides data collection, storage, and analytics tools for K-12 school districts in the United States and abroad.[9] In 2024,

---

[9] *Bain Capital Completes Acquisition of PowerSchool*, POWERSCHOOL GROUP, LLC (Oct. 1, 2024), https://www.powerschool.com/bain-capital/.

PowerSchool was acquired by Bain Capital in a transaction that valued the company at $5.6 billion.[10] Among other products, PowerSchool sells a widely used service called PowerSchool's SIS, a cloud-based platform that enables school districts to manage student records and provide access to grades, assignments, attendance, and schedules for educators, students, and parents.[11]

23.    PowerSchool markets SIS as a solution that will "save time, reduce costs, improve student outcomes, and increase security."[12] To enable this service, PowerSchool collects vast amounts of sensitive information from the School Districts, including records containing information about schoolchildren, parents, and teachers. Approximately 75 percent of students in North America use the PowerSchool platform, including those attending 90 of the 100 largest school districts in the United States. [13]

24.    The scope of data collected includes highly sensitive PII, PHI, and other confidential records, and, among other things, includes: names, social security numbers, email addresses, phone numbers, dates of birth, medical details (*e.g.*, food allergies, learning disabilities), criminal histories, demographic profiles, reduced-meal program eligibility (*i.e.*, financial status), grades, staff and student ID numbers, and more (collectively, "Protected Information"). The Protected Information comprises approximately 150 unique fields per student and 97 fields per staff member.[14]

25.    Most critically, PowerSchool promised that "Customers own their student and school data; **PowerSchool has no rights to access** or sell **student or school data**. It does not collect, maintain, use, or share student personal information beyond that needed

---

[10] *Id.*

[11] *PowerSchool SIS*, POWERSCHOOL GROUP, LLC, https://www.powerschool.com/solutions/student-information/powerschool-sis/ (last visited June 26, 2025).

[12] *Solutions*, POWERSCHOOL GROUP, LLC, https://www.powerschool.com/solutions/ (last visited June 26, 2025).

[13] *Id.*

[14] *Id.*

for authorized educational or school purposes or as authorized by the parent or student."[15] Relevantly, in that same support resource, PowerSchool also stated that since "threats to student data privacy continue to rise…it's critical to ensure you're partnering with EdTech platform vendors that prioritize student data security" and highlighted a key feature as "Single Sign-On (SSO)/Multifactor Authentication (MFA) Support" that "should support SSO integrations with an external identity where MFA can be enabled for an additional layer of security."[16] The resource also included the following infographic:



26.    Despite highlighting these security measures as examples of "how PowerSchool provides superior student data privacy and security," in fact PowerSchool had not implement multifactor authentication and its backend administrators had the capability to access student and school data. As a result, the hackers were able to obtain compromised credentials for a contractor handling backend technical support, and then steal data for thousands of School Districts. Even worse, PowerSchool failed to prevent the theft of high-level administrative credentials, which should have required multiple security controls to use.

---

[15] PowerSchool, Student Data Privacy: Everything You Need to Know, PowerSchool (blog) (June 20, 2023), https://www.powerschool.com/blog/student-data-privacy-everything-you-need-to-know/ (Emphasis added).
[16] *Id.*

27.     As PowerSchool's CISO, Mishka McCowan, stated in an interview—the PowerSchool Data Breach occurred through a Maintenance Access Portal that allowed PowerSchool's Support Department to access student and school data in violation of their contracts with the School Districts and prior representations about that access.[17]

28.     In discussing changes made to the SIS platform and the Maintenance Access tool following the Data Breach, Mr. McCowan stated as follows:

> Probably the largest [change we made] is on the SIS itself, admins have always had the ability to turn things off, um, turn off the maintenance, it's called maintenance access and they could turn it off [and is turned on and kept on indefinitely by default]. And one of the first things we did is we just like for all of our hosts, so we just turned it off. And then for the release that happened in January for the SIS, what we did is we turned off the ability to leave it on in perpetuity. So what we did is instead of just being a binary on or off, it's now time based. You can put it on and as soon as an admin enables it, the clock starts to tick down from whatever they set it to.
>
> It could be one day, it could be up to thirty days And then when it reaches zero, it turns off automatically. No one has to remember to do it. It just gets turned off. And what that does is it lowers the potential blast rate. So we put in all these layers in front of it to make sure that no one can get in, but once youre in, you have to plan for someone getting in and you have to If they get in, you have to contain the blast radius.
>
> And what this does is it means that for most of the SISs at any given moment, that access is off, so you can't get in. Now, that has some interesting side effects like for our support department. So for us to get in at any given moment to help someone or do a services engagement, we have to call and say, Hey, we got this ticket here from you. Can you let us in? And they turn it on and we go in and it gets automatically turned off.[18]

29.     In addition to allowing their employees and contractors broad access to this data, unbeknownst to Plaintiff and Class Members, PowerSchool also failed to implement basic security measures, such as multi-factor authentication ("MFA") across its platform. This failure, among others, led to the Data Breach.

30.     PowerSchool frequently instruct School Districts to implement multifactor authentication. PowerSchool itself represents that it takes certain "Accessing and

---

[17] *Mishka McCowan, Statement* at 36:01 - 37:27, in *Special Episode: PowerSchool CISO Mishka McCowan,* K12 TECH TALK PODCAST (Apr. 8, 2025), https://k12techtalkpodcast.com/e/surviving-a-cyber-nightmare-inside-powerschools-response-strategy/

[18] *Id.*

Credentialing" measures to ensure that the data provided by the School Districts is protected, including:

- Multi-factor authentication ("MFA"), biometric authentication, role-based access controls, and VPN-secured product portals to ensure only authorized personnel can access customer data.

- Shared credentials are strictly limited, tightly controlled, and only allowed when technically necessary.

- Access to customer data is reviewed monthly, requires leadership approval, and is automatically removed if no valid business need is identified.

- All access to PowerSchool systems requires the use of PowerSchool-managed devices, with login sessions and maintenance windows tightly restricted to minimize risk.[19]

31.    PowerSchool has also created educational materials that emphasize the value of implementing this basic security measure. In a video uploaded to YouTube on October 5, 2023, titled 'What is Multi-Factor Authentication' where PowerSchool stated as follows:

> Today, more than ever, the security of your K-12 institution's data is critical. That's why **we're here to discuss an essential tool in safeguarding your school's information, multi-factor authentication or MFA.** Let's start with the basics.
>
> MFA is a security protection that goes beyond traditional passwords. It adds an extra layer of protection by requiring users to provide multiple forms of identification before granting access. The way MFA works is that it requires you to provide something in addition to your username and password.
>
> That something extra is called a factor, and it's either something you have or something you are. An example of something you have is your smartphone, while an example of something you have or you are is your fingerprint. You may have used MFA before when you went to a website and you entered your username and password, but then were required to enter a number that was texted to your phone.

---

[19]    PowerSchool, Security & Trust Center, PowerSchool, https://www.powerschool.com/security/ (last visited June 27, 2025).

That's MFA in action. Adding MFA enhances security significantly because criminals can't just guess your password. They would also have to have your phone or fingerprints as well.

**So what are the benefits of MFA? First and foremost, MFA drastically reduces the risk of unauthorized access.** Even if a password is compromised, such as through a phishing email, a hacker still needs that additional factor to gain entry. That means stealing your phone or your fingerprints.

**Now, with MFA in place, sensitive student and staff data remains secure. This includes grades, personal information, and so much more. Many educational institutions have state data protection regulations in addition to FERPA.**

**MFA helps meet those compliance requirements, ensuring your school avoids legal complications. As you consider various software as a service or SaaS offerings for your school, it's crucial to prioritize those that include multi-factor authentication.** Here's why.

SaaS providers that offer MFA demonstrate their commitment to security. **It's a clear sign that they take data protection seriously. By choosing SaaS solutions with MFA, you're proactively reducing the risk of data breaches, protecting your students' and staff's information.**

Now, most SaaS offerings come with built-in MFA features, making implementation a breeze. Your IT can set it up in no time at all. The best approach to implement MFA is to do it as part of an overall identity management program that includes single sign-on, known as SSO, that enables users to have a single set of credentials, their username, password, and MFA for login across all of your district systems.

In conclusion, multi-factor authentication is a powerful tool for enhancing security at your school. Its benefits include enhancing security, data protection, and regulatory compliance. **It makes it a must-have feature when considering a SaaS solution.**

Now, remember, **investing in MFA just isn't about protecting data. It's about safeguarding the future of education.** Make security a priority, and your school will thrive in this digital age.

Connect with us to learn how PowerSchool can help you implement cybersecurity best practices. Thank you.[20]

---

[20] What Is Multi-Factor Authentication – Cybersecurity Best Practices for K-12 Education, YouTube (PowerSchool), (Nov. 5, 2023), https://www.youtube.com/watch?v=_rQ4qCY1rpc (Emphasis added).

32.     Likewise, in another YouTube video uploaded on September 25, 2023, titled "5 Ways PowerSchool Helps Secure Your District," PowerSchool states: "PowerSchool offers free single sign-on or multi-factor authentication support" in its bundle of services.[21]

33.     On September 10, 2024, PowerSchool published an article on its website, titled the 'Top 6 Best Practices for Improving Student Information System (SIS) Cybersecurity' and included the following infographic:[22]



34.     That article went out to state that "your SIS requires periodic maintenance to keep it secure."[23] Further, it outlined several measures that should be implemented to protect School Districts against a data breach, including:

**1.     Implement a Strong Password Policy**

---

[21] 5 Ways PowerSchool Helps Secure Your District, YouTube (PowerSchool), (Sept. 25, 2023), https://www.youtube.com/watch?v=vRJOR5iEaS8.
[22] PowerSchool, Top 6 Best Practices for Improving Student Information System (SIS) Cybersecurity,        PowerSchool        Blog        (Sept.        10,        2024), https://www.powerschool.com/blog/best-practices-improving-sis-cybersecurity/.
[23] *Id.*

Passwords are the first line of defense against unauthorized access to your school's systems. It's essential that every user—whether they're a student, teacher, or administrator—has a strong, unique password. A password should be at least eight characters long, but 12 or more characters is preferable. The longer the password, the harder it is for cyber criminals to crack it.

Enforcing a strong password policy protects not only individual accounts but also the entire school's network. Simple passwords like "password123" or "school2024" are easy targets for hackers using automated tools. Encourage staff to create passwords that combine letters, numbers, and special characters. While this may seem burdensome, tools like password managers can simplify the process by securely storing and generating strong passwords.

## 2.    Reduce the Number of Admins to Eliminate Entry Points

In many school systems, too many individuals have administrative access to critical systems. This broad access increases the risk of accidental or intentional misuse. The principle of least privilege should be applied, meaning users should have the minimum level of access necessary to perform their job functions.

Review the list of users with administrative rights regularly. Administrators should be limited to a small group of trusted individuals who understand the responsibilities and risks associated with such access. By reducing the number of admins, you limit the potential entry points for attackers, making it harder for them to exploit the system if they manage to compromise an account.

## 3.    Review and Set Permissions

Setting appropriate permissions is vital for safeguarding sensitive information. Not everyone in the school needs access to every piece of data. For instance, while teachers need access to student grades, they shouldn't necessarily have access to payroll information or other sensitive administrative data.

Review the permissions set for all user roles in your system. Make sure students, teachers, and administrative staff have access only to the data and tools they need to perform their tasks. Overly broad permissions increase the risk of data breaches, either through malicious intent or accidental misuse. By tightening up these permissions, you help protect your school's information from falling into the wrong hands.

…

## 5.    Enable Single Sign-On (SSO) and Multi-Factor Authentication (MFA)

Implementing Single Sign-On (SSO) and Multi-Factor Authentication (MFA) is a best practice that significantly boosts your school's cybersecurity. SSO allows users to log in once and gain access to all their necessary applications, reducing the number of passwords they need to remember. This not only makes life easier for users but also reduces the chances of password fatigue, where users might reuse passwords across different platforms.

14

> MFA can be enabled as part of the SSO configuration (SAML or OIDC for those that are technically inclined). It adds an extra layer of security by requiring a second form of verification, such as a text message code or an authentication app, in addition to the password. This ensures that even if a password is compromised, unauthorized access is still prevented. Implementing these technologies helps protect sensitive information and provides peace of mind that your school's digital assets are secure.[24]

35.    PowerSchool also publicly represented it was implementing these secure measures. For example, in an article written by PowerSchool CEO, Mr. Gulati, he stated that PowerSchool was one of the first software companies to commit to CISA's Voluntary Pledge to design products with greater security built in.[25] In his words, "[c]ompanies signing the pledge publicly agree to take ownership of customer security outcomes, embrace radical transparency and accountability, and lead from the top by making secure technology a key priority for leadership."[26]

36.    However, the very first rule for the CISA Voluntary Pledge—that Mr. Gulati claimed PowerSchool is committed too—is to: "Within one year of signing the pledge, demonstrate actions taken to measurably increase the use of multi-factor authentication across the manufacturer's products [as] Multi-factor authentication is the greatest defense against password-based attacks such as credential stuffing and password theft."[27]

37.    PowerSchool also makes multiple representations about the privacy and security standards that it implements across its product lines. For example, PowerSchool represents that it uses "industry standards" to "improve data integrity and security."[28] It

---

[24] *Id.*

[25] *PowerSchool Presents Cybersecurity Commitments at White House K–12 Cybersecurity & Data Privacy Event*, PowerSchool Blog (Sep. 21, 2023), https://www.powerschool.com/blog/powerschool-presents-cybersecurity-commitments-at-white-house-k-12-cybersecurity-data-privacy-event/.

[26] *Id.*

[27] *Cybersecurity & Infrastructure Security Agency, Secure by Design Pledge* (May 8, 2024), https://www.cisa.gov/sites/default/files/2024-05/CISA%20Secure%20by%20Design%20Pledge_508c.pdf.

[28] *PowerSchool Group LLC, Interoperability Overview* (Feb. 14, 2023), https://www.powerschool.com/interoperability-overview/. powerschool.com+12

15

claims that all products are "[c]ertified to meet the 1EdTech open standard data & privacy rubric," and have received "ISO 27001" certification through "A-LIGN."[29]

38.    Another example, its "Cybersecurity, Data Privacy, and Infrastructure" webpage states that "PowerSchool is committed to being a good custodian of student data, taking all reasonable and appropriate countermeasures to ensure data confidentiality, integrity, and availability."[30]

39.    PowerSchool is entrusted with highly sensitive, personal information that reveals extraordinary granular details, including innermost thoughts, insecurities, and actions of the School Districts' students – the disclosure of which invades and infringes upon basic privacy rights and norms. That PowerSchool implements robust data security measures was, and remains, of utmost importance to the School Districts.

**B.    PowerSchool Laid Off 5% of Its Workforce and Outsourced Backend Operations Offshore**

**1.    Bain Capital Acquires PowerSchool, Saddling the Company with Significant Debt**

40.    Beginning on August 31, 2022, Bain Capital expressed interest in discussing potential opportunities for a business combination or acquisition of PowerSchool.[31]

41.    Over the next two years, representatives of Bain Capital continued to have discussions with principal shareholders and with Mr. Gulati regarding PowerSchool's organic growth potential and strategic merger and acquisition opportunities.[32]

---

[29] *Id.*

[30]    *PowerSchool's Privacy Principles*, PowerSchool, https://www.powerschool.com/privacy/ (last visited June 27, 2025).

[31] PowerSchool Holdings, Inc., DEF M-14C Definitive Information Statement relating to Merger or Acquisition, at 21, available at https://www.sec.gov/Archives/edgar/data/1835681/000119312524212624/d836904ddefm14c.htm (September 4, 2024).

[32] *Id.*

42.    On June 6, 2024, these discussions culminated into PowerSchool and Bain Capital executing a merger agreement and, among other things, an equity commitment letter.[33]

43.    A group of private credit lenders provided debt financing for this $5.6 billion acquisition.[34] The PowerSchool transaction is an example of a leveraged buyout, commonly referred to as an "LBO."[35] Lenders, including private credit firms and banks, contemplated the financing to be a roughly $3 billion financing package, with one iteration including pricing at around 4.75 percentage points over the Secured Overnight Financing Rate, resulting in an effective interest rate at the closing of the financing of approximately 9.80718% (based on assumed Adjusted Term SOFR of 5.05718%).[36]

44.    This debt financing arrangement is secured and backed by substantially all of the assets and capital stock of PowerSchool and its subsidiaries.[37] Accordingly, in order to consummate the merger, PowerSchool shouldered nearly $3 billion in new debt—subject to an approximate 9.8% interest rate—despite only being valued at $5.6 billion dollars itself.[38]

45.    As Megan Greenwell writes, this created a situation for PowerSchool where the "path of success beg[an] to look more like a tightrope over a canyon."[39] This is because:

---

[33] *Id.* at 45.

[34] Paula Seligson, *Private Credit Provides Debt for Bain Capital's PowerSchool Buyout*, BLOOMBERG LAW (Jun. 7, 2024), available at https://news.bloomberglaw.com/bankruptcy-law/private-credit-provides-debt-for-Bain Capitals-powerschool-buyout.

[35] *Id.*

[36] DEF M-14C Definitive Information Statement relating to Merger or Acquisition, at 86, available at https://www.sec.gov/Archives/edgar/data/1835681/000119312524212624/d836904ddef m14c.htm (September 4, 2024).

