James E. Cecchi (NJ 030861989)
*Admitted Pro Hac Vice*
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com

*Lead Counsel for Plaintiffs and the School District Class Action*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: POWERSCHOOL HOLDINGS, INC. AND POWERSCHOOL GROUP, LLC CUSTOMER SECURITY BREACH LITIGATION,<br><br>*This Document Relates to the School District Class Action Track* | Case No. 25-md-3149-BEN-MSB<br><br>MDL 3149<br><br>CONSOLIDATED MDL DOCKET |

# PLAINTIFFS' BRIEF IN OPPOSITION TO THE POWERSCHOOL DEFENDANTS' MOTION TO DISMISS THE AMENDED SCHOOL DISTRICT CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Section** **Page**

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

LEGAL STANDARD ..... 5

ARGUMENT ..... 6

A. PLAINTIFFS HAVE ADEQUATELY PLED BREACH OF CONTRACT ..... 6

1. Plaintiffs Have Pled the Terms That Were Breached ..... 7

2. Plaintiffs' Damages Are Not Barred By a Limitation on Liability ..... 10

B. PLAINTIFFS' NEGLIGENCE CLAIM IS WELL PLED ..... 12

1. The Economic Loss Doctrine Does Not Apply to Plaintiffs' Negligence Claim ..... 12

2. PowerSchool Owed Plaintiffs a Duty of Care ..... 15

i. General Common Law Duty ..... 15

ii. Special Relationship ..... 18

C. POWERSCHOOL WAS UNJUSTLY ENRICHED ..... 21

D. PLAINTIFFS HAVE SUFFICIENTLY PLED THEIR CFAA CLAIMS ..... 24

1. Plaintiffs Clearly Allege that PowerSchool Accessed Protected Data Without Authorization and Exceeded Its Authorization ..... 25

2. Plaintiffs Allege that PowerSchool Acted Knowingly and Intentionally to Access Protected Data Without Consent ..... 29

3. Plaintiffs Allege Damages and Loss as Defined by the CFAA ..... 30

E. PLAINTIFFS' CDAFA CLAIM IS SUFFICIENTLY PLED ..... 32

F. PLAINTIFFS ARE ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF ........ 33

CONCLUSION ........ 35

## TABLE OF AUTHORITIES

**Case** **Page(s)**

*1410 Grand Adams, LLC v. Trematore Contsr., LLC*,
2025 N.J. Super. Unpub. LEXIS 1139 (N.J. June 24, 2025) ........ 12

*In re Accellion, Inc. Data Breach Litig.*,
713 F. Supp. 3d 623 (N.D. Cal. 2024) ........ 16, 19

*Adkins v. Everest Glob. Servs., Inc.*,
2024 WL 3887127 (D.N.J. Aug. 21, 2024) ........ 20

*In re Adobe Sys., Inc. Priv. Litig.*,
66 F. Supp. 3d 1197 (N.D. Cal. 2014) ........ 34, 35

*In re Am. Med. Collection Agency Customer Data Sec. Breach Litig.*,
2021 WL 5937742 (D.N.J. Dec. 16, 2021) ........ 14, 15, 16

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*,
2023 WL 8540911 (D.N.J. May 5, 2023) ........ 23, 24

*In re Ambry Genetics Data Breach Litig.*,
567 F. Supp. 3d 1130 (C.D. Cal. 2021) ........ 22, 23, 35

*Angelucci v. Mayorkas*,
2021 WL 4523690 (S.D. Cal. Oct. 4, 2021) ........ 6

*In re Apple Inc. Device Performance Litig.*,
347 F. Supp. 3d 434 (N.D. Cal. 2018) ........ 27

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 5, 9

*AtPac, Inc. v. Aptitude Sols., Inc.*,
730 F. Supp. 2d 1174 (E.D. Cal. 2010) ........ 28

*Bass v. Facebook, Inc.*,
394 F. Supp. 3d 1024 (N.D. Cal. 2019) ........ 11, 14, 17

*Baton v. Ledger SAS*,
740 F. Supp. 3d 847 (N.D. Cal. 2024) ........ 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 5

*Braden v. Wal-Mart Stores, Inc.*,
588 F.3d 585 (8th Cir. 2009) ....................5

*Branca v. Nordstrom, Inc.*,
2015 WL 10436858 (S.D. Cal. Oct. 9, 2015) ....................6

*Brown v. Van's Int'l Foods, Inc.*,
2022 WL 1471454 (N.D. Cal. May 10, 2022) ....................22

*Bruton v. Gerber Prod. Co.*,
703 F. App'x 468 (9th Cir. 2017) .................... 21

*Bui-Ford v. Tesla, Inc.*,
2024 WL 694485 (N.D. Cal. Feb. 20, 2024) ....................27

*C. M. v. MarinHealth Med. Grp., Inc.*,
2024 WL 217841 (N.D. Cal. 2024) ....................22

*Bon Appetit Danish, Inc. v. Delta Sys. & Automation, LLC*,
2025 WL 879553 (C.D. Cal. Mar. 10, 2025) ....................11

*Canal Ins. Co. v. Fema Trucking, LLC*,
2022 WL 3227188 (D.N.J. Aug. 10, 2022) ....................34

*In re Cap. One Consumer Data Sec. Breach Litig.*,
488 F. Supp. 3d 374 (E.D. Va. 2020) .................... 18, 22, 34

*Carr v. Oklahoma Student Loan Auth.*,
699 F. Supp. 3d 1241 (W.D. Okla. 2023) ....................34

*Celebrity Chefs Tour, LLC v. Macy's, Inc.*,
2014 WL 1664272 (S.D. Cal. Apr. 25, 2014) ....................9

*CIBC Inc. v. Grande Vill. LLC*,
2015 WL 5723135 (D.N.J. Sept. 29, 2015) ....................9

*Clark v. LG Elecs. U.S.A., Inc.*,
2013 WL 5816410 (S.D. Cal. Oct. 29, 2013) ....................6

*Clemens v. ExecuPharm, Inc.*,
678 F. Supp. 3d 629 (E.D. Pa. 2023) ....................35

*Cmty. Bank of Trenton v. Schnuck Markets, Inc.*,
887 F.3d 803 (7th Cir. 2018) .................... 14

*Coda v. Constellation Energy Power Choice, LLC*,
409 F. Supp. 3d 296 (D.N.J.) .......... 10

*Coyle v. Hornell Brewing Co.*,
2010 WL 2539386 (D.N.J. 2010) .......... 22

*Creative Computing v. Getloaded.com LLC*,
386 F.3d 930 (9th Cir. 2004) .......... 32

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) .......... 11

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*,
362 F. Supp. 3d 1295 (N.D. Ga. 2019) .......... 17

*In re Facebook Consumer Privacy User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) .......... 14

*Faistl v. Energy Plus Holdings, LLC*,
2012 WL 3835815 (D.N.J. Sept. 4, 2012) .......... 10

*Ferdous v. Hasan*,
231 N.Y.S.3d 518 (N.Y. App. Div. 2025) .......... 10

*Fero v. Excellus Health Plan, Inc.*,
236 F. Supp. 3d 735 (W.D.N.Y. 2017) .......... 20

*In re Fortra File Transfer Software Data Sec. Breach Litig.*,
749 F. Supp. 3d 1240 (S.D. Fla. 2024) .......... 16

*Gaddy v. Long & Foster Companies, Inc.*,
2022 WL 22894854 (D.N.J. Mar. 16, 2022) .......... 21, 24

*Golub v. Modern Yachts, LLC*,
2024 N.Y. Misc. LEXIS 1284 (Mar. 11, 2024) .......... 12

*Grifo & Co., PLLC v. Cloud X Partners Holdings, LLC*,
485 F. Supp. 3d 885 (E.D. Mich. 2020) .......... 20, 21

*Hanna v. Plumer*,
380 U.S. 460 (1965) .......... 9

*J'Aire Corp. v. Gregory*,
24 Cal. 3d 799 (1979) .......... 19, 20

*Jasper v. Bank of Am. Corp.*,
2020 WL 5868849 (D.N.J. Oct. 2, 2020) .......... 18

*In re K-Dur Antitrust Litig.*,
338 F. Supp. 2d 517 (D.N.J. 2004) .......... 22

*Koninklijke Philips N.V. v. Elec-Tech Intl. Co., Ltd.*,
2015 WL 1289984 (N.D. Cal. Mar. 20, 2015) .......... 24

*Law Office of Drew J. Bauman v. Hanover Insurance Co.*,
2023 WL 2238552 (D.N.J. Feb. 27, 2023) .......... 10

*In re Lenovo Adware Litig.*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) .......... 30, 31, 33

*Ltd. v. U.S. Bank Nat'l Ass'n*,
2024 WL 1381354 (S.D.N.Y. Mar. 31, 2024) .......... 15, 17

*MerkAmerica Inc. v. Dell Mktg. LP*,
2020 WL 6582665 (C.D. Cal. Nov. 10, 2020) .......... 11

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) .......... 23

*In re MOVEit Customer Data Sec. Breach Litig.*,
2025 WL 2176590 (D. Mass. July 31, 2025) .......... 34, 35

*Owens v. Gaffken & Barriger Fund, LLC*,
2009 WL 3073338 (S.D.N.Y. Sept. 21, 2009) .......... 10

*People Exp. Airlines, Inc. v. Consol. Rail Corp.*,
100 N.J. 246, 495 A.2d 107 (1985) .......... 18

*Regents of Univ. of Cal. v. Superior Court*,
4 Cal. 5th 607 (2018) .......... 12

*Robinson Helicopter Co. v. Dana Corp.*,
34 Cal. 4th 979 (2004) .......... 12

*Rudolph v. Hudson's Bay Co.*,
2019 WL 2023713 (S.D.N.Y. May 7, 2019) .......... 18

*Sackin v. TransPerfect Glob., Inc.*,
278 F. Supp. 3d 739 (S.D.N.Y. 2017) .......... 18, 22, 23

*San Miguel v. HP Inc.*,
317 F. Supp. 3d 1075 (N.D. Cal. 2018) ........ 31

*In re Sequoia Benefits & Ins. Data Breach Litig.*,
2024 WL 1091195 (N.D. Cal. Feb. 22, 2024) ........ 19

*Sovereign Bank v. BJ's Wholesale Club, Inc.*,
533 F.3d 162 (3d Cir. 2008) ........ 14

*Stasi v. Inmediata Health Grp. Corp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020) ........ 14, 16, 19

*Szaloczy v. KONE Elevators & Escalators*,
2021 WL 2680185 (D.N.J. June 29, 2021) ........ 6

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
2016 WL 2897520 (N.D. Ga. May 18, 2016) ........ 34

*Therapeutic Research Faculty v. NBTY, Inc.*,
488 F. Supp. 2d 991 (E.D. Cal. 2007) ........ 31

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*,
315 F. Supp. 3d 1147 (C.D. Cal. 2018) ........ 24, 26, 29, 32

*In re TJX Cos. Retail Sec. Breach Litig.*,
564 F.3d 489 (1st Cir. 2009) ........ 14

*Toretto v. Donnelley Fin. Sols., Inc.*,
583 F. Supp. 3d 570 (S.D.N.Y. 2022) ........ 18

