James E. Cecchi (NJ 030861989)
*Admitted Pro Hac Vice*
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Email: jcecchi@carellabyrne.com

*Lead Counsel for the proposed School District Class and Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: POWERSCHOOL HOLDINGS, INC. AND POWERSCHOOL GROUP, LLC CUSTOMER SECURITY BREACH LITIGATION,<br><br>*This Document Relates to the School District Class Action Track* | Case No. 25-md-3149-BEN-MSB<br><br>MDL 3149<br><br>**DECLARATION OF JAMES E. CECCHI IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS POWERSCHOOL HOLDINGS, INC.'S AND POWERSCHOOL GROUP, LLC'S MOTION TO DISMISS THE SCHOOL DISTRICT AMENDED CLASS ACTION COMPLAINT** |

I, JAMES E. CECCHI, ESQ., of full age, hereby declares under penalty of perjury as follows:

1. I am an attorney licensed to practice in New Jersey and am a member of Carella, Byrne, Cecchi, Brody & Agnello, P.C., and have been named as Lead Counsel for the School District Class and Counsel for Plaintiffs in the above matter. In such capacity, I am fully familiar with the facts contained herein.

2. This Declaration is based on my personal knowledge, and if called on to do so, I could and would testify competently thereto.

3. I submit this declaration in support of Plaintiffs' Brief in Opposition to the Motion of Defendants PowerSchool Holdings, Inc.'s and PowerSchool Group, LLC's to dismiss Plaintiffs' School District Amended Class Action Complaint.

4. I have caused true and correct copies of the following exhibits, attached as exhibits to the Declaration of Anne Johnson Palmer, Dkts. 302-3, 302-4, 302-5, to be filed concurrently with this declaration:

a. Attached hereto as Exhibit A, with highlighting, is a true and correct copy of PowerSchool's 2024 Main Services Agreement (the "MSA").

b. Attached hereto as Exhibit B, with highlighting, is a true and correct copy of PowerSchool's New York Statewide Data Privacy Agreement, as incorporated into the MSA.

c. Attached hereto as Exhibit C, with highlighting, is a true and correct copy of PowerSchool's New Jersey Statewide Data Privacy Agreement, as incorporated into the MSA.

I declare under penalty of perjury, under the laws of the United States and the State of California, that the foregoing is true and correct to the best of my knowledge. This declaration was executed on October 27, 2025, in Roseland, New Jersey.

*/s/ James E. Cecchi*
James E. Cecchi

# Exhibit A

PowerSchool

# MAIN SERVICES AGREEMENT
**2024 version**

This Main Services Agreement (with all attached exhibits and referenced documents and links, the "**Main Services Agreement**"), combined with active Quotes and Statements of Work for Professional Services or any other duly executed documents referencing this Main Services Agreement, will constitute the "**Agreement**", as may be amended from time to time. The Quotes and SOWs, including any addenda and supplements thereto, may be individually referred to as an "**Ordering Document**" or collectively referred to as the "**Ordering Documents**".

This Agreement is entered into by and between the applicable PowerSchool Contracting Entity (as defined below) ("**PowerSchool**") and Customer identified below and governs Customer's access and use of Services. This Agreement is effective and accepted on the earliest of the following: (i) the date that the last Party directly signs this Main Services Agreement, (ii) the date that the last Party signs the Quote that references this Main Services Agreement (or if the Quote is not signed, then the date of the purchase order received by PowerSchool), or (iii) the date on which Customer is granted access to the Services (the "**Effective Date**"). Each PowerSchool and Customer is individually referred to as a "**Party**" and collectively as the "**Parties**".

## 1. DEFINITIONS.

**1.1.** "**Account Country**" is the country associated with the Customer account. If Customer has provided a valid tax registration number for Customer's account, then Customer's Account Country is the country associated with such tax registration. If Customer has not provided a valid tax registration, then Customer's Account Country is the country where the Customer billing address is located.

**1.2.** "**Customer**" means the school, school district, college, university, institution, agency, or other entity that purchases one or more of the Services, as identified on the applicable Ordering Document.

**1.3.** "**Customer Data**" means all data (including Personal Data), files, documents and records uploaded to a Subscription Service or transmitted to PowerSchool under this Agreement by or on behalf of Customer.

**1.4.** "**De-identified Data**" means information generated by the data processor that does not contain Personal Data and any direct or indirect personal identifiers, and that is not used or linked to identify any individual.

**1.5.** "**Documentation**" means user manuals describing the functionality, features and operating characteristics of the applicable PowerSchool Software as made available to Customer by PowerSchool, including any updates thereto.

**1.6.** "**Excluded Claims**" means claims or liability arising out of: (a) a Party's violation of the other Party's proprietary or intellectual property rights; (b) PowerSchool's violation of its obligations under this Agreement (including the applicable data privacy agreement) pertaining to Customer Data; or (c) either Party's indemnity obligations under this Agreement.

**1.7.** "**Intellectual Property Rights**" means any and all, now or hereafter in existence, unpatented inventions, patent applications, patents, design rights, copyrights, Trademarks, mask work rights, know-how, trade secret rights, moral rights, database protection, and all other intellectual property and proprietary rights, modifications, adaptations, derivatives thereof, and improvements thereto, and forms of protection of a similar nature anywhere in the world.

**1.8.** "**Licensed Applications**" means software applications developed by third parties that are licensed by PowerSchool and are embedded in or bundled with the Subscription Services provided by PowerSchool hereunder.

**1.9.** "**Licensed Site(s)**" means the internet address of the web-based location for accessing a Subscription or, if for an on-premise implementation, the initial location where the PowerSchool Software listed on the applicable Quote is installed.

**1.10.** "**Personal Data**" means information that alone, or in combination with other information about an individual, identifies, relates to, or could reasonably be linked to a natural person.

**1.11.** "**PowerSchool Contracting Entity**" means the entity identified in the table below, based on Customer's Account Country.

| Account Country | PowerSchool Contracting Entity | Mailing Address |
|---|---|---|
| Canada | PowerSchool Canada ULC | PowerSchool Canada ULC<br>150 Parkshore Drive<br>Folsom, CA 95630 |
| United States | PowerSchool Group LLC | PowerSchool Group LLC<br>150 Parkshore Drive<br>Folsom, CA 95630 |
| Any other country that is not Canada, the United States, India, or UAE[1] | PowerSchool Group LLC | PowerSchool Group LLC<br>150 Parkshore Drive<br>Folsom, CA 95630 |

**1.12.** "**PowerSchool Software**" means PowerSchool's proprietary software applications and the associated Licensed Applications, including any and all updates and subsequent versions thereto. PowerSchool Software does not include Third-Party Software.

**1.13.** "**Professional Services**" means work performed by PowerSchool or its permitted subcontractors or channel partners under an Ordering Document, including implementation, training, consulting, customization and other professional services, and any deliverables specified in an Ordering Document.

**1.14.** "**Quote**" means PowerSchool's standard order form that (i) specifies the Services provided to Customer; (ii) references this Agreement or the applicable agreement; and (iii) is signed or incorporated into or referenced in a signed agreement by authorized representatives of both Parties. Unless otherwise agreed in writing by the Parties, Customer's issuance of a purchase order is deemed as acceptance of the terms and conditions set forth in the applicable Quote.

**1.15.** "**Services**" means any Subscription Service(s), including all content made available by PowerSchool through the Subscription Services, and any Professional Services provided to Customer hereunder.

**1.16.** "**Statement of Work**" or "**SOW**" means a statement of work document that describes the Professional Services to be performed hereunder and that is entered into between Customer and PowerSchool or is otherwise incorporated into a Quote entered into between Customer and PowerSchool.

**1.17.** "**Subscription Services**" means the provision of the PowerSchool Software to Customer on a subscription basis as a cloud-based service, a term license, or as an on-premise installation, including any hosting services or Support Services provided as part of the Subscription Services or otherwise purchased by Customer.

**1.18.** "**Subscription Term**" has the meaning set forth in Section 13.2 (Subscription Term).

**1.19.** "**Support Services**" means the maintenance and support for the Subscription Services or as purchased by Customer, as described in PowerSchool's standard support policy at https://www.powerschool.com/Support-Policy-SLA_2024/.

**1.20.** "**Term**" has the meaning set forth in Section 13.1 (Agreement Term).

**1.21.** "**Third-Party Software**" means software products supplied or developed for a particular purpose by someone other than PowerSchool and not licensed by PowerSchool hereunder.

**1.22.** "**Trademarks**" means all trademarks, service marks, logos, slogans, trade names, business names, and other source identifiers, including domain names, whether registered or unregistered, and including all of the goodwill of the business related to the foregoing.

**1.23.** "**Transaction Data**" means system performance information monitoring the PowerSchool Software alone and at times of usage as the User may access and progress through the features and functions of a Subscription Service.

**1.24.** "**User(s)**" means individuals authorized by Customer to access PowerSchool Software, including teachers, students, parents, guardians, employees, authorized personnel, and job applicants as applicable to the respective PowerSchool Software.

## 2. PROVISION OF SERVICES AND RESTRICTIONS.

[1] PowerSchool Offerings in India and United Arab Emirates are under a different Main Services Agreement.

PowerSchool

**2.1 Subscription Services.** If Customer makes all payments on time, PowerSchool will: (a) for cloud-based Subscription Services, make such Subscription Services available to the Customer and for the contracted quantity at each Licensed Site in conformance with the applicable Documentation and the terms of this Agreement, and host such Subscription Services consistent with the service level agreement set forth at https://www.powerschool.com/Support-Policy-SLA_2024/; (b) for on-premise Subscription Services, grant Customer a restricted, personal, non-exclusive, non-transferable, terminable access to use such Subscription Service specified in the applicable Quote, only at the Licensed Sites, not to exceed the maximum quantity identified on the applicable Quote; and (c) provide the applicable standard Support Services (or upgraded Support Services if purchased). Customer must purchase separate Support Services for on-premise implementation of the Subscription Services.

**2.2 Professional Services.** If purchased, PowerSchool will provide the Professional Services specified in the applicable SOW, subject to Customer's payment of all applicable fees and to the terms of PowerSchool's Professional Services Policy set forth at https://www.powerschool.com/Professional-Services-Policy_2024/, which is incorporated herein by reference.

**2.3 Restrictions.** Subscription Service(s) will only be used as expressly authorized by this Agreement and in compliance with all applicable laws and regulations. All rights not expressly granted to Customer herein are expressly reserved by PowerSchool.

**2.3.1** Customer will use the Services only for the internal purposes of Customer and only for Licensed Sites through the stated Subscription Term in the Quote. Customer shall not exceed the maximum quantity for the Subscription Services as stated in the Quote without additional payment.

**2.3.2** Customer will not, and will not permit Users or third parties to: (a) make any of the Services, its results, outputs or deliverables available to anyone other than Customer or Users, or use them for the benefit of anyone other than Customer; (b) sell, resell, rent, lease, license, distribute, sublicense, or otherwise include any of the Services to a third party or in a service bureau or outsourcing offering; (c) make any use of the Services for which Customer has not paid; (d) store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third-party privacy rights; (e) interfere with or disrupt the integrity or performance of any of the Services; or (f) remove or obscure any proprietary or other notices contained in any PowerSchool Services. Customer shall not use plugins that are not approved by PowerSchool.

**2.3.3** Customer and its Users shall keep user identification and password information strictly confidential and not share such information with any unauthorized person and shall be responsible for any and all activities that occur under all Customer accounts. If unauthorized access to, or use of, the Services occurs, Customer shall promptly notify PowerSchool.

**2.3.4** Customer shall be prohibited from performing penetration testing against PowerSchool-hosted Services, applications, data stores, or systems. Penetration tests, if not performed properly and under the supervision and coordination of the PowerSchool information security team, can have unintended consequences such as corrupting data, unauthorized access to data, and degradation of systems. PowerSchool allows vulnerability scanning from PowerSchool-approved vendors, such as the Cybersecurity & Infrastructure Security Agency (CISA).

**2.3.5** PowerSchool may (or may ask Customer to) suspend or terminate any User's access to the Services upon notice to Customer if PowerSchool reasonably determines that such User has violated any of the terms of the Agreement.

**2.4 Updates to Subscription Services**. During the Term, PowerSchool may, at no cost to Customer, update or upgrade features, functionality, software, or user types that Customer and Users access pursuant to a Quote; provided that such updates will not materially degrade existing features and functionality. After giving Customer reasonable advance notice, PowerSchool may update and/or upgrade the Subscription Services provided to Customer so that it remains current with the then-current version of the PowerSchool Software available to PowerSchool's customers generally.

**2.5 Sustaining Application Planning Program (SAP)**. PowerSchool reserves the right to discontinue a PowerSchool Software as part of its sustaining application planning program (SAP). PowerSchool shall provide Customer with twelve (12) months' advanced notice for PowerSchool's proprietary Software affected, and for affected Licensed Applications, as much notice as practical after PowerSchool receives notice from the applicable licensors. PowerSchool will use commercially reasonable efforts to transition Customer to a PowerSchool Software with substantial similar functions and features. If PowerSchool does not have a substantially similar PowerSchool Software, then PowerSchool will credit to Customer any unused portion of the prepaid fee for such PowerSchool Software that is discontinued. Such credit can be applied towards the future purchase of a Service

PowerSchool

within twelve (12) months of issuance. Unused credits will expire after twelve (12) months of their issuance.

