James E. Cecchi (NJ 030861989)
*Admitted Pro Hac Vice*
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com

*Lead Counsel for Plaintiffs and the School District Class Action*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: POWERSCHOOL HOLDINGS, INC. AND POWERSCHOOL GROUP, LLC CUSTOMER SECURITY BREACH LITIGATION,<br><br>*This Document Relates to the School District Class Action Track* | Case No. 25-md-3149-BEN-MSB<br><br>MDL 3149<br><br>CONSOLIDATED MDL DOCKET |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT BAIN CAPITAL, L.P.'S MOTION TO DISMISS THE SCHOOL DISTRICTS' AMENDED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Section** **Page**

TABLE OF AUTHORITIES ..... iii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

A. Bain and Its Acquisition of PowerSchool ..... 2

B. PowerSchool's Ties to New Jersey and New York ..... 6

C. PowerSchool's Jurisdictional Ties are Imported to Bain ..... 7

LEGAL STANDARD ..... 8

ARGUMENT ..... 9

A. The Court Has Personal Jurisdiction Over Bain ..... 9

1. Specific Jurisdiction ..... 10

i. Successor Liability ..... 10

ii. Calder "Effects" Test ..... 12

2. The Exercise of Jurisdiction Comports with Fair Play and Substantial Justice ..... 13

3. Pendent Jurisdiction for the State Law Claims Is Appropriate ..... 14

4. In the Alternative, Jurisdictional Discovery Is Appropriate, and/or Plaintiffs Request Leave to Amend Their Forum Designations ..... 15

B. Plaintiffs' Claims Are Well Pled ..... 15

1. Plaintiffs Adequately Allege a Claim for Intentional Interference with Contract ..... 15

i. Bain's Intentional Interference with the Contracts ..... 16

ii. Bain's Actions Caused PowerSchool to Breach the Contracts ..... 19

iii. PowerSchool Breached Its Contracts with Plaintiffs ..... 20

2. Bain Conspired to Violate the Computer Fraud and Abuse Act ..... 20

3. Bain Assisted PowerSchool in Violating the California Comprehensive Data Access and Fraud Act ........ 25

4. Bain Has Sufficient Notice of the Claims Pled Against It ........ 26

5. Plaintiffs' Remaining Common Law Claims Are Well Pled ........ 27

i. Bain Acted Negligently ........ 27

ii. Bain Was Unjustly Enriched ........ 33

6. Declaratory Judgment and Injunctive Relief Are Necessary ........ 34

CONCLUSION ........ 35

# TABLE OF AUTHORITIES

**Case** **Page(s)**


*Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174 (9th Cir. 2004) ....14

*Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511 (N.D. Cal. 1990) ....22

*In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig.*, 2021 WL 5937742 (D.N.J. Dec. 16, 2021) ....28, 29

*In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130 (C.D. Cal. 2021) ....33, 35

*Angelucci v. Mayorkas*, 2021 WL 4523690 (S.D. Cal. Oct. 4, 2021) ....8

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ....8

*Attisha Enters., Inc. v. Cap. One, N.A.*, 505 F. Supp. 3d 1051 (S.D. Cal. 2020) ....30

*Bank of New York v. Fremont General Corp.*, 523 F.3d 902 (9th Cir. 2008) ....19

*Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024 (N.D. Cal. 2019) ....30, 31

*Baton v. Ledger SAS*, 740 F. Supp. 3d 847 (N.D. Cal. 2024) ....29

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ....8

*Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009) ....8

*Branca v. Nordstrom, Inc.*, 2015 WL 10436858 (S.D. Cal. Oct. 9, 2015) ....8

*Briskin v. Shopify, Inc.*, 135 F.4th 739 (9th Cir. 2025) ....10, 11

*Brown v. USA Taekwondo*, 11 Cal.5th 204, 483 P.3d 159 (2021) ....29

*Bustamante v. Bank of Am., N.A.*,
2012 WL 13175878 (S.D. Cal. May 21, 2012) ....................27

*Butcher's Union Local No. 498 v. SDC Investment, Inc.*,
788 F.2d 535 (9th Cir. 1986) ....................15

*Cahill v. Liberty Mut. Ins. Co.*,
80 F.3d 336 (9th Cir. 1996) ....................8

*Calder v. Jones*,
465 U.S. 783 (1983)....................1, 12, 13

*Calendar Research LLC v. Stubhub, Inc.*,
2020 WL 4390391 (C.D. Cal. May 13, 2020)....................23

*Canal Ins. Co. v. Fema Trucking, LLC*,
2022 WL 3227188 (D.N.J. Aug. 10, 2022) ....................35

*In re Cap. One Consumer Data Sec. Breach Litig.*,
488 F. Supp. 3d 374 (E.D. Va. 2020) ....................30, 34

*Claridge v. RockYou, Inc.*,
785 F. Supp. 2d 855 (N.D. Cal. 2011)....................25

*Clemens v. ExecuPharm, Inc.*,
678 F. Supp. 3d 629 (E.D. Pa. 2023)....................35

*Cline v. Dan-Bunkering (Am.), Inc.*,
2025 WL 1194076 (S.D. Cal. Apr. 23, 2025) ....................10

*Cloudpath Networks, Inc. v. SecureW2 B.V.*,
157 F. Supp. 3d 961 (D. Colo. 2016)....................14

*Cohodes v. MiMedx Grp., Inc.*,
2022 WL 15523079 (N.D. Cal. Oct. 27, 2022) ....................15

*CollegeSource, Inc. v. AcademyOne, Inc.*,
653 F.3d 1066 (9th Cir. 2011) ....................14

*Connell v. Weiss*,
1985 WL 428 (S.D.N.Y. Mar. 19, 1985)....................16

*Cruz v. Sears*,
2012 WL 13175896 (S.D. Cal. Apr. 16, 2012) ....................29

*Dacas v. Duhaney*,
2022 WL 5422709 (E.D.N.Y. Aug. 11, 2022) ....................11

*Doe v. Camp Pendleton & Quantico Hous. LLC*, 2020 WL 1890576 (S.D. Cal. Apr. 16, 2020) ........ 27

*Dole Food Co. v. Watts*, 303 F.3d 1104 (9th Cir. 2002) ........ 12

*Edifecs, Inc. v. Profant*, 2017 WL 2464129 (W.D. Wash. June 7, 2017) ........ 13

*ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023 (9th Cir. 2016) ........ 33

*Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279 (N.D. Cal. 2011)........ 23, 25

*Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058 (9th Cir. 2016) ........ 24, 25

*In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524 (E.D. Pa. 2010)........ 34

*In re Fortra File Transfer Software Data Sec. Breach Litig.*, 749 F. Supp. 3d 1240 (S.D. Fla. 2024)........ 28

*Frost v. LG Elecs. Inc.*, 2017 WL 1425919 (N.D. Cal. Apr. 21, 2017)........ 15

*Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101 (9th Cir. 2020) ........ 9

*Greer v. PowerSchool Holdings, Inc.*, 2025 WL 986229 (M.D.N.C. Apr. 2, 2025) ........ 12

*Harris v. Perl*, 197 A.2d 359 (N.J. 1964) ........ 16, 19

*In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879 (D. Colo. 2020)........ 34

*Horton v. NeoStrata Co. Inc.*, 2016 WL 11622008 (S.D. Cal. Nov. 22, 2016)........ 27

*In Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450 (9th Cir. 2007) ........ 12

*Komaiko v. Baker Technologies, Inc.*, 2020 WL 1915884 (N.D. Cal. Apr. 20, 2020)........ 11

*Komlodi v. Picciano*,
89 A.3d 1234 (N.J. 2014) .......... 19

*Labus v. Navistar Intern. Transp. Corp.*,
740 F. Supp. 1053 (D.N.J. 1990) .......... 19

*Lakeland Tours, LLC v. Bauman*,
2014 WL 12570970 (S.D. Cal. Feb. 11, 2014) .......... 21

*Lefkowtiz v. Scytl USA*,
2016 WL 537952 (N.D. Cal. Feb. 11, 2016) .......... 10, 11

*In re Lenovo Adware Litig.*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) .......... 23

*Linlor v. JPMorgan Chase & Co.*,
2017 WL 3446814 (S.D. Cal. Aug 9, 2017) .......... 13

*Logical Sol. Servs., Inc. v. McMahon*,
2025 WL 428560 (D.N.J. Feb. 7, 2025) .......... 12

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
922 F.3d 946 (9th Cir. 2019) .......... 13

*Modisette v. Apple Inc.*,
30 Cal. App. 5th 136 (2018) .......... 30, 31, 32

*In re MOVEit Customer Data Sec. Breach Litig.*,
2025 WL 2176590 (D. Mass. July 31, 2025) .......... 35

*In re MOVEit Customer Data Sec. Breach Litig.*,
2025 WL 2179475 (D. Mass. July 31, 2025) .......... 29

*Munenzon v. Peters Advisors, LLC*,
2022 WL 1486195 (D.N.J. May 10, 2022) .......... 10, 15

*Nat'l Indem. Co. v. Companhia Siderurgica Nacional S.A.*,
2016 WL 520952 (D.N.J. Feb. 8, 2016) .......... 10

*Navarro v. Data*,
2022 WL 18280359 (C.D. Cal. Dec. 7, 2022) .......... 30

*NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*,
87 N.Y.2d 614 .......... 19

*NetApp, Inc. v. Nimble Storage, Inc.*,
41 F. Supp. 3d 816 (N.D. Cal. 2014) .......... 22, 23

*In re NVIDIA Corp. Sec. Litig.*,
768 F.3d 1046 (9th Cir. 2014) ....................................................................3

*OEC Freight (NY), Inc. v. Storlie Furniture Distributors, LLC*,
2025 WL 1617456 (S.D.N.Y. June 6, 2025) ....................................................10

*Pelman v. McDonald's Corp.*,
237 F. Supp. 2d 512 (S.D.N.Y. 2003) ....................................................32, 33

*Quelimane Co. v. Stewart Title Guaranty Co.*,
19 Cal. 4th 26 (1998) ....................................................................15, 16, 18, 19

*RMS NA, Inc. v. RMS (Aus) Pty Ltd*,
2025 WL 592740 (S.D. Cal. Feb. 24, 2025)....................................................12

*Rutherford v. Owens-Illinois, Inc.*,
16 Cal.4th 953 (1997) ....................................................................................19

*Ryanair DAC v. Booking Holdings Inc.*,
636 F. Supp. 3d 490 (D. Del. 2022)...........................................................23, 24

*Schwarzenegger v. Fred Martin Motor Co.*,
374 F.3d 797 (9th Cir. 2004) ..........................................................................9

*Score Bd., Inc. v. Upper Deck Co.*,
959 F. Supp. 234 (D.N.J. 1997).......................................................................16

*Smahaj v. Retrieval-Masters Creditors Bureau, Inc.*,
69 Misc. 3d 597, 131 N.Y.S.3d 817 (N.Y. Sup. Ct. 2020)..................................30

*Spertus, M.D. v. Epic Sys. Corp.*,
2022 WL 4367195 (W.D. Mo. Sept. 21, 2022) .................................................12

*SuccessFactors v. Softscape, Inc.*,
544 F. Supp. 2d 975 (N.D. Cal. 2008).............................................................24

*Successor Agency to Former Emeryville Redevelopment Agency v. Swagelok Co.*,
364 F. Supp. 3d 1061 (N.D. Cal. 2019)......................................................10, 12

*Sun Life Assur. Co. of Canada v. Imperial Premium Fin., LLC*,
904 F.3d 1197 (11th Cir. 2018) .......................................................................19

