# Exhibit A

EXECUTION COPY

## Global Services Agreement

This Global Services Agreement, including any and all attached exhibits and addenda together with the applicable Statement of Work, (the "**Agreement**") is entered into as of March 28, 2022 ("**Effective Date**") by and between PowerSchool Group LLC ("**PowerSchool**"), with principal offices located at 150 Parkshore Drive, Folsom, CA 95630 and SlashSupport, Inc. d.b.a. CSS Corp with Company Number: 3113555 ("**Supplier**") with offices at 5600 Tennyson Parkway, Suite 255, Plano, Texas 75024, USA.

PowerSchool and Supplier may be collectively referred to as "**Parties**" and individually as "**Party**."

1. **Definitions**

    1.1. **"Affiliate"** any entity that directly or indirectly owns, is owned by or is under common ownership with a Party hereto, where "owns" or "ownership" means direct or indirect possession and/or control of at least fifty percent (50%) of the outstanding voting securities of a corporation or a comparable equity interest in any other type of entity.

    1.2. "**Applicable Laws**" means all constitutions, laws, statutes, codes, ordinances, orders, judgments, decrees, injunctions, rules, regulations, permits and legally binding requirements of all international, federal, country, provincial, state and local governmental authorities applicable to either Party's or its Affiliates' performance of the obligations and Services under this Agreement.

    1.3. "**Claims**" means any and all: (i) third-party claims, actions, demands, lawsuits, or proceedings, and (ii) damages, costs (including reasonable fees of attorneys and other professionals), or liabilities of any kind (including any fine, penalty, judgment, or order issued by a governmental, regulatory, or judicial body), in each case arising out of or relating to that third-party claim, action, demand, lawsuit, or proceeding.

    1.4. "**Customer**" means a PowerSchool customer to whom PowerSchool has agreed to provide products or services.

    1.5. "**Customer Data**" means any information, data, content or materials, including, without limitation, personally identifiable information, student data and teacher data, provided by or behalf of a Customer or its end users to PowerSchool.

    1.6. "**Deliverable**" means any and all software (object code and source code), hardware, documentation, written material, work product, and other tangible item that is made, authored, conceived, reduced to practice, created or developed by or on behalf of a Supplier Entity, whether alone or jointly, while performing the Services and regardless of whether it is completed or partially completed. For clarity, Deliverables may include reports, documents, processes, technologies, designs, marketing assets, drawings, plans, records, forms, specifications, templates, methodologies, charts, flow charts, user interfaces, templates, menus, buttons, icons, tools, data, and ideas, concepts, know-how and methods or other manifestations of the efforts of any Supplier Entity, regardless of their form that are authored, conceived, reduced to practice, while performing the Services. For the avoidance of doubt, Supplier Pre-Existing IP as provided to PowerSchool that have not been specifically customized or developed for PowerSchool is not a Deliverable.

    1.7. "**Intellectual Property Rights**" means any and all, now or hereafter in existence, unpatented inventions, patent applications, patents, design rights, copyrights, Trademarks, mask work rights, know-how, trade secret rights, moral rights, database protection, and all other intellectual property and proprietary rights, modifications, adaptations, derivatives thereof, and improvements thereto, and forms of protection of a similar nature anywhere in the world.

    1.8. "**Personnel**" means individuals who are employed by Supplier and/or its Affiliates for the provision of Services to PowerSchool under this Agreement. For clarity, Personnel of a Supplier Entity shall not include any independent contractors retained by such Supplier Entity without PowerSchool's prior written consent.

1.9. "**Pre-Existing IP**" means any Intellectual Property Rights owned, created, developed, and/or licensed by a Party prior to, outside of or independently from this Agreement or the Services, including without limitation technology, tools, methods, algorithms, application programming interfaces, know-how and data. For clarity, the Pre-Existing IP of Supplier may include techniques and skills that are specific to Supplier's business and generic in nature with respect to any customer of Supplier, including common configurations and generic templates that are not specifically related to any Deliverable provided to PowerSchool or includes or references any PowerSchool Confidential Information.

1.10. "**Services**" means any services, including, but not limited to, professional services, consulting services, information technology services and any other services provided by Supplier or its Affiliate(s) under this Agreement and as further described in a Statement of Work.

1.11. "**SOW**" or "**Statement of Work**" means a document that is executed by PowerSchool and Supplier substantially in the form of <u>Exhibit A</u> attached hereto and that describes the Services to be performed or provided by Supplier and/or its Affiliates to PowerSchool pursuant to this Agreement. Each Statement of Work will be sequentially numbered, beginning with Statement of Work #1, and executed by authorized representatives of the Parties, and upon execution by both Parties, each such Statement of Work will be incorporated into this Agreement.

1.12. "**Supplier Entities**" means Supplier and its Affiliates that are performing or will perform the Services or any other obligations under this Agreement.

1.13. "**Trademarks**" means all trademarks, service marks, trade dress, logos, slogans, trade names, business names, fictitious business names, and other source identifiers, including domain names, together with all translations, adaptations, derivations, and combinations thereof, whether registered or unregistered (as the case may be), and including all of the goodwill of the business related to the foregoing.

2. **Scope and Performance of Services**

2.1. **Generally**. This Agreement sets forth the terms under which PowerSchool will purchase Services from Supplier and Supplier will provide such Services. Services are purchased exclusively under this Agreement. Supplier shall not provide PowerSchool with any Services, and PowerSchool shall not be obligated to pay for any Services, unless the Parties have executed a Statement of Work describing such Services and PowerSchool has issued a Purchase Order ("**PO**") for such Services.

2.2. **Statements of Work**. For each engagement under this Agreement, the Services to be performed by a Supplier Entity at PowerSchool's request will be described in a Statement of Work. Each Statement of Work shall set forth as applicable: (i) a description of the specific Services to be performed by Supplier, (ii) the requirements and specifications for any Deliverables to be completed under this Agreement, (iii) the performance schedule, milestones, term and completion date related to the Services (collectively, the "Schedule"), (iv) all applicable fees and charges to be paid to Supplier for the Services described in such Statement of Work along with the associated payment schedule, (v) the identity and contact information of each Party's project manager or liaison, and (vi) other applicable terms and conditions. Each Statement of Work and each amendment thereto must be signed by both Parties and must state that it is made pursuant to this Agreement. Each Statement of Work will constitute a separate agreement which incorporates the terms and conditions of this Agreement. The provisions of this Agreement will have control over any conflicting provisions in a Statement of Work, except to the extent that a provision of this Agreement specifically states that a Statement of Work may provide different terms. A Statement of Work may contain additional terms, provided that the terms do not conflict with the provisions of this Agreement.

2.3. **Changes to Services**. PowerSchool may request changes to the Services to be provided under this Agreement or changes to any aspect thereof, but no such changes take effect unless agreed in writing by

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

both Parties. Any changes to the Services must be made by a written change order executed by authorized representatives of both Parties ("**Change Order**") or by a new SOW or an amendment to an existing SOW before the start of the Services affected by the changes, which will reflect any changes in the Fees for the Services and any changes in the schedule for completing the Services.  No additional services, extra work or changes to the Services will be recognized or paid for, unless incorporated in a written Change Order signed by both Parties or in a new SOW or an amendment to an existing SOW.  Both Parties agree to cooperate to enable both Parties to assess the impact of any requested changes on the cost, timing or any other aspect of the Services.

2.4.   **Conflict of Interest**.  During the term of this Agreement, Supplier Entities, without PowerSchool's prior written consent, shall not engage in work or render services that will conflict with the relationship of trust and cooperation created hereby or that may otherwise conflict with Supplier's obligations under this Agreement. Notwithstanding the foregoing and for the sake of clarity, PowerSchool acknowledges that: (i) Supplier is in the business of providing Information Technology services across the software and hardware development lifecycle, end to end network services, infrastructure management services, enterprise technology support, consumer technology support, managed services and such other outsourcing services; and (ii) Supplier in the course of providing such services, either independently or in collaboration or through a third-party, either for itself or for its clients, whether pre-existing or independent of this Agreement, might provide services that are identical or develop products and applications that may be substantially similar to the products and services offered by Supplier to PowerSchool pursuant to this Agreement or the products and services provided by PowerSchool to its Customers. PowerSchool therefore agrees that nothing in this Agreement shall prohibit Supplier from carrying their business or Supplier from dealing with such contracts.

2.5.   **Cooperation**.  Both Parties acknowledge that it is necessary to cooperate in order to carry out this Agreement, and each Party agrees to provide the other Party reasonable and cooperative access to its facilities, personnel, and resources as needed for provision and receipt of the Services.

3.   **Compensation and Payment**.

3.1.   **Fees**. Each Statement of Work will specify the fees (the "**Fees**") for the Services and Deliverables and whether the Fees for the engagement will be on a time-and-materials basis, a fixed price basis, or a combination of both.  All Fees shall be specified in U.S. Dollars and paid in U.S. Dollars. All Fees shall not be increased during the term of the Statement of Work without PowerSchool's prior written consent. Upon renewal of the Agreement, the Fees shall remain the same and shall not be increased without PowerSchool's prior written consent.

3.2.   **Expenses**.  Unless specifically provided in the applicable SOW, PowerSchool will not be responsible for actual out-of-pocket expenses (including, without limitation, travel and material expenses) incurred by Supplier in order to perform the Services ("**Expenses**"). If specified in the applicable SOW, PowerSchool shall reimburse Supplier for reasonable and necessary out-of-pocket Expenses incurred by Supplier in the performance of the Services subject to any maximum reimbursable amount or any other limitations on expenses specified in the applicable Statement of Work; provided that Supplier has submitted all expenses with receipts to PowerSchool within  four (4) weeks of when the Expenses were incurred and the trip is approved in advance by an authorized representative of PowerSchool.  All Expenses incurred by Supplier without submission and approval prior to incurrence are deemed waived for purposes of reimbursement by Supplier. Reimbursable travel expenses will be paid in accordance with PowerSchool's travel policy, a copy of which will be provided to Supplier upon request.  Any  expenses incurred by

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

EXECUTION COPY

Supplier in excess of the maximum reimbursable amount shall not be deemed a reimbursable Expense, and no Expenses claimed will be payable unless properly documented in accordance with this Section 3.2 (*Expenses*).

3.3. **Invoices**. Supplier shall submit to PowerSchool an invoice reasonably detailing the charges and description of the Services performed by Supplier under this Agreement and any pre-approved reimbursable Expenses as such Expenses become due.  Invoices for work performed on a fixed Fee basis will be issued as provided in the Statement of Work.  If the Services are provided on a time and materials basis, Supplier shall invoice PowerSchool on a monthly basis for all Services performed by Supplier during the immediately preceding calendar month.  Invoice shall be sent electronically to ap@powerschool.com, and include the PowerSchool purchase order number, project name and project number. Supplier's invoices must be accompanied by copies of invoices from its pre-approved suppliers, material men, and vendors (if any), together with complete documentation of any Expenses claimed and any other documentation as may be requested by PowerSchool for its proper review of Supplier's invoices.

3.4. **Payment**. PowerSchool shall pay all properly submitted and undisputed invoices, in accordance therewith, within thirty (30) days of PowerSchool's receipt and approval of the applicable invoice. All payments will be subject to Supplier's meeting Deliverable requirements to the reasonable satisfaction of PowerSchool. Payment will not constitute acceptance of Services or impair PowerSchool's right to inspect.  PowerSchool, at its option, and with reasonable prior notice to Supplier, shall have the right to set off or deduct from any Supplier invoice, any credits, refunds or claims of any kind due to PowerSchool.

3.5. **Taxes**. Unless otherwise provided in the Statement of Work, the Fees excludes the amount of any present or future sales, use, excise, or other similar tax applicable to the performance of the Services. Supplier shall have full responsibility for the payment of all federal, state, and local taxes, contributions, and assessments, including penalties and interest, imposed pursuant to unemployment insurance, social security, income tax, workers' compensation or any other similar statute with respect to the work performed hereunder and the Fees. Supplier will defend, indemnify and hold harmless PowerSchool and its Affiliates from and against all claims, demands, losses and expenses, including but not limited to attorneys' fees arising out of or resulting from Supplier's failure to withhold or pay any local, state or federal sales use, income and other taxes.

3.6. **Records and Inspections**. All Supplier Entities shall keep complete and accurate accounting, transaction, and other applicable records in accordance with the United States' generally accepted accounting principles applied, to support, substantiate and document all amounts payable to Supplier under this Agreement and each Supplier Entity's compliance with this Agreement.  Each Supplier Entity shall retain all such records during the Term of this Agreement and for three (3) years thereafter.  Supplier Entities shall make such periodic reports as may be reasonably requested by PowerSchool with respect to the current status, progress to date and activities planned for future periods.  Upon fifteen (15) business days prior written notice to Supplier, PowerSchool (or a third party on its behalf not being a competitor of Supplier) may, at its own expense, inspect, audit and examine any Supplier Entity's books, records, facilities and systems relating to or used to provide the Services during normal business hours, for the purpose of confirming Supplier's charges and compliance with this Agreement. Supplier shall, in a timely manner, cooperate with the PowerSchool (or the third party auditing on its behalf not being a competitor of Supplier) and provide PowerSchool (or the third party auditing on its behalf not being a competitor of Supplier) assistance as it may reasonably request in connection with any audit.  Any audit shall not occur more than once a calendar year, unless material irregularities were found in an audit, at which time such audit may occur quarterly.

4. **Term and Termination**

   4.1. **Term**.

   4.1.1. **Term of Agreement**.  This Agreement shall commence on the Effective Date and shall remain in force for two (2) years **("Initial Term")**, unless terminated earlier according to the terms in this Section. PowerSchool shall have the option to renew the Agreement for additional one (1) year periods (each a "**Renewal Term**") by providing to Supplier with a written notice of its intention to renew at least thirty (30) days prior to the expiration of the Initial Term or the then-current Renewal Term. The Initial Term and Renewal Term shall be collectively referred to as the "**Term**."

   4.1.2. **Term of SOW**.  Each SOW is effective as of the earlier of the last date a Party executes such SOW or the effective date indicated on the SOW and shall remain in force until final acceptance by PowerSchool of each Deliverable identified in such SOW or until end date indicated on the applicable SOW, whichever is later, unless earlier terminated as provided for in this Agreement.

   4.2. **Termination of the Agreement.**

   4.2.1. **Termination for Convenience**. PowerSchool reserves the right to terminate the Agreement without liability at any time, without cause, upon providing forty-five (45) days' prior written notice to Supplier.

   4.2.2. **Termination for Cause**. Either Party will have the right to terminate this Agreement (and all Statements of Word under it) upon providing thirty (30) days' prior written notice to the other Party, in the event the other Party materially breaches this Agreement and fails to correct such breach within such thirty (30) day period; provided that no such termination shall be permitted for non-payment by PowerSchool unless PowerSchool shall have failed to make payment of all undisputed amounts within forty-five (45) days after PowerSchool's receipt of a written notice of non-payment from Supplier.  In the event that a purported termination for cause by PowerSchool is determined by a competent authority not to be properly a termination for cause, then such termination by PowerSchool shall be deemed to be a termination at will under the Agreement.

   4.3. **Termination of a Statement of Work.**

   4.3.1. **Termination for Convenience**. PowerSchool reserves the right to terminate a Statement of Work, or any portion of a SOW, without liability at any time, without cause, upon providing forty-five (45) days' prior written notice to Supplier.

   4.3.2. **Termination for Cause.** Either Party will have the right to terminate a Statement of Work in whole or in part upon providing thirty (30) days' prior written notice to the other Party, in the event the other Party materially breaches this Agreement and fails to correct such breach within such thirty (30) day period; provided that no such termination shall be permitted for non-payment by PowerSchool unless PowerSchool shall have failed to make payment of all undisputed amounts within forty-five (45) days after PowerSchool's receipt of a written notice of non-payment from Supplier.  In the event that a purported termination for cause by PowerSchool is determined by a competent authority not to be properly a termination for cause, then such termination by PowerSchool shall be deemed to be a termination at will under the Agreement.

   4.4. **Suspension**.  Without limiting any other right or remedy available to PowerSchool, whether under this Agreement, at law or in equity, PowerSchool may order the temporary suspension of any Services when, in its sole discretion, performance is not being conducted in a safe manner, the specified quality or performance measurement or Net Promoter score of any Services is not being met or the Services are not otherwise being performed in accordance with the requirements of this Agreement.  If any unsatisfactory condition of any Services is brought to Supplier's attention and is (i) corrected by Supplier

DocuSign Envelope ID: 38C9540E-BE4A-4B78-BA5B-77D13C95B34A

to PowerSchool's complete satisfaction, PowerSchool shall authorize resumption of the Services; or (ii) not corrected by Supplier to PowerSchool's complete satisfaction, PowerSchool shall be entitled to terminate this Agreement without liability.  If any suspension of Services significantly increases the time required for the performance of the Services, an equitable adjustment may, in PowerSchool's sole discretion, be made in the performance obligations.  In no event, however, shall any suspension be the basis for any claim or cause of action against PowerSchool by Supplier or Supplier Personnel.

4.5.  **Effect of Termination**. Upon termination of the Agreement or a Statement of Work, unless otherwise indicated by PowerSchool's written notice or direction, Supplier will:  (i) immediately cease all work in the case of termination of this Agreement, or, in the case of termination of a SOW, cease work related to such SOW; (ii) immediately cease use of PowerSchool's Intellectual Property Rights, PowerSchool Materials and any PowerSchool Pre-Existing IP licensed to Supplier; and (iii) immediately provide PowerSchool with any and all Deliverables and other work in progress or completed prior to the effective date of termination. As PowerSchool's sole obligation to Supplier resulting from such termination, PowerSchool will pay Supplier an equitable or prorated amount as determined by PowerSchool for the partially completed work in progress and the agreed-to price for the completed Deliverables and Services provided and accepted prior to the date of termination. Supplier will assist PowerSchool with a post-termination transition at PowerSchool's request. Supplier's assistance will not exceed ninety (90) calendar days. PowerSchool will pay Supplier for its assistance at a rate no greater than the rate set forth in the Statement of Work.  All Statements of Work shall terminate automatically immediately upon termination of this Agreement, unless the Parties otherwise agree in writing.

4.6.   **Return of Materials**. Upon termination of the Agreement or completion of Supplier's Services under the Agreement, whichever occurs first, Supplier shall promptly return to PowerSchool all materials and or tools, including without limitation PowerSchool Materials and Pre-Existing IP, provided by PowerSchool under the Agreement and all written Confidential Information provided by PowerSchool to Supplier.

4.7.  **Survival of Obligations**. The provisions of this Agreement which by their terms require performance after the termination or expiration of this Agreement or have application to events that may occur after the termination or expiration of this Agreement, will survive such termination or expiration.  For the avoidance of doubt, the following Sections shall survive termination or expiration of this Agreement:  1 (Definitions), 3.5 (Taxes) (only last sentence), 3.6 (Records and Inspections), 4.5 (Effect of Termination), 4.6 (Return of Materials), 4.7 (Survival of Obligations), 5 (Confidential Information), 6 (Intellectual Property; Licenses), 7 (Indemnification), 8 (Limitation of Liability), 9 (Representations and Warranties), and 15 (General Provisions).

5.  **Confidential Information**

5.1.  **Confidential Information**. In connection with this Agreement, each Party (as the "**Disclosing Party**") may disclose or make available Confidential Information to the other Party (as the "**Receiving Party**"). Subject to the Exclusions Section, "Confidential Information" means non-public information in any form or medium (whether oral, written, electronic or other) that the Disclosing Party considers confidential or proprietary, including information consisting of or relating to the Disclosing Party's technology, trade secrets, know-how, business operations, plans, strategies, customers, suppliers, subcontractors, and pricing, and information with respect to which the Disclosing Party has contractual or other confidentiality obligations, in each case whether or not marked, designated or otherwise identified as "confidential." Without limiting the foregoing, the PowerSchool Offering are the Confidential Information of PowerSchool, the terms of this Agreement are Confidential Information of PowerSchool. For purposes of this Section, PowerSchool Materials, PowerSchool Pre-Existing IP, Customer Data and any other Customer

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

EXECUTION COPY

information or data disclosed to Supplier or its Affiliates are the Confidential Information of PowerSchool or its licensors. To the extent the Parties executed a non-disclosure agreement prior to the Effective Date (the "**Prior NDA**"), such Prior NDA shall govern the confidential information exchanged by the Parties under the Prior NDA and the confidentiality obligations of this Agreement shall govern the exchange of Confidential Information by the Parties under this Agreement starting on the Effective Date.

5.2.   **Protection of Confidential Information**.  Except as expressly allowed in this Agreement, the Receiving Party shall: (a) keep completely confidential and will not publish or otherwise disclose the Disclosing Party's Confidential Information to any third party except to: (i) its Affiliates, employees, consultants, contractors, sub-processors, or agents having a need to know (and only to the extent needed) and who have signed confidentiality agreements with the Receiving Party containing protections not materially less protective of the Confidential Information than those of this Agreement; or (ii) its legal, financial or other professional advisors as reasonably necessary, and (b) use the Disclosing Party's Confidential Information only in connection with the performance of its obligations under this Agreement. The Receiving Party shall protect the proprietary nature of the Confidential Information with no less care than it uses with respect to its own Confidential Information and, in any event, no less than reasonable care. The Receiving Party's obligations under Section 5 (Confidentiality) shall survive the termination or expiration of this Agreement and continue in effect thereafter for a period of five (5) years with respect to Confidential Information that does not qualify as a trade secret under applicable law, and, with respect to Confidential Information that qualifies as a trade secret under applicable law, in perpetuity after the termination or expiration of the Agreement.

5.3.   **Exclusions**. Confidential Information does not include and the obligations of this Section will not extend to any information that the Receiving Party can reasonably demonstrate by written or other documentary records: (i) is now, or hereafter becomes, publicly known or available through no act or failure to act on the part of the Receiving Party; (ii) is known by the Receiving Party at the time of receiving such information; (iii) is or becomes lawfully available from a third party without restriction; (iv) is hereafter furnished to the Receiving Party by a third party having the legal right to do so and without restriction on disclosure; or (v) is independently developed by the Receiving Party without the aid, , application or use of the Confidential Information.

5.4.   Return of Confidential Information.  The Receiving Party shall, upon any request by the Disclosing Party, immediately return or destroy the Disclosing Party's Confidential Information and all portions and copies thereof, which are in Receiving Party's possession or control.

5.5.   -Injunctive Relief.  The Receiving Party acknowledges that disclosure of Confidential Information would cause substantial harm for which damages alone would not be a sufficient remedy, and therefore that upon any such disclosure by the Receiving Party, the Disclosing Party will be entitled to seek appropriate equitable relief in addition to whatever other remedies it may have at law.

5.6.   **Defend Trade Secrets Act Notice**.  Supplier acknowledges receipt of the following notice pursuant to 18 U.S.C § 1833(b)(1): "An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that (A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal."

5.7.   **Publicity**.  Supplier shall obtain PowerSchool's prior written consent as to form and substance prior to making any press release, public announcement or public statement regarding the relationship set forth in this Agreement, including, but not limited to, the existence or contents of this Agreement or any Statement of Work, any future product developments, technical publications or product technology

EXECUTION COPY

comparisons. Further, Supplier shall not advertise or promote itself using PowerSchool's Trademarks without PowerSchool's prior written consent in the case of each such use. Notwithstanding the foregoing, Supplier shall be permitted to disclose any details regarding this relationship to the extent required by law.

6.  **Intellectual Property**

6.1.  **Retained Rights**. Each Party will retain all right, title, and interest in and to its own Pre-Existing IP irrespective of any disclosure of such Pre-Existing IP to the other Party, subject to any licenses granted herein.

6.2.  **Ownership**. Supplier acknowledges and agrees that all Services and Deliverables and all Intellectual Property Rights therein are Confidential Information and the sole and exclusive property of PowerSchool. Supplier agrees that, to the fullest extent legally possible, all Deliverables shall be considered "work for hire" as defined under the United States Copyright Act of 1976 (17 U.S.C. §101), as amended, and shall be the sole and exclusive property of PowerSchool as of the date of their creation, conception, development or reduction to practice. To the extent that any Deliverable is not considered a "work made for hire", Supplier shall and hereby does irrevocably assign and transfer all of its right, title, and interest in and to the Deliverables and all Intellectual Property therein to PowerSchool, and Supplier agrees that PowerSchool is under no further obligation, monetary or otherwise, to Supplier for such assignment. If Supplier has any rights to the Deliverables that cannot be assigned as described above, Supplier agrees, on its behalf and on behalf of its Affiliates, to waive enforcement worldwide of such rights against PowerSchool and its Affiliates and each of their officers, directors, shareholders, agents, customers, employees, successors and assigns and hereby grants to PowerSchool and its Affiliates an exclusive, fully-paid-up, royalty-free, transferrable, sublicenseable, irrevocable and perpetual worldwide license thereto. Supplier shall ensure that its Personnel engaged under the Agreement shall comply with the requirements of this Section.

6.3.  **Supplier's Use of Intellectual Property**. Supplier will not incorporate any materials from a third party into any Deliverable unless: (i) Supplier clearly identifies the specific elements of the Deliverable to contain third party materials; (ii) Supplier identifies the corresponding third-party licenses and any restrictions on use thereof; and (iii) approval is given by PowerSchool.

6.4.  **License to PowerSchool Materials**. To the extent PowerSchool provides Supplier or its Affiliate with access to, any software, specifications, documentation, data, hardware, tools, know-how, methodologies, processes and/or any other materials, information or Intellectual Property Rights owned, leased and/or licensed by PowerSchool ("**PowerSchool Materials**"), PowerSchool hereby grants to Supplier, during the Term, a limited, non-transferable, worldwide, royalty-free, revocable license to use such PowerSchool Materials solely for PowerSchool's benefit and solely for the purpose of performing the Services and its obligations to PowerSchool under this Agreement. Except for the limited license to use PowerSchool Materials to provide Services under this Agreement, Supplier or its Affiliate is granted no right, title, or interest in any PowerSchool Materials.

6.5.  **License to Supplier Materials**. To the extent Supplier provides PowerSchool or its Affiliate with access to, any software, specifications, documentation, data, hardware, tools, know-how, methodologies, processes and/or any other materials, information or Intellectual Property Rights owned, leased and/or licensed by Supplier ("**Supplier Materials**"), Supplier hereby grants to PowerSchool, during the Term, a limited, non-transferable, worldwide, royalty-free, revocable license to use, copy, modify, make derivative works of, publicly display, publicly perform, digitally transmit, sublicense, distribute, and otherwise exploit such Supplier Materials as an integral part of the Deliverables solely for the benefit of PowerSchool or its

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

Affiliates. Except for this limited license, PowerSchool or its Affiliate is granted no right, title, or interest in any PowerSchool Materials.

6.6. **Licenses to Supplier Pre-Existing IP.**   No Supplier Pre-Existing IP shall be incorporated into any Deliverables unless specified in the SOW.  To the extent a Deliverable contains or reduces to practice any Supplier Pre-Existing IP, Supplier retains all ownership of such Supplier Pre-Existing IP. Supplier hereby grants to PowerSchool and its Affiliates a worldwide, non-exclusive, perpetual, irrevocable, fully paid-up, royalty-free, transferable, sublicensable license under all of Supplier's Intellectual Property Rights in any and all of the Supplier Pre-Existing IP used with or incorporated in any Deliverable to:  (i) use, copy, modify, make derivative works of, publicly display, publicly perform, digitally transmit, sublicense and distribute the Supplier Pre-Existing IP as necessary or desirable for the business of PowerSchool and its Affiliates; (ii) to use, make, have made, sell, offer to sell, import, and otherwise exploit any product or service based on, embodying, incorporating or derived from the Supplier Pre-Existing IP; and (iii) to exercise any and all other present or future rights in the Supplier Pre-Existing IP, in each case only to the extent reasonably necessary or required to make full use of the Deliverables and to allow PowerSchool to enjoy the full benefits of ownership of the Deliverables. To the extent any Supplier Pre-Existing IP is not proprietary to Supplier, Supplier is solely responsible for the acquisition of any third-party permissions or licenses necessary for PowerSchool's and its Affiliates' exercise of the license granted this Section 6.6.

7. **Indemnification.**

7.1. **Indemnification by Supplier**.  To the fullest extent permitted by law, Supplier will defend, indemnify, and hold PowerSchool and its Affiliates and each of their respective directors, officers, employees, representatives, and agents harmless from and against all Claims to the extent such Claims arise out of or relate to:

a.   Supplier's breach of any of its representations or warranties,

b.   Supplier's or its Affiliate's infringement, misuse, or misappropriation of any third-party or Customer Intellectual Property Rights,

c.   Supplier's or its Affiliate's breach of any obligations under the Data Privacy Agreement or unauthorized use, access, disclosure, or dissemination of Customer Data,

d.   Supplier's or its Affiliate's non-compliance with Applicable Laws,

e.   Supplier's or its Affiliate's misrepresentations to Customers about any PowerSchool products or services,

f.   Supplier's or its Affiliate's negligent or intentional acts or omissions, or

g.   actions by Personnel of Supplier or its Affiliates against PowerSchool for wages, fringe benefits, other compensation, or similar claims, and claims challenging Supplier's right to dismiss its Personnel.

7.2. **Indemnification by PowerSchool**.  PowerSchool will defend, indemnify, and hold Supplier harmless from and against all Claims to the extent such Claims arise out of or relate to; (i) PowerSchool's breach of any of its representations and warranties under this Agreement; or (ii) intentional misconduct or fraud by PowerSchool.

7.3. **Procedure**.  Promptly upon becoming aware of any Claim that is subject to the provisions of this Section 7, the Party seeking indemnity (the "**Indemnified Party**") must give notice of the Claim to the other Party (the "**Indemnifying Party**"), accompanied by a copy of any written documentation regarding the Claim received by the Indemnified Party.  The Indemnifying Party may assume the defense or (subject to the terms below) settlement of the Claim by providing the Indemnified Party prompt written notice that it is responsible to provide indemnity for the Claim and will, settle or defend, at its own expense and with

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A
Case 3.25-md-03149-BEN-MSB    Document 366-2    Filed 11/17/25    PageID.4279    Page 11 of 28

EXECUTION COPY

counsel reasonably acceptable to the Indemnified Party, the Claim (the "**Notice**").  Any delay in the giving of the Notice shall not invalidate the obligations of the Indemnifying Party under this Section 7 unless and only to the extent the Indemnifying Party is materially prejudiced by the delay.  The Indemnified Party will have the right, at its option, to participate in the settlement or defense of the Claim, with its own counsel and at its own expense, but the Indemnifying Party will have the right to control the settlement or defense, subject to the terms of this Section 7.  The Indemnifying Party will not enter into any settlement that imposes any liability or obligation on the Indemnified Party without its prior written consent.  The Parties will cooperate in the settlement or defense and give each other reasonable access to all relevant information.

8.  **LIMITATION OF LIABILITY**. AS PERMITTED BY APPLICABLE LAW AND EXCEPT AS SET FORTH IN THIS SECTION 8, EACH PARTY AND ITS AFFILIATES WILL NOT BE LIABLE TO THE OTHER PARTY OR ITS AFFILAITES FOR ANY CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES (INCLUDING DAMAGES FOR LOSS OF DATA, REVENUE, OR PROFITS), WHETHER FORESEEABLE OR UNFORESEEABLE, ARISING OUT OF THIS AGREEMENT OR THE SERVICES REGARDLESS OF WHETHER THE LIABILITY IS BASED ON BREACH OF CONTRACT, TORT, STRICT LIABILITY, BREACH OF WARRANTIES, OR OTHERWISE, AND EVEN IF THE PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF THOSE DAMAGES. IN ANY EVENT AND EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 8, IN RESPECT OF ANY CLAIM, DEMAND, OR ACTION ARISING OUT OF THIS AGREEMENT, NEITHER PARTY'S TOTAL AGGREGATE LIABILITY TO THE OTHER PARTY WILL EXCEED THE TOTAL AMOUNT OF MONEY PAID BY POWERSCHOOL TO SUPPLIER DURING THE IMMEDIATELY PRECEDING TWELVE (12) MONTH PERIOD WITH RESPECT TO THE SERVICES PROVIDED UNDER AN APPLICABLE STATEMENT OF WORK ON WHICH THE CLAIM IS BASED. NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT, THE EXCLUSIONS AND LIMITATIONS IN THIS SECTION 8 SHALL NOT APPLY TO ANY LIABILITY ARISING OUT OF OR IN CONNECTION WITH: (i) SUPPLIER'S INDEMNIFICATION OBLIGATIONS UNDER THE AGREEMENT; (ii) SUPPLIER'S OR ITS AFFILIATE'S BREACH OF DATA PRIVACY OBLIGATIONS UNDER THE AGREEMENT OR THE DATA PRIVACY AGREEMENT; (iii) SUPPLIER OR ITS AFFILIATE'S INFRINGEMENT OR MISAPPROPRIATION OF POWERSCHOOL'S INTELLECTUAL PROPERTY RIGHTS; OR (iv) ANY LIABILITY ARISING OUT OF A POWERSCHOOL'S, SUPPLIER'S OR AN AFFILIATE OF SUPPLIER'S'S  FRAUD, GROSS NEGLIGENCE OR WILFUL MISCONDUCT.

9.  **Representations and Warranties.**

9.1.  **PowerSchool Representations and Warranties**.  Each Party represents and warrants that: (a) it has the full right, power and authority to enter into this Agreement and perform its obligations hereunder; (b) the individual accepting or executing this Agreement and each SOW has the authority to bind such Party to the terms and conditions of this Agreement and such SOW; and (c) when accepted or executed, this Agreement and each SOW will constitute the legal, valid and binding obligation of each Party.

9.2.  **Supplier Representations and Warranties**.  In addition, Supplier represents, warrants and covenants during the Term of the Agreement that: (i) each Supplier Entity is duly-organized and validly-existing under the Applicable Laws of the jurisdiction of its incorporation and has full corporate power and authority to enter into the Agreement and each SOW and to carry out the provisions hereof and the person entering into the Agreement and each SOW on behalf of Supplier is authorized to do so, (ii) Supplier and its Affiliates shall comply with all Applicable Laws in performing the Services and other obligations under this Agreement, (iii) the Agreement and the provision of the Services do not breach any other agreement

EXECUTION COPY

to which Supplier or its Affiliate is a party or bound, (iv) Supplier will, at the time of delivery of any Services, have all the rights and licenses in such Services necessary to allow PowerSchool to own, use and/or receive such Services without additional restrictions or charges, including having in place appropriate written agreements with its Personnel, (v) to the best of Supplier's knowledge, Services do not infringe or misappropriate any Intellectual Property Rights of any third party, (vii) Services performed by Supplier and its Affiliates will comply with the highest standards of care practiced in the industry except to the extent higher standards of performance are required hereunder, but in no event less than a good, professional and workmanlike manner standard, (viii) the Services shall meet or exceed the performance standards and service level agreement set forth in the applicable SOW; and (ix) Supplier and its Affiliates will be properly licensed, certified or accredited and have sufficient skills, knowledge, and training to deliver the Services. Supplier shall promptly notify PowerSchool of any fact, event or circumstance that would make any representation or warranty provided by Supplier or its Affiliates untrue or inaccurate in any respect.

9.3. **DISCLAIMER OF WARRANTIES**. EXCEPT AS OTHERWISE STATED ABOVE OR AS EXPRESSLY PROVIDED IN THE APPLICABLE STATEMENT OF WORK AND TO THE MAXIMUM EXTENT ALLOWABLE UNDER APPLICABLE LAW, THE DELIVERABLES ARE PROVIDED ON AN "AS IS" BASIS, AND EACH PARTY EXPRESSLY DISCLAIMS ANY AND ALL WARRANTIES OF ANY KIND OR NATURE, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, WARRANTIES RELATED TO MERCHANTABILITY, SUITABILITY, CAPACITY, FITNESS FOR A PARTICULAR OR OTHER PURPOSE (IRRESPECTIVE OF ANY PREVIOUS COURSE OF DEALING BETWEEN THE PARTIES OR CUSTOM OR USAGE OF TRADE) OR RESULTS TO BE DERIVED FROM THE USE OF SUCH SERVICES OR DELIVERABLES, INFORMATION OR BUSINESS ADVICE PROVIDED, ARISING BY STATUTE OR OTHERWISE IN LAW, ALL OF WHICH ARE EXPRESSLY DISCLAIMED.

10. **Insurance.** During the Term of the Agreement and for a period of one (1) year thereafter, Supplier shall maintain insurance coverage in accordance with the terms of the attached Insurance Requirements set forth on **Exhibit C**, or such additional coverage as may be specified in the applicable Statement of Work or related RFP/bid.

11. **Data Security and Privacy.** Parties agree to comply with all applicable local, state, federal and international laws, regulations and conventions, including, without limitation, those related to data privacy and data transfer including General Data Protection Regulation (GDPR). Further, Supplier agrees to execute a data privacy agreement with PowerSchool in a form and substance identical or substantially similar to the PowerSchool Data Privacy Agreement ("**DPA**") set forth on **Exhibit B** attached hereto and incorporated herein by reference.

12. **Non-Solicitation and No-Hire.** Each Party agrees that during the Term and for a period of six (6) months thereafter, it and its Affiliates, employees or Personnel will not solicit employment nor hire directly any of the other Party's employees directly involved in providing the Services under the Agreement during the Term of this Agreement. This provision shall not restrict the right of the Parties to solicit or recruit generally in the media, and shall not prohibit the Parties from hiring an employee of the other Party who answers any advertisement or who otherwise voluntarily applies for hire directly or via search firm without having been initially personally solicited or recruited by such Party. Except as requested by PowerSchool, during Supplier's engagement with PowerSchool hereunder, Supplier shall not directly or indirectly: (i) cause or induce or attempt to cause or induce any employee, agent or supplier of PowerSchool or any PowerSchool Affiliate to terminate his or her employment, agency or supplier relationship with PowerSchool or any PowerSchool Affiliate; (ii) solicit to employ, retain or otherwise engage as an employee, independent service provider or otherwise, any individual

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

EXECUTION COPY

that is, or during the twelve (12) months prior to becoming employed or retained by Supplier or any of Supplier's Affiliates was, an employee of PowerSchool or its affiliates; (iii) solicit or cause any such present or prospective customer, supplier, distributor or client to terminate or substantially reduce the business it does with PowerSchool; or (iv) interfere or attempt to interfere with any transaction, agreement, prospective agreement, business opportunity or business relationship in which PowerSchool or any Affiliate was involved at any point during Supplier's engagement hereunder. For clarity, PowerSchool acknowledges that the Supplier may have contractual relationships with the present or prospective customer, supplier, distributor or client of PowerSchool, whether pre-existing or independent of this Agreement, that may be similar or, identical services offered to PowerSchool in furtherance to this Agreement. PowerSchool therefore agrees that it is not the intent of this Agreement to prevent the Supplier from pursuing its business by independently creating and/or providing similar and identical applications/software/service offerings, either for itself or for the benefit of third parties, *provided* however that the Supplier shall not violate any of its obligations with respect to the confidential information and proprietary information of PowerSchool

13. **Subcontractors.**  Supplier shall not subcontract all or any portion of the Services to any third party without PowerSchool's prior written consent in each instance. To the extent that PowerSchool grants any such consent for Supplier to subcontract, Supplier shall remain responsible for the performance of each such subcontractor and its employees as though they were Supplier's own employees. Supplier shall be responsible to PowerSchool for the acts and omissions of any of Supplier's subcontractors and suppliers and of persons directly or indirectly employed or contracted by any of them.

14. **Compliance with Policies and Laws.**
    14.1. **Applicable Laws**. Supplier warrants that it will comply with all Applicable Laws in its performance under this Agreement. PowerSchool will not be responsible for monitoring Supplier's nor its Affiliate's compliance with any Applicable Laws.

    14.2. **Anti-Corruption.** Respecting the obligations set forth under applicable anti-corruption / bribery laws including but not limited to the US Foreign Corrupt Practices Act ("FCPA"), the UK Bribery Act ("UKBA"), as well as other global anti-corruption laws, each Party hereby undertakes that, at the date of the entering into force of the Agreement, itself, its directors, officers or employees have not offered, promised, given, authorized, solicited or accepted any undue pecuniary or other advantage of any kind (or implied that they will or might do any such thing at any time in the future) in any way connected with the Agreement and that it has taken reasonable measures to prevent subcontractors, agents or any other third parties, subject to its control or determining influence, from doing so.

    14.3. **Supplier Code of Conduct.** At all times during the Term of this Agreement, Supplier shall comply with the PowerSchool Global Supplier Code of Conduct as amended by PowerSchool from time-to-time, available at: [https://www.powerschool.com/wp-content/uploads/2022/02/Global-Supplier-Code-of-Business-Conduct-and-Ethics-February-2022.pdf.](https://www.powerschool.com/wp-content/uploads/2022/02/Global-Supplier-Code-of-Business-Conduct-and-Ethics-February-2022.pdf.)

    14.4. **Prohibition on Use of Independent Contractors**. All Personnel used for providing Services under the Agreement and the applicable Statement of Work will be employees of Supplier; they will not be independent contractors. Supplier will, to the extent they apply, abide by all local and applicable requirements under the Applicable Laws, including the requirements of 41 CFR sections 60-300.5(a) and 60-741.5(a). These regulations prohibit discrimination against qualified individuals based on their status as protected veterans or individuals with disabilities, prohibit discrimination against all individuals based on their race, color, religion, sex, sexual orientation, gender identity, or national origin and require

affirmative action to employ and advance in employment individuals without regard to race, color, religion, sex, sexual orientation, gender identity, national origin, protected veteran status or disability.

15. **General Provisions**.

15.1. **Assignment.** Neither PowerSchool nor Supplier may make any assignment of this Agreement or any interest herein, by operation of law or otherwise, without the prior written consent of the other Party; provided, however, that either Party may assign its rights and obligations under this Agreement without the consent of the other Party in the event such Party undergoes corporate reorganization, consolidates with, or merges into, any person or transfers all or substantially all of its properties or assets to any entity, including any of its Affiliates. In addition, PowerSchool, in its discretion and at its option, may assign or transfer certain obligations and benefits of this Agreement ("**Certain Terms**") to its selected vendor management services provider ("**VMSP**") for the benefit of PowerSchool. At such time, Supplier shall cooperate and work with PowerSchool and the VMSP to migrate and transition such Certain Terms for the benefit of PowerSchool to PowerSchool's VMSP, and Supplier shall not increase any fees set forth in this Agreement; provided that Supplier shall not be assessed during the Initial Term any incremental fee due to this migration or transition to the VMSP. The Parties shall mutually agree on any additional fees that may be assessed upon Supplier during any Renewal Term as a result of such migration or transition to the VMSP. This Agreement will inure to the benefit of and be binding upon the Parties, their respective successors, executors, administrators, heirs and permitted assignees.

15.2. **Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of New York, United States of America.

15.3. **Independent Contractor Relationship**

15.3.1. **Parties' Intentions.** It is the intention of the Parties that Supplier be an independent contractor and not an employee, agent, joint venture, or partner of PowerSchool. Nothing in this Agreement shall be interpreted or construed as creating or establishing the relationship of employer and employee between PowerSchool and either Supplier or any employee, agent or Affiliate of Supplier.

15.3.2. **Non-Exclusive.** Supplier shall retain the right to perform work for others during the Term. PowerSchool shall retain the right to cause work of the same or a different kind to be performed by other Suppliers during the Term.

15.4. **Severability.** If any term or provision of this Agreement is held to be illegal or unenforceable, the validity or enforceability of the remainder of this Agreement shall not be affected. In such event, the parties will negotiate a valid, enforceable substitute provision that most nearly effects the Parties' original intent in entering into this Agreement or provide an equitable adjustment in the event no such provision can be added.

15.5. **Force Majeure.** Neither Party is liable for failing to perform its obligations under this Agreement due to acts of God, natural disasters, pandemic, war, civil disturbance, or government action where the cause is beyond the Party's reasonable control ("**Force Majeure Event**"). In the case of a Force Majeure Event, the nonperforming Party will be excused from further performance or observance of the obligations so affected for as long as such circumstances prevail and such Party continues to use commercially reasonable efforts to recommence performance or observance whenever and to whatever extent possible without delay. Any Party so delayed in its performance will immediately notify the Party to whom performance is due and describe at a reasonable level of detail the circumstances causing such delay. As soon as the nonperforming Party is able to resume performance of its obligations, it will do so and will promptly give the other party notice of such resumption. All amounts payable to Supplier hereunder will

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

EXECUTION COPY

be equitably adjusted in a manner such that PowerSchool is not required to pay any amounts for Services that PowerSchool is not receiving.

15.6. **Entire Agreement.** This Agreement, including and all attached exhibits, and any amendments, constitute the complete and entire agreement between the Parties with respect to its subject matter, and supersedes all prior discussions, understandings, arrangements, proposals, and negotiations with respect to same.

15.7. **Waiver.** No delay or omission by either Party in the exercise or enforcement of any of its powers or rights hereunder will constitute a waiver of such power or right. A waiver by PowerSchool of any provision of this Agreement must be in writing and signed by PowerSchool and will not imply subsequent waiver of that or any other provision.

15.8. **Headings**.  The headings in this Agreement are for reference purposes only and will not be deemed a part of this Agreement.

15.9. **Order of Precedence**. In the event of a conflict between the Agreement and any Exhibit, SOW or PO, the order of precedence shall be as follows: (i) the Agreement, (ii) the applicable Exhibit, and (iii) the applicable SOW. Notwithstanding the foregoing, the terms of an Exhibit or SOW may prevail for purposes of that Exhibit or SOW if: (a) the Exhibit or SOW expressly identifies and supersedes or modifies a provision in this Agreement or Exhibit, and (b) the Exhibit or SOW is signed by an authorized signatory of PowerSchool. No additional terms contained in any invoice, purchase order, order acknowledgment, other correspondence, or written or oral communication between the Parties will be valid and such additional or conflicting terms are deemed rejected by the Parties unless such terms are contained in an SOW, an amendment to this Agreement or an SOW, or other written agreement executed by both Parties.

15.10. **Exhibits**. The following exhibits, as indicated below and attached hereto, shall constitute a part of this Agreement and are incorporated into this Agreement for all purposes.

      A.    Exhibit A – Statement of Work Template

      B.    Exhibit B – Data Privacy Agreement

      C.    Exhibit C – Insurance Requirements

15.11. **Remedies Not Exclusive**.  Unless this Agreement expressly states that a remedy is exclusive, no remedy made available under this Agreement is intended to be exclusive

15.12. **No Reliance**. Each Party acknowledges that it has not made any promise or representation that is not expressed in this Agreement; and that it has not been induced into entering this Agreement by any representation about the nature and extent of its existing or potential claims or damages made by the other Party or by the other Party's attorney, representative, or agent. The Parties are not relying upon – and disclaim reliance upon – any statement or representation that is not in this Agreement but are instead relying solely upon their own judgment in consultation with their respective attorneys.

15.13. **Bankruptcy**. PowerSchool and Supplier acknowledge that this Agreement (including any SOWs) will be subject to Section 365(n) of the Bankruptcy Code. Supplier acknowledges that if Supplier, as a debtor in possession or a trustee in bankruptcy in a case under the Bankruptcy Code, rejects this Agreement, PowerSchool may elect to retain its rights under this Agreement as provided in Section 365(n) of the Bankruptcy Code.  Upon written request of PowerSchool to Supplier or the bankruptcy trustee, Supplier or such bankruptcy trustee will not interfere with the rights of PowerSchool as provided in this Agreement.

15.14. **Notices.**  All notices under this Agreement must be in writing and delivered and will be deemed to have been received by the addressee: (i) if given by hand, immediately upon receipt; (ii) if given by overnight courier service, the first business day following dispatch; (iii) if given by registered or certified mail, postage prepaid and return receipt requested (or the equivalent delivery method in an international jurisdiction), the second business day after such notice is deposited in the mail; or (iv) if given by email, immediately upon confirmed receipt.

EXECUTION COPY

| | |
|---|---|
| **In case of notice to PowerSchool:** | **In case of notice to Supplier:** |
| **Address:** Attn:  General Counsel | **Address:** Attn. CEO / CFO |
| 150 Parkshore Drive | 5600 Tennyson Parkway, |
| Folsom, CA 95630 | Suite 255, Plano, |
| **Email**:  legal@powerschool.com | Texas 75024, USA |
| | **Email**: |

With a copy to:

Attn:  Group VP, Technical Support

150 Parkshore Drive

Folsom, CA 95630

15.15. **Attorneys' Fees**. In the event that any action, suit, or other legal or administrative proceeding is instituted or commenced by either Party hereto against the other Party arising out of this Agreement, the prevailing Party shall be entitled to recover its reasonable attorneys' fees and court costs from the non-prevailing Party.

15.16. **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. For purposes of executing this Agreement, a facsimile copy or a ".pdf" image delivered via email of an executed copy of this Agreement will be deemed an original, and an electronic signature has the same legal effect as a manual or handwritten signature.

**IN WITNESS HEREOF**, the Parties hereto have caused their duly authorized agents to execute this Agreement as of the Effective Date, and by executing below, hereby acknowledge that they have read the Agreement, understand it, and agree to be bound by its terms.

| **POWERSCHOOL GROUP, LLC.** | **SLASHSUPPORT, INC. d.b.a. CSS CORP** |
|---|---|
| By:  *Philip Radmilovic* | By:  *Sunil Mittal* |
| 170B9E005E66422... | 6056519832984EF... |
| Name:  Philip Radmilovic | Name:  Sunil Mittal |
| Title:  VP Treasurer | Title:  CEO |
| Date:  3/28/2022 | Date:  3/29/2022 |

EXECUTION COPY

## EXHIBIT A

## STATEMENT OF WORK TEMPLATE

Statement of Work No. <#> ("**SOW**") is issued on <Date>, and incorporated by reference in the Global Services Agreement (together with all of its exhibits and any amendments, the "**GS Agreement**") dated <Date> between POWERSCHOOL GROUP LLC ("**Client**" or "**PowerSchool**") and SlashSupport, Inc. d.b.a. CSS Corp with Company Number: 3113555 ("**Supplier**"), with offices at 5600 Tennyson Parkway, Suite 255, Plano, Texas 75024. PowerSchool and Supplier may be collectively referred to hereinafter as the "**Parties**" and individually as a "**Party**." This SOW is entered into by the Parties pursuant to the terms of the GS Agreement and details the Services to be delivered by Supplier to the Client.  Any capitalized term not otherwise defined in this SOW shall have the same meaning ascribed to it in the GS Agreement.

The Parties will work together in good faith to implement this SOW.

**Key Contacts and Liaison**

| | Name | Contact Details |
|---|---|---|
| r Contact | | |
| Contact | | |

**Nature of Services to be Provided:**

**Metrics and SLAs:**

**Hours of Operations (HoOps):**

**Location of Support:**

**Project Manager:**

**Start date:**

The agreed upon expected start date shall be _____.  In the event either party needs to alter this expected start date, notice shall be reasonably provided in writing to the other party and a revised expected start date will be agreed upon.

**Training:**

**Technology:**

The Client will be responsible for providing the following:

The Supplier will be responsible for providing the following:

**Staffing:**

Supplier shall provide:

| Product | Position | FTE | Business Hours |
|---|---|---|---|
| | | | |

**Capacity Planning and Staff Availability:**

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

EXECUTION COPY

**Availability Targets:**
**Payment Credits and Bonus Structure:**

**Typical Monthly PowerSchool Cost for Services Rendered:**

**Fees:**

**Billable Hour**:

**Holidays:**

**Service Levels Reporting:**

**Escalation Process:**

**Security:**

**Quality Assurance ("QA"):**

The undersigned warrant that they have the authority to commit Client and Supplier, respectively,   to this SOW and that they agree to all terms and conditions of this SOW on behalf of their respective company.

Executed on the later of the signature dates below.

---

POWERSCHOOL GROUP LLC                    SLASHSUPPORT, INC. D.B.A. CSS CORP.

By: _____          By: _____

Name:                                   Name:

Title:                                  Title:

Date: _____            Date: _____

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

EXECUTION COPY

**EXHIBIT B**

**DATA PRIVACY AGREEMENT**

This Data Privacy Agreement ("**DPA**") supplements the agreed to the Global Services Agreement ("**Agreement**") between PowerSchool Group LLC, with offices at 150 Parkshore Drive, Folsom, CA 95630 ("**PowerSchool**"), and SlashSupport, Inc. d.b.a. CSS Corp ("**Supplier**") and is made and entered into as of the last signature below, (the "**Effective Date**").  The terms herein supplement and amend the terms of the Parties' standard Agreement, or, if there is none, the then-existing applicable agreement between PowerSchool and Supplier.  The term "Agreement" includes all exhibits, addenda, statements of work, and quotes that are attached to, referenced in or otherwise associated with the Agreement.  In the event of a conflict between the Agreement and this DPA, the DPA controls. Below are the terms and conditions pursuant to which any Customer Data will be handled by Supplier during the term of the Agreement and after its termination. Any capitalized terms not defined herein shall have the meaning given to them in the Agreement.

PowerSchool and Supplier are individually known as a "**Party**" and collectively referred to as "**Parties**."

1. **Glossary of Terms**

    1.1. The terms, "**Controller**," "**Data Subject**," "**Personal Data**," "**Personal Data Breach**," "**Processor**," and "**Processing**" (includes "**Processed**") shall have the same meaning as in the EU General Data Protection Regulation ("**GDPR**").

    1.2. "**Aggregate Data**" is raw data gathered and expressed in a summary form for statistical analysis.

    1.3. "**Applicable Law**" means any law that regulates the privacy of data subjects, processing or security of Customer Data, and that is directly applicable to each Party to this DPA in the context of the Supplier Processing Customer Data.

    1.4. "**Customer Data**" means any content, materials, data and information disclosed to the Supplier as a function of the services provided pursuant to the Agreement.

    1.5. "**Education Records**" are records that are directly related to a student and that are maintained by an educational agency or institution or a party acting for or on behalf of the agency or institution.  These records include but are not limited to grades, transcripts, class lists, student course schedules, health records (at the K-12 level), student financial information (at the postsecondary level), and student discipline files.  The information may be recorded in any way, including, but not limited to, handwriting, print, computer media, videotape, audiotape, film, microfilm, and microfiche.  34 CFR § 99.3.  For the purpose of this DPA, "Education Records" provided to Supplier are presumed to be owned and under the control of PowerSchool's Customer(s).

    1.6. "**Student Data**" is a subset of Customer Data and contains Personal Data that would typically include pupil records of students and parents of students enrolled in a school, such as Education Records.

    1.7. "**Vendor-Data Subprocessor**" means PowerSchool's contractors or agents, appointed by or on behalf of PowerSchool in PowerSchool's role as a Processor to Process Customer Data on behalf of Customer(s) in accordance with this DPA and agreements between PowerSchool and Supplier.

    1.8. "**Student Profile**" means a collection of Personal Data elements relating to a student of PowerSchool's Customer.

2. **Purpose**

    To describe Supplier's responsibilities as a Vendor-Data Sub-processor for handling and protecting Customer Data. Supplier shall be responsible for the compliance to the terms of this DPA by its Affiliates who provide the Services under the Agreement.

3. **Data Classification**

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

3.1     PowerSchool classifies data as public, private, or restricted, with restricted requiring the highest level of care and security.

3.1.1 All Customer Data that have not been de-identified or aggregated are classified as restricted.

3.1.2 Supplier agrees to employ physical, administrative, and technological safeguards for restricted data.

**4.   Customer Data**

4.1     Supplier agrees to maintain all Customer Data in strict confidence and will not disclose any such Customer Data, or copies thereof, to any person or entity other than as directed in writing by PowerSchool. The Customer Data shared pursuant to this DPA and Agreement, including persistent unique identifiers, will be used for no purpose other than the performance of the services as agreed to in the Agreement.  If Supplier desires to use any Customer Data for purposes not contemplated in this DPA or the Agreement, Supplier must first obtain written approval from PowerSchool.

4.1.1     Customer Data, Personal Data, and Student Data do not include De-identified Data, Aggregate Data or Transaction Data.  See Agreement for permitted uses of De-identified Data, Aggregate Data, and Transaction Data.

4.2     Supplier acknowledges that Supplier has no rights of ownership to or control of any data provided by PowerSchool, including but not limited to, Customer Data, De-identified Data, Aggregate Data or Transaction Data.

**5.   Processing of Customer Data**

5.1     Supplier will safeguard and maintain the confidentiality, integrity, and availability of Customer Data obtained from PowerSchool.

5.2     Supplier may access and use Customer Data on a need-to-know basis and only as expressly authorized by PowerSchool for the sole and express purpose of fulfilling its obligations under the Agreement and this DPA and any applicable Quote or Statement of Work.  Such access or use of Customer Data by Supplier shall be to the minimum extent necessary and only for Supplier to fulfill its obligations under the Agreement and this DPA and any applicable Quote or Statement of Work.

5.3     Supplier shall Process Customer Data according to the PowerSchool's instructions documented in the Agreement unless otherwise required by Applicable Law.

5.3.1     In the event of Processing required by Applicable Law, and to the extent permitted by Applicable Law, Supplier will inform PowerSchool before Processing Customer Data.

5.4     With the exception of De-identified Data, Aggregate Data, and Transaction Data uses permitted under the Agreement, Supplier shall not:

5.4.1     Use, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the PowerSchool, except as required by Applicable Law or contracted for in the Agreement;

5.4.2     Use Customer Data for its own commercial benefit, including but not limited to, advertising or marketing of any kind directed toward children, parents, guardians, or Customer employees, unless such use is specifically authorized by this DPA or otherwise authorized in writing by PowerSchool;

5.4.3     Use Customer Data to create a Student Profile other than as authorized or required by the Agreement to perform the Services; and

EXECUTION COPY

5.4.4    Store United States Customer Data outside the continental United States.

5.5    <u>Qualified FERPA Exception</u>.    If Supplier has access to Education Records, Supplier acknowledges that, for the purposes of this DPA and the Agreement, pursuant to the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g and its implementing regulations, 34 C.F.R. Part 99 ("**FERPA**"), it will be designated as a "school official" with "legitimate educational interests" in the Customer Education Records, Student Data, and Personal Data disclosed pursuant to the Agreement, and Supplier agrees to abide by the FERPA limitations and requirements imposed on school officials.  Supplier will use the Education Records only for the purpose of fulfilling its duties under the Agreement for PowerSchool Customer's and its Users' benefit, and shall not share Customer Data, Student Data, or Personal Data with or disclose it to any third party except as provided for in the Agreement or this DPA, as required by Applicable Law, or if authorized in writing by PowerSchool. Supplier warrants and represents that during the five-year period preceding the Effective Date of this Agreement, it has not been found in violation of FERPA by the Family Policy Compliance Office.

5.6    The Parties acknowledge that applicable Customer Data may include Personal Data from children under the age of 13, subject to the Children's Online Privacy Protection Act and related regulations ("COPPA").

5.7    Supplier agrees not to edit or use any information or content, including any Customer Data, unless:

5.7.1 integral to and clearly contemplated by the particular nature of the services or otherwise permitted pursuant to the Agreement or this DPA;

5.7.2 written consent is first procured from PowerSchool; OR

5.7.3 the editing is performed to maintain the integrity of the Customer Data.

5.8    Supplier acknowledges that it has read, fully understands, and agrees to abide by PowerSchool's Privacy Policy, available at www.powerschool.com/privacy and as may be revised from time-to-time, incorporated by reference herein.

**6.    Reliability of Supplier's Employees, Agents and Contractors**

Supplier shall take reasonable measures to ensure the reliability of employees, agents, and contractors of Supplier and Vendor-Data Subprocessors who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the Agreement or this DPA, and to comply with Applicable Law in the context of individual's duties to the Supplier and Vendor-Data Subprocessor, ensuring that individuals are subject to confidentiality obligations.

**7.    Security of Processing**

7.1    Taking into account the state of the art, the costs of implementation and the nature, scope, context and purposes of Processing as well as the risk of varying likelihood and severity for the rights and freedoms of Data Subjects, Supplier shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk.

7.2    **Data Security**. Supplier agrees to abide by and maintain adequate data security measures, consistent with industry standards for digital storage of Customer Data, to protect Customer Data from unauthorized disclosure or acquisition by an unauthorized person. The general security obligations of Supplier are set forth below. These security measures will include, but are not limited to:

EXECUTION COPY

7.2.1 **Passwords and Employee Access**. Supplier will secure usernames, passwords, and any other means of gaining access to the services or to Customer Data, at a level meeting or exceeding the applicable standards. Supplier will only provide access to Customer Data to employees or contractors who require access pursuant to the Agreement and this DPA, and only on terms consistent with or exceeding the data security measures required by this DPA between the Parties.

7.2.2 **Security Protocols**. The Parties agree to maintain security protocols that meet industry standards in the transfer or transmission of Customer Data, including ensuring that Customer Data may only be viewed or accessed by parties legally allowed to do so. Supplier will maintain all Customer Data obtained pursuant to the Agreement in a secure digital environment and will not copy, reproduce, or transmit Customer Data obtained pursuant to this Agreement, except as necessary to fulfill the purpose of data requests by PowerSchool.

7.2.3 **Employee Training**. Supplier will provide periodic security training to those employees who operate or have access to the system. Further, Supplier will provide PowerSchool with contact information in <u>Annexure A</u> of an employee whom PowerSchool may contact if there are any security concerns or questions.

7.2.4 **Security Technology**. Supplier will employ industry standard measures to protect data from unauthorized access. The service security measures will include server authentication and data encryption. Supplier will host Customer Data pursuant to the Agreement in an environment using firewall(s) that are updated according to industry standards.

7.2.5 **Monitoring**.  Supplier will log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability.

7.2.6 **Security Coordinator**. Supplier will provide and maintain the name and contact information of Supplier's security coordinator (<u>Annexure A</u>) for the Customer Data received pursuant to the Agreement and this DPA.

7.2.7 **Vendor-Data Subprocessors Bound**. Supplier will enter into written agreements whereby Vendor-data subprocessors agree to secure and protect Customer Data in a manner consistent with the terms of this DPA. Supplier will periodically conduct or review compliance monitoring and assessments of Vendor-Data Subprocessors to determine their compliance with this DPA.

7.2.8 **Periodic Risk Assessment**. Supplier acknowledges and agrees to conduct digital and physical periodic risk assessments at least annually.

7.2.9 **Vulnerability Identification and Remediation**.  Supplier shall take commercially reasonable and industry standard measures to identify and remediate security and privacy vulnerabilities at an industry standard frequency and without undue delay for known security and privacy vulnerabilities.

7.2.10 **Established Security Policies**. Supplier will have and follow its established access security policies to support the confidentiality, integrity, and availability of the Customer Data against risks including but not limited to unauthorized access, collection, use, disclosure or disposal, loss, or modification. Such security arrangements will include, without limitation, reasonable physical, administrative, and technical safeguards.

7.2.11 **Audits and Compliance Reports**. Supplier will share with PowerSchool its security compliance like ISO27001 Certification as assessed by independent third-party auditors.  To the extent that Supplier discontinues a third-party audit, Supplier will adopt or maintain an equivalent industry-recognized security standard.

8.    **Vendor-Data Subprocessing**

EXECUTION COPY

8.1    In the event that PowerSchool authorizes Supplier to use Vendor-Data Subprocessors:

8.1.1    Supplier will enter into written agreements ("Vendor-Data Subprocessor Agreement") whereby Vendor-Data Subprocessors agree to secure and protect Customer Data in a manner consistent with the terms of this DPA and Agreement.

8.1.2    Supplier will periodically conduct or review compliance monitoring and assessments of Vendor-Data Subprocessors to determine their compliance with this DPA and Agreement.

8.1.3    At the conclusion or termination of the work, as directed by PowerSchool through Supplier, delete or return to PowerSchool all Customer Data in possession, custody or control.

## 9.    Data Subject Rights

9.1    With respect to requests from Data Subjects regarding Customer Data, Supplier shall:

9.1.1    Promptly notify PowerSchool if Supplier receives a request from a Data Subject under any Applicable Law with respect to Customer Data;

9.1.2    Reasonably cooperate and assist PowerSchool in connection with access requests, inquiries, and complaints from Data Subjects to whom the data relates or from data protection authorities; and

9.1.3    Not directly respond to the request except on documented instructions of the Customer through PowerSchool.

9.2    Supplier acknowledges that Applicable Law regarding Data Subject Rights may be further promulgated, modified, or interpreted by state attorney generals.  Supplier will reasonably cooperate and assist PowerSchool in adapting Supplier's support of PowerSchool regarding responding to Data Subject requests.

## 10.    Security Incident Involving Customer Data

10.1    Upon Supplier becoming aware of a Security Incident that involves Customer Data, Supplier shall immediately investigate the Incident.

10.1.1    In the course of the investigation, Supplier shall take reasonable steps to mitigate and remediate the Incident.

10.1.2    Supplier shall provide PowerSchool with reasonably sufficient information to permit PowerSchool to make a determination as to any notification obligations under Applicable Law.

10.2.    Supplier shall cooperate with PowerSchool and take commercially reasonable steps to assist PowerSchool in an investigation of the Incident.

10.3    In the event Customer Data is accessed or obtained by an unauthorized individual or third party, Supplier will:

10.3.1 provide notification to PowerSchool within a reasonable amount of time of discovery of the Incident, not exceeding seventy-two (72) hours.

10.3.2 Supplier agrees to comply with all reasonable requests from PowerSchool in relation to such Incident and, in consultation with PowerSchool and subject to any directions from PowerSchool, take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of Customer Data.

10.4    In the event of an Incident, Supplier will follow the following process:

10.4.1    Without undue delay, after discovery of an incident, promptly communicate the incident to PowerSchool followed by a written security incident notification to PowerSchool.

10.4.2    The written security incident notification will include, at a minimum, the following information:

10.4.2.1.    A list of the types of Customer Data that were or are reasonably believed to have been the subject of an incident.

10.4.2.2    If the information is possible to determine at the time the notice is provided, then either (1) the date of the incident, (2) the estimated date of the incident, or (3) the date range within which the incident occurred.

10.4.2.3    Whether the notification was delayed as a result of a law enforcement investigation, if that information is possible to determine and permitted at the time the notice is provided.

10.4.2.4    A general description of the incident, if that information is possible to determine at the time the notice is provided.

10.4.2.5 Steps taken to remediate and the status of the incident.

10.5    Supplier agrees to adhere to all requirements in applicable state, provincial and federal law with respect to an Incident related to Customer Data, including, when appropriate or required, the required responsibilities and procedures for notification and mitigation, where commercially reasonable, of any such data breach.

10.6    Supplier maintains a written incident response plan that is consistent with industry standards and the applicable federal (country), state, or provincial law for responding to a data incident, security incident, privacy incident, or unauthorized acquisition or use of the Customer Data or any portion thereof.

10.7    If PowerSchool requests Supplier's assistance providing notice of unauthorized access, and such assistance does not take on a form unduly burdensome to Supplier, Supplier will reasonably co-operate and assist in, any investigation of a complaint that any Customer Data has been collected, used or disclosed contrary to Privacy Laws, whether such investigation is conducted by PowerSchool itself or a body having the legal authority to conduct the investigation, including but not limited to co-operation and assistance in notifying the affected Data Subject(s) of the unauthorized access.

**11.  Data Protection Impact Assessment**

Supplier shall provide reasonable assistance related to the nature of Processing to PowerSchool in the event that a data protection impact assessment is required by Applicable Law.

**12.  Return and Disposition of Customer Data**

12.1    Upon written request from PowerSchool and in accordance with the applicable terms in the following provisions of this Section 12 (Return and Disposition of Customer Data), Supplier will dispose or delete all Customer Data within a commercially reasonable time when it is no longer needed for the purpose for which it was obtained.

12.1.1 In no event will Supplier dispose of Customer Data pursuant to this provision unless and until Supplier has received affirmative written confirmation from PowerSchool.

12.1.2 Disposition will include (1) the shredding of any hard copies of any Customer Data; (2) erasing; or (3) otherwise modifying the Customer Data in those records to make the information unreadable or indecipherable by human or digital means.

12.1.3 Nothing in this DPA or the Agreement authorizes Supplier to maintain Customer Data beyond the time reasonably needed to complete the disposition.

12.1.4 Upon request by PowerSchool, Supplier will provide written notification to PowerSchool when all Customer Data have been disposed.

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

12.1.5    Upon receipt of a request from PowerSchool, Supplier will provide PowerSchool return of Customer Data, within ten (10) calendar days of receipt of said request, as commercially reasonable.

12.1.6    PowerSchool acknowledges there may be a reasonable service fee attached to such data return service where more than two (2) such service requests are submitted by PowerSchool during the Term of the Agreement.

12.2    Throughout the Term of the Agreement, PowerSchool may request partial disposal of Customer Data that is no longer needed.

12.3    Supplier may retain Customer Data if required by Applicable Law.

13. **Transfer of Customer Data to Succeeding Vendor Upon Termination.**

Upon termination of this DPA, Supplier will, if requested by PowerSchool, securely transfer all Customer Data directly from Supplier's Site to the hosting site or platform of another vendor designated by PowerSchool, such transfer to occur on a date on or after the effective date of termination as directed by PowerSchool in a format mutually agreed by Supplier and at PowerSchool's cost.  Supplier will have no obligation to transfer Customer Data in a form or format specified by succeeding vendor, but Supplier will provide Customer Data in a manner that is the industry standard.

14. **Response to Legal Orders, Demands or Requests for Data**

14.1  The terms herein will not be construed as prohibiting either Party hereto from disclosing information to the extent required by law, regulation, or court order, provided such Party notifies, where not prohibited, the other party promptly after becoming aware of such obligations and provides the other Party an opportunity to seek a protective order or otherwise to challenge or limit such required disclosure.

14.2  Supplier will not disclose (and will not instruct any of its employees or Vendor-Data Subprocessors to disclose) in any manner whatsoever any Customer Data to any third party unless:

14.2.1 such disclosure is required in order for Supplier to perform its obligations pursuant to the Agreement or this DPA and any applicable Quote or Statement of Work; or

14.2.2  such disclosure is permitted under Applicable Law.

15. **Compliance with Applicable Law**

15.1 The Parties acknowledge that Customer Data may include Personal Data from Education Records that are subject to Applicable Law of the applicable jurisdiction.

16. **Termination**

16.1    Subject to agreed data return, data transfer, data disposal, legal, or other end of term obligations, this DPA will automatically terminate without any further action of the Parties upon the termination or expiration of the applicable Agreement between the Parties or successful completion of the services under such Agreement.

16.2    The obligations of the Parties under this DPA shall survive termination or expiration of this DPA or Agreement, until all Customer Data have been returned or disposed.

17. **General Terms**

17.1    The Parties to this DPA hereby submit to the choice of jurisdiction stipulated in the Agreement with respect to any disputes or claims arising under this DPA.

17.2    The terms of this DPA do not reduce Supplier's obligations under the Agreement regarding the protection of Customer Data and does not permit Supplier to Process Customer Data in ways prohibited by the Agreement.

17.3    In the event that there is a conflict or inconsistencies between this DPA, Applicable Law, and the Standard Contract Clauses regarding cross-board transfer issues, the conflict or inconsistencies

EXECUTION COPY

shall be resolved in the following order:  (i) first, Applicable Law, (ii) second, the Standard Contract Clauses, and (iii) then the DPA.

17.4    In the event that there is a conflict or inconsistencies between the Agreement and this DPA, this DPA controls.

IN WITNESS WHEREOF, the Parties, through their authorized representatives, have executed this DPA as indicated below.

**POWERSCHOOL GROUP, LLC.**                    **SLASHSUPPORT, INC. d.b.a. CSS CORP**

By:                                            By:

Name:                                          Name:

Title:                                         Title:

Date:                                          Date:

EXECUTION COPY

**ANNEXURE A**
**CONTACTS**

Information Security Contact – for reporting security incidents

**POWERSCHOOL GROUP, LLC.**                     **SLASHSUPPORT, INC. D.B.A. CSS CORP**

   Name: Mishka McCowan                          Name:

   Title: VP, Cyber Threat Management            Title:

   Telephone #: 571.581.8192                     Telephone #:

   Email: Mishka.mccowan@powerschool.com         Email:

Data Subject Questions or Requests Contact

   **POWERSCHOOL GROUP, LLC.**

   Email: privacy@powerschool.com

   Address:

   PowerSchool Group, LLC.
   150 Parkshore Drive
   Folsom, CA 95630
   ATTN: Privacy

DocuSign Envelope ID: 38C9540E-BF4A-4B78-BA5B-77D13C95B34A

EXECUTION COPY

**EXHIBIT C**
**INSURANCE REQUIREMENTS**

SUPPLIERS INSURANCE. Supplier agrees to provide and maintain at all times, during which Supplier is providing services under this Agreement, such insurance coverages as are set forth in this Exhibit, and to otherwise comply with the provisions that follow.

a. Workers Compensation. Workers' Compensation insurance in compliance with all applicable statutes. Such policy shall include Employer's Liability coverage in at least such amount(s) as are customarily provided in Workers' Compensation policies issued in the jurisdiction(s) in which Supplier's services are to be provided.

b. General Liability. "Commercial General Liability Insurance" coverage (Insurance Services Office form title), under a policy providing coverage on an "occurrence," rather than on a "claims made" basis, which policy shall include, but not be limited to, coverage for Bodily Injury, Property Damage, Personal Injury, Contractual Liability, (applying to this Agreement), Independent Contractors, and Products-Completed Operations liability. Such policy shall provide a combined limit of at least $2,000,000 Each Occurrence, and shall include PowerSchool, its directors, officers, employees and agents as Additional Insureds thereunder.

c. Automobile. Automobile Liability insurance covering liability for Bodily Injury and Property Damage arising out of the ownership, use, maintenance, or operation of all owned, non-owned and hired automobiles and other motor vehicles utilized by Contractor in connection with the services to be performed on behalf of PowerSchool. Such policy shall provide a total liability limit of combined Bodily Injury and/or Property Damage in the amount of at least $1,000,000 per accident, and shall include PowerSchool, its directors, officers, employees and agents as Additional Insureds thereunder.

d. Errors or Omissions. "Errors & Omissions" Liability Insurance in the amount of at least $2,000,000 Each Occurrence (or "Wrongful Act" or equivalent), covering Contractor's liability for negligent acts, errors or omissions in the performance of services in connection with this Agreement.

e. Limits. Each of the liability insurance limit requirements set forth above may be satisfied by a primary policy, or by a primary policy in combination with one or more Umbrella or Excess Liability policies. Supplier is in the best position to evaluate its own potential for liability and to make its own risk assessment. The minimum limits of insurance stated herein are not intended in any way to limit Supplier's liability.

f. Evidence of Insurance. Prior to beginning any performance under this Agreement, Supplier shall provide PowerSchool with evidence that the insurance coverage required hereunder is in full force and effect. In the event that any such insurance renews or is terminated during the time this Agreement is in effect, Supplier shall promptly provide PowerSchool with evidence that such coverage will be renewed or replaced upon termination with insurance that complies with these provisions. Such evidence of insurance shall be in the form of a standard Certificate of Insurance, or in such other form as PowerSchool may reasonably request and shall contain sufficient information to allow PowerSchool to determine whether there is compliance with these provisions. All such policies shall be endorsed to require that the Insurer provide at least thirty (30) days' notice to PowerSchool prior to the effective date of policy cancellation, non-renewal, or material adverse change in coverage terms.

g. Insurers. All policies of insurance required hereunder shall be issued by financially responsible insurers, and all such insurers must be acceptable to PowerSchool. Such acceptance by PowerSchool shall not be unreasonably withheld or delayed.

h. Insurance Terms. Insurance terms not otherwise defined herein shall be interpreted consistent with insurance industry usage.