UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: POWERSCHOOL HOLDINGS, INC. AND POWERSCHOOL GROUP, LLC CUSTOMER SECURITY BREACH LITIGATION.** | ) Case No.:  25-md-03149-BEN-MSB <br> ) <br> ) **ORDER GRANTING IN PART AND** <br> ) **DENYING IN PART DEFENDANT** <br> ) **POWERSCHOOL HOLDINGS, INC.** <br> ) **AND POWERSCHOOL GROUP,** <br> ) **LLC'S MOTION TO DISMISS** <br> ) **(TRACK 2)** <br><br> [Dkt. 302] |

## I. INTRODUCTION

This multidistrict litigation arises from a data breach involving Defendants PowerSchool Holdings, Inc. and PowerSchool Group, LLC (collectively, "PowerSchool").  PowerSchool provides cloud-based data management software for students and educators in K-12th.  PowerSchool stores sensitive student medical, academic, and other personally identifiable information in a searchable format.

Powerschool moves to dismiss the Track 2 Plaintiffs' claims against it.  For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Powerschool's motion.

-1-

25-md-03149-BEN-MSB

## II. BACKGROUND[1]

It is alleged that PowerSchool is a Sacramento-based provider of educational management software used by schools.  Schools require students, parents, and teachers to provide PowerSchool with sensitive personally identifiable information ("PII"), and PowerSchool stores and maintains this data.  There are approximately 4,700 school customers, 4,668,000 teachers and 43,800,000 students affected by Powerschool's maintenance of PII.  Powerschool, according to the Complaint, holds out its school software product as being a secure repository of PII data.

On December 20, 2024, the criminal group ShinyHunters used the stolen employee credentials of a Powerschool cybersecurity subcontractor (Movate, Inc.) to access PowerSchool's student information system through its PowerSource portal.  PowerSchool discovered the breach on December 28, 2024, and notified customers on January 7, 2025.  The hacker(s) exfiltrated PII and demanded a ransom from Powerschool.  Powerschool paid the ransom.  The Complaint alleges that the breach compromised the PII of approximately 50 million individuals, PII including social security numbers, medical information, financial information, addresses, disability records, and custody information.

## III. APPLICABLE LAW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims alleged in the complaint.  Under Federal Rule of Civil Procedure 8, a complaint should include a "short and plain statement of the claim showing that the pleader is entitled to relief," and may be dismissed under Rule 12(b)(6) if the plaintiff fails to state a cognizable legal theory or has not alleged sufficient facts to support such a theory.  *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013).  The

---

[1] When deciding whether to grant a motion to dismiss, the court generally accepts as true all well-pleaded factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009).  The Court is not making findings of fact, but summarizing some of the allegations made in the 436 page, 81 claim, Consolidated Individual Users Class Action Complaint (filed August 11, 2025) (Dkt. 259) ("Complaint").

court construes the alleged facts in the light most favorable to the plaintiff. *See Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.,* 768 F.3d 938, 945 (9th Cir. 2014). However, "courts are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678.

To survive a motion to dismiss, a complaint must state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Twombly*, 550 U.S. at 556. If the plaintiff's explanation is plausible, the complaint survives a motion to dismiss under Rule 12(b)(6), "regardless of whether there is a more plausible alternative explanation." *Iqbal*, 556 U.S. at 678. While some courts disagree,[2] this Court is not persuaded that a class action complaint has a higher plausibility threshold than a garden variety complaint.

Thus, a "Rule 12(b)(6) motion tests the sufficiency of a complaint; it does not . . . resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses." *W. Ins. Co. v. Frontier Homes, LLC*, 2018 WL 8220544, at *2 (C.D. Cal. Mar. 27, 2018) (quoting *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016)).

**IV. DISCUSSION**

There are two groups of plaintiff school districts asserting claims against Powerschool. The School District Amended Class Action Complaint ("CAC") (Dkt. 263) sets out eight claims for relief. The School District Direct Action First Amended Consolidated Master Complaint ("DAC") (Dkt. 288) sets forth 46 claims for relief. Because both complaints are voluminous and claims for relief manifold, not all claims are

---

[2] *See e.g., Grigsby v. Valve Corp.*, No. C12-0553JLR, 2012 WL 5993755, at *4 (W.D. Wash. Nov. 14, 2012) ("Plaintiffs' [class action] complaint must rise to a higher plausibility threshold than it would if it were a garden-variety tort claim or a claim brought by Mr. Grigsby alone.").

25-md-03149-BEN-MSB

addressed individually and not all grounds for dismissal are mentioned and discussed. Claims that are not specifically identified as requiring dismissal are considered to be plausible and sufficiently pleaded for purposes of the motion to dismiss.  The claims are not addressed in numerical order but generally in the order used by the movant.

### A.  Joint Motion

By joint motion, three Direct Action School Plaintiffs' claims for relief have already been dismissed without prejudice: Count 4 (Computer Fraud and Abuse Act), Count 23 (New York Education Law), and Count 6 (California Unfair Competition Law). *See* Joint Mot. Dkt. 362; Dkt. 373.

### B.  Powerschool's Motion to Dismiss

Powerschool seeks dismissal of the remaining claims for failure to state a claim under Rule 12(b)(6).

### 1.  Breach of Contract Claims

The Track Two school Plaintiffs' primary claims against Powerschool are based on contract agreements for Powerschool software products.  Powerschool argues that the breach of contract claims (CAC Count 1, DAC Counts 10, 13, 15, 18, 20, 24, 26, 28, 30, 33, 35, 37, 40, 42 & 44) should be dismissed for failure to plead that Powerschool breached the contracts or that plaintiffs have not incurred resulting damages.

All Track Two Plaintiffs allege that they had contracts with PowerSchool that required PowerSchool to perform certain actions related to the Data received from Plaintiffs' users, including encrypting and safeguarding that Data, and that PowerSchool breached those contracts.  CAC ¶¶ 1, 149-158; DAC *passim*.

### a.  Class Action Plaintiffs

Powerschool first objects that at no point, however, do the Class Action Plaintiffs identify which provisions of their contracts with PowerSchool were purportedly breached and the absence of such basic factual allegations is fatal to the Class Plaintiffs' claims, citing *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1117 (N.D. Cal. 2011) ("In an action for breach of a written contract, a plaintiff must allege the specific provisions in

-4-

the contract creating the obligation the defendant is said to have breached."). But *Young* does not recite a rigid rule. FRCP Rule 8(e) admonishes courts that "[p]leadings must be construed so as to do justice." And Rule 8(a)(2) requires no more than a "short plain statement of the claim showing that the pleader is entitled to relief."

The Class Action Plaintiffs use 77 pages to state eight claims. They could have been more precise, but a passing review of Powerschool's 12-page, single-spaced, Main Services Agreement ("MSA") and the associated state-specific Data Services Agreements ("DSA") make clear that there were written contracts that imposed obligations on Powerschool to take careful measures to protect the personal information data of school students and teachers. For example, Paragraph 5.1 of the New Jersey DSA says that "Powerschool will maintain all Customer Data in strict confidence . . . ." Likewise, Paragraph 6.1 of the DSA says that "Powerschool will safeguard and maintain the confidentiality of Customer Data obtained from the Customer." Similar obligations are set out in Paragraph 7, 8, 9.4.5., and Schedule 1C, Section A.1(1-10). Class Plaintiffs have not specifically identified these provisions in their Complaint, but it is obvious that they could have. Had they done so, they would have made an already too large and overly complicated multi-state class action pleading even more verbose. Construing the pleading so as to do justice, as Rule 8 requires, the Class Action Plaintiffs have adequately stated a plausible claim for breach of contract.

### b. Direct Action Plaintiffs

Next, Powerschool faults the Direct Action School Plaintiffs for the opposite condition. Powerschool objects that the DAC alleges too many contractual provisions labeling it as an improper "shotgun pleading" and citing this Court's decision in *Borrego Cmty. Health Found. v. Hebets*, 2024 WL 1269476, at *6 (S.D. Cal. Mar. 25, 2024) (Benitez, J.) ("Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff's allegations."). *Hebets*, however, was a quite different context in which multiple claims were made against multiple defendants without

specifying which one of the defendants was responsible for which acts or omissions, or which of the defendants the claim is brought against.  The plaintiff alleged 59 separate claims for relief, against 40 different defendants, arising out of 12 distinct schemes to siphon money, that took place over a decade of fraudulent conduct, and that failed to satisfy the heightened pleading standard of FRCP Rule 9(b).  *Hebets* is a far cry from the type of pleading the Direct Plaintiffs have set out in their DAC.

Powerschool agrees that the Direct Plaintiffs "allege breaches of at least 100 provisions."  But Powerschool still objects arguing that they "provide no factual allegations as to how each contractual provision was breached."  Mot. to Dismiss (Dkt. 302) at 10; see also at 14 ("While the Direct Plaintiffs identify a litany of different statutes that PowerSchool supposedly violated, they fail to allege facts that would explain how those statutes were violated and thus fail to allege breach of contract on those grounds.").  The DAC is already 243 pages in length.  Rule 8 does not require a lengthier description of how each of the 100+ contract provisions were breached in order to satisfy Rule 8.

Noting several contractual provisions that require PowerSchool to "safeguard and maintain the confidentiality of Customer Data," Powerschool suggests that "the parties did not intend for a cybersecurity incident to constitute some violative 'disclosure' of customer data."  However, evidence of the parties' intent must wait for summary judgment or trial.

Powerschool also argues that the Direct Action School Plaintiffs' "reliance on the mere occurrence of the Incident—unadorned by any well-pled facts regarding PowerSchool's vetting and monitoring practices—does not allege a breach of the duty to supervise provisions."  But for purposes of Rule 8, the incident which is accompanied by other well-pled facts does sufficiently allege a breach of the contractual duty to supervise provisions.  *See e.g.,* New Jersey DSA ¶¶ 7-9.

Powerschool also takes issue with the Direct Action School Plaintiffs' allegations of breaches of contractual notice and incident response provisions, where PowerSchool

25-md-03149-BEN-MSB

agreed to notify the School Districts of any security incident "without unreasonable delay," or within a specified time period, and to assist in mitigation of any data incident. Powerschool does not dispute the existence of these types of contract provisions but instead says that the Direct Action School Plaintiffs do not plausibly identify damages arising from the supposed delay in notification, and so their claims should be dismissed for lack of damages, citing *In re MOVEit Customer Data Sec. Breach Litig.*, 2025 WL 2179475, at *27 (D. Mass. July 31, 2025). *MOVEit* addressed a delay in notification claim arising under the California Customer Records Act (Cal. Civ. Code § 1798.82(a)), rather than a simple breach of contract claim based on a contractual obligation. The DAC sufficiently pleads damages arising from the alleged breach of contract.

### c. Limitation of Liability -- CAC and DAC

Powerschool's arguments hit much harder when it asserts that both the Class Action and Direct Action School Plaintiffs seek damages that are barred in substantial part by the MSA's Limitation of Liability clause (¶¶ 11.1, 11.2). Powerschool points out that in addition to their request for general damages, Plaintiffs seek special damages, expectation damages, consequential damages, and incidental damages. (CAC ¶ 158; DAC ¶¶ 353, 393, 434, 482, 524, 608, 674, 710, 774, 827, 891, 949, 1011, 1074, 1137.)

The Limitation of Liability provision in the MSA, however, makes clear that Plaintiffs cannot recover for "any lost profits or funding, revenues, goodwill, or indirect, incidental, consequential, cover, business interruption, or punitive damages, whether an action is in contract or tort." MSA § 11.1 ("TO THE MAXIMUM EXTENT PERMITTED BY LAW, IN NO EVENT WILL EITHER PARTY OR ITS AFFILIATES BE LIABLE TO THE OTHER PARTY FOR ANY LOST PROFITS OR FUNDING, REVENUES, GOODWILL, OR INDIRECT, INCIDENTAL, CONSEQUENTIAL, COVER, BUSINESS INTERRUPTION OR PUNITIVE DAMAGES, WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF

LIABILITY. . . .").[3]  The contract specifies in § 11.2 that the cap on monetary liability applies "whether an action is in contract or tort and regardless of liability . . . ."

The allegations in the Track 2 Complaints, taken as a whole, plausibly allege a garden variety breach of contract claim involving Powerschool's numerous customer school district entities.  The Class Action and Direct Action School Plaintiffs have stretched to mold their breach of contract claim into tort actions, such as claims for simple negligence and negligence per se.  Unfortunately for the contracting Plaintiffs, the MSA Limitation of Liability provision (a provision set out in all capital letters in the MSA) expressly extends to tort claims *under any theory* and cuts off any additional damages.  Consequently, both the Class and Direct Plaintiffs' tort claims pleaded in addition to simple breach of contract claims fail the plausibility test and will be dismissed to the extent they seek such damages.

### d. **The Economic Loss Doctrine -- CAC and DAC**

As an alternative to the Limitation of Liability argument, Powerschool says that the negligence claims should be dismissed because Plaintiffs seek to recover economic damages that are squarely barred by the *economic loss doctrine* in multiple states, and they do not allege facts that would plausibly show that PowerSchool owed any non-contract duty to its school district customers.  Powerschool argues that in at least twelve of the states in which Plaintiffs bring claims, they cannot recover in negligence for purely economic losses, especially where, as here, the claim arises under a contract and is not appropriately addressed in tort.

"The economic loss doctrine was created judicially and has been adopted in various forms throughout the United States."  Grant Treaster, *The Confusion Continues: The New Dynamic of the Economic Loss Doctrine in Kansas*, 62 U. Kan. L. Rev. 1326

---

[3] There is also a contractual cap on monetary liability which is specified as "two times (2X) the total amount paid by customer . . . in the twelve (12) months preceding the first incident out of which the liability arose."  *See* MSA § 11.2.

-8-

(2014).  It is a recent jurisprudential trend.  "The economic loss doctrine was first officially adopted by the California Supreme Court in the 1965 case of *Seely v. White Motor Co.*"  *Id.* at 1330.  In its most basic form, the economic loss doctrine bars plaintiffs from making tort claims based on only economic losses.  The doctrine is most typically applied to product liability claims.

"The economic loss doctrine has been labeled "obscure," "confusing," and "concerning."  *Id*. at 1325.  Nevertheless, in 1986 the Supreme Court adopted the doctrine in an admiralty case.  *See E. River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 872–73 (1986).  The Court explained, "[c]ontract law, and the law of warranty in particular, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements.  The manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies.  In exchange, the purchaser pays less for the product.  Since a commercial situation generally does not involve large disparities in bargaining power, we see no reason to intrude into the parties' allocation of the risk."  The Court continues, "[a] warranty action also has a built-in limitation on liability, whereas a tort action could subject the manufacturer to damages of an indefinite amount.  The limitation in a contract action comes from the agreement of the parties and the requirement that consequential damages, such as lost profits, be a foreseeable result of the breach."  *Id.* at 874.

The same allocation of responsibilities supports the application of the doctrine in this case.  Powerschool, through the MSA, intended to restrict its liability, within limits, by limiting remedies.  In exchange, the theory goes, the school district Plaintiffs were able to pay less for the Powerschool product.  Since the commercial situation did not involve large disparities in bargaining power, the parties thereby fairly allocated the risks.  This case, then, falls squarely within the rationale of the economic loss rule, which the Supreme Court famously said prevents "contract law [from] drown[ing] in a sea of tort."  *Id.* at 866; *see also Serifos Mar. Corp. v. Glencore Singapore Pte Ltd*., No. 24-1303-CV, 2025 WL 1554798, at *3 (2d Cir. June 2, 2025) ("The District Court also correctly

dismissed Serifos's gross negligence cause of action as duplicative of its breach of contract claim. 'It is a well-established principle' under New York law 'that a simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.'"); *In re Snowflake, Inc., Data Sec. Breach Litig*, 2025 U.S. Dist Lexis 212557*18 (D. Mont. 2025) ("The economic loss doctrine precludes recovery in tort for alleged negligence on a topic covered by a contract unless a plaintiff also can demonstrate noneconomic losses . . . .").

The School District Plaintiffs allege economic losses stemming from the alleged breach of the contracts with Powerschool. They claim in a general fashion that they incurred damages consisting of "inflated contract prices"; "additional wages"; "increased workload"; cybersecurity expenses and legal fees; costs for transferring data, security implementation, and training; "lost opportunity costs"; credit monitoring costs; identity theft protection expenses; ongoing monitoring costs; notification expenses; hotline costs; and administrative expenses. (CAC ¶ 80; DAC ¶¶ 136, 348, 388, 429, 477, 519.) These claims are foreclosed by the contract Limitation of Liability clause, as discussed above. Even if the limitation of liability provision did not apply, these additional economic losses claimed by the School District Plaintiffs would be barred by the economic loss doctrine.

Powerschool alternatively argues that there is no tort duty that it owes to the school district customers. "Regardless of the Court's application of the economic loss doctrine, Plaintiffs' claims still fail. A negligence claim requires a plaintiff to establish that a duty was owed to them." Although it may be the case that there is no particular duty owed by Powerschool to its school district entity customers, the Court need not reach a decision on this question because the negligence tort claims are foreclosed by the contractual limitation of liability and the economic loss doctrine. After all, as Powerschool persuasively argues, even assuming Plaintiffs can allege a general common law duty to safeguard personal information, that duty is not one that PowerSchool would owe to the

-10-

Track Two Plaintiffs which are schools and school districts that merely collected the personal information belonging to individual students and teachers.

### 2. Negligence Per Se Claims

The Direct Action School Plaintiffs plead negligence per se as a separate claim (Count 2), while the Class Action Plaintiffs plead negligence per se as part of their negligence claim.  Powerschool moves to dismiss both.  The motion to dismiss the negligence per se claims, whether alleged as a separate count or as a theory of negligence, will be granted for the same reasons as Plaintiffs' simple negligence claims.

### 3. Unjust Enrichment Claims (CAC Count 7, DAC Count 3)

In addition to their simple breach of contract claims against Powerschool, the School District Plaintiffs assert claims for unjust enrichment.  (CAC Count 7, DAC Count 3).  Powerschool moves to dismiss.  The motion is granted.

The general rule is summed up like this: "as a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights.  When parties have an actual contract covering a subject, a court cannot—not even under the guise of equity jurisprudence—substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract." *California Med. Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc.*, 94 Cal. App. 4th 151, 172 (2001).  In a similar case, where a person's PII was exfiltrated in a data breach in New Jersey the court found that she could not assert an unjust enrichment claim against an insurer to which she gave her PII explaining, "[t]he FAC lacks any allegations that Defendant benefited from Plaintiff's PII, by, for example, selling the data or otherwise commercially profited from same.  Without this, Plaintiff's unjust enrichment claim fails." *Adkins v. Everest Glob. Servs., Inc.*, No. CV 23-004 (RK), 2024 WL 3887127, at *12 (D.N.J. Aug. 21, 2024).

In this case the school Plaintiffs (which are artificial entities) lost no PII of their own.  There are no allegations that a school or school district lost in the data breach its own social security number, date of birth, age, or health information from which

-11-

Powerschool was unjustly enriched by, for example, selling such PII data.  There appears to be nothing given by Plaintiffs to Powerschool by which Powerschool was enriched or profited over and above the contracted amounts paid.  The theory of unjust enrichment in the context presented by this case, viewing the CAC and DAC as a whole, simply does apply.  Like the New York court points out in *In re Waste Mgmt. Data Breach Litig.*, 2022 WL 561734, at *6 (S.D.N.Y. Feb. 24, 2022), in a typical data breach case it is the "third-party hackers [that] benefitted at the expense of both the plaintiffs and [the data breached defendant], and it is that person or persons which in equity and good conscience owes restitution to the plaintiffs."  The unjust enrichment claims are dismissed.

### 4. **Fraudulent Concealment Claim (DAC Count 5)**

Only the Direct Action Plaintiffs assert a claim against Powerschool for fraudulent concealment.  (DAC Count 5).  Powerschool moves to dismiss on two grounds.  First, it argues that the complaint does not satisfy the heightened pleading standard required by FRCP Rule 9(b).  That is correct.  More importantly, even if the more stringent requirements of Rule 9(b) were to be satisfied, the Direct Action Plaintiffs would be unable to plausibly allege that PowerSchool had a duty to disclose concealed information that is separate and apart from its contractual duty to perform under their contracts.  The motion to dismiss is granted.

### 5. **The Federal CFAA (CAC Count 4, DAC Count 4)**

Both groups of Track Two Plaintiffs put forth claims that Powerschool violated the federal Computer Fraud and Abuse Act, 18 U.S.C. Section 1030, *et seq*.  The CFAA is a criminal statute defining a crime of improperly accessing a protected computer. *Musacchio v. United States*, 577 US 237, 240 (2016).  "Hacking" is a useful euphemism for unauthorized or criminal access to a computer network.  Although hacking does not appear in the text, the CFAA is fairly described as an anti-hacking statute. *See United States v. Nosal,* 676 F.3d 854, 857-58 (9th Cir. 2012).  "CFAA violations require a person to engage in the hacking . . . ." *Koninklijke Philips N.V. v. Elec-Tech Int'l Co.*, 2015 WL 1289984, at *4 (N.D. Cal. Mar. 20, 2015).  Plaintiffs do not claim Powerschool

-12-

engaged in hacking or was the hacker that infiltrated its own system to exfiltrate PII and demand from itself a ransom for the return of its PII. That would be a novel claim.

But Plaintiffs appear to allege facts describing a different, but equally novel, crime. Plaintiffs allege Powerschool made contractual promises to Plaintiffs that it would in essence keep student and teacher PII safe from hackers. Plaintiffs then allege that Powerschool negligently breached its contractual promises in various ways thereby acting without authorization and in criminal violation of the CFAA. In the process, Powerschool left open a network vulnerability which a third-party criminal Shiny Hunter actor took advantage of in order to exfiltrate Plaintiffs' PII. *See* CAC paras 184-209. The CFAA does not reach so far. As the Ninth Circuit said in *Nosal*, construing the statute that way would "expand its scope far beyond computer hacking to criminalize any unauthorized use of information obtained from a computer." 676 F.3d at 859. "This would make criminals of large groups of people who would have little reason to suspect they are committing a federal crime." *Id.*

Instead, Plaintiffs point to provisions of the CFAA as the basis for Powerschool's alleged liability. See CAC ¶ 185 (citing 18 U.S.C. §§ 1030(a)(2)(C) & (a)(5)(C)); DAC ¶¶ 201-02 (citing 18 U.S.C. §§ 1030(a)(4) & 1030(a)(5)(B)). But Plaintiffs do not allege that Powerschool was the hacker of its own computers. Each of these CFAA provisions requires the defendant to have accessed a computer either "without authorization" or in a manner that "exceeds authorized access," and to have done so either knowingly or intentionally. The weak point of this claim is that Powerschool, of course, accessed its own computers *with* authorization. How could it be otherwise? Plaintiffs by contract hired Powerschool to use its computers to continually access and maintain Plaintiffs' data as Plaintiffs' needs required. Additionally, a plaintiff must allege they have suffered "damage or loss by reason of [the CFAA] violation." 18 U.S.C. § 1030(g). At bottom, Plaintiffs' theory is something along the lines of: we gave Powerschool our students' data to maintain and store so it would be in a useful format, but Powerschool did not actually have our authorization to maintain or store the data in the careless way that it did and

-13-

when it did we suffered a loss and Powerschool violated the CFAA.  The claim is implausible in its present form.  Rather, Plaintiffs' allegations demonstrate that PowerSchool was the victim of an outside hacker.  Because Plaintiffs have failed to plausibly allege any of these elements, their CFAA claims are dismissed.

### 6. **The State CDAFA (CAC Count 5)**

The Class Action Plaintiffs assert a claim under California Penal Code § 502 known as the California's Comprehensive Data Access and Fraud Act ("CDAFA").  The CDAFA, like the CCDA, is a criminal statute.  Plaintiffs piggyback onto their CFAA allegations using similar language and theories for their CDAFA claim.  CAC ¶ 222.  As described in paragraphs 184 through 209 of the CAC, the Class Action Plaintiffs claim that in addition to violating the CFAA, PowerSchool violated the CDAFA by knowingly and without permission accessing, using, or damaging, Plaintiffs' and Class Members' data; using Computer Services; assisting in unauthorized access; and causing unauthorized access to Plaintiffs' and Class Members' Computer Systems, including in furtherance of a scheme to defraud and to wrongfully obtain data and property. Powerschool moves to dismiss for two reasons.

First, argues Powerschool, the CDAFA does not apply because PowerSchool did not actually participate in unauthorized hacking, which is a requirement for liability under the Act.  Powerschool suggests that courts have recognized that the CDAFA is not meant to impose liability on a defendant when it is a third-party hacker that gains unauthorized access to a defendant's system.  *See Claridge v. Rock You, Inc.*, 785 F. Supp. 2d 855,  863 N.D. Cal. 2011).  *Claridge* is persuasive.  *Claridge* strictly construed the CDAFA  statute because it is a criminal statute and found that the legislature intended to reach third party hackers, rather than firms that may have "failed to provide a sufficiently secure computer system." *Id*. at 863.

The Class Plaintiffs retort that the CDAFA creates broader liability than the CFAA in that it predicates liability on as little as "knowing access" rather than unauthorized access, relying on  *Facebook, Inc. v. Power Ventur*es, 844 F.3d 1058, 1069 (9th Cir.

-14-

2016).  Perhaps so, but *Facebook* was addressing a different context where authorized access had been formally withdrawn (in a cease and desist letter to the defendant) after which the defendant acted to circumvent Facebook's IP barriers to knowingly gain systems access.  *Id.* at 1068.  That is not the allegation in the present case.  Therefore, Powerschool's motion to dismiss is granted for the CDAFA claims.

### 7. The Illinois Biometric Privacy Act (DAC Count 17)

The Illinois' Biometric Privacy Act ("BIPA") regulates the collection, use, and handling of biometric data.  It applies only to entities "in possession of" biometric data.  *See* 740 Ill. Comp. Stat. 14/15(e).  The Direct Action Plaintiffs claim Powerschool violated the Act's restrictions on possession of biometric data.  "As a private entity in possession of this data containing biometric identifiers and biometric information, PowerSchool was required to do the following pursuant to 740 Ill. Comp. Stat. Ann. 14/15(e): . . . ."  DAC ¶ 457.  Plaintiffs assert that PowerSchool collects biometric information of students because: it "enables students and others to log in to its smartphone application, PowerSchool Mobile, by using biometric identifiers including Face ID, Touch ID, or Secure ID."  DAC ¶¶ 34, 456.  Under the Act, a firm that possesses such data is required to use the reasonable standard of care used within the firm's industry and in a manner that is at least as protective as the way the firm protects other sensitive information.  Plaintiffs allege that standard of care was not met, and that "Biometric information is contained within the data that was compromised."  DAC at ¶ 461.

Courts have recognized that allegations such as "PowerSchool enabled users to log in to a mobile app with Face ID or Touch ID" would not suffice to allege that PowerSchool received such data.  *G.T. v. Samsung Elecs. Am. Inc.*, 742 F. Supp. 3d 788, 796 (N.D. Ill. 2024) (dismissing BIPA claim where plaintiff merely alleged that defendant controlled an app and its technology, but not that defendant had control over biometric information generated from the app).  *G.T.* is persuasive.  But Plaintiffs go farther and allege that Powerschool also possessed such data -- which was not the case in

-15-

*G.T.* Powerschool takes a better approach when it argues that even if it did possess such data, Plaintiffs do not allege that they themselves provided any biometric information to PowerSchool. According to the Complaint, it is not the students or other humans who provided biometric data that are the named plaintiffs in Track Two. Plaintiffs here are Illinois school entities. Consequently, the Court concludes that the Direct Action School Plaintiffs are not the "person[s] aggrieved" with the right to bring a private action under the BIPA. For all of these reasons, the motion to dismiss the Illinois biometric data claim is granted.

**8. The Consumer Protection Statute Claims  (CAC Count 6, DAC Counts 12, 14, 16, 19, 21, 22, 25, 27, 29, 31, 34, 38, 41, 43 & 45)**

The Class Plaintiffs bring a claim under the California Unfair Competition Law ("UCL") (CAC Count 6), and the Direct Action Plaintiffs bring claims under the state consumer protection statutes of 14 additional states (collectively, the "Consumer Protection Claims").

### *a. California UCL Claim by Class Action Plaintiffs*

Powerschool moves to dismiss the Class Action Plaintiffs' California UCL claim (Count 6) arguing, first, that the Class Plaintiffs are not located in California and therefore cannot bring an extraterritorial claim under California's UCL. Powerschool is correct that the application of California law is limited by the presumption against extraterritorial application. The California Supreme Court has said that "[n]either the language of the UCL nor its legislative history provides any basis for concluding the Legislature intended the UCL to operate extraterritorially. Accordingly, the presumption against extraterritoriality applies to the UCL in full force." *Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011). Consequently, California generally does not extend the application of the UCL beyond state lines. *See, e.g., Diva Limousine, Ltd. v. Uber Techs., Inc.*, 392 F. Supp. 3d 1074, 1094 (N.D. Cal. 2019) ("It is well-established that the UCL does not apply extraterritorially."). The Class Plaintiffs cannot bring a UCL claim

-16-

because they cannot show a "clearly expressed" legislative intent to apply the UCL extraterritorially.

Secondly, Powerschool argues that the Class Plaintiffs cannot proceed under the UCL because they do not allege lacking an adequate remedy at law.  The Court agrees. *Zaback v. Kellogg Sales Co.*, 2020 WL 6381987, at *4 (S.D. Cal. Oct. 29, 2020) (dismissing UCL claim due to plaintiff's failure to plead he lacked an adequate remedy at law); *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 845 (9th Cir. 2020) ("Regardless of whether California authorizes its courts to award equitable restitution under the UCL . . . when a plain, adequate, and complete remedy exists at law, we hold that federal courts rely on federal equitable principles before allowing equitable restitution in such circumstances.  And because [plaintiff] fails to demonstrate that she lacks an adequate legal remedy in this case, we affirm the district court's order dismissing her claims for restitution.").  Therefore, Powerschool's motion to dismiss the Class Plaintiffs' UCL claim (Count 6) is granted.

### b. *State Consumer Protection Laws -- Direct Action Plaintiffs*

The Direct Action Plaintiffs bring state law statutory claims under the laws of 15 states.

#### i. New York, Rhode Island, Utah, Vermont, and Virginia

Powerschool asserts that claims under the *New York, Rhode Island, Utah, Vermont, and Virginia* statutes should be dismissed because Plaintiffs cannot allege, as these statutes generally require, that its software product was primarily used for personal, family, or household use.  For example, Utah's statute applies only to a "consumer transaction" for goods or services for "*primarily personal, family, or household purpose*s."  Utah Code Ann. § 13-11-3(2)(a)(i) (emphasis added).  Vermont's statute is similarly intended to protect a person as defined as follows:  "Consumer" means any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services . . . *for the person's use or benefit or the use or benefit of a member of the person's household, or in connection with the operation of the person's household or*

-17-

*a farm. . . . "* Vt. Stat. Ann. tit. 9, § 2451a(1) (emphasis added). The claim based on Oklahoma's consumer protection statute (Count 43) falls into the same camp. The Oklahoma statute "gives a private right of action only to 'an aggrieved consumer.'" *Patterson v. Beall*, 19 P.3d 839, 846 (Okla. 2000).

The Direct Action Plaintiffs disagree, but their rationale is unpersuasive. The Direct Action School Plaintiffs explain that Powerschool's products are used by the students and families that they serve. Therefore, the Direct Action School Plaintiffs propose, that "*Plaintiffs are consumers acting as the vector through which persons, families, and households use Powerschool's products*." Oppo. (Dkt. 343) at 31 (emphasis added). The weakness of the argument is that these types of statutes are intended to protect human consumers rather than "vectors" or corporate intermediaries. Consequently, Powerschool's argument for dismissing these types of consumer protection claims is more persuasive.

The exception is New York's statute, as Plaintiffs point out. New York's statute does not have the same limiting "personal use" requirement; the New York statute protects businesses as well as individual consumers from deceptive advertising. *See* Gen. Bus. Law §§ 349, 350. Therefore, Powerschool's motion to dismiss is **granted** as to the Rhode Island (Count 34), Utah (Count 12), Vermont (Count 25), Virginia (Count 38), and Oklahoma (Count 43) consumer protection claims; the motion to dismiss is **denied** as to the New York (Count 21 and 22) statutory claims.

### ii. California and Wisconsin

Powerschool also argues that both the Class Action and the Direct Action School Plaintiffs' consumer protection claims, whether under the states addressed above or the remaining states, fail for additional reasons. In particular, Powerschool says that Plaintiffs' allegations assert that PowerSchool made misrepresentations and omissions about its data security practices and procedures. *See* CAC ¶¶ 233(d)-(g) (California); DAC ¶¶ 359-65 (Utah), 397-402 (Wisconsin). Because these claims sound in fraud, Plaintiffs must satisfy the heightened pleading standard of Federal Rule of Civil

-18-

Procedure 9(b).  For Rule 9(b), a plaintiff must state with particularity the "who, what, where, and when of the allegedly false or fraudulent representation." *In re MOVEit*, 2025 WL 2176590, at *3; *Sony I*, 996 F. Supp. 2d at 959 (requiring pleading of "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation").  The Utah claim is dismissed above.  The California and Wisconsin claims as pleaded do not sound primarily in fraud so as to require Rule 9(b) pleading specificity so Powerschool's motion to dismiss on this ground is denied.  But Powerschool has other theories and objections to the remaining state law statutory claims.

iii. Arizona, South Carolina, New York, Tennessee, Utah, Vermont, Virginia, Washington, and Wisconsin

Powerschool next argues more generally that "most of the statutes at issue require a causal link between the alleged misrepresentation and the plaintiffs' claimed injury," and/or reliance on the allegedly deceptive conduct.  Powerschool then maintains that Plaintiffs do not allege when, how, or even if they saw PowerSchool's advertisements or marketing materials, much less that they relied on them to their detriment, pointing to integration clauses in the MSA agreements.

For example, the Powerschool contracts with the plaintiff schools expressly provide that "[e]ach Party acknowledges that it has not made any promise or representation that is not expressed in this Agreement."  MSA § 14.9.  Consequently, Powerschool argues that the Direct Action School Plaintiffs do not plausibly allege reliance on Powerschool's misleading advertising which would be necessary to recover under these typical consumer protection state statutes.  The Court agrees.

Take the Direct Action School Plaintiffs' claim made under Arizona's consumer protection statute (Count 41).  In that claim, the school Plaintiffs allege: "PowerSchool published *on its website* the statement that PowerSchool 'invests in updated security technology and adheres to strict security regulations' while representing on its website that it supposedly did these acts to 'keep your data secure.'  Also, *through its website*, PowerSchool represented itself as an 'industry leader for protected private data.'

-19-

PowerSchool made representations to members of the public that they could 'trust' PowerSchool to safeguard and protect children's personal information." *See* DAC ¶1018 (emphasis added). The school Plaintiffs' South Carolina consumer protection act claim (Count 19) is similar. The claim alleges: "PowerSchool repeatedly *advertised on its website* that PowerSchool 'invests in updated security technology and adheres to strict security regulations' while representing that it did so to 'keep your data secure.' Also *through its website*, PowerSchool advertised itself as an 'industry leader for protected private data.' PowerSchool continually used *advertisements and promotions* of its services to make representations to members of the public that they could 'trust' PowerSchool to safeguard and protect children's personal and private information." DAC at ¶ 490 (emphasis added); *see also* Utah (Count 12) at ¶ 360 (same); Vermont (Count 25) at ¶615 (same); Washington (Count 45) at ¶1144 (same); New York (Count 29) at ¶ 549 ("PowerSchool *published on its website* the statement that PowerSchool 'invests in updated security technology and adheres to strict security regulations' while representing on its website that it did so to 'keep your data secure.' Also *through its webs*ite, PowerSchool represented itself as an 'industry leader for protected private data.'") (emphasis added); Tennessee (Count 29) at ¶ 715 ("Before entering into contracts with the Tennessee Districts and throughout the duration of the Parties' commercial relationship, PowerSchool published in *promotional, marketing, and advertising materials* statements. . . .") (emphasis added); Virginia (Count 38) at ¶ 954 ("Both before entering into contracts with the Virginia Districts and throughout the duration of the Parties' commercial relationship, PowerSchool published *in promotional, marketing, and advertising materials* statements . . . .") (emphasis added).

In each of these claims the Direct Action School Plaintiffs plead that they relied on misleading statements that were part of advertising or website statements made to the general public. At the same time, however, the school Plaintiffs allege that they each entered into direct written contracts with Powerschool with full integration clauses. Applying the federal plausibility standard for pleading, the school Plaintiffs' claims that

-20-

25-md-03149-BEN-MSB

they relied on advertising statements rather than the actual negotiated terms of the MSA agreements fall short of satisfying the plausibility requirement.  The relied upon consumer protection statutes do not contemplate placing liability where a sophisticated entity is the consumer and that entity enters into a written contract that excludes the allegedly misleading general advertising statements.  Plaintiffs do not cite cases to the contrary.

Therefore, because the claims discussed above lack plausible allegations of reliance or causation in view of the written MSAs, Powerschool's motion to dismiss the consumer protection claims based upon the consumer protection statutes of the states of Arizona, South Carolina, New York, Tennessee, Utah, Vermont, Virginia, Washington, and Wisconsin, is **granted**.

iv. Idaho, New Hampshire and Pennsylvania

In a similar vein, the Direct Action School Plaintiffs allege Powerschool misled them and are thus liable under the consumer protection statutes of Idaho (Count 27), New Hampshire (Count 31) and Pennsylvania (Count 36).  However, rather than claiming Powerschool made misleading affirmative statements in its public statements, for these claims the school Plaintiffs assert that Powerschool made *omissions* about weaknesses in its data security.  Here is an example from the Idaho consumer protection statute claim (Count 27) at ¶ 682: "The Idaho Districts justifiably acted or relied to their detriment upon PowerSchool's *omissions* of fact concerning the above-described *omissions* and representations regarding PowerSchool's data security practices and procedures, as evidenced by their purchase of PowerSchool's products and services."  (Emphasis added.)

The New Hampshire consumer protection claim  similarly relies on omissions (Count 31) at ¶¶ 779-781: "In purchasing PowerSchool's products and services, the New Hampshire Districts were deceived by PowerSchool's *failure to disclose* that PowerSchool, contrary to its representations, did not: a. properly encrypt data; b. implement multi-factor authentication; c. monitor for unauthorized access; d. ensure that its staff was adequately trained to recognize and respond to cyber threats; e. regularly and

-21-

proactively patch vulnerabilities that could be exploited by hackers; and f. properly isolate sensitive student and teacher data from other less secure systems.  The New Hampshire Districts reasonably relied on PowerSchool's *omissions*, and they did not and could not unravel PowerSchool's deception on their own.  PowerSchool's concealment, suppression, and *omission* of material facts were likely to and did in fact deceive reasonable consumers." (Emphasis added); *see also* DCA Count 36 (Pennsylvania) at ¶ 896 ("PowerSchool . . . *failed to disclose* the truth about the measures and protocols it implemented to protected data containing PII that was entrusted to it, and did so with the intent that consumers rely on that *failure to disclose* in deciding whether to purchase its EdTech products and services.") (emphasis added).

Applying the federal plausibility standard for pleading, the Direct Action School Plaintiffs' claims that they were misled by omissions beyond the actual negotiated terms of the MSA agreement fall short of satisfying the plausibility requirement.  The applicable consumer protection statutes do not contemplate placing liability where a sophisticated entity is the consumer and that entity enters into a written contract that excludes any other statements or omissions.  And again, Plaintiffs do not cite cases to the contrary.

Therefore, because the claims discussed above lack plausible allegations of reliance or causation in view of the written MSAs, Powerschool's motion to dismiss the consumer protection claims based upon the consumer protection statutes of the states of Idaho, New Hampshire and Pennsylvania, is **granted**. [4]

---

[4]    Powerschool makes an alternative argument that in order to correctly plead a claim based on unlawful, unfair, or unconscionable conduct under several of the state statutes, they must allege that PowerSchool's conduct offends established public policy, is "immoral, unethical, oppressive, unscrupulous," or substantially injurious to consumers, citing *Ahern v. Apple Inc*., 411 F. Supp. 3d 541, 579-80 (N.D. Cal. 2019) (Illinois, New Hampshire, North Carolina); Okla. Stat. Ann. tit. 15, § 752(14) (Oklahoma); *Ames v. Oceanside Welding & Towing Co.*, 767 A.2d 677, 681 (R.I. 2001) (Rhode Island) ("In looking to determine whether a practice is "unfair" under the statute, this Court considers:

-22-

**9. The New Hampshire, Virginia, and Washington Data Breach Notification Laws (DAC Counts 32, 39 & 46)**

The Direct Action School Plaintiffs also assert claims alleging violations of the data breach notifications laws of New Hampshire, Virginia and Washington (Counts 32, 39 & 46).   Powerschool moves to dismiss because Plaintiffs do not allege facts demonstrating PowerSchool's notification was unreasonably delayed or that they were injured by any delay in receiving notice.

New Hampshire's statute requires one to "notify and cooperate with the owner or licensee of the information of any breach of the security of the data immediately

---

(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise-whether, in other words, it is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers (or competitors or other businessmen)."); *World Cam, LLC v. Omnibond Sys., LLC*, 2021 WL 4132100, at *6 (D.S.C. Sept. 9, 2021) (South Carolina) ("A trade practice is 'unfair' when it is offensive to public policy or when it is immoral, unethical, or oppressive; a practice is 'deceptive' when it has a tendency to deceive."); *Picket Fence Preview, Inc. v. Zillow, Inc.*, 623 F. Supp. 3d 371, 382 (2022) (Vermont) (the Vermont Supreme Court has reiterated that in order to recover for an alleged violation of § 2453 of the VCPA, a plaintiff must establish that they are a consumer); *Taylor v. Amazon.com, Inc.*, 2025 WL 104381, at *5 (W.D. Wash. Jan. 15, 2025) (Washington) ("To prevail in a private CPA claim, the plaintiff must prove (1) an unfair or deceptive act or practice, (2) occurring in trade or commerce, (3) affecting the public interest, (4) injury to a person's business or property, and (5) causation."); *Cotte v. CVI SGP Acquisition Tr.*, 2022 WL 464307, at *10 (D. Utah Feb. 15, 2022) (Utah) ("And Plaintiffs have failed to allege any facts specifically demonstrating unconscionability, must less any facts that would rise to the level of "extreme unfairness" required to constitute unconscionability."). Powerschool argues that Plaintiffs do not explain how their allegations of negligent or inadequate cybersecurity countermeasures rise to the level of "immoral," "unethical," "oppressive," or the equivalent. Because these state consumer protection statutory claims are dismissed for other reasons, the argument is not resolved here.

-23-

following discovery. . . ." N.H. Rev. Stat. Ann. § 359-C:20. Virginia's statute provides that notice of a data breach is to be given "without unreasonable delay." However, it also provides that, "[n]otice required by this section *may be reasonably delayed* to allow the individual or entity to determine the scope of the breach of the security of the system and restore the reasonable integrity of the system." Va. Code Ann. § 18.2-186.6(B) (emphasis added). Washington's data breach notification statute provides, [n]otification to affected consumers under this section must be made *in the most expedient time possible, without unreasonable delay, and no more than thirty calendar days after* the breach was discovered . . . ." Wash. Rev. Code Ann. § 19.255.010(8) (emphasis added). The Direct Action School Plaintiffs here simply allege: "Powerschool breached that obligation." DAC at ¶1165.

When the plausibility requirement is applied for evaluating these three claims for alleged delay, the school Plaintiffs do not state claims upon which relief may be granted. Powerschool's breach announcement is alleged to have been initiated only ten days after the breach was discovered including weekends and national holidays. Ten days of "delay" is reasonable and would likely satisfy the notice obligations imposed by any of these three state statutes. Therefore, Powerschool's motion to dismiss the Direct Action School Plaintiffs' claims alleging violations of the data breach notifications laws of New Hampshire, Virginia, and Washington (Counts 32, 39 & 46) is **granted.**

### 10. Express Indemnity (DAC Count 6)

The Direct Action School Plaintiffs also assert a claim for indemnification, which is premised upon a provision in the MSA specifying that PowerSchool "will defend Customer . . . from and against any claim, demand, suit or proceeding brought by a third party against a Customer" under certain circumstances. DAC ¶ 245; MSA § 10.1. Powerschool asks that this claim be dismissed because the Direct Action School Plaintiffs do not identify any actual third-party claim as of today that would make their indemnity claim ripe for adjudication. The Plaintiffs instead seek declaratory relief, "whereby this Court will use its authority under 28 U.S.C. §§ 2201, *et seq*., to issue a declaration that, in

the event that Plaintiffs are sued as a result of PowerSchool's failure to adequately secure the PII at issue, Plaintiffs will be indemnified." DAC ¶ 247 (emphasis added). The Declaratory Judgment Act ("DJA") does require an "actual controversy." 28 U.S.C. § 2201(a) (emphasis added). And a "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." On the other hand, the Plaintiffs state a claim that is plausible. The claim may or may not eventually prove to be ripe by the time of trial, but permitting the claim to go forward rather than requiring an amendment later better serves scarce judicial resources. Therefore, the motion to dismiss Count 6 is **denied**.

### 11. Class Action Plaintiffs' Claim for Declaratory And Injunctive Relief (CAC Count 8)

The Class Action Plaintiffs state a claim for declaratory and injunctive relief Count 8). Powerschool moves to dismiss. The Declaratory Judgment Act mainly provides a remedy, not an independent cause of action. *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878–79 (9th Cir. 2022) ("We agree with our sister circuits that have considered the issue that the Declaratory Judgment Act does not provide an affirmative cause of action where none otherwise exists.").[5]

Here, because the Class Action Plaintiffs other claims for relief may proceed and because Plaintiffs' declaratory judgment claim is predicated on those claims, the Class Action Plaintiffs have sufficiently established a plausible claim for declaratory relief and injunctive relief. Therefore, Powerschool's motion to dismiss the Class Action Plaintiffs' Count 8 is **denied**.

---

[5] "A plaintiff's inability to rely on the Declaratory Judgment Act to obtain affirmative relief where no cause of action otherwise exists contrasts with the well-established availability of the Act for defensive use against anticipated claims. *See Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1322 (9th Cir. 1998) (observing that, "[f]requently, the point of a declaratory action is to assert a defense anticipatorily")." *City of Reno*, 52 F.4th at 879.

-25-

25-md-03149-BEN-MSB

## V.   CONCLUSION

For the foregoing reasons, the Court **ORDERS** that the:

1.     The Class Action Plaintiffs and the Direct Action School Plaintiffs' claims for breach of contract are sufficiently pleaded.

2.     The Class Action and the Direct Action School Plaintiffs' simple negligence claims and other tort claims pleaded in addition to the simple breach of contract claims found at CAC Count 1 and DAC Counts 10, 13, 15, 18, 20, 24, 26, 28, 30, 33, 35, 37, 40, 42 and 44 do not satisfy the plausibility test and are dismissed.

3.     The Direct Action School Plaintiffs' claims for economic losses stemming from the alleged breach of the contracts with Powerschool (*i.e.,* "inflated contract prices"; "additional wages"; "increased workload"; cybersecurity expenses and legal fees; costs for transferring data, security implementation, and training; "lost opportunity costs"; credit monitoring costs; identity theft protection expenses; ongoing monitoring costs; notification expenses; hotline costs; and administrative expenses) (CAC ¶ 80; DAC ¶¶ 136, 348, 388, 429, 477, 519) are foreclosed by the contract Limitation of Liability clause or the *economic loss doctrine* and are dismissed.

4.     The negligence per se claims, whether alleged as a separate count or as a theory of negligence, are dismissed for the same reasons as Plaintiffs' simple negligence claims.

5.     The claims for unjust enrichment by the Class Action Plaintiffs (CAC Count 7) and the Direct Action School Plaintiffs (DAC Count 3) are dismissed.

6.     The Direct Action School Plaintiffs' Fraudulent Concealment Claim (Direct Action Count 5) is dismissed.

7.     The Class Action Plaintiffs and the Direct Action School Plaintiffs' CFAA Claims (CAC Count 4, DAC Count 4) are dismissed.

8.     The Class Action Plaintiffs' CDAFA Claim  (CAC Count 5) is dismissed.

9.     The Direct Action School Plaintiffs' Illinois Biometric Privacy Act Claim  (DAC Count 17) is dismissed.

10.    The Class Action Plaintiffs' UCL claim (CAC Count 6) is dismissed, as previously stipulated.

11.    The Direct Action School Plaintiffs' claims under the consumer protection statutes of Rhode Island (Count 34), Utah (Count 12), Vermont (Count 25), Virginia (Count 38), and Oklahoma (Count 43) are dismissed.

The claims based on New York's statutes (Count 21 and 22) are sufficiently pleaded.

12.    The Direct Action School Plaintiffs' claims under the consumer protection statutes of the states of Arizona (Count 41), South Carolina (Count 19), New York (Count 22), Tennessee (Count 29), Utah (Count 12), Vermont (Count 25), Virginia(Count 38), Washington (Count 45), and Wisconsin (Count 14), are dismissed.

13.    The Direct Action School Plaintiffs' claims under the consumer protection statutes of the states of Idaho, New Hampshire and Pennsylvania, are dismissed.

14.    The Direct Action School Plaintiffs' claims alleging violations of the data breach notifications laws of New Hampshire, Virginia, and Washington (Counts 32, 39 & 46) are dismissed.

15.    The Direct Action School Plaintiffs' claim for express indemnity (Count 6) is sufficiently pleaded.

16.    The Class Action Plaintiffs' Claim for Declaratory and Injunctive Relief (CAC Count 8) is sufficiently pleaded.

17.    Direct Action School Plaintiffs' Count 4 (Computer Fraud and Abuse Act) and Count 23 (New York Education Law) are dismissed, as previously stipulated.

**IS SO ORDERED.**

**DATED:    March 18, 2026**

**Hon. Roger T. Benitez**

**United States District Judge**

-27-