[37] *Id.*

[38] *Id.*

[39] Greenwell, Megan. *Bad Company: Private Equity and the Death of the American Dream—An Exposé of Private Equity's Devastating Impact on American Lives, Communities, and the Economy* (pp. xvi-xvii). HarperCollins. Kindle Edition.

> Large amounts of debt, of course, make for riskier investments. If a company is responsible not just for increasing profits, but for paying back massive loans and then increasing profits, the path to success begins to look more like a tightrope over a canyon. The threat of bankruptcy and liquidation increases exponentially. With those kinds of odds, it might seem like a wonder that the private equity industry exists at all. Why would the smartest guys in finance choose to work in a system where the risk of catastrophic failure is so high?
>
> The answer is that the risk of catastrophic failure is high—but not for private equity. When a firm acquires a new company, it borrows money in the company's name, not its own. Even though the firm is the company's sole owner, even though its executives are the ones who decided to take out the loans, it is not legally responsible for paying the money back. If the acquired company runs into financial trouble, its owners need not bail it out. Even in bankruptcy, when a company declares in court that it cannot pay all of its creditors, the private equity firm that owns it—a firm worth orders of magnitude more than the company itself—won't step in to cover the costs. As secured creditors, banks are the first to be paid back with the money that remains after a bankruptcy, so the threat to them is low too. The company and its employees shoulder the risk.[40]

46.     Given the high interest rates associated with acquiring capital for an LBO, the objective for private equity executives is to sell their investment for a short-term profit, not grow a company over the course of decades.[41] To that end, cost cutting pays off almost instantly.[42] A 2019 paper found that employment shrinks by an average of 4.4 percent in the two years following an LBO, and 12.6 percent when the company was previously publicly traded, like PowerSchool (Two finance professors argued that those figures actually significantly understated job losses by miscategorizing different types of buyouts, suggesting that employment shrinks by more than 25 percent in the five years after a public company is bought by private equity).[43]

47.     As described further below, these aggressive cost-cutting measures were implemented by Bain Capital almost instantly, and the measures implemented by Defendants not only contributed to the Data Breach—but also expressly breached PowerSchool's contractual obligations with the School Districts and other obligations. At

---

[40] *Id.*
[41] *Id.* at xx.
[42] *Id.*
[43] *Id.*

18

bottom, Defendants' actions to extract value fostered a process where costs were cut and liberties were taken with contractual obligations, with schools, schoolchildren, and teachers ultimately paying the price. To put it another way:

> When the only worth of a local grocery store, a newspaper, or a hospital is the short-term profits it can generate, the company becomes little more than a mine awaiting extraction. Businesses that were once pillars of a society flounder and crumble. In the best-case scenario, money that used to flow continuously through town is redirected to a gleaming office tower in Manhattan. In the worst case, grocery stores and newspapers and hospitals disappear altogether. Workers lose their jobs. Customers lose the services they rely on. Little League teams lose their sponsors. Communities lose their institutions. Only private equity wins.[44]

### 2. Bain Capital Lays off Approximately 5% of the PowerSchool Workforce

48. As of December 31, 2024, PowerSchool reportedly had approximately 3,500 employees in the United States.[45] Within three months of announcing the acquisition, on August 13, 2024, reports began to circulate that PowerSchool had laid off 5% of its workforce—some of whom had been with the company for over twenty years.[46]

49. As reported, an inside source claimed that "some departments were basically gutted."[47] The alleged justification for these layoffs was that PowerSchool reported a quarterly earnings per share of $0.23, missing the consensus estimate of $0.24 per share, by one penny per share.[48]

---

[44] *Id.* at xxii.
[45] PowerSchool Holdings, Inc., Stock Analysis, https://stockanalysis.com/stocks/pwsc/employees/
[46] Wyatt Gaylor (@wyattg), X (Aug. 13, 2024, 2:09 PM EST), https://x.com/wyattg/status/1823421671799447980; *see also* PowerTool (@PowerTool_), X (Aug. 14, 2024, 2:49 AM EST), https://x.com/PowerTool_/status/1823612984624664959; *see also* PowerTool (@PowerTool_), X (Aug. 17, 2024, 11:51 AM EST), https://x.com/PowerTool_/status/1824836415164735656 (Comment from Dominic Butler, Advanced Support Engineer II at PowerSchool, "[PowerSchool] just laid off 5% of their workforce yesterday.").
[47] Wyatt Gaylor (@wyattg), X (Aug. 14, 2024, 11:09 AM EST), https://x.com/wyattg/status/1823738764730229073.
[48] *Id.*, *see also PowerSchool Announces Second Quarter Financial Results*, Business Wire (Aug. 9, 2024), available at

50.     In the wake of the layoffs, former employees took to social media and career sites to voice their frustrations. On Glassdoor, a former Product Engineer complained of a "[l]arge scale layoff" and stated that it "is a general trend to outsource all the jobs to off shore…now it's shifting to support and product management."[49] Another complained on Glassdoor that the "Company is also clearly shifting to an India-based workforce at the expense of US-based employees."[50] Likewise, another stated that what "started as a mission-driven company to help every student achieve quickly became a profit-first march towards ed-tech domination."[51] Finally, a fourth indicated that if someone works in the United States for PowerSchool, they "will get laid off within 6 months as your job responsibilities get moved [offshore.]"[52]

51.     As described further below, the first incident of unauthorized access by a third-party actor occurred only *three days* after the mass layoffs, on August 16, 2024.

### 3.     Bain Capital Outsources Operations

52.     During the background of the merger, PowerSchool announced a major change to the company—seeking to nearly double its employees within the next 3 to 5 years by expanding into the Indian employment market.[53]

---

https://www.businesswire.com/news/home/20240808373822/en/PowerSchool-Announces-Second-Quarter-Financial-Results.

[49] Anonymous, Employee Review: PowerSchool Group (Aug. 19, 2024) (Glassdoor.com), https://www.glassdoor.com/Reviews/Employee-Review-PowerSchool-Group-E1110566-RVW90216913.htm (last visited June 18, 2025).

[50] Anonymous, Employee Review of PowerSchool Group (Aug. 20, 2024) (Glassdoor.com), https://www.glassdoor.com/Reviews/Employee-Review-PowerSchool-Group-E1110566-RVW90258225.htm (last visited June 18, 2025).

[51] Anonymous, Employee Review of PowerSchool Group (Sep. 12, 2024) (Glassdoor.com), https://www.glassdoor.com/Reviews/Employee-Review-PowerSchool-Group-E1110566-RVW90973925.htm (last visited June 18, 2025).

[52] Anonymous, Employee Review of PowerSchool Group (Oct. 12, 2024) (Glassdoor.com), https://www.glassdoor.com/Reviews/Employee-Review-PowerSchool-Group-E1110566-RVW92208768.htm (last visited June 18, 2025).

[53] EdTech Leader PowerSchool Makes Substantial Infrastructure Investment in India & Aims to Expand the India Employee Base to 2000 in 3–5 Years, ANI/Business Standard-style press release, Jan. 8, 2024, https://www.aninews.in/news/business/business/edtech-leader-powerschool-makes-substantial-infrastructure-investment-in-india-amp-aims-to-expand-the-india-employee-base-to-2000-in-3-5-years20240108124645/ (last visited June 18, 2025).

53.    On January 8, 2025, PowerSchool announced that its India-based employee base would expand to 2,000 personnel, which represented an expansion of their current existing workforce in India of 1,300.[54]

54.    Likewise, concurrently with acquiring PowerSchool, Bain Capital announced its acquisition of Outsourcing, Inc.[55] Bain Capital stated it "recognizes Outsourcing has built deep relationships with industry-leading and technological customers in each of its businesses. In the future, Bain Capital hopes to support management in enhancing Outsourcing's competitiveness[.]"[56] Further Bain Capital stated that it desired to actualize Outsourcing's strategy of "VISION 2025: Building a new stage." The goal of VISION2025 comes in "response to the rapidly increasing use of technology in the post-pandemic era, such as with the spread of remote work, [Outsourcing] ha[s] decided it is necessary to change our business model by incorporating digital technology and pursue higher profit margins."[57]

55.    The VISION2025 plan relevantly states that companies offshoring will see reduced costs through offshoring and sharing back-office operations in engineering, as this slide from their power presentation shows:[58]

---

[54] *Id.*

[55] Statement from Bain Capital Private Equity regarding Outsourcing Inc., Bain Capital, Dec. 8, 2023, https://www.Bain Capitalcapital.com/news/statement-Bain Capital-capital-private-equity-regarding-outsourcing-inc (last visited June 18, 2025).

[56] *Id.*

[57] *Id.*

[58] VISION2025: Building a New Stage—FY2023–25 Medium-Term Management Plan, Outsourcing    Inc.,    Feb.    2023,    https://www.outsourcing.co.jp/-/media/outsourcing/en/top/ir/irlibrary/midiplan/VISION2025_eng.ashx (last visited June 18, 2025).



56.     Likewise, the Definitive Merger Statement relied upon analyses contemplating the efficiencies from offshoring. Indeed, representatives of Goldman Sachs and Centerview relied upon certain offshoring cost-saving estimates provided by PowerSchool, that were approved by the Board of Directors and PowerSchool's management for use in connection with Goldman Sachs' and Centerview's financial analyses and fairness opinions. Those assumptions stated:

     a.     adjusted gross profit margins growing from 71% in 2024 to 74% in 2034, reflecting the assumption of continued efficiencies and scale with PowerSchool's hosting costs and PowerSchool's customer support organization, **including increased use of PowerSchool's offshore centers of excellence**;

     b.     adjusted research and development expenses as a percentage of revenue ranging from 12% in 2024 to 10% in 2034, reflecting the assumption of continued scaling of PowerSchool's product development organizations **with increased use of PowerSchool's offshore centers of excellence**;

c.   adjusted EBITDA margins ranging from 35% in 2024 to 48% in 2034, reflecting PowerSchool's expectations for margin expansion driven by (1) lower cost of revenue from process efficiencies, (2) operating expense economies of scale as PowerSchool grows revenue, and (3) **increased utilization of PowerSchool's offshore centers of excellence**.[59]

57.   Shortly after Bain's acquisition—and following the mass layoffs in the United States—outsourcing practices began across PowerSchool's lines of business. These actions align with Bain Capital's ambitious expansion plans while concurrently tightening Gross Profit, R&D Costs, and Adjusted EBITDA. The consequences are that Bain Capital have moved to swiftly to execute on this offshoring plan while sacrificing data security and integrity in effort to rapidly cut costs. For example, Movate, Inc. is a global outsourcing company that subcontracts to meet the needs of various companies in the United States and across the globe.[60]

58.   It appears that the individual with compromised credentials, Rayson Cruz, may have also been working for Movate in the Philippines.[61] There is no publicly listed individual in the United States by that name.[62] As described below, the compromised credentials in the Data Breach belonged to a subcontractor who lacked MFA protection—that user's credentials are also for an individual identified as Rayson Cruz.[63] This

---

[59] PowerSchool Holdings, Inc., DEF M-14C Definitive Information Statement relating to Merger or Acquisition, at 84, available at https://www.sec.gov/Archives/edgar/data/1835681/000119312524212624/d836904ddefm14c.htm (September 4, 2024).

[60] Movate, "Who We Are : Movate Company Overview," Movate Inc., https://www.movate.com/about-us/who-we-are/ (last visited June 18, 2025).
[61] Maryan Medua, LinkedIn Profile (accessed June 18, 2025), https://www.linkedin.com/in/maryan-medua-902aa6328/.
[62] Rayson Cruz, LinkedIn Profile (accessed June 18, 2025), https://www.linkedin.com/in/rayson-cruz-3425bb292/
[63] Westlaw Precision Reports show no profile or records for anyone in the United States by this name.

compromised user—Rayson Cruz or not—was given access to the SIS platform and the entire data set of Private Information stored therein. Despite having such expansive access to sensitive data and infrastructure, no measures were in place to detect login attempts from unusual IP addresses, to authenticate the access credentials using MFA, to monitor for unusual access or activity, including the transfer of large volumes of data to external networks, or to rotate credentials to ensure that compromised credentials are invalidated.[64]

59.    There is other circumstantial evidence that suggests outsourcing to Movate Philippines, Inc. was a part of a boarder strategy implemented by Bain Capital. For example, following the merger announcement, job descriptions began appearing for a "PowerSchool Account" from PowerSchool India Pvt. Ltd. In India, and also from Movate, Inc. in the Philippines.

60.    Likewise, on July 24, 2024, a Business Process Outsourcing ("BPO") account on Facebook claimed that Movate Philippines, Inc. was hiring for Technical Support Agents, with one of those account being for "PowerSchool." The account sought to hire an employee for the PowerSchool account with: "1+ year of technical support experience – especially with SaaS/cloud-based/CRM solutions[.]"[65] Similarly, around the same time, Movate sought to hire a Network Operations Engineer (as noted in a now-deleted job posting) in the Philippines, whose role would have required no high school diploma and would have involved operating backend technical operations.[66]

---

[64] PowerSchool Incident FAQs, EduTech (N.D. Information Tech.), https://www.edutech.nd.gov/services/powerschool/powerschool-incident-faqs (last visited June 18, 2025) ("A Remote Support connection from the IP address of 91[.]218[.]50[.]11 with the user "Rayson Cruz" is one of the primary indicators of compromise.").

[65] MOVATE PHILIPPINES INC., "MOVATE PHILIPPINES INC. is now hiring for TECHICAL SUPPORT agents…" (Facebook Group: Movate Philippines Inc.), July 24, 2024, https://www.facebook.com/groups/1175349822483308/posts/8616442245040658 ph.jobstreet.com+1m.faceb

[66] Careers at Movate Philippines, Movate, https://www.movate.com/careers-at-movate-philippines/ (archived on Oct. 4, 2024, at http://web.archive.org/web/20241004204953/https://www.movate.com/careers-at-movate-philippines/).

24

61.     Finally, Several LinkedIn accounts from Filipino workers, likewise describe their time working for the offshore PowerSchool Account. For example, Hanna De Leon, describes herself as a Technical Support Engineer located in Taguig, Philippines, where "the team at Movate has been leveraging my expertise since August 2024…primarily handling the PowerSchool account."[67] Another example, Maryan Medua, also in the Philippines, describes herself as an experienced IT Support Specialist, where at Movate she worked for PowerSchool Enrollment, and whose job responsibilities included the following:

> I provided comprehensive support to school directors for their online forms, websites, and student information systems (SIS). I played a key role in setting and managing project milestones ahead of the school year, ensuring seamless project execution. I collaborated closely with clients to configure systems according to their needs, troubleshoot technical issues, and delivered timely solutions to ensure smooth enrollment and data management. This role was recently transitioned to our outsourcing company.[68]

62.     If Rayson Cruz was indeed affiliated with an offshoring company in the Philippines, then it indicates a second lapse of judgment by Defendants—allowing a foreign national full access to records for 75% of school districts in the United States.

### 4.    This follows a Pattern for Bain Capital

63.     Bain Capital has a long and consistent history of investing in companies that offshore jobs to lower-wage countries, prioritizing cost savings over domestic employment.[69] As early as the 1990s, Bain Capital-backed firms, such as Stream International and Modus Media, began relocating call centers and manufacturing

---

[67] Hanna De Leon, LinkedIn Profile (accessed June 18, 2025), https://www.linkedin.com/in/hanna-de-leon-253726300/.

[68] Maryan Medua, LinkedIn Profile, LinkedIn (accessed June 18, 2025), https://www.linkedin.com/in/maryan-medua-902aa6328/.

[69] Tom Hamburger, Romney's Bain Capital Invested in Companies That Moved Jobs Overseas, Wash. Post (June 21, 2012), https://www.washingtonpost.com/business/economy/romneys-Bain Capital-capital-invested-in-companies-that-moved-jobs-overseas/2012/06/21/gJQAsD9ptV_story.html (last visited June 18, 2025).

operations to Asia and Europe, with Bain Capital providing strategic direction during this expansion.[70]

64.    This offshoring pattern continues today. In 2021, Bain Capital sought to acquire VXI Global Solutions, a business process outsourcing firm operating in countries such as China and the Philippines.[71] Likewise, as described above, in 2023, Bain Capital acquired Outsourcing Inc., a Japan-based conglomerate with a sprawling offshore labor model. Outsourcing's "VISION2025" plan—endorsed by Bain Capital—calls for massive growth in overseas engineering and manufacturing operations, driven by digital management and workforce consolidation.[72]

65.    Bain Capital has made clear that this model is central to its investment strategy.[73] Through firms like House of HR, Macromill, and Bellsystem24, Bain Capital continues to expand its global footprint in human resource outsourcing.[74] By restructuring companies and building centralized systems, Bain Capital helps these firms with a more cost-effective labor models while potentially reducing domestic job opportunities.[75]

66.    In short, Bain Capital doesn't just tolerate offshoring—it actively directs, enables and profits from it. Its investments show a clear pattern: cut costs by shifting labor overseas, even at the expense of properly staffing and funding its data security obligations to American School Districts, including Plaintiff and Class Members.

---

[70] Id.

[71] Manuel Baigorri, Bain Capital, Baring Said to Vie for $2 Billion Outsourcing Firm VXI, Bloomberg News (Dec. 6, 2021), https://www.bloomberglaw.com/product/blaw/bloomberglawnews/bloomberg-law-news/XDIVMT04000000

[72] Statement from Bain Capital Private Equity regarding Outsourcing Inc., Bain Capital, Dec. 8, 2023, https://www.Bain Capitalcapital.com/news/statement-Bain Capital-capital-private-equity-regarding-outsourcing-inc (last visited June 18, 2025).

[73] Tom Hamburger, Romney's Bain Capital Invested in Companies That Moved Jobs Overseas, Wash. Post (June 21, 2012), https://www.washingtonpost.com/business/economy/romneys-Bain Capital-capital-invested-in-companies-that-moved-jobs-overseas/2012/06/21/gJQAsD9ptV_story.html (last visited June 18, 2025).

[74] Id.

[75] Id.

**C.    POWERSCHOOL FAILED TO PROTECT FORMER AND CURRENT CUSTOMERS' SENSITIVE PERSONAL INFORMATION**

**1.    PowerSchool's Systems Were Compromised, and Personal Identifying Information of Thousands of School Districts Was Exfiltrated and Is Now Being Used in Ransom Attacks**

67.    On January 7, 2025, PowerSchool publicly announced the Data Breach and disclosed that detailed records for tens of millions of schoolchildren and teachers had been exposed.

68.    PowerSchool's announcement, posted on its website stated:

**What Happened?**

On December 28, 2024, PowerSchool became aware of a cybersecurity incident involving unauthorized exfiltration of certain personal information from PowerSchool Student Information System (SIS) environments through one of our community-focused customer support portals, PowerSource.

**What Information Was Involved?**

Due to differences in customer requirements, the information exfiltrated for any given individual varied across our customer base.    For involved individuals, the types of information exfiltrated in the incident included one or more of the following, which varied by person: the individual's name, contact information, date of birth, limited medical alert information, Social Security Number, and other related information.[76]

69.    On or about January 28, 2025, PowerSchool began providing notice of the Data Breach to impacted parties,[77] including to Plaintiff and Class Members.

70.    PowerSchool claimed that the Data Breach took place between December 19 and December 28, 2024—and that the stolen data had been deleted by the Threat Actor (defined below).[78] But PowerSchool's initial statements and representations concerning

---

[76] *Id.*

[77] *See, e.g.*, Jameet Singh, *PowerSchool begins notifying students and teachers after massive data breach*, TechCrunch (Jan. 28, 2025), available at https://techcrunch.com/2025/01/28/powerschool-begins-notifying-students-and-teachers-after-massive-data-breach/ (last visited Jun. 14, 2025).

[78] NAPS District, PowerSchool Data Breach Update, Colegrove Park Elementary School (Jan. 9, 2025), https://ces.napsk12.org/o/cpes/article/1955718.

27

the timing and extent of the breach deliberately minimized critical facts revealing the shocking extent of the security lapse at PowerSchool.

71.    In particular, after the Breach became known, the U.S. Department of Education under the direction of Michael Klein, worked with schools, the FBI and other intelligence agencies to develop a response and preparedness strategy.[79] Mr. Klein, now the senior director at the Institute for Security and Technology, revealed that PowerSchool's initial claims—that the breach began in December 2024—were false.[80] In reality, the attacker first gained access to PowerSchool systems in September 2024.[81] Accordingly, "there were roughly 106 days between the day that [a] 19-year-old from Massachusetts gained initial access to PowerSchool systems," and the day when that data was exfiltrated, *en masse*, in December 2024.[82]

72.    This timeline contradicts previous claims by PowerSchool's employees, their four webinars (which were attended by approximately 10,000 people in aggregate), and an interview with Mishka McCowan, PowerSchool's Chief Information Security Officer.[83]

73.    A forensic report issued by CrowdStrike ("CrowdStrike Report") provided evidence of unauthorized activity even earlier than the confirmed data breach window, by an unknown actor, on August 16, 2024—but there was not sufficient evidence to attribute this activity to those actors responsible for the Data Breach.[84] This activity

---

[79] Mark Racine & Michael Klein, Statements at 26:35 - 26:58 and 28:45 - 29:10, in *Episode 215 – PowerSchool Hacker Has Been Caught!*, K12 TECH TALK PODCAST (May 22, 2025), https://k12techtalkpodcast.com/e/unmasking-the-powerschool-hacker-an-inside-job/.

[80] *Id.*, Statements at 6:50 – 7:22 and 29:10 - 29:53.

[81] *Id.*

[82] *Id.*

[83] *Supra* note [podcast], Statement at 6:50 - 7:14; *see also* Mishka McCowan, Statement at 10:03 - 10:37, in *Special Episode: PowerSchool CISO Mishka McCowan,* K12 TECH TALK PODCAST (Apr. 8, 2025), https://k12techtalkpodcast.com/e/surviving-a-cyber-nightmare-inside-powerschools-response-strategy/.

[84] *See* PowerSchool, CrowdStrike Final Incident Report, at 5 (Feb. 28, 2025), available at https://www.powerschool.com/wp-content/uploads/2025/03/PowerSchool-CrowdStrike-Final-Report.pdf.

occurred just *three days* after PowerSchool laid off approximately 5% of its workforce, including domestic information technology staff, following the Bain Capital acquisition.[85]

74.     Immediately following the Data Breach announcement, multiple affected School Districts reported that "all" of their historical data stored in PowerSchool, including sensitive data such as information about parental access rights to their children, had been accessed.[86] For example, the Toronto District School Board confirmed that nearly forty years of student data was disclosed—for almost 1.5 million students—and included data on students' genders, grades, medical information, and disability accommodation details.[87] Likewise, Idaho's West Ada School District stated the stolen personal information from current and former students included "life-safety health and grade information."[88] Alexandria City Public Schools in Virginia also confirmed that the Data Breach compromised students' personal information, medical data, and free meal statuses. And similarly indicative of the gravity of the Data Breach, Rochester City School District confirmed that the stolen information included students' legal alerts, medical diagnoses, and medical conditions.

75.     In the ensuing weeks, Plaintiff and Class Members were left "scrambling to figure out the extent of the breach, or even if they had been breached at all."[89] The email listservs of PowerSchool customers, where they customarily share information with each other, "exploded," as Adam Larsen, the assistant superintendent for Community Unit School District 220 in Oregon, Illinois stated.

76.     On January 8, 2024, less than 24 hours after PowerSchool notified all customers, one school systems administrator sent a shared Google Doc on WhatsApp in

---

[85] *See Infra* Factual Background, Section B, 2.
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] Lorenzo Franceschi-Bicchierai, How victims of PowerSchool's data breach helped each other investigate 'massive' hack, TechCrunch (Jan. 18, 2025), https://techcrunch.com/2025/01/18/how-victims-of-powerschools-data-breach-helped-each-other-investigate-massive-hack/ (Last accessed: June 14, 2025).

group chats with other PowerSchool administrators based in Europe and across the Middle East, who often share information and resources to help each other. Several other school workers supported each other in several Reddit threads—such as publishing on the K-12 systems administrators' subreddit, where users have to be vetted and verified to be able to post. This community response was necessary, as one school administrator informed TechCrunch, because "for so many of us, we don't have the funding for the full cybersecurity resources we need to respond to incidents[.]"

77.    By mid-February 2025, it became clear that highly sensitive information of an estimated 62.4 million students and 9.5 million teachers had been stolen, including, among other things, names, dates of birth, Social Security numbers, contact information, medical information special education status, mental health details, disciplinary notes and parent restraining orders.[90], [91]

78.    PowerSchool informed Recorded Future News that about 6,500 of its more than 18,000 clients were impacted in the Breach.[92] By then, School Districts had finally started to understand the extent of the breach. For example, one notification email sent to parents in the Wakefield, Massachusetts school district said that custody alerts — including information such as custody agreements, restraining orders, and other legal information — were exposed for 31 prior and current students.[93] Wakefield also reported that a data field identifying students with special education plans was exposed for 708 former and current students, and medical alerts for 1,384 current and former students were exposed.[94]

---

[90]    https://www.powerschool.com/security/sis-incident/notice-of-united-states-data-breach/

[91] Suzanne Smalley, PowerSchool breach exposed special education status, mental health data and parent restraining orders, Recorded Future News (Feb. 11, 2025), https://therecord.media/powerschool-breach-exposed-special-ed-status-mental-health-data.

[92] *Id.*

[93] *Id.*

[94] *Id.*

79.     Similarly, Adam Larsen, an assistant superintendent at an Illinois school district who also works as a data consultant for schools, said several of his school district clients had sensitive student mental health and special education data exposed. Adam Larsen stated that "[t]he kinds of things that got snagged by the hackers are statuses — a student has an IEP or a 504 [special education designations], they have anxiety disorder, there is an order of protection…[i]t's usually high level like, 'Hey, everyone this kid has an anxiety disorder so you should be aware that they might have panic episodes.'"[95]

80.     On February 28, 2025, PowerSchool released a report from its vendor, CrowdStrike ("CrowdStrike Report").[96] CrowdStrike's investigation began on December 29, 2024, and concluded on February 17, 2025.[97]

81.     Regarding CrowdStrike's review, PowerSchool's endpoints and servers are protected by CrowdStrike's Falcon Endpoint Detection and Response ("EDR") software, which provides advanced security monitoring, threat detection, next-generation antivirus, and real-time EDR capabilities.[98] PowerSchool's systems are also protected by CrowdStrike's Falcon Overwatch, a threat hunting service.[99] In addition, PowerSchool's systems and data storage was configured with AES-256 encryption by CrowdStrike for data at rest.[100] These services together are referred to as PowerSchool's "CrowdStrike Defenses."[101]

---

[95] *Id.*
[96] *See supra* note 84 at 1.
[97] *Id.* at 3.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] CrowdStrike has a conflict in conducting an independent review of the Data Breach— as any flaw in the PowerSchool's CrowdStrike Defenses may also have triggered independent liability for CrowdStrike. While the CrowdStrike Report is informative, it should thus be understood as not a comprehensive assessment by a third-party, but by an interested party who has every financial and legal incentive to minimize liability for itself, and for PowerSchool, to every extent possible. Independent review and discovery is necessary to understand how the Data Breach occurred and what the real impacts are.

31

82.     The CrowdStrike Report found that the earliest evidence of unauthorized activity attributable to the Threat Actor within the PowerSchool environment occurred on December 19, 2024, at 04:06:24 UTC.[102] Between December 19, 2024, at 23:02:54 UTC, and December 23, 2024, at 08:04:45 UTC, the Threat Actor exfiltrated data from the Teachers and Students tables of the PowerSchool SIS[103] instances for certain PowerSchool customers.[104]

83.     Further, the CrowdStrike Report describes the exfiltration in the Data Breach occurring as follows:

> December 19, 2024, at 19:43:14 UTC, and December 28, 2024, at 06:31:18 UTC, the Threat Actor performed Maintenance Remote Support operations in PowerSource, which enabled the Threat Actor to access the individual customer organizations' SIS instances. At 19:43:37 UTC, the Threat Actor initiated a Maintenance Remote Support connection to PowerSchool SIS from the same IP address using the compromised support credentials. Per PowerSchool's website, "PowerSource is a community-focused customer support portal for all PowerSchool products." As such, PowerSource allows a support technician with sufficient permissions to gain access to customer SIS database instances for maintenance purposes.[105]

84.     However, the CrowdStrike Report also found an earlier data breach beginning on August 16, 2024, at 01:27:29 UTC, where PowerSource logs showed that an unknown actor successfully accessed the PowerSchool Maintenance Access Portal using the compromised support credentials.[106] While the CrowdStrike Report did not find sufficient evidence to attribute this activity to the Threat Actor responsible for the activity in December 2024—the available SIS log data did not go back far enough to show

---

[102] *Supra* note 84 at 5.

[103] Per PowerSchool's website, PowerSchool SIS "provides back-office administrator functionality, as well as student, parent- and faculty-facing functionality to manage key organizational information assets, including demographic data, enrollment, grades, transcripts, and other governmental agency reporting capabilities." *See* https://www.powerschool.com/operations/student-informationsystems/.

[104] *Id.*

[105] *Supra* note 84 at 5.

[106] *Id.*

whether the August and September activity included unauthorized access to PowerSchool SIS data.[107]

85.    In other words, it is completely unknown whether the Threat Actor had access to the systems at issue far earlier—or if it was another third-party actor entirely. Moreover, this unauthorized access went undetected for months. PowerSchool only became aware of the breach after the Threat Actor attempted to extort the company and made his presence known.

86.    The CrowdStrike Report also may minimize the extent of the Data Breach, as PowerSchool informed customers the Data Breach was linked to the compromise of a subcontractor's account. PowerSchool spokesperson Beth Keebler confirmed to TechCrunch that "the subcontractor's account used to breach the customer support portal was not protected with multi-factor authentication, a widely used security feature that can help to protect accounts against hacks linked to password theft."

87.    It is alarming that PowerSchool failed to implement MFA on their subcontractor's account, particularly in light of the fact that, in an article posted on its website (since deleted), PowerSchool specifically advised School Districts to enact certain preventative measures, like MFA, to secure an organization's student information system. PowerSchool further advised School Districts that "Administrators should be limited to a small group of trusted individuals who understand the responsibilities and risks associated with such access. By reducing the number of admins, you limit the potential entry points for attackers, making it harder for them to exploit the system if they manage to compromise an account." Likewise, PowerSchool advised that "[s]etting appropriate permissions is vital for safeguarding sensitive information. Not everyone in the school needs access to every piece of data. For instance, while teachers need access to student grades, they shouldn't necessarily have access to payroll information or other

[107] *Id.*

sensitive administrative data…[and that overly] broad permissions increase the risk of data breaches, either through malicious intent or accidental misuse."

88.    PowerSchool fully recognized that "Multi-Factor Authentication (MFA) is a best practice that significantly boosts your school's cybersecurity." PowerSchool further recognized that multi-factor authentication, "adds an extra layer of security by requiring a second form of verification, such as a text message code or an authentication app, in addition to the password. This ensures that even if a password is compromised, unauthorized access is still prevented. Implementing these technologies helps protect sensitive information and provides peace of mind that your school's digital assets are secure." Accordingly, had PowerSchool required that all employees with access to sensitive information implement multi-factor authentication, the Threat Actor would have been unable to use the compromised credentials to perpetrate the Data Breach.

89.    In addition to the failure to implement multi-factor authentication, as described above, it appears the subcontractor referred to in the TechCrunch Report is an individual with the username, "Rayson Cruz."[108] Rayson Cruz is affiliated with an IT outsourcing company in the Philippines. By allowing subcontractors spread across the globe with access the School Districts' data containing the Protected Information of the School Districts, including for tens of millions of American students and teachers (including Social Security numbers, names, addresses, medical information, and more that could subject children to identify theft), PowerSchool further expanded the threat to its systems without having sufficient safeguards or proper monitoring systems in place.

90.    Remarkably, PowerSchool only first became aware that the Data Breach occurred *while it was being extorted*. In other words, Rayson Cruz, a subcontractor, had the capability to download all records for 10,000+ School Districts in the United States, without it even triggering a red flag in the PowerSchool system.

---

[108] FAQ published by the North Dakota government states that a "Remote Support connection from the IP address of 91[.]218[.]50[.]11 with the user "Rayson Cruz" is one of the primary indicators of compromise." As described above, there appears to be no resident in the United States by this name.

91.     The contractor—offshore or not—had have been given "back-office administrator functionality, as well as student, parent- and faculty-facing functionality to manage key organizational information assets, including demographic data, enrollment, grades, transcripts, and other governmental agency reporting capabilities."[109] This full administrative access exceeded the authorized access that the School Districts agreed to in their Main Service Agreement ("MSA") and Data Privacy Agreements ("DPA"). Not only were these privileges excessive, but those credentials were not even properly secured by MFA, which PowerSchool frequently advised schools to implement and pledged it had or would implement.

92.     To somehow make matters even worse, following the Data Breach, TechCrunch reported that a second—so far undisclosed—data breach occurred.[110] In January 2025, TechCrunch reported that it had learned that week of a separate security incident, involving a PowerSchool software engineer, whose computer was infected with malware that stole their company credentials prior to the cyberattack. The extent of this secondary breach, and the data that was stolen (if any) has not been disclosed publicly. Regardless of whether any additional information was unlawfully obtained, it reaffirms the inadequacy of the data security practices at PowerSchool.

93.     Plaintiff and Class Members provided their Protected Information to PowerSchool with the reasonable expectation that PowerSchool would comply with its obligations to keep such information confidential and secure. PowerSchool failed to comply with these obligations.

### 2.     A Criminal Indictment and Subsequent Guilty Plea

94.     On May 20, 2025, a 19-year-old student at Assumption University in Worcester, Massachusetts, Matthew D. Lane (along with ShinyHunters, the "Threat

---

[109] *See supra* note 84, n. 1.

[110] PowerSchool software engineer, whose computer was infected with malware. https://techcrunch.com/2025/01/17/malware-stole-internal-powerschool-passwords-from-engineers-hacked-computer/

Actor"), pled guilty to hacking into the networks of two companies, PowerSchool, and extorting them for ransoms, as announced by the U.S. Department of Justice.

95.    The Threat Actor agreed to plead guilty to cyber extortion conspiracy, cyber extortion, unauthorized access to protected computers, and aggravated identity theft in connection with the Data Breach. While neither the criminal information nor plea agreement filed in Massachusetts federal court name PowerSchool as a victim of the Data Breach, and the Justice Department declined to identify the impacted companies, a person familiar with the matter confirmed to NBC News that PowerSchool was indeed one of the victims.

96.    According to NBC News, the Threat Actor used stolen log-in credentials to access PowerSchool's network. The company is identified in the filings only as "Victim 2" and described in the DOJ's statement as "a software and cloud storage company that served school systems in the United States, Canada and elsewhere."

97.    Prosecutors said the Threat Actor transferred personally identifying information of students and teachers to a server he was leasing in Ukraine. On Dec. 28, 2024, the Threat Actor threatened to leak that information "worldwide" if PowerSchool didn't shell out $2.85 million in Bitcoin. This appears to be the first time PowerSchool learned of the Data Breach, when the Threat Actor told PowerSchool about the Data Breach. This is evidence that the threat monitoring practices at PowerSchool were not adequate to detect an intrusion in its network or the transfer of large volumes of data to external networks.

98.    According to prosecutors, PowerSchool asked if a ransom payment would actually mean the data wouldn't be leaked. The Threat Actor then purportedly responded: "We are the only ones with a copy of this data now. Stop this nonsense [or] your executives and employees will see the same fate. ... Make the correct decision and pay the ransom. If you keep stalling, it will be leaked."

99.    Importantly, the indictment made clear the Threat Actor acted with the assistance of at least one unknown accomplice. That accomplice, or accomplices, have

36

not yet been arrested and are still at large. Moreover, as described below, members of the well-known cybercriminal group, "ShinyHunters" seemingly have possession of the exfiltrated data and have been using it to target affected schools and even affected individuals with ransom demands, indicating that the data has been passed form the initial threat actor to a broader criminal group.

### 3. The Information is Reportedly Still Circulating and Being Utilized in Ransom Attacks Against Class Members

100. The CrowdStrike Report indicated that as of February 28, 2025, CrowdStrike had not identified any evidence of information exfiltrated in this incident being made available for sale or download.[111] Yet multiple "WhiteHat" security researchers and journalists reported signs that compromised PowerSchool credentials and access was still ongoing.

101. For example, a data leak report on the Data Breach provided infostealer statistics indicating a significant increase in PowerSchool credentials, with many of the accounts used recently.[112] This screenshot is provided for reference:



102. PowerSchool has itself acknowledged that paying a ransom does not guarantee that the data will continue to be leaked or sold, stating that in the face of a

---

[111] *See supra* note 84 at 6.
[112] Dark Web Informer (@DarkWebInformer), X (formerly Twitter), Jan. 19, 2025, https://x.com/DarkWebInformer/status/1877461389691736573 (last visited June 19, 2025).

ransomware attack: "Do not pay the ransom or negotiate with the attackers. Paying the ransom does not guarantee that you will get your data back, or that it will not be leaked or sold. Even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify that copies of the data are destroyed.[113] It also encourages the attackers to continue their malicious activities and makes you a more attractive target for future attacks."[114] Yet, PowerSchool failed to heed its own advice in the wake of the Data Breach.

103.    Stolen data may also take some time to be published on the Dark Web. Data holds its highest value before it is sold because its utility and exclusivity are intact.[115] In underground markets, for example, stolen credentials, credit card numbers, and account access have the greatest potential for profit only when the buyer can be confident they are the sole possessor.[116] Once data is sold—or worse, sold multiple times—it quickly loses value, as competitors race to exploit the same credentials.[117] This degradation in value stems from both diminishing exclusivity and increasing detection risks.

104.    Selling data on the Dark Web or elsewhere creates traceability and risk. The act of transferring stolen information introduces exposure to law enforcement or countermeasures (*e.g.*, honeypots or fake buyers). For experienced actors in the "upper tier" of the underground economy, it is more profitable and less risky to exploit the data directly rather than sell it.[118] Hence, raw data's worth lies not just in its market price, but in the potential value it holds before being diluted by risk, competition, or exposure.

---

[113]    *2020 Ransomware Marketplace Report,* available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report

[114] *PowerSchool: A Leader in Responsible AI for Education*, at 14, PowerSchool (Jun. 14, 2024), https://go.powerschool.com/rs/861-RMI-846/images/Responsible_AI_Cybersecurity_Report.pdf?version=0

[115] Cormac Herley & Dinei Florêncio, *Nobody Sells Gold for the Price of Silver: Dishonesty, Uncertainty and the Underground Economy* (Microsoft Research, Working Paper, 2009), https://www.microsoft.com/en-us/research/publication/nobody-sells-gold-for-the-price-of-silver-dishonesty-uncertainty-and-the-underground-economy/.

[116] *Id.*

[117] *Id.*

[118] *Id.*

105.    Additionally, the underground economy operates under extreme uncertainty and dishonesty, often likened to a "market for lemons."[119] Buyers have no way of verifying the quality or exclusivity of data before purchase. It is therefore likely that data leaked onto the Dark Web has already been drained for its resources.

106.    It should not be surprising then that the data has not been reported to have been leaked onto the Dark Web, but is instead being used in ransom attacks against School Districts by the infamous cybersecurity operation, ShinyHunters.

107.    ShinyHunters is a well-known collection of cyber criminals that has been credited with several large scale breaches going to 2020. ShinyHunters initially began by exfiltrating and attempting to sell stolen data but has since transitioned to using stolen data for extortion attempts and then, sometimes several years after the fact, publishing the data to anyone with internet access.[120]

108.    Months after PowerSchool assured School Districts that the data was contained, schools and affected individuals were targeted with ransom demands with those targeted reporting that the "sender has the same data that was hacked, [and] leading state officials to believe the data is now in the hands of bad actors.[121]

109.    The Sampson County Public Schools in North Carolina warned students and parents that ShinyHunters was targeting individuals affected by the Data Breach and cautioned them to "not open any suspicious links or emails related to this incident with content referencing in the first line of the email, 'We are ShinyHunters.'"[122] It further warned "not [to] engage with anyone claiming to have this data" and reminded affected

---

[119] *Id.*

[120] *The Evolution of ShinyHunters: From Data Leaks to Extortions* (August 26, 2021), https://reliaquest.com/blog/the-eeveelution-of-shinyhunters-from-data-leaks-to-extortions/

[121] *'Threat actor' claims to have NC student data months after PowerSchool assured officials it was safe* (May 7, 2025), https://www.wral.com/news/*education*/threat-actor-claims-to-have-nc-student-data-may-2025/

[122] *Update on New PowerSchool Data Breach and Ongoing Protection Measures* (May 8, 2025 ), https://www.sampson.k12.nc.us/article/2199993

families that PowerSchool was offering identity protection and credit monitoring to victims of the Data Breach.

110.  On May 7, 2025, an article published by CyberScoop states that a threat actor contacted four school district customers of PowerSchool within a few days, threatening to leak their data if they did not pay a ransom.[123]

111.  Despite PowerSchool paying the ransom demand, it should not be assumed that the compromised data has been sequestered or deleted. In fact, in an article published by DataBreaches.Net that same day states that "[b]efore the breach had ever become public, ShinyHunters had contacted DataBreaches on Telegram and mentioned a huge breach in the education sector that would be devastating if the victim did not pay up."[124] Accordingly, by all indications, the data from the Data Breach was not deleted or other copies were made, and the threat poised to Plaintiff and Class Members—along with all other victims—remains ongoing.

112.  The cost to School Districts imposed by the Data Breach is significant as they have been forced to devote limited time and resources to communicating with affected students and their families, understanding the scope of the Data Breach and the potential threats and consequences to students and teachers, and taking measures to ensure that data is protected from misuse and unauthorized access going forward. Indeed, some School Districts have decided not to renew their contracts with PowerSchool which requires them to expend time and resources researching and vetting alternate providers, removing their data from PowerSchool and providing data to new providers. For example, after confirming that "the people who sent the [ransom] texts have access to the same

---

[123] Matt Kapko, PowerSchool Customers Hit by Downstream Extortion Threats, CyberScoop (May 7, 2025), available at https://cyberscoop.com/powerschool-customers-hit-by-downstream-extortion-threats (last visited June 19, 2025)

[124] PowerSchool paid a hacker's extortion demand, but now school district clients are being extorted anyway, DataBreaches.net (May 7, 2025), https://databreaches.net/2025/05/07/powerschool-paid-a-hackers-extortion-demand-but-now-school-district-clients-are-being-extorted-anyway/ (last visited June 19, 2025)

data that was compromised in December," the North Carolina Department of Instruction "said the state will not renew its contract with PowerSchool, and instead [will] go with a different provider – called Infinite Campus – for its official student information system."[125]

### 4. PowerSchool Could Have (and Should Have) Secured Their Systems Against an Attack

113.    PowerSchool could have and should have taken steps that would have mitigated the typical and fundamental tactics that resulted in this Data Breach.

114.    The Data Breach was accomplished by using stolen access credentials, which did not require MFA to access unencrypted data stored in an internet accessible location. Defendant could have prevented the Data Breach by, *inter alia*, implementing spam filters to prevent phishing messages from reaching its employees, educating employees to detect and report phishing or other attempts to acquire access credentials, employing multi-factor authentication to prevent stolen credentials from being misused to gain access to sensitive data, ensuring that Protected Information was properly encrypted or redacted, limiting access to Protected Information to only necessary employees, and monitoring the network for instances of unauthorized access or unusual activity, including access to and transfer of large volumes of data. These are industry standard practices and consistent with FTC and HIPAA guidelines.

115.    The use of MFA entirely prevents a data breach caused by the compromise of first level user credentials. With the disclosure of the Data Breach, it has been reported that PowerSchool did not have MFA in place.[126] Had PowerSchool followed industry

---

[125] *North Carolina won't renew PowerSchool contract after data breach, texts from 'threat actors'* (May 8, 2025), https://www.wbtv.com/2025/05/08/north-carolina-wont-renew-powerschool-contract-after-data-breach-texts-threat-actors/

[126] Clay Wallace, *Two-factor authentication could have prevented Data Breach affecting 110 million customers*, WUKY (July 18, 2024), https://www.wuky.org/local-regional-news/2024-07-18/two-factor-authentication-could-have-prevented-at-t-data-breach-affecting-110-million-customers; Megan Leader, *Supply Chain Nightmare: PowerSchool-Snowflake Breach Is What Keeps CISOs Up at Night*, VIRTRU (July 12, 2024), https://www.virtru.com/blog/cloud-security/att-snowflake-breach.

standards and used MFA to prevent unauthorized use of user credentials, it would have prevented the Data Breach as the Threat Actor would have been unable to perform the second layer of authentication to validate the stolen access credentials. MFA is an industry standard and has been since 2019.[127]

116.    When data is at rest, it should be encrypted. Encryption is insurance against a data breach because it prevents an unauthorized third-party from exploiting stolen data, even if they gain access to it. Encryption at rest is commonly used to protect sensitive information like personal data, financial records, and intellectual property stored on local devices or in cloud storage, reducing the risk of a data breach if the stored information is stolen or compromised. When data is properly encrypted, a threat actor will acquire a string of unintelligible data that cannot be read without the corresponding encryption key. Instead, PowerSchool left the data unencrypted and unprotected, allowing the Threat Actor to immediately exploit the stolen data without having to decrypt it.

117.    Vulnerability scans of all systems, particularly those systems containing PII, should be done frequently. A vulnerability scan is an automated process used to identify security weaknesses or vulnerabilities in a computer system, network, application, or

---

[127] *See, e.g., NIST Special Publication 800-63B; Digital Identity Guidelines; Authentication and Lifecycle Management*, NIST (June 2017), https://pages.nist.gov/800-63-3/sp800-63b.html; *NIST Update: Multi-Factor Authentication and SP 800-63 Digital Identity Guidelines*, NIST (Feb. 15, 2022), https://csrc.nist.gov/csrc/media/Presentations/2022/multi-factor-authentication-and-sp-800-63-digital/images-media/Federal_Cybersecurity_and_Privacy_Forum_15Feb2022_NIST_Update_Multi-Factor_Authentication_and_SP800-63_Digital_Identity_%20Guidelines.pdf; *Require Multifactor Authentication*, CISA, https://www.cisa.gov/secure-our-world/require-multifactor-authentication (last visited Jun. 18, 2025); *Multi-factor authentication: Key protection to tax professionals' security arsenal now required*, IRS (Aug. 6, 2024), https://www.irs.gov/newsroom/multi-factor-authentication-key-protection-to-tax-professionals-security-arsenal-now-required; *Multi-Factor Authentication*, PCI SECURITY STANDARDS COUNCIL (Feb. 2017), https://listings.pcisecuritystandards.org/pdfs/Multi-Factor-Authentication-Guidance-v1.pdf; *A guide to the FTC Safeguards Rule's FTC MFA requirement*, IS DECISIONS (July 21, 2023), https://www.isdecisions.com/en/blog/compliance/compliance-with-the-ftc-mfa-requirement; *PCI DSS 4.0: New multi-factor authentication requirements*, ONESPAN (May 23, 2024), https://www.onespan.com/blog/new-mfa-requirements-in-PCI-DSS-4.0; *Multifactor Authentication Cheat Sheet*, OWASP, https://cheatsheetseries.owasp.org/cheatsheets/Multifactor_Authentication_Cheat_Sheet.html (last visited Jun. 18, 2025).

device. Organizations perform these scans regularly to detect and address potential threats before they can be exploited by attackers. Vulnerability scans are an essential part of proactive cybersecurity practices and play a crucial role in maintaining a secure IT environment. Readily available, intuitive, and easy-to-use specialized software tools are used to perform vulnerability scans. These tools examine the target system's configurations, files, software versions, and open network ports to identify potential security flaws. Common tools include Nessus, Qualys, and OpenVAS. After the scan, a report is generated detailing the identified vulnerabilities, their severity levels, and recommendations for remediation. This helps security teams prioritize and address the most critical vulnerabilities first. Vulnerability scans could have potentially detected malware that was used during the Data Breach.

118. Any organization that utilizes cloud storage or services should be focused on cloud security. Simply relying on the cloud vendor to meet all security needs is not recommended. There are specific standards and guidelines readily available to assist any organization in managing cloud security:

    i.    ISO 27017 is guidance for cloud security. It applies the guidance of ISO 27002 to the cloud with seven additional controls.

    ii.    ISO 27018 is closely related to ISO 27017. ISO 27018 defines privacy requirements in a cloud environment, particularly how the customer and cloud provider must protect PII.

    iii.    NSA Cloud Security Strategies.[128]

    iv.    OWASP Cloud-Native Application Security Top 10.[129]

    v.    Checkpoint Security Top 15 Cloud Security Issues.[130]

---

[128] *NSA Releases Top Ten Cloud Security Mitigation Strategies*, NSA (Mar. 7, 2024), https://www.nsa.gov/Press-Room/Press-Releases-Statements/Press-Release-View/Article/3699169/nsa-releases-top-ten-cloud-security-mitigation-strategies/.

[129] *OWASP Cloud-Native Application Security Top 10*, OWASP FOUNDATION https://owasp.org/www-project-cloud-native-application-security-top-10/ (last visited Jun. 18, 2025).

[130] *Top 15 Cloud Security Issues, Threats and Concerns*, CHECK POINT, https://www.checkpoint.com/cyber-hub/cloud-security/what-is-cloud-security/top-cloud-security-issues-threats-and-concerns/ (last visited Jun. 18, 2025).

vi.    NIST Special Publication 800-144, Guidelines on Security and Privacy in Public Cloud Computing.[131]

119.    Given that threat actors frequently attack cloud repositories, improved cloud security can mitigate attacks from this group, as well as other cyber threat groups. Had PowerSchool implemented sufficient cloud storage protections, the Data Breach could have been prevented.

## D.    POWERSCHOOL HAD A DUTY TO FOLLOW GUIDANCE AND INDUSTRY-STANDARD CYBERSECURITY PRACTICES

120.    PowerSchool's data security failure is attributable to its failure to comply with state and federal laws and regulations, as well as basic industry standards governing the protection of Protected Information.

### 1.    PowerSchool Must Comply with COPPAto Secure Plaintiff's and Class Members' Information

121.    PowerSchool is also subject to the Children's Online Privacy Protection Act, ("COPPA"), which applies to operators of commercial websites and online services directed to U.S. children under the age of 13 that collect personal information from children, and to operators of general audience websites with actual knowledge that they are collecting information from U.S. children under the age of 13.

122.    As PowerSchool admits in its SEC filings, some of its solutions are directed, in part, at children under the age of 13. Through these solutions, PowerSchool collects certain personal information, including names and email addresses from children.

123.    PowerSchool also recognizes that "if we fail to accurately anticipate the application, interpretation or legislative expansion of COPPA we could be subject to governmental enforcement actions, litigation, fines and penalties, or adverse publicity and we could be in breach of our customer contracts and our customers could lose trust in us, which could harm our reputation and business."

---

[131] Wayne Jansen & Tim Grance, *NIST SP 800-144, Guidelines on Security and Privacy in Public Cloud Computing*, NIST (Dec. 2011), https://csrc.nist.gov/pubs/sp/800/144/final.

### 2. PowerSchool Is a Business Associate and Must Comply with HIPAA Security Standards

124. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH") and their respective implementing regulations, imposes specified requirements relating to the privacy, security and transmission of individually identifiable health information. Among other things, HITECH makes HIPAA's security standards directly applicable to "business associates." As disclosed in its SEC filings, PowerSchool functions "as a business associate for certain of our customers that are HIPAA covered entities and service providers, and in that context we are regulated as a business associate for the purposes of HIPAA."[132]

125. As a business associate, PowerSchool is required by HIPAA to maintain HIPAA-compliant business associate agreements with its customers that are HIPAA covered entities and service providers, as well as its subcontractors that access, maintain, create or transmit individually identifiable health information on its behalf for the rendering of services to its HIPAA covered entity and service provider customers.[133]

126. Student and teacher medical records, disability status, and other PHI were disclosed in the Data Breach in violation of HIPAA and PowerSchool's business associate agreements.

---

[132] PowerSchool Holdings, Inc., Annual Report on Form 10-K at 41 (filed Feb. 24, 2023), for the fiscal year ended Dec. 31, 2022, https://www.sec.gov/ix?doc=/Archives/edgar/data/0001835681/000183568123000012/pwsc-20221231.htm ("If we are unable to comply with our obligations as a HIPAA business associate, we could face substantial civil and even criminal liability. HITECH imposes four tiers of civil monetary penalties and gives state attorneys general authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys 'fees and costs associated with pursuing federal civil actions. In addition, many state laws govern the privacy and security of health information in certain circumstances, many of which differ from HIPAA and each other in significant ways and may not have the same effect.").

[133] *Id.* ("These agreements impose stringent data security and other obligations on us. If we or our subcontractors are unable to meet the requirements of any of these business associate agreements, we could face contractual liability under the applicable business associate agreement as well as possible civil and criminal liability under HIPAA, all of which can have an adverse impact on our business and generate negative publicity, which, in turn, can have an adverse impact on our ability to attract and retain customers.").

127.   As a business associate, PowerSchool is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

128.   These rules establish national standards for the protection of patient information, including protected health information ("PHI"), defined as "individually identifiable health information" which either "identifies the individual" or where there is a "reasonable basis to believe the information can be used to identify the individual," that is held or transmitted by a healthcare provider.  *See* 45 C.F.R. § 160.103.

129.   HIPAA limits the permissible uses of PHI and prohibits unauthorized disclosures of PHI.

130.   HIPAA requires that Defendants implement appropriate safeguards for this information.

131.   HIPAA requires that Defendants provide notice of a breach of unsecured PHI, which includes PHI that is not rendered unusable, unreadable, or indecipherable to unauthorized persons—*i.e.*, non-encrypted data.

132.   HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." *See* US Department of Health & Human Services, Security Rule Guidance Material.[134] The list of resources includes a link to guidelines set by the National Institute of Standards and

---

[134] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.

Technology (NIST), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." *See* US Department of Health & Human Services, Guidance on Risk Analysis.[135]

133.    Defendants failed to comply with their duties under HIPAA and their own Privacy Practices. Indeed, Defendants failed to:

    a.    Maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

    b.    Adequately protect Plaintiff's and the Class Members' Protected Information;

    c.    Ensure the confidentiality and integrity of electronic PHI created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

    d.    Implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

    e.    Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

    f.    Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

    g.    Protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding

---

[135]    https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html.

47

individually identifiable health information, in violation of 45 C.F.R. § 164.306(a)(3);

h. Take safeguards to ensure that Defendants' business associates adequately protect PHI;

i. Conduct the Four Factor Risk Analysis following the Data Breach;

j. Properly send notice to Plaintiff and Class Members pursuant to 45 C.F.R. §§ 164.400-414;

k. Ensure compliance with the electronic PHI security standard rules by its workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

l. Train all members of its workforce effectively on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out its functions and to maintain security of PHI, in violation of 45 C.F.R. § 164.530(b).

134. Defendants failed to comply with their duties under HIPAA despite being aware of the risks associated with unauthorized access of Plaintiff's and Class Members' Protected Information.

### 3. FTC Guidance Regarding Safeguarding Customer Data

135. PowerSchool also failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and industry-standard cybersecurity practices. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like PowerSchool. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

136. To that end, the FTC recommends the following practices:

- limiting access to customer information to employees who have a business reason to see it;

- keeping customer information in encrypted files to provide better protection in case of theft;

- maintaining up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

- using appropriate oversight or audit procedures to detect the improper disclosure or theft of customer information;

- monitoring both in- and out-bound transfers of information for indications of compromise, such as unexpectedly large amounts of data being transmitted to unknown users; and

- monitoring activity logs for signs of unauthorized access to customer information.[136]

137.    The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[137]

138.    In 2016, the FTC updated its publication, Protecting PII: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses.[138] The guidelines note that businesses should protect the personal customer information that they keep; properly delete PII that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting

---

[136] *Financial Institutions and Customer Information: Complying with the Safeguards Rule*, FED. TRADE COMM'N (Apr. 2006), https://www.lb7.uscourts.gov/documents/20-0046.pdf.

[137] *Start With Security*, FED. TRADE COMM'N (June 2025), http://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[138] *Protecting PII: A Guide for Business*, FED. TRADE COMM'N, http://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

49

to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

139.    The FTC recommends, among other things, that businesses delete payment card information after the time needed to process a transaction; restrict employee access to sensitive customer information; require that strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third-parties with access to sensitive information use reasonable security measures.

140.    The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.

141.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

142.    The FTC has also interpreted Section 5 of the FTC Act to apply to failures to appropriately store and maintain personal data.

### 4.    Industry Standards Regarding Network Security

143.    PowerSchool also failed to comply with industry standards relating to data security, including those expressly identified in PowerSchool's contracts. PowerSchool's contracts with the School Districts represent that Defendant will comply with industry standard data standards including NIST and ISO 27001, and that it was SOC 2 certified.

144.   Under its Contracts, PowerSchool was obligated to follow industry standard security practices, such as ISO 27001:2103 and SOC II compliance. Additionally, industry standard security compliance requires, *inter alia*, the following:

a.   **Passwords and Employee Access.** PowerSchool must secure usernames, passwords, and any other means of gaining access to the Services or to Customer Data, at a level meeting or exceeding the applicable standards. PowerSchool must only provide access to Customer Data to employees or contractors who require access pursuant to the MSA and this DPA, and only on terms consistent with or exceeding the data security measures required by this DPA between the Parties.

b.   **Security Protocols.** PowerSchool must maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so. PowerSchool  must maintain all data obtained or generated pursuant to the MSA in a secure digital environment.

c.   **Security Technology**. PowerSchool must employ industry standard measures to protect data from unauthorized access. The service security measures must include server authentication and data encryption. PowerSchool must host data pursuant to the MSA in an environment using firewall(s) that are updated according to industry standards.

d.   **Monitoring**. PowerSchool must log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability of Customer Data.

e.   **Vendor-Data Subprocessors Bound.** PowerSchool must enter into written agreements whereby Vendor-Data Subprocessors agree to secure and protect Customer Data. PowerSchool must periodically conduct or review compliance monitoring and assessments of Vendor-Data Subprocessors to determine their compliance.

f.    **Periodic Risk Assessment**. PowerSchool must conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner.

g.    **Established Security Policies.** PowerSchool must follow its established access security policies to support the confidentiality, integrity, and availability of the Customer Data against risks including but not limited to unauthorized access, collection, use, disclosure or disposal, loss, or modification. Such security arrangements must include, without limitation, reasonable physical, administrative, and technical safeguards.

145.    PowerSchool was further obligated to, as required by the NIST Cybersecurity Framework, have the following reasonable administrative, technical, operational and physical safeguards and practices in place:

a.    Data-at-rest & data-in-transit (motion) is encrypted;

b.    Data destruction is performed according to contract and agreements;

c.    A plan for vulnerability management is developed and implemented;

d.    Log/audit records are ascertained, implemented, documented, and reviewed according to policy;

e.    Credentials and identities are issued, verified, managed, audited, and revoked, as applicable, for authorized devices, processes, and users; and

f.    Remote access is managed [by] PowerSchool [and] also conforms to the ISO 27001:2013 standard.

146.    As set forth below, regardless as to whether ISO 27011, SOC 2, or NIST standards are applied, Defendant's failure to implement multi-factor authentication, encrypt data at rest and in transit, limit access to sensitive information to only essential employees, monitor its networks for unusual activity or transfer of large volumes of data,

and ensure that employees are adequately trained was contrary to Defendants 'contractual promises and noncompliant with ISO 27011, SOC 2, or NIST standards.

147.    Various cybersecurity industry best practices have also been published, are readily available, and should be consulted as a go-to source for an entity instituting, developing, maintaining, or enhancing its cybersecurity standards.

148.    These practices are applied to all industries managing, using, storing or transferring PII and include, in relevant part, educating and implementing appropriate access restriction for all personnel with regard to proper creation, collection, maintenance, and use of Protected Information; enforcing strong password and similar protections, including MFA; monitoring for suspicious or irregular traffic to servers, limiting credentials used to access servers, segregating data, monitoring activity by known or unknown users and server requests; implementing encryption to render data unreadable without proper authorization; and ensuring security of cloud storage.

149.    Additional cybersecurity best practices include, but are not limited to, installing appropriate malware detection software, monitoring and limiting network posts, securing web browsers and e-mail systems, configuring network infrastructure (like firewalls, switches, and routers), safeguarding physical security systems, training staff on key cybersecurity aspects, monitoring for vulnerability alerts, and promptly detecting and addressing vulnerability alerts before exploitation by cyber criminals.

150.    The ISO 27001 standard focuses on establishing, implementing, maintaining, and continually improving an information security management system. Adopting ISO 27001 standards mitigates risk of unauthorized access and Data Breach.[139] ISO standards recommend that companies undertake a risk assessment to determine if encryption must be used to protect the confidentiality of sensitive information and ensure

[139] *ISO/IEC 27001:2022 Information security, cybersecurity and privacy protection — Information security management systems — Requirements*, ISO (2022), https://www.iso.org/standard/27001.

that the data is accessible to those who need them when it is required.[140] ISO standards further address limiting access to sensitive data to only essential employees, implementing measures to ensure that access to data is allowed only after a verified authentication process, and implement a system to alert the organization to unauthorized access to data.[141]

151.    The SOC 2 standard is another widely recognized standard in the United States. SOC 2 compliance ensures that data is managed in a way that protects privacy and security, requiring regular audits and controls over data access. [142] SOC 2 compliance examines whether organizations encrypt data at rest and in transit, restrict "access to information assets, including hardware, data (at-rest, during processing, or in transmission), software, administrative authorities, mobile devices, output, and offline system components," identify and authenticate individuals who can access sensitive data and infrastructure, and segment networks and data bases and limit points of access to sensitive network segments."[143]

152.    The National Institute of Standards and Technology ("NIST") and the Center for Internet Security, Inc. ("CIS")[144] have established standards for reasonable cybersecurity readiness.

---

[140] *ISO 27002:2022 – Control 8.24 – Use of Cryptography*, available at https://www.isms.online/iso-27002/control-8-24-use-of-cryptography/

[141] ISO 27002:2022 – Control 8.3 – Information Access Restriction, available at https://www.isms.online/iso-27002/control-8-3-information-access-restriction/

[142] *2018 SOC 2® Description Criteria (With Revised Implementation Guidance – 2022)*, AICPA & CIMA (Oct. 1, 2023), https://www.aicpa-cima.com/resources/download/get-description-criteria-for-your-organizations-soc-2-r-report.

[143] *2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy* (updated March 2020), available at https://assets.ctfassets.net/rb9cdnjh59cm/72xv4p67HVXKp6CjWmjkPk/1cdbfa19f6307e2720396b66a6194dc9/trust-services-criteria-updated-copyright.pdf

[144] CIS is a community-driven nonprofit responsible for globally recognized best practices for securing IT systems and data, including a prescriptive, prioritized, and simplified set of best practices in cybersecurity (referred to as "CIS Controls") and consensus-based prescriptive configuration recommendations of global cybersecurity experts (referred to as "CIS Benchmarks"). Per the CI website, the CIS Controls are a general set of recommended practices for securing a wide range of systems and devices, whereas CIS Benchmarks are guidelines for hardening specific operating systems, middleware, software applications, and network devices. The need for secure

153.    Recognizing that the national and economic security of the United States is dependent upon the reliable function of critical infrastructure, President Barack Obama issued Executive Order 13636, Improving Critical Infrastructure Cybersecurity, in February 2013. Executive Order 13636 directed NIST to work with stakeholders to develop a voluntary framework—based on existing standards, guidelines, and practices—for reducing cyber risks to critical infrastructure. Created through collaboration between industry and government, the voluntary framework promotes the protection of critical infrastructure, and provides standards, guidelines, tools, and technologies to protect information technology systems against threats to the confidentiality of information, integrity of information and processes, and availability of information and services.

154.    Relevant here, NIST standards require that organizations encrypt data both at rest and while in transit, "implement[] role-based access control and configuring it so that each user can access only the pieces of data necessary for the user's role" and "ensure that users who must access records containing PII only have access to the minimum amount of PII, along with only those privileges (e.g., read, write, execute) that are necessary to perform their job duties."[145]

155.    Cybersecurity and Infrastructure Security Agency ("CISA") guidance encourages organizations to prevent unauthorized access by:

•    Conducting regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

_____

configurations is referenced throughout the CIS Controls. In fact, CIS Control 4 specifically recommends secure configurations for hardware and software on mobile devices, laptops, workstations, and servers. Both the CIS Controls and the CIS Benchmarks are developed by communities of experts using a consensus-based approach. *See CIS Critical Security Controls FAQ*, CENTER FOR INTERNET SECURITY, https://www.cisecurity.org/controls/cis-controls-faq (last visited Jun. 18, 2025).

[145] *Guide to Protecting the Confidentiality of Personally Identifiable Information (PII) - Recommendations of the National Institute of Standards and Technology* (April 2010), available at https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf

- Regularly patching and updating software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

- Ensuring devices are properly configured and that security features are enabled;

- Employing best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

- Disabling operating system network file sharing protocol known as Server Message Block (SMB), which is used by threat actors to travel through a network to spread malware or access sensitive data.[146]

156.    CISA guidance further recommends use of the principle of least privilege (POLP) should be applied to all systems so that users only have the access they need to perform their jobs.[147]

157.    Not only should PowerSchool have had measures in place to prevent compromise in the first place, PowerSchool should have also properly siloed their systems so that a bad actor would be unable to escalate privileges and move laterally through PowerSchool's systems. When data is properly siloed rather than maintained in centralized database, an intruder is only able to access data to which any compromised credentials were allowed access rather than an entire set of sensitive data. Had PowerSchool limited access to sensitive data sets to only essential employees, the Threat Actor would have been able to acquire a subset of data and not the entire student and teacher data sets at issue in the Data Breach.

---

[146] *Ransomware Guide*, Multi-State Information Sharing & Analysis Center, Cybersecurity & Infrastructure Security Agency, U.S. Dept. of Homeland Security, at 4 (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C_.pdf.
[147] *Id.* at 6.

158.   CISA guidance recommends that using a comprehensive network, in addition to network segregation, will help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.[148]

159.   Based upon the known details of the Data Breach and how it occurred, PowerSchool also failed to fully comply with industry-standard cybersecurity practices, including, but not limited to, network segmentation, secure credential storage, implementation of MFA, rate limiting, user-activity monitoring, limiting access to data sets to only those required to access it, data-loss prevention, and intrusion detection and prevention.

160.   PowerSchool was aware of its obligations to protect its customers' Protected Information before the Data Breach, yet failed to take reasonable steps to protect its customers' Protected Information from unauthorized access. In this case, PowerSchool was at all times fully aware of its obligation to protect the Protected Information of its customers. PowerSchool was also aware of the significant repercussions if it failed to do so because PowerSchool collected Protected Information from millions of students, teachers and School Districts and it knew that this Protected Information, if hacked, would result in injury, including to Plaintiff and Class Members.

## E.   PLAINTTIFF AND CLASS MEMBERS HAVE BEEN HARMED

161.   PowerSchool provides subscription-based and support services.[149] As disclosed in its Annual Report for the fiscal year ending December 31, 2023, revenues from Subscriptions and Support totaled approximately $600,189,000, representing about 86.05% of PowerSchool's total revenue for that year.[150]

---

[148] *Id.*
[149] PowerSchool Holdings, Inc., Annual Report at Page 64 (Form 10-K) (filed Feb. 29, 2024), for fiscal year ended Dec. 31, 2023, available at: https://www.sec.gov/ix?doc=/Archives/edgar/data/0001835681/000183568124000016/pwsc-20231231.htm.
[150] *Id.* at 61, 65, 107.

162.    Subscription and Support revenues are further divided into two revenue recognition categories: Software-as-a-Service ("SaaS") and Software Maintenance.[151] SaaS accounted for approximately $485,913,000 of this total.[152] Under its SaaS model, PowerSchool promises customers ongoing access to its application platforms, which are considered stand-ready performance obligations consisting of daily services.[153]

163.    The remaining $114,276,000 was generated from Software Maintenance.[154] This category includes stand-ready services such as technical support and software updates and upgrades, which are provided on an as-available basis.[155] Revenue from Software Maintenance is typically based on fixed fees, with payments generally required annually in advance and recognized ratably over the maintenance term.[156]

164.    From year-end 2020 through 2023, the proportion of total revenue derived from Subscriptions and Support remained relatively consistent with the 2023 figures.[157]

165.    These SaaS and Software Maintenance services constitute the core offerings purchased by school districts from PowerSchool.[158] School Districts that acquired PowerSchool's services were promised secure, reliable maintenance and data security. However, despite substantial payments, those promises were not fulfilled.[159] Specifically, PowerSchool's SIS platform—the "backbone" of its SaaS offerings—lacked multifactor authentication, endpoint protection for contractors, password rotations, password minimum requirements, and sufficient data encryption implementation thereby jeopardizing sensitive information stored on the platform.[160]

---

[151] *Id.* at 96.
[152] *Id.* at 107.
[153] *Id.* at 96.
[154] *Id.* at 107.
[155] *Id.* at 97.
[156] *Id.*
[157] *Id.* at 107.
[158] *Id.* at 61.
[159] *Id.* at 106.
[160] *Id.* at 11.

166.    Similarly, in the case of Software Maintenance, Plaintiff and Class Members paid for 'technical support services and software updates and upgrades,' but failed to receive basic, fundamental data security protections—amounting to a fundamental overpayment—as described in this complaint.[161]

167.    Plaintiff and Class Members paid significant amounts of money for the use of the PowerSchool platform and for the storage and protection of sensitive student and teacher data. Part of the price that Plaintiff and Class Members paid for PowerSchool, included the funds necessary for the protection of data provided to PowerSchool. Had Plaintiff and Class Members known that Defendants would fail to adequately fund their data security obligations, or would divert those funds to their own profits, Plaintiff and Class Members would not have paid for PowerSchool's platform or would have paid less for it.

168.    Defendants' failure to keep Plaintiff's and Class Members' Protected Information secure has severe ongoing ramifications and has forced the affected schools to devote valuable time and resources to understanding the breach and how its students and teachers are affected, communicating known threats and risks to affected individuals, exploring alternate means of storing and using sensitive data, and ensuring that sensitive data is protected against misuse and unauthorized access in the future. Plaintiff and Class Members have also suffered reputational damage in addition to incurring the costs associated with the Data Breach. Plaintiff has suffered serious injury and face a present and also imminent and substantial risk of further injury, including future extortion attempts or dealing with the consequences from the misuse of student or teacher data.

169.    As a direct and proximate result of PowerSchool's known deficient data security, as well as PowerSchool's concealment of the same, Plaintiff and Class Members have suffered and will suffer injury.

---

[161] *Id.* at 97.

170.   Defendants were required to safeguard Plaintiff's Protected Information, both by contract, duty, and in equity, but did not. Because data privacy and security are an integral and necessary part of the software product offered by Defendants to Plaintiff and Class Members, Plaintiff and Class Members received a product that did not include all the benefits that they were promised, reasonably expected, or to which they were otherwise entitled under their contracts. Plaintiff and Class Members suffered an economic loss: the difference in value between the product as received and the product that they should have received.

171.   The difference in value between the product Defendants provided (lacking adequate data security), and the product Plaintiff and Class Members should have received (with data security) is objective—market price itself provides a common, objective measure of value. If there is a difference between the market valuation of the product that should have been provided and the product as received, then all Class Members have suffered the same loss commensurate or proportional to the price paid by them or on their behalf for the product.

172.   While data security is obviously material to the Class given their statutory and common law duties, this loss occurs regardless of whether or not an individual Class Member's data was actually subject to the Data Breach. The market establishes a value for the loss of a particular product feature by aggregating the views of all current and potential customers in the establishment of a market price level.

173.   Even apart from overpayment for PowerSchool services, the stolen Protected Information is one of the most valuable commodities on the Dark Web. According to PowerSchool's CEO, ransomware attacks can hold a district's data hostage until paying exorbitant sums of money (the average is $268,000). Yet there are time lags between when PII is stolen, when it is used, and when the discovery occurs that it has been used. In some cases data sets are leaked years after the initial exfiltration, demonstrating the ongoing risk that the data set at issue here will be misused.

174. Plaintiff and Class Members will need to remain vigilant against unauthorized use of the stolen data use for years or even decades to come and must continue to devote school resources to monitoring the Data Breach and communicating with affected individuals.

175. Accordingly, Plaintiff and Class Members seek full disgorgement of Defendants' ill-gotten gains. The revenues described in the preceding paragraphs are reflective of the dollar amounts that Defendants benefit from on an annual basis in part due to their cost-cutting and unlawful conduct. Plaintiff and Class Members allege that their payments to PowerSchool were excessive in light of PowerSchool's failure to deliver the functional data security and contractual support services promised under contracts with Plaintiff and Class Members. Plaintiff and Class Members also seek compensatory damages for the measurable value of their compromised data, the cost of future protective measures, time spent remedying exposure, injunctive or equitable relief and any other damages, economic or non-economic, arising from Defendants' unlawful conduct.

## CLASS ALLEGATIONS

176. Plaintiff brings this class action individually on behalf of itself and on behalf of all similarly situated school districts, charter schools, parochial schools, and private schools (collectively, "School Districts") in a nationwide class and, in the alternative, the statewide subclasses (together, "Classes") pursuant to Federal Rule of Civil Procedure 23. As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a), 23(b)(2), and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)). Accordingly, Plaintiff seek certification of the following Classes:

## NATIONWIDE CLASS

177. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as applicable, Plaintiff seek certification of the following Nationwide Class ("Nationwide Class"):

**Nationwide Class:** All School Districts in the United States that contracted with PowerSchool to provide cloud-based software solutions.

178.  The Nationwide Class asserts claims against PowerSchool and/or Bain Capital—as delineated by each Count—for Breach of Express Contract (Count 1), Intentional Tortious Interference with Contract (Count 2), Negligence (Count 3), violation of the CFAA, 18 U.S.C. § 1030, *et seq.* (Count 4), violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502(a), *et seq.* (Count 5), Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (Count 6), Unjust Enrichment (Count 7), and Declaratory Judgment and Injunctive Relief (Count 8).

## ALTERNATIVE STATEWIDE SUBCLASSES

179.  In the alternative, Plaintiff repeats and reiterates the Class Definition and Claims on behalf of itself and a statewide subclass ("Alternative Statewide Subclasses") compromised of School Districts in their respective state of residence.

180.  Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Classes are any judicial officer presiding over this matter, members of their immediate family, and members of their judicial staff.

181.  **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, Defendants have acknowledged that tens of thousands of School Districts have been affected. The list of affected School Districts is available from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

182.  **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which

predominate over any questions affecting individual Class Members. These common questions include:

      i.      Whether and to what extent Defendants had a duty to protect the confidentiality the Protected Information of PowerSchool's customers and former customers;

      ii.      Whether PowerSchool failed to take reasonable and prudent security measures to ensure its systems were protected;

      iii.      Whether Bain Capital interfered post-acquisition with Plaintiff's contracts with PowerSchool and prevented their execution through sudden layoffs and outsourcing;

      iv.      Whether PowerSchool failed to use reasonably available information to monitor its systems and prevent the Data Breach from happening;

      v.      Whether PowerSchool required its contractors and subcontractors to implement sufficient security measures, including the same security measures that it required;

      vi.      Whether PowerSchool implemented MFA protection for its administrators and technical staff;

      vii.      Whether Defendants knew or should have known that PowerSchool's computer and data storage systems were vulnerable to compromise;

      viii.      Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices at PowerSchool;

      ix.      Whether Defendants' security measures for PowerSchool were reasonable in light of applicable legal and regulatory requirements and industry standards, including COPPA and HIPAA;

      x.      Whether PowerSchool exceeded authorized access of Plaintiff's and Class Members' computer in violation of the CFAA, 18 U.S.C. § 1030, *et seq.*;

      xi.      Whether PowerSchool complied with federal law and took such actions as were necessary to prevent unauthorized access to its customers' data by

persons other than the customer and PowerSchool, as required by COPPA and its customers' contracts;

xii.    Whether PowerSchool had any contractual obligations to provide for the security of its customers' Protected Information;

xiii.   Whether PowerSchool has complied with any contractual obligations to protect its customers' Protected Information;

xiv.    Whether Defendants failed to notify Plaintiff and Class Members as soon as practicable and without delay after the Data Breach was discovered;

xv.     Whether Plaintiff and Class Members overpaid for PowerSchool's services;

xvi.    Whether Defendants' conduct resulted in or was the proximate cause of Plaintiff's and Class Members' injuries;

xvii.   Whether Plaintiff and Class Members suffered damages or other losses because of Defendants' failure to protect their Protected Information;

xviii.  Whether Defendants should retain the money paid by Plaintiff and Class Members to protect their Protected Information, as well as the profits Defendants generated using Plaintiff's and Class Members' Protected Information;

xix.    Whether PowerSchool should retain Plaintiff's and Class Members' valuable Protected Information; and

xx.     Whether Plaintiff and Class Members are entitled to declaratory and injunctive relief.

183.    **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of other Class Members' claims because Plaintiff and Class Members were subjected to the same allegedly unlawful conduct and harmed in the same way. Plaintiff's Protected Information was in Defendants' possession at the time of the Data Breach and was compromised as a result of the Data Breach. Plaintiff's damages and injuries are akin to those of other Class Members, and Plaintiff seek relief consistent with the relief of the Class.

184.    **Adequacy of Representation: Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Classes because Plaintiff is a member of the Classes and is committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiff has no conflicts of interest with the Classes. Plaintiff's Counsel are competent and experienced in litigating class actions, including extensive experience in data breach and privacy litigation. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

185.    **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because the issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and Class Members may be relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

186.    **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members would create the risk of inconsistent adjudications and incompatible standards of conduct

for PowerSchool or would be dispositive of the interests of Members of the proposed Class.

187.    **Ascertainability.** The Classes are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within each Class. The Classes consist of School Districts that contracted for PowerSchool services, and class membership can be determined using PowerSchool's records.

188.    **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive relief appropriate to the Classes as a whole. Injunctive relief is necessary to uniformly protect the Class Members' data. Plaintiff seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

189.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein**.**

## CAUSES OF ACTION

### COUNT 1
### BREACH OF EXPRESS CONTRACT
### (On behalf of the Nationwide Class against PowerSchool)

190.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 189 above and incorporates the same as if set forth herein.

191.    Plaintiff brings this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Alternative Statewide Subclasses under the laws of their respective states of residence.

192.    Plaintiff, Class Members, and PowerSchool are parties to the Main Services Agreement ("MSA"), which incorporates the Data Privacy Agreement ("DPA") (together with the MSA, the "Contract").

193.    At all relevant times, Plaintiff and Class Members fully performed their obligations under the Contract.

194.   The Contract sets forth the terms which govern customer data provided to PowerSchool. This Customer Data includes the Protected Information of Plaintiff's employees, students, teachers, and/or parents of students, all of which was compromised and stolen while in the care, custody, and control of PowerSchool.

195.   The Contract describes PowerSchool's duties and responsibilities handling customer data, requiring PowerSchool to do so in accordance with applicable law and pursuant to the terms of the Contract.

196.   The Contract requires PowerSchool to maintain the confidentiality, privacy, and security of the customer data it handles.

197.   PowerSchool failed to perform this obligation because PowerSchool failed to safeguard the confidential, private, and sensitive data it obtained from Plaintiff. This was a material term of the Contract because a major factor in the decision to entrust PowerSchool with the handling of sensitive Protected Information and to pay PowerSchool for such entrustment was PowerSchool's reciprocal promise to safeguard the data containing this Protected Information.

198.   An essential purpose for which the Contract was entered into was to safeguard the Protected Information of students, teachers, and employees within Plaintiff's and Class Members' districts while providing a COPPA and HIPAA compliant system for organizing and carrying out Plaintiff's operations. The Data Breach has deprived Plaintiff and Class Members of a benefit that they reasonably expected to receive at the time the Contract was made. Therefore, PowerSchool's failure to substantially perform this obligation was a material breach of the Contract.

199.   The Contract also imposes limits on PowerSchool's use, transfer and disclosure of customer data, restricting PowerSchool to only those purposes provided for in the Contract or consented to by Plaintiff or Class Members.

200.   The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures, constituting an unauthorized transfer of the Protected

Information that created the opportunity for the potential sale of students', teachers', parents', and faculty members' Protected Information on the Dark Web.

201.   Hackers exported entire student and teacher databases without authorization. PowerSchool thus allowed for the disclosure of data to which Plaintiff and Class Members did not consent, and neither applicable law nor the Contract allowed for this disclosure.

202.   Ensuring the Protected Information that Plaintiff and Class Members entrusted to PowerSchool was not used, sold, transferred, or disclosed without Plaintiff's consent was an essential purpose of the Contract. Plaintiff and Class Members sought to effectively and efficiently provide services to students, teachers, parents, and employees in agreeing to purchase PowerSchool's products and services, and Plaintiff and Class Members reasonably believed that PowerSchool would not allow for the disclosure of such consent or as authorized by law.

203.   Accordingly, PowerSchool violated the Contract and materially breached the Contract by allowing unauthorized use, transfer and disclosure of customer data.

204.   The DPA provides further details regarding what PowerSchool must do to ensure its employees, agents, contractors, and subprocessors comply with the terms of the Contract, including by maintaining the confidentiality, security, and privacy of customer data.

205.   PowerSchool failed to ensure the reliability of its employees, agents, vendors and contractors as it agreed to in the Contract. These employees, agents, vendors, contractors, and subprocessors would have implemented basic procedures and practices - such as MFA and data encryption - if they could reasonably be called reliable for purposes of ensuring the privacy and security of Protected Information under the terms of the DPA and MSA. The Data Breach is itself evidence of PowerSchool's failure to perform its obligations under the Contract, and PowerSchool has offered no explanation for how PowerSchool took reasonable measures to ensure compliance by its employees, agents, vendors, contractors, and subprocessors.

206.   When the Contract was made, Plaintiff and Class Members reasonably expected that PowerSchool would take reasonable measures to ensure the reliability of PowerSchool's agents, employees, contractors, and subprocessors in limiting the accessibility of Protected Information. Plaintiff and Class Members performed Plaintiff's obligations under the Contract under the reasonable belief that PowerSchool was adequately performing its reciprocal promise to take reasonable measures to ensure the reliability of PowerSchool employees, agents, contractors, and subprocessors in ensuring limited access to the Protected Information of Plaintiff's students and employees.

207.   Therefore, PowerSchool's failure to ensure compliance by those individuals and entities to whom PowerSchool provided access to customer data materially breached the Contract.

208.   With respect to the processing of data in PowerSchool's possession, the DPA provides further details regarding the measures PowerSchool was contractually required to implement so as to provide appropriate and reasonable safeguards to ensure the security of customer data.

209.   PowerSchool failed to perform its obligation under the Contract because PowerSchool failed to take reasonable safeguards, such as encrypting aggregated data containing sensitive Protected Information that PowerSchool processed and using MFA, and this Protected Information was the subject of the Data Breach. PowerSchool committed this failure despite knowing that this Protected Information holds substantial value and is at great risk of being targeted by hackers as, for example, Mr. Gulati wrote and then published on PowerSchool's website following his attendance at a White House Summit on Education Technology hosted by former President Joe Biden. This was a material term of the Contract because Plaintiff's and Class Members' performance and payments to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. Plaintiff and Class Members reasonably believed that

PowerSchool would implement these reasonable and appropriate measures when the Contract was made.

210. Therefore, in failing to perform its obligations identified in the DPA, PowerSchool committed a material breach of the Contract.

211. In the event of a breach of customer data, PowerSchool was obligated to respond to the security incident. Specifically, PowerSchool was contractually obligated to investigate and take reasonable steps to mitigate the breach, provide prompt notice to Plaintiff and Class Members, and facilitate compliance with applicable laws, including obligating PowerSchool to:

    a.    Take steps to mitigate and remediate a data breach;

    b.    Notify Plaintiff and Class Members without undue delay;

    c.    Provide Plaintiff and Class Members with sufficient information to permit Plaintiff and Class Members to make a determination as to any notification obligations under federal, state, or local laws and regulations; and

    d.    Cooperate with Plaintiff and Class Members and take commercially reasonable steps to assist Plaintiff and Class Members in an investigation of the breach.

212. Upon learning of the Data Breach, PowerSchool was obligated to perform its obligations under the Contract. PowerSchool substantially or entirely failed to do so, as PowerSchool instead:

    a.    Took no steps in furtherance of mitigation or remediation of the Data Breach, beyond receiving purported assurances that the Protected Information would not be sold or used from the hackers who risked criminal prosecution in accessing and acquiring the Protected Information;

    b.    Notified Plaintiff and Class Members of the Data Breach ten or more days after learning that the Data Breach had occurred, an undue delay

that diminished, constrained, and limited Plaintiff's ability to learn who possessed the Protected Information and which Protected Information had been compromised;

c.    Failed to provide Plaintiff and Class Members information that would be sufficient for Plaintiff and Class Members to readily and adequately determine the scope of its legal obligations to notify students, teachers, parents, and employees; and

d.    Failed to take commercially reasonable steps to assist Plaintiff and Class Members in an investigation of the Data Breach by keeping Plaintiff and Class Members in the dark about it for such a time that any investigation would be fruitless.

213.    Plaintiff and Class Members reasonably expected PowerSchool to perform its duties under the Contract. Plaintiff and Class Members were assured that PowerSchool could react in a timely and organized fashion to address the negative implications should a breach occur. Plaintiff and Class Members continued to perform their obligations and make payments under this reasonable belief and have now been prejudiced by PowerSchool's undue delay that has lessened Plaintiff's ability to proactively notify affected individuals, determine Plaintiff's legal obligations, and investigate the potential exposure of Protected Information. PowerSchool has failed to mitigate or remedy the consequences of the Data Breach and has instead acted in a commercially unreasonable manner by paying a ransom to the cyber criminals who compromised the Protected Information when Plaintiff and Class Members had no way of knowing the Data Breach had even occurred.

214.    Therefore, the actions and omissions of PowerSchool after the Data Breach were violations of the DPA which constitute material breaches of the Contract.

215.    Under the Contract, PowerSchool was also obligated to, at a minimum, abide by and maintain adequate data security measures, consistent with industry standards , to

protect Customer Data from unauthorized disclosure or acquisition by an unauthorized person, which would include obligations to:

     a.    Secure usernames, passwords, and any other means of gaining access to the services or to Protected Information, at a level meeting or exceeding the applicable standards;

     b.    Maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so;

     c.    Employ industry standard measures to protect data from unauthorized access; and

     d.    Conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner.

216. PowerSchool failed to perform such data security obligations, as PowerSchool did not:

     a.    Secure means of gaining access to usernames and passwords, because PowerSchool did not implement MFA or any other available measure consistent with industry standards that would be considered sufficient to meet this obligation;

     b.    Maintain security protocols that met industry standards for monitoring and preventing the unauthorized access, transfer, or transmission of data, as PowerSchool failed to implement end-to-end encryption of data at rest and in transit to prevent unauthorized access, which proximately and directly allowed for the unauthorized viewing, transfer, and transmission of the data containing Protected Information;

c.  Conduct periodic risk assessments to detect system vulnerabilities before the Data Breach, as such assessments would have led PowerSchool to implement stronger security measures before the Data Breach occurred;

d.  Conduct security audits or penetration testing that would have allowed PowerSchool to identify and address vulnerabilities to its data security systems before the Data Breach occurred; and

217.  Under the Contract, PowerSchool was also obligated to have a remediation plan in place in the event of a breach of data security, which would include obligations to:

a.  Provide notification to Plaintiff and Class Members within a reasonable amount of time of confirmation of the Data Breach, not exceeding seventy-two (72) hours;

b.  Take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of data;

c.  Provide a security incident notification written in plain language after confirmation of the incident; and

d.  Provide a list of the types of data that were or are reasonably believed to have been the subject of the Data Breach.

218.  PowerSchool however failed to perform such obligations. Notably, while PowerSchool had reportedly detected the Data Breach by December 28, 2024, it did not notify customers until January 7, 2025—a delay of ten days. This undue delay was a material breach of the Contract that has left Plaintiff and Class Members scrambling to determine the potential exposure of Protected Information.

219.  Under the Contract, PowerSchool was also obligated to have in place a data security and privacy plan, which would include obligations to:

73

a.  Review its data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws and the terms of this DPA;

b.  Implement commercially reasonable efforts to ensure compliance with applicable laws and DPA terms in the event that PowerSchool's policy and practices were found to not conform with said laws and terms;

c.  Encrypt data-at-rest and data-in-transit;

d.  Implement data leak protections and information protection processes and procedures;

e.  Perform data destruction according to the Contract;

f.  Develop and implement a plan for vulnerability management;

g.  Ascertain, document, and review log and audit records according to policy; and

h.  Issue, verify, manage, audit, and revoke, as applicable, authentication and access control for authorized devices, processes, and users.

220.  PowerSchool was further obligated to manage data security and privacy incidents that implicate Protected Information, including identifying breaches and unauthorized disclosures, and providing prompt notification of any breaches or unauthorized disclosures of Protected Information.

221.  However, both before the Data Breach and after it occurred, PowerSchool failed to perform its obligations under the Contract.

222.  At the time the Contract was made, Plaintiff and Class Members reasonably expected PowerSchool to perform these obligations in the interest of the students, parents, and employees who Plaintiff and Class Members serves and seeks to protect. The failure to perform these obligations accordingly constitutes material breaches of the Contract.

223.  PowerSchool failed to take steps to mitigate and remediate the Data Breach, as Plaintiff and Class Members has yet to understand the full extent and scope of the

impact of the Data Breach. PowerSchool has failed to take commercially reasonable steps to assist Plaintiff and Class Members by providing Plaintiff and Class Members with necessary information sought by Plaintiff's faculty, students, and parents of students.

224.    When the Contract was made, Plaintiff and Class Members reasonably expected that PowerSchool would implement and maintain commercially reasonable, industry standard security protocols—such as those set forth by the ISO or NIST— in the interest of protecting the privacy of students, parents, and teachers. Plaintiff's agreement to pay PowerSchool all amounts due under the Contract and subsequent performance of that obligation was substantially based on PowerSchool's reciprocal promise to implement these standards, and Plaintiff and Class Members reasonably believed that PowerSchool had done so and would continue to do so.

225.    Thus, the failure by PowerSchool to abide by commercially reasonable, industry standard security standards was a material breach of the Contract.

226.    As a direct and proximate result of PowerSchool's breaches of the Contract identified herein, Plaintiff and Class Members have suffered monetary and other damages.

227.    These include the additional out-of-pocket costs and expenses incurred for:

a.    Paying inflated contract prices for services that were not actually provided.

b.    Additional wages paid to staff members to address the breach, such as overtime pay;

c.    Increased workload on administrative staff for managing affected data and addressing concerns from parents, students, and faculty;

d.    Expenses for hiring cybersecurity experts to investigate the breach;

e.    Costs for cybersecurity experts to assess potential risks to students, teachers, parents, and staff;

f.    Fees for cybersecurity experts to provide recommendations on securing School Districts' data;

g.     Legal consultation costs to determine potential liability;

h.     Legal expenses to understand regulatory compliance obligations;

i.     Legal fees to prepare for potential lawsuits from affected individuals;

j.     Expenses to transition data from PowerSchool to a different, more secure platform;

k.     Technical support costs associated with data transfer;

l.     Costs for staff training on the new system;

m.     Expenses for implementing improved security measures;

n.     Lost opportunity costs from redirecting school staff to mitigate the Data Breach's impact;

o.     Wages lost due to time spent monitoring and responding to identity theft risks;

p.     Costs for providing credit monitoring services to affected students, parents, and faculty;

q.     Expenses for identity theft protection services for those impacted by the Data Breach;

r.     Ongoing monitoring costs due to delayed or hidden fraudulent activity;

s.     Future legal and expert consultation expenses to manage ongoing risks of Protected Information exposure;

t.     Expenses for drafting and sending notification letters/emails to affected individuals;

u.     Costs for setting up support hotlines or response teams for inquiries; and

v.     Administrative expenses for responding to concerns from students, teachers, parents, and faculty about potential identity theft.

228.   All of these out-of-pocket losses were foreseeable to PowerSchool when the Contract was made given PowerSchool's familiarity with Plaintiff's status as school

76

districts. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool materially breached the Contract.

229.   In committing the acts and omissions that have directly and proximately caused Plaintiff's out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under the Contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to Plaintiff and Class Members and to those whose Protected Information was entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to Plaintiff and Class Members flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in breaching the Contract and causing Plaintiff's substantial monetary losses.

230.   As a direct and proximate result of PowerSchool's breaches of the Contract, Plaintiff and Class Members were deprived of the full benefit of data security protection that was promised under the Contract. Plaintiff and Class Members have still not received the benefit that Plaintiff and Class Members bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

231.   Plaintiff and Class Members are informed and believe that the monetary damages caused by PowerSchool's various breaches of the Contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach.

232.   Based upon PowerSchool's various failures to perform obligations that amount to material breaches of the Contract, Plaintiff and Class Members seek to recover all available general damages, special damages, benefit-of-the-bargain damages,

attorneys' fees and costs, and all other damages sufficient to compensate Plaintiff and Class Members for their injuries as permitted by law.

## COUNT 2
## INTENTIONAL TORTIOUS INTERFERENCE WITH CONTRACT
### (On behalf of the Nationwide Class against Bain Capital)

233.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 189 above and incorporates the same as if set forth herein.

234.    Plaintiff brings this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Alternative Statewide Subclasses under the laws of their respective states of residence.

235.    Plaintiff and Class Members entered into valid and enforceable contracts with PowerSchool for educational software and related services, including contractual obligations for cybersecurity protections.

236.    Defendant Bain Capital had actual knowledge of these contracts and their terms, including PowerSchool's cybersecurity obligations to Plaintiff and Class Members, by virtue of its ownership interest, board-level oversight, and direct involvement in operational decisions at PowerSchool, including during the background of the merger.

237.    Despite this knowledge, Bain Capital intentionally and improperly interfered with PowerSchool's performance under those contracts by directing, encouraging, or pressuring PowerSchool to (1) reduce spending on cybersecurity infrastructure and compliance in order to increase profitability; (2) lay off employees involved in cybersecurity operations and information technology infrastructure; and (3) outsource backend administrative operations to subcontractors.

238.    Bain Capital's interference was neither justified nor privileged. It was done with the improper motive of maximizing its own financial return at the expense of PowerSchool's contractual obligations to Plaintiff and Class Members.

239.    As a direct and proximate result of Bain Capital's intentional interference, PowerSchool breached its contractual duties by failing to provide the promised level of cybersecurity protections, thereby exposing Plaintiff and Class Members to a Data Breach, increased risk of ransom attacks, lawsuits, and other consequences of cybercrime, and causing them to overpay for services not rendered.

240.    Plaintiff and Class Members have suffered damages as a result of Bain Capital's tortious interference, including overpayments for under-delivered services, loss of contractual value, increased exposure to cybersecurity threats, and related harm.

241.    Plaintiff and Class Members are entitled to compensatory and punitive damages in an amount to be proven at trial.

**COUNT 3**
**NEGLIGENCE**
**(On behalf of the Nationwide Class against all Defendants)**

242.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 189 above and incorporates the same as if set forth herein.

243.    Plaintiff brings this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Alternative Statewide Subclasses under the laws of their respective states of residence.

244.    Plaintiff and Class Members were required to submit sensitive Protected Information to use PowerSchool's services, and did so pursuant to so PowerSchool's agreement to collect, encrypt, de-identify, and safely store their Protected Information. Defendants had full knowledge of the sensitivity of the Protected Information and the types of harm that Plaintiff and Class Members could and would suffer if the Protected Information were wrongfully disclosed.

245.    Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Protected Information in their possession from being compromised, lost, stolen, accessed or misused by unauthorized persons. More specifically, this duty included, among other things: (a) designing, maintaining, and testing PowerSchool's security

systems to ensure that Plaintiff's and Class Members' Protected Information in their possession was properly secured and protected; (b) implementing processes that would detect a breach of PowerSchool's security system in a timely manner; (c) timely acting upon warnings and alerts, including those generated by PowerSchool's security systems, regarding intrusion to its networks; (d) maintaining security measures consistent with industry standards discussed herein; and (e) failing to delete customer Protected Information that PowerSchool no longer reasonably needed to keep, particularly as to former customers.

246. Defendants' duty to use reasonable care arose from several sources, including but not limited to the following:

a.    PowerSchool holds itself out as a protector of consumer data even previously advertising its privacy and cybersecurity pledges and accolades on its website. PowerSchool, along with Bain Capital, thereby assumed a duty to reasonably protect the data that was provided to it by Plaintiff and Class Members. Because of its role as one of the largest education technology companies, PowerSchool was in a unique and superior position to protect against the harm suffered by Plaintiff and Class Members as a result of the Data Breach. PowerSchool's own privacy policies set forth some of the duties it assumed when obtaining customers' Protected Information;

b.    Defendants' duty also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Protected Information by companies such as PowerSchool. Various FTC publications further form the basis of Defendants' duty. In addition, individual jurisdictions have enacted statutes either based upon the FTC Act that also created a duty or that incorporate similar duties, as alleged below. *See, e.g.*, Cal Civ. Code § 1798.100; Cal. Civ. Code § 1798.80;

c.      PowerSchool violated Section 5 of the FTC Act and similar state consumer protection statutes by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. PowerSchool's conduct was particularly unreasonable given the nature and amount of Protected Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and Class Members. Plaintiff and Class Members were within the class of persons the FTC Act and similar state consumer protection statutes were intended to protect and the type of harm that resulted from the Data Breach was the type of harm that the statutes were intended to guard against. Thus, PowerSchool's violation of Section 5 of the FTC Act and similar statutes constitutes negligence;

d.      PowerSchool also had a duty to safeguard the PII of Plaintiff and Class Members and to promptly notify them of a breach pursuant to state statutes that require PowerSchool to reasonably safeguard sensitive Protected Information.

e.      PowerSchool had common law duties to prevent foreseeable harm to Plaintiff and Class Members. These duties existed because Plaintiff and Class Members were the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiff and Class Members would be harmed by PowerSchool's failure to protect their Protected Information because hackers routinely attempt to steal such information and use it for nefarious purposes, but hackers had also targeted PowerSchool's data systems prior to the Data Breach; and

f.      PowerSchool's duty to use reasonable security measures also arose as a result of the special relationship that existed between PowerSchool, on the one hand, and Plaintiff and Class Members, on the other hand. The special relationship arose because Plaintiff and Class Members entrusted PowerSchool with their Protected Information as part of the purchase of and subsequent use of the services PowerSchool offers as a major education technology company. PowerSchool alone

could have ensured that its security systems and data storage architecture were sufficient to prevent or minimize the Data Breach. Additionally, imposing liability here will encourage similarly situated companies to implement reasonable and sufficient data security practices to ensure the protection of information entrusted to them and is aligned with California public policy which recognizes that companies and agencies have legal and moral obligations to protect personal information with reasonable and appropriate safeguards.

247.    Defendants were required to provide timely, adequate, and appropriate notification of the Data Breach to Plaintiff and Class Members. As discussed above, Plaintiff and Class Members needed timely and effective notice so they could take appropriate measures to prevent, mitigate, or ameliorate the damage caused by Defendants' misconduct.

248.    Defendants were subject to these "independent duties," untethered to any contract between PowerSchool and Plaintiff and Class Members.

249.    Defendants knew or should have known that their computing systems and data storage were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing confidential Protected Information in light of the statements by Mr. Gulati that School Districts' data is particularly sensitive and highly valuable, and that Defendants failed to implement certain cybersecurity measures at PowerSchool—while concurrently reducing and outsourcing personnel—that it often advised its customers to undertake as a precaution and in best practices.

250.    Defendants breached the duties they owed to Plaintiff and Class Members described above and thus were negligent. Defendants breached these duties by, among other things, failing to: (a) exercise reasonable care and implement proper security systems, protocols and practices sufficient to protect the Protected Information of Plaintiff and Class Members; (b) detect the Data Breach while it was ongoing from; (c) maintain security systems consistent with industry standards during the period of the Data Breach; (d) comply with federal regulations protecting the Protected Information at issue;

(e) disclose in a timely and adequate manner that Plaintiff's and Class Members' Protected Information in Defendants' possession had been, or was reasonably believed to have been, stolen or compromised; and (f) delete customer Protected Information that PowerSchool no longer reasonably needed to keep, particularly as to its former customers.

251.    Plaintiff and Class Members were foreseeable victims of Defendants' inadequate data security practices, and it was also foreseeable that Defendants' failure to provide timely and adequate notice of the Data Breach would result in injury to Plaintiff and Class Members as described herein.

252.    Defendants' duty extended to protecting Plaintiff and Class Members from the risk of foreseeable criminal conduct of third-parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B (1965). Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

253.    Defendants' failure to take proper security measures to protect the sensitive Protected Information of Plaintiff and Class Members created conditions conducive to a foreseeable, intentional act, namely the unauthorized access of Plaintiff's and Class Members' Protected Information.

254.    As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: lost benefit of their bargains and overcharges for services or products; time spent in response to the Data Breach; expenses and time spent responding to constituent concerns; decreased reputation and community trust; lost work time; lost value of the Protected Information; the amount of the actuarial present value of ongoing high-quality identity defense and credit monitoring services made necessary as mitigation measures because of the Data Breach; threat of

future cyberattacks and litigation expenses; nominal and general damages; and other economic and non-economic harm.

**COUNT 4**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT**
**18 U.S.C. § 1030, *et seq.***
**(On behalf of the Nationwide Class against PowerSchool)**

255. Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 189 above and incorporates the same as if set forth herein.

256. The CFAA establishes a private cause of action against a person who "knowingly accessed a computer without authorization or exceeding authorized access," and whose prohibited access results in damage or loss in excess of $5,000 in any one-year period. 18 U.S.C. § 1030(a)(4).

257. The CFAA also establishes liability against whomever "intentionally accesses a protected computer without authorization, as a result of such conduct, recklessly causes damage." 18 U.S.C. § 1030(a)(5)(B).

258. PowerSchool explicitly agreed it may access and use Customer Data solely on a "need-to-know" basis and strictly limited to purposes expressly authorized by Plaintiff and necessary for the fulfillment of obligations under their contracts.

259. Despite clear contractual limitations, PowerSchool exceeded authorized access, or otherwise permitted, enabled, or allowed unauthorized third-party access, to the protected computer systems of Plaintiff, which house and manage federally protected and confidential student and employee data. PowerSchool exceeded authorized access when it:

    a.    Enabled subcontractors to access Plaintiff's Protected Information without Plaintiff's consent;

    b.    Enabled third-parties to have back-office administrator functionality over all PowerSchool systems, as well as student, parent- and faculty-facing functionality to manage key organizational information assets,

including demographic data, enrollment, grades, transcripts, and other governmental agency reporting capabilities;

c.    Failed to implement reasonable security and monitoring protocols to detect if an employee or agent was exceeding authorized access to Plaintiff's Computer Systems;

d.    Knowingly allowed Technical Support employees to access data stored in the School Districts' PowerSchool SIS that contained school and student data despite their express representations that this data was inaccessible to PowerSchool and secured;

e.    Intentionally accessed the School Districts' PowerSchool SIS in a manner that exceeded authorization and recklessly caused damage to the School Districts;

f.    Negligently allowed a third-party Threat Actor to steal all Plaintiff's student, teacher, and School District information; and

g.    Exceeded authorized access by failing to restrict access to student and teacher data only to the "minimum extent necessary."

260.    PowerSchool enabled contractors to access Plaintiff's Computer Systems and Protected Information without informing Plaintiff and putative Class members of the lack of security controls (MFA) and the risks of a data breach—despite explicitly issuing informative guides on its website warning Plaintiff to implement these measures at their schools. Plaintiff and the other putative Class members did not give permission for PowerSchool to allow contractors to access their data without their consent, and PowerSchool was not authorized to do. As a result, Plaintiff and the putative Class Members had their aggregated, identifiable, COPPA and HIPAA Protected Information exposed to third-parties and to the Threat Actor.

261.    PowerSchool violated 18 U.S.C. § 1030(a) by knowingly providing access to Plaintiff's and the putative Class Members' Computer Systems and allowing its backend administrators to access, collect, and transmit information concerning their

Protected Information, which are protected computers as defined above. By failing to de-aggregate, providing administrative level access without MFA security, PowerSchool intentionally caused damage without authorization, or at the very least, exceeded the authorized access to Plaintiff's and the other putative Class Members' Computer Systems by failing to de-aggregate, de-identify, or otherwise encrypt data, and then making it accessible through a single vector of attack without proper protections in place despite the security measures warranted, represented, and advertised by PowerSchool.

262.   Plaintiff and Class Members did not authorize PowerSchool to access school or student records that were de-anonymized and/or unencrypted.

263.   In exceeding its authorized access, PowerSchool failed to inform Plaintiff and other owners of the PowerSchool Software of the security vulnerabilities and broad administrative access privileges to student data. PowerSchool did so with an intent to defraud Plaintiff and the other putative Class members and furthered the fraudulent intent to avoid its duties and legal obligations to provide Plaintiff and the putative Class Members with adequate data monitoring and protection services. The cost of the Data Breach exceeds $5,000, and therefore PowerSchool's fraudulent intent and conduct as alleged herein constitutes a violation of 18 U.S.C. § 1030(a)(4).

264.   PowerSchool's acts have also caused actual monetary loss in terms of overpayment for services. Plaintiff and putative Class members paid for a secure platform. Plaintiff and Class Members did not receive the benefit of their bargain.

265.   As alleged above and herein, PowerSchool knowingly caused the transmission of "a program, information, code, or command . . . to a protected computer" and as a result of that conduct, intentionally caused damage to Plaintiff and the putative Class. 18 U.S.C. § 1030(a)(5)(A).

266.   Unless PowerSchool is retrained and enjoined, PowerSchool will continue to commit such acts. Plaintiff's remedy at law is thus inadequate to compensate for these intentionally inflicted and threatened injuries, therefore entitling Plaintiff and the putative class to remedies including injunctive relief as provided for by § 1030(g).

267.    Therefore, Plaintiff and the putative Class members are entitled to obtain compensatory damages, injunctive relief, or other equitable relief as provided under 18 U.S.C. § 1030(g).

**COUNT 5**
**CALIFORNIA'S COMPREHENSIVE DATA ACCESS AND FRAUD ACT**
**Cal. Penal Code § 052**
**(On behalf of the Nationwide Class against PowerSchool)**

268.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 189 above and incorporate the same as if set forth herein.

269.    The California Legislature enacted the California Comprehensive Computer Data Access and Fraud Act ("CDAFA") to provide protection from "tampering, interference, damage, and unauthorized access to (including the extraction of data from) lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

270.    The CDAFA allows for a private right of action to owners of computers, networks, systems, programs, and data who suffer because of a violation of the CDAFA. Cal. Penal Code § 502(c)(1).

271.    The CDAFA creates a civil claim against a person who:

a.    "Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." Cal. Penal Code § 502(c)(1);

b.    "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section" Cal. Penal Code § 502(c)(6);

c.    "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network" Cal. Penal Code § 502(c)(7); or

d.    "Knowingly introduces any computer contaminant into any computer, computer system, or computer network." Cal. Penal Code § 502(c)(8).

272.    The CDAFA defines "Computer services" as "includes, but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(4).

273.    The CDAFA defines "Computer network" as "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2).

274.    The CDAFA defines "Computer system" as "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5).

275.    The CDAFA defines "Data" as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

276.    The CDAFA defines "Computer contaminant" as "any set of computer instructions that are designed to modify, damage, destroy, record, or transmit information within a computer, computer system, or computer network without the intent of the owner of the information. They include, but are not limited to, a group of computer instructions commonly called viruses or worms, which are self-replicating or self-propagating and are designed to contaminate other computer programs or computer data, consumer computer resources, modify, destroy, record, or transmit data, or in some other fashion usurp the normal operation of the computer, computer system, or computer network." Cal. Penal Code § 502(b)(12).

277.    The CDAFA provides that "a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Cal. Penal Code § 502(j).

278.    Plaintiff's and Class Members' electronic devices are "computers, computer systems, and/or computer networks" within the meaning of the CDAFA.

279.    Plaintiff's and Class Member's data includes, but is not limited to, nonpublic information, communications, and personally identifiable information.

280.    As a direct and proximate result of PowerSchool's unlawful conduct within the meaning of the CDAFA, PowerSchool has caused loss to Plaintiff and Class Members and unjustly profited from the data taken from Plaintiff's and Class Members' computers without authorization or consent.

281.    Plaintiff and Class Members seek compensatory damages, in an amount to be proven at trial, and injunctive or other equitable relief, including without limitation restitution of the revenue and other benefits accruing to PowerSchool by virtue of its violations of the CDAFA, as well as to recover reasonable attorneys' fees under Cal. Penal Code § 502(e).

282.    Plaintiff and Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because PowerSchool's violations were willful and, upon information and belief, PowerSchool is guilty of oppression, fraud, or malice as defined in Cal. Civil Code § 3294.

283.    Plaintiff and Class Members have also suffered irreparable injury from these unauthorized acts of disclosure, to wit: all of their personal, private, and sensitive  data have been viewed, accessed, stored, and disclosed by PowerSchool, and due to the continuing threat of such injury, have no adequate remedy at law, entitling Plaintiff to injunctive relief.

**COUNT 6**
**CALIFORNIA'S UNFAIR COMPETITION LAW**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(On behalf of the Nationwide Class against PowerSchool)**

284.   Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 189 above and incorporate the same as if set forth herein.

*285.*   California's Unfair Competition Law ("UCL") prohibits any (1) unlawful, unfair, or fraudulent business act or practice and (2) unfair, deceptive, untrue, or misleading advertising. Cal. Bus. & Prof. Code § 17200, *et seq.*

286.   PowerSchool is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

287.   PowerSchool maintains its corporate offices and principal place of business in California and the acts and omissions complained of herein were conceived of, designed, implemented, and disseminated from within California.

288.   PowerSchool violated the UCL by engaging in unlawful, unfair, and fraudulent business acts and practices.

289.   Defendant's unlawful, unfair, and deceptive acts and practices include:

a.   Failing to implement and maintain reasonable security and privacy measures to protect information entrusted to it;

b.   Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks;

c.   Failing to comply with common law and statutory duties pertaining to the security and privacy of Protected Information;

d.   Misrepresenting that it would protect the privacy and confidentiality of information entrusted to it, including by implementing and maintaining reasonable security measures;

e.   Misrepresenting that it would comply with industry standards and common law and statutory duties pertaining to the security and privacy of Protected Information;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Protected Information; and

g.    Omitting, suppressing, and concealing the material fact that it did not comply with industry standards pertaining to the security and privacy of Protected Information.

290.   PowerSchool violated the UCL by engaging in and by deceptive, untrue, or misleading advertising. PowerSchool's representations and omissions were material because they were likely to deceive the School Districts about the adequacy of PowerSchool's data security and ability to protect the confidentiality of Protected Information entrusted to it.

291.   In violation of California Business and Professional Code § 17200, *et seq.*, PowerSchool's conduct cited herein is ongoing and includes, but is not limited to, statements made by PowerSchool in its information privacy and confidentiality practices.

292.   By engaging in the acts and practices described herein, PowerSchool knowingly and/or recklessly allowed access to Protected Information in ways that Plaintiff and Class Members could not have anticipated. Plaintiff's and Class Members' interests were also violated through PowerSchool's deceptive acts in that they were induced to do business with PowerSchool based on representations as to data security protections that PowerSchool willfully chose not to implement.

293.   As a result, Plaintiff and Class Members have suffered injury-in-fact and have lost money and/or property as described herein. Such loss includes, but is not limited to, Plaintiff's and Class Members payments for data security services that they were promised but did not receive.

294.   In reasonable reliance on PowerSchool's misrepresentations and omissions, Plaintiff and Class Members paid money for PowerSchool's services with the understanding that a portion of that payment would be applied to data security when in reality Defendants diverted those funds to their own profits.

295.   PowerSchool's business acts and practices are unlawful in that they violate:

h.    Section 5 of the FTC Act, 15 U.S.C. § 45;

i.    Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*; and

j.    California Comprehensive Data Access and Fraud Act, Cal. Penal Code § 502.

296.    PowerSchool's conduct violated the spirit and letter of these laws, which are intended to protect personal information from unauthorized access.

297.    PowerSchool's conduct is unfair because it violated this public policy by, among other things, intentionally disregarding its duties to safeguard Protected Information in its custody, diverting funds intended to apply to data security to its own profits, failing to inform Plaintiff and Class Members as to material changes in its data security measures, and disregarding industry standards that it represented that it would comply with.

298.    PowerSchool's also violated the interests protected by the CDAFA, California's statutory protections against larceny and deceit, and common law protections against invasion of privacy. To establish liability under the unfair prong, Plaintiff need not establish that these statutes were actually violated, although the claims pleaded herein do so.

299.    PowerSchool's business acts and practices are unfair because they cause harm and injury in fact to Plaintiff and Class Members, and for which PowerSchool has no justification other than to increase, beyond what PowerSchool would have otherwise realized, its own profits to justify its market valuation and Bain Capital's investment.

300.    PowerSchool's conduct lacks reasonable and legitimate justification in that PowerSchool has benefited from such conduct and practice while Plaintiff and Class Members have been misled as to the nature and integrity of PowerSchool's services and have, in fact, suffered material disadvantage regarding the integrity of data that they entrusted to PowerSchool.

301.    PowerSchool's acts and practices are fraudulent within the meaning of the UCL, because they mislead Plaintiff and Class Members concerning the safety and security of information stored on PowerSchool's platform.

302.    Plaintiff and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all payments made to PowerSchool; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

**COUNT 7**
**UNJUST ENRICHMENT**
**(On behalf of the Nationwide Class against all Defendants)**

303.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 189 above and incorporates the same as if set forth herein.

304.    Plaintiff brings this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Alternative Statewide Subclasses under the laws of their respective states of residence.

305.    Plaintiff brings this claim in the alternative to Count 1, Breach of Contract, provided that Plaintiff and Class Members have no adequate remedy at law.

306.    Defendants Bain Capital and PowerSchool received monetary benefits from Plaintiff and Class Members in the form of payments made under contracts for software services that were supposed to include adequate cybersecurity protections.

307.    Defendants knowingly accepted and retained those payments while deliberately failing to provide the full scope of services promised—specifically, by under delivering or omitting contractually required cybersecurity measures.

308.    Defendants' retention of these funds was unjust, as it resulted from fraudulent misrepresentations, omissions, and systemic concealment of material facts regarding the actual quality and security of the services provided.

309.    Under principles of equity and good conscience, Defendants should not be permitted to retain the financial benefits wrongfully obtained through their deceptive and wrongful conduct.

310.    As a direct and proximate result, Plaintiff and Class Members have suffered economic harm and are entitled to restitution in an amount to be determined at trial.

**COUNT 8**
**DECLARATORY AND INJUNCTIVE RELIEF**
**28 U.S.C. §§ 2201, *et seq.***
**(On behalf of the Nationwide Class against all Defendants)**

311.   Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 189 above and incorporates the same as if set forth herein.

312.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

313.   An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard its customers' Protected Information and Defendants' failure to maintain data security measures that effectively protect Plaintiff and Class Members from further Data Breach that compromise their Protected Information. Plaintiff continue to suffer injury as a result of the compromise of their Protected Information and remain at imminent risk that further compromises of their Protected Information will occur in the future given the nature and quantity of the Protected Information stored by PowerSchool and Defendants' repeated failure to maintain adequate data security measures at PowerSchool resulting in numerous Data Breach, as described in detail herein.

314.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.   Defendants owe a legal duty to secure School Districts' Protected Information at PowerSchool and to timely notify School Districts of a data breach under the common law, Section 5 of the FTC Act;

      b.   Defendants continue to breach this legal duty by failing to employ reasonable measures to secure School Districts' Protected Information at PowerSchool; and

        c.     As a result of Defendants' ongoing breach of this legal duty, Plaintiff and Class Members remain subject to continuing and imminent risk of extortion.

315.   The Court also should issue corresponding prospective injunctive relief requiring PowerSchool to employ proper security protocols consistent with law and industry standards to protect School Districts' Protected Information.

316.   If an injunction is not issued, Plaintiff will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at PowerSchool. The risk of another such breach is real, immediate, and substantial. If another breach at PowerSchool occurs, Plaintiff will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

317.   The hardship to Plaintiff if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs at PowerSchool, Plaintiff will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

318.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at PowerSchool, thus eliminating the additional injuries that would result to Plaintiff and Class Members whose Protected Information would be further compromised.

## **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all Class Members of the proposed Nationwide Class and/or Alternative Statewide Subclass(es), respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A.      That the Court certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.      That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

C.      That the Court award Plaintiff and Class Members compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

D.      That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by PowerSchool as a result of its unlawful acts, omissions, and practices;

E.      That the Court award statutory damages, treble, and punitive or exemplary damages, to the extent permitted by law;

F.      That Plaintiff be granted the declaratory relief sought herein;

G.      That the Court award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

I.       That the Court grant all such other relief as it deems just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues so triable.

1   Dated: June 27, 2025                            Respectfully submitted,

2                                                    */s/ John Nelson*
                                                     John Nelson (SBN 317598)
3                                                    **MILBERG COLEMAN BRYSON**
                                                     **PHILLIPS GROSSMAN, PLLC**
4                                                    402 W Broadway, Suite 1760
                                                     San Diego, California 92101
5                                                    Tel: (858) 209-6941
                                                     Email: jnelson@milberg.com
6
                                                     James E. Cecchi (NJ 030861989)
7                                                    *Admitted Pro hac Vice*
                                                     Jordan M. Steele (Admitted in CA on June
8                                                    27, 2025 – Assignment of SBN Pending)
                                                     *Admitted Pro hac Vice*
9                                                    **CARELLA, BYRNE, CECCHI,**
                                                     **OLSTEIN, BRODY & AGNELLO, P.C.**
10                                                   5 Becker Farm Road
                                                     Roseland, New Jersey 07068
11                                                   Tel: (973) 994-1700
                                                     Email: jcecchi@carellabyrne.com
12                                                   Email: jsteele@carellabyrne.com

13                                                   M. Anderson Berry (SBN 262879)
                                                     **ARNOLD LAW FIRM**
14                                                   865 Howe Avenue,
                                                     Sacramento, California 95825
15                                                   Tel: (916) 777-7777
                                                     Email: aberry@justice4you.com
16
                                                     Kristen Lake Cardoso (SBN 338762)
17                                                   **KOPELOWITZ OSTROW P.A.**
                                                     One West Las Olas Blvd., Suite 500
18                                                   Fort Lauderdale, Florida 33301
                                                     Tel: (954) 525-4100
19                                                   Email: cardoso@kolawyers.com

20                                                   Tyler S. Graden (NJ 028462007)
                                                     *Admitted Pro hac Vice*
21                                                   **KESSLER TOPAZ**
                                                     **MELTZER CHECK LLP**
22                                                   280 King of Prussia Road
                                                     Radnor, Pennsylvania 19087
23                                                   Tel: (610) 667-7706
                                                     Email: tgraden@ktmc.com
24
                                                     *Attorneys for Plaintiff, Lead Counsel, and*
25                                                   *Steering Committee for the proposed*
                                                     *School District Class*
26
                                                     Michael Critchley, Sr. (NJ 251821972)
27                                                   *Pro hac Vice Forthcoming*
                                                     **CRITCHLEY & LURIA, LLC**
28

                                                     97

75 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 422-9200

*Additional Attorney for Plaintiff*