*U.S. v. Nosal*,
676 F.3d 854 (9th Cir. 2012) ........ 24, 30

*U.S. v. Nosal*,
930 F. Supp. 2d 1051 (N.D. Cal. 2013) ........ 24, 30

*In re U.S. Vision Data Breach Litig.*,
2025 WL 615366 (D.N.J. Feb. 26, 2025) ........ 17

*In re Unite Here Data Sec. Incident Litig.*,
740 F. Supp. 3d 364 (S.D.N.Y. 2024) ........ 35

*Valerio v. City of N.Y.*,
2020 WL 353749 (S.D.N.Y. Jan. 21, 2020) ........ 6

*Van Buren v. U.S.*,
593 U.S. 374 (2021) ........................................ 27, 29

*Wallace v. Health Quest Sys.*,
2021 WL 1109727 (S.D.N.Y. Mar. 23, 2021) ........................................ 14, 23

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
313 F. Supp. 3d 1113 (N.D. Cal. 2018) ........................................ 19

*Young v. Facebook, Inc.*,
790 F. Supp. 2d 1110 (N.D. Cal. 2011) ........................................ 10, 29, 33

**Statutes**

28 U.S.C. § 2201 ........................................ 33, 34, 35

Computer Fraud and Abuse Act,
18 U.S.C. § 1030 ........................................ *passim*

Comprehensive Data Access and Fraud Act,
Cal. Penal Code § 502 ........................................ 2, 4, 5, 32, 33

Federal Trade Commission Act,
15 U.S.C. §§ 53 ........................................ 13, 21

Health Insurance Portability and Accountability Act of 1996,
Pub. L. No. 104-191, 110 Stat. 1936 (1996) ........................................ 13, 21

**Other Authorities**

Black's Law Dictionary (11th ed. 2019) ........................................ 32

Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U.L. Rev. 1596 (2003) ........................................ 29

# INTRODUCTION

PowerSchool Group LLC and PowerSchool Holding Inc. ("PowerSchool") collected, accessed, and then failed to safeguard school districts' highly sensitive information, including students' course enrollment and grades, attendance and discipline records, college trajectories, immutable information (such as names, parental identifiers and custodial rights, and social security numbers) and protected traits, such as disabilities, gender, and immigration status.

Plaintiffs are schools and school districts in the United States ("School Districts" or "Class Members")[1] who bring claims on their own behalf and on behalf of a class of similarly situated School Districts that paid PowerSchool for a secure administrative platform to host their confidential data. Plaintiffs and Class Members paid PowerSchool hundreds of millions of dollars annually and fulfilled their obligations under their contracts. PowerSchool made contractual promises in return; misrepresenting that it would implement and periodically review access restrictions, provide industry standard data protections, and abide by nationally recognized cybersecurity frameworks. Plaintiffs seek to recover the full benefit of their bargain through overpayment damages and restitution, consequential damages arising from the data breach, and injunctive relief to prevent another data security incident at PowerSchool.

PowerSchool's Motion to Dismiss ("Motion" or "Mot.") scarcely engages with Plaintiffs' allegations, and its arguments are readily countered: (1) Plaintiffs identified the specific contracts at issue, the contractual provisions breached, and plead conduct falling under exceptions for any limitation on liability; (2) PowerSchool acted negligently by

[1] References to "¶__" cite to the corresponding paragraphs in the School District Amended Class Action Complaint [Dkt. 263] ("Complaint"). The terms "Class" and "School Districts" are defined to include: "All School Districts in the United States that contracted with PowerSchool to provide a Student Information System." ¶ 136. The term "Plaintiffs" includes seven School Districts in New York and New Jersey: Brooklyn Laboratory Charter Schools, The Academy Charter School, The Academy Charter School 2, Gateway Academy Charter School, BRICK Buffalo Academy Charter School, Our World Neighborhood Charter Schools, and Irvington Public Schools.

failing to impose access restrictions and deploy adequate defenses, and the economic loss doctrine does not apply because PowerSchool had both a common law duty and duty arising from its special relationship with the School Districts that is independent of any contract; (3) PowerSchool was unjustly enriched, although a valid contract exists PowerSchool denies its validity and applicability, and so the claim may proceed as an independent cause of action; (4) Plaintiffs properly invoke the federal Computer Fraud and Abuse Act ("CFAA") and its California analogue, the Comprehensive Data Access and Fraud Act ("CDAFA"), because PowerSchool violated access restrictions that these statutes are designed to address; and (5) Plaintiffs' claims for injunctive and declaratory relief are well pled as Plaintiffs allege "imminent" and "substantial" harm, and allege that multiple School Districts have already been extorted.[2] Each of these arguments is handled in turn; PowerSchool's Motion should be denied in its entirety.

**FACTUAL BACKGROUND**

PowerSchool is the largest education technology ("EdTech") company in United States, serving more than 18,000 customers, including over 90 of the 100 largest school districts by student enrollment in the United States. ¶¶ 16, 172(a). The backbone of PowerSchool's product suite is its Student Information System ("SIS")—a database housing highly sensitive data relating to students, school teachers, and administrative matters. ¶¶ 1, 124. The SIS enables school districts to manage student records, provide grades and assignments, mark attendance, and allows educators, students, and parents to schedule their children's education-related tasks. ¶ 27.

PowerSchool is highly regulated because it collects, processes, and is tasked with protecting data pertaining to children ("Protected Data" or "Data"). ¶¶ 50, 51, 129. Accordingly, PowerSchool recognized that it is "critical to ensure" that school districts

[2] After meeting and conferring with PowerSchool pursuant to this Court's Case Management Order No. 6, and in order to streamline the issues to be decided by the Court, Plaintiffs have agreed to voluntarily dismiss their claims for violations of the California Unfair Competition Law (Count 6), but reserve the right to reassert this claim in a future amendment on behalf of any plaintiff located in California.

partner "with EdTech platform vendors that prioritize student data security." ¶ 29. PowerSchool made countless similar representations to School Districts through its website, during summits and conferences, throughout informational and marketing materials, and in each Data Privacy Agreement ("DPA") that PowerSchool is "committed to being a good custodian of student data, taking all reasonable and appropriate countermeasures to ensure data confidentiality, integrity, and availability." ¶¶ 27-37, 66.

The DPAs are expressly incorporated into Main Service Agreements ("MSAs") that are executed by School Districts when purchasing or leasing PowerSchool's SIS (the "Contracts" as defined in the Complaint). ¶ 66. In the Contracts, PowerSchool also committed to abide by cybersecurity frameworks including those issued by the National Institute of Standards and Technology ("NIST"), International Organization for Standardization ("ISO") in 27001, and/or that it was in compliance with Service Organization Control 2 ("SOC 2"). ¶ 67. Under these frameworks, PowerSchool promised to secure the Data with basic, industry standard protections, including multi-factor authentication ("MFA") and password rotation, endpoint protection for suspicious network activity, monthly access review and approval for personnel, and encryption of identifiable data in motion or use. ¶¶ 1, 39, 68, 69.

On August 16, 2024, PowerSchool's SIS was breached through its support portal, with the actor utilizing a maintenance access tool ("Backdoor Access Tool") installed by default as part of PowerSchool's installation process; this Backdoor Access Tool provided PowerSchool with complete, unrestricted, access to the Protected Data. ¶¶ 46-48. This breach occurred only three days after PowerSchool laid off over five percent of its workforce at the direction of Defendant Bain Capital, L.P. ("Bain"). ¶ 108.

On September 17, 2024, a second breach occurred, this time by the hacker Matthew Lane, a nineteen-year-old college student. ¶¶ 17, 47. This breach, and the earlier breach, went completely undetected by PowerSchool. ¶¶ 46-48. On December 19, 2024, Matthew Lane and his accomplices ("Threat Actors") again logged into the compromised maintenance account through a server in Ukraine, but this time, the Threat Actors exported

all of the Protected Data in the SIS, including extremely sensitive information for approximately 62.4 million schoolchildren in kindergarten through the twelfth grade ("K-12") and their parents, as well as 9.5 million teachers and administrators for K-12 schools. ¶¶ 3-4, 27. Nine days later, on December 28, 2024, the Threat Actors informed PowerSchool that they stole the Protected Data—the first time PowerSchool learned that its systems were compromised—in order to demand a ransom for $2.85 million dollars payable in Bitcoin (referred to as the "Data Breach"). ¶¶ 41, 48.

The Threat Actors accomplished the Data Breach by logging into the same previously-compromised maintenance account lacking MFA, an elementary attack that required only one password. ¶¶ 46, 87-90. The compromised account belonged to a subcontractor for PowerSchool's cloud operations, Movate, Inc. ("Movate"), a Microsoft Gold Partner, and its offshore affiliate companies.[3] *Id.* More specifically, the account belonged to a foreign contractor in the Philippines who was employed by Movate to provide maintenance and technical support for PowerSchool—an allegation that has not been denied by PowerSchool, Bain, nor Movate.[4] *Id.* PowerSchool first announced the Data Breach on January 7, 2025, after paying the ransom demanded by the Threat Actors. ¶¶ 2, 40. In the ensuing months, the Threat Actors extorted multiple school districts for ransom—making it apparent that the Protected Data was not deleted and that the threat of further ransom attacks is imminent and substantial. ¶¶ 111-20.

In the wake of the Data Breach, it is also apparent that PowerSchool failed to implement basic cybersecurity protocols. ¶¶ 4, 6-7. For example, while the Protected Data was encrypted at rest, when PowerSchool personnel logged into the SIS, the Data became fully *decrypted* and *accessible* thus allowing contractors—here, a foreign national located in the Philippines—the capability to access, review, and export extremely detailed records

[3] The Protected Data is stored: (1) on Microsoft Azure, PowerSchool's optional cloud-based vendor; and (2) locally, on-premise, on servers hosted by the School Districts.

[4] *See generally* Mot.; motions to dismiss filed by Defendants Bain Capital, L.P. (Dkt. 303), and Movate, Inc. (Dkt. 317 at 4) (Movate, does not deny that a "Movate employee working from the Philippines . . . had access to PowerSchool's Student Information System.").

for over seventy million Americans. ¶¶ 1, 39, 89. PowerSchool provided this access to its personnel with no threat monitoring, no endpoint detection, no password rotation, no access controls, no review of administrative privileges, no server authentication, no segmentation of its database, no MFA, no encryption of data in motion or use—and most alarmingly—there was no system in place to alert PowerSchool when its personnel acquired local copies of the Protected Data even when it consisted of the entire SIS database.[5] ¶¶ 68-70, 93.

Plaintiffs are putative class representatives consisting of seven schools and school districts in New Jersey and New York. ¶¶ 20-26. Each Plaintiff contracted with PowerSchool to provide and maintain the SIS. *Id.* PowerSchool is correct that the "putative class is not limited to school districts with users of PowerSchool's SIS whose Data was actually involved in the Incident[.]" Mot. at 5. Plaintiffs and Class Members paid PowerSchool billions of dollars in aggregate for a "secure and reliable" platform and to provide "technical support services," but failed to receive the software and services as promised. ¶¶ 124-26. Plaintiffs seek overpayment and restitution damages arising from PowerSchool's breaches of contract and other unlawful conduct, as well as compensation for the time and resources diverted when responding to the Data Breach. ¶ 8. Plaintiffs also seek injunctive relief to protect their data, personnel, and students from further harm. *Id.*

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint only requires "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[6] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Complaints "should be read as a whole" and "not parsed piece by piece to determine whether each allegation, in

[5] To the extent that PowerSchool had any of these protections in place, Plaintiffs have also alleged that these protections were materially inadequate. ¶ 182.

[6] Throughout this brief, case citations omit internal citations and internal quotation marks, and emphasis is added unless otherwise noted.

isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). In reviewing the plausibility of a complaint on a motion to dismiss, courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *See Branca v. Nordstrom, Inc.*, 2015 WL 10436858, at *2 (S.D. Cal. Oct. 9, 2015) (citing *Cahill v. Liberty Mut. Ins. Co*., 80 F.3d 336, 337-38 (9th Cir. 1996)). Factual disputes are inappropriate for consideration on a motion to dismiss. *See, e.g.*, *Angelucci v. Mayorkas*, 2021 WL 4523690, at *3 (S.D. Cal. Oct. 4, 2021). In determining the propriety of a Rule 12(b)(6) dismissal, courts generally may not look beyond the complaint for additional facts. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

## ARGUMENT

### A. PLAINTIFFS HAVE ADEQUATELY PLED BREACH OF CONTRACT

The primary basis that PowerSchool raises to dismiss Plaintiffs' breach of contact claim is premised on its assertion that Plaintiffs purportedly "fail to identify the terms of the contracts they claim were breached." Mot. at 8. By making this strategic decision to ignore the relevant, plainly identifiable portions of the Complaint detailing PowerSchool's breach of its contractual obligations, PowerSchool has waived any argument that Plaintiffs have not plausibly alleged a breach of those specific terms. *See, e.g.*, *Clark v. LG Elecs. U.S.A., Inc.*, 2013 WL 5816410, at *7 n.8 (S.D. Cal. Oct. 29, 2013) (quoting *United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006)) ("[A]rguments not raised by a party in its o[p]ening brief are deemed waived."); *Szaloczy v. KONE Elevators & Escalators*, 2021 WL 2680185, at *5 (D.N.J. June 29, 2021) (argument not addressed in the opening motion to dismiss brief waived even if it has merit) (collecting cases); *Valerio v. City of N.Y.*, 2020 WL 353749, at *5 (S.D.N.Y. Jan. 21, 2020) ("Defendants had ample opportunity to raise this issue in the opening brief and failed to do so. It is therefore forfeited for the purposes of the motion to dismiss.").

PowerSchool's additional argument for dismissal—that the damages sought by Plaintiffs are barred—ignores the clear exception found in the limitation of liability in its

Contracts. Accordingly, as detailed below, the Court needs to look no further than the Complaint to deny PowerSchool's Motion and allow Plaintiffs' contract claim to proceed.

**1. Plaintiffs Have Pled the Terms That Were Breached**

At the outset of the Complaint, Plaintiffs plainly allege that PowerSchool failed to honor essential elements of its contracts by failing to secure the data with "multi-factor authentication and password rotation for its contractors, endpoint protection for suspicious network activity, and encryption of identifiable data in motion or use." ¶¶ 1, 5 ("Despite contractual obligations to limit PowerSchool's access to only encrypted, anonymized, or de-identified data—and to obtain consent from the School Districts before accessing unencrypted or identifiable information—PowerSchool failed to uphold these obligations."). Plaintiffs also unmistakably allege that the MSAs, which incorporate the DPAs, that Plaintiffs collectively define as the operative "Contracts," form the basis of the contractual agreement between PowerSchool and the School Districts. ¶ 66. Indeed, PowerSchool admits as much, recognizing:

> Plaintiffs allege that they and PowerSchool are parties to written agreements that govern the services that PowerSchool provides to them, consisting of a Main Services Agreement ("MSA"), which incorporates a state-specific Data Privacy Agreement ("DPA") that sets forth PowerSchool's obligations related to customer data.

Mot. at 4 (citing ¶ 66). PowerSchool also submits a copy of the 2024 MSA, as well as the New York and New Jersey DPAs as exhibits to the Declaration of Anne Johnson Palmer, plainly recognizing that these contracts control and undeniably aware of the terms of each. ECF No. 302-3 to 302-5, Ex. A-C. Plaintiffs' re-submit those exhibits with highlighting of relevant contractual language and provisions.[7]

Moreover, not only do Plaintiffs allege that PowerSchool breached the MSA and incorporated DPAs, but Plaintiffs also point to specific contractual requirements in the Contracts that PowerSchool failed to perform. For example, Plaintiffs allege that PowerSchool was breached its Contracts because PowerSchool was required but failed to:

[7] *See* Declaration of James E. Cecchi in Support of Plaintiffs' Opposition: Exhibit A is the 2024 MSA; Exhibit B is the New Jersey DPA; and Exhibit C is the New York DPA.

- Comply with industry standards relating to data security, including NIST and/or ISO 27001:2103, and be Service Organization Control 2 ("SOC 2") certified, all of which require that PowerSchool implement MFA, encrypt data in motion or use, limit access to sensitive information to only essential employees, monitor its networks for unusual activity or transfer of large volumes of data, and ensure that employees are adequately trained. ¶¶ 67, 69-73, ¶ 153(c); NY DPA at 4-5; NJ DPA at 5, 9, 12.
- Secure usernames, passwords, or any other means of gaining access to the SIS or customer data. ¶¶ 68(a), 153(c); NY DPA at 4,122; NJ DPA at 9.
- Only provide access to customer data to employees or contractors who require access pursuant to the Contracts, and only on terms consistent with or exceeding the data security measures required by the DPAs. ¶¶ 68(a), 153(b); MSA at 5.
- Maintain security protocols that meet industry standards in the transfer or transmission of data, including ensuring that the data would be encrypted, de-identified, and thus inaccessible to PowerSchool personnel. ¶¶ 68(b), 153(b)-(c); NY DPA at 16; NJ DPA at 9, 12.
- Employ industry standard measures to protect data from unauthorized access, such as server authentication and malware detection software. ¶¶ 68(c), 153(f); NY DPA at 4, 16; NJ DPA at 9, 12.
- Log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability of customer data, including monitoring to identify potential threats such as unauthorized downloads. ¶¶ 68(d), 153(f); NY DPA at 4, 16; NJ DPA at 9, 12.
- Review compliance monitoring and assessments of vendor-data subprocessors to determine their compliance, including that those contractors implemented MFS protection and other industry standard data practices. ¶¶ 68(e), 153 (b); NY DPA at 16; NJ DPA at 5, 9, 12.
- Periodically conduct digital and physical risk assessments and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner. ¶¶ 68(f), 15(e)-(f); NY DPA at 4-5; NJ DPA at 5, 9.
- Follow established access security policies to support the confidentiality, integrity, and availability of data against risks, and refuse to engage with threat actors during a ransom attack. ¶¶ 68(g), 153(e); NY DPA at 4; NJ DPA at 9.
- Notify victims of a security breach of customer data not later than three business days and take reasonable steps to mitigate the breach ¶¶ 78-79, 153(e); NY DPA at 5-6; NJ DPA at 5, 12.
- Obtain the School Districts' consent for certain access or use of their Data. ¶¶ 68(b), 153(d); NY DPA at 3; NJ DPA at 4.

Ultimately, PowerSchool failed to safeguard the confidential, private, and sensitive data it obtained from Plaintiffs and the class, a material term, and an essential purpose of the Contracts. ¶ 153(a). *See also* MSA at 4 ("PowerSchool will ensure that its use of the Customer Data always complies with this Agreement, PowerSchool's privacy statement, and all applicable laws, regulations, and conventions"). Despite acknowledging that the

MSA and incorporated DPAs control, ***PowerSchool does not deny that the MSA and DPAs required that PowerSchool comply with these provisions, nor does it deny that these provisions were breached***. Instead, PowerSchool feigns ignorance, tellingly ignoring Plaintiffs' allegations and failing to grapple with obligations that it cannot deny existed.

Plaintiffs' pleading of PowerSchool's contractual responsibilities throughout the Complaint fully satisfies applicable pleading standards, as Plaintiffs have unquestionably put PowerSchool on notice as to the substance of the material terms that Plaintiffs allege PowerSchool has breached. *See Hanna v. Plumer*, 380 U.S. 460, 465-66 (1965) (advising that "federal courts are to apply state substantive law and federal procedural law"). As Judge Hayes recently recognized in *Grapevine Education, LLC v. Education Ventures, LLC*, it is well established under federal pleading standards that "[t]o plead the existence of a contract, the plaintiff may set forth the terms of the contract verbatim, attach the contract as an exhibit to the pleading, or plead it according to its legal effect—*i.e.*, allege the substance of its material terms." 2023 WL 6536237, at *3 (S.D. Cal. Aug. 21, 2023). *See also Celebrity Chefs Tour, LLC v. Macy's, Inc.*, 2014 WL 1664272, at *4 (S.D. Cal. Apr. 25, 2014) ("[F]ederal courts 'have generally recognized that relatively simple allegations will suffice to plead a breach of contract claim even post-*Twombly* and *Iqbal*.'") (quoting *Comfort Inn Oceanside v. Hertz Corp*., 2011 WL 5238658, at *7 (E.D.N.Y. Nov. 1, 2011)). Plaintiffs need not "quote the exact language in the agreement," but instead need only identify the substance of the contractual provisions they allege have been breached sufficient to put the responding party on notice. *CIBC Inc. v. Grande Vill. LLC*, 2015 WL 5723135, at *6 (D.N.J. Sept. 29, 2015). The Complaint identifies the specific contracts at issue and the substance of the contract provisions that were breached, thus putting PowerSchool on notice as to the breach of contract claim. Nothing more is required.

PowerSchool's cited authority does not hold otherwise and, in fact, supports Plaintiffs' position. For example, in *Eprotec Preservation, Inc. v. Engineered Materials, Inc.*, the District of New Jersey court found that the plaintiff's description of the contractual terms in its complaint without verbatim recitation or specific citation to contract was

sufficient. 2011 WL 867542, at *8 (D.N.J. Mar. 9, 2011) (finding allegation that the "[defendant] failed to perform obligations under the License Agreement, including, without limitation, honoring its obligation to provide EP with an exclusive license for the IP for consumer applications of the IP" sufficient). What the *Eprotec Preservation* court found insufficient were allegations regarding other provisions of the contract that were "vaguely drafted to the point of incoherence."[8] *Id.* Similarly, in *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D. Cal. 2011), the plaintiff merely alleged that the defendant "did not perform in accordance with the terms of agreement . . . by arbitrarily and impulsively handling Plaintiff's member account," providing far less detail about the material terms of the contract than those Plaintiffs allege PowerSchool breached. In *Owens v. Gaffken & Barriger Fund, LLC*, 2009 WL 3073338, at *14 (S.D.N.Y. Sept. 21, 2009), the plaintiff failed to even "allege the existence of a contract."[9] As detailed above, none of these issues are at play here.

**2. Plaintiffs' Damages Are Not Barred By a Limitation on Liability**

"Based upon PowerSchool's material breaches of the Contracts, Plaintiffs and Class Members seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate Plaintiffs and Class Members for their injuries as permitted by law." ¶ 158. Contrary to PowerSchool's argument, the foregoing alleged damages are not barred in part by the

---

[8] The same was true in *Faistl v. Energy Plus Holdings, LLC*, 2012 WL 3835815, at *7 (D.N.J. Sept. 4, 2012)—where the complaint was so vague that it was unclear which particular defendant the plaintiff claimed breached the agreement, which agreement controlled, and what provisions were alleged to be breached—and in *Ferdous v. Hasan*, 231 N.Y.S.3d 518, 522 (N.Y. App. Div. 2025), a New York state court case, where the court summarily dismissed a breach of contract claim brought by a former employee and residential tenant who wholly "failed to identify any specific provisions of the parties' contract or contracts which were alleged to have been breached." Similarly, in *Law Office of Drew J. Bauman v. Hanover Insurance Co.*, 2023 WL 2238552, at *3 (D.N.J. Feb. 27, 2023), the plaintiffs only made "the conclusory assertion that the [] Defendants 'have breached the contract of insurance . . . by refusing or failing to fully perform' under it."

[9] In *Coda v. Constellation Energy Power Choice, LLC*, 409 F. Supp. 3d 296, 303 (D.N.J.), the court did not find that the terms allegedly breached were insufficiently pled, but instead disagreed with the plaintiffs' interpretation of the relevant provisions.

MSA's limitation of liability clause because the MSA also unequivocally provides that any liability arising from PowerSchool's gross negligence, willful misconduct, or fraud ***are exempt*** from the limitation of liability provision:

> **11.3 EXCEPTIONS**. THE FOREGOING LIMITATIONS SHALL NOT APPLY TO LIABILITY ARISING OUT OF A PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD.

*See* MSA at § 11.3. Plaintiffs allege that PowerSchool materially breached the Contracts with Plaintiffs and Class Members by deliberately allowing its personnel to have broad, unfettered access to the Data despite PowerSchool's contractual restrictions, which proximately caused the Data Breach. *See, e.g.*, ¶¶ 7, 46, 88, 153(b). The foregoing facts allege willful or grossly negligent conduct, which precludes application of the limitation of liability clause to Plaintiffs' breach of contract claim damages. In *Civic Ctr. Drive Apartments Ltd. P'ship v. Sw. Bell Video Servs.*, the Northern District of California noted "a limitation of liability provision may be unenforceable if it is in violation of public policy, *even if* the plaintiff asserts only a breach of contract claim." 295 F. Supp. 2d 1091, 1106 (N.D. Cal. 2003). Moreover, courts allow breach of contract claims to proceed to summary judgment where intentional conduct is alleged, as here. *See Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1084–85 (N.D. Cal. 2023), *motion to certify appeal denied*, 2024 WL 4375776 (N.D. Cal. Oct. 2, 2024) ("Given the . . . the intentional conduct alleged (distinguishing this case from *Bass*), the breach of contract claims will not be dismissed based on the limitation of liability clause."); *c.f.*, *Bon Appetit Danish, Inc. v. Delta Sys. & Automation, LLC*, 2025 WL 879553, at *7 n.11 (C.D. Cal. Mar. 10, 2025), *reconsideration denied*, 2025 WL 1356930 (C.D. Cal. Apr. 1, 2025) (finding plaintiff failed to establish contract was breached with willful intent or gross negligence to overcome contract's limitation of liability provision).[10] Additionally, a limitation of liability clause does not extend to bar recovery for statutory or regulatory violations. *See MerkAmerica Inc. v. Dell*

[10] The limitation of liability clause is also inapplicable to Plaintiffs' negligence damages, which are also based on PowerSchool's willful or grossly negligent conduct. ¶ 168 (repeating and realleging paragraphs 7, 46, and 88 of the Complaint).

*Mktg. LP*, 2020 WL 6582665, at *3 (C.D. Cal. Nov. 10, 2020) (citing to *Health Net of Cal., Inc. v. Dep't of Health Servs.*, 113 Cal. App. 4th 224, 233 (2003) ("[S]ection 1668 prohibits the enforcement of any contractual clause that seeks to exempt a party from liability for violations of statutory and regulatory law[.]")).

## B. PLAINTIFFS' NEGLIGENCE CLAIM IS WELL PLED

### 1. The Economic Loss Doctrine Does Not Apply to Plaintiffs' Negligence Claim

The economic loss doctrine does not apply under California, New Jersey, or New York law where a defendant has a legal duty that is independent of any contract. *See, e.g.*, *1410 Grand Adams, LLC v. Trematore Contsr., LLC*, 2025 N.J. Super. Unpub. LEXIS 1139, at *25-26 (N.J. June 24, 2025) (stating the existence of an independent duty is an exception to the economic loss doctrine); *Golub v. Modern Yachts, LLC*, 2024 N.Y. Misc. LEXIS 1284, *32 (Mar. 11, 2024) (recognizing the established principle that "a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated"); *Robinson Helicopter Co. v. Dana Corp.*, 34 Cal. 4th 979, 990 (2004) (holding economic loss rule did not bar plaintiff's tort claims because they were independent of the defendant's breach of contract).

The existence of an independent tort duty is determined based on several factors, including the foreseeability of harm, the nature of the injury, the closeness of the connection between the defendant's conduct and the injury sustained, the moral blame attached to defendant's conduct, the policy of preventing future harm, the burden to defendant contrasted with the consequences to the community of imposing a duty and liability for its breach, and the availability of insurance to cover any risk involved. *See Regents of Univ. of Cal. v. Superior Court*, 4 Cal. 5th 607, 628 (2018); *see also Golub*, 2024 N.Y. Misc. LEXIS 1284, at *32 ("In determining whether a defendant owes a duty of care distinct from the parties' contract, the court must look to the nature of the services performed and the defendant's relationship with its customer, as well as the nature of the injury, the manner in which the injury occurred and the resulting harm.") (cleaned up).

Here, Plaintiffs were required to provide sensitive Data to use PowerSchool's SIS, and did so pursuant to PowerSchool's agreement to collect, encrypt, de-identify, and safely store their Data. ¶ 170. In addition to PowerSchool's contractual duties to protect Plaintiffs' and Class Members' Data, Plaintiffs allege PowerSchool had a duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, and deleting the Data in its possession from being compromised, lost, stolen, accessed, or misused by unauthorized persons, and to refrain from accessing, viewing, and/or using unencrypted and identifiable Data. ¶ 171. Plaintiffs allege this duty arose from several sources independent of their contracts with PowerSchool, including: (1) PowerSchool holding itself out as a protector of consumer data, even advertising its privacy and cybersecurity pledges and accolades on its website; (2) Section 5 of the FTC Act and similar state statutes; (3) HIPAA; and (4) state statutes requiring PowerSchool to reasonably safeguard sensitive Data.

Plaintiffs also allege PowerSchool had a duty independent of its contracts with Plaintiffs and Class Members to prevent foreseeable harm to Plaintiffs and Class Members, as they were the foreseeable and probable victims of any inadequate security practices. ¶ 174. PowerSchool "had full knowledge of the sensitivity of the Data and the types of harm that Plaintiffs and Class Members could and would suffer if the Data were wrongfully disclosed." ¶ 170; *see also* ¶¶ 181-182. It was foreseeable that Plaintiffs and Class Members would be injured from PowerSchool's violation of its duties in mishandling the Data.

Further, Plaintiffs allege PowerSchool voluntarily solicited and accepted Plaintiffs' and Class Members' Data, and that Plaintiffs and Class Members relied on PowerSchool to exercise its professional judgment to safeguard that Data from unauthorized access, based on PowerSchool's misrepresentations regarding its purported expertise in data security and unique position to guard against the Data Breach. ¶ 175.

Plaintiffs also claim PowerSchool's duty to implement and maintain reasonable security measures arose from their special relationship between PowerSchool, Plaintiffs, and Class Members, because Plaintiffs and Class Members entrusted PowerSchool with their Data as part of the purchase and subsequent use of the services that PowerSchool

offers as a major EdTech company. ¶ 176. "Public policy also recognizes that companies and agencies have legal and moral obligations to protect personal information with reasonable and appropriate safeguards." *Id.*

These independent duties relating to the safekeeping of sensitive Data are untethered to any contract between PowerSchool and Plaintiffs, and Class Members. ¶ 179. Indeed, courts recognize an independent duty to handle sensitive information with due care consistent with industry standards, to prevent foreseeable harm from a breach. *See Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 915 (S.D. Cal. 2020) (finding plaintiffs plausibly alleged breach of duty to protect their personal information); *In re Facebook Consumer Privacy User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (holding data breach plaintiffs sufficiently alleged breach of duty owed to them); *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019) (finding the failure to impose an independent duty "would create perverse incentives for businesses who profit off the use of consumers' personal data to turn a blind eye and ignore known security risks"); *Wallace v. Health Quest Sys.*, 2021 WL 1109727, at *9 (S.D.N.Y. Mar. 23, 2021) (finding economic loss rule inapplicable where plaintiffs alleged defendant had duties to safeguard private information separate from any duty that may have been created by contract); *In re Am. Med. Collection Agency Customer Data Sec. Breach Litig.*, 2021 WL 5937742, at *16 n.29 (D.N.J. Dec. 16, 2021) (economic loss doctrine would not bar claims under New Jersey law because plaintiffs were an "identifiable class that the defendant should have reasonably foreseen was likely to be injured by the defendant's conduct"). Because PowerSchool's tort duty arose from its statutory violations, as well as social duties based on sound public policies, Plaintiffs sufficiently state a claim for negligence independent from any contract, and the economic loss doctrine does not apply.

PowerSchool's cited cases are inapposite. The plaintiffs in *Cmty. Bank of Trenton v. Schnuck Markets, Inc.*, 887 F.3d 803 (7th Cir. 2018), *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489 (1st Cir. 2009), and *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162 (3d Cir. 2008), were card-issuing banks that sued the defendant-retailers for

claims arising from the banks' indemnification of their card-holding customers for losses resulting from the retailers' data breaches and, thus, are inapplicable for that reasons alone. Furthermore, none of these cases applied the economic loss rule under California, New Jersey, or New York law that PowerSchool argues applies to Plaintiffs' claims.

Finally, PowerSchool's argument that Plaintiffs' negligence claim should be dismissed as duplicative of their breach of contract claims should be rejected. Unlike in *Triaxx Prime CDO 2006-1 Ltd. v. U.S. Bank Nat'l Ass'n*, 2024 WL 1381354, at *15 (S.D.N.Y. Mar. 31, 2024), Plaintiffs' negligence and breach of contract claims are not "based on the same misconduct" and "for the same injury" because PowerSchool had independent duties to safeguard Plaintiffs' information. Mot. at 19 (citing *Triaxx Prime CDO 2006-1 Ltd.*, 2024 WL 1381354, at *15). *See, e.g.*, ¶¶ 151-155 (outlining PowerSchool's breach of contractual terms governing customer data provided to PowerSchool); ¶¶ 156-158 (asserting monetary and other damage based on PowerSchool's breach of the Contracts); ¶¶ 169-183 (asserting breach of duty to exercise reasonable care, prevent foreseeable harm, independent from contractual duties). PowerSchool's motion to dismiss Plaintiffs' negligence claims based on the economic loss doctrine should be denied.

**2. PowerSchool Owed Plaintiffs a Duty of Care**

PowerSchool also argues that Plaintiffs' negligence claim should be dismissed because of a failure to "plausibly allege[] that PowerSchool owed them a duty beyond its contractual obligations." Mot. at 19. PowerSchool implies that there is no general common law duty to safeguard personal information, which is incorrect, and wrongly states that if such duty existed, it would be owed to the individual students and teachers and not to the schools and school districts (*i.e.*, Plaintiffs). Mot. at 19. This argument is misplaced.

**i. General Common Law Duty**

Courts consistently hold that there is a general common law duty to safeguard personal and sensitive information of the type taken in this Data Breach. *See In re Am. Med. Collection Agency, Inc.*, 2021 WL 5937742, at *14-15 ("Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, securing,

safeguarding, storing, and protecting Plaintiffs' and Class Members' Personal Information within their control from being compromised, lost, stolen, accessed and misused by unauthorized persons"). In *Am Med.*, the court stated explicitly in finding the existence of such a duty that "[c]ourts that have considered this argument in similar data breach cases have reached the same conclusion." *Id.* (collecting cases); *see also In re Fortra File Transfer Software Data Sec. Breach Litig.*, 749 F. Supp. 3d 1240, 1263 (S.D. Fla. 2024) ("It is well-established that under federal law, entities which collect sensitive, private data from consumers and store such data on their networks have a duty to protect the information. . . . ***Where a defendant's conduct creates a foreseeable zone of risk***, the law will recognize a duty placed upon [the] defendant either to lessen the risk or [to] see that sufficient precautions are taken to protect others from the harm that the risk poses.").

As to PowerSchool's claim that it only owed a duty, if any, to the individual students and teachers, PowerSchool acknowledged that Plaintiffs "own their student and school data." ¶ 29; *see also* ¶¶ 191-194. Because Plaintiffs own the data that PowerSchool collected, processed, managed, maintained, and stored, PowerSchool owed a duty of care to the School Districts. *Compare In re Accellion, Inc. Data Breach Litig.*, 713 F. Supp. 3d 623, 634 (N.D. Cal. 2024), *reconsideration denied*, 2024 WL 4592367 (N.D. Cal. Oct. 28, 2024) ("[F]ederal courts applying California law have not hesitated to extend a data company's duty of care beyond those with whom it shares privity or exceeds some threshold level of interactions.") *See also Stasi*, 501 F. Supp. 3d at 915 (finding that defendant healthcare software company "owed a duty to protect Plaintiffs' information despite the fact that Plaintiffs were not [the defendant's] customers or otherwise in privity with [defendant]"); *Castillo*, 2016 WL 9280242, at *3 (finding that defendant was "duty-bound to take reasonable steps to protect all personal identifying information it obtained from its employees, including information pertaining to employees' spouses and dependents"); *Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 908 (N.D. Cal. 2024) (denying motion to dismiss a negligence claim, explaining that "it is foreseeable that companies dealing with PII must implement adequate security practices and must exercise reasonable care in

ascertaining which subcontractors/vendors and employees they choose to work with, especially when sharing customers' PII with said vendors").

In addition to owning the data that was breached, it is Plaintiffs and members of the Class that have received, and will continue to be subjected to, ransom demands from the hackers, their affiliates, and/or other bad actors. *See, e.g.*, ¶¶ 3, 118-19. Finally, Plaintiffs clearly have alleged that they suffered damages because of PowerSchool's breach of its duty to safeguard the data, including "time and resources the School Districts were required to divert responding to the Data Breach." ¶¶ 8, 127. Thus, Plaintiffs were within the foreseeable scope of parties that could be harmed by PowerSchool's failure to properly secure the sensitive and personal data it collected and stored such that it is proper to find that PowerSchool owed School Districts a duty of care, especially because PowerSchool profited off the payments made by Plaintiffs themselves. *See Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019) ("From a policy standpoint, to hold that Facebook has no duty of care here would create perverse incentives for businesses who profit off the use of consumers' personal data to turn a blind eye and ignore known security risks."); *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1325 (N.D. Ga. 2019) ("As such, plaintiff Adkins has met his obligation to plausibly plead duty of care.").

PowerSchool's reliance on different cases does not change this conclusion. For example, *Triaxx Prime CDO 2006-1 Ltd. v. U.S. Bank Nat'l Ass'n*, 2024 WL 1381354 (S.D.N.Y. Mar. 31, 2024), is not a data breach case. Nevertheless, the court implied that a duty could be established if "plaintiffs [had] explained how they—as opposed to the CDO Noteholders—are harmed by U.S. Bank's alleged negligence." *Id.* at *15. While *In re U.S. Vision Data Breach Litig.*, 2025 WL 615366 (D.N.J. Feb. 26, 2025), did involve a data breach, the court found no duty based on an artificial distinction between the defendant who was the "storing entity" and did not owe a duty versus the defendant who actually collected plaintiffs' PII/PHI who did owe a duty. Here, PowerSchool was both the collecting and the storing entity and therefore owed a duty to Plaintiffs even based on the reasoning of the *U.S. Vision* court.

### ii. Special Relationship

Next, PowerSchool asserts that there is no special relationship here that could create a duty of care (Mot. at 20), but PowerSchool ignores any analysis of what it takes to establish a special relationship. For example, under New Jersey law "[c]ourts have justified their finding of liability in these negligence cases based on notions of a special relationship between the negligent tortfeasors and the foreseeable plaintiffs who relied on the quality of defendants' work or services, to their detriment. The special relationship, in reality, is an expression of the courts' satisfaction that a duty of care existed because the plaintiffs were particularly foreseeable and the injury was proximately caused by the defendant's negligence." *People Exp. Airlines, Inc. v. Consol. Rail Corp.*, 100 N.J. 246, 256-57, 495 A.2d 107, 112 (1985); *see also Jasper v. Bank of Am. Corp.*, 2020 WL 5868849, at *3 (D.N.J. Oct. 2, 2020) ("Under New Jersey's economic loss doctrine, in negligence cases alleging economic damages aside from physical injury, a defendant owes a duty of care to plaintiffs comprising an identifiable class with respect to whom defendant knows or has reason to know are likely to suffer such damages from its conduct.").

In New York, no analysis of the special relationship doctrine is required because the economic loss doctrine simply does not apply to the data breach context. *See Toretto v. Donnelley Fin. Sols., Inc.*, 583 F. Supp. 3d 570, 590 (S.D.N.Y. 2022) ("[N]umerous federal courts applying New York law have concluded that the economic loss doctrine does not bar negligence claims in data breach cases. . . . The Court similarly concludes that the economic loss doctrine does not bar Plaintiffs' negligence claims.") (citing *Cohen v. Ne. Radiology, P.C.*, 2021 WL 293123, at *7 (S.D.N.Y. Jan. 28, 2021)); *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, at *9 (S.D.N.Y. May 7, 2019) (same); *Sackin v. TransPerfect Glob., Inc.*, 278 F. Supp. 3d 739, 749 (S.D.N.Y. 2017) (same); *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 396 (E.D. Va. 2020) (same).

And, under California law, a special relationship giving rise to a duty of care can be established by the existence of "at least four features that are common to many recognized

special relationships: (1) Dependency . . . (2) Control . . . (3) Limited Communities . . . [and] (4) Beneficial to the duty-holder[.]" *In re Accellion*, 713 F. Supp. 3d at 632-33.

In this case, Plaintiffs relied on PowerSchool to collect, store, manage, maintain, and secure their data. It also is clear that PowerSchool had superior control over the means of protection because it was the one that designed and maintained the SIS, and it was PowerSchool's security systems that were breached. Third, this duty by PowerSchool is limited to a specific community—the Schools and School Districts and the individual students and teachers as opposed to the public at large. Finally, PowerSchool significantly benefited from the relationship in the form of revenue derived from the School Districts, resulting in its $5.6 billion valuation. Thus, just as in *In re Accellion*, the Court should find that PowerSchool owed Plaintiffs a duty due to the existence of a special relationship:

> First … [t]he Complaint alleges that '[i]n the ordinary course of doing business with entities that use Accellion's FTA, individuals are typically required to provide PII that is then transferred by Accellion,' and 'when electronic files containing such information are transferred, the transfer must be secure.' [] [Plaintiffs' reliance on Accellion] is all the more heightened by the high value of PII and its frequent targeting by hackers and cybercriminals. [] … Second, … Accellion demonstrated this [superior] control when it released patches for the vulnerabilities within days after they were exploited. [] Third, … the special relationship in this case extends to 'the end users of the services Accellion and Flagstar provided to their clients,' i.e., 'those to whom the data belonged.' … Finally, the Complaint alleges that Accellion is a benefactor of this special relationship, given that '[t]his business model proved successful for Accellion for many years.' [] Indeed, 'Accellion's entire business model was built on promising its clients that it provided a platform to securely transfer files that contained sensitive data.

*Id*. at 633-34. *See also Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 914 (S.D. Cal. 2020) ("Inmediata provides no support, however, for its argument that no special relationship exists between a company that possesses people's personal and medical information and those people"); *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 313 F. Supp. 3d 1113, 1133 (N.D. Cal. 2018). Likewise, *In re Sequoia Benefits & Ins. Data Breach Litig.*, 2024 WL 1091195, at *3 (N.D. Cal. Feb. 22, 2024), the court analyzed the special

relationship doctrine set forth in *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979),[11] finding five of the six factors satisfied and the economic loss doctrine inapplicable to the plaintiffs' claims. *Compare id. with* ¶ 176.

PowerSchool's reliance on a handful of other cases does not result in a contrary finding. For example, *Fero v. Excellus Health Plan, Inc.*, 236 F. Supp. 3d 735 (W.D.N.Y. 2017), *on reconsideration*, 304 F. Supp. 3d 333 (W.D.N.Y. 2018), *order clarified*, 502 F. Supp. 3d 724 (W.D.N.Y. 2020), *order clarified*, 502 F. Supp. 3d 724 (W.D.N.Y. 2020), involved a claim for negligent misrepresentation under New York law where the court held that "courts applying New York law consistently reject negligent misrepresentation claims brought ***against insurers absent some specific allegations of interactions between the parties*** creating a special relationship." *Id*. at 773. As a result, this case adds nothing to the analysis of whether PowerSchool owed a duty for a negligence claim involving a data breach, as Plaintiffs have plainly alleged the specific interactions giving rise to this special relationship.[12] ¶¶ 38, 51-53, 60, 176

*Adkins v. Everest Glob. Servs., Inc.*, 2024 WL 3887127 (D.N.J. Aug. 21, 2024), is an out-of-district outlier under a different set of facts where the plaintiff wholly failed to support their argument with relevant precedent. In *Grifo & Co., PLLC v. Cloud X Partners Holdings, LLC*, 485 F. Supp. 3d 885 (E.D. Mich. 2020), also appears to be an outlier. In *Grifo*, the data at issue was not sensitive personal or medical information; rather it was data related to an accounting firm's business, including tax engagement files and business contacts. *Id*. at 889. While the court held that there was no special relationship between a "data-hoster" and "data-owner," it was not presented with, and therefore did not have the

[11] The six factors to determine a special relationship include: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm. *J'Aire Corp*, 24 Cal. 3d at 804.

[12] ¶ 51 at n. 16 ("If we are unable to comply with our obligations as a HIPAA business associate, we could face substantial civil and even criminal liability.").

ability to consider, the numerous cases where courts have found defendants owed a duty of care, either by common law or as a result of a special relationship, because "Plaintiff cites no case law establishing the existence of a broad special relationship for all data hosts to data owners, and instead relies on unpublished case law from the Michigan Court of Appeals and Sixth Circuit that have found special relationships in distinct factual scenarios." *Id.* at 897. In the end, the court was uncomfortable finding such a duty based on the specific facts of that case because "[p]laintiff wishes to extend Michigan's law of 'special relationships' to a new and expansive commercial context without the benefit of any Michigan precedent on point." *Id.* at 898. As set forth above, the Court will not be treading new ground by finding that PowerSchool owed a duty of care to the School Districts' data about millions of schoolchildren and was therefore obligated to enact reasonable security standards, consistent with numerous courts that have found a special relationship or general common law duties in analogous data breach cases.

Finally, PowerSchool argues that there is no duty of care owed under HIPAA or the FTC Act. Mot. at 20-21. PowerSchool misapprehends Plaintiffs' claims. Plaintiffs are not asserting claims under HIPAA or the FTC Act, but rather point to HIPAA and the FTC Act as examples of the codification of well-established duties under common law. The standards set forth in HIPAA and the FTC Act are evidence of industry reasonable standards of data security that companies like PowerSchool should adhere to and thus reliance on such statutes is wholly relevant to establish PowerSchool's negligence. In short, Plaintiffs' negligence claim against PowerSchool is well pled because it has established that PowerSchool owed them a duty to protect and secure the data collected by PowerSchool based on common law and the existence of a special relationship.

**C. POWERSCHOOL WAS UNJUSTLY ENRICHED**

As a preliminary matter, PowerSchool errs in suggesting that neither New Jersey nor California recognize independent claims for unjust enrichment. "Under New Jersey law, to prove a claim for unjust enrichment, a party must demonstrate that the opposing party received a benefit and that retention of that benefit without payment would be unjust."

*Gaddy v. Long & Foster Companies, Inc.*, 2022 WL 22894854, at *12 (D.N.J. Mar. 16, 2022). And in California, the Ninth Circuit recognized nearly a decade ago that an unjust enrichment claim may proceed as an independent cause of action. *See Bruton v. Gerber Prod. Co.*, 703 F. App'x 468, 470 (9th Cir. 2017) (noting that "the California Supreme Court has clarified California law, allowing an independent claim for unjust enrichment to proceed in an insurance dispute" and reversing dismissal of the claim) (citing *Hartford Cas. Ins. Co. v. J.R. Mktg., L.L.C.*, 61 Cal. 4th 988, 1000 (2015)). "To allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1145 (C.D. Cal. 2021) (quoting *ESG Capital Partners, LP v. Stratos*, 828 F.3d 1023, 1038-39 (9th Cir. 2016)).

PowerSchool next argues that Plaintiffs may not assert a claim for unjust enrichment when there is an express contract. However, the claim may be pled in the alternative, particularly when the parties dispute the application of the contract as PowerSchool does here. *See Sackin*, 278 F. Supp. 3d at 751-752 (citing *Fero v. Excellus Health Plain, Inc.*, 236 F. Supp. 3d 735, 770 (W.D.N.Y. 2017) (sustaining unjust enrichment upon finding that "the parties dispute whether the parties have an enforceable contract with definite and material terms regarding the provision of data security")); *In re Cap. One*, 488 F. Supp. 3d at 412 ("[T]here is a fundamental dispute between the parties concerning the scope of that contractual relationship and whether it definitively defines Capital One's obligations with respect to protecting Plaintiffs' PII."); *Coyle v. Hornell Brewing Co.*, 2010 WL 2539386, at *5 (D.N.J. 2010) ("It is true that restitution for unjust enrichment is an equitable remedy that is unavailable when a plaintiff has an adequate remedy at law. However, it is equally true that plaintiffs are permitted to plead alternative theories of recovery.").

To the extent PowerSchool insists that Plaintiffs have not alleged an inadequate remedy at law; it ignores Plaintiffs' plain allegations to the contrary. *Compare* ¶¶ 227, 248 *with* Mot. at 22-23. Indeed, "at the pleading stage all a plaintiff needs to allege is inadequate remedies at law to pursue equitable claims." *C. M. v. MarinHealth Med. Grp., Inc.*, 2024

WL 217841, at *6 (N.D. Cal. 2024); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 544 (D.N.J. 2004) (finding dismissal of plaintiff's unjust enrichment claim premature despite the availability of other adequate remedies at law); *Brown v. Van's Int'l Foods, Inc.*, 2022 WL 1471454, at *13 (N.D. Cal. May 10, 2022) ("Once the plaintiff has met her burden to plead the inadequacy of legal remedies, it will typically make sense to defer the determination of whether . . . a plaintiff's legal remedies will ultimately be adequate). Thus "[t]he Court need not resolve this dispute, however, because [P]laintiffs do allege that legal remedies are inadequate, and no more is required at this stage." *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1008 (N.D. Cal. 2024).

PowerSchool's final argument in support of dismissing Plaintiffs' unjust enrichment claim—that it was the hackers and not PowerSchool who were unjustly enriched at Plaintiffs' expense—appears to misapprehend the nature of Plaintiffs' claim. *See* Mot. at 23-24. Here, Plaintiffs allege that PowerSchool was unjustly enriched by receiving money for data maintenance and security that it did not provide. ¶ 252 ("Defendants were aware that part of the money paid to them by Plaintiffs and Class Members was intended to be applied to data security and rather than appropriately fund their data security obligations, Defendants instead directed that money to their own profits."). These are precisely the allegations that courts in California and New York have found sufficient to sustain an unjust enrichment claim. The court in *In re Ambry*, explained:

> Courts have concluded that the failure to secure a plaintiff's data can give rise to an unjust enrichment claim, reasoning that a defendant has accepted the benefits accompanying plaintiff's data, but does so at the plaintiff's expense by not implementing adequate safeguards, thus making it inequitable and unconscionable to permit defendant to retain funds that it saved by shirking data-security and leaving the plaintiff to suffer the consequences.

567 F. Supp. 3d at 1145 (citing *Rudolph v. Hudson's Bay Co.*, 2019 WL 2023713, at *12 (S.D.N.Y. May 7, 2019) (analyzing unjust enrichment claim under California law)); *Sackin*, 278 F. Supp. 3d at 751 (finding under New York law that "it would be inequitable and unconscionable to allow TransPerfect to retain the money it saved by shirking data-security"); *Wallace*, 2021 WL 1109727, at *11 (same). New Jersey courts have also upheld

unjust enrichment claims in the data breach context "when businesses commoditize or receive an independent pecuniary benefit from holding the Personal Information." *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2023 WL 8540911, at *5 (D.N.J. May 5, 2023); *c.f. Gaddy*, 2022 WL 22894854, at *13 ("Plaintiffs do not show that Defendant had any use for or derived any value from Plaintiffs' PII. As such, Plaintiffs cannot sustain a claim for unjust enrichment."). Here, PowerSchool's entire business model relied on extracting value from the storage of personal information, and it accepted payment for doing so. ¶¶ 1, 16, 20-28. Moreover, "PowerSchool profited by aggregating and analyzing large-scale student and school data for its latest product offerings." ¶ 195(a). These allegations are sufficient to "plausibly suggest that the [Protected] Information itself is a part of Defendants' business model" and sufficient to sustain a claim under New Jersey law. *In re Am. Med.*, 2023 WL 8540911, at *5.

Accordingly, irrespective of which state law is applied, the result is the same, and Plaintiffs have satisfied their burden at the pleading stage to allege an unjust enrichment.

### D. PLAINTIFFS HAVE SUFFICIENTLY PLED THEIR CFAA CLAIMS

The CFAA is a statute concerning "violations of restrictions on access to information." *U.S. v. Nosal*, 930 F. Supp. 2d 1051, 1059 (N.D. Cal. 2013) ("*Nosal II*"). The word "hacking" is "only a shorthand term used as common parlance" by courts to describe the general purpose of the CFAA. *Id.* at 1060.[13] PowerSchool asserts throughout its brief that the CFAA is an "anti-hacking statute," but as other courts have recognized "the word 'hack' does not appear anywhere in the statute's text." *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147, 1169 (C.D. Cal. 2018). Indeed, a claim under the CFAA "doesn't depend on whether any Defendant hacked anything. The proper inquiry is whether [the plaintiff] has sufficiently pled that Defendants accessed [the plaintiffs'] computers, either without any authorization, or in excess of the authorization they did have." *Id. See*

[13] The court in *Nosal II* explains that the Ninth Circuit in *U.S. v. Nosal,* 676 F.3d 854 (9th Cir. 2012) ("*Nosal I*") did not "hold that the CFAA is limited to hacking crimes, or discuss the implications of so limiting the statute." *Nosal II*, 930 F. Supp. 2d at 1060.

*Koninklijke Philips N.V. v. Elec-Tech Intl. Co., Ltd.*, 2015 WL 1289984, at *4 (N.D. Cal. Mar. 20, 2015) ("[T]he plain language of the CFAA targets the unauthorized procurement or alternation of information[.]").

PowerSchool argues that it was a victim of the Data Breach, and it cannot be held liable for unauthorized access by third party hackers. Mot. at 28. This simply mischaracterizes Plaintiffs' claims and well pled allegations: Plaintiffs allege that PowerSchool "exceeded the access permitted by the School Districts in their Contracts" and that any authorization was premised on "ill-gotten consent." ¶ 93. The theft of the Data was only possible because PowerSchool failed to uphold its contractual obligations, such as "ensuring that Data was properly encrypted or redacted when accessed," that it "limit[ed] access to Data to only necessary employees," and that "[a]ccess to customer data [was] reviewed monthly, requiring leadership approval." ¶¶ 30, 33, 97. If PowerSchool acted within the bounds of these contractual access restrictions, then the third-party hackers could not have stolen anything or the stolen information would have been unusable.[14]

PowerSchool's violations of the CFAA compromised and impaired "the integrity of the School Districts' data, systems, and/or information."[15] ¶ 208. As a result, Plaintiffs were damaged by their overpayment for these safeguards and by incurring time and expenses responding to the Data Breach. 18 U.S.C. § 1030(g).

### 1. Plaintiffs Clearly Allege that PowerSchool Accessed Protected Data Without Authorization and Exceeded Its Authorization

PowerSchool attempts to evade liability by arguing that Plaintiffs fail to allege that

[14] The data breach cases cited by PowerSchool are inapplicable as Plaintiffs allege that it was PowerSchool's access—not that of a third party—that violated the CFAA. ¶ 197.

[15] PowerSchool's SIS is "hosted either locally on School District servers or on PowerSchool's optional cloud hosting service with its third-party partners." In either case, the data is stored on a "Protected Computer" under the CFAA, because the computers are "used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." ¶ 189 (citing 18 U.S.C. § 1030(e)(2)). This is a critical point, as PowerSchool may have not only accessed data stored on its cloud hosting service, but accessed data hosted on School Districts' on-premise local servers located across the country. *Id.*

PowerSchool accessed the Protected Computers without, or in excess of authorization. Mot. at 28-29. "The CFAA 'provides two ways of committing the crime of improperly accessing a protected computer: (1) obtaining access without authorization; and (2) obtaining access with authorization but then using that access improperly.'" *Ticketmaster*, 315 F. Supp. 3d at 1169 (quoting *Musacchio v. United States*, 577 U.S. 237, 240 (2016)). Here, Plaintiffs allege both: that PowerSchool accessed the Protected Computers without authorization in violation of § 1030(a)(5)(C) and that PowerSchool exceeded its authorized access in violation of § 1030(a)(2)(C).

Plaintiffs' Complaint contains detailed allegations that PowerSchool represented that its "customers own their student and school data; ***PowerSchool has no rights to access*** or sell ***student or school data***." ¶ 191 (emphasis in original). PowerSchool's Contracts state that all data, files, documents, and records transmitted to PowerSchool would be held in strict confidence and restricted. ¶ 192. Even for routine processing, PowerSchool agreed to inform the School Districts before accessing restricted information. *Id.* All other data access was to occur only in a secured, encrypted, and anonymized form. *Id.* School Districts shared data with PowerSchool on the understanding, based on both contract and federal regulations, that the Data would be encrypted and de-identified, and thus inaccessible to PowerSchool personnel. ¶ 193. These contractual representations functioned as access restrictions within the meaning of the CFAA. *Id.*

***§ 1030(a)(5)(C)—Without Authorization***

PowerSchool accessed protected computers "without authorization" by concealing a "maintenance access tool…that allows PowerSchool's customer support team full, direct access to unencrypted customer databases." ¶ 46. PowerSchool promised it would obtain consent before accessing Plaintiffs' data. *See, e.g.*, Dkt. 302-5 at 3, NJ DPA § 5.1 ("If PowerSchool desires to use any Customer Data for purposes not contemplated in the MSA, PowerSchool must first obtain written approval from Customer."); *Id.* at 4, NJ DPA § 6.3 ("PowerSchool will inform the Customer before Processing Customer Data."). Not only did PowerSchool fail to obtain consent before processing their data as contemplated in the

NJ DPA, it also intentionally inserted the Backdoor Tool and failed to implement access restrictions for its personnel. ¶¶ 7, 46, 88, 195-196.

The Complaint properly alleges that if "PowerSchool had obtained consent, then it was ill-gotten" because "PowerSchool concealed the backdoor access tool and failed to inform Plaintiffs and Class Members that, in spite of its extensive data protection promises, its personnel had the capability to access nearly all of the School Districts' unencrypted and identifiable data, exfiltrate it *en masse*, and download that data without it even triggering a security alert in PowerSchool's systems." ¶ 196. Unlike access based on valid, voluntary and adequately informed consent, "ill-gotten consent," such as one obtained through "blatantly misdescrib[ing] the nature of [the software] in order to gain access," is sufficient to satisfy the "access . . . without authorization" element of § 1030(a)(5). *In re Apple Inc. Device Performance Litig.*, 347 F. Supp. 3d 434, 452-453 (N.D. Cal. 2018), *on reconsideration in part*, 386 F. Supp. 3d 1155 (N.D. Cal. 2019). *See also Bui-Ford v. Tesla, Inc.*, 2024 WL 694485, at *4 (N.D. Cal. Feb. 20, 2024) (critically missing are allegations that Tesla "misdescribed the nature of the software").

***§ 1030(a)(2)(C)—Exceeds Authorized Access***

Even if the Court finds that PowerSchool accessed the Protected Computers with authorization, PowerSchool's access, and ability to retrieve unencrypted information was expressly restricted by the Contracts. *See Van Buren v. U.S.*, 593 U.S. 374, 396 (2021). Under the CFAA, one "exceeds authorized access" when "he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." *Id.*

PowerSchool asserts in its defense that it did not exceed its authorized access by allowing its personnel to access the Data, Mot. at 30, relying on § 3.2 of the MSA, which states that: "Customer hereby grants all such rights and permissions in or relating to Customer Data to PowerSchool, its subprocessors and the PowerSchool personnel as are necessary to provide, perform and deliver the Services." Dkt. 302-3 at 2, MSA § 3.2. However, PowerSchool fails to recognize that the DPAs expressly limit this authorization

and are controlling. Ex. B, NY DPA ("In the event of a conflict between the MSA and this DPA, the DPA controls."); Ex. C at 2, NJ DPA (exact same language).

To determine whether a defendant's access exceeds authorization, courts consider the relevant agreements between the parties that govern use of the data at issue. *See* Mot. at 30; *AtPac, Inc. v. Aptitude Sols., Inc.*, 730 F. Supp. 2d 1174, 1181 (E.D. Cal. 2010). The contractual access restrictions are reflected in the DPAs, attached as Exhibits B and C to the Cecchi Decl., for example, the DPAs state:

- PowerSchool "warrants and represents that [] its technologies, safeguards and practices … include … **limitations on access** to Protected Information…[.]" Ex. B at 4-5, NY DPA § 5(d).
- PowerSchool "**agrees to use encryption technology to protect Protected Information while in motion or in its custody** from unauthorized disclosure[.]" *Id.*, NY DPA § 5(d).
- "PowerSchool will maintain all Customer Data in **strict confidence**…If PowerSchool desires to use any Customer Data for purposes not contemplated in the MSA, **PowerSchool must first obtain written approval** from Customer." Ex. C at 3, NJ DPA § 5.1.
- "PowerSchool may access and use Customer Data on a **need-to-know basis and only as expressly authorized** by Customer for the sole and express purpose of fulfilling its obligations[.] **Such access…shall be to the minimum extent necessary**[.]" *Id.*, NJ DPA § 6.2.
- "PowerSchool **will inform the Customer before Processing** Customer Data." *Id.*, NJ DPA § 6.3.
- "PowerSchool will have the following…safeguards and practices in place…Data-at-rest & **data-in-transit (motion) is encrypted** [and] Credentials and identities are issued, **verified, managed, audited, and revoked**, as applicable, for authorized devices, processes, and users[.]" *Id.* at 12, NJ DPA, PowerSchool Data Security and Privacy Plan.[16]

[16] *See also* Ex. B at 3, NY DPA § 2 (PowerSchool "agrees to hold the Confidential Information in strict confidence, and not to . . . Process such Confidential Information . . . for any use or purpose other than for providing the Services."); *Id.* at 16, NY DPA Questionnaire (PowerSchool "manages remote access through credentials and identities that are issued, verified, managed, audited, and revoked, as applicable, for authorized devices, processes, and users."); Ex. C at 3, NJ DPA § 4.1 ("All Customer Data that has not been de-identified or aggregated are classified as restricted in PowerSchool products, solutions, and services."); *Id.*, NJ DPA § 4.2 ("PowerSchool employs physical, administrative, and technological safeguards for restricted data."); *Id.*, NJ DPA § 6.1 ("PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained

PowerSchool thus contractually promised in its DPAs that it was in compliance with cybersecurity frameworks, such as NIST or ISO 27001, that required it to implement access restrictions that were "'configur[ed] so that each user can access only the pieces of data necessary for the user's role' and 'ensure that users who must access records containing PII only have access to the minimum amount of PII, along with only those privileges (*e.g.*, read, write, execute) that are necessary to perform their job duties.'" ¶ 71. The CFAA is specifically designed for this exact situation, to provide a cause of action for violations of access restrictions, because traditional causes of action are "ill suited to address cybercrimes that did not deprive computer owners of property in the traditional sense." *Van Buren*, 593 U.S. at 378 (citing Orin S. Kerr, *Cybercrime's Scope: Interpreting "Access" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U.L. Rev. 1596, 1605-1613 (2003) ("*Kerr Note*")).[17]

**2. Plaintiffs Allege that PowerSchool Acted Knowingly and Intentionally to Access Protected Data Without Consent**

Next, PowerSchool makes little effort to argue that it did not intentionally access Plaintiffs' Protected Data.[18] *See* Mot. at 30-31. The element is easily addressed and resolved in Plaintiffs' favor. Plaintiffs allege that PowerSchool entered a scheme with Bain to circumvent its authorization and access information it was denied. ¶¶ 192, 195. Where access to data—here the data in its unencrypted form—is expressly denied and then

from Customer."); *Id.* at 9, NJ DPA § A.1.4 ("PowerSchool will employ industry standard measures to protect data from unauthorized access. The service security measures will include server authentication and data encryption."); *Id.*, NJ DPA § A.1.5 ("PowerSchool will log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability of Customer Data.").

[17] The U.S. Supreme Court relies on the *Kerr Note* when interpreting the CFAA in *Van Buren*, 593 U.S. at 378. The *Kerr Note* provides an analysis of the present circumstance: when "two parties are bound by a contract that implicitly or explicitly regulates access to a computer, and one side uses the computer in a way that arguably breaches the contract. The question: Does the breach of contract make the access unauthorized?" *Kerr Note*, 78 N.Y.U.L. Rev. at 1638. The answer is that "at least in civil cases: Yes." *Id.*

[18] For example, Plaintiffs neither allege nor bring claims under 18 U.S.C. § 1030(a)(4), which contains a "intent to defraud" element. *See* Mot. at 31; ¶ 185.

circumvented, the knowing and intentional element is satisfied. *See Facebook*, 844 F.3d at 1068; *Ticketmaster*, 315 F. Supp. 3d at 1171.

PowerSchool's repeated reference to hacking is, once again, a red herring. As described above, PowerSchool's access was ill-gotten because it misrepresented the protections it had in place in violation of § 1030(a)(5)(C), and PowerSchool knew it had access restrictions and disregarded those contractual restrictions. ¶¶ 191-196. Moreover, PowerSchool also attacks Plaintiffs' allegations sounding in negligence; however, negligence is all that is required under § 1030(a)(2)(C), the exceeding authorized access prong of the CFAA. *Nosal I*, cited by PowerSchool, confirms that 1030(a)(2)(C) of the CFAA provides "penalties for exceeding authorized access of a computer even *without any culpable intent*." *Nosal II*, 930 F. Supp. 2d at 1060 (citing *Nosal I*, 676 F.3d at 859).[19] This is a case where if access restrictions were implemented in the SIS as promised, then the SIS would have been protected against the Data Breach. It is *exactly* the sort of conduct protected by the CFAA.

**3. Plaintiffs Allege Damages and Loss as Defined by the CFAA**

Finally, PowerSchool wrongly implies that Plaintiffs *must even plead* damages concerning their violation of § 1030(a)(2) claim.[20] A violation of § 1030(a)(2)(C) requires only that a person "[i]ntentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer." *In re Lenovo Adware Litig.*, 2016 WL 6277245, at *6 (N.D. Cal. Oct. 27, 2016). To maintain a civil action under the CFAA, Plaintiffs need only allege that they suffered "damage **or** loss." 18 U.S.C. § 1030(g). "[T]he term 'loss' means any reasonable cost to any victim[.]"

[19] *Nosal I* concerned limiting the definition of "exceeds authorized access" to exclude actions that violate use agreements (as opposed to access restrictions) with the court concerned that use agreements could create liability for users of the numerous websites and computer systems that have lengthy use agreements that often go unread by users. *Nosal I*, 676 F.3d at 857. That is not the case here as PowerSchool entered into extensive data privacy agreements entered into with each School District requiring PowerSchool to implement access restrictions in order to receive data concerning children.

[20] PowerSchool does raise any argument concerning this important distinction, and so this argument is waived for reasons previously discussed.

18 U.S.C. § 1030(e)(11). Simply put, § 1030(a)(2)(C) requires only that Plaintiffs allege reasonable costs incurred from PowerSchool's unauthorized access.

The Complaint clearly alleges that Plaintiffs and Class Members suffered extensive losses, including that: "Plaintiffs and Class Members suffered actual losses, including the cost of responding to the Data Breach, conducting damages assessments, restoring SIS data, programs, systems, or information to its condition prior to the Data Breach . . . [and these costs were] incurred because of interruption [to] the SIS during the past one-year period, and those actual losses aggregated at least $5,000 in value." ¶ 207 (citing 18 U.S.C. §§ 1030(e)(11)). This allegation is sufficient under the CFAA, because even if Plaintiffs' allegations were "not particularly detailed" as PowerSchool contends, "for the purposes of deciding a motion to dismiss pursuant to Rule 12(b)(6), the issue is not whether a party will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Lenovo Adware Litig.*, 2016 WL 6277245, at *6.

And so the Court need not reach Plaintiffs' other theories of loss under the CFAA—that Plaintiffs incurred undue costs for paying for illusory access restrictions and injunctive relief sought—but those theories too are well pled. The Complaint alleges that Plaintiffs and Class Members "paid hundreds of millions of dollars annually for the use of the PowerSchool platform and for the storage and protection of their Data . . . [this included the undue costs] for the protection of the Data." ¶ 126. *See In re Lenovo Adware Litig.*, 2016 WL 6277245, at *6 (denying defendant's motion to dismiss a claim under the CFAA where the plaintiff alleged incurred costs through overpaying for the benefit received from defendant); *Therapeutic Research Faculty v. NBTY, Inc.*, 488 F. Supp. 2d 991, 996 (E.D. Cal. 2007) (denying defendant's motion to dismiss a CFAA claim where the plaintiff alleged that defendants obtained access valued materially greater than the amount paid); *San Miguel v. HP Inc.*, 317 F. Supp. 3d 1075, 1081, 1086 (N.D. Cal. 2018) (denying defendant's motion to dismiss plaintiffs' CFAA claim alleging that plaintiffs would have "paid significantly less" and finding that "at the pleading stage, these allegations are sufficient."). "Under federal notice pleading standards, it is enough if [Plaintiffs']

allegations allow the Court to plausibly infer that [the] loss' exceeds $5,000." *Ticketmaster*, 315 F. Supp. 3d at 1173 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plaintiffs are not required to allege with specificity those losses at the pleading stage. *Id*.

Unlike § 1030(a)(2), under § 1030(a)(5), access to the Protected Computer must be "without authorization" and such conduct must cause "damage **and** loss." *Universal Protec. Serv., LP*, 2023 WL 4042582, at *8. PowerSchool principally argues that damages under the CFAA are limited only to "the corruption of files"—which is just one example of damages under the CFAA. Mot. at 32 (quoting *Van Buren v. United States*, 593 U.S. 374, 391-92 (2021)). However, the CFAA defines the term "damage" to mean "any impairment to the integrity or availability of data, a program, a system, or information[.]" 18 U.S.C. § 1030(e)(8). Multiple intrusions can cause a single impairment and be described as a single "impairment" to the data or system. *Creative Computing v. Getloaded.com LLC*, 386 F.3d 930, 934-35 (9th Cir. 2004).[21]

Black's Law Dictionary defines the verb to "impair" as "[t]o diminish the value of (property or a property right)." Black's Law Dictionary (11th ed. 2019) ("Hacking"). Plaintiffs allege that PowerSchool's use of a Backdoor Access Tool enabled PowerSchool employees to access the School Districts' unencrypted data, that this unmonitored and unauthorized access compromised and impaired the security and integrity of the School Districts' data, systems, and/or information. ¶¶ 203, 208 (citing 18 U.S.C. § 1030(e)(8)). Under 18 U.S.C. § 1030(g), Plaintiffs may maintain a civil action and PowerSchool's Motion should be denied.

**E. PLAINTIFFS' CDAFA CLAIM IS SUFFICIENTLY PLED**

PowerSchool repeats the same arguments to dismiss Plaintiffs' claim under California's Comprehensive Data Access and Fraud Act ("CDAFA"), *i.e.*, asserting that PowerSchool did not participate in the hacking and that PowerSchool did not access data without permission. Mot. at 33. For the reasons above, both arguments fail. "The CDAFA

---

[21] Each incident of unauthorized access is an independent violation of the CFAA and compromised the integrity and security of the School Districts' Data. ¶ 199.

is California's state-law analogue to the CFAA." *Ticketmaster*, 315 F. Supp. 3d at 1174. However, "the California statute does not require *unauthorized* access. It merely requires *knowing* access." *Facebook*, 844 F.3d at 1069 (Once the defendant was aware its access was without permission, it "knowingly accessed and without permission took, copied, and made use of Facebook's data" in violation of section 502.). Here, the analysis is the same as the CFAA. *Id*. This Count charges PowerSchool itself with knowingly implementing a backdoor to access and process data stored in the SIS—that at least in some cases was stored on local servers. ¶¶ 188-190, 192-196.

*Nowak v. Xapo, Inc.*, is of little value to the analysis because that case concerned CFAA and CDAFA charges against a cryptocurrency exchange that received stolen goods after a third party had hacked into a computer. 2020 WL 6822888, at *4 (N.D. Cal. Nov. 20, 2020) ("The CFAA claim appears to rely only on Defendant's alleged acts or omissions after the hacking occurred."). Similarly, in *Claridge v. RockYou, Inc.*, the plaintiff attempted to charge the defendant with providing the means to gain unauthorized access "by failing to establish commercially reasonable security methods to protect the PII on its system." 785 F. Supp. 2d 855, 863 (N.D. Cal. 2011). In neither case was the defendant alleged to have gained unauthorized access to the system itself; rather unrelated third parties had committed violations of the CDAFA or CFAA. Here, by contrast, Plaintiffs squarely allege that PowerSchool knew it had no authorization and violated access restrictions in its Contracts. Accordingly, Plaintiffs state a claim for violation of the CDAFA. *See In re Lenovo Adware Litig.*, 2016 WL 6277245, at *7 (declining to dismiss CDAFA claim where CFAA claim was sustained).

### F. PLAINTIFFS ARE ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF

PowerSchool next seeks dismissal of Plaintiffs' claim for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.* ("DJA") on three erroneous bases: (1) that no independent claim is available under the DJA; (2) that Plaintiffs have not

alleged a threat of future injury; and (3) that the claim for declaratory relief is duplicative of Plaintiffs' other claims for relief. Mot. at 48.

*First*, "[u]nder 28 U.S.C. § 2201(a), the Court may, in its discretion, declare the rights of the parties in the event of an actual controversy between them." *Canal Ins. Co. v. Fema Trucking, LLC*, 2022 WL 3227188, at *5 (D.N.J. Aug. 10, 2022). "Basically, the question in each [DJA] case is whether the facts alleged . . . show there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Carr v. Oklahoma Student Loan Auth.*, 699 F. Supp. 3d 1241, 1250 (W.D. Okla. 2023) (citation omitted). Whether a request for declaratory relief is styled as a remedy or a cause of action is immaterial because the Court is empowered to impose such relief and to resolve an ongoing conflict. *See In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 2897520, at *4 (N.D. Ga. May 18, 2016) ("The Plaintiffs ask for an injunction corresponding to their declaratory judgment claim. Such a claim is permissible under the Declaratory Judgment Act.").

*Second*, Plaintiffs have clearly alleged that PowerSchool continues to maintain their Data and that such Data remains unsecure from future threats. ¶¶ 257-58(b), 260; *compare with In re Cap. One*, 488 F. Supp. 3d at 414-415 (sustaining the declaratory judgment claim because "there remains a dispute over the security of Plaintiff's Private Information, which continues to be stored on AWS's servers and remain subjected to a heightened risk of access and misuse by hackers"); *In re MOVEit Customer Data Sec. Breach Litig.*, 2025 WL 2176590, at *34 (D. Mass. July 31, 2025) ("An allegation of continued inadequacy of a Defendant's security measures substantiates a claim for declaratory judgment in a data breach case."); *In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1221 (N.D. Cal. 2014) ("Plaintiffs plausibly allege that they face a substantial risk of future harm if Adobe's security shortcomings are not redressed, making this dispute sufficiently real and immediate, and the dispute underlying Plaintiffs' declaratory relief claim concerns Adobe's current security practices, rather than a hypothetical set of acts or omissions."). In fact, several Plaintiffs' DPAs with PowerSchool expressly authorize Plaintiffs to seek

injunctive and/or declaratory relief as a remedy for any breach of the contracts that remain uncured. *See* Ex. B at 7 ("**[I]*n addition to all other remedies that School District may have, School District shall be entitled to enforce the data-security provisions of this Agreement by seeking specific performance or other equitable relief as a remedy for any breach that is not cured after 24-hours' notice*.**"). Here, Plaintiffs allege that PowerSchool's cybersecurity is insufficient and injunctive and/or declaratory relief is necessary to resolve this dispute. Nothing more is required.

*Finally*, PowerSchool argues that Plaintiffs' plea for declaratory relief is duplicative. Mot. at 48. Yet declaratory relief is necessarily forward-looking and intended to prevent future harm rather than compensate for past injuries. *See In re Ambry*, 567 F. Supp. 3d at 1151 ("Plaintiffs may seek both damages for past harm and injunctive relief to prevent future harm."); *see also In re Unite Here Data Sec. Incident Litig.*, 740 F. Supp. 3d 364, 388 (S.D.N.Y. 2024) (same). Forward-looking relief is precisely what Plaintiffs seek here where they allege that their Data remains in PowerSchool's possession and that PowerSchool's data security remains inadequate to prevent future intrusions. ¶¶ 257-61; *compare In re MOVEit*, 2025 WL 2176590, at *34 ("Rejecting that the DJA claim is duplicative because [the] tort and contract claims, however, seek only retrospective relief."); *In re Adobe Sys.*, 66 F. Supp. 3d at 1222 (declaratory relief appropriate where "Plaintiffs . . . seek a declaration [ ] that Adobe's *existing* security measures do not comply with its contractual obligations"). It is premature to dismiss this claim at the pleading stage where "[the] remaining claims have not been fully developed . . . [and] the Court cannot fully evaluate the extent of the overlap to determine whether declaratory judgment would serve [any] useful purpose in clarifying the legal rights and relationships at issue." *Clemens v. ExecuPharm, Inc.*, 678 F. Supp. 3d 629, 639 (E.D. Pa. 2023) (citation omitted).

## <u>CONCLUSION</u>

The Court should thus deny PowerSchool's motion to dismiss in its entirety.[22]

[22] In the event that the Court requires additional factual allegations, Plaintiffs pray for leave to amend.

Dated: October 27, 2025

Respectfully submitted,

/s/ James E. Cecchi

James E. Cecchi (NJ 030861989)
*Admitted Pro Hac Vice*
Jason H. Alperstein (FL 64205)
*Admitted Pro Hac Vice*
Jordan M. Steele (SBN 362684)
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com
Email: jalperstein@carellabyrne.com
Email: jsteele@carellabyrne.com

*Lead Counsel for Plaintiffs and the School District Class Action*

John Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
402 W Broadway, Suite 1760
San Diego, California 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

M. Anderson Berry (SBN 262879)
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Telephone: (916) 823-6955
Email: anderson@emeryreddy.com

Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: cardoso@kolawyers.com

Tyler S. Graden (NJ 028462007)
*Admitted Pro Hac Vice*
**KESSLER TOPAZ MELTZER CHECK LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Email: tgraden@ktmc.com

*Members of the Steering Committee for the School District Class Action*

Michael Critchley, Sr. (NJ 251821972)
*Pro Hac Vice Forthcoming*
**CRITCHLEY & LURIA, LLC**
75 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 422-9200
Email: mcritchley@critchleylaw.com

*Additional Counsel for Plaintiffs*