**2.6 Background Checks**. PowerSchool conducts thorough nation-wide and province-wide background checks, including criminal records, terrorist watch list, sex offender database and a multi-panel drug test on all employees. PowerSchool also requires its contractors, under its separate agreement, to conduct a background check of its employees before any assignment of services from PowerSchool to the Customer.

**3. CUSTOMER DATA.**

**3.1 Rights in Customer Data**. As between Customer and PowerSchool, Customer is and will remain the sole and exclusive owner of all right, title and interest in and to all Customer Data, including all Intellectual Property Rights relating thereto, subject to the rights and permissions granted in this Section 3 (Customer Data). Customer is responsible for the accuracy and legality of any content provided to PowerSchool as Customer Data. PowerSchool will ensure that its use of the Customer Data always complies with this Agreement, PowerSchool's privacy statement, and all applicable laws, regulations, and conventions.

**3.2 Consent to Use Customer Data.** Customer hereby grants all such rights and permissions in or relating to Customer Data to PowerSchool, its subprocessors and the PowerSchool personnel as are necessary to provide, perform and deliver the Services. The Customer further agrees to establish a basis for the processing of Personal Data, including, where required by applicable laws and regulations, by obtaining the relevant informed and voluntary consent from any applicable data subject (in the case of when the data subject is a child or minor, then informed, voluntary, and verified consent from the relevant parent or guardian of the child or minor is required) for: (a) PowerSchool to process the data subject's information, in the form of Customer Data; and (b) the Customer to be allowed to transfer Personal Data to PowerSchool for processing, by sharing such Personal Data with its other approved data subprocessors. Except as provided in Section 5.4 (Compelled Disclosure), PowerSchool will not share the Customer Data with third parties without Customer's express consent. PowerSchool will not rent or sell Customer Data and will treat such data as Confidential Information. "

**3.3 Data Privacy and Security.** By executing the MSA or an Ordering Document or issuing a purchase order referencing an Ordering Document, each Party agrees to the terms of the specified PowerSchool statewide data privacy agreement set forth at https://www.powerschool.com/Customer-State-DPA_2024/ for the Customer's applicable state ("**PowerSchool State DPA**"). However, if the Parties, at the time of execution of this MSA or an Ordering Document, expressly agree in writing to supersede such PowerSchool State DPA with a separately negotiated data privacy agreement executed by and between the Parties ("**Negotiated DPA**"), such Negotiated DPA shall govern the Customer Data processed under this Agreement. Such Negotiated DPA, if existing, shall be executed and either submitted with the applicable Ordering Document or separately returned to PowerSchool as a stand-alone document. The Parties agree to comply with the PowerSchool State DPA or the Negotiated DPA, as applicable, and such applicable DPA shall supplement the terms of this Agreement.

**3.4 Security Training**. Customer agrees to require annual cyber security training for User(s) when reasonably applicable. Customer will also require User(s) to utilize multi-factor authentication to access computer systems with the Services when available within the applicable Service. Customer agrees to keep a record of such training and PowerSchool may request to see them as part of compliance verification.

**4. PROPRIETARY RIGHTS**

**4.1 PowerSchool Services and Software.** PowerSchool and its licensors solely and exclusively own all right, title, and interest, including all related Intellectual Property Rights, in and to the Services and PowerSchool Software. This Agreement is not a sale and does not convey to Customer any rights of ownership in or related to the Services or PowerSchool Software, or the Intellectual Property Rights owned or licensed by PowerSchool.

**4.2 Transaction Data.** Notwithstanding anything to the contrary, PowerSchool has the right to collect and use Transaction Data solely for internal research and to develop, improve, support, and operate its products and services during and after the Term.

**4.3 De-Identified Data**. Notwithstanding anything to the contrary, Customer hereby agrees and acknowledges that PowerSchool shall have the right to process, aggregate and analyze De-Identified Data relating to the provision, use and performance of various aspects of the Services and related systems and technologies, and PowerSchool will be free (during and after the Term) to: (i) use such De-identified Data to improve and enhance the Services and for other development, diagnostic and corrective purposes in connection with the Services and other PowerSchool products and services, and (ii) use De-identified Data for internal use only and for training and conducting demonstrations.

**4.4 Feedback**. If Customer or any User provides PowerSchool with any suggestions, comments,

enhancement requests, or other feedback relating to the PowerSchool Services or any other PowerSchool's products or services (collectively, "**Feedback**"), Customer grants to PowerSchool a worldwide, perpetual, irrevocable, royalty-free, and transferable license to use and incorporate into PowerSchool Services and PowerSchool Software such Feedback (excluding any Customer Confidential Information contained in the Feedback).

**4.5 PowerSchool Trademarks.** PowerSchool exclusively owns all of its Trademarks associated with the Services. No right or license is granted by this Agreement to their use.

**4.6 No Use of Trademarks.** Except as set forth below, neither Party nor its affiliates shall use the other Party's Trademarks in any form or substance in any medium or for any purpose without the other Party's prior written consent (which consent can be via e-mail if such e-mail is from an authorized representative of the consenting Party).

**4.7 Marketing.** Subject to Customer's trademark usage guidelines, Customer grants PowerSchool a non-exclusive, worldwide, royalty-free right to include Customer's Trademark and other related transactional information (including enrollment count, names of the Services ordered by Customer, etc., but excluding pricing) in any customer listing appearing on or in any PowerSchool websites, brochures, fliers, presentations, press releases, annual reports and any other marketing materials. Customer may withdraw or terminate the foregoing license at any time by providing PowerSchool with thirty (30) days' prior written notice of its intent to terminate. Such notice of withdrawal or termination must be sent via e-mail to champions@powerschool.com with a copy to legalnotices@powerschool.com, and the email subject line must state "Trademark Consent Withdrawal". After such thirty (30) day period, the foregoing license will terminate, and PowerSchool will remove Customer's Trademarks from its website and cease from creating any new marketing material containing the same. However, PowerSchool's right to continue to use any marketing materials produced, published, or disseminated prior to such termination will continue until the supply, publication, dissemination and/or use of such materials is exhausted or terminates.

**5. CONFIDENTIALITY.**

**5.1 Confidential Information**. Each Party (as may disclose or make available Confidential Information to the other Party. "**Confidential Information**" means non-public information disclosed by a Party (the "**Disclosing Party**") to the other Party (the "**Receiving Party**"), whether orally or in writing, that is designated as confidential or that reasonably should be understood to be confidential given the nature of the information and the circumstances of disclosure, including business and marketing plans, technology and technical information, product plans, roadmaps, and designs, and business processes. Confidential Information of Customer includes Customer Data; and Confidential Information of PowerSchool includes the Services, PowerSchool Software, and, subject to Section 5.4 (Public Records Act), the terms of this Agreement and each Ordering Document (including pricing). However, Confidential Information does not include any information that the Receiving Party can reasonably demonstrate by written or other documentary records: (i) is or becomes publicly known or available without breach of any obligation owed to the Disclosing Party; (ii) was known by the Receiving Party prior to its disclosure by the Disclosing Party without breach of any obligation owed to the Disclosing Party; (iii) is received from a third party without knowledge of any breach of any obligation owed to the Disclosing Party; or (iv) is independently developed by the Receiving Party without the aid, application or use of the Confidential Information. For the avoidance of doubt, the non-disclosure obligations set forth in this "Confidentiality" section apply to Confidential Information exchanged between the Parties in connection with the evaluation of additional PowerSchool services.

**5.2 Protection of Confidential Information**. The Receiving Party will use the same degree of care that it uses to protect the confidentiality of its own confidential information of like kind (but not less than reasonable care) to (i) not use any Confidential Information of the Disclosing Party for any purpose outside the scope of this Agreement, and (ii) except as otherwise authorized by the Disclosing Party in writing, limit access to Confidential Information of the Disclosing Party to those of its and its affiliates' employees, contractors, sub-processors and agents who need that access for purposes consistent with this Agreement and who have signed confidentiality agreements with the Receiving Party containing protections not materially less protective of the Confidential Information than those herein. The Receiving Party's obligations under Section 5 (Confidentiality) shall survive the termination or expiration of this Agreement and continue in effect thereafter for a period of five (5) years with respect to Confidential Information that does not qualify as a trade secret under applicable law, and, with respect to Confidential Information that qualifies as a trade secret under applicable law, in perpetuity after the termination or expiration of the Agreement.

**5.3 Compelled Disclosure**. The Receiving Party may disclose Confidential Information of the Disclosing Party to the extent compelled by law to do so, provided the Receiving Party gives the Disclosing Party prior notice of the compelled disclosure (to the extent legally permitted) and reasonable assistance, at the Disclosing Party's cost, if the Disclosing Party wishes to contest the disclosure.

**5.4 Public Record Act.** Notwithstanding anything herein to the contrary, PowerSchool acknowledges that, to the extent Customer is subject to public record acts or freedom of information acts, (a) PowerSchool will reasonably work with Customer to provide appropriate information in response to such requests, to the extent such requested information is not PowerSchool's proprietary information or otherwise exempted from disclosure; and (b) Customer shall provide PowerSchool a reasonable opportunity to object to any such request as permitted under applicable law.

**6. FEES AND PAYMENT.**

**6.1 Fees**. Customer agrees to pay PowerSchool for all fees charged for the Services consistent with the terms on the Quote and invoice. Unless Customer provides PowerSchool with evidence of its tax-exemption status, Customer will be responsible for paying all applicable sales, use, value-added, or other taxes or duties, however designated, except for taxes based on PowerSchool's net income. Customer agrees to pay for PowerSchool's pre-approved reasonable travel and lodging expenses for Professional Services performed at Customer's premises. All fees set forth in any Quote or invoice will be in the currency set forth in the applicable Quote.

**6.2 Enrollment Increases**. If fees for any of the Services are based on quantity or student count and Customer accesses such Services with more than the quantity identified in the applicable Quote, then Customer will pay the fees for the excess usage based on its then-current per individual and support fees. Any such increase in quantity will be maintained through the end of the then-current subscription period.

**6.3 Payment**. Unless otherwise set forth in the applicable Quote or invoice, Customer shall make all payments on or before the due date specified on the applicable invoice by the method specified on the invoice. PowerSchool may accept credit card payment; however, credit card payments shall subject Customer to a transaction fee and a $250,000 transaction limit. Subject to the "Payment Disputes" section below, if an invoiced amount is overdue by thirty (30) or more days, PowerSchool reserves the right to charge a late fee of 1.5% monthly (18% annually) or the maximum rate allowed by law, whichever is lower, on the amounts overdue.

**6.4 Payment Disputes**. If Customer reasonably and in good faith disputes all or any portion of any invoice, Customer shall notify PowerSchool in writing of its objection within twenty (20) days from the date of the applicable invoice, provide a detailed description of the reasons for the objection, and pay the portion of the invoice which is not in dispute. If Customer does not object in a timely manner within this time period, the amount invoiced shall be conclusively deemed correct by the Parties. If the Parties are unable to resolve such payment dispute within thirty (30) days from PowerSchool's receipt of Customer's written objection, each Party shall have the right to seek any remedies it may have under this Agreement, at law or in equity, irrespective of any terms that would limit remedies on account of a dispute. For clarity, any undisputed amounts must be paid in full.

**6.5 No Deductions or Setoffs**. Subject to Customer's right to dispute an invoice under Section 6.4 (Payment Dispute), all amounts payable to PowerSchool under this Agreement shall be paid by Customer to PowerSchool in full without any setoff, deduction, or withholding for any reason.

**7. PRODUCT-SPECIFIC AND PASS-THROUGH TERMS.**

**7.1 Licensed Applications**. If the Services include Licensed Applications, provision of such Licensed Applications may be subject to additional license terms identified at https://www.powerschool.com/Product-Specific-Terms_2024/, which terms are incorporated herein by reference and are required by PowerSchool's licensors to pass through to Customer without any modification. Such licensors audit PowerSchool to ensure compliance with this requirement.,

**7.2 Third-Party Software**. Third-Party Software is licensed directly to the Customer pursuant to separate license terms between Customer and a third-party supplier. All support, warranties, and services related to Third-Party Software are provided by the supplier of the Third-Party Software under such third party's terms and conditions, and not by PowerSchool. PowerSchool will have no obligations or liability regarding any Third-Party Software.

**7.3 Product-Specific Terms**. Certain Services may be subject to additional product-specific terms identified at https://www.powerschool.com/Product-Specific-Terms_2024/, which are incorporated herein by reference.

**8. LIMITED WARRANTY.**

PowerSchool

PowerSchool warrants that the PowerSchool Software included in the Services will operate in substantial conformity with the applicable Documentation under normal use and circumstances. If Customer notifies PowerSchool in writing of a breach of this warranty, PowerSchool will, at its option, either: (a) use commercially reasonable efforts to correct the reported non-conformity, at no charge to Customer, or (b) if PowerSchool determines such remedy to be impracticable, issue Customer a credit of a portion of the fees pre-paid by Customer for the nonconforming Subscription Service that fairly reflects (at PowerSchool's reasonable determination) the diminished value of the non-conforming Subscription Service. The foregoing constitutes Customer's sole and exclusive remedy for any breach of this limited warranty. This warranty will not apply: (i) unless Customer makes a claim within thirty (30) days of the date on which Customer first noticed the non-conformity, or (ii) if the non-conformity was caused by misuse, unauthorized modifications, or third-party hardware, software, or services.

**9. DISCLAIMER OF WARRANTIES.** EXCEPT AS EXPRESSLY SET FORTH IN SECTION 8 (WARRANTIES), THE SERVICES, POWERSCHOOL SOFTWARE AND THIRD-PARTY SOFTWARE ARE PROVIDED "AS IS", AND POWERSCHOOL AND ITS LICENSORS EXPRESSLY DISCLAIM ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, ANY IMPLIED WARRANTIES OF MERCHANTABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT, AND ALSO ANY WARRANTIES THAT THE SERVICES WILL BE UNITERRUPTED OR ERROR-FREE. CUSTOMER MAY HAVE OTHER STATUTORY RIGHTS, BUT THE DURATION OF STATUTORILY REQUIRED WARRANTIES, IF ANY, SHALL BE LIMITED TO THE SHORTEST PERIOD PERMITTED BY LAW. THE ABOVE DISCLAIMER APPLY TO THE FULLEST EXTENT ALLOWED BY APPLICABLE LAW.

**10. INDEMNIFICATION.**

**10.1 PowerSchool Indemnity**. PowerSchool will defend Customer and its board members, officers, staff, employees and representatives ("**Customer Indemnitees**") from and against any claim, demand, suit or proceeding brought by a third party against Customer Indemnitee (a "**Claim Against Customer**"): (i) alleging any Service, when used as authorized under this Agreement, infringes or misappropriates a third party's Intellectual Property Rights; (ii) to the extent arising from the Services being provided in an unlawful manner or in violation of the Agreement or regulations; (iii) alleging a confirmed data breach (as defined by the applicable state law) to the extent attributable to PowerSchool resulting from PowerSchool's violation of the data security provisions expressly set forth in this Agreement or the DPA executed between the Parties; or (iv) to the extent arising out of death, personal injury or damage to tangible property to the extent caused by PowerSchool personnel or subcontractors in their performance of the Services. PowerSchool will indemnify and hold Customer harmless from any damages, attorney fees, and costs finally awarded against Customer as a result of, or for amounts paid by Customer under a settlement approved by PowerSchool in writing of, a Claim Against Customer.

**10.1.1 Mitigation**. If Customer's use of the Services is enjoined or, in PowerSchool's reasonable opinion, is likely to be enjoined, PowerSchool may (i) substitute for the Services, a substantially and functionally similar product(s) and documentation; (ii) procure for Customer the right to continue using the Services; or if (i) or (ii) is not possible after reasonable commercial efforts from PowerSchool, then PowerSchool may terminate this Agreement and credit a pro-rated return of unused portion of the fees prepaid by Customer for the applicable Services.

**10.1.2 Exclusions**. The above defense and indemnification obligations do not apply to the extent the Claim Against Customer arises from: (i) modifications to the Services by any party other than PowerSchool or its subcontractor; (ii) the combination of the Services with software, hardware, data, products or processes not provided by PowerSchool, if the Services or use thereof would not infringe without such combination; (iii) Customer's breach of this Agreement or violation of applicable law; or (iv) Customer Data, or any deliverables or components not provided by PowerSchool or its subcontractor.

**10.2 Indemnification by Customer**. To the extent permitted under applicable law, Customer will defend PowerSchool and its affiliates and each of their respective directors, officers, employees, representatives and agents (collectively, "**PowerSchool Indemnitees**") from and against any claim, demand, suit or proceeding brought by a third party against a PowerSchool Indemnitee (a "**Claim Against PowerSchool**") to the extent arising out of: (a) any Customer Data or use of Customer Data with the Services; (b) any information or content (other than PowerSchool-provided content) transmitted or submitted by Customer or its Users through the Services or shared with any third party; or (c) Customer's use of the Services or content therein in an unlawful manner or in violation of the Agreement. Customer will indemnify and hold PowerSchool harmless from any damages, attorney fees, and costs finally awarded against PowerSchool as a result of, or for amounts paid by PowerSchool under a

PowerSchool

settlement approved by Customer in writing of, a Claim Against PowerSchool. The above defense and indemnification obligations do not apply if a Claim Against PowerSchool arises from PowerSchool's breach of the Agreement or violation of applicable law.

**10.3 Procedure**. The indemnifying Party's obligations are expressly conditioned upon the following: (a) the indemnified Party will promptly notify the indemnifying Party in writing of any Claim Against Customer or Claim against PowerSchool, as applicable (the "**Claim**"); (b) the indemnifying Party will have sole control of the defense and settlement of the Claim; (c) the indemnified Party gives all reasonable assistance, at the indemnifying Party's expense, to facilitate the settlement or defense of the Claim; and (d) the indemnifying Party will not settle any claim or suit in a manner that results in an admission of liability by the indemnified Party, without the indemnified Party's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed.

**10.4 Sole and Exclusive Remedy**. THIS "INDEMNIFICATION" SECTION STATES THE INDEMNIFYING PARTY'S SOLE LIABILITY TO, AND THE INDEMNIFIED PARTY'S EXCLUSIVE REMEDY AGAINST, THE OTHER PARTY FOR ANY THIRD-PARTY CLAIM DESCRIBED IN THIS SECTION.

**11. LIMITATION OF LIABILITY.**

**11.1 EXCLUSION OF DAMAGES**. TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR FUNDING, REVENUES, GOODWILL, OR INDIRECT, INCIDENTAL, CONSEQUENTIAL, COVER, BUSINESS INTERRUPTION OR PUNITIVE DAMAGES, WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF LIABILITY, AND EVEN IF A PARTY OR ITS AFFILIATES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES OR IF A PARTY'S OR ITS AFFILIATES' REMEDY OTHERWISE FAILS OF ITS ESSENTIAL PURPOSE. THE FOREGOING DISCLAIMER WILL NOT APPLY TO THE EXTENT PROHIBITED BY LAW.

**11.2 CAP ON MONETARY LIABILITY.** TO THE MAXIMUM EXTENT PERMITTED BY LAW AND EXCEPT AS STATED HEREIN, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EACH PARTY TOGETHER WITH ALL OF ITS AFFILIATES ARISING OUT OF OR RELATED TO THIS AGREEMENT EXCEED THE TOTAL AMOUNT PAID BY CUSTOMER AND ITS AFFILIATES HEREUNDER FOR THE SERVICES GIVING RISE TO THE LIABILITY IN THE TWELVE (12) MONTHS PRECEDING THE FIRST INCIDENT OUT OF WHICH THE LIABILITY AROSE. NOTWITHSTANDING THE FOREGOING, IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EACH PARTY TOGETHER WITH ALL OF ITS AFFILIATES ARISING OUT OF OR RELATED TO THE EXCLUDED CLAIMS EXCEED TWO TIMES (2X) THE TOTAL AMOUNT PAID BY CUSTOMER AND ITS AFFILIATES HEREUNDER FOR THE SERVICES GIVING RISE TO THE LIABILITY IN THE TWELVE (12) MONTHS PRECEDING THE FIRST INCIDENT OUT OF WHICH THE LIABILITY AROSE. THE FOREGOING LIMITATION WILL APPLY WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF LIABILITY BUT WILL NOT LIMIT CUSTOMER'S AND ITS AFFILIATES' PAYMENT OBLIGATIONS UNDER THE "FEES AND PAYMENT" SECTION ABOVE.

**11.3 EXCEPTIONS**. THE FOREGOING LIMITATIONS SHALL NOT APPLY TO LIABILITY ARISING OUT OF A PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD.

**12. INSURANCE.** Each Party will maintain, at its own expense during the Term, insurance appropriate to its obligations under this Agreement, including as applicable general commercial liability, errors and omissions, employer liability, cyber liability, automobile liability, and worker's compensation insurance as required by applicable law**.** PowerSchool's current certificate of insurance ("**COI**") is found at https://www.powerschool.com/Certificate of Insurance 2024/, which will be updated annually and not subject to any modifications by Customer. Upon Customer's request, PowerSchool agrees to include Customer as a certificate holder (but not as additional insured) on such COI. PowerSchool will provide notice and an updated COI to Customer in the event of a cancellation or other material change to the insurance coverage described in such COI. The obligation for PowerSchool to maintain insurance coverage as set forth herein shall in no way impact the terms of the "Limitation of Liability" Section.

**13. TERM AND TERMINATION**

**13.1 Agreement Term.** This Agreement commences on the Effective Date and continues until all the Services hereunder have expired or terminated pursuant to the terms of this Agreement (the "**Term**").

**13.2 Subscription Term.** The subscription term of each Subscription Service (the "**Subscription Term**") will be as specified in the applicable Quote. The start date of the Subscription Term shall be the later of (i) the start date specified on the Quote, or (ii) the date last signed on the Quote (or if the Quote is not signed, then the date

of the Customer purchase order received by PowerSchool referencing the applicable Quote number). Except as otherwise specified in the applicable Quote, Subscription Services will automatically renew for successive twelve (12) month periods, unless either Party gives the other Party written notice (email acceptable) at least sixty (60) days before the end date specified on the applicable Quote. Customer shall send any notice of non-renewal to nonrenewal@powerschool.com. Except as otherwise specified in the applicable Quote, renewal of Subscription Services will be subject to an uplift, and renewal of promotional or one-time priced subscriptions or licenses will be at PowerSchool's applicable list price in effect at the time of the applicable renewal.

**13.3 Suspension.** If Customer's account is thirty (30) days or more overdue for any PowerSchool product or service (except with respect to charges then under reasonable and good faith dispute), PowerSchool reserves the right, in addition to any of its other rights or remedies, to suspend any of Customer's Services until such amounts are paid in full, provided that, other than for customers paying by credit card or direct debit and whose payment has been declined, PowerSchool has given Customer at least ten (10) business days' prior notice that its account is overdue in accordance with the "Notices" section below. In addition, PowerSchool will have the right to suspend provision of the Services under this Agreement if: (a) Customer or User accessed or used the Services beyond the scope of the rights granted or for purpose not authorized under this Agreement; (b) Customer or any User is or has been involved in any fraudulent, misleading or unlawful activities relating to or in connection with any of the Services; or (c) Customer is notified that an objective security threat arises so great as to warrant immediate action by PowerSchool to protect the security of Customer Data and the PowerSchool systems, including if the Subscription Services are experiencing denial of service attacks, mail flooding, or other attacks or disruptions outside of PowerSchool's control.

**13.4 Termination for Breach.** A Party may terminate this Agreement for cause (i) upon 30 days written notice to the other Party of a material breach if such breach remains uncured at the expiration of such 30-day period, or (ii) if the other Party becomes the subject of a petition in bankruptcy or any other proceeding relating to insolvency, receivership, liquidation or assignment for the benefit of creditors.

**13.5 Termination for Non-Appropriation for Governmental Entities Only.** The Parties acknowledge and agree that if Customer is a governmental entity that is bound to statutory provisions that prevent it from committing to the payment of funds beyond its fiscal year, and if funds are not allocated for the Services specified on a Quote following the commencement of any succeeding fiscal year during which the Quote may continue, then Customer may terminate the Quote without liability for any termination charges or penalties at the end of its last fiscal period or the Subscription Term for which funds were appropriated, subject to Customer's providing the required notice herein. Customer will pay all charges incurred through the end of the last fiscal period or Subscription Term for which funds were appropriated. Customer will give PowerSchool written notice that funds have not been appropriated and that Customer wants to terminate the Agreement: (a) immediately after Customer receives notice of such non-appropriation; and (b) at least thirty (30) days prior to the end of the applicable fiscal period or Subscription Term. Customer will not utilize this clause as a right to terminate any Quote or this Agreement for convenience. PowerSchool reserves the right to request, and Customer shall provide, documentation deemed reasonably sufficient by PowerSchool evidencing such non-appropriation of funds.

**13.6 Mutual Termination**. The Parties may terminate this Agreement by mutual written agreement.

**13.7 No Other Termination Right**. Except as expressly set forth in this Agreement, neither Party has a right to terminate this Agreement or any Quote prior to its expiration.

**13.8 Effect of Termination**. In the event of any termination of all or any portion of this Agreement, Customer will not be relieved of any obligation to pay any sums of money that have accrued prior to the date of termination. In addition, the provisions of Sections 1 (Definitions), 4 (Proprietary Rights), 6 (Fees and Payment), 7 (Product-Specific and Pass-Through Terms), 9 (Disclaimer of Warranties), 10 (Indemnification), 11 (Limitation of Liability), 13.8 (Effect of Termination), and 14 (General Provisions) will survive termination or expiration of this Agreement. The protection of Customer Data as stated in the applicable DPA will survive any termination or expiration of this Agreement for so long as PowerSchool retains possession of Customer Data. Once the Customer Data has been made available to return to Customer and is permanently deleted, the executed DPA associated with this Agreement will automatically expire.

**13.9 Return or Disposal of Customer Data**. Upon termination or expiration of the Agreement, PowerSchool shall return to Customer or delete the Customer Data in its possession, custody or control in accordance with the terms of the DPA, unless otherwise required by applicable law.

## 14. GENERAL PROVISIONS

**14.1 Governing Law**. This Agreement will be governed by the laws of the country, territory, province, or

Case 3:25-md-03149-BEN-MSB Document 301-3 Filed 09/25/25 PageID.3026 Page 13 of 42

PowerSchool

state in which Customer resides or has its principal place of business, without regard to its conflicts of laws rules or the United Nations Convention on the International Sale of Goods or the Uniform Computer Information Transactions Act.

**14.2 Venue**. The state, provincial, and federal courts located the country, territory, province, state, or county in which Customer resides or has its principal place of business will have exclusive jurisdiction and venue over any dispute relating to this Agreement, and each Party consents to the exclusive jurisdiction of those courts.

**14.3 Amendment**. This Agreement may only be amended or modified by a writing specifically referencing the particular section(s) of this Agreement to be modified and signed by authorized representatives of the Parties.

**14.4 Force Majeure**. Neither Party will be liable to the other for any delay or failure to perform any obligation under this Agreement (except for a failure to pay fees owed) if the delay or failure results from any cause beyond such Party's reasonable control, including acts of God or of a public enemy, acts of terrorism, war, United States or foreign governmental acts or restrictions in either a sovereign or contractual capacity, labor strikes, fire, power outages, road icing or inclement conditions, flood, epidemic or pandemic as designated by the World Health Organization, earthquakes, or tsunamis.

**14.5 Severability**. If any provision of this Agreement is held by a court of competent jurisdiction to be contrary to law, the provision will be deemed null and void, and the remaining provisions of this Agreement will remain in effect.

**14.6 No Waiver**. No failure or delay by either party in exercising any right under this Agreement will constitute a waiver of that right.

**14.7 Notices**. All notices under this Agreement must be in writing and delivered and will be deemed to have been received by the addressee: (i) if given by hand, immediately upon receipt; (ii) if given by overnight courier service, the first business day following dispatch; (iii) if given by registered or certified mail, postage prepaid and return receipt requested (or the equivalent delivery method in an international jurisdiction), the second business day after such notice is deposited in the mail; or (iv) if given by email, immediately upon confirmed receipt. Notices delivered personally are deemed given upon documented receipt or refusal by recipient to accept receipt. In the case of notices to PowerSchool, such notices must be sent to:

**PowerSchool Group LLC,**
**Attn: Chief Legal Officer**
**150 Parkshore Drive,**
**Folsom, CA 95630**
**legalnotices@powerschool.com**

In the case of notices to Customer, such notices will be sent to PowerSchool's address of record for Customer. Either Party may change its notice address by notifying the other Party in like manner.

**14.8 Assignment.** Neither PowerSchool nor Customer shall assign or transfer this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other Party; provided, however, that PowerSchool may assign its rights and obligations under this Agreement without the consent of the Customer in the event PowerSchool hereafter effects a corporate reorganization, consolidates with, or merges into, any entity or transfers all or substantially all of its properties or assets to any entity. This Agreement will inure to the benefit of and be binding upon the Parties, their respective successors and permitted assigns.

**14.9 No Reliance**. Each Party acknowledges that it has not made any promise or representation that is not expressed in this Agreement; and that it has not been induced into entering this Agreement by any representation about the nature and extent of its existing or potential claims or damages made by the other Party or by the other Party's attorney, representative, or agent.

**14.10 Export Compliance.** Customer shall not use the Services for any reason if Customer or any User is subject to sanctions or otherwise designated on any list of prohibited or restricted parties, including but not limited to the lists maintained by the U.S. Government (e.g., the Specially Designated Nationals List and Foreign Sanctions Evaders List of the U.S. Department of Treasury, and the Entity List of the U.S. Department of Commerce), the European Union or its Member States, or other applicable government authority. Customer shall not use the Services to export or re-export any information or technology to any country, individual, or entity to which such export or re-export is restricted or prohibited.

**14.11 Anti-Corruption**. Neither Party has received or been offered any illegal or improper bribe, kickback, payment, gift, or thing of value from an employee or agent of the other party in connection with this Agreement. Reasonable gifts and entertainment provided in the ordinary course of business do not violate the above restriction.

**14.12 Relationship of the Parties**. This Agreement does not create a partnership, franchise, joint venture,

PowerSchool

agency, fiduciary or employment relationship between the Parties.

**14.13 Entire Agreement; Order of Precedence**. This Agreement and/or exhibits referenced herein, and any addendums and amendments, constitute the complete and entire agreement between the Parties with respect to its subject matter, and supersedes all prior, written or oral, discussions, understandings, arrangements, proposals, responses to proposals, and negotiations with respect to the same. The Parties acknowledge and understand that the disclaimers and limitations of liability set forth in this Agreement form an essential basis of the agreement between the Parties. The Parties agree that any term or condition stated in a Customer purchase order or in any other Customer order documentation (excluding Quotes and SOWs) is void. In the event of any conflict or inconsistency among the following documents, the order of precedence shall be: (1) the applicable executed Quote, (2) the body of this Agreement; and (3) any referenced and applicable exhibit, schedule, addendum, or amendment to this Agreement. Titles and headings of sections of this Agreement are for convenience only and shall not affect the construction of any provision of this Agreement.

**14.14 Third-Party Beneficiaries**. There are no third-party beneficiaries under this Agreement.

**14.15 Counterparts**. This Agreement may be executed electronically and in counterparts.

# Exhibit B

# STUDENT DATA PRIVACY AGREEMENT

## STATE: NEW YORK

**PROCESSOR:** **PowerSchool Group, LLC**

PowerSchool

This Data Privacy Agreement ("**DPA**") supplements the agreed to license and service agreement for the PowerSchool Services between the PowerSchool Contracting Entity ("**PowerSchool**") and the entity identified on applicable quote, MSA or issued purchase order ("**Customer**") and is made and entered into as of the last signature below, (the "Effective Date"). The terms herein supplement and amend the terms of the PowerSchool's standard Main Services Agreement or, if there is none, the then-existing applicable agreement between PowerSchool and Customer for the provision of PowerSchool's services and products, as amended by the Parties from time to time (the "**MSA**"). The term "MSA" includes all exhibits, addenda, statements of work, and quotes that are attached to, referenced in or otherwise associated with the MSA. In the event of a conflict between the MSA and this DPA, the DPA controls. Below are the terms and conditions pursuant to which any Customer Data will be handled by PowerSchool and permitted third parties during the term of the MSA and after its termination. Any capitalized terms not defined herein shall have the meaning given to them in the MSA. PowerSchool and Customer are individually known as a "Party" and collectively referred to as "Parties."

Attachments:

A Services Description

B Parents' Bill of Rights for Data Privacy and Security

The Processor agrees as follows:

1. Definitions.

"Confidential Information" means (a) Protected Information; (b) any personally identifiable information related to CUSTOMER employees, agents and/or volunteers obtained by or furnished to the Processor; (c) all findings, analysis, data, reports or other information, whether in oral, written, graphic, or machine-readable form, obtained from the CUSTOMER or furnished by the CUSTOMER to the Processor in connection with the Services; and (d) all information marked "confidential" in writing.

Confidential Information excludes any information that both (a) is not Protected Information and (b) is: (i) lawfully in the public domain at the time of receipt or which lawfully comes into the public domain thereafter through no act of the Processor in breach of this Agreement, (ii) demonstrated to have been known to the Processor prior to disclosure by or through the CUSTOMER, (iii) disclosed with the prior written approval of the CUSTOMER, (iv) demonstrated to have been independently developed by the Processor without reference to the Confidential Information, and (v) disclosed to the Processor by a third party under conditions permitting such disclosure, without breach of this Agreement.

"NIST Cybersecurity Framework" means the U.S. Department of Commerce National Institute for Standards and Technology Framework for Improving Critical Infrastructure Cybersecurity Version 1.1, or any successor thereto.

"Process" or "Processing" means to perform any act, omission or operation on or with respect to data or information, such as accessing, adapting, altering, blocking, collecting, combining, delivering, deleting, destroying, disclosing, disseminating, erasing, generating, learning of, organizing, recording, releasing, retrieving, reviewing, sharing, storing, transmitting, using or otherwise making data or information available.

"Protected Information," as it relates to (a) CUSTOMER's current, future and former students and their families, consists of "personally identifiable information" as defined by the Family Educational Rights and Privacy Act, 20 U.S.C. 1232g and its implementing regulations, 34 C.F.R. Part 99 ("FERPA;") and (b) as it relates to certain CUSTOMER employees, consists of "personally identifying information" as that

term is used in New York Education Law 3012-c(10). In the case of either (a) or (b), Protected Information shall consist of any such information Processed by the Processor in the course of providing the Services, whether disclosed or provided by the CUSTOMER or collected, accessed or generated by the Processor in some other manner.

2. Confidentiality. Subject to any security review as required by the CUSTOMER Division of Instructional and Information Technology at its discretion, in furtherance of the use of Processor's software and/or services on behalf of the CUSTOMER (the "Services,") the Processor is permitted to Process the CUSTOMER's Confidential Information as set forth in the Service Description, attached hereto as Attachment A. In accordance with FERPA, the Processor agrees that to the extent that the Services relate to the Processor's Processing of Protected Information, the Services are (a) for the Processor to perform an institutional service or function for which the CUSTOMER would otherwise use its employees; or (b) in connection with an audit or evaluation of federal or state supported education programs, or for the enforcement of or compliance with federal legal requirements that relate to those programs. The Processor further agrees that it is hereby designated as the authorized representative of the CUSTOMER to the extent that the Services are in connection with an audit or evaluation of federal or state supported education programs, or for the enforcement of or compliance with federal legal requirements that relate to those programs. The Processor agrees to hold the Confidential Information in strict confidence, and not to disclose Confidential Information to or otherwise permit the Processing of Confidential Information by any other parties, nor Process such Confidential Information for the benefit of another or for any use or purpose other than for providing the Services. The confidentiality and data security obligations of the Processor under this Agreement shall survive any termination of this Agreement. The Processor agrees to conduct the Services in a manner that does not permit the personal identification of parents and students by anyone other than Authorized Users with legitimate interests in the Protected Information.

3. Authorized Users. The Processor shall only disclose Confidential Information to its employees (hereinafter referred to as "Personnel"), and its nonemployee agents, assignees, consultants or subcontractors (hereinafter collectively referred to as "Non-Employee Processors," and together with Personnel, "Authorized Users") who need to Process the Confidential Information in order to carry out the Services and in those instances only to the extent justifiable by that need. The Processor shall ensure that all such Authorized Users comply with the terms of this Agreement. The Processor agrees that upon request by the CUSTOMER, it will provide the CUSTOMER with the names and affiliations of the Non-Employee Processors to whom it proposes to disclose, or has disclosed, Confidential Information. The Processor agrees and acknowledges that the data protection obligations imposed on it by state and federal law, as well as the terms of this Agreement, shall apply to any Non-Employee Processor it engages to Process Confidential Information of the CUSTOMER. The Processor therefore agrees to ensure that each Non-Employee Processor is contractually bound by an agreement that includes confidentiality and data security obligations equivalent to, and no less protective than, those found in this Agreement.

4. Compliance with Law.

(a) The Processor agrees to hold all Confidential Information it Processes incompliance with all applicable provisions of federal, state and local law, including but not limited to FERPA and New York Education Law §2-d and any applicable regulations promulgated thereunder. The Processor understands that the disclosure of Protected Information to persons or agencies not authorized to receive it is a violation of United States federal law and New York state law, which may result in civil and/or criminal penalties under New York State and Federal laws.

(b) In the event that disclosure of Confidential Information (including Protected Information) is required of the Processor under the provision of any law, judicial order or

lawfully-issued subpoena, the Processor will (a)promptly notify the CUSTOMER of the obligations to make such disclosure sufficiently in advance of the disclosure, if possible, to allow the CUSTOMER to seek a protective order or to make any notifications required by law, and (b)disclose such Confidential Information only to the extent (i) allowed under a protective order, if any, or(ii)necessary to comply with the law or court order.

5. Mandatory N.Y. Education Law 2-d Requirements.

(a) CUSTOMER Data Privacy and Security Policies. The Processor agrees that it will comply with the CUSTOMER's data privacy and security policy, and any successor thereto.

(b) Subject Data Requests. If permitted by law, the Processor agrees to notify the CUSTOMER of any requests it receives from parents, students, principals or teachers ("Subjects") or parties authorized by Subjects, to amend, inspect, obtain copies of, or otherwise access Protected Information in the possession or control of the Processor, in advance of compliance with such requests. The Processor shall defer to the judgment of the CUSTOMER in granting or denying such requests, and in confirming the identity of Subjects and the validity of any authorizations submitted to the Processor. The Processor agrees to assist the CUSTOMER in processing such requests in a timely manner, whether received by the Processor or by the CUSTOMER. The Processor shall amend any Protected Information in accordance with the CUSTOMER's decision and direction.

(c) Training. The Processor shall ensure that all Authorized Users with access to the Confidential Information are trained in their confidentiality and data security responsibilities under applicable law and understand the privacy and data security obligations of this Agreement.

(d) Privacy and Security Plan; Additional Data Privacy and Security Protections. The Processor shall neither retain nor incorporate any of the Confidential Information into any database or any medium other than may be required for it to provide the Services. The Processor agrees to maintain appropriate administrative, technical and physical safeguards in accordance with industry standard practices and applicable law to protect the security, confidentiality and integrity of Protected Information in its custody. The Processor agrees to adhere to(a) its data privacy and security plan and the CUSTOMER Information Security Requirements as adjusted with compensating controls as described in Attachment B(together, the "Plan"), attached hereto as Attachment B. The Processor warrants and represents that (i)its technologies, safeguards and practices, as outlined in the Plan, align with the NIST Cybersecurity Framework, and include sufficient (A) data privacy protections, including processes to ensure that personally identifiable information is not included in public reports or other public documents; and (B) data security protections, including data systems monitoring, encryption of data in motion and at rest, an incident response plan, limitations on access to Protected Information, safeguards to ensure Protected Information is not accessed by unauthorized persons when transmitted over communication networks, and destruction of Protected Information when no longer needed; and (ii)its Plan meets all additional requirements of New York Education Law 2-d. The Processor agrees to use encryption technology to protect Protected Information while in motion or in its custody from unauthorized disclosure using a technology or methodology specified by the United States Department of Health and Human services in guidance issued under Section 13402(H)(2) of Public Law 111- 5. The Processor acknowledges and agrees to conduct digital and physical periodic risk

PowerSchool

assessments and to appropriately remediate any identified security and privacy vulnerabilities in a timely manner. The CUSTOMER reserves the right to request information from the Processor regarding its security practices and compliance with the Plan, prior to authorizing any exchange of Confidential Information. The Processor's security compliance is assessed by independent third-party auditors as described in the following industry standards. Upon CUSTOMER agreeing to an NDA, Processor shall provide access to Processor's Information Security Management System Policy, relevant annual penetration test reports, and ISO 27001:2103and SOCII Reports. To the extent that Processor discontinues a third-party audit, Processor will adopt or maintain equivalent industry-recognized security standard procedures and policies. The CUSTOMER may audit the Processor's Processing of the Confidential Information for data privacy and data security purposes. For clarity, such "audit" means an annual security and privacy questionnaire followed by a reasonable number of interview sessions with applicable CUSTOMER staff; a CUSTOMER review of Processor's security and privacy related policies and procedures; and, in coordination with Processor's Information Security department, an annual scheduled penetration test of identified systems not impacting any other customers.

(e) Parent Bill of Rights. The Processor agrees to comply with the CUSTOMER Parents' Bill of Rights for Data Privacy and Security, attached hereto as Attachment B. The Processor shall complete the Supplemental Information section of Attachment B and append it to this Agreement. The Processor shall notify the CUSTOMER on a yearly basis, by January 31 of each year that this Agreement remains in effect, of any change to its responses to Attachment B. The Processor acknowledges and agrees that the CUSTOMER shall make the Processor's Supplemental Information public, including but not limited to posting it on the CUSTOMER's website. The Processor acknowledges that this Agreement, including the attachments hereto, may be made available to the public.

(f) Reportable Data Events. The Processor shall promptly notify, without unreasonable delay the CUSTOMER at located identified on applicable quote, MSA or issued purchase order of (i)any unauthorized release or unauthorized Processing of Confidential Information, whether by the Processor, its Authorized Users or any other party that shall have gained access to the affected Confidential Information; or (ii)any other breach of contractual obligations relating to data privacy and security under this Agreement or any other applicable Agreement("Reportable Data Event"). In no event shall such notification occur more than forty-eight (48) hours after confirmation of an event described in clause (i)of the previous sentence, or more than seven (7) calendar days after confirmation of an event described in clause (ii) of the previous sentence. Moreover, to the extent(a) New York Education Law 2-d or any other law or regulation requires parties affected by the Reportable Data Event to be notified, and (b)the Reportable Data Event is not attributable to the acts or omissions of the CUSTOMER, the Processor shall be responsible, at its own cost and expense, to notify in writing all persons affected by the Reportable Data Event, or shall compensate the CUSTOMER for the full cost of any notifications that the CUSTOMER instead makes. The Processor and CUSTOMER will collaborate to support such notification. The Processor agrees to assist and collaborate with the CUSTOMER in ensuring that required notifications shall be clear, concise, use language that is plain and easy to understand, and to the extent available, include: (a) a brief description of the Reportable Data Event, the dates of the incident and the date of discovery, if known; (b) a description of the types of Confidential Information affected; (c)an estimate of the number of records affected;(d) a brief description of the investigation or plan to investigate; and (e) contact information for

PowerSchool

representatives who can assist parents or adult students that have additional questions. Processor follows its established incident response plan which ensures the CUSTOMER receives updates from knowledgeable Processor employees of the Reportable Data Event. If requested, Processor shall provide the CUSTOMER with access to Processor's Authorized Users or other employees with knowledge of the Reportable Data Event. The Processor shall reasonably cooperate with and assist the CUSTOMER in investigating the Reportable Data Event or in effectuating notifications, including reasonable disclosure of any relevant access information, records or other material necessary for such purposes or required to comply with applicable law.

(g) No Sale or Commercial Use. The Processor agrees that it will not (i) sell Protected Information; (ii)use, disclose or otherwise Process Confidential Information for purposes of receiving remuneration, whether directly or indirectly; or(iii) use, disclose or otherwise Process Confidential Information for marketing, commercial or advertising purposes (or facilitate its Processing by any other party for such purposes), or to develop, improve or market products or services to students, or permit another party to do so.

6. Right to Termination. The CUSTOMER shall have the right at its sole discretion to terminate the Processor's access to the CUSTOMER's Confidential Information upon fifteen (15) days written notice to the Processor. The CUSTOMER shall have the right at its sole discretion to terminate the Processor's access to the CUSTOMER's Confidential Information immediately upon the Processor's breach of any confidentiality obligations herein. No claim for damages will be made or allowed to the Processor because of said termination.

7. Confidential Information Retention, Transfer and Destruction. Upon the earliest of any of the following (i)whenever requested by the CUSTOMER, (ii) whenever the Processor no longer needs the Confidential Information to provide the Services to the CUSTOMER, (iii) whenever a CUSTOMER school or office ceases use of a product or service of the Processor, with respect to the Confidential Information Processed for the school or office with respect to that productor service, or (iv) no later than upon termination of this Agreement, the Processor shall promptly. (a) with respect to physical copies of Confidential Information, surrender, or if surrender is not practicable, securely delete or otherwise destroy Confidential Information and (b) with respect to digital and electronic Confidential Information, securely delete or otherwise destroy Confidential Information remaining in the possession of the Processor and its Authorized Users, including all hard copies, archived copies, electronic versions or electronic imaging of hard copies of such data. The Processor shall ensure that no copies, summaries, or extracts of Confidential Information are retained on any storage medium whatsoever by the Processor or its Authorized Users. The Processor shall certify, in writing, that Confidential Information has been surrendered or destroyed in accordance with this Agreement via the "Certificate of Records Disposal" form attached to this Agreement as Attachment D. Any and all measures related to the extraction, deletion, transmission, destruction or disposition of Confidential Information will be accomplished utilizing an appropriate method of confidential destruction, including shredding, burning or certified/witnessed destruction of physical materials or verified erasure of magnetic media using approved methods of electronic file destruction. The Processor agrees not to attempt to re-identify, or have others attempt to re-identify, Subjects from any data remaining after such deletion, destruction or disposition. If student-, parent-or employee-generated content is stored or maintained by the Processor, Processor shall, at the request of the CUSTOMER, and if severable, provide opportunity to CUSTOMER to download Confidential Information upon termination of this Agreement.

8. CUSTOMER Property. All reports and work product containing Confidential Information(a)created or collected by the Processor, or (b) disclosed or transmitted to the Processor,

PowerSchool

pursuant to this Agreement, shall remain the exclusive property of the CUSTOMER. All rights, including the intellectual property rights in and to the Confidential Information Processed pursuant to this Agreement shall remain the exclusive property of the CUSTOMER. Any reports or work product may not contain any Confidential Information, unless required by the CUSTOMER or if necessary to carry out the Services.

9. Other Agreements. The Processor agrees that to the extent that any confidentiality or data security terms or conditions regarding the Services found in another agreement binding CUSTOMER employees, subcontractors, parents or students(together, "CUSTOMER Users,")including but not limited to any end-user license agreement, "clickwrap," "click-through," "click and accept, "web-wrap," or other form of agreement requiring the individual user to accept terms in order to use or benefit from the Services, conflict with the terms found in this Agreement, the terms and conditions which afford more protection to CUSTOMER Users shall apply. Any subsequent agreements between the Processor and the CUSTOMER with respect to the provision of the Services shall include confidentiality and data security obligations on the part of the Processor at least as strict as set those forth in this Agreement. In the event a subsequent agreement fails to contain confidentiality and data security provisions with obligations at least as strict as this Agreement, the confidentiality provisions of this Agreement shall be deemed inserted therein, and shall continue to bind the Processor, unless such subsequent agreement specifically references this Agreement by name and disclaims its obligations in writing.

10. Other Terms.

(a) As a supplement to the existing injunctive relief provisions in the underlying subscription/services agreement, the Processor agree that money damages would be an insufficient remedy for breach or threatened breach of this Agreement. Accordingly, in addition to all other remedies that School District may have, School District shall be entitled to enforce the data-security provisions of this Agreement by seeking specific performance or other equitable relief as a remedy for any breach that is not cured after 24-hours' notice.

(b) Nothing in this Agreement obligates either party to consummate a transaction, to enter into any agreement or negotiations with respect thereto, or to take any other action not expressly agreed to herein.

(c) The Processor shall defend, indemnify and hold harmless the CUSTOMER from any and all claims brought by third parties to the extent arising from, or in connection with, any negligent acts or omissions of the Processor and the Processor's Authorized Users or any other representatives for whom the Processor is legally responsible for, in connection with the performance of this Agreement.

(d) No failure or delay (in whole or in part) on the part of either party hereto to exercise any right or remedy hereunder shall impair any such right or remedy, operate as a waiver thereof, or affect any right or remedy hereunder. All rights and remedies hereunder are cumulative and are not exclusive of any other rights or remedies provided hereunder or by law or equity. To the extent any provision of this Agreement is held to be unenforceable or invalid, the remainder of the Agreement shall remain in full force and effect, and the Agreement shall be interpreted to give effect to such provision to the maximum extent permitted by law.

(e) This Agreement shall be governed by and construed in accordance with the law of the State of New York. The Federal or State Courts of New York, New York will have exclusive jurisdiction to adjudicate any dispute arising under or in connection with this Agreement. This Agreement constitutes the entire Agreement with respect to the subject matter hereof; it supersedes any other Processor terms and conditions, all prior agreements or understandings of the parties, oral or written, relating to the subject

matter of this Agreement and shall not be modified or amended except in writing signed by the Processor and the CUSTOMER. The Processor may not assign or transfer, without the prior written consent of the CUSTOMER, this Agreement. This Agreement shall inure to the benefit of the respective parties, their legal representatives, successors, and permitted assigns. This Agreement is effective upon execution of the Processor.

PowerSchool

## Attachment A: Services Description

**Naviance CCLR**: Naviance is a college and career readiness platform that Naviance helps students explore goal setting, career interests, academic planning, and college preparation, while operating as the system of records for schools and districts. (former product name: PowerSchool Unified Classroom Naviance CCLR)

**Enrollment**: Enrollment is an enterprise enrollment product that facilitates student acquisition and registration business process through data collection from parents, administrative workflows, data integration with various SIS's, and lotteries, streamlining related business processes. Registration is a multitenant cloud-based web application. (former product name: PowerSchool Unified Operations Enrollment)

**Enrollment Express**: Enrollment Express is a student enrollment management system inside PowerSchool SIS. (former product name: PowerSchool Unified Operations Enrollment Express)

**Performance Matters**: Performance Matters and its Advanced Reporting feature brings multiple data measures into one location to help school districts identify, monitor, and improve student performance. Dashboards provide access to state and national test scores, third-party diagnostic results, and district-based common formative assessments to give you the data needed to inform decisions for your schools, district, and students. (former product: PowerSchool Unified Classroom Performance Matters Advanced Reporting)

**Performance Matters**: Performance and its Matters Assessment offers a school-wide assessment management system for curriculum teams to build student assessments for use across grade levels, content areas, and schools. Various assessment delivery methods are available including online testing, scanning, and observational scoring tools. The data is available within minutes to view how students performed on standards, each item, and overall making data-driven decisions about instructional needs quick and easy for teachers. (former product: PowerSchool Unified Classroom Performance Matters Assessment)

**PowerSchool SIS**: Our PowerSchool SIS solution provides deep functionality across PowerSchool solutions empowering schools to configure the administrative and instructional tools for their unique needs, from managing classroom data and assignments to family engagement, student enrollment and registration, student analytics, and special education. (former product name: Unified Classroom PowerSchool SIS)

**Employee Records**: Digitizing processes with Employee Records simplifies onboarding. Online checklists, digital storage, centralized tracking, automated alerts, and information forwarding combine to create a more positive experience. Say goodbye to the calls, emails, and tedious verifications that hamper traditional, paper-based onboarding processes. (former product name: PowerSchool Unified Talent Employee Records)

**Schoology Learning**: Schoology Learning Management System (LMS) provides learning management, assessment, and professional development all in one integrated platform. Be prepared for inevitable changes and challenges with a more flexible and reliable approach to teaching and learning while providing consistent access to learning resources across your whole district. (former product name: PowerSchool Unified Classroom Schoology Learning)

**Curriculum and Instruction**: Provide centralized access to shared curriculum so teachers can collaborate in real-time and connect curriculum directly to their lesson plans. Streamline horizontal and vertical standards alignment with our integrated digital curriculum mapping and lesson planning solution. (former product name: PowerSchool Unified Classroom Curriculum and Instruction)

**Special Programs**: Special Programs gives special education staff the support they need to simplify case management, collaborate with general education staff, save time, and meet compliance requirements with confidence. This allows special education staff the ability to provide high-quality instruction, services, and appropriate modifications and accommodations for students with disabilities. (former product name: PowerSchool Unified Classroom Special Programs"

**Behavior Support:** Support the whole child with the only evidence-based (ESSA Level II) behavior solution proven to reduce suspensions and referrals and increase school positivity. Educators can collect and analyze real-time data to further positive behavior support and interventions (PBIS) and social and emotional learning (SEL). (former product name: PowerSchool Unified Classroom Behavior Support)

**Communication**: Improve communication between school and home by engaging in two-way conversations that create partnerships between educators and families. Improve equity of access by reducing technology gaps and language barriers with two-way translated text messaging, multimedia messaging, and more. (former product name: PowerSchool Unified Operations Communication; Unified Home Communication, Kinvo Connect)

**Attendance Intervention:** Perform research-based attendance interventions that use best-practice, data-driven family engagement tools that are proven to address the root causes and improve attendance and engagement. Track and view actionable attendance data and strengthen and simplify school-home connections by communicating in real-time via two-way translated text notifications, multimedia messages, visual postcards, and more. (former product name: PowerSchool Unified Operations Attendance Intervention Suite; and Kinvo Attend)

**Student Readiness Analytics, Risk Analysis and MTSS**: Unified Insights provides a comprehensive analytics platform with actionable insights across key aspects of school and district operations and allows district staff to extract student data, create notifications, gain access with mobile devices, and distribute reports throughout the entire district. (former product name: Unified Insights)

**Perform**: K-12 teacher evaluation software that Improves teacher support and retains effective educators. Manage and conduct teacher evaluations and observations online or in person. (former product name: PowerSchool Unified Talent Perform)

**Professional Learning**: Provides professional learning for teachers that supports career growth with easier professional development management and 24/7 accessibility. (former product name: PowerSchool Unified Talent Professional Learning)

**SmartFind Express**: K-12 substitute teacher management software that automates callouts and streamlines online substitute management to quickly fill teacher and staff absences. (former product name: PowerSchool Unified Talent SmartFind Express)

**Applicant Tracking:** Helps schools and districts hire the teachers and staff they need faster and easier. (former product name: PowerSchool Unified Talent Applicant Tracking)

PowerSchool

**Attachment B: Parents' Bill of Rights for Data Privacy and Security**

Both state and federal laws protect the confidentiality of information about your child that identifies him or her. Such information, which includes student-specific data, is known as "personally identifiable information." Under New York state's education law, if you are a parent of a child in the School District, you have the following rights regarding the privacy and security of your child's personally identifiable information and data.

(1) Your child's personally identifiable information cannot be sold or released for any commercial purposes.

(2) If your child is under age 18, you have the right to inspect and review the complete contents of your child's education records.

(3) Safeguards must be in place to protect your child's personally identifiable data when it is stored or transferred. These safeguards must meet industry standards and best practices. Examples of such safeguards include encryption, firewalls and password protection.

(4) You have the right to make complaints about possible breaches of student data and to have such complaints addressed. Complaints to the SED should be directed in writing to the Chief Privacy Officer, New York State Education Department, 89 Washington Avenue, Albany NY 12234, email to CPO@mail.nysed.gov. Complaints to the School District should be directed via email to address of Customer.

(5) You have additional rights as a parent, including additional privacy rights under federal law. They are found in the District's Parents' Bill of Rights and Responsibilities.

(6) You can find a complete list of all of the types of student data that the New York State Education Department (SED) collects at this web-link: http://www.p12.nysed.gov/irs/sirs/documentation/NYSEDstudentData.xlsx

You may also obtain a copy of this list by writing to the Office of Information & Reporting Services, New York State Education Department, Room 863 EBA, 89 Washington Avenue, Albany, NY 12234.

Case 3:25-md-03149-BEN-MSB Document 301-4 Filed 09/23/25 PageID.3040 Page 23 of 44

PowerSchool

**Parents Bill of Rights for Data Privacy and Security—Supplemental Information**

**I. Explanation and Instructions**

Pursuant to New York Education Law §2-d and 8 N.Y.C.R.R 121.3, School District is required to supplement its Parents Bill of Rights for Data Privacy and Security with additional information concerning a written agreement ("Agreement") under which an outside entity ("Entity") will receive personally identifiable information from education records of students ("PII"; see full definition below). In accordance with these provisions, it is necessary for you to provide a complete and accurate response to each item below. If an item is not applicable to your agreement with School District, explain why. Your responses will be posted are subject to review and approval by the School District, and will be posted to the School District's website.

Please note that New York Education Law 2-d defines PII as follows:

1. With respect to student data, personally identifiable information from the DOE's education records, including but not limited to the following:
   a. The student's name;
   b. The name of the student's parent or other family members;
   c. The physical or electronic address, device number (including telephone and mobile phone numbers, geolocation information and IP addresses) and other contact information of the student or student's family;
   d. A personal identifier, such as the student's social security number, student number, or biometric record (including but not limited to fingerprints, facial images, iris scans and handwriting);
   e. Other indirect identifiers, such as the student's date of birth, place of birth, and mother's maiden name;
   f. Other information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty—including combinations of demographic, performance and school information that could lead to the student being identified); and
   g. Information requested by a person who the educational agency or institution reasonably believes knows the identity of the student to whom the education record relates.
2. With respect to teacher or principal data, any annual professional performance review (APPR) data disclosed by the School District to the Entity on an identifiable basis.

Please note that "education records" include records directly related to a student and maintained by **or on behalf of** the School District. Accordingly, to the extent the Entity is providing a service or function on behalf of the School District, education records, and the PII found in it, includes information that the Entity may collect directly from parents or students.

With respect to any explanation the Entity provides below in response to the questionnaire:

- The School District reserves the right to review and reject them, or request further explanation. Note that certain options below match federal and state legal requirements, and deviations will need to be reviewed and considered on a case-by-case basis.
- Phrase your responses so that public posting of it will not jeopardize the security of PII or your data protection processes.
- Do not refer back to your written agreement with the School District, or use defined terms found elsewhere in the agreement or in other documents. Your explanations must stand on their own, since they will be posted publicly.
- Ensure that it is clear and uses plain English, because the audience for it consists of School District parents, staff, students and other interested members of the public.

**II. Questionnaire**

**1. Name of Entity**

**PowerSchool Group LLC**

**2. Type of Entity**

☒ Commercial Enterprise

☐ Research Institution or Evaluator

☐ Community Based Organization or Not-for-Profit

☐ Government Agency

☐ Other (You must explain below)

Click or tap here to enter text.

**3. Contract / Agreement Term**

Contract Start Date: ____________________

Contract End Date: ____________________

**4. Description of the exclusive purpose(s) for which Entity will receive/access PII**

Describe briefly the project/evaluation/research you are conducting or participating in, and/or the commercial product or service you are providing. Describe the purposes for which you are receiving or accessing PII.

**5. Type of PII that the Entity will receive/access**

Check all that apply:

☒ Student PII

☐ APPR PII (Identifiable Teacher or Principal Annual Professional Performance Review Data)

☐ Entity will not receive or access PII (do not choose this response if Entity's services or products permit users to store PII on a platform that the Entity or its subcontractors host)

☐ Other (You must explain below)

Click or tap here to enter text.

**6. Subcontractor Written Agreement Requirement**

In accordance with New York Education Law 2-d, the Entity may not share PII with subcontractors without a written agreement that requires each of its subcontractors to adhere to, at a minimum, materially similar—and no less protective—data protection obligations imposed on the Entity by the Agreement with the School District and by applicable state and federal laws and regulations.

Check one option only:

☐ The Entity will not share PII with subcontractors, outside persons, or third party entities.

☒ The Entity will utilize subcontractors or third party entities and agrees not share PII unless similar data protection obligations contained herein are imposed on each subcontractor or third party, in compliance with applicable New York State and federal law and using industry standard best practices for data privacy and security.

☐ Other (You must explain below)

Click or tap here to enter text.

**7. Data Transition and Secure Destruction**

Upon expiration or termination of the Agreement, the Entity shall (check all that apply):

☐ Securely transfer PII to School District, or a successor contractor at the School District's option and written discretion, in a format agreed to by the parties

☒ Securely delete and/or destroy PII

☐ Other (You must explain below)

Click or tap here to enter text.

PowerSchool

**8. Challenges to Data Accuracy**

In accordance with N.Y. Education Law 2-d, parents, students, eligible students, teachers, or principals may seek copies of their PII, or seek to challenge the accuracy of PII in the custody or control of the Entity. Typically, they can do so by contacting the School District using the email address or mailing address below. If a correction to PII is deemed necessary, the Entity agrees to facilitate such corrections within 21 days of receiving the School District's written request. The Entity must forward the request to the School District as soon as practicable in order for the School District to authenticate the identity of the student or parent, and to advise the Entity on how to process the request.

All requests for copies of PII or requests to challenge the accuracy of PII should be directed to the address in the Agreement.

Please select one option only:

☒ The Entity agrees to the procedure outlined above

☐ Other (You must explain below)

Click or tap here to enter text.

**9. Security and Storage Protections**

Describe where PII will be stored or hosted (check all that apply)

☒ Using a cloud or infrastructure owned tool hosted by a subcontractor

☐ Using an Entity-owned and/or internally hosted-solution

☐ No PII will be stored or hosted by Entity

☐ Other (you must explain below):

Click or tap here to enter text.

**10. Describe the administrative, technical and/or physical safeguards to ensure PII will be protected and how the Entity will mitigate data privacy and security risks. (Please do so in a manner that ensures that disclosure of the description on School District's website will not compromise the security of the data or the Entity's security practices and protocols):**

**Data Security and Privacy Plan**

Processor agrees that it will protect the security, confidentiality, and integrity of the Customer Data it receives from Customers in accordance with customer's Parents' Bill of Rights for Data Privacy and Security.

Additional elements of Processor's Data Security and Privacy Plan are as follows:

PowerSchool

(a) To implement all state, federal, and local data security and privacy requirements, including those contained within this Data Security and Privacy Plan ("DSPP"), consistent with customer's data security and privacy policy, Processor will: Review its data security and privacy policy and practices to ensure they are in conformance with all applicable federal, state, and local laws and the terms of this DSPP. In the event Processor's policy and practices are not in conformance, Processor will implement commercially reasonable efforts to ensure such compliance.

(b) As required by the NIST Cybersecurity Framework, to protect the security, confidentiality and integrity of the Customer Data that it receives under the MSA, Processor will have the following reasonable physical, administrative, and technical safeguards and practices in place throughout the term of the Agreement:

*Data Security:*

Processor ensures that both data-at-rest and data-in-transit (motion) is encrypted, and data leak protections are implemented.

*Information Protection Processes and Procedures:*

Processor performs data destructions according to the terms set in contracts and agreements. Processor also possesses a vulnerability management plan that will be developed and implemented.

*Protective Technology:*

To ensure that network communications are protected, log/audit records are ascertained, implemented, documented, and reviewed according to Processor/District policy.

*Identity Management, Authentication and Access Control:*

Processor manages remote access through credentials and identities that are issued, verified, managed, audited, and revoked, as applicable, for authorized devices, processes, and users.

(c) If Processor engages any subcontractors, assignees, or other authorized agents to perform its obligations under the MSA, Processor will require such subcontractors, assignees, or other authorized agents to execute written agreements requiring those parties to protect the confidentiality and security of Protected Data under applicable privacy laws.

**11. Encryption**

Pursuant to New York Education Law 2-d, PII must be encrypted while in motion and while at rest. By checking the box below, Entity agrees that PII will be encrypted using industry standard data encryption technology while Protected Information is in motion and at rest.

☒ Entity agrees that PII will be encrypted in motion and at rest using industry-standard data encryption technology.

☐ Other (you must explain below):

Click or tap here to enter text.

# Exhibit C

# STUDENT DATA PRIVACY AGREEMENT

## STATE: NEW JERSEY

**PROCESSOR:** **PowerSchool Group, LLC**

PowerSchool

## DATA PRIVACY AGREEMENT

This Data Privacy Agreement ("**DPA**") supplements the agreed to license and service agreement for the PowerSchool Services between the PowerSchool Contracting Entity ("**PowerSchool**") and the entity identified on applicable quote, MSA or issued purchase order ("**Customer**") and is made and entered into as of the effective date of signed quote, MSA or issued purchase order (the "**Effective Date**"). The terms herein supplement and amend the terms of the PowerSchool's standard Main Services Agreement or, if there is none, the then-existing applicable agreement between PowerSchool and Customer for the provision of PowerSchool's services and products, as amended by the Parties from time to time (the "**MSA**"). The term "MSA" includes all exhibits, schedules, addenda, statements of work, and quotes that are attached to, referenced in or otherwise associated with the MSA. In the event of a conflict between the MSA and this DPA, the DPA controls.

Below are the terms and conditions pursuant to which any Customer Data will be handled by PowerSchool and permitted third parties during the term of the MSA and after its termination. Any capitalized terms not defined herein shall have the meaning given to them in the MSA. PowerSchool and Customer are individually known as a "**Party**" and collectively referred to as "**Parties**."

**1. Glossary of Terms.**

The terms, "**Controller**", "**Data Subject**", "**Personal Data**", "**Personal Data Breach**", "**Processor**", and "**Processing**" (includes "**Processed**") shall have the same meaning as in the EU General Data Protection Regulation ("**GDPR**").

**1.1** "**Aggregate Data**" is raw data gathered and expressed in a summary form for statistical analysis.

**1.2** "**Applicable Law**" means any law that regulates the processing, privacy, or security of Customer Data and that is directly applicable to each Party to this DPA in the context of PowerSchool Processing Customer Data.

**1.3** "**Customer Data**" means all data, files, documents, and records uploaded to a PowerSchool Subscription Service or transmitted to PowerSchool under this Agreement by or on behalf of the Customer.

**1.4** "**Designated Representative**" means Customer or Processor employees as specified in the MSA to whom all notices required in this DPA will be sent.

**1.5** "**Education Records**" are records that are directly related to a student and that are maintained by an educational agency or institution or a party acting for or on behalf of the agency or institution. These records include but are not limited to grades, transcripts, class lists, student course schedules, health records (at the K- 12 level), student financial information (at the postsecondary level), and student discipline files. The information may be recorded in any way, including, but not limited to, handwriting, print, computer media, videotape, audiotape, film, microfilm, and microfiche. 34 CFR § 99.3. For the purpose of this DPA, "Education Records" provided to PowerSchool are presumed to be owned and under the control of the Customer.

**1.6** "**Student Data**" is a subset of Customer Data and contains Personal Data that would typically include pupil records of students and parents of students enrolled in a school, such as education records.

**1.7** "**Vendor-Data Subprocessor**" means PowerSchool's subcontractors or agents, appointed by or on behalf of PowerSchool in PowerSchool's role as Processor to Process Personal

Data on behalf of Customer in accordance with the MSA, or other service to operate and/or improve its software, and who has access to Customer Data.

**1.8** "**Student Profile**" means a collection of PII data elements relating to a student of the Customer.

**2. Purpose.**

To describe PowerSchool's responsibilities and solutions as a Processor for handling and protecting Customer Data.

**3. PowerSchool Products and Solutions.**

The MSA along with the accompanying applicable Quote(s) or Statement(s) of Work, provides the contracted- for PowerSchool products, solutions, and services.

**4. Data Classification.**

PowerSchool classifies data as public, private, or restricted, with restricted requiring the highest level of care and security.

**4.1.** All Customer Data that has not been de-identified or aggregated are classified as restricted in PowerSchool products, solutions, and services.

**4.2.** PowerSchool employs physical, administrative, and technological safeguards for restricted data. See Schedule 1-C (Physical, Administration, And Technological Safeguards) for more detail.

**5. Customer Data.**

**5.1.** PowerSchool will maintain all Customer Data in strict confidence and will not disclose any such Customer Data, or copies thereof, to any person or entity other than Customer's legal counsel or Customer's designated contact, or pursuant to the MSA. The Customer Data shared pursuant to the MSA, including persistent unique identifiers, will be used for no purpose other than the performance of the Services, improvement of PowerSchool Product(s), or internal research or as further agreed to in the MSA. If PowerSchool desires to use any Customer Data for purposes not contemplated in the MSA, PowerSchool must first obtain written approval from Customer.

**5.2.** Customer Data does not include metadata, De-identified Data, Aggregate Data or Transaction Data. See MSA for permitted uses of De-identified Data, Aggregate Data, and Transaction Data.

**5.3.** PowerSchool acknowledges that Customer retains full right and ownership to and control of all of their data, which includes User-provided or User-generated content (such content not encompassing any modifications to PowerSchool's Pre-existing Intellectual Property), unless such rights are specifically granted to PowerSchool in a writing signed by Customer and the User(s) or, if the User(s) is a minor child, by the child's parent/guardian.

**6. Processing of Customer Data.**

**6.1.** PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained from Customer.

**6.2.** PowerSchool may access and use Customer Data on a need-to-know basis and only as expressly authorized by Customer for the sole and express purpose of fulfilling its obligations under the MSA and this DPA and any applicable Quote or Statement of Work. Such access or use of Customer Data by PowerSchool shall be to the minimum extent necessary and only for PowerSchool to fulfill its obligations under the MSA and this DPA and any applicable Quote or Statement of Work.

**6.3.** PowerSchool and its Vendor–Data Subprocessors shall Process Customer Data according to the Customer's instructions documented in the MSA unless otherwise required by

PowerSchool

Applicable Law. In the event of Processing required by Applicable Law, and to the extent permitted by the Applicable Law, PowerSchool will inform the Customer before Processing Customer Data.

**6.4.** With the exception of De-identified Data, Aggregated Data, Transaction Data, and Vendor-Data Subprocessor uses permitted under the MSA, PowerSchool shall not:

**6.4.1.** Use, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA;

**6.4.2.** Use Customer Data for its own commercial benefit, including but not limited to, advertising or marketing of any kind directed toward children, parents, guardians, or Customer employees, unless such use is specifically authorized by this DPA or otherwise authorized in writing by the Customer;

**6.4.3.** Use Customer Data to create a Student Profile other than as authorized or required by the MSA to perform the Services; and

**6.4.4.** Store Customer Data outside the continental United States unless Processor has given the Customer Designated Representative advance written notice of where and how the servers are housed, managed, and secured, and that the security standards required herein can be achieved; and the storage would be permitted under Applicable Law.

**6.5.** Qualified FERPA Exception. If PowerSchool will have access to Education Records, Processor acknowledges that, for the purposes of this DPA and the MSA, pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g and its implementing regulations, 34 C.F.R. Part 99 ("FERPA"), it will be designated as a "school official" with "legitimate educational interests" in the Customer Education Records, Student Data, and Personal Data disclosed pursuant to the MSA, and PowerSchool agrees to abide by the FERPA limitations and requirements imposed on school officials. Processor will use the Education Records only for the purpose of fulfilling its duties under the MSA for Customer's and its Users' benefit, and shall not share Customer Data with or disclose it to any third party except as provided for in the MSA or this DPA, as required by Applicable Law, or if authorized in writing by the Customer.

**6.6.** Customer represents and warrants that it has obtained all necessary consents and government authorizations required under Applicable Law to permit the Processing of Customer Data.

**6.7.** Customer agrees to indemnify and hold PowerSchool and its Affiliates harmless from and against any action, claim, expense, damage, and cost brought against PowerSchool or any of its Affiliates, whether by a Data Subject or a government authority, related to necessary Data Subject consents and government authorizations for Processing.

**6.8.** PowerSchool agrees not to edit or use Customer Data, unless:

**6.8.1.** integral to and clearly contemplated by the particular nature of the Services or otherwise permitted pursuant to the MSA or this DPA;

**6.8.2.** written consent is first procured from and through the Customer;

**6.8.3.** the data is De-identified Data; Aggregate Data or Transactional Data; OR

**6.8.4.** the editing is performed to maintain the integrity of the Customer Data.

**7. Reliability of PowerSchool's and Vendor-Data Subprocessors' Employees, Agents and Contractors.** PowerSchool shall take reasonable measures to ensure the reliability of employees, agents, and contractors of PowerSchool, and Vendor-Data Subprocessors who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the MSA or this DPA, and to comply with Applicable Law in the context of individual's duties to the Processor and Vendor-Data Subprocessor, ensuring that individuals are subject to confidentiality obligations.

PowerSchool

**8. Security of Processing.**

Taking into account the state of the art, the costs of implementation and the nature, scope, context and purposes of Processing as well as the risk of varying likelihood and severity for the rights and freedoms of Data Subjects, PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk. For further information on PowerSchool's technical and organizational measures, see Schedule 1-C (Physical, Administration, and Technological Safeguards).

**9. Vendor-Data Subprocessing.**

**9.1.** Customer authorizes PowerSchool to appoint Vendor-Data Subprocessors in accordance with this subsection and the MSA.

**9.2.** PowerSchool will enter into written agreements ("**Vendor-Data Subprocessor Agreement**") whereby Vendor-Data Subprocessors agree to secure and protect Customer Data in a manner consistent with the terms of this DPA and the MSA.

**9.3.** PowerSchool will periodically conduct or review compliance monitoring and assessments of Vendor-Data Subprocessors to determine their compliance with this DPA and MSA.

**9.4.** Pursuant to its respective Vendor-Data Subprocessor Agreement, the applicable Vendor-Data Subprocessors shall:

**9.4.1.** not disclose Customer Data, in whole or in part, to any third party with the exception of a Vendor-Data Subprocessor properly vetted by the primary Vendor-Data Subprocessor;

**9.4.2.** not use any Customer Data to advertise or market to students or their parents/guardians;

**9.4.3.** access, view, collect, generate and use Customer Data only to the extent necessary to assist Processor in performing its obligations specified in this DPA and the MSA;

**9.4.4.** at the conclusion or termination of the work, as directed by the Customer through PowerSchool, delete or return to the Customer all Customer Data in possession, custody or control, at the election of the Customer;

**9.4.5.** utilize reasonable physical, administrative, and technical safeguards in accordance with industry standards to secure Customer Data from unauthorized disclosure, access and use. Vendor-Data Subprocessor shall ensure that its employees and subcontractors who have access to Customer Data have been adequately vetted, trained, and possess the necessary qualifications to comply with the terms of this DPA; and

**9.4.6.** not re-identify or attempt to re-identify any De-identified Data or use De-identified Data in combination with other data elements or De-identified Data in the possession of a third-party affiliate, thereby posing risks of re-identification.

**10. Data Subject Rights.**

**10.1.** With respect to requests from Data Subjects regarding Customer Data, PowerSchool shall:

**10.1.1.** promptly notify the Customer if PowerSchool receives a request from a Data Subject under any Applicable Law with respect to Customer Data;

**10.1.2.** reasonably cooperate and assist Customer in connection with access requests, inquiries, and complaints from Data Subjects to whom the data relates or from data protection authorities; and

**10.1.3.** not directly respond to the request except on documented instructions of the Customer.

**10.2.** PowerSchool acknowledges that Applicable Law regarding Data Subject Rights may be further promulgated, modified, or interpreted by state attorney generals. PowerSchool will reasonably cooperate and assist Customer in adapting PowerSchool's support of Customer regarding responding

PowerSchool

to Data Subject requests.

**11. Personal Data Breach.**

**11.1.** Customer agrees to notify PowerSchool immediately of any unauthorized use of Customer's accounts or any other breach of security.

**11.2.** Upon PowerSchool's becoming aware of a Personal Data Breach of Customer Data, PowerSchool shall immediately investigate the Personal Data Breach.

**11.2.1.** In the course of the investigation, PowerSchool shall take steps to mitigate and remediate the Personal Data Breach.

**11.2.2.** PowerSchool shall notify Customer without undue delay, and within the time period required by Applicable Law.

**11.2.3.** PowerSchool shall provide Customer with sufficient information to permit Customer to make a determination as to any notification obligations under Applicable Law.

**11.3.** PowerSchool shall cooperate with Customer and take commercially reasonable steps to assist Customer in an investigation of the Data Breach.

**11.4.** For additional information regarding Personal Data Breach notification and response, see Schedule 1-C.

**12. Data Protection Impact Assessment.**

PowerSchool shall provide reasonable assistance related to the nature of Processing to Customer in the event that a data protection impact assessment be required by Applicable Law.

**13. Return and Disposition of Customer Data.**

**13.1.** Upon written request from Customer and in accordance with the applicable terms in the following provisions of the Section 13 (Return and Disposition of Customer Data), PowerSchool will dispose or delete all Customer Data within a commercially reasonable time period when it is no longer needed for the purpose for which it was obtained.

**13.1.1.** Customer must inform PowerSchool when Customer Data is no longer needed. In no event will PowerSchool dispose of Customer Data pursuant to this provision unless and until PowerSchool has received affirmative written confirmation from Customer that Customer Data does not need to be transferred to a separate account.

**13.1.2.** Disposition will include (1) the shredding of any hard copies of any Customer Data; (2) erasing; or (3) otherwise modifying the personal information in those records to make the information unreadable or indecipherable by human or digital means.

**13.1.3.** Nothing in this DPA or the MSA authorizes PowerSchool to maintain Customer Data beyond the time period reasonably needed to complete the disposition.

**13.1.4.** Upon request by Customer, PowerSchool will provide written notification to Customer when all Customer Data have been disposed.

**13.1.5.** Upon receipt of a request from Customer, PowerSchool will provide Customer return of Customer Data, as commercially reasonable.

**13.1.6.** Customer acknowledges there may be a reasonable service fee attached to such data return service where more than two (2) such service requests are submitted by the Customer during the term of the MSA.

**13.2.** Throughout the Term of the MSA, Customer may request partial disposal of Customer Data that is no longer needed.

**13.2.1.** Partial disposal of Customer Data will be subject to Customer's request to transfer such data to a separate account.

**13.2.2.** To the extent Customer is unable to transfer such data by their own accord,

PowerSchool agrees to assist Customer, at Customer's expense, to transfer any Customer Data in question, so long as it is commercially reasonable to do so.

**13.2.3.** To the extent transfer or partial disposal of Customer Data is not commercially reasonable, PowerSchool will inform the Customer of the actual costs to undertake such a transfer, and Customer may agree to pay the cost of such transfer. If Customer does not agree to pay the cost of such transfer, PowerSchool has no obligation to conduct any data transfer on Customer's behalf.

**13.2.4.** All transfers must comply with Applicable Law. PowerSchool is not liable or in breach of this Agreement if PowerSchool denies a transfer that, in its reasonable judgment, does not comply with the Applicable Law. Any transfer made on Customer's written request requires Customer to fully indemnify and hold harmless PowerSchool from complying with Customer's instructions.

**13.3.** PowerSchool may retain Customer Data if required by Applicable Law.

**14. Transfer of Customer Data to Succeeding Vendor Upon Termination.**

Upon termination of this DPA, PowerSchool will, if so requested by Customer, securely transfer all Customer Data directly from PowerSchool's Site to the hosting site or platform of another vendor designated by Customer, such transfer to occur on a date on or after the effective date of termination as directed by Customer in a format mutually agreed by PowerSchool and at Customer's cost. PowerSchool will have no obligation to transfer Customer Data in a form or format specified by succeeding vendor, but PowerSchool will provide Customer Data in a manner that is the industry standard.

**15. Response to Legal Orders, Demands or Requests for Data.**

**15.1.** The terms herein will not be construed as prohibiting either Party hereto from disclosing information to the extent required by law, regulation, or court order, provided such Party notifies, where not prohibited, the other party promptly after becoming aware of such obligations and provides the other Party an opportunity to seek a protective order or otherwise to challenge or limit such required disclosure.

**15.2.** PowerSchool will not disclose (and will not instruct any of its employees or Vendor-Data Subprocessors to disclose) in any manner whatsoever any Customer Data to any third party unless:

**15.2.1.** such disclosure is required in order for PowerSchool to perform its obligations pursuant to the MSA or this DPA and any applicable Quote or Statement of Work;

**15.2.2.** such disclosure is permitted under Applicable Law; or

**15.2.3.** the third party agrees, in writing, to protect the confidentiality and security of Customer Data. If PowerSchool becomes legally compelled to disclose Customer Data, PowerSchool will, to the extent permitted by law and if time permits, provide Customer with prompt written notice thereof prior to disclosure.

**16. Compliance with Applicable Law.**

**16.1.** The Parties acknowledge that Customer Data may include Personal Data from Education Records that are subject to Applicable Law of the applicable jurisdiction.

**16.2.** Where required by Applicable Law, Customer acknowledges it has obtained all valid consents from the parents or pupils related to the Customer Data sufficient to grant PowerSchool the permission to conduct Processing on such Customer Data on behalf of the Customer.

**17. Termination.**

**17.1.** Subject to agreed data return, data transfer, data disposal, legal, or other end of term obligations, this DPA will automatically terminate without any further action of the Parties upon the termination or expiration of the applicable MSA between the Parties or successful completion of the Services under such MSA. Alternatively, upon re-execution of the MSA by the Customer, this DPA shall

also be revived and be of full force and effect.

**17.2.** The obligations of PowerSchool and Customer under this DPA shall survive termination or expiration of this DPA or MSA, until all Customer Data have been returned or disposed.

**18. General Terms.**

**18.1.** The parties to this DPA hereby submit to the choice of jurisdiction stipulated in the MSA with respect to any disputes or claims arising under this DPA.

**18.2.** The terms of this DPA do not reduce PowerSchool's obligations under the MSA regarding the protection of Customer Data and does not permit PowerSchool to Process Customer Data in ways prohibited by the MSA.

**18.3.** In the event that there is a conflict or inconsistencies between this DPA, Applicable Law, and the Standard Contract Clauses regarding cross-board transfer issues, the conflict or inconsistencies shall be resolved in the following order: (i) first, Applicable Law, (ii) second, the Standard Contract Clauses, and (iii) then the DPA.

**18.4.** In the event that there is a conflict or inconsistencies between the MSA and this DPA, this DPA controls.

SCHEDULE 1-C

# PHYSICAL, ADMINISTRATIVE, AND TECHNOLOGICAL SAFEGUARDS

**A.1 Data Security**. PowerSchool agrees to abide by and maintain adequate data security measures, consistent with industry standards for digital storage of Customer Data, to protect Customer Data from unauthorized disclosure or acquisition by an unauthorized person. The general security obligations of PowerSchool are set forth below. These security measures will include, but are not limited to:

**A.1.1 Passwords and Employee Access**. PowerSchool will secure usernames, passwords, and any other means of gaining access to the Services or to Customer Data, at a level meeting or exceeding the applicable standards. PowerSchool will only provide access to Customer Data to employees or contractors who require access pursuant to the MSA and this DPA, and only on terms consistent with or exceeding the data security measures required by this DPA between the Parties.

**A.1.2 Security Protocols**. The Parties agree to maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so. PowerSchool will maintain all data obtained or generated pursuant to the MSA in a secure digital environment.

**A.1.3 Employee Training**. PowerSchool will provide periodic security training to those employees who operate or have access to the system. Further, PowerSchool will provide Customer with contact information of an employee whom Customer may contact if there are any security concerns or questions.

**A.1.4 Security Technology**. PowerSchool will employ industry standard measures to protect data from unauthorized access. The service security measures will include server authentication and data encryption. PowerSchool will host data pursuant to the MSA in an environment using firewall(s) that are updated according to industry standards.

**A.1.5 Monitoring**. PowerSchool will log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability of Customer Data.

**A.1.6 Security Coordinator**. PowerSchool will provide the name and contact information of PowerSchool's security coordinator for the Customer Data received pursuant to the MSA and this DPA upon written request.

**A.1.7 Vendor-Data Subprocessors Bound.** PowerSchool will enter into written agreements whereby Vendor-Data Subprocessors agree to secure and protect Customer Data in a manner consistent with the terms of this exhibit and the DPA. PowerSchool will periodically conduct or review compliance monitoring and assessments of Vendor-Data Subprocessors to determine their compliance with this exhibit and DPA.

**A.1.8 Periodic Risk Assessment**. PowerSchool acknowledges and agrees to conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner.

**A.1.9 Established Security Policies.** PowerSchool will follow its established access security policies to support the confidentiality, integrity, and availability of the Customer Data against risks including but not limited to unauthorized access, collection, use, disclosure or disposal, loss, or modification. Such security arrangements will include, without limitation, reasonable physical, administrative, and technical safeguards.

**A.1.10 Audits and Compliance Reports.** PowerSchool's security compliance is assessed by independent third-party auditors. Upon Customer agreeing to an NDA, PowerSchool shall provide access to information regarding PowerSchool's ISO 27001:2103 certification and SOC II Reports. To the extent that PowerSchool discontinues a third- party audit, PowerSchool will adopt or maintain an equivalent industry-recognized security standard.

**B.1 Data Incident.** In the event Customer Data is accessed or obtained by an unauthorized individual or third party, PowerSchool will:

B.1.1 provide notification to Customer within a reasonable amount of time of confirmation of the Incident, not exceeding seventy-two (72) hours.

B.1.2 PowerSchool agrees to comply with all reasonable requests from Customer in relation to such Incident and, in consultation with Customer and subject to any directions from Customer, take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of Customer Data.

**B.2 Post Incident Process**. In the event of an Incident, PowerSchool will follow the following process:

B.2.1 Provide a security incident notification written in plain language after confirmation of the incident.

B.2.2 The security incident notification will include, at a minimum, the following information:

B.2.2.1 The name and contact information of Customer's Designee or his/her designee for this purpose.

B.2.2.2 A list of the types of Customer Data that were or are reasonably believed to have been the subject of an incident.

B.2.2.3 If the information is possible to determine at the time the notice is provided, then either (1) the date of the incident, (2) the estimated date of the incident, or (3) the date range within which the incident occurred. The notification will also include the date of the notice.

B.2.2.4 Whether the notification was delayed as a result of a law enforcement investigation, if that information is possible to determine and permitted at the time the notice is provided.

B.2.2.5 A general description of the incident, if that information is possible to determine at the time the notice is provided.

B.2.3 PowerSchool agrees to adhere to all requirements in applicable state, provincial and federal law with respect to an Incident related to Customer Data, including, when appropriate or required, the required responsibilities and procedures for notification and mitigation, where commercially reasonable, of any such data breach.

B.2.4 PowerSchool maintains a written incident response plan that is consistent with industry standards and the applicable federal (country), state, or provincial law for responding to a data incident, security incident, privacy incident, or unauthorized acquisition or use of the Customer Data or any portion thereof, including personally identifiable information.

B.2.5 If Customer requests PowerSchool's assistance providing notice of unauthorized access, and such assistance does not take on a form unduly burdensome to PowerSchool, PowerSchool will reasonably co- operate and assist in, any investigation of a complaint that any Customer Data has been collected, used or disclosed contrary to Privacy Laws, or the policies of Customer, whether such investigation is conducted by Customer itself or a body having the legal authority to conduct the investigation, including but not limited to co-operation and assistance in notifying the affected Data Subject(s) of the unauthorized access.

**C.1 Canada**: For engagements with Customers and Users located in Canada and any of its provinces, the Parties acknowledge such Customer Data will be subject to public sector or private sector data protection laws, as applicable, including the Personal Information Protection and Electronic Documents Act, and any substantially similar provincial law.

C.1.1 As an example, if the province of Ontario, the Education Act, RSO 1990, c.E.2, Personal Health Information Protection Act, 2004, S.O. 2004, c. 3, Sched. A., Municipal Freedom of Information and Protection of Privacy Act RSO 1990, c.M.56 and the Protection of Personal Information and Electronic Documents Act S.C. 2000, c. 5.

**C.2 United States**: For engagements with Customers and Users located in the United States any specific states territory, the Parties acknowledge that:

C.2.1 Customer Data may include Personal Data from Education Records that are subject to the Family Educational Rights and Privacy Act, as amended ("FERPA Records");

C.2.2 to the extent that Customer Data includes FERPA Records, PowerSchool will be considered a "School Official" (as that term is used in FERPA and its implementing regulations) and will comply with the requirements and obligations of School Officials under FERPA. Each Party represents and warrants to the other Party that it will comply with all provisions of FERPA applicable to such Party's performance hereunder.

C.2.3 the Parties also acknowledge that applicable Customer Data may include Personal Data from children under the age of 13, subject to the Children's Online Privacy Protection Act and related regulations ("COPPA").

C.2.4 Where applicable, Customer acknowledges that it will act as agent for the parents of students under the age of 13 for purposes of COPPA. Customer represents to PowerSchool that through the duration of this Agreement, the Customer is duly authorized to provide the data to PowerSchool for processing based on having obtained parental consent where necessary.

C.2.5 Customer acknowledges that it has read, fully understands, and agrees to abide by PowerSchool's Privacy Policy, available at www.powerschool.com/privacy and as may be revised from time-to- time, incorporated by reference herein.

**C.3 European Union**: For engagements with Customers and User(s) located in the member countries of the European Union and the European Economic Area, the Parties acknowledge applicable Customer Data will be subject to the General Data Protection Regulation (GDPR), as amended with enforcement from the European Data Protection Board through EU and EEA national data protection authorities, and the European Data Protection Supervisor (EDPS).

**C.4 United Kingdom**: For engagements with Customers and User(s) located in the United Kingdom after December 31, 2020, the Parties acknowledge applicable Customer Data will be subject to the United Kingdom General Data Protection Regulation, and Data Protection Act of 2018, as amended, along with will regulations such as the Pupils' Educational Records Regulation 2003 (Scotland); the Public Information Regulations 2011 (Wales); and the Education Regulations (Northern Ireland) of 2009, as amended, and as enforced by the Information Commissioner.

**C.5 Switzerland:** For engagements with Customers and its User(s) located in Switzerland, the Parties acknowledge applicable Customer Data will be subject to the Swiss Federal Data Protection Act, to be replaced with the Swiss Data Protection Act 2020 (DPA).

Case 3:25-md-03149-AEB-MSB Document 301-5 Filed 09/26/25 PageID.3707 Page 43 of 43

SCHEDULE 2-C

# POWERSCHOOL DATA SECURITY AND PRIVACY PLAN

PowerSchool agrees that it will protect the confidentiality, privacy and security of the Protected Data it receives from Customers in accordance with this DPA.

Additional elements of PowerSchool's Data Security and Privacy Plan are as follows:

(a) In order to implement all state, federal, and local data security and privacy requirements, including those contained within this Data Security and Privacy Plan ("DSPP"), PowerSchool will: Review its data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws and the terms of this DSPP. In the event PowerSchool's policy and practices are not in conformance, PowerSchool will implement commercially reasonable efforts to ensure such compliance.

(b) As required by the NIST Cybersecurity Framework, in order to protect the security, confidentiality and integrity of the Protected Data that it receives under the Agreement, PowerSchool will have the following reasonable administrative, technical, operational and physical safeguards and practices in place throughout the term of the Agreement:

Data Security:

· Data-at-rest & data-in-transit (motion) is encrypted
· Data leak protections are implemented

Information Protection Processes and Procedures:

· Data destruction is performed according to contract and agreements
· A plan for vulnerability management is developed and implemented Protective Technology:

· Log/audit records are ascertained, implemented, documented, and reviewed according to policy
· Network communications are protected

Identity Management, Authentication and Access Control:

· Credentials and identities are issued, verified, managed, audited, and revoked, as applicable, for authorized devices, processes, and users
· Remote access is managed PowerSchool also conforms to the ISO 27001:2013 standard.

(c) For any of its employees (or employees of any of its subcontractors or assignees) who have access to Protected Data, PowerSchool has provided or will provide training on the federal and state laws governing confidentiality of such data prior to their receiving access, as follows: Annually, PowerSchool will require that all of its employees (or employees of any of its subcontractors or assignees) undergo data security and privacy training to ensure that these individuals are aware of and familiar with all applicable data security and privacy laws.

(d) In the event that PowerSchool engages any subcontractors, assignees, or other authorized agents to perform its obligations under the Agreement, it will require such subcontractors, assignees, or other authorized agents to execute written agreements requiring those parties to protect the confidentiality and security of Protected Data under applicable privacy laws.

(e) PowerSchool will manage data security and privacy incidents that implicate Protected Data, including identifying breaches and unauthorized disclosures, and PowerSchool will provide prompt notification of any breaches or unauthorized disclosures of Protected Data. More information on how incidents are handled can be found in the Main Service Agreement ("MSA").

(f) PowerSchool will implement procedures for the return, transition, deletion and/or destruction of Protected Data at such time that the Agreement is terminated or expires, as more fully described in MSA.