*Taboola, Inc. v. Ezoic Inc.*,
2020 WL 1900496 (S.D.N.Y. Apr. 17, 2020) ...................................................16

*In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*,
2016 WL 2897520 (N.D. Ga. May 18, 2016)....................................................35

*Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*,
315 F. Supp. 3d 1147 (C.D. Cal. 2018) .......... 20, 22, 24, 25

*In re Unite Here Data Sec. Incident Litig.*,
740 F. Supp. 3d 364 (S.D.N.Y. 2024) .......... 35

*United States v. Nosal*,
930 F. Supp. 2d 1051 (N.D. Cal. 2013) .......... 21

*Universal Protec. Serv., LP v. Coastal Fire and Integration Sys., Inc.*,
2023 WL 4042582 (S.D. Cal. June 15, 2023) .......... 23

*US Bioservices Corp. v. Lugo*,
2008 WL 4747473 (D. Kan. Oct. 23, 2008) .......... 14

*Util. Metal Research, Inc. v. Coleman*,
2008 WL 850456 (E.D.N.Y. Mar. 28, 2008) .......... 19

*Van Buren, Petitioner v. United States, Respondent*,
2020 WL 7024931 (U.S. Oral. Arg., 2020) .......... 21

*Wall v. Wescom Cent. Credit Union*,
2024 WL 1158361 (C.D. Cal. Mar. 18, 2024) .......... 33

*Weinberg v. Advanced Data Processing, Inc.*,
147 F. Supp. 3d 1359 (S.D. Fla. 2015) .......... 34

*Will Co. v. Lee*,
47 F.4th 917 (9th Cir. 2022) .......... 9

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
379 F.3d 1120 (9th Cir. 2004) .......... 12

*Yamashita v. LG Chem, Ltd.*,
62 F.4th 496 (9th Cir. 2023) .......... 11

*Zarif v. Hwareh.com*,
789 F. Supp. 3d 880 (S.D. Cal. 2025) .......... 9

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
601 F. Supp. 3d 625 (C.D. Cal. 2022) .......... 10, 13

*In re Zhejiang Topoint Photovoltaic Co., Ltd.*,
651 B.R. 477 (Bankr. D.N.J. 2023) .......... 11

**Other Authorities**

28 U.S.C. § 2201 ........ 34

Computer Fraud and Abuse Act,
18 U.S.C. § 1030 ........ *passim*

Computer Fraud and Abuse Act,
Pub. L. No. 98-473, 98 Stat. 1837 (Oct. 12, 1984) ........ 22

Computer Fraud and Abuse Act,
Pub. L. No. 99-474, § 2, 100 Stat. 1213 (Oct. 16, 1986) ........ 22

Comprehensive Data Access and Fraud Act,
Cal. Penal Code § 502 ........ 2, 25, 26

Federal Trade Commission Act,
15 U.S.C. §§ 53 ........ 13, 21

Health Insurance Portability and Accountability Act of 1996,
Pub. L. No. 104-191, 110 Stat. 1936 (1996). ........ 13, 21

Restatement (Second) of Torts § 411 (1965) ........ 29

Plaintiffs Brooklyn Laboratory Charter Schools, The Academy Charter School, The Academy Charter School 2, Gateway Academy Charter School, BRICK Buffalo Academy Charter School, Our World Neighborhood Charter Schools, and Irvington Public Schools ("Plaintiffs"), by and through their undersigned counsel, submit this Memorandum of Law in Opposition to Defendant Bain Capital, L.P.'s ("Bain") Motion to Dismiss the School District Amended Class Action Complaint ("Motion" or "Mot.") pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6). For the reasons set forth below, Bain's Motion fails on both fronts.

## INTRODUCTION

Bain argues there is no jurisdiction over it in the transferor courts of New Jersey or New York. Not so. Several theories underpin the Court's proper exercise of personal jurisdiction over Bain. First, the theory of successor liability stemming from Bain's acquisition of PowerSchool affords a basis for specific jurisdiction over Bain because Bain absorbed PowerSchool's jurisdictional contacts in New Jersey and New York upon acquisition. Second, Bain expressly aimed its tortious conduct at New Jersey and New York, thus establishing specific jurisdiction under the "*Calder* effects" test, set forth in *Calder v. Jones*, 465 U.S. 783 (1983), as it relates to Plaintiffs' tortious intentional interference with contract claim. Third, pendant personal jurisdiction exists because Plaintiffs' state law claims share a common nucleus of operative facts with Plaintiffs' federal Computer Fraud and Abuse Act ("CFAA") claim. Finally, the exercise of jurisdiction over Bain comports with due process—an issue, unsurprisingly, that Bain barely touches. Bain cannot escape this Court's jurisdictional reach.

Moreover, Plaintiffs' claims are well pled. As reflected in the detailed School District Amended Class Action Complaint ("Complaint") and as described below, Bain knew, or reasonably should have known, that its decisions to cut cybersecurity and monetize student data would have a direct and adverse effect on the School Districts' Contracts, all of which clearly memorialize PowerSchool's obligations to provide critical data security, including data encryption, restrict access to personal data, and review access to customer data on a monthly basis, none of which occurred here. Plaintiffs further allege

that Bain conspired with PowerSchool to intentionally access or exceed authorized access to Plaintiffs' sensitive and protected data in violation of the CFAA. Similarly, Bain violated California's Comprehensive Data Access and Fraud Act ("CDAFA") by virtue of Bain's direction to PowerSchool to insert a secretive "backdoor tool" to gain full access to Plaintiffs' protected data without the requisite consent. Plaintiffs' negligence, unjust enrichment and declaratory judgment claims also meet applicable pleading standards. In sum, Bain's motion to dismiss should be denied.

## FACTUAL BACKGROUND

### A. Bain and Its Acquisition of PowerSchool

Bain "is one of the world's leading private multi-asset alternative investment firms." School District Amended Class Action Complaint (Dkt. 263) ¶ 18.[1] It is a Delaware corporation with its principal place of business in Massachusetts. *Id.* In 2024, Bain acquired PowerSchool, a Delaware company with its headquarters in California, and a leading provider of software for K-12 education. ¶¶ 16-19. Bain dictates PowerSchool's strategic directives and uses PowerSchool's operations to further Bain's private investment purposes. ¶ 18. Bain is the "ultimate controlling entity for all Bain Capital operations, exercised pervasive domination over its affiliated entities, and used them as mere instrumentalities to consummate its acquisition of PowerSchool." ¶ 19; *see also* ¶¶ 18, 201-205. In connection with the merger between Bain's affiliates and PowerSchool, which resulted in "a change in control of" PowerSchool, Bain replaced PowerSchool's entire board of directors with its own trusted operators and replaced the CEO with its own chosen CEO. *See* Declaration of James E. Cecchi ("Cecchi. Decl.), Exs. A-E; *id.* at Ex. F, at 4-5.

Plaintiffs and Class Members entered into Contracts with PowerSchool, which represented that their data would be protected with industry standard protocols and safeguards, including—but not limited to—access controls, encryption of data in transit and motion, password rotation, monthly review of access credentials, multi-factor

[1] Citations to "¶ _" or "¶¶ _" refer to the operative Complaint (Dkt. 263). Unless otherwise noted, and all terms otherwise undefined have the same meaning as set forth therein.

authentication ("MFA"), endpoint protection to monitor suspicious network activity, and other administrative, technical, and physical safeguards designed to ensure the confidentiality, integrity, and availability of their data.[2] ¶¶ 1, 20-26, 57, 65-67, 70, 73.

Bain knew of the Contracts and their terms, including PowerSchool's cybersecurity obligations to Plaintiffs and Class Members, by virtue of its ownership interest in, board-level oversight of, and direct involvement in operational decisions at PowerSchool, including during the Background of the Merger. ¶¶ 5, 7, 18, 19, 98, 162. The Information Statement also describes dozens of meetings and in-person diligence sessions between Bain and PowerSchool's management and executive teams over the course of six months, including that Bain had access to both public and confidential information in PowerSchool's virtual data room.[3] This information informed Bain of PowerSchool's business operations, customer relationships, contractual data rights and obligations, and the substantial risks related to technical support and maintenance services. ¶¶ 7, 69, 98, 162.

Bain thus knew that layoffs affecting PowerSchool employees who were responsible for important leadership role—such as reviewing access to restricted information, monitoring PowerSchool's networks for unusual activity or the transfer of large volumes of data, and adequately training employees—ran contrary to contractual promises. ¶ 69. Despite its knowledge of these deficiencies, Bain allowed them to drive costs lower and increase profitability. Further, Bain not only knew of the risks of failing to implement and abide by the security protections required by the Contracts, but approved the Information

---

[2] PowerSchool made these contractual promises to Plaintiffs and Class Members in its Main Services Agreements ("MSAs"), which incorporate the Data Privacy Agreements ("DPAs" together with the MSAs, the "Contracts"). ¶ 66.

[3] *See* PowerSchool Holdings, Inc., S*chedule 14C Information Statement Relating to Merger or Acquisition* at 21-26, 31 (Sept. 4, 2024), https://www.sec.gov/Archives/edgar/data/1835681/000119312524212624/d836904ddefm14c.htm ("Info. Stmt." or "Information Statement"). As acknowledged by Bain, Plaintiffs' Complaint incorporates the Merger Agreement and Information Statement by reference. *See* Mot. at 6; s*ee also* Mot., at 4, n. 4 (referencing the Information Statement and citing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) for the assertion that a document is incorporated by reference in full where plaintiffs "rely[] on portions of it in their complaint").

Statement explicitly disclosing those risks, warning of negative consequences concerning "the impact of potential information technology or data security breaches or other cyber-attacks or other disruption," "[PowerSchool's] ability to comply with legal requirements, contractual obligations and industry standards relating to security, data protection and privacy," and "risks to [PowerSchool's] reputation and of liability from a failure to comply with a variety of complex procurement rules and regulation." Info. Stmt. at 96-98.

Bain immediately pushed its post-acquisition strategy in two primary ways: (1) cutting costs at PowerSchool; and (2) aggregating and analyzing student and school district data. ¶¶ 195, 201-206. First, in pursuit of cost reductions, Bain directed PowerSchool to rapidly execute an offshoring plan that sacrificed data security and integrity in the pursuit of cost reductions. ¶ 109. While PowerSchool retained control over its operations prior to the closing of the merger, the Merger Agreement prohibited PowerSchool from taking significant actions—such as implementing layoffs of fifty or more employees—without Bain's prior written consent.[4] Info. Stmt. at 108, 109. Yet shortly after Bain announced its acquisition in June 2024 (prior to the merger), PowerSchool laid off over 5% of its workforce—an action requiring Bain's approval under the Merger Agreement. ¶ 102.

As part of this strategy on cost reduction, Bain also approved PowerSchool to accelerate shifting those jobs overseas to PowerSchool's Offshore Centers of Excellence; granting offshore contractors back-office administrator functionality as well as student-, parent-, and faculty-facing functionality to manage key organizational information assets, including social security numbers, demographic data, enrollment, grades, transcripts, and governmental reporting data. ¶¶ 91-93, 108. Indeed, Movate, Inc. neither contests that it

[4] Plaintiffs allege that the Bain Entities are the agent/alter ego of Bain Capital, L.P. and were undercapitalized, had no meaningful independent operations, shared offices and personnel, and existed solely to carry out Defendant Bain Capital, L.P.'s private equity deals. ¶ 19. Moreover, layoffs and outsourcing required Bain's written approval under the Merger Agreement. *Compare* Mot. at 6-7 *with* Info. Stmt. at 108-109. Plaintiffs also allege that Bain had control and/or approval over board-level and executive decisions regarding PowerSchool's personnel and compliance policies. ¶ 205.

was contracted to provide those technical support services, nor that its employee located in the Philippines, a foreign national, had complete, unrestricted access to this information.[5] This level of access exceeded that permitted by the School Districts in the Contracts. ¶ 93.

To further enable those offshoring efforts, Bain also knowingly authorized PowerSchool's use of an access tool that bypassed the bargained-for consent and access protocols—as was necessary to enable those efforts—allowing PowerSchool employees or contractors to access the School Districts' unencrypted, identifiable data without proper authorization. ¶¶ 203-205. This tool saved technical support staff time by eliminating the need for direct communication with the School Districts and facilitated Bain's offshoring strategy.[6] ¶ 195. And so, rather than directing PowerSchool to comply with the security and access control promises, Bain directed actions that further weakened PowerSchool's cybersecurity—essentially firing the guards at the gate—while ratifying access to data that far exceed that permitted under the Contracts. ¶ 203.

Consequently, within only seventy-two hours of the layoffs directed by Bain, on August 16, 2024, the first indication of a data breach occurred. ¶ 47.

Moreover, Bain began implementing its plan to aggregate and analyze large-scale student and school data—enhancing PowerSchool's marketability, cost savings, and product development, particularly its initiatives focused on integrating artificial intelligence into school systems. ¶ 204. These capabilities were central to Bain's valuation of PowerSchool and its justification for the acquisition, as PowerSchool's post-acquisition growth was to be driven by growth in "international and AI initiatives."[7] ¶ 108; *see also*

[5] *See* Dkt No. 317 at 4 (Movate, Inc.'s Motion to Dismiss the Track 1 and Track 2 Direct Action Complaints does not deny that a "Movate employee working from the Philippines … had access to PowerSchool's Student Information System.").

[6] Bain has a long and consistent history of investing in companies that offshore jobs to lower-wage countries, prioritizing cost savings over domestic employment. ¶ 110.

[7] *See* Schedule 13E-3, Rule 13E-3 Transaction Statement Under Section 13(E), Exhibit (c)(viii) - Discussion materials prepared by Centerview Partners LLC for the Special Committee of the Board of Directors, dated May 3, 2024, Page 4-6, available at: https://www.sec.gov/Archives/edgar/data/1835681/000119312524183020/d862409dex99

Info. Stmt., Ex. (c)(viii) at 4-6. For example, the financial analyses underpinning the merger were based on PowerSchool moving from 0% in Annual Recurring Revenue ("ARR") in 2023 to 10% ARR by 2029 for Personalized Education AI. *Id*. This ARR would be generated by aggregating and analyzing large-scale student and school data for its latest product offerings, and that also required loosening access restrictions and created a strong incentive for Bain to leverage PowerSchool's access to customer data and further develop Personalized Education AI. ¶¶ 195, 204.

Plaintiffs and Class Members paid hundreds of millions of dollars annually for the use of the PowerSchool platform and for the storage and protection of their Data. ¶ 126. Plaintiffs have suffered damages proximately caused by Bain's conduct, including overpayments for under-delivered services, loss of contractual value, increased exposure to cybersecurity threats, and related harm. ¶¶ 165, 166.

**B. PowerSchool's Ties to New Jersey and New York**

PowerSchool is a software company that provides data collection, storage, and analytics tools for K-12 school districts in the United States and abroad. ¶ 27. "Among other products and services, PowerSchool sells a widely used service called PowerSchool's SIS, a cloud-based platform that enables school districts to manage student records and provide access to grades, assignments, attendance, and schedules for educators, students, and parents. *Id*. "Approximately 75% of students in North America use the PowerSchool platform, including those attending 90 of the 100 largest school districts in the United States." ¶ 28. Through the websites of numerous school districts, PowerSchool provides access to its products and services, including through its PowerSchool parent portal, to schools, parents, and students throughout New Jersey and New York. *See* Cecchi Decl., Ex. G, ¶¶ 20-26. The portal enables access to information such as attendance records,

cviii.htm ("Info. Stmt., Ex. (c)(viii)"). Because the Merger is a "going private" transaction, PowerSchool, the Schedule 13E-3, including any amendments and exhibits filed or "incorporated by reference" in the Information Statement. Info. Stmt. at 145.

grades, assignments and schedules. ¶ 27. PowerSchool enters into contracts with School Districts through which it provides its products and services. ¶¶ 1, 5, 20-26, 95.

### C. PowerSchool's Jurisdictional Ties are Imported to Bain

Bain Capital, L.P. is the corporate parent and ultimate controlling entity for all Bain Capital operations, exercised pervasive domination over its affiliated entities, and used them as mere instrumentalities to consummate its acquisition of PowerSchool. ¶ 19; *see also* ¶¶ 18, 201, 205. As a result of the merger, "PowerSchool transition[ed] into a private entity under Bain's leadership." Cecchi Decl., Ex. B, at 2. Defendant Bain Capital, L.P. dominated and controlled the following affiliates: Bain Capital Private Equity, L.P., Bain Capital Investors, LLC, Bain Capital Fund XIII General Partner, LLC, Bain Capital Fund XIII, L.P., Bain Capital Fund (Lux) XIII, SCSp, BCPE Polymath Topco GP, LLC, BCPE Polymath Topco, L.P., BCPE Polymath Intermediate, LLC, BCPE Polymath Buyer, Inc., and BCPE Polymath Merger Sub, Inc. (the "Bain Entities"). ¶ 19. The Bain Entities had no meaningful independent operations, shared offices and personnel, and existed solely to carry out Defendant Bain Capital, L.P.'s private equity deals.[8] *Id.* For example, the boards of BCPE Polymath Buyer, Inc. and BCPE Polymath Merger Sub, Inc. consisted entirely of partners, principles or legal counsel for Bain's private equity operations, including Dave Humphrey, Max de Groen, Valentin Fernandez, Krista Snow, and Bryan Curran, all of whom worked for Bain for at least five years prior to the Merger. *Id.*, Info. Stmt. at 137. At all relevant times, there was a unity of interest and ownership between Defendant Bain Capital, L.P. and these entities such that separate personalities did not exist, and treating them as distinct would allow Bain to evade liability for its conduct. ¶ 19.

BCPE Polymath Buyer, Inc. is a Delaware corporation that was formed solely for the purpose of entering into the Merger Agreement. Info. Stmt. at 2. BCPE Polymath

[8] *See* Info. Stmt. at 138 ("The principal business address for each of the Bain Entities and the controlling persons is 200 Clarendon Street, Boston, MA 02116 and their telephone number is (617) 516-2000.").

Buyer, Inc. is wholly owned by BCPE Polymath Intermediate, LLC and "is an affiliate of investment funds advised by Bain." *Id.*

Similarly, BCPE Polymath Merger Sub, Inc. was formed by BCPE Polymath Buyer, Inc. solely for the purpose of entering into the Merger Agreement. Info. Stmt. at 2. On October 1, 2024, BCPE Polymath Merger Sub, Inc. merged with and into PowerSchool Holdings, Inc., with PowerSchool continuing as the surviving corporation and a wholly owned subsidiary of BCPE Polymath Buyer, Inc. *Id.* After the Merger, BCPE Polymath Merger Sub, Inc. ceased to exist. *Id*; *see also id.* at 76. At the time of Merger, the bylaws of PowerSchool became the bylaws of Merger Sub and its directors were appointed to PowerSchool's board. Info. Stmt. at 79; Cecchi Decl., Exs. A-F. The post-acquisition entity resulting from the merger between BCPE Polymath Merger Sub, Inc. and PowerSchool Holdings, Inc., which was effective on October 1, 2024, is now, PowerSchool.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint only requires "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[9] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Complaints "should be read as a whole" and "not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

In reviewing the plausibility of a complaint on a motion to dismiss, courts must assume the truth of all factual allegations and must construe them in the light most favorable to the nonmoving party. *See Branca v. Nordstrom, Inc.*, 2015 WL 10436858, at *2 (S.D. Cal. Oct. 9, 2015) (citing *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996)). Factual disputes are inappropriate for consideration on a motion to dismiss. *See Angelucci v. Mayorkas*, 2021 WL 4523690, at *3 (S.D. Cal. Oct. 4, 2021) ("Consistent with

[9] Throughout this brief, case citations omit internal citations and internal quotation marks and emphasis is added, unless otherwise noted.

the admonition against resolving factual disputes at the pleading stage, the Court finds [d]efendant's arguments inappropriate for consideration at this time.").

On a motion for dismissal under Rule 12(b)(2), where the motion is based only on written materials, as here, "the [C]ourt evaluates only whether the plaintiff demonstrates a prima facie showing of personal jurisdiction based on the plaintiff's pleadings and affidavits." *Zarif v. Hwareh.com*, 789 F. Supp. 3d 880, 887 (S.D. Cal. 2025) (citing *Will Co. v. Lee*, 47 F.4th 917, 921 (9th Cir. 2022)). "The [C]ourt must take unchallenged allegations in the complaint as true, and conflicts between the parties over statements within any affidavits must be resolved in favor of the plaintiff." *Id.*

## ARGUMENT

### A. The Court Has Personal Jurisdiction Over Bain

This Court has personal jurisdiction over Bain for multiple reasons: (1) under the theory of successor liability, Bain's acquisition of PowerSchool affords a basis for specific jurisdiction; (2) Bain expressly aimed its conduct at New Jersey and New York, thus establishing specific jurisdiction for purposes of Plaintiffs' claim for intentional interference tortious interference with contract; (3) this Court's exercise of jurisdiction over Bain comports with due process; and (4) pendent personal jurisdiction is appropriate because Plaintiffs' state law claims share a common nucleus of operative facts with their federal claim under the CFAA.

When a motion to dismiss for lack of personal jurisdiction is "based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts." *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020). The uncontroverted allegations in the complaint are taken as true and all genuine factual disputes are resolved in favor of the plaintiff. *Id.*; *see also Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 798 (9th Cir. 2004) ("the prima facie jurisdictional analysis requires us to accept the plaintiff's allegations as true" and courts generally "must adopt [the plaintiff's] version of events").

**1. Specific Jurisdiction**

**i. Successor Liability**

This Court has specific jurisdiction under the theory of successor liability. A court has personal jurisdiction over an alleged successor company, if: (i) "the court would have had personal jurisdiction over the predecessor and (ii) the successor company effectively assumed the subject liabilities of the predecessor." *Lefkowtiz v. Scytl USA*, 2016 WL 537952, at *3 (N.D. Cal. Feb. 11, 2016); *see also OEC Freight (NY), Inc. v. Storlie Furniture Distributors, LLC*, 2025 WL 1617456, at *4 (S.D.N.Y. June 6, 2025); *Munenzon v. Peters Advisors, LLC*, 2022 WL 1486195, at *5 (D.N.J. May 10, 2022). First, this Court, the District of New Jersey court, and the Eastern District of New York court would have had personal jurisdiction over PowerSchool because it purposefully directed its conduct at these forums and Plaintiffs' claims arise out of or relate to that conduct. Specifically, PowerSchool's purposeful direction occurred when it entered into contracts with schools of the Plaintiffs in New Jersey and New Jersey to provide and perform the services it offered to them. *See* ¶¶ 1, 16, 20-26, 38, 65-80, 151-57. *See generally Nat'l Indem. Co. v. Companhia Siderurgica Nacional S.A.*, 2016 WL 520952, at *6 (D.N.J. Feb. 8, 2016) (party purposefully directed its contacts into New Jersey when it entered into contract with New Jersey party); *Successor Agency to Former Emeryville Redevelopment Agency v. Swagelok Co.*, 364 F. Supp. 3d 1061, 1073-74 (N.D. Cal. 2019). Bain has not disputed this point, nor does PowerSchool raise jurisdictional arguments in its motion to dismiss.

Plaintiffs' claims arise out of or relate to PowerSchool's forum-related conduct. *See Briskin v. Shopify, Inc.*, 135 F.4th 739, 760 (9th Cir. 2025); *Cline v. Dan-Bunkering (Am.), Inc.*, 2025 WL 1194076, at *3-4 (S.D. Cal. Apr. 23, 2025). The allegations support reasonable inferences that, but for PowerSchool's forum-related activities, Plaintiffs' alleged injuries would not have occurred. *See* ¶¶ 20-26, 47, 101-110, 121-34, 163-66, 201-205; *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 702-03 (C.D. Cal. 2022). Plaintiffs' claims "relate to" PowerSchool's contacts with New Jersey and New York because Plaintiffs allege the kind of injury that would "tend to be caused"

by PowerSchool's contacts with New Jersey and New York schools. *See Briskin*, 135 F.4th at 760; *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 505 (9th Cir. 2023). In particular, PowerSchool's contacts with New Jersey and New York, which included contracting with local school districts to provide secure software and data security and maintenance, are the kind of contacts that would tend to cause contractual injuries. Plaintiffs' injuries relate to PowerSchool's forum contacts because it "should have foreseen the risk that its contacts might cause injuries like that of the plaintiff[s]." *Yamashita*, 62 F.4th at 506. In arguing that Plaintiffs "must" show that their claims "arise out of" forum contacts, Mot. at 15-16, Bain misstates and fails to address the applicable standard, which includes claims that "relate to" PowerSchool's forum contacts.

Second, as part of the purchase of PowerSchool, Bain, through its affiliates, assumed the liabilities of PowerSchool when PowerSchool merged with a Bain entity. Info. Stmt, at 81. Bain's affiliate agreed to assume PowerSchool's liabilities and the transaction essentially amounted to a consolidation or merger of Bain and PowerSchool (through which PowerSchool was subsumed by Bain).[10] In doing so, Bain effectively absorbed the jurisdictional contacts of PowerSchool.[11] Accordingly, the Court has personal jurisdiction

---

[10] "[A] successor generally does not assume liability for its predecessor's liabilities unless one of . . . four exceptions applies." *Komaiko v. Baker Technologies, Inc.*, 2020 WL 1915884, at *11 (N.D. Cal. Apr. 20, 2020). These four exceptions are:

> (1) the successor expressly or impliedly agrees to assume the subject liabilities; (2) the transaction amounts to a consolidation or merger of the successor and the predecessor (*de facto* merger); (3) the successor is a mere continuation of the predecessor; or (4) the transfer of assets to the successor is for the fraudulent purpose of escaping liability for the predecessor's debts.

*Lefkowtiz*, 2016 WL 537952, at *4; *see In re Zhejiang Topoint Photovoltaic Co., Ltd.*, 651 B.R. 477, 494 (Bankr. D.N.J. 2023); *Dacas v. Duhaney*, 2022 WL 5422709, at *12 (E.D.N.Y. Aug. 11, 2022), *report and recommendation adopted*, 2022 WL 4483188 (E.D.N.Y. Sept. 27, 2022).

[11] Bain claims it has no "ownership interest" in PowerSchool, pointing to the merger between PowerSchool and a Bain entity, BCPE Polymath Buyer, Inc. Mot. at 5 n.6. The Court should reject Bain's corporate shell game. *See supra* at n.3 (detailing Bain's control over merger entities). Bain argues that PowerSchool survived the merger as a wholly owned subsidiary of BCPE Polymath Buyer Inc. Bain, however, ignores that BCPE

over Bain under a theory of successor liability. *See generally Successor Agency to Former Emeryville Redevelopment Agency*, 364 F. Supp. 3d at 1073-74.

**ii. *Calder* "Effects" Test**

For Plaintiffs' claims sounding in intentional tort, Plaintiffs satisfy the "effects" test of *Calder v. Jones*, 465 U.S. 783 (1984). *See generally In Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 454 (9th Cir. 2007).

"Under the three-part *Calder* 'effects' test to evaluate purposeful direction, Plaintiff must establish that the defendants allegedly '(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state.'" *RMS NA, Inc. v. RMS (Aus) Pty Ltd*, 2025 WL 592740, at *6 (S.D. Cal. Feb. 24, 2025) (quoting *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)); *Logical Sol. Servs., Inc. v. McMahon*, 2025 WL 428560, at *5-6 (D.N.J. Feb. 7, 2025). Here, Plaintiffs allege that Bain committed intentional acts, *see* ¶¶ 101, 162-63, 198, 202, 205, 222, and that the conduct of Bain was expressly aimed at New Jersey and New York, *see supra* at 3-6, 11; ¶¶ 163-65. Because Bain knew of the contracts with Plaintiffs, ¶ 162-63; *supra* at 3, Bain knew that the wrongful conduct was targeted at Plaintiff-residents of New Jersey and New York. *See Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 379 F.3d 1120, 1124-25 (9th Cir. 2004). That PowerSchool aimed its actions at multiple states is irrelevant. *See, e.g.*, *Spertus, M.D. v. Epic Sys. Corp.*, 2022 WL 4367195, at *6 (W.D. Mo. Sept. 21, 2022) ("a defendant is capable at aiming its actions at more than one state"). The allegations and evidence further support reasonable inferences that Bain's conduct would cause harm that Bain knew would likely be suffered in New Jersey and New York. ¶¶ 86, 162-63, 181, 205-08, 222-24. Plaintiffs were residents of New

---

Polymath Buyer, Inc. was created by Bain to acquire PowerSchool, and that BCPE Polymath Buyer, Inc. is a wholly owned subsidiary of BCPE Polymath Intermediate, LLC whose sole member is [BCPE Polymath Parent LLC]. "*BCPE Parent's majority member is majority-owned by certain funds and entities advised by Bain Capital.*" *Greer v. PowerSchool Holdings, Inc.*, 2025 WL 986229, at *2 (M.D.N.C. Apr. 2, 2025).

Jersey and New York so the brunt of the harm would be felt there. Plaintiffs therefore satisfy the *Calder* "effects" test. *See, e.g.*, *ZF-TRW*, 601 F. Supp. 3d at 700-02.

### 2. The Exercise of Jurisdiction Comports with Fair Play and Substantial Justice

The burden is on the defendant to present a compelling case that the exercise of jurisdiction would not be unreasonable. *See ZF-TRW*, 601 F. Supp. 3d at 703. Bain, spending only four sentences on this prong and citing no supporting evidence, Mot. at 16-17, fails to meet its burden. Rather, consideration of the relevant seven factors (*see ZF-TRW*, 601 F. Supp. 3d at 703), shows that the exercise of jurisdiction is reasonable. Bain, however, fails to address factors three, six, and seven. *See id.* at 16-17. These allegations support reasonable inferences that Bain purposefully interjected itself into the affairs of New Jersey and New York by contracting with school districts and then engaging in conduct that led to the breach of those contracts by failing to safeguard the private information of students. Bain's arguments, *id*. at 16, which improperly demand "specific allegations," ignore reasonable inferences from the allegations and evidence.[12] Bain, which has offices in Massachusetts, New York, and California, further cites no facts or evidence demonstrating any burden imposed on it by litigating this case in California, New Jersey, or New York. As noted, Bain fails to address the third factor, thus citing no facts or evidence showing any conflict with the sovereignty of the state of its headquarters, Massachusetts. By contrast, New Jersey and New York have a strong interest in having this dispute adjudicated under their laws because it involves school districts within their respective jurisdictions, and they have a strong interest providing an effective means of redress for their residents who are tortiously injured. *See Linlor v. JPMorgan Chase & Co.*, 2017 WL 3446814, at *4 (S.D. Cal. Aug 9, 2017). The most efficient judicial resolution

[12] *See Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946, 951 (9th Cir. 2019) ("At this stage, a complaint's factual allegations need not be detailed."); *Edifecs, Inc. v. Profant*, 2017 WL 2464129, at *3 (W.D. Wash. June 7, 2017) ("The *Iqbal/Twombly* standard . . . does not require 'specific allegations' or evidence at this stage of this proceeding.").

would be to have this case resolved by this Court applying the applicable laws of New Jersey and New York with respect to claims arising under those states' laws. The application of the laws of the forums of New Jersey and New York is certainly important to Plaintiffs' interest in convenient and effective relief, since they were harmed in those states. Finally, Bain has not pointed to the existence of adequate alternative forums to handle the claims of the New Jersey and New York Plaintiffs. The seven-factor balancing test weighs in Plaintiffs' favor or is, at best, a wash. Therefore, Bain has failed to make a compelling case that the Court's exercise of personal jurisdiction over it would be unreasonable, particularly in light of New Jersey's and New York's strong interest in adjudicating matters involving torts and breaches of contract occurring within, and directed at, their respective states.

### 3. Pendent Jurisdiction for the State Law Claims Is Appropriate

"[A] court may assert pendent personal jurisdiction over a defendant with respect to a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004). Bain does not dispute that the Court has personal jurisdiction for purposes of Plaintiffs' claim under the CFAA. Further, Plaintiffs' CFAA claim and state law claims arise out of a common nucleus of operative facts. *See* ¶¶ 184-209. The consideration of judicial economy, convenience, and fairness warrant that these claims be resolved together.[13]

[13] *See, e.g.*, *Cloudpath Networks, Inc. v. SecureW2 B.V.*, 157 F. Supp. 3d 961, 971 (D. Colo. 2016) (exercising pending personal jurisdiction over state law claims that shared common factual predicates with CFAA claim); *US Bioservices Corp. v. Lugo*, 2008 WL 4747473, at *4 & n.2 (D. Kan. Oct. 23, 2008) (exercising pendent personal jurisdiction over defendant because personal jurisdiction existed in case with CFAA claim); *cf. CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1070-73, 1080 (9th Cir. 2011) (finding pendent personal jurisdiction where plaintiff raised CFAA and state law claims).

#### 4. In the Alternative, Jurisdictional Discovery Is Appropriate, and/or Plaintiffs Request Leave to Amend Their Forum Designations

In the event that the Court declines to find personal jurisdiction over Bain, Plaintiffs request leave to conduct jurisdictional discovery and/or leave to amend their forum designations. This Court has "broad discretion" to permit or deny discovery to aid in determining whether it has personal jurisdiction. *See Butcher's Union Local No. 498 v. SDC Investment, Inc.*, 788 F.2d 535, 540 (9th Cir. 1986) (trial court has "broad discretion to permit or deny discovery"). "Discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Id.* The allegations and evidence plausibly suggest that PowerSchool was absorbed by Bain, that Bain has a significant amount of control over PowerSchool and that relevant facts are in control of Bain and PowerSchool, thus warranting development of jurisdictional evidence concerning the corporate arrangements, the relationship between the two, and their actions. The Court should therefore, in the alternative, grant jurisdictional discovery. *See, e.g.*, *Munenzon*, 2022 WL 1486195, at *5-7 (granting discovery where facts concerning successor liability were largely in control of defendants); *Cohodes v. MiMedx Grp., Inc.*, 2022 WL 15523079, at *3 (N.D. Cal. Oct. 27, 2022) (granting jurisdictional discovery); *Frost v. LG Elecs. Inc.*, 2017 WL 1425919, at *2 (N.D. Cal. Apr. 21, 2017) (same). Plaintiffs also request in the alternative leave to amend their forum designations so as to designate forums that would have general jurisdiction.

### B. Plaintiffs' Claims Are Well Pled

#### 1. Plaintiffs Adequately Allege a Claim for Intentional Interference with Contract

The elements of a claim for intentional interference with contractual relations are essentially the same under California, New Jersey, and New York law. Plaintiffs must allege "(1) a valid contract between Plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Quelimane Co. v. Stewart Title Guaranty Co.*, 19

Cal. 4th 26, 55 (1998); *Score Bd., Inc. v. Upper Deck Co.*, 959 F. Supp. 234, 238 at n.4 (D.N.J. 1997) ("[T]here is very little conflict between New Jersey and California law on tortious interference."); *Taboola, Inc. v. Ezoic Inc.*, 2020 WL 1900496, at *6 (S.D.N.Y. Apr. 17, 2020) (citing *Quelimane*, and finding "these match the elements of the tort under New York law"). To the extent applicable to Bain's state of mind, a defendant's intent may be plead generally. *See* Fed. R. Civ. P. 9(b).

Bain does not dispute that valid contracts exist between PowerSchool and Plaintiffs or that it had actual knowledge of the relevant Contracts that PowerSchool maintained with Plaintiffs. Instead, Bain takes issue with the adequacy of Plaintiffs' allegations that Bain procured a breach by PowerSchool of its MSAs and DPAs, Mot. at 29-30, and contends that Plaintiffs do not sufficiently allege Bain's intention to cause PowerSchool to breach its contracts with Plaintiffs. *Id.* at 31-32. Bain also argues that Plaintiffs fail to allege a causal relationship between any of its actions and Plaintiffs' injuries. *Id.* at 33-34. Finally, Bain argues there are no allegations of an underlying breach of contract. *Id.* at 34-35. These arguments are all easily rejected.

**i. Bain's Intentional Interference with the Contracts**

Intentional interference exists where the actor "knows that the interference is certain or substantially certain to occur as a result of his action." *Quelimane*, 19 Cal. 4th at 55. But, "[b]ecause interference with an existing contract receives greater solicitude than does interference with prospective economic advantage, it is not necessary that defendant's conduct be wrongful apart from the interference with the contract itself." *Id.* "Wrongfulness independent of the inducement to breach the contract is not an element of the tort of intentional interference with *existing* contractual relations." *Id.* (emphasis in original). Moreover, the actor's primary purpose need not be disruption of the contract. *Id.*; *Connell v. Weiss*, 1985 WL 428, at *2 (S.D.N.Y. Mar. 19, 1985) ("[w]here a contract exists, intentional interference by the defendant is actionable even in the absence of malice"); *Harris v. Perl*, 197 A.2d 359, 363 (N.J. 1964) ("one who unjustifiably interferes with the contract of another is guilty of a wrong").

Here, Plaintiffs allege that, beginning in August 2022, Bain and PowerSchool explored the acquisition, engaged in over six months of intensive due diligence investigation, and ultimately executed the Agreement and Plan of Merger on June 6, 2024 ("Merger Agreement"). ¶ 98. During this period, as part of its due diligence, Bain became intimately familiar with all aspects of PowerSchool's business, including its material contracts with Plaintiffs that contain critical cybersecurity terms, ¶ 162, and PowerSchool's adherence to those contractual obligations. Merger Agreement, Data Privacy § 3.17(a) (stating PowerSchool has "*currently and during the past three (3) years*, materially complied with all applicable Data Protection Obligations"[14]); *id.* §3.17(c) (stating PowerSchool has not experienced any Security Incident[15] or received any claim alleging that PowerSchool has violated any Data Protection Obligation *in the past three (3) years*). Info. Stmt. at A-32.

After executing the Merger Agreement, Bain directed severe cost-cutting measures at an aggressive pace. *See* ¶ 101. Bain directed reductions to PowerSchool's internal cybersecurity team and the outsourcing of backend personnel involved in cybersecurity, without adequate oversight or enforcement of the contractually required security for Plaintiffs' highly sensitive PHI/PII. ¶¶ 7, 163. Within three scant months of announcing the PowerSchool acquisition, in August 2024, reports circulated publicly that PowerSchool had already laid off 5% of its workforce and was shifting to an India-based workforce. ¶ 102; *see also* ¶¶ 107, 103-104, 106. Bain was responsible for these workforce cuts. ¶ 109.

---

[14] In the Merger Agreement, "Data Protection Obligations" is defined as "all (i) federal, state, provincial, municipal, local or foreign Laws, (ii) *contractual obligations of the Company* and its Subsidiaries, and (iii) written privacy policies, terms of use, or other public representations of the Company or any of its Subsidiaries, in each case, to the extent related to privacy, *information security*, *data protection*, data breach notification, *cross border data transfers*, targeted advertising, online marketing activities, *the tracking or monitoring of online activity*, or Processing of Personal Information." (emphasis added). Info. Stmt. at A-7.

[15] The Merger Agreement defines "Security Incident" as "any (i) unauthorized or unlawful acquisition of, access to, loss of, misuse of, or disclosure of Personal Information; or (ii) ransomware, phishing or other cyberattack that resulted in a material monetary loss or a significant business disruption to Systems." Info. Stmt. at A-13.

In short, the workforce reductions imposed by Bain, especially in the cybersecurity realm, left PowerSchool unable to provide the contractually promised data security, which in turn enabled hackers to gain unauthorized access to PowerSchool's systems as early as August 16, 2024, ¶ 105, and thereafter suffered the Data Breach in December 2024. Given the acknowledgement in the Merger Agreement that since 2021, PowerSchool had been compliant with its Data Protection Obligations, a reasonable inference is that Bain's drastic workforce reductions only months before the Data Breach prevented PowerSchool from complying with its contractual data security promises, thus interfering with those contracts.

Bain relies on the Merger Agreement's "No Control of the Other Party's Business" clause to argue that up until the acquisition was consummated on October 1, 2024, "PowerSchool retained complete control and supervision over [its] own business and operations," Mot. at 30-31; *see also id.* at 7, and therefore was solely responsible for the cybersecurity workforce reductions that led to PowerSchool's breach of the security terms in their contracts with Plaintiffs. But, this argument is belied by other express terms of the Merger Agreement. According to the Merger Agreement, during the "Interim Operation of the Company," (Art. V, at page A-45), which is defined as the time between the execution of the Merger Agreement (June 6, 2024) and the "Effective Time"—the date upon which the merger is fully consummated, here October 1, 2024—PowerSchool was forbidden to (*i.e.*, "shall not") "implement any layoffs . . . affecting 50 or more employees" without Bain's express permission. §5.2(E) at A-45; §5.2(k) at A-47; *see also* §5.2(i) (terminating any employee earning in excess of $250,000 without Bain's permission). Accordingly, it is more than plausible, given all favorable inferences, that Bain directed PowerSchool to purge its workforce, including its critical cybersecurity personnel. And, by severely reducing critical employees, including those associated with implementing and maintaining the cybersecurity obligations in accordance with the PowerSchool contracts, Bain caused PowerSchool to breach its Contracts with Plaintiffs to provide the contracted-for data security and protection, which was "certain or substantially certain to occur as a result of [Bain's] action." *Quelimane Co.*, 19 Cal. 4th at 55.

"[C]ausing a breach of an existing contract is [ ] a wrong in and of itself," *Quelimane*, 19 Cal.4th at 56; *Harris*, 197 A.2d at 363; therefore, whether Bain had a legitimate business purpose which justified its cybersecurity workforce reductions, Mot. at 32, or did so wrongfully without regard for PowerSchool's contractual obligations, ¶ 101, is a matter for trial—not resolution on a motion to dismiss. *Quelimane*, 19 Cal.4th at 57 (denying motion to dismiss intentional interference with existing contractual relations in part on this basis); *see also NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 621 ("[W]here there is an existing, enforceable contract and a defendant's deliberate interference results in a breach of that contract, a plaintiff may recover damages for tortious interference with contractual relations even if the defendant was engaged in lawful behavior."); *Labus v. Navistar Intern. Transp. Corp.*, 740 F. Supp. 1053, 1063 (D.N.J. 1990) ("The interference alleged must be both intentional and legally or ethically improper."). Moreover, Bain's intent to interfere in PowerSchool's contracts can be alleged generally without running afoul of notice pleading standards, as it has been here. ¶ 163; *cf. Sun Life Assur. Co. of Canada v. Imperial Premium Fin., LLC*, 904 F.3d 1197, 1215 (11th Cir. 2018) (applying Rule 9(b) and reversing district court's ruling that knowledge of the relevant contract need be plead with specificity in an intentional interference with contract claim).

**ii. Bain's Actions Caused PowerSchool to Breach the Contracts**

Bain argues that Plaintiffs have failed to allege that its interference was a "substantial factor" in PowerSchool's breach of its Contracts with Plaintiffs. Mot. at 33-34. Bain is wrong. "California law defines 'substantial factor' expansively, and at least one court has cautioned against placing 'undue emphasis' on the ordinary meaning of that word." *Bank of New York v. Fremont General Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) (citing *Rutherford v. Owens-Illinois, Inc.*, 16 Cal.4th 953, 969 (1997)); *Util. Metal Research, Inc. v. Coleman*, 2008 WL 850456, at *8 (E.D.N.Y. Mar. 28, 2008) ("A plaintiff claiming tortious interference with contract is obligated to establish that intentional acts on the part of a defendant were a substantial factor in the disruption of the contract."); *Komlodi v.*

*Picciano*, 89 A.3d 1234, 1254-55 (N.J. 2014) (finding that "[a] substantial factor is one that is 'not a remote, trivial or inconsequential cause.'").

PowerSchool contracted to provide cybersecurity for the sensitive PHI and PII it collected from Plaintiffs and the School Districts. ¶ 1, *see also* Opposition to PowerSchool MTD, Breach of Contract, Dkt. 341, at 6-10. Thus, as Plaintiffs allege, Bain's approved reduction and international outsourcing of, *inter alia*, PowerSchool's workforce such as those responsible for reviewing access controls and network monitoring, ¶ 7, "expressly breached PowerSchool's contractual and other obligations with the School Districts," ¶ 101, because it prevented PowerSchool from providing the promised level of cybersecurity protections, exposing Plaintiffs to the Data Breach and consequent harms. ¶ 165. Plaintiffs have met their pleading burden to allege that Bain's actions were a substantial factor in causing the breach of PowerSchool's contracts.

**iii. PowerSchool Breached Its Contracts with Plaintiffs**

For the reasons set forth in the Opposition to PowerSchool's Motion to Dismiss Plaintiffs' Breach of Contract claim, Dkt. 341 at 6-10, incorporated herein by reference, Plaintiffs have adequately pled a breach of contract. Indeed, Plaintiffs allege that PowerSchool breached its Master Services Agreements and Data Privacy Agreements by failing to encrypt and abide by access restrictions to the security of Plaintiffs' highly sensitive PII and PHI. ¶¶ 1, 4, 5, 39, 69, 81-83, 87-88, 93, 97.

**2. Bain Conspired to Violate the Computer Fraud and Abuse Act**

Like PowerSchool, with Plaintiffs' opposition incorporated herein by reference, Bain first attacks Plaintiffs' conspiracy claim under the CFAA, arguing it cannot be liable as the statute 'is designed to target criminal hacking.'[16] Mot. at 36. However, courts have consistently rejected this argument, noting that "the word 'hack' does not appear anywhere in the statute's text." *Ticketmaster L.L.C. v. Prestige Ent. W., Inc.*, 315 F. Supp. 3d 1147,

[16] Bain also argues that Plaintiffs failed to allege violations under 18 U.S.C. §§ 1030 (a)(2)(c) or (a)(5)(c), but Plaintiffs do not bring their claims under those provisions against Bain. *See* Mot., Ex. A at 2, Email from Jordan M. Steele ("Plaintiffs are similarly pursuing their CFAA claim against Bain for violations of §1030(b), CFAA's conspiracy prong.").

1169 (C.D. Cal. 2018). A claim under the CFAA "doesn't depend on whether any Defendant hacked anything." *Id.*; *see also United States v. Nosal*, 930 F. Supp. 2d 1051, 1060 (N.D. Cal. 2013) (the Ninth Circuit "did not . . . hold that the CFAA is limited to hacking crimes, or discuss the implications of so limiting the statute . . . [h]acking was only a shorthand term used as common parlance by the court to describe the general purpose of the CFAA").

Bain also characterizes Plaintiffs' CFAA claim as involving "a novel scenario far from the hacking context[.]" Mot. 36. Bain's characterization is incomplete, because while this situation is novel so are the circumstances: PowerSchool is a highly regulated entity that collects and manages the data of children, as such it is subject to FERPA, COPPA, HIPAA, HITECH, and other federal and state laws. ¶50; Dkt. 302-4 at 2-3, 302-5 at 11. PowerSchool was required to implement access restrictions either explicitly by contract or implicitly by contract when promising to abide by nationally recognized cybersecurity frameworks. PowerSchool entered into data privacy agreements with School Districts promising to restrict access to data and then *accessed the data anyway*. The "circumvention of technical access barriers" by PowerSchool, as tactically understood and agreed to by Bain, falls well within the statute even if not within the everyday understanding of the word 'hacking.' Mot. 36 (citing *Lakeland Tours, LLC v. Bauman*, 2014 WL 12570970 (S.D. Cal. Feb. 11, 2014)). Bain's liability requires only a straightforward application of statutory text under the CFAA.[17]

While it is true that PowerSchool was hacked, the Data Breach has no bearing on whether Bain conspired with PowerSchool to access without or exceed authorization to

[17] The cases cited by Bain concerning a limited application of the CFAA for "hacking" offenses involve cases addressing purpose-based access to information. For example, *Van Buren* concerned a police officer's use of a license plate search falling outside his authorization to use that system. *Van Buren, Petitioner v. United States, Respondent*, 2020 WL 7024931, 18 (U.S. Oral. Arg., 2020). The Government, in charging Van Buren, sought to add purpose-based restrictions to the CFAA, an approach that it is inapplicable to Plaintiffs' allegations—thus the 'parade of horribles' contemplated by *Van Buren* are not at play here. *Id.* ("[T]he conduct in this case [would] cover[] all kinds of other violations of purpose-based restrictions that could appear in terms of service contracts, employee handbooks, course syllabuses, syllabi at universities, or even oral dictates.").

Plaintiffs' Protected Data in the first instance. *Ticketmaster*, 315 F. Supp. 3d at 1172 ("the CFAA penalizes both access without authorization *and* situations where a defendant possesses some authorization, but acts excess of that authorization.") (citing to 18 U.S.C. § 1030(a)(2)(c)). Plaintiffs do ***not allege*** that the design or manufacture of PowerSchool's SIS violated the CFAA; rather, Plaintiffs allege that PowerSchool intentionally intruded into Plaintiffs' Protected Computers in violation of those access restrictions. *See* Mot. at 37. PowerSchool's intrusion is even more apparent when considering the fact that some School Districts hosted their SIS locally, on-premise, and PowerSchool also had access to those Protected Computers via the Backdoor Access Tool—but in any event PowerSchool agreed not to access unencrypted personal data. ¶ 215.

***Conspiracy.*** Bain attempts to argue that Plaintiffs have failed to allege "'an agreement and common activities' in furtherance of any CFAA violation." Mot. at 37 (quoting *NetApp, Inc. v. Nimble Storage, Inc.*, 41 F. Supp. 3d 816, 835 (N.D. Cal. 2014)). Section 1030(b) was amended in 1986 to delete the requirement that a CFAA violation requires action taken "in furtherance" of the conspiracy. Pub. L. No. 99-474, § 2, 100 Stat. 1213 (Oct. 16, 1986) (striking out the statutory requirement that the parties must take action "in furtherance of such offense" for a violation of § 1030 (b)); Pub. L. No. 98-473, 98 Stat. 1837 (Oct. 12, 1984). The relevant provision currently states:

> Whoever conspires to commit or attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section.

18 U.S.C. § 1030 (b).

Rather, "[i]n the context of civil conspiracy, '[t]o survive a motion to dismiss, plaintiff must allege with sufficient factual particularity that defendants reached some explicit or tacit understanding or agreement.'" *NetApp.*, 41 F. Supp. 3d at 836 (quoting *Alfus v. Pyramid Tech. Corp.*, 745 F. Supp. 1511, 1521 (N.D. Cal. 1990)). The *NetApp* court rejected the charge of conspiracy because the plaintiffs had only alleged bare legal conclusions. *Id.* That is simply not the case because Plaintiffs allege that "Bain Capital knowingly authorized or ratified PowerSchool's use of a Backdoor Access Tool that

bypassed bargained-for consent and access protocols," Bain "directed or allowed PowerSchool to engage in conduct that Bain Capital knew would—or was willfully blind to—violate the CFAA. Moreover, PowerSchool's layoffs required Bain to take action by providing approval in writing. Bain Capital's oversight role extended not only to governance but also to risk mitigation and legal compliance" and it stood to financially benefit from PowerSchool's violation of the CFAA. ¶¶ 203-06. These allegations, unlike those in *NetApp*, suffice at the pleading stage.[18]

***Damages and Loss.***[19] As explained in the opposition to PowerSchool's Motion, Dkt. 341 at 24-32, Plaintiffs need not allege damages to plead a violation of § 1030(a)(2). *Universal Protec. Serv., LP v. Coastal Fire and Integration Sys., Inc.*, 2023 WL 4042582, at *8 (S.D. Cal. June 15, 2023). If the Court finds that PowerSchool violated § 1030(a)(2) and that Bain had a 'tacit understanding or agreement' with PowerSchool to commit those violations, then it is sufficient that Plaintiffs plead costs incurred by the School Districts. *Id.* Bain's argument is instead focused on § 1030(a)(5), that unlike § 1030(a)(2), requires that access to the Protected Computer must be "without authorization" and that such conduct must cause "damage and loss." *Universal Protec. Serv.*, LP, 2023 WL 4042582, at *8. Nonetheless, Plaintiffs allege both sufficiently to also satisfy § 1030(a)(5).

Bain provides a very narrow definition of "damage" under the CFAA. Mot. at 39-40. To be clear, the "CFAA defines 'loss' as 'any reasonable cost to any victim,' and lists

---

[18] Like *In re Lenovo Adware Litig.*, Plaintiffs have alleged "facts showing 'a knowing agreement with another to commit the unlawful act.'" 2016 WL 6277245, at *6 (N.D. Cal. Oct. 27, 2016) (denying motion to dismiss claim of section 1030(b) conspiracy liability). *See also Ryanair DAC v. Booking Holdings Inc.*, 636 F. Supp. 3d 490, 510 (D. Del. 2022) ("[c]ourts have routinely entertained claims under section 1030(b) in civil cases."); *Calendar Research LLC v. Stubhub, Inc.*, 2020 WL 4390391, at *26 (C.D. Cal. May 13, 2020) ("[c]onspiracy liability is specifically provided for in the CFAA under § 1030(b)"); *Facebook, Inc. v. MaxBounty, Inc.*, 274 F.R.D. 279, 284 (N.D. Cal. 2011) ("[H]eightened pleading standards of Rule 9(b) do not apply to the Computer Fraud and Abuse Act.").

[19] Bain did not argue that Plaintiffs did not incur a "loss" as defined by the CFAA, § 1030(e)(11), and that argument is deemed waived. If the Court finds Plaintiffs' allegations of conspiracy sufficient, then Plaintiffs' § 1030(b) claim may proceed under PowerSchool's violations of § 1030(a)(2).

as examples 'the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service.'" § 1030(e)(11). While the CFAA defines "damage" as "any impairment to the integrity or availability of data, a program, a system, or information." § 1030(e)(8). In *Ticketmaster*, the court considered and rejected a narrow reading of the requisite harm:

> The Court disagrees with this reading of the statute's definition of "loss" for two reasons. First, the placement of the commas in the definition of "loss" indicates that "the cost of responding to an offense" does not have to be caused by "interruption of service." *See* 18 U.S.C. 1030(e)(11). These two clauses are separated by seven commas, and a strained reading is required to conclude that the last clause controls the first. The cost of "responding to an offense," on its own, qualifies as loss under the CFAA, without any need to connect it to an interruption of service.

*Ticketmaster*, 315 F. Supp. 3d at 1172 (citing *SuccessFactors v. Softscape, Inc.*, 544 F. Supp. 2d 975 (N.D. Cal. 2008); *Facebook*, 844 F.3d at 1066 ("costs spent . . . responding to a defendant's unauthorized access, even when that access led to no actual loss . . . qualify as the cost of responding to an offense").

Plaintiffs allege both damage and loss, including from the losses incurred by responding to the Data Breach, conducting damages assessments, restoring data, programs, systems, or information to their prior condition, costs incurred from overpayment of PowerSchool's services, and/or other consequential damages in excess of $5,000. ¶ 207. Further, Plaintiffs allege that Bain conspired with PowerSchool to violate access restrictions for the Protected Computers and that by accessing the Protected Computers, PowerSchool impaired the integrity and security of the School Districts' systems and Data. That is enough at this stage. *See Ticketmaster*, 315 F. Supp. 3d at 1172.[20]

[20] It is sufficient that the harm suffered by Plaintiffs and Class Members was caused either "directly" by PowerSchool or "indirectly" by Bain. *Ryanair DAC*, 636 F. Supp. 3d at 504.

**3. Bain Assisted PowerSchool in Violating the California Comprehensive Data Access and Fraud Act**

Bain next attempts dismissal of Plaintiffs' claims under the CDAFA by again asserting that hackers are responsible for the breach. But, as Plaintiffs explain, the later hack is irrelevant to whether Bain violated the CDAFA by implementing the Backdoor Tool. In *Claridge v. RockYou, Inc.*, upon which Bain relies, the plaintiff attempted to charge the defendant with providing the means to gain unauthorized access "by failing to establish commercially reasonable security methods to protect the PII on its system." 785 F. Supp. 2d 855, 863 (N.D. Cal. 2011). Plaintiffs do not allege such conduct with respect to this Count; rather, Plaintiffs allege that Bain and PowerSchool affirmatively acted to surreptitiously insert an access tool to circumvent permission restrictions. ¶ 195.

Here, the Court need not conduct an analysis into the CDAFA in a vacuum and without considering the CFAA. "The CDAFA is California's state-law analogue to the CFAA." *Ticketmaster*, 315 F. Supp. 3d at 1174. However, "the California statute does not require *unauthorized* access. It merely requires *knowing* access." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1069 (9th Cir. 2016) ("[O]nce the defendant was aware his access was revoked he 'knowingly accessed and without permission took, copied, and made use of Facebook's data' in violation of section 502."). Thus, while more lenient, the analysis is largely the same as under the CFAA. *Id*.

*Ticketmaster* is instructive. There, applying the principles set forth by the Ninth Circuit in *Facebook*, the court analyzed whether the use of a tool to access a computer network, bots in that case, constituted violations of the CDAFA with respect to §§ 502(c)(2) and 502(c)(7). 315 F. Supp. 3d at 1176. The *Ticketmaster* court held that the use of the tool showed that such conduct was a knowing, intentional effort to avoid limitations on access to data and thus violated the relevant sections of the CDAFA. *Id.* The same is true here where Bain is alleged to have directed PowerSchool's use of a tool, the Backdoor Tool, to secretly and without the knowledge of Plaintiffs, access the Protected Data with full knowledge that it was doing so without the requisite consent. ¶ 222.

Finally, with respect to damages, Bain ignores Plaintiffs' allegations and pretends that Plaintiffs simply allege that the violations of the CDAFA "have caused loss to Plaintiffs and Class Members and [Defendants have] profited at their expense." Mot. at 43 (citing ¶ 224). While this may be true, Plaintiffs also incorporate by reference paragraphs 184 through 209 in this Count where they allege that Plaintiffs incurred losses, "including the cost of responding to the Data Breach, conducting damages assessments, restoring SIS data, programs, systems, or information to its condition prior to the Data Breach, costs incurred from overpayment of PowerSchool's security services, and/or other consequential damages." ¶ 207. Accordingly, reading the Complaint as a whole, Plaintiffs have stated a claim for Bain's violation of the CDAFA.

### 4. Bain Has Sufficient Notice of the Claims Pled Against It

Bain claims that it does not have sufficient notice of Plaintiffs' claims for negligence, violation of the CDAFA, unjust enrichment, and declaratory and injunctive relief because of "improper group pleading," yet Bain concedes that there are "allegations brought expressly against Bain" and Bain had sufficient notice such that it was able to make specific arguments against the negligence, CDAFA, and unjust enrichment claims. Mot. at 43-44.

Consistent with the standards for a Rule 12 motion, Plaintiffs' specific allegations, and the reasonable inferences that may be drawn therefrom, provide ample notice of Bain's illegal conduct that forms the basis of Plaintiffs' claims. *To wit*: (1) PowerSchool made specific and enforceable representations and promises regarding its security practices (¶¶ 1, 31-37, 172); (2) PowerSchool understood the importance and sensitivity of the data it collects (¶¶ 1, 6, 28); (3) PowerSchool acknowledged that Plaintiffs' owned such data (¶¶ 29, 191-194); (4) PowerSchool fully recognized and accepted the risks of a potential data breach and the subsequent damages its customers would, and ultimately did, suffer (¶¶ 3, 6, 29); (5) Bain pursued a purchase of PowerSchool and, during the due diligence process, Bain knew or should have known of the aforementioned facts (¶¶ 17, 18, 98); (6) Bain nevertheless completed its purchase and thereby undertook the responsibilities and obligations of PowerSchool due to its direct control and management of PowerSchool's

operations (¶¶ 7, 18, 27, 98-99, 172, 195, 201-205); and (7) Bain's direct actions in cost-cutting resulted in the reduction of PowerSchool's workforce, including those specifically responsible for security, and the subsequent outsourcing of such responsibilities oversees allowed the data breach to occur (¶¶ 7, 47, 92, 101-104, 108-110, 195).

Thus, Plaintiffs' Complaint is nothing like the complaints relied upon by Bain, which contained "broad and conclusory" allegations against the defendants generally. *Compare Bustamante v. Bank of Am., N.A.*, 2012 WL 13175878, at *2 (S.D. Cal. May 21, 2012) (where the plaintiff's response to the motion to dismiss, and not the complaint itself, was so conclusory and lacked any application of legal authority or attempt to address any substantive argument that the court considered the motion to dismiss to be "unopposed" and therefore granted the motion); *Horton v. NeoStrata Co. Inc.*, 2016 WL 11622008, at *3 (S.D. Cal. Nov. 22, 2016) (finding the complaint "impermissibly groups NeoStrata together with ***seven other*** Defendants without distinguishing between the alleged conduct of each Defendant" and plaintiff merely asserted that "group pleading is permissible"); *Doe v. Camp Pendleton & Quantico Hous. LLC*, 2020 WL 1890576, at *8 (S.D. Cal. Apr. 16, 2020) (in a case involving three defendants, "[p]laintiffs . . . fail to specify the representative's employer. Plaintiffs additionally allege that 'Defendants informed' Plaintiffs about the need for them to move out and the status of the mold in the apartment, but Plaintiffs do not specify which Defendant."). Thus, Bain has more than sufficient notice of the claims against it.

**5. Plaintiffs' Remaining Common Law Claims Are Well Pled**

**i. Bain Acted Negligently**

Plaintiffs have pled all the necessary elements of their negligence claim against Bain.

***Duty.*** Bain incorrectly argues that "Plaintiffs do not allege that Bain owed them a duty of care" and support this claim by selectively relying on a single allegation of the Complaint. Mot. at 46. As set forth above, the numerous specific allegations, and reasonable inferences that can be drawn therefrom, establish Bain's duty to Plaintiffs. In particular, Bain knew, or should have known, of PowerSchool's promises and

representations vis-à-vis data security; the vast amount of personal and sensitive data PowerSchool collected, stored, and controlled that was owned by Plaintiffs; and the serious risks of a data breach and the subsequent harm to Plaintiffs. In light of this, Bain had an independent duty not to cause PowerSchool to breach its duty of care or to increase the risk of a data breach through Bain's cost-cutting measures. Indeed, "[i]t is axiomatic that a defendant has a duty to protect a plaintiff against foreseeable harm." *In re Am. Med. Collection Agency, Inc. Customer Data Sec. Breach Litig. ("AMCA")*, 2021 WL 5937742, at *14-15 (D.N.J. Dec. 16, 2021).

In *AMCA*, the court agreed that "Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiffs' and Class Members' Personal Information within their control from being compromised, lost, stolen, accessed and misused by unauthorized persons." *Id*. The court explicitly stated that it was not alone in finding the existence of such a duty as "[c]ourts that have considered this argument in similar data breach cases have reached the same conclusion." *Id*. (collecting cases); *see also In re Fortra File Transfer Software Data Sec. Breach Litig.*, 749 F. Supp. 3d 1240, 1263 (S.D. Fla. 2024) ("It is well-established that under federal law, entities which collect sensitive, private data from consumers and store such data on their networks have a duty to protect the information. . . . ***Where a defendant's conduct creates a foreseeable zone of risk***, the law generally will recognize a duty placed upon [the] defendant either to lessen the risk or [to] see that sufficient precautions are taken to protect others from the harm that the risk poses.").

The mere fact that Bain itself did not hold any of the data does not change this conclusion because Bain was not some unaffiliated third party; rather, it had direct knowledge of PowerSchool's duty and the ability to affect PowerSchool's ability to uphold that duty through the financing and control of the operations of PowerSchool. It was Bain's decision to engage in aggressive cost-cutting measures that led to the reduction of PowerSchool's experienced and US-based workforce and the outsourcing of operations overseas to third party contractors. It was these direct measures by Bain that allowed, or at

least contributed to, the data breach. In other words, it was more than foreseeable that Bain's actions of cost-cutting and workforce reduction would lead to the harm that Plaintiffs experienced; thus, Bain had a duty to ensure that PowerSchool maintained adequate data security rather than gutting PowerSchool's ability to do so. *See Brown v. USA Taekwondo*, 11 Cal.5th 204, 213-14, 483 P.3d 159, 164 (2021) ("We have explained that the law imposes a general duty of care on a defendant only when it is the defendant who has 'created a risk' of harm to the plaintiff, including when 'the defendant is responsible for making the plaintiff's position worse.' . . . 'Under general negligence principles, . . . a person ordinarily is obligated to exercise due care in his or her own actions so as not to create an unreasonable risk of injury to others[.]'"); *compare AMCA*, 2021 WL 5937742, at *15 ("Defendants likewise miss the mark by arguing that Defendants did not have a duty to oversee the operations of AMCA, an independent contractor. . . . The Court agrees that Defendants were not required to oversee all of AMCA's operations, but this does not absolve Defendants of their duty to take reasonable care by, for example, reasonably ensuring that the third-party collection agency they contracted with had adequate data security."); *Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 908 (N.D. Cal. 2024) (denying motion to dismiss negligence claim against company who was not the subject of the data breach, explaining as to duty that "it is foreseeable that companies dealing with PII must implement adequate security practices and must exercise reasonable care in ascertaining which subcontractors/vendors and employees they choose to work with, especially when sharing customers' PII with said vendors"); *In re MOVEit Customer Data Sec. Breach Litig.*, 2025 WL 2179475, at *9 (D. Mass. July 31, 2025) ("[N]egligence law generally imposes a duty of 'reasonable care to employ a competent and careful contractor,' Restatement (Second) of Torts § 411 (1965).").

Likewise, Bain's citation to a number of inapposite cases does not change this conclusion. *See Cruz v. Sears*, 2012 WL 13175896, at *1 (S.D. Cal. Apr. 16, 2012) (a negligence and product liability case where "Plaintiff states in a conclusory manner that Defendant owed a duty and that the duty was breached when he was injured by the

Craftsman tool, but he fails to state Defendant Apex's role in the tool or injury"); *Attisha Enters., Inc. v. Cap. One, N.A.*, 505 F. Supp. 3d 1051, 1056-57 (S.D. Cal. 2020) (a wire fraud claim where many common law claims were displaced by UCC and the court simply reiterated that generally "banks do not owe a duty of care to noncustomers"; however, the court noted that the bank would have a duty to investigate if there were suspicious circumstances alleged); *Navarro v. Data*, 2022 WL 18280359, at *10-11 (C.D. Cal. Dec. 7, 2022) (where, on summary judgment, court found that defendants did not owe a duty because "they only sell and install [the systems collecting data]" and thus had no control over the collection and storage of data); *Smahaj v. Retrieval-Masters Creditors Bureau, Inc.*, 69 Misc. 3d 597, 603, 131 N.Y.S.3d 817, 823 (N.Y. Sup. Ct. 2020) (stating that plaintiff could have established defendant's duty if there were allegations that the defendant "retained, supervised, controlled, directed[,] and authorized all actions of AMCA, which resulted in [p]laintiff['s] and class members' personal information being compromised").

Here, because Bain profited from PowerSchool's data-dependent business and controlled the resources that provided security to PowerSchool's SIS system, it owed a duty of care to Plaintiffs. *See Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019) ("From a policy standpoint, to hold that Facebook has no duty of care here would create perverse incentives for businesses who profit off the use of consumers' personal data to turn a blind eye and ignore known security risks. . . . As such, plaintiff Adkins has met his obligation to plausibly plead duty of care.").

***Breach.*** Bain merely argues that "Absent duty, there can be no breach and thus no negligence." Mot. at 47. Because, as set forth above, Plaintiffs have established Bain's duty, Bain has waived any right to dispute the existence of a breach of that duty.

***Causation.*** As to causation, Bain reiterates its allegation of group pleading, which was thoroughly refuted above. In addition, "[o]rdinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint." *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 152 (2018).

Nevertheless, to the extent the Court will entertain Bain's arguments on a motion to dismiss, Bain fails to provide any analysis of its primary argument that "allegations of cost reductions alone would not render injuries from a subsequent cybersecurity incident 'fairly traceable' to those alleged measures." Mot. at 48. Moreover, none of the cases relied upon by Bain for this proposition involve data breaches and thus are inapposite. For example, *Modisette* involved a fatal car accident where the "driver using the FaceTime application on his iPhone crashed into [plaintiffs'] car on a Texas highway." *Id*. at 139. The court held that Apple did not owe a duty to plaintiffs because of "two considerations: first, the tenuous connection between the Modisettes' injuries and Apple's design of the iPhone 6 Plus without lockout technology; and, second, the burden to Apple and corresponding consequences to the community that would flow from such a duty." *Id*. at 142.

Here, the connection between Bain's cost-cutting that lead to a reduction of workforce and outsourcing of data security to overseas third-parties is direct and "fairly traceable" as it was these contractors' credentials that were compromised. *See* ¶¶ 47, 87, 89, 92. In addition, there would not be any undue burden or consequences to the community at large in finding that Bain owed a duty—the finding of such a duty only means that a company like Bain, which acquires a company whose entire business model is predicated on the collection and storage of private and sensitive data for school children cannot gut a company's resources and compromise the data security capabilities of said acquired company. *See Bass*, 394 F. Supp. 3d at 1039.

To the extent Bain argues that the actions of the third-party hackers precludes a finding of a duty, even the court in *Modisette* recognized that "the involvement of a third party (the driver Wilhelm) in the accident does not, standing alone, preclude a duty of care on the part of Apple. [O]ne's general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm through the reasonably foreseeable conduct (including the reasonably foreseeable negligent conduct) of a third person." *Id*. at 30 Cal. App. 5th at 145. Thus, Bain's duty to exercise due care required it not to place PowerSchool, and thus Plaintiffs,

in a situation in which they were exposed to the unreasonable risk of a data breach through the reasonably foreseeable conduct of threat actors hacking into and breaching the SIS.

In *Modisette*, because the court did not find that Apple owed a duty, it did not consider the issue of proximate causation vis-à-vis the negligence claim; but the court did analyze it as to the other claims. The court stated that "[p]roximate cause has two aspects. One is cause in fact. An act is a cause in fact if it is a necessary antecedent of an event. This is sometimes referred to as but-for causation." *Id.* at 153. "The second aspect of proximate cause focuses on public policy considerations," *id.*, because "[a]s a matter of practical necessity, legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay." *Id*. at 154. In this case, there can be no reasonable dispute that Bain's cost-cutting was a cause in fact of the data breach, and, as set forth above, because Bain profited from its acquisition and directed subsequent cost-cutting measures compromising the security of said data, it is fair for Bain to pay when those same measures allowed the breach.

Bain's reliance on *Pelman v. McDonald's Corp.*, 237 F. Supp. 2d 512 (S.D.N.Y. 2003) is equally misplaced. *Pelman* involved "infant plaintiffs [who] are consumers who have purchased and consumed the defendants' products and, as a result thereof, have become overweight and have developed diabetes, coronary heart disease, high blood pressure, elevated cholesterol intake, and/or other detrimental and adverse health effects as a result of the defendants' conduct and business practices." *Id*. at 532. Unsurprisingly, the court dismissed the negligence claim because "[a]s long as a consumer exercises free choice with appropriate knowledge, liability for negligence will not attach to a manufacturer. . . . Plaintiffs have failed to allege in the Complaint that their decisions to eat at McDonalds several times a week were anything but a choice freely made and which now may not be pinned on McDonalds." *Id*. at 532-33.

The *Pelman* court articulated the proximate cause standard as "a plaintiff must establish that the defendant's conduct was a substantial cause in bringing about the harm. . . . 'The word 'substantial' is used to denote the fact that the defendant's conduct has such

an effect in producing the harm as to ***lead reasonable [persons] to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility***[.]'" *Id*. at 537-38. The court found that no proximate causation existed because "any number of other factors then potentially could have affected the plaintiffs' weight and health" and "a number of factors other than diet may come into play in obesity and the health problems of which plaintiffs complain." *Id*. at 538-39. Here, there are no "other factors" that would justify finding as a matter of law that Plaintiffs' have not pled proximate causation because Bain's direct conduct of cost-cutting resulted in a reduction of workforce and outsourcing of services to international third-parties was a "significant [and] substantial factor" (*id*. at 539) in allowing the Data Breach.

***Damages.*** Finally, Bain claims that Plaintiffs also failed to adequately plead concrete damages, relying on Section III of PowerSchool's Motion to Dismiss. Plaintiffs hereby incorporate by reference their arguments in Section B of their opposition to PowerSchool's Motion.

**ii. Bain Was Unjustly Enriched**

First, Bain errs in asserting that California does not recognize unjust enrichment. Mot. at 49. Rather, "[the Ninth] Circuit has construed the common law to allow an unjust enrichment cause of action through quasi-contract." *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1144 (C.D. Cal. 2021) (quoting *ESG Cap. Partners, LP v. Stratos*, 828 F.3d 1023, 1038 (9th Cir. 2016)). "To allege unjust enrichment as an independent cause of action, a plaintiff must show that the defendant received and unjustly retained a benefit at the plaintiff's expense." *Id*. Privity between the parties is not required where the defendant has unjustly received a benefit at the plaintiff's expense. *See Wall v. Wescom Cent. Credit Union*, 2024 WL 1158361, at *6 (C.D. Cal. Mar. 18, 2024).

While Bain urges dismissal of Plaintiffs' unjust enrichment claim by arguing that Plaintiffs have failed to allege that Bain received a benefit, Plaintiffs allege that Bain received some of the money that Plaintiffs paid to PowerSchool, while also benefiting from cost-cutting by directing PowerSchool to skimp on data security funding. ¶¶ 101, 126, 164-

64, 249. Plaintiffs allege that Bain was financially incentivized to reduce PowerSchool's operational costs to boost PowerSchool's gross profit margin, *i.e.*, Bain's own bottom line. ¶¶ 99-101, 103, 108-10. Accordingly, Plaintiffs' allegations that Bain received and unjustly retained a benefit from Plaintiffs are hardly conclusory; rather, they are the crux of Plaintiffs' allegations against Bain. To the extent that Bain insists that Plaintiffs' claims arise under the contracts with PowerSchool and not Bain, this is immaterial when Bain directed the unjust acts and realized a financial benefit as a result. For example, in *In re Cap. One Consumer Data Sec. Breach Litig.*, the court examined the relationship between the plaintiffs and their bank which used a portion of their payments to pay a third party for data hosting services. 488 F. Supp. 3d 374, 413 (E.D. Va. 2020). The court concluded that "[r]etaining these profits without adequately securing the data would be unjust." *Id.*

Thus, even absent a contractual relationship with Bain, Plaintiffs have nevertheless conferred a direct benefit, which Bain now unjustly retains. *Weinberg v. Advanced Data Processing, Inc.*, 147 F. Supp. 3d 1359, 1368 (S.D. Fla. 2015) (the "direct benefit" element of an unjust enrichment claim may be satisfied where a benefit is conferred through an intermediary. In other words, a direct benefit can derive from a transaction with no direct contact."); *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 544 (E.D. Pa. 2010) ("as a general matter, unjust enrichment does not require that the benefit conferred be done so directly"); *In re HomeAdvisor, Inc. Litig.*, 491 F. Supp. 3d 879, 902 n.17 (D. Colo. 2020) ("Even states that have a "direct benefit" requirement do not require that the plaintiff provide the benefit to the defendant firsthand.") (citing *Weinberg*, 147 F. Supp. 3d at 1368). Accordingly, Plaintiffs' unjust enrichment claim is properly asserted.

### 6. Declaratory Judgment and Injunctive Relief Are Necessary

Bain makes two seemingly inapposite arguments against Plaintiffs' prayer for declaratory relief: first, that the statute does not provide an independent cause of action and, second, that the relief is "unnecessary where an adequate remedy exists under some other cause of action." Mot. at 50. However, it does not matter whether the Declaratory Judgment Act is construed as a remedy or a cause of action. "Under 28 U.S.C. § 2201(a),

the Court may, in its discretion, declare the rights of the parties in the event of an actual controversy between them." *Canal Ins. Co. v. Fema Trucking, LLC*, 2022 WL 3227188, at *5 (D.N.J. Aug. 10, 2022); *In re The Home Depot, Inc., Customer Data Sec. Breach Litig.*, 2016 WL 2897520, at *4 (N.D. Ga. May 18, 2016) ("The Plaintiffs ask for an injunction corresponding to their declaratory judgment claim. Such a claim is permissible under the Declaratory Judgment Act."). Accordingly, it is clear that the Court is empowered to resolve the dispute regarding Bain's obligations to Plaintiffs and Class Members with respect to Bain's obligation to Plaintiffs. *See* ¶¶ 256-62.

Second, Bain insists that declaratory relief is unnecessary where adequate relief is available through Plaintiffs' other causes of action. Mot. at 50. Not so. Declaratory relief is necessarily forward looking and intended to prevent future harm rather than compensate for past injuries. *In re Ambry*, 567 F. Supp. 3d at 1151 ("Plaintiffs may seek both damages for past harm and injunctive relief to prevent future harm."); *see also In re Unite Here Data Sec. Incident Litig.*, 740 F. Supp. 3d 364, 388 (S.D.N.Y. 2024) (same); *In re MOVEit Customer Data Sec. Breach Litig.*, 2025 WL 2176590, at *34 (D. Mass. July 31, 2025) ("Rejecting that the DJA claim is duplicative because '[the] tort and contract claims, however, seek only retrospective relief."). Moreover, it is premature to dismiss this claim at the pleading stage where "[the] remaining claims have not been fully developed ... [and] the Court cannot fully evaluate the extent of the overlap to determine whether declaratory judgment would serve [any] useful purpose in clarifying the legal rights and relationships at issue." *Clemens v. ExecuPharm, Inc.*, 678 F. Supp. 3d 629, 639 (E.D. Pa. 2023).

## **CONCLUSION**

The Court should thus deny Bain's motion to dismiss in its entirety. If the Court is inclined to grant Bain's motion to dismiss under Rule 12(b)(2), Plaintiffs respectfully request leave to conduct jurisdictional discovery and/or to amend the forum designations.

Dated: October 27, 2025

Respectfully submitted,

*/s/ James E. Cecchi*

James E. Cecchi (NJ 030861989)
*Admitted Pro Hac Vice*
Jason H. Alperstein (FL 64205)
*Admitted Pro Hac Vice*
Jordan M. Steele (SBN 362684)
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com
Email: jalperstein@carellabyrne.com
Email: jsteele@carellabyrne.com

*Lead Counsel for Plaintiffs and the School District Class Action*

John Nelson (SBN 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
402 W Broadway, Suite 1760
San Diego, California 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

M. Anderson Berry (SBN 262879)
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Telephone: (916) 823-6955
Email: anderson@emeryreddy.com

Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100
Email: cardoso@kolawyers.com

Tyler S. Graden (NJ 028462007)
*Admitted Pro Hac Vice*
**KESSLER TOPAZ MELTZER CHECK LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Email: tgraden@ktmc.com

*Members of the Steering Committee for the School District Class Action*

Michael Critchley, Sr. (NJ 251821972)
*Pro Hac Vice Forthcoming*
**CRITCHLEY & LURIA, LLC**
75 Livingston Avenue
Roseland, New Jersey 07068
Telephone: (973) 422-9200
Email: mcritchley@critchleylaw.com

*Additional Counsel for Plaintiffs*