James E. Cecchi (NJ 030861989)
*Admitted Pro Hac Vice*
**CARELLA, BYRNE, CECCHI,**
**BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Email: jcecchi@carellabyrne.com

*Lead Counsel for the proposed School*
*District Class and Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: POWERSCHOOL HOLDINGS, INC. AND POWERSCHOOL GROUP, LLC CUSTOMER SECURITY BREACH LITIGATION, <br><br> *This Document Relates to the School District Class Action Track* | Case No. 25-md-3149-AJB-MSB <br><br> MDL 3149 <br><br> CONSOLIDATED MDL DOCKET <br><br> Designated Forum: California |

## SCHOOL DISTRICT SECOND AMENDED CLASS ACTION COMPLAINT

## <u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

**Section**                                                                      **Page**

INTRODUCTION ........................................................................................... 1

JURISDICTION AND VENUE ...................................................................... 4

PARTIES ........................................................................................................ 6

FACTUAL BACKGROUND ......................................................................... 9

    A.   POWERSCHOOL COLLECTED AND ENABLED ACCESS TO THE SCHOOL DISTRICTS' PROTECTED DATA ........................... 9

    B.   POWERSCHOOL FAILED TO PROTECT THE SCHOOL DISTRICTS' PROTECTED DATA .................................................... 15

        1.   PowerSchool Had a Duty to Follow Regulatory Guidance and Industry-Standard Cybersecurity Practices .................................. 18

            i.   PowerSchool is a business associate and must comply with HIPAA security standards ................................................. 18

            ii.   PowerSchool must comply with FTC guidance regarding safeguarding the School Districts' Data ................. 22

            iii.   PowerSchool was contractually obligated to meet or exceed industry standards regarding its network security ...................................................................... 24

        2.   PowerSchool Failed to Encrypt Data in Motion or Use for the School Districts ......................................................... 32

        3.   PowerSchool Failed to Implement Basic Security Controls to Protect the School Districts' Data and Detect the Breach .............. 33

        4.   The Data Breach Followed Significant Layoffs of PowerSchool's Workforce and Outsourcing of Its Backend Operations ........................................................................ 36

    C.   POWERSCHOOL PAID A FUTILE RANSOM IN AN ATTEMPT TO CONTAIN THE EXFILTRATED DATA, WHICH IS STILL CIRCULATING AND BEING USED BY HACKERS ...................... 40

    D.   PLAINTTIFFS AND CLASS MEMBERS HAVE BEEN HARMED ................................................................................. 43



CLASS ALLEGATIONS ....................................................................................46

CAUSES OF ACTION ......................................................................................52

    COUNT 1:  BREACH OF EXPRESS CONTRACT ....................................52

    COUNT 2:  INTENTIONAL TORTIOUS INTERFERENCE
               WITH CONTRACT ...................................................55

    COUNT 3:  NEGLIGENCE .........................................................................57

    COUNT 4:  VIOLATION OF THE COMPUTER FRAUD AND
               ABUSE ACT .............................................................61

    COUNT 5:  VIOLATION OF CALIFORNIA'S COMPREHENSIVE
               DATA ACCESS AND FRAUD ACT ......................68

    COUNT 6:  VIOLATION OF CALIFORNIA'S UNFAIR
               COMPETITION LAW ..............................................72

    COUNT 7:  UNJUST ENRICHMENT ........................................................75

    COUNT 8:  DECLARATORY AND INJUNCTIVE RELIEF ....................76

    COUNT 9:  NEGLIGENCE (AGAINST MOVATE) ................................78

    COUNT 10: NEGLIGENET HIRING, TRAINING, SUPERVISION
               AND RETENTION (AGAINST MOVATE)........................85

PRAYER FOR RELIEF ....................................................................................87



Plaintiffs The Academy Charter School, The Academy Charter School 2, Our World Neighborhood Charter Schools, and Irvington Public Schools ("Plaintiffs"), individually and on behalf of the Nationwide Class and Statewide Subclasses, as defined below ("Classes," and members of the Classes, including Plaintiffs, are referred to as "Class Members" or "School Districts"), allege the following against Defendants Bain Capital, L.P. ("Bain Capital"), PowerSchool Corporation,[1] and PowerSchool Group LLC (together "PowerSchool"), and Movate, Inc. ("Movate" and with Bain Capital and PowerSchool "Defendants"), based upon personal knowledge, the investigation of counsel, and on information and belief as to all other matters:

## **INTRODUCTION**

1.    This class action arises out of PowerSchool's material uniform breach of its contracts with thousands of School Districts across the United States. Specifically, when the School Districts contracted to utilize PowerSchool's Student Information System ("SIS") – a database which houses highly sensitive data relating to students, school teachers, and administrative matters – PowerSchool committed to securing that data with industry standard cybersecurity protocols, including multi-factor authentication and password rotation for its contractors, endpoint protection for suspicious network activity, and encryption of identifiable data-in-motion. Unfortunately, PowerSchool failed to honor these critical and essential elements of its contracts. As a result, on December 19, 2024, hackers gained access to the SIS and exfiltrated unencrypted data belonging to the School Districts ("Data Breach" or "Breach"). The data concerned highly sensitive personally identifiable information ("PII") and protected health information ("PHI"), including confidential records containing full names, addresses, Social Security Numbers, medical information, disability status, criminal records, and other unspecified PII and PHI (collectively, "Data" or "Protected Data").

---

[1] Formerly known as PowerSchool Holdings, Inc. *See* Dkt. No. 423.



2. Instead of immediately notifying the School Districts of the Data Breach, PowerSchool attempted to conceal it by negotiating with the hackers. A subsequent indictment by the Department of Justice revealed the identity of one of the hackers to be Matthew Lane, a nineteen-year-old college student, who worked with his accomplices (collectively, "Threat Actors"), to demand a ransom from PowerSchool in exchange for the return and/or destruction of the stolen Data. PowerSchool eventually paid the ransom and was promised by the Threat Actors that the School Districts' Data would be deleted.

3. Unsurprisingly, the Threat Actors behind the theft did not destroy the Data, and there is every indication that it remains in the hands of bad actors, including the notorious cybercriminal collective, ShinyHunters. Specifically, even though law enforcement arrested and prosecuted Matthew Lane, at least one of his alleged accomplices remains unidentified and able to perpetrate additional ransom attacks on the School Districts. And, several of the School Districts have subsequently been extorted by ShinyHunters, whose affiliation to the Threat Actors is unknown, despite PowerSchool paying the ransom.

4. The Data Breach resulted from an obvious vulnerability in PowerSchool's cybersecurity. In particular, it is believed that the Threat Actors obtained a single login credential that had been assigned to a contractor who worked for PowerSchool. The compromised credential was utilized from a server based in Ukraine. This should not have been possible because, had PowerSchool acted reasonably, it could have implemented a security feature called endpoint protection, which would have detected and blocked suspicious activity. But it did not, and as a result, this compromised credential enabled the Threat Actors to download all the Data without triggering a red flag in PowerSchool's cybersecurity system.

5. To make matters worse, PowerSchool should never have had access to this information in the first place. The stolen Data was both unencrypted and identifiable in violation of PowerSchool's representations and contractual obligations, making it immensely more valuable, and its exfiltration was only possible because PowerSchool



provided its personnel with access to the School Districts' restricted digital environments in the SIS. When PowerSchool's personnel log into the SIS with support credentials, the School Districts' Data is processed and decrypted, thus making it accessible, viewable, and downloadable. Despite contractual obligations to limit PowerSchool's access to only encrypted, anonymized, or de-identified data – and to obtain consent from the School Districts before accessing unencrypted or identifiable information – PowerSchool failed to uphold these obligations. As a result, the School Districts' highly sensitive information was left vulnerable and exposed, directly resulting in the exfiltration of the Data and subsequent ransom attacks.

6.      The need for these basic security features was well known to PowerSchool. PowerSchool's Chief Executive Officer, Hardeep Gulati, has publicly acknowledged that school records are extremely valuable to cybercriminals. Yet, despite this awareness and its contractual obligations, PowerSchool failed to implement appropriate cybersecurity protocols to protect the Data.

7.      PowerSchool's failure to detect or contain the Breach followed a series of cost-cutting measures, including reductions to its internal security team and the outsourcing of backend operations at the direction of Bain Capital, who initiated its acquisition of PowerSchool on June 26, 2024. Full administrative backdoor access was granted to personnel without adequate oversight or enforcement of necessary security protocols. These financially-driven decisions compromised PowerSchool's cybersecurity and were undertaken to enhance PowerSchool's cash flow with little concern for the direct impact these decisions had on the School Districts.

8.      Through this action, Plaintiffs seek to recover economic damages as well as injunctive relief compelling PowerSchool to upgrade, enhance, and improve its cybersecurity and to maintain such improvements. The economic relief sought includes all damages naturally flowing from PowerSchool's breach of contract and Defendants' negligence, including, *inter alia*, overpayment and benefit of the bargain damages, and



compensation for time and resources the School Districts were required to divert responding to the Data Breach.

## JURISDICTION AND VENUE[2]

9. This Court has subject matter jurisdiction under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq.*, thus implicating federal question jurisdiction pursuant to 28 U.S.C. § 1331.

10. This Court also has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists, as Defendants are citizens of states different from that of at least one Class Member. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

---

[2] Plaintiff Irvington Public Schools initially filed its action in the District of New Jersey, which the Judicial Panel on Multidistrict Litigation transferred to this District on May 9, 2025. *See* Case No. 2:25-cv-3317 (D.N.J.), at Dkt. 1. On September 15, 2025, Plaintiffs Our World Neighborhood Charter School, The Academy Charter School and The Academy Charter School 2 filed Direct Filing Notices in this District, designating federal courts in their home states as the federal district courts in which these Plaintiffs would have filed their claims against all defendants in the first instance. *See* Case Nos. 3:25-cv-02418, at Dkt. 1 (Our World Neighborhood Charter School designating the Eastern District of New York as the federal district court in which Plaintiff would have filed in the absence of direct filing); 3:25-cv-02419, at Dkt. 1 (same for The Academy Charter School); and 3:25-cv-02424, at Dkt. 1 (same for The Academy Charter School 2). On March 18, 2026, this Court entered an order granting in part and denying in part the Class Action Plaintiffs' claims against Bain Capital, finding that this Court lacked personal jurisdiction over Plaintiffs' claims against Bain Capital because "[t]heir complaint alleges that personal jurisdiction is proper in California, but it contains no allegations showing that Bain is subject to personal jurisdiction in New Jersey or New York." ECF No. 435 at 8. Accordingly, contemporaneously with this filing, the Plaintiffs are filing Direct Filing Notices in this District designating the Eastern District of California as the federal district court in which Plaintiffs would have filed their claims against Bain Capital in the absence of direct filing.



11. This Court has personal jurisdiction over PowerSchool because it regularly conducts business in California and its headquarters is located in California.

12. This Court also has personal jurisdiction over Bain Capital. As discussed below, Bain Capital purposefully directed its activities toward California and availed itself of the benefits and protections of California law, based on its merger-related contacts with California and operational control over a California company. Specifically, Bain Capital approached PowerSchool—a California-headquartered company—about a business merger in August 2022. Further, Plaintiffs' claims arise out of Bain Capital's activities related to California.

13. This Court's exercise of jurisdiction over Bain Capital is reasonable and comports with fair play and substantial justice. First, Bain Capital's interjection into California is extensive: it negotiated a multi-billion-dollar acquisition of a California-headquartered company over two years, obtained contractual control rights during the interim period, and directed that company's operations after closing. Second, Bain Capital will not be burdened by defending itself in this forum because it is a sophisticated investment firm managing $185 billion in assets with counsel admitted in this district. Third, litigating in California will not conflict with the sovereignty of Massachusetts or Delaware, Bain Capital's state of incorporation. Fourth, California's interest in this litigation is substantial: PowerSchool is headquartered here, California residents' data was compromised, and California Plaintiffs seek relief under California law. Fifth, the JPML's consolidation of this MDL in this Court confirms that centralizing the litigation in California promotes efficient judicial resolution. Sixth, California is important to Plaintiffs' interests because PowerSchool is headquartered here and relevant documents and witnesses are likely located here. Finally, while Massachusetts or Delaware might serve as alternative forums, the existence of an alternative forum does not render California unreasonable when all other factors support jurisdiction.

14. As also admitted by PowerSchool and Bain Capital, many of the relevant witnesses and evidence related to the Data Breach incident are located in California. *See*



*In Re: PowerSchool Holdings, Inc., and PowerSchool Group, LLC Customer Data Sec. Breach Litig.*, MDL No. 3149, Docket No. 97 at 8, 10 (J.P.M.L. Feb. 20, 2025). Accordingly, the tortious conduct by Defendants giving rise to Plaintiffs' and Class Members' injuries and claims was conducted in and emanated from California.

15. Moreover, this Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. §1407, Rule 7.1 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("JPML"), and the Transfer Order of the JPML in MDL 3149, ECF No. 152 ("Transfer Order"), transferring any actions related to this matter to this Court, as well as any future transfer orders the JPML may enter.

16. This Court has personal jurisdiction over Defendant Movate because this action arises from Movate's continuous and systematic contacts with California. Movate exercised control over the data Plaintiffs entrusted to PowerSchool, a California company. Movate intentionally directed contacts to California through technical support for PowerSchool customers and through its decision to conduct continuous business with PowerSchool.

17. Venue is proper in this District under 28 U.S.C. §1407 and Rule 7.1 of the Rules of Procedure of the JPML. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because PowerSchool's principal place of business is in California.

## PARTIES

18. Defendant PowerSchool Group LLC is a Delaware company based in Folsom, California. Defendant PowerSchool Group LLC is the operating company for PowerSchool. PowerSchool provides a suite of solutions, which includes a software suite for records used by state departments of education, school districts, charter schools, and public and private schools. As of June 30, 2024, PowerSchool served more than 18,000 customers, including over 90 of the 100 largest school districts by student enrollment in the United States. PowerSchool also has over 30 state-, province-, and territory-wide contracts in North America, and sold solutions in over 90 countries globally. PowerSchool's principal executive offices are located at 150 Parkshore Drive, Folsom,

California 95630. Defendant PowerSchool Group LLC is, and was at all relevant times, a wholly owned subsidiary of Defendant PowerSchool Corporation, formerly known as PowerSchool Holdings, Inc.

19. Defendant PowerSchool Corporation is a Delaware corporation headquartered at 150 Parkshore Drive, Folsom, California 95630. On October 1, 2024, PowerSchool Holdings, Inc. merged with and into BCPE Polymath Merger Sub, Inc., and became a wholly owned subsidiary of Defendant Bain Capital, L.P. Until October 1, 2024, PowerSchool was a publicly-traded company legally distinct from Defendant Bain Capital, L.P., including when the first known incident of unauthorized access occurred on August 16, 2024, and on September 17, 2024, the earliest known date of unauthorized access attributable to the Threat Actors.

20. Defendant Bain Capital, L.P. is a Delaware limited partnership, which maintains its headquarters at 200 Clarendon St., Boston, Massachusetts. Bain Capital is one of the world's leading private multi-asset alternative investment firms. Since 1984, it has expanded into numerous asset classes, including private equity, credit, public equity, venture capital, real estate, life sciences, insurance, and other strategic areas of focus. It has offices on four continents, more than 1,800 employees, and approximately $185 billion in assets under management. Bain Capital, through its agents/alter egos, consummated the acquisition of PowerSchool in October 2024. Bain Capital dictates PowerSchool's strategic directives and uses PowerSchool's operations to further its private investment purposes.

21. In addition, Defendant Bain Capital, L.P. is the appropriate party named in this action because it serves as the corporate parent and ultimate controlling entity for all Bain Capital operations, exercised pervasive domination over its affiliated entities, and used them as mere instrumentalities to consummate its acquisition of PowerSchool. Defendant Bain Capital, L.P. dominated and controlled the following affiliates: Bain Capital Private Equity, L.P., Bain Capital Investors, LLC, Bain Capital Fund XIII General Partner, LLC, Bain Capital Fund XIII, L.P., Bain Capital Fund (Lux) XIII, SCSp, BCPE Polymath Topco GP, LLC, BCPE Polymath Topco, L.P., BCPE Polymath Intermediate,

LLC, BCPE Polymath Buyer, Inc., and BCPE Polymath Merger Sub, Inc. These entities were undercapitalized, had no meaningful independent operations, shared offices and personnel, and existed solely to carry out Defendant Bain Capital, L.P.'s private equity deals. For example, the boards of BCPE Polymath Buyer, Inc. and BCPE Polymath Merger Sub, Inc. consisted entirely of Bain Capital executives, including Dave Humphrey, Max de Groen, Valentin Fernandez, Krista Snow, and Bryan Curran, all of whom served in senior roles within Bain Capital's private equity business. At all relevant times there was a unity of interest and ownership between Defendant Bain Capital, L.P. and these entities such that separate personalities did not exist, and treating them as distinct would allow Defendant Bain Capital, L.P. to evade liability for its conduct.

22.     Defendant Movate is a Delaware corporation headquartered at 600 Tennyson Parkway, Suite 255, Plano, Texas 75024. Movate is a technology services company that PowerSchool engaged as a subcontractor to provide technical support and network operations services for PowerSchool's Student Information System ("SIS"). Throughout the time period alleged herein, Movate had a continuous business relationship with Defendant PowerSchool. Upon information and belief, Movate failed to ensure that it and its employees had adequate protections in place to prevent unauthorized access to PowerSchool's systems, including SIS.

23.     Plaintiff The Academy Charter School ("Plaintiff," for purposes of this paragraph) operates two tuition-free public charter school districts located in Hempstead, New York and Uniondale, New York, serving approximately 3,600 students. It includes six schools (elementary, middle, and high school), with education spanning from pre-kindergarten through twelfth grade. Plaintiff contracted with PowerSchool to utilize the SIS. As a result of failing to implement adequate cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Data Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.



24.     Plaintiff The Academy Charter School 2 ("Plaintiff," for purposes of this paragraph) is a tuition-free public charter school located in Wyandanch, New York, serving approximately 475 students. It includes one elementary school and one middle school, with education spanning from kindergarten through seventh grade. Plaintiff contracted with PowerSchool to utilize the SIS. As a result of failing to implement adequate cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Data Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

25.     Plaintiff Our World Neighborhood Charter Schools ("Plaintiff," for purposes of this paragraph) operates three tuition-free public charter schools located in Queens, New York, serving approximately 1,500 students, with education spanning from kindergarten through eighth grade. Plaintiff contracted with PowerSchool to utilize the SIS. As a result of failing to implement adequate cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

26.     Plaintiff Irvington Public Schools ("Plaintiff," for purposes of this paragraph) is a school district serving 7,675 students located in Irvington, New Jersey. It includes thirteen schools, with education spanning from pre-kindergarten through twelfth grade. Plaintiff contracted with PowerSchool to utilize the SIS. As a result of failing to implement adequate cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

## **FACTUAL BACKGROUND**

### A.     **POWERSCHOOL COLLECTED AND ENABLED ACCESS TO THE SCHOOL DISTRICTS' PROTECTED DATA**

27.     PowerSchool is an education technology ("EdTech") company that provides data collection, storage, and analytics tools for K-12 school districts in the United States

and abroad. On October 1, 2024, PowerSchool was acquired by Bain Capital in a transaction that valued the company at $5.6 billion. Among other products and services, PowerSchool sells a widely used service called PowerSchool's SIS, with an optional cloud-based storage solution hosted by PowerSchool's technology partner, Microsoft Corporation ("Microsoft Azure"), that enables school districts to manage student records and provide access to grades, assignments, attendance, and schedules for educators, students, and parents.

28.     PowerSchool's SIS is marketed as a solution that will "save time, reduce costs, improve student outcomes, and increase security."[3] To enable this service, PowerSchool collects vast amounts of sensitive information from the School Districts, including records containing information about schoolchildren, parents, and teachers. Approximately 75% of the K-12 market in North America use the PowerSchool platform, including 90 of the 100 largest school districts in the United States.

PowerSchool recognizes that: "customers own their student and school data" and promised that it "has no rights to access or sell student or school data. [PowerSchool] does not collect, maintain, use, or share student personal information beyond that needed for authorized educational or school purposes or as authorized by the parent or student."[4] PowerSchool also states that since "threats to student data privacy continue to rise…it's critical to ensure you're partnering with EdTech platform vendors that prioritize student data security" and prominently featured Single Sign-On ("SSO") and Multi-factor Authentication ("MFA") support as one of the "4 Key Features" of its "Student Data Privacy Platform":

---

[3] *Solutions*, POWERSCHOOL GROUP LLC, https://www.powerschool.com/solutions/ (last visited June 26, 2025).

[4] *Student Data Privacy: Everything You Need to Know* (June 20, 2023), POWERSCHOOL GROUP LLC , https://www.powerschool.com/blog/student-data-privacy-everything-you-need-to-know/ (last visited June 26, 2025).





29.     PowerSchool frequently instructed School Districts to implement MFA. PowerSchool represented that it took certain "accessing and credentialing" measures to ensure the data provided by the School Districts was protected, such as:

a.      MFA, biometric authentication, role-based access controls, and VPN-secured product portals to ensure only authorized personnel can access customer data.

b.      Shared credentials were strictly limited, tightly controlled, and only allowed when technically necessary.

c.      Access to customer data as being reviewed monthly, requiring leadership approval, and automatically removed if no valid business need was identified.

d.      Access to PowerSchool's SIS required PowerSchool-managed devices, with login sessions and maintenance windows purportedly restricted.[5]

---

[5] *PowerSchool Security & Trust Center*, POWERSCHOOL GROUP LLC, https://www.powerschool.com/security/ (last visited June 27, 2025).

30.    PowerSchool also created marketing materials that emphasized the value of implementing basic cyber-security measures. For example, in a video uploaded to YouTube on October 5, 2023, titled "What is Multi-Factor Authentication," PowerSchool stated that MFA is "an essential tool in safeguarding your school's information" and "drastically reduces the risk of unauthorized access[,]" explaining that "with MFA in place, sensitive student and staff data remains secure[,]…[e]ven if a password is compromised."[6] For this reason, PowerSchool stated that MFA is "a must-have feature," and that "it's crucial to prioritize [offerings] that include multi-factor authentication[,]" noting that "[i]t's a clear sign that [EdTech companies] take data protection seriously."[7]

31.    On September 10, 2024, PowerSchool published an article on its website, titled the "Top 6 Best Practices for Improving Student Information System (SIS) Cybersecurity" and that included the following infographic:[8]

![Top 6 Best Practices for Improving Student Information System (SIS) Cybersecurity. 1 Implement a Strong Password Policy. 2 Reduce the Number of Admins to Eliminate Entry Points. 3 Review and Set Permissions. 4 Eliminate Risk of Previous Employees. 5 Enable Single Sign-On (SSO) and Multi-Factor Authentication (MFA). 6 Utilize PowerSchool Contacts. PowerSchool]

---

[6] PowerSchool Group LLC (@mypowerschool), *What Is Multi-Factor Authentication – Cybersecurity Best Practices for K-12 Education* (Nov. 5, 2023), YOUTUBE, https://www.youtube.com/watch?v=_rQ4qCY1rpc (last visited June 26, 2025).

[7] *Id.*

[8] *Top 6 Best Practices for Improving Student Information System (SIS) Cybersecurity* (Sept. 10, 2024), POWERSCHOOL GROUP LLC, https://www.powerschool.com/blog/best-practices-improving-sis-cybersecurity/ (last visited June 26, 2025).



32.    This article stated that "your SIS requires periodic maintenance to keep it secure" and outlined several measures that should be implemented to protect School Districts against a data breach, including the following:

**Review and Set Permissions**

Setting appropriate permissions is vital for safeguarding sensitive information. Not everyone in the school needs access to every piece of data. For instance, while teachers need access to student grades, they shouldn't necessarily have access to payroll information or other sensitive administrative data.

Review the permissions set for all user roles in your system. Make sure students, teachers, and administrative staff have access only to the data and tools they need to perform their tasks. Overly broad permissions increase the risk of data breaches, either through malicious intent or accidental misuse. By tightening up these permissions, you help protect your school's information from falling into the wrong hands.

…

**Enable Single Sign-On (SSO) and Multi-Factor Authentication (MFA)**

Implementing Single Sign-On (SSO) and Multi-Factor Authentication (MFA) is a best practice that significantly boosts your school's cybersecurity. SSO allows users to log in once and gain access to all their necessary applications, reducing the number of passwords they need to remember. This not only makes life easier for users but also reduces the chances of password fatigue, where users might reuse passwords across different platforms.

MFA can be enabled as part of the SSO configuration (SAML or OIDC for those that are technically inclined). It adds an extra layer of security by requiring a second form of verification, such as a text message code or an authentication app, in addition to the password. This ensures that even if a password is compromised, unauthorized access is still prevented. Implementing these technologies helps protect sensitive information and provides peace of mind that your school's digital assets are secure.[9]

33.    PowerSchool also publicly represented it was implementing these security measures. For example, an article written by PowerSchool Chief Executive Officer, Mr. Gulati, stated that PowerSchool was one of the first software companies to commit to the Voluntary Pledge by the United States Cybersecurity and Infrastructure Security Agency

---

[9] *Id.*



("CISA") to design products with greater security built-in, stating, "[c]ompanies signing the pledge publicly agree to take ownership of customer security outcomes, embrace radical transparency and accountability, and lead from the top by making secure technology a key priority for leadership."[10]

34. The very first rule for the CISA Voluntary Pledge – that Mr. Gulati claimed PowerSchool committed to – is to: "[w]ithin one year of signing the pledge, demonstrate actions taken to measurably increase the use of multi-factor authentication across the manufacturer's products [as] Multi-factor authentication is the greatest defense against password-based attacks such as credential stuffing and password theft."[11] Mr. Gulati wrote the article nearly two years before the Breach, yet failed to implement MFA for PowerSchool's support personnel.

35. PowerSchool also made multiple representations about the privacy and security standards that it implements across its product lines. For example, PowerSchool represents that it uses "industry standards" to "improve data integrity and security."[12] It claims that all products are "[c]ertified to meet the 1EdTech open standard data & privacy rubric," and have received "ISO 27001" certification through "A-LIGN."[13]

36. As another example, its "Cybersecurity, Data Privacy, and Infrastructure" webpage states that "PowerSchool is committed to being a good custodian of student data,

---

[10] *PowerSchool Presents Cybersecurity Commitments at White House K–12 Cybersecurity & Data Privacy Event* (Sep. 21, 2023), POWERSCHOOL GROUP LLC, https://www.powerschool.com/blog/powerschool-presents-cybersecurity-commitments-at-white-house-k-12-cybersecurity-data-privacy-event/ (last visited June 26, 2025).
[11] *Secure by Design Pledge* (May 8, 2024), CYBERSECURITY & INFRASTRUCTURE SECURITY AGENCY, https://www.cisa.gov/securebydesign/pledge (last visited June 26, 2025).
[12] *Interoperability Overview* (Feb. 14, 2023), POWERSCHOOL GROUP LLC, https://www.powerschool.com/interoperability-overview/ (last visited June 26, 2025).
[13] *Id.*



Page **14** of **89**
MDL 3149, Case No. 25md3149
Track 2: School District Class Action

taking all reasonable and appropriate countermeasures to ensure data confidentiality, integrity, and availability."[14]

37. The School Districts entrusted PowerSchool with highly sensitive, personal information that reveals extraordinarily granular details, including the innermost thoughts and insecurities of the School Districts' students – the disclosure of which invades and infringes upon their basic privacy rights and norms, as well as the School Districts' ability to protect their students and faculty. In entering into the relevant contracts at issue, it was of utmost importance that PowerSchool do everything it was contractually obligated to do in order to protect this data.

38. Despite highlighting the security measures above as examples of "how PowerSchool provides superior student data privacy and security," PowerSchool failed to implement MFA and its backend administrators had unfettered access to student and school data. While the School Districts' Data is and was encrypted while at rest, upon logging into the SIS, the Data became fully decrypted and accessible to PowerSchool's personnel, allowing contractors to compromise the Data's integrity and providing those contractors with the capability to collect, obtain, and exfiltrate identifiable and unencrypted school and student records without oversight.

### B. POWERSCHOOL FAILED TO PROTECT THE SCHOOL DISTRICTS' PROTECTED DATA

39. On January 7, 2025, PowerSchool publicly announced the Data Breach and disclosed that detailed records for tens of millions of schoolchildren, teachers, and administrators had been exposed.

40. According to PowerSchool, on December 28, 2024, "PowerSchool became aware of a cybersecurity incident involving unauthorized exfiltration of certain personal

---

[14] *PowerSchool's Privacy Principles*, POWERSCHOOL GROUP LLC, https://www.powerschool.com/privacy/ (last visited June 27, 2025).



information from PowerSchool Student Information System (SIS) environments through one of our community-focused customer support portals, PowerSource."[15]

41.    While PowerSchool admitted that "the types of information exfiltrated in the incident included . . . the individual's name, contact information, date of birth, limited medical alert information, Social Security Number, and other related information."[16]

42.    On or about January 28, 2025, PowerSchool started notifying impacted parties of the Data Breach.

43.    Immediately following the Data Breach announcement, multiple affected School Districts reported that all of their historical data stored in PowerSchool, such as information about custodial rights to their children, had been accessed.

44.    For example, the Toronto District School Board confirmed that nearly forty years of student data was disclosed – for almost 1.5 million students – and included data on students' genders, grades, medical information, and disability accommodation details. Idaho's West Ada School District stated the stolen personal information from current and former students included "life-safety health and grade information." Alexandria City Public Schools in Virginia confirmed the Data Breach compromised students' personal information, medical data, and free meal statuses. Rochester City School District confirmed the stolen information included students' legal alerts, medical diagnoses, and medical conditions. In an email sent to parents in a School District in Wakefield, Massachusetts, the School District disclosed that custody alerts – including information such as custody agreements, restraining orders, and other legal information – was exposed for current and prior students, and it also reported that Data concerning students with special education plans, consisting of 708 current and former students, and medical alerts for 1,384 current and former students were exposed. Similarly, Adam Larsen, an assistant

---

[15] *Notice of Data Breach for Individuals in the United States*, POWERSCHOOL GROUP LLC, https://www.powerschool.com/security/sis-incident/notice-of-united-states-data-breach/ (last visited June 26, 2025).
[16] *Id.*



superintendent at an Illinois School District, who also works as a data consultant for schools, said several of his clients had sensitive student mental health and special education data exposed.

45. In or about January 2025, PowerSchool contracted with its historical and current cybersecurity vendor, CrowdStrike Holdings, Inc. ("CrowdStrike"), to investigate the Data Breach. CrowdStrike's report of the incident was released on February 28, 2025 ("CrowdStrike Report").[17] According to the CrowdStrike Report, hackers compromised PowerSchool's PowerSource customer support portal. PowerSource contained a maintenance access tool ("Backdoor Access Tool") that allows PowerSchool's customer support team, including Movate employees, full, direct access to unencrypted customer databases. Between December 19-28, 2024, the Threat Actors specifically performed "Maintenance Remote Support" operations in PowerSource, which, unbeknownst to the School Districts, was installed by default as part of the PowerSchool installation and left on in perpetuity. Once inside the SIS, the Threat Actors extracted and exported the Data from the students' and teachers' database tables in the SIS. It is unknown whether the Backdoor Access Tool was limited to PowerSchool's optional cloud-based storage vendor, Microsoft Azure, or whether the access extended locally to SIS software hosted on servers operated by the School Districts.

46. CrowdStrike found that the earliest unauthorized activity attributable to the Data Breach occurred on December 19, 2024, but its report also provided evidence of unauthorized activity as early as August 16, 2024. This unauthorized activity occurred just three days after PowerSchool laid off approximately 5% of its workforce, including domestic information technology staff, following the Bain Capital acquisition, as described below. Also, the first incident of unauthorized activity by the Threat Actors may have also occurred earlier, on September 17, 2024.

---

[17] CrowdStrike Holdings, Inc., *Investigation Report* (Feb. 28, 2025), POWERSCHOOL GROUP LLC, https://www.powerschool.com/wp-content/uploads/2025/03/PowerSchool-CrowdStrike-Final-Report.pdf (last visited June 26, 2025).



47. According to an indictment from the U.S. Department of Justice, PowerSchool received an extortion demand of approximately $2.85 million payable in Bitcoin on December 28, 2024. This is the first time PowerSchool learned of the Data Breach when the Threat Actors told PowerSchool that the Data was stolen. In that extortion demand, the Threat Actors claimed to have stolen the personal data of 62.4 million students and 9.5 million teachers.

48. PowerSchool paid the ransom in exchange for a video allegedly showing the Threat Actors deleting the only copy of the Data. However, as recently as May 7, 2025, extortion emails received by schools in Canada and North Carolina included samples of the stolen Data, demonstrating that other copies of the Data were made.

**1. PowerSchool Had a Duty to Follow Regulatory Guidance and Industry-Standard Cybersecurity Practices**

49. The Breach and exfiltration were a direct result of PowerSchool's failure to comply with state and federal laws and regulations, as well as basic industry standards governing the protection of Data.

**i. PowerSchool is a business associate and must comply with HIPAA security standards**

50. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH") and their respective implementing regulations, imposes specific requirements relating to the privacy, security and the transmission of PHI. Among other things, HITECH makes HIPAA's security standards directly applicable to "business associates." As disclosed in its SEC filings, PowerSchool functions "as a business associate for certain of



our customers that are HIPAA covered entities and service providers, and in that context we are regulated as a business associate for the purposes of HIPAA."[18]

51. As a business associate, PowerSchool is required by HIPAA to maintain HIPAA-compliant business associate agreements with its customers that are HIPAA covered entities and service providers, as well as its subcontractors that access, maintain, create or transmit individually identifiable health information on its behalf for the rendering of services to its HIPAA covered entity and service provider customers.[19]

52. Student and teacher medical records, disability status, and other PHI disclosed in the Data Breach violates HIPAA and PowerSchool's business associate agreements.

53. As a business associate, PowerSchool is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

---

[18]    PowerSchool Holdings, Inc., *Annual Report on Form 10-K for the fiscal year ended December 31, 2022*, at 41 (filed Feb. 24, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001835681/000183568123000012/pwsc-20221231.htm (last visited June 26, 2025) ("If we are unable to comply with our obligations as a HIPAA business associate, we could face substantial civil and even criminal liability. HITECH imposes four tiers of civil monetary penalties and gives state attorneys general authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys 'fees and costs associated with pursuing federal civil actions. In addition, many state laws govern the privacy and security of health information in certain circumstances, many of which differ from HIPAA and each other in significant ways and may not have the same effect.").

[19] *Id.* ("These agreements impose stringent data security and other obligations on us. If we or our subcontractors are unable to meet the requirements of any of these business associate agreements, we could face contractual liability under the applicable business associate agreement as well as possible civil and criminal liability under HIPAA, all of which can have an adverse impact on our business and generate negative publicity, which, in turn, can have an adverse impact on our ability to attract and retain customers.").



54.    These rules establish national standards for the protection of patient information, including PHI.  *See* 45 C.F.R. § 160.103.

55.    HIPAA limits the permissible uses of PHI and prohibits unauthorized disclosures of PHI and requires the implementation of appropriate safeguards for this information.

56.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." *See* US Department of Health & Human Services, Security Rule Guidance Material.[20] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology ("NIST"), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." *See* US Department of Health & Human Services, Guidance on Risk Analysis.[21]

57.    PowerSchool failed to comply with its duties under HIPAA and its own privacy practices. These failures include, but are not limited to:

    a.    Maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

    b.    Adequately protect Plaintiffs' and the Class Members' PHI;

    c.    Ensure the confidentiality and integrity of electronic PHI created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

---

[20] U.S. Dep't of Health & Human Servs., *Security Rule Guidance Material*, HIPAA for Professionals,  https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited June 26, 2025).
[21] *Id*.

d.    Implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e.    Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f.    Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g.    Protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under privacy rules regarding PHI, in violation of 45 C.F.R. § 164.306(a)(3);

h.    Take safeguards to ensure that PowerSchool's business associates adequately protect PHI;

i.    Properly send notice to Plaintiffs and Class Members pursuant to 45 C.F.R. §§ 164.400-414;

j.    Ensure compliance with the electronic PHI security standard rules by its workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

k.    Train all members of its workforce effectively on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out and maintain security of PHI, in violation of 45 C.F.R. § 164.530(b).

58.    PowerSchool failed to comply with its duties under HIPAA despite being aware of the risks associated with the unauthorized access of Plaintiffs' and Class Members' Protected Health Information.



### ii. PowerSchool must comply with FTC guidance regarding safeguarding the School Districts' Data

59.     PowerSchool also failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and complying with industry-standard cybersecurity practices. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies, like PowerSchool. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. To that end, the FTC recommends the following practices:

a.     Limit access to customer information to only those employees who have a business reason to see it;

b.     Keep customer information encrypted to provide better protection in case of theft;

c.     Maintain up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

d.     Use appropriate oversight and/or audit procedures to detect the improper disclosure or theft of customer information;

e.     Monitor both in- and out-bound transfers of information for indications of compromise, such as large volumes of data being transmitted unexpectedly; and

f.     Monitor activity logs for signs of unauthorized access to customer information.[22]

---

[22] Fed. Trade Comm'n, *Financial Institutions and Customer Information: Complying with the Safeguards Rule* (Apr. 2006), https://www.lb7.uscourts.gov/documents/20-0046.pdf (last visited June 26, 2025).



60.    The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[23]

61.    In 2016, the FTC issued a publication, Protecting PII: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses.[24] The guidelines note that businesses should protect the personal customer information they keep; properly delete PII that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system or accessing from an unknown location; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

62.    The FTC recommends, among other things, that businesses restrict employee access to sensitive customer information; require that strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third-parties with access to sensitive information use reasonable security measures.

63.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting

---

[23] Fed. Trade Comm'n, *Start With Security* (June 2025), http://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited June 26, 2025).

[24] Fed. Trade Comm'n, *Protecting PII: A Guide for Business*, http://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited June 26, 2025).



from these actions further clarify the measures that businesses must take to meet their data security obligations.

### iii. PowerSchool was contractually obligated to meet or exceed industry standards regarding its network security

64. PowerSchool failed to comply with industry standards relating to data security, including those expressly identified in PowerSchool's contracts.

65. PowerSchool made promises to Plaintiffs and Class Members in its Main Services Agreements ("MSAs"), which incorporate the Data Privacy Agreements ("DPAs" together with the MSAs, the "Contracts").

66. PowerSchool's Contracts represent that it will comply with industry data standards including NIST and/or ISO 27001:2103, and that it was Service Organization Control 2 ("SOC 2") certified.

67. The Contracts required that PowerSchool implement, *inter alia*, the following:

a. **Passwords and Employee Access.** PowerSchool must secure usernames, passwords, and any other means of gaining access to the SIS or to customer data, at a level meeting or exceeding the applicable standards. PowerSchool must only provide access to customer data to employees or contractors who require access pursuant to the Contracts, and only on terms consistent with or exceeding the data security measures required by the DPAs between the School Districts. PowerSchool failed to limit access to only those who explicitly require it, failed to implement a password rotation policy, and failed to silo and segment data.

b. **Security Protocols.** PowerSchool was required to maintain security protocols that met industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so. PowerSchool was required to maintain all data obtained or generated pursuant to the MSA in a secure digital environment. School Districts shared data with PowerSchool on the understanding – based on both contract and



federal regulations – that the data would be encrypted, de-identified, and thus inaccessible to PowerSchool personnel.

c.    **Security Technology**. PowerSchool must employ industry standard measures to protect data from unauthorized access. The security measures must include server authentication and data encryption. PowerSchool must host data pursuant to the MSA in an environment using firewalls that are updated according to industry standards. PowerSchool failed to implement server authentication, and as result the compromised user's credentials accessed the data from a server hosted in the Ukraine.

d.    **Monitoring**. PowerSchool must log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability of customer data. PowerSchool failed to detect the Data Breach and its endpoint protection failed to detect a download of the Data provided by the School Districts.

e.    **Vendor-Data Subprocessors Bound.** PowerSchool must enter into written agreements whereby vendor-data subprocessors agree to secure and protect customer data. PowerSchool must periodically conduct or review compliance monitoring and assessments of vendor-data subprocessors to determine their compliance. PowerSchool failed to monitor its subprocessors and ensure those contractors implemented MFA protection and other industry standard data practices.

f.    **Periodic Risk Assessment**. PowerSchool must conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner. Had PowerSchool conducted adequate risk assessments it would have detected the severe risk posed by its lax security standards.

g.    **Established Security Policies.** PowerSchool must follow established access security policies to support the confidentiality, integrity, and availability of the Data against risks, including but not limited to unauthorized access, collection,



use, disclosure or disposal, loss, or modification. Such security arrangements must include, without limitation, reasonable physical, administrative, and technical safeguards. PowerSchool failed to abide by its own policies and guidance, including providing timely notification to its customers and refusing to engage with threat actors during a ransom attack.

68.    As set forth below, regardless of whether ISO 27001, SOC 2, or NIST standards are applied, Defendants' failure to implement MFA, encrypt data in motion and in transit, limit access to sensitive information to only essential employees, monitor its networks for unusual activity or transfer of large volumes of data, and ensure that employees are adequately trained was contrary to Defendants' contractual promises and was noncompliant with ISO 27001, SOC 2, and NIST standards.

69.    Under the NIST cybersecurity framework, PowerSchool was further obligated to have the following reasonable administrative, technical, operational and physical safeguards and practices in place:

    a.    Data-in-transit (motion) is encrypted;

    b.    Data destruction is performed according to contract and agreements;

    c.    A plan for vulnerability management is developed and implemented;

    d.    Log/audit records are ascertained, implemented, documented, and reviewed according to policy;

    e.    Credentials and identities are issued, verified, managed, audited, and revoked, as applicable, for authorized devices, processes, and users; and

    f.    Remote access is managed by PowerSchool and also conforms to the ISO 27001:2013 standard.

70.    Relevant here, NIST standards require that organizations encrypt data both at rest and while in motion, "implement[] role-based access control and configuring it so that each user can access only the pieces of data necessary for the user's role" and "ensure that users who must access records containing PII only have access to the minimum amount of



PII, along with only those privileges (*e.g.,* read, write, execute) that are necessary to perform their job duties."[25]

71.    Like the NIST standard, the ISO 27001 standard focuses on establishing, implementing, maintaining, and continually improving an information security management system. Adopting ISO 27001 standards mitigates risk of unauthorized access and data breaches.[26] ISO standards recommend that companies undertake a risk assessment to determine if encryption must be used to protect the confidentiality of sensitive information and ensure that the data is accessible to those who need them when it is required.[27] ISO standards further address limiting access to sensitive data to only essential employees, implementing measures to ensure that access to data is allowed only after a verified authentication process, and implement a system to alert the organization to unauthorized access to data.[28]

72.    Similarly, the SOC 2 standard is another widely recognized standard in the United States. SOC 2 compliance ensures that data is managed in a way that protects privacy and security, requiring regular audits and controls over data access.[29] SOC 2

---

[25] Nat'l Inst. of Standards & Tech., *Guide to Protecting the Confidentiality of Personally Identifiable Information (PII): Recommendations of the National Institute of Standards and Technology* (Apr. 2010), https://nvlpubs.nist.gov/nistpubs/legacy/sp/nistspecialpublication800-122.pdf (last visited June 26, 2025).

[26] Int'l Org. for Standardization, *ISO/IEC 27001:2022 Information Security, Cybersecurity and Privacy Protection — Information Security Management Systems — Requirements* (2022), https://www.iso.org/standard/27001 (last visited June 26, 2025).

[27] Int'l Org. for Standardization, *ISO 27002:2022 – Control 8.24 – Use of Cryptography*, https://www.isms.online/iso-27002/control-8-24-use-of-cryptography/ (last visited June 26, 2025).

[28] Int'l Org. for Standardization, *ISO 27002:2022 – Control 8.3 – Information Access Restriction*, https://www.isms.online/iso-27002/control-8-3-information-access-restriction/ (last visited June 26, 2025).

[29] *AICPA & CIMA, 2018 SOC 2 Description Criteria (With Revised Implementation Guidance – 2022)* (Oct. 1, 2023), https://www.aicpa-cima.com/resources/download/get-description-criteria-for-your-organizations-soc-2-r-report (last visited June 26, 2025).



compliance examines whether organizations encrypt data in motion, restrict "access to information assets, including hardware, data (including during processing and in transmission), software, administrative authorities, mobile devices, output, and offline system components," and "identify and authenticate individuals who can access sensitive data and infrastructure, and segment networks and data bases and limit points of access to sensitive network segments."[30]

73. CISA guidance also encourages organizations to prevent unauthorized access by:

a. Conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

b. Regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

c. Ensure devices are properly configured and that security features are enabled;

d. Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

e. Disable operating system network file sharing protocol known as Server Message Block ("SMB"), which is used by threat actors to travel through a network to spread malware or access sensitive data.[31]

---

[30] AICPA, *2017 Trust Services Criteria for Security, Availability, Processing Integrity, Confidentiality, and Privacy* (updated Mar. 2020), https://assets.ctfassets.net/rb9cdnjh59cm/72xv4p67HVXKp6CjWmjkPk/1cdbfa19f6307e2720396b66a6194dc9/trust-services-criteria-updated-copyright.pdf (last visited Aug. 11, 2025).

[31] Multi-State Info. Sharing & Analysis Ctr., Cybersecurity & Infrastructure Sec. Agency, U.S. DEP'T OF HOMELAND SEC., *Ransomware Guide*, at 4 (Sept. 2020), https://www.cisa.gov/sites/default/files/publications/CISA_MS-ISAC_Ransomware%20Guide_S508C_.pdf (last visited June 26, 2025).



CISA guidance further recommends use of the principle of least privilege ("POLP") should be applied to all systems so that users only have the access they need to perform their jobs.[32]

74.   CISA guidance recommends that using a comprehensive network, in addition to network segregation, will help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.[33]

75.   Lastly, various cybersecurity industry best practices also have been published, are readily available, and should be consulted as a go-to source for an entity instituting, developing, maintaining, or enhancing its cybersecurity standards. Additional cybersecurity best practices include, but are not limited to, installing appropriate malware detection software, monitoring and limiting network posts, securing web browsers and e-mail systems, configuring network infrastructure (like firewalls, switches, and routers), safeguarding physical security systems, training staff on key cybersecurity aspects, monitoring for vulnerability alerts, and promptly detecting and addressing vulnerability alerts before exploitation by cybercriminals.

76.   Not only should PowerSchool have had measures in place to prevent compromise in the first place, PowerSchool also should have properly siloed its systems. When data is properly siloed rather than maintained in a centralized database, an intruder is only able to access data to which any compromised credentials were allowed access rather than to the entire set of sensitive data. Had PowerSchool limited access to sensitive data sets to only essential employees, the hackers would have only been able to acquire a subset of data and not the entire student and teacher data sets at issue in the Data Breach.

77.   In the event of a breach of customer data, PowerSchool was obligated to notify victims of the security incident within three business days under the Contracts. Specifically, PowerSchool was contractually required to investigate and take reasonable

---

[32] *Id.* at 6.
[33] *Id.*



steps to mitigate the breach, provide prompt notice to Plaintiffs and Class Members, and facilitate compliance with applicable laws, including to:

a.    Take steps to mitigate and remediate a data breach;

b.    Notify Plaintiffs and Class Members without undue delay;

c.    Provide Plaintiffs and Class Members with sufficient information to permit Plaintiffs and Class Members to make a determination as to any notification obligations under federal, state, or local laws and regulations; and

d.    Cooperate with Plaintiffs and Class Members and take commercially reasonable steps to assist Plaintiffs and Class Members in an investigation of the Data Breach.

78.    Upon learning of the Data Breach, PowerSchool substantially or entirely failed to perform these contractual obligations; rather PowerSchool instead:

a.    Notified Plaintiffs and Class Members of the Data Breach ten or more days after learning that the Data Breach had occurred; an undue delay that diminished, constrained, and limited Plaintiffs' and Class Members' ability to learn who possessed the Data and which Data had been compromised;

b.    Paid a futile ransom to the hackers before notifying Plaintiffs and Class Members of the Breach, thereby prioritizing PowerSchool's attempt to avoid liability rather than promptly informing the School Districts, which further exacerbated the effects of the Breach;

c.    Failed to provide Plaintiffs and Class Members information that would be sufficient for Plaintiffs and Class Members to readily and adequately determine the scope of its legal obligations to notify students, teachers, parents, and employees;

d.    Failed to take commercially reasonable steps to assist Plaintiffs and Class Members in an investigation of the Data Breach by keeping Plaintiffs and Class Members in the dark;

e.    Failed to take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of data;



Page **30** of **89**
MDL 3149, Case No. 25md3149
Track 2: School District Class Action

f.      Failed to provide a security incident notification written in plain language after confirmation of the incident; and

g.      Failed to provide a list of the types of data that were or are reasonably believed to have been the subject of the breach.

79.    As a result of failing to meet its obligations under the Contracts, Plaintiffs and/or Class Members suffered actual harm, including but not limited to, the following:

a.      Paying inflated prices for services that were not actually provided;

b.      Paying additional wages to staff members to address the Breach, such as overtime pay;

c.      Increased workload on administrative staff for managing affected Data and addressing concerns from parents, students, and faculty;

d.      Expenses for hiring cybersecurity experts to investigate the Breach;

e.      Costs for cybersecurity experts to assess potential risks to students, teachers, parents, and staff;

f.      Fees for cybersecurity experts to provide recommendations on securing the School Districts' Data;

g.      Legal consultation costs to determine potential liability;

h.      Legal expenses to understand regulatory compliance obligations;

i.      Legal fees to prepare for potential lawsuits from affected individuals;

j.      Expenses to transition data from PowerSchool to a different, more secure platform;

k.      Technical support costs associated with data transfer;

l.      Expenses for implementing improved security measures;

m.      Lost opportunity costs from redirecting school staff to mitigate the Data Breach's impact;

n.      Costs for providing continued credit monitoring and identity theft services to affected students, parents, and faculty;

o.      Ongoing monitoring costs due to delayed or hidden fraudulent activity;

p.    Expenses for drafting and sending notification letters/emails to affected individuals;

q.    Costs for setting up support hotlines or response teams for inquiries; and

r.    Administrative expenses for responding to concerns from students, teachers, parents, and faculty about the Data Breach.

### 2. PowerSchool Failed to Encrypt Data in Motion or Use for the School Districts

80.    The CrowdStrike Report states PowerSchool's "systems and data storage were configured with AES-256 encryption for data at rest." Nevertheless, the Threat Actors were able to download the entirety of the affected School Districts' unencrypted Data. When PowerSchool personnel login through the PowerSource support portal and utilize the Backdoor Access Tool, the Data is no longer at rest and is instead processed and decrypted.

81.    When data is encrypted at rest, it means it's stored in an encrypted format on a device or server, unreadable without the decryption key. If a technical support administrator accesses that data and it becomes unencrypted, the data is no longer considered "at rest." Instead, it is now "in use" or "in process," as it's being actively accessed, processed, or viewed. The encrypted data at rest, stored securely (*e.g.*, on a database or disk), is then decrypted by the SIS when the administrator accesses it, typically using authorized credentials or a decryption key. This decryption happens in memory or within the application the administrator is using, allowing it to be read or manipulated.

82.    Failing to implement encryption for data in motion is a critical point of vulnerability, as administrator (or an attacker with admin privileges) could misuse the unencrypted data. This failure directly contributed to the Data Breach.

83.    Any organization that utilizes cloud storage or services should be focused on cloud security. There are specific standards and guidelines readily available to assist any organization in managing cloud security, including:



a. ISO 27017, which provides guidance for cloud security and applies the guidance of ISO 27002 to the cloud with seven additional controls; and

b. ISO 27018, which is closely related to ISO 27017, and defines privacy requirements in a cloud environment, particularly how the customer and cloud provider must protect PII.

84. Given that threat actors frequently attack cloud repositories, improved network security can help mitigate attacks. Had PowerSchool implemented sufficient network security protections, such as appropriate encryption Data during processing, then the Data Breach could have been prevented.

85. PowerSchool was aware of its obligations to protect its customers' Data before the Data Breach, yet failed to take reasonable steps to protect it from unauthorized access. PowerSchool also was aware of the significant repercussions if it failed to do so because PowerSchool collected Data from millions of students, teachers, and School Districts and it knew that this Data, if hacked, would result in injury, including to Plaintiffs and Class Members as it disclosed this risk in its Annual Report filed with the SEC.

### 3. PowerSchool Failed to Implement Basic Security Controls to Protect the School Districts' Data and Detect the Breach

86. Due to the lack of MFA protection, PowerSchool failed to prevent the theft of high-level administrative credentials, which should have required multiple security controls to use. As a result, the hackers were able to obtain compromised credentials for a contractor handling backend technical support, and then steal data for thousands of School Districts.

87. As PowerSchool's CISO, Mishka McCowan, acknowledged in an interview – the PowerSchool Data Breach occurred through the Backdoor Access Tool allowing PowerSchool's support department to access student and school data in violation of its

Contracts with the School Districts and representations about the scope of that access.[34] In addition to not following its own advice, PowerSchool failed to comply with industry standards, as set forth above.

88.    According to sources speaking with the news outlet, TechCrunch, PowerSchool told its customers the Threat Actors accessed its SIS using a single compromised maintenance account associated with a Movate technical support subcontractor to PowerSchool.[35]

89.    As previously mentioned, PowerSchool fully recognized that "Multi-Factor Authentication (MFA) is a best practice that significantly boosts your school's cybersecurity." PowerSchool further recognized that multi-factor authentication, "adds an extra layer of security by requiring a second form of verification, such as a text message code or an authentication app, in addition to the password. This ensures that even if a password is compromised, unauthorized access is still prevented. Implementing these technologies helps protect sensitive information and provides peace of mind that your school's digital assets are secure."

90.    Had PowerSchool practiced what it preached and required that all of its employees and contractors with access to sensitive information implement multi-factor authentication, the hackers would have been unable to use the compromised credentials to perpetrate the Data Breach.

---

[34] Mishka McCowan, statement at 36:01 - 37:27, *Special Episode: PowerSchool CISO Mishka McCowan*, K12 TECH TALK PODCAST (Apr. 8, 2025), https://k12techtalkpodcast.com/e/surviving-a-cyber-nightmare-inside-powerschools-response-strategy/

[35] Discovery will inform Plaintiffs of the compromised user, including the user's access and use of PowerSchool's SIS, and the security protocols implemented to ensure that user complied with PowerSchool's security obligations. Without the benefit of discovery, Plaintiffs' investigation provides a reasonable basis to single out the compromiser user's credentials as belonging to an former employee with the outsourcing company, Movate, Inc. – a Microsoft Gold Partner – in the Philippines.



91. In addition to the failure to implement multi-factor authentication, as described above, it appears the subcontractor whose credentials were compromised is affiliated with an IT outsourcing company in the Philippines. By providing subcontractors spread across the globe with access to the School Districts' data containing the Data of the School Districts, including for tens of millions of American students and teachers (including Social Security numbers, names, addresses, medical information, and more that could subject children to identify theft), PowerSchool further exposed its systems to threats without having sufficient safeguards or proper monitoring systems in place.

92. The Movate contractor – offshore or not – had been given back-office administrator functionality, as well as student-, parent- and faculty-facing functionality to manage key organizational information assets, including demographic data, enrollment, grades, transcripts, and other governmental agency reporting capabilities. This full administrative access exceeded the access permitted by the School Districts in their Contracts which allowed access to Protected Data under specific circumstances and with express authorization. Not only were these privileges excessive, but those credentials were not even properly secured by MFA, which PowerSchool frequently advised schools to implement and pledged that it had or would implement itself, but which it did not enforce the use of on Movate.

93. To make matters even worse, following the Data Breach, TechCrunch reported that a second – so far undisclosed – data breach occurred.[36] In January 2025, TechCrunch reported a separate security incident, involving a PowerSchool software engineer, whose computer was infected with malware which stole the engineer's company credentials. The extent of this second breach, and the data that was stolen (if any) has not

---

[36] Zack Whittaker, *Malware Stole Internal PowerSchool Passwords from Engineer's Hacked Computer*, TECHCRUNCH (Jan. 17, 2025), https://techcrunch.com/2025/01/17/malware-stole-internal-powerschool-passwords-from-engineers-hacked-computer/ (last visited April 7, 2026).

been disclosed publicly. Regardless of whether any additional data was unlawfully obtained, it reaffirms the inadequacy of data security practices at PowerSchool.

94.    Plaintiffs and Class Members contracted with PowerSchool on the reasonable expectation that PowerSchool would comply with its obligations to keep such information confidential and secure. PowerSchool failed to comply with these obligations.

95.    PowerSchool could have, and should have, taken steps that would have mitigated the risks from the typical and fundamental hacking tactics that resulted in this Data Breach.

96.    The Data Breach was accomplished by using stolen access credentials, which did not require MFA when accessing unencrypted data stored in an internet accessible location. Defendants could have prevented the Data Breach by, *inter alia*, implementing spam filters to prevent phishing messages from reaching its employees, educating employees to detect and report phishing or other attempts to acquire access credentials, employing MFA to prevent stolen credentials from being misused to gain access to sensitive data, ensuring that Data was properly encrypted or redacted when accessed by contractors, limiting access to Data to only necessary employees, and monitoring the network for instances of unauthorized access or unusual activity, including access to and the transfer of large volumes of the data.

### 4.    The Data Breach Followed Significant Layoffs of PowerSchool's Workforce and Outsourcing of Its Backend Operations

97.    Beginning on August 31, 2022, Bain Capital expressed interest in discussing potential opportunities for a business combination or acquisition of PowerSchool. Over the next two years, representatives of Bain Capital had multiple meetings and communications (at least some of which occurred in California) with principal shareholders and with Mr. Gulati regarding PowerSchool's organic growth potential and strategic merger and acquisition opportunities. On June 6, 2024, these discussions culminated in PowerSchool and Bain Capital executing a merger agreement and, among other things, an equity commitment letter.



98.    A group of private credit lenders provided debt financing for this $5.6 billion acquisition. The PowerSchool transaction is an example of a leveraged buyout, commonly referred to as an "LBO." This debt financing arrangement is secured and backed by substantially all of the assets and capital stock of PowerSchool and its subsidiaries. Accordingly, in order to consummate the merger, PowerSchool shouldered nearly $3 billion in new debt – subject to an approximate 9.8% interest rate.

99.    Given the high interest rates associated with acquiring capital for an LBO, the objective for private equity executives is to sell their investment for a short-term profit, not to organically grow the company over the course of decades. To that end, cost-cutting pays off almost instantly. A 2019 paper found that employment shrinks by an average of 4.4% in the two years following an LBO, and 12.6% when the company was previously publicly traded, like PowerSchool.

100.    Aggressive cost-cutting measures were implemented by Bain Capital almost instantly while PowerSchool was still an independent, public entity. The measures implemented by Defendants not only contributed to the Data Breach, but also expressly breached PowerSchool's contractual and other obligations with the School Districts. At bottom, Defendants' actions to extract value fostered a process where costs were cut and liberties were taken with contractual obligations, with schools, schoolchildren, and teachers ultimately paying the price.

101.    Within three months of announcing the acquisition, on August 13, 2024, reports circulated that PowerSchool laid off 5% of its workforce, some of whom had been with the company for over twenty years.

102.    An inside source claimed that "some departments were basically gutted."[37] The justification for these layoffs from another source is that PowerSchool reported a quarterly earnings per share of $0.23, missing the consensus estimate by one penny.

---

[37] Wyatt Gaylor (@wyattg), X (Aug. 14, 2024, 11:09 AM EST), https://x.com/wyattg/status/1823738764730229073 (last visited June 26, 2025).



103.   In the wake of the layoffs, former employees took to social media and career sites to voice their frustrations. A former Product Engineer complained of a "[l]arge scale layoff" and stated that it "is a general trend to outsource all the jobs to off shore…now it's shifting to support and product management." Another complained that the "[c]ompany is also clearly shifting to an India-based workforce at the expense of US-based employees." And yet another indicated that if someone works in the United States for PowerSchool, they "will get laid off within 6 months as your job responsibilities get moved [offshore.]"

104.   As noted above, the first incident of unauthorized access by a third-party actor occurred only three days after the mass layoffs, on August 16, 2024.

105.   Just prior to the merger, PowerSchool announced a major change to the company – seeking to nearly double its employees within the next 3 to 5 years by expanding into the Indian labor market.[38] On January 8, 2025, PowerSchool announced that its India-based workforce would expand from 1,300 to 2,000 personnel.

[38] EdTech Leader PowerSchool Makes Substantial Infrastructure Investment in India & Aims to Expand the India Employee Base to 2000 in 3–5 Years, ANI/Business Standard-style press release, Jan. 8, 2024, https://www.aninews.in/news/business/business/edtech-leader-powerschool-makes-substantial-infrastructure-investment-in-india-amp-aims-to-expand-the-india-employee-base-to-2000-in-3-5-years20240108124645/ (last visited Apr. 6, 2026).



106.   Concurrently with acquiring PowerSchool, Bain Capital announced its acquisition of Outsourcing, Inc.,[39] and stated that it desired to actualize Outsourcing's "VISION 2025" strategy, which relevantly states that companies offshoring will see reduced costs through offshoring and sharing back-office operations in engineering, as the below slide from a presentation shows:[40]



107.   Likewise, the definitive merger statement relied upon analyses contemplating the efficiencies from offshoring, and those analyses were reviewed and approved by the executives for each Defendant. Indeed, representatives of Goldman Sachs and Centerview relied upon certain offshoring cost-saving estimates provided by PowerSchool, that were approved by the Board of Directors and PowerSchool's management, for use in connection

---

[39] *Statement from Bain Capital Private Equity Regarding Outsourcing Inc.*, BAIN CAPITAL (Dec. 8, 2023), https://www.baincapital.com/news/statement-bain-capital-private-equity-regarding-outsourcing-inc (last visited June 18, 2025).

[40] *VISION2025: Building a New Stage—FY2023–25 Medium-Term Management Plan*, OUTSOURCING INC., Feb. 2023, https://www.outsourcing.co.jp/-/media/outsourcing/en/top/ir/irlibrary/midiplan/VISION2025_eng.ashx (last visited June 18, 2025).



with Goldman Sachs' and Centerview's financial analyses and fairness opinions. Those assumptions stated: adjusted gross profit margins growing from 71% in 2024 to 74% in 2034, adjusted research and development expenses as a percentage of revenue ranging from 12% in 2024 to 10% in 2034, adjusted EBITDA margins ranging from 35% in 2024 to 48% in 2034, and increased utilization of PowerSchool's offshore centers of excellence.[41]

108.    Shortly after Bain Capital's acquisition – and following the mass layoffs in the United States – outsourcing practices began across PowerSchool's lines of business. These actions align with Bain Capital's ambitious expansion plans while concurrently improving Gross Profit, R&D Costs, and Adjusted EBITDA for PowerSchool. The consequences are that Bain Capital has moved to swiftly execute on this offshoring plan while sacrificing data security and integrity in effort to rapidly cut costs.

109.    Bain Capital has a long and consistent history of investing in companies that offshore jobs to lower-wage countries, prioritizing cost savings over domestic employment. In short, Bain Capital does not just tolerate offshoring – it actively directs, enables and profits from it. Its investments show a clear pattern: cut costs by shifting labor overseas, even at the expense of properly staffing and funding its target data security obligations.

**C.    POWERSCHOOL PAID A FUTILE RANSOM IN AN ATTEMPT TO CONTAIN THE EXFILTRATED DATA, WHICH IS STILL CIRCULATING AND BEING USED BY HACKERS**

110.    Since the Data Breach, multiple security researchers have reported signs of PowerSchool credentials circulating on the Dark Web. For example, a data leak report on

---

[41] PowerSchool Holdings, Inc., *DEF M-14C Definitive Information Statement Relating to Merger or Acquisition*, at 84 (Sept. 4, 2024), https://www.sec.gov/Archives/edgar/data/1835681/000119312524212624/d836904ddefm14c.htm (last visited June 26, 2025).



the Data Breach provided infostealer statistics indicating a significant increase in the use of PowerSchool credentials, with many of the accounts used recently.[42]

111. PowerSchool has itself acknowledged that paying a ransom does not guarantee the data will be deleted, stating that in the face of a ransom attack: "do not pay the ransom or negotiate with the attackers. Paying the ransom does not guarantee that you will get your data back, or that it will not be leaked or sold. It also encourages the attackers to continue their malicious activities and makes you a more attractive target for future attacks."[43] Yet, PowerSchool failed to heed its own advice in the wake of the Data Breach.

112. The CrowdStrike Report indicated that, as of February 28, 2025, the Data had not been sold on the Dark Web – yet stolen data also takes time to be published – as data holds its highest value before it is sold because its utility and exclusivity are intact. In underground markets undisclosed PII and PHI has the greatest potential for profit only when the buyer can be confident they are the sole possessor. Once data is sold – or worse, sold multiple times – it quickly loses value, as competitors race to exploit the same credentials. This degradation in value stems from both diminishing exclusivity and increasing detection risks.

113. Selling data on the Dark Web or elsewhere creates traceability and risk. The act of transferring stolen information introduces exposure to law enforcement or countermeasures (*e.g.,* honeypots or fake buyers). For experienced actors in the "upper tier" of the underground economy, it is more profitable and less risky to exploit the data directly rather than sell it. Hence, raw data's worth lies not just in its market price, but in the potential value it holds before being diluted by risk, competition, or exposure.

---

[42] Dark Web Informer (@DarkWebInformer), X (formerly Twitter), Jan. 19, 2025, https://x.com/DarkWebInformer/status/1877461389691736573 (last visited June 19, 2025).

[43] *PowerSchool: A Leader in Responsible AI for Education*, at 14, POWERSCHOOL GROUP LLC (Jun. 14, 2024), https://go.powerschool.com/rs/861-RMI-846/images/Responsible_AI_Cybersecurity_Report.pdf?version=0 (last visited June 26, 2025).



114. Additionally, the underground economy operates under extreme uncertainty and dishonesty, often likened to a "market for lemons." Buyers have no way of verifying the quality or exclusivity of data before purchase. It is therefore likely that data leaked onto the Dark Web has already been drained for its resources.

115. It should not be surprising then that the Data has not been reported to have been leaked onto the Dark Web, but is instead being used in ransom attacks against School Districts by, at a minimum, ShinyHunters.

116. ShinyHunters is a well-known collective of cybercriminals that has been credited with several large scale breaches going back to 2020. ShinyHunters initially began by exfiltrating and attempting to sell stolen data but has since transitioned to using stolen data for extortion attempts and then, sometimes several years after the fact, publishing the data to anyone with internet access.[44]

117. Months after PowerSchool assured School Districts that the Data Breach was contained, several School Districts were targeted with ransom demands. Those targeted reported that the "sender has the same data that was hacked, leading state officials to believe the data is now in the hands of bad actors."[45]

118. The Sampson County Public Schools in North Carolina warned students and parents that ShinyHunters was targeting individuals affected by the Data Breach and cautioned them to "not open any suspicious links or emails related to this incident with content referencing in the first line of the email, 'We are ShinyHunters.'"[46] It further warned "not [to] engage with anyone claiming to have this data" and reminded affected

[44] *The Evolution of ShinyHunters: From Data Leaks to Extortions* (August 26, 2021), https://reliaquest.com/blog/the-eeveelution-of-shinyhunters-from-data-leaks-to-extortions/ (last visited June 26, 2025).

[45] *'Threat actor' claims to have NC student data months after PowerSchool assured officials it was safe* (May 7, 2025), https://www.wral.com/news/education/threat-actor-claims-to-have-nc-student-data-may-2025/ (last visited June 26, 2025).

[46] *Update on New PowerSchool Data Breach and Ongoing Protection Measures* (May 8, 2025 ), https://www.sampson.k12.nc.us/article/2199993 (last visited June 26, 2025).

families that PowerSchool was offering identity protection and two years of credit monitoring to victims of the Data Breach. However, because stolen information does not have a shelf life, Plaintiffs and Class Members will face the threat of extortion for years to come.

119. Some School Districts have decided not to renew their Contracts with PowerSchool, requiring them to expend time and resources researching and vetting alternative providers, removing their Data from PowerSchool, and providing their data to the new providers. For example, after confirming that "the people who sent the [ransom] texts have access to the same data that was compromised in December," the North Carolina Department of Instruction "said the state will not renew its contract with PowerSchool, and instead [will] go with a different provider – called Infinite Campus – for its official student information system."[47] On August 7, 2025, the State Board of Education for North Carolina announced that it would move its student EdTech software solutions to a new company.

### D.    PLAINTTIFFS AND CLASS MEMBERS HAVE BEEN HARMED

120. PowerSchool provides subscription-based and support services that Plaintiffs and Class Members overpaid considerably for.

121. As disclosed in its Annual Report for the fiscal year ending December 31, 2023, revenues from Subscriptions and Support totaled approximately $600,189,000, representing about 86.05% of PowerSchool's total revenue for that year.[48] Subscription and Support revenues are divided into two revenue recognition categories: Software-as-a-

---

[47] *North Carolina won't renew PowerSchool contract after data breach, texts from 'threat actors'* (May 8, 2025), https://www.wbtv.com/2025/05/08/north-carolina-wont-renew-powerschool-contract-after-data-breach-texts-threat-actors/ (last visited June 26, 2025).

[48] PowerSchool Holdings, Inc., *Annual Report* at 64 (Form 10-K) (Feb. 29, 2024) (for fiscal year ended Dec. 31, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001835681/000183568124000016/pwsc-20231231.htm (last visited June 26, 2025).



Service ("SaaS"), which accounted for $485,913,000 of this total and Software Maintenance, which accounted for the remaining $114,276,000.[49]

122. Under its SaaS model, PowerSchool promises customers ongoing access to its application platforms – and this category includes income derived from those services. Meanwhile, the Software Maintenance category includes stand-ready services such as technical support and software updates and upgrades, which are provided on an as-available basis. SaaS and Software Maintenance services constitute the core offerings purchased by school districts from PowerSchool.

123. School Districts that acquired PowerSchool's SaaS services were promised secure, reliable maintenance and data security. However, despite substantial payments, those promises were not fulfilled. Specifically, PowerSchool's SIS platform – the "backbone" of its SaaS offerings[50] – lacked multi-factor authentication and password rotation for contractors, endpoint protection for suspicious network activity, and adequate data encryption implementation, thereby jeopardizing sensitive information stored on the platform.

124. Similarly, in the case of Software Maintenance, Plaintiffs and Class Members paid for "technical support services and software updates and upgrades," but failed to receive basic, fundamental data security protections – amounting to a fundamental overpayment – as described in this complaint.[51]

125. Plaintiffs and Class Members paid hundreds of millions of dollars annually for the use of the PowerSchool platform and for the storage and protection of their Data. Part of the price that Plaintiffs and Class Members paid included the funds necessary for the protection of the Data. Had Plaintiffs and Class Members known that Defendants would

---

[49] From year-end 2020 through 2023, the proportion of Total Revenue derived from Subscriptions and Support remained relatively consistent with the 2023 figures. *See id.* at 107.

[50] *Id.* at 11.

[51] *Id.* at 97.



fail to adequately fund their data security obligations, or would divert those funds for their own profit, Plaintiffs and Class Members would not have paid for PowerSchool's platform or would have paid less for it.

126. Defendants' failure to keep Plaintiffs' and Class Members' Data secure has severe ongoing ramifications and has forced the affected School Districts to devote valuable time and resources to understanding the Breach and how its students and teachers are affected, communicating known threats and risks to affected individuals, exploring alternate means of storing and processing their Data, and ensuring that sensitive data is protected against misuse and unauthorized access in the future. Plaintiffs and Class Members also have suffered reputational damage in addition to incurring the costs associated with the Data Breach. Plaintiffs and Class Members have suffered serious injury and face a present and imminent substantial risk of future injury, including extortion attempts and/or dealing with the consequences from the misuse of their Data.

127. As a direct and proximate result of PowerSchool's known deficient data security practices, as well as Defendants' concealment of the same, Plaintiffs and Class Members have suffered and will continue to suffer injury.

128. Defendants were required to safeguard Plaintiffs' and Class Members' Data, both by the Contracts, applicable laws, regulations, industry standards, and in equity, but did not. Because data privacy and security are an integral and necessary part of the software product offered by Defendants to Plaintiffs and Class Members. Plaintiffs and Class Members received a product that did not include all the benefits that they were promised, reasonably expected, or to which they were otherwise entitled to under their contracts. Plaintiffs and Class Members suffered an economic loss: the difference in value between the product as received and the product that they should have received.

129. The difference in value between the product Defendants provided (lacking adequate data security), and the product Plaintiffs and Class Members should have received (with data security) is objective. If there is a difference between the market valuation of the product that should have been provided and the product as received, then all Class



Members have suffered the same loss commensurate or proportional to the price paid by them or on their behalf for the SIS.

130. Data security is obviously material to Plaintiffs and Class Members and they have been damaged whether or not an individual Class Member's data was actually subject to the Data Breach by overpaying for features that were never implemented.

131. Even apart from the overpayment for PowerSchool's services, the stolen Data is one of the most valuable commodities on the Dark Web. According to PowerSchool's Chief Executive Officer, ransom attacks can hold a district's data hostage until paying exorbitant sums of money (the average is $268,000). Moreover, there are time lags between when data is stolen, when it is used, and when the discovery occurs that it has been used. In some cases, data is leaked years after the initial exfiltration, demonstrating the ongoing risk that the Data at issue here will be misused.

132. Plaintiffs and Class Members will need to remain vigilant against unauthorized use of the stolen Data for years to come and must continue to devote school resources to monitoring the Data Breach and communicating with affected individuals.

133. Accordingly, Plaintiffs and Class Members seek full disgorgement of Defendants' ill-gotten gains. The revenues described in the preceding paragraphs are reflective of the dollar amounts that Defendants benefitted from on an annual basis in part due to their cost-cutting and unlawful conduct. Plaintiffs and Class Members allege that their payments to PowerSchool were excessive in light of PowerSchool's failure to deliver the functional data security and contractual support services promised under the Contracts. Plaintiffs and Class Members also seek compensatory damages for the measurable value of their Data, the cost of future protective measures, time spent remedying exposure, injunctive or equitable relief and any other damages, economic or non-economic, arising from Defendants' unlawful conduct.

## **CLASS ALLEGATIONS**

134. Plaintiffs bring this class action individually on behalf of themselves and on behalf of all similarly situated School Districts, including state departments of education,

school districts, charter schools, and public and private schools in a nationwide class and, in the alternative, statewide subclasses, pursuant to Federal Rule of Civil Procedure 23. As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a), 23(b)(2), and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)). Accordingly, Plaintiffs seek certification of the following Classes:

## NATIONWIDE CLASS

135.   Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as applicable, Plaintiffs seek certification of the following nationwide class:

> All School Districts in the United States that contracted with PowerSchool to provide a Student Information System ("Nationwide Class").

136.   The Nationwide Class asserts claims against PowerSchool and/or Bain Capital – as delineated by each Count – for Breach of Express Contract (Count 1), Intentional Tortious Interference with Contract (Count 2), Negligence (Count 3), Violation of the CFAA, 18 U.S.C. § 1030, *et seq.* (Count 4), Violation of California's Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502(a), *et seq.* (Count 5), Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (Count 6), Unjust Enrichment (Count 7), and Declaratory Judgment and Injunctive Relief (Count 8).[52]

## STATEWIDE SUBCLASSES

137.   In the alternative, Plaintiffs repeat and reiterate the Nationwide Class definition and claims on behalf of themselves and subclasses ("Statewide Subclasses" and with the Nationwide Class, the "Classes") consisting of School Districts in New Jersey and New York under the laws of each respective state.

---

[52] The Court previously dismissed, without prejudice, Counts 3-7 as to PowerSchool and Counts 4-7 as to Bain Capital. *See* Dkt Nos. 437, 440. Plaintiffs include those dismissed Counts here soley to preserve the record for appeal.



138. Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Classes are any judicial officers presiding over this matter, members of their immediate family, and members of their judicial staff having a financial or other beneficial interest in the outcome of this litigation.

139. **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, Defendants have acknowledged that thousands of School Districts have been affected. The list of affected School Districts is available from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

140. **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common questions, among others, include:

a. Whether and to what extent Defendants had a duty to protect the confidentiality of the Data for PowerSchool's customers and former customers;

b. Whether PowerSchool failed to take reasonable and prudent security measures to ensure its systems were protected;

c. Whether Defendants enabled personnel and third-party partners to access unencrypted and identifiable School District records in violation of PowerSchool's DPAs;

d. Whether Bain Capital interfered post-acquisition with Class Members' contracts with PowerSchool and prevented their execution through sudden layoffs and outsourcing;



e.      Whether PowerSchool failed to use reasonably available information to monitor its systems and prevent the Data Breach from happening;

f.      Whether PowerSchool required its contractors and subcontractors to implement sufficient security measures, including the same security measures that it required for its direct employees;

g.      Whether PowerSchool implemented MFA protection for its administrators and technical staff;

h.      Whether Defendants knew or should have known that PowerSchool's computer and data storage systems were vulnerable to compromise;

i.      Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices at PowerSchool;

j.      Whether Defendants' security measures for PowerSchool were reasonable in light of applicable legal and regulatory requirements and industry standards, including HIPAA and the FTC Act;

k.      Whether the stolen Data was stored solely on PowerSchool's optional, cloud-based storage solution or whether the Threat Actors also gained administrative access to SIS software operating on servers hosted by the School Districts;

l.      Whether Defendants exceeded or conspired to exceed authorized access of Plaintiffs' and Class Members' computer systems in violation of the CFAA, 18 U.S.C. § 1030, *et seq.*;

m.      Whether Defendants exceeded or conspired to exceed authorized access of Plaintiffs' and Class Members' computer systems in violation of the CDAFA, Cal. Penal Code § 502(a), *et seq.*;

n.      Whether Defendants committed unfair or unlawful trade practices in violation of California's UCL, Cal. Bus. & Prof. Code § 17200, *et seq.*;

o.      Whether PowerSchool had any contractual obligations to provide for the security of its customers' Data;



p.      Whether PowerSchool has complied with any contractual obligations to protect its customers' Data;

q.      Whether Defendants failed to notify Plaintiffs and Class Members as soon as practicable and without delay after the Data Breach was discovered;

r.      Whether Plaintiffs and Class Members overpaid for PowerSchool's services;

s.      Whether Defendants' conduct resulted in or was the proximate cause of Plaintiffs' and Class Members' injuries;

t.      Whether Plaintiffs and Class Members suffered damages or other losses because of Defendants' failure to protect their Data;

u.      Whether Defendants should retain the money paid by Plaintiffs and Class Members to protect their Data; and

v.      Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

141.    **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and harmed in the same way. Plaintiffs paid for cybersecurity protection features for the SIS that were not implemented. Plaintiffs' damages and injuries are akin to those of other Class Members, and Plaintiffs seek relief consistent with the relief of the Class.

142.    **Adequacy of Representation. Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Classes because Plaintiffs are impacted members of the Classes and are committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiffs have no conflicts of interest with the Classes. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach and data privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.



143. **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because the issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and Class Members may be relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

144. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members creates the risk of inconsistent adjudications and incompatible standards of conduct for Defendants.

145. **Ascertainability.** The Classes are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within each Class. The Classes consist of School Districts that contracted for PowerSchool services, and class membership can be determined using PowerSchool's records.

146. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive relief



appropriate. Injunctive relief is also necessary to uniformly protect the Class Members' Data. Plaintiffs seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

147. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

## CAUSES OF ACTION

### COUNT 1
### BREACH OF EXPRESS CONTRACT
**(On behalf of the Nationwide Class against PowerSchool)**

148. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

149. Plaintiffs bring this claim on behalf of the Nationwide Class under California law, or, in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.

150. Plaintiffs, Class Members, and PowerSchool are parties to the Contracts. Plaintiffs and Class Members fully performed their obligations under the Contracts.

151. The Contracts set forth the terms that govern customer data provided to PowerSchool. This customer data includes the Data of Plaintiffs' and Class Members' administration, employees, students, teachers, and/or parents of students, all of which was compromised and stolen while in the care, custody, and control of PowerSchool. The Contracts also describe PowerSchool's duties and responsibilities for handling customer data, requiring PowerSchool to do so in accordance with applicable law and pursuant to the terms of the Contracts.

152. PowerSchool breached its Contracts by, among other things:

    a.    Failing to safeguard the confidential, private, and sensitive data it obtained from Plaintiffs and the Class. The Contracts require PowerSchool to maintain the confidentiality, privacy, and security of the customer data. This was a material term and an essential purpose of the Contracts – as well as a major factor



for purchasing decisions – because each School District was required to obtain a regulatory-compliant system when entrusting PowerSchool with the handling of sensitive Data. The School Districts' decision to purchase and utilize SIS was conditioned on PowerSchool's reciprocal promise to safeguard the Data. The Data Breach has deprived Plaintiffs and Class Members of a benefit they reasonably expected to receive at the time the Contracts were made.

b.      The Contracts impose limits on PowerSchool's access, collection, and processing of the Data, restricting PowerSchool to only those purposes provided for in the Contracts or consented to by Plaintiffs or Class Members. Access to the Data for any other means is limited by the Contracts to de-identified, anonymized, and/or encrypted data. The access restrictions in the Contracts prohibited PowerSchool from processing and using the Data without consent, and formed an essential element of the Contracts. However, PowerSchool personnel had broad, unfettered access to the Data despite these contractual access restrictions. The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures resulting in the unauthorized access, collection, and processing of the Data. Accordingly, PowerSchool violated and materially breached the Contracts by allowing the unauthorized access, collection, and processing of the Data.

c.      The DPAs further provide details regarding what PowerSchool must do to ensure its employees, agents, contractors, and subprocessors comply with the terms of the Contracts, including by maintaining the confidentiality, security, and privacy of customer data. PowerSchool failed to ensure the compliance of its employees, agents, vendors and contractors as it agreed to in the Contracts. These employees, agents, vendors, contractors, and subprocessors should have implemented basic procedures and safe data practices - such as MFA, data encryption, password rotation, and endpoint protection - for purposes of ensuring the privacy and security of Data under the terms of the Contracts. PowerSchool's failure to do so was unreasonable and inexcusable and directly caused the injuries



complained of herein. PowerSchool's failure to ensure compliance by its agents, employees, contractors, and subprocessors, to whom PowerSchool provided access to customer data, also materially breached the Contracts.

d.      With respect to processing and use of Data in PowerSchool's possession, PowerSchool breached its DPAs. For example, the DPAs require PowerSchool to obtain the School Districts' consent for certain access or use of their Data. PowerSchool was required to inform the School Districts when processing identifiable and/or unencrypted Data, and to obtain written consent if PowerSchool intended to collect or use identifiable and/or unencrypted Data. PowerSchool failed to perform its obligation under the Contracts concerning the processing and use of the Data, because it failed to implement reasonable security safeguards, such as encrypting aggregated data that PowerSchool processed, implementing endpoint protection and password rotation for personnel with access to the Data, and using MFA. Therefore, in failing to perform its obligations identified in the DPAs, PowerSchool materially breached the Contracts.

e.      In the event of a breach of customer data, PowerSchool also was obligated to notify victims of the security incident within three business days. Upon learning of the Data Breach, PowerSchool substantially or entirely failed to perform these contractual obligations as PowerSchool.

f.      PowerSchool was obligated to, at a minimum, abide by and maintain adequate data security measures, consistent with industry standards, to protect customer data from unauthorized disclosure or acquisition by an unauthorized person. PowerSchool also failed to perform its data security obligations according to industry standards and regulatory guidance, and have in place a Data Security and Privacy Plan. PowerSchool failed to perform its obligations under the Contracts, and the failure by PowerSchool to abide by commercially reasonable, industry security standards was a material breach of the Contracts.

153. PowerSchool breached the Contracts despite knowing that the Data holds substantial value and is at great risk of being targeted by hackers.

154. Plaintiffs and Class Members reasonably expected PowerSchool to perform its duties under the Contracts. Plaintiffs and Class Members were assured that PowerSchool could react in a timely and organized fashion to address the negative implications should a data breach occur. Plaintiffs and Class Members continued to perform their obligations and make payments under this reasonable belief.

155. As a direct and proximate result of PowerSchool's breaches of the Contracts identified herein, Plaintiffs and Class Members have suffered monetary and other damages. This harm was foreseeable to PowerSchool as the Contracts expressly included these protections. These losses were and are unavoidable as they are a natural and probable consequence of PowerSchool's acts and omissions through which PowerSchool materially breached the Contracts.

156. As a direct and proximate result of PowerSchool's breaches of the Contracts, Plaintiffs and Class Members were deprived of the full benefit of data security protection that was promised under the Contracts.

157. Based upon PowerSchool's material breaches of the Contracts, Plaintiffs and Class Members seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate Plaintiffs and Class Members for their injuries as permitted by law.

## COUNT 2
### INTENTIONAL TORTIOUS INTERFERENCE WITH CONTRACT
**(On behalf of the Nationwide Class against Bain Capital)**

158. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

159. Plaintiffs bring this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.



160. Plaintiffs and Class Members entered into valid and enforceable Contracts with PowerSchool for EdTech software and related services, including contractual obligations for cybersecurity protections.

161. Bain Capital had actual knowledge of these Contracts and their terms, including PowerSchool's cybersecurity obligations to Plaintiffs and Class Members, by virtue of its ownership interest, board-level oversight, and direct involvement in operational decisions at PowerSchool, including during the background phase of the merger. PowerSchool and Bain Capital described these cybersecurity obligations in detail in the Proxy statement filed with the SEC in connection with the acquisition, recognizing that the Contracts impose stringent cybersecurity protocols.

162. Despite this knowledge, Bain Capital intentionally and improperly interfered with PowerSchool's performance under those Contracts by directing, encouraging, and/or pressuring PowerSchool to (1) reduce spending on cybersecurity infrastructure and compliance in order to increase profitability; (2) lay off employees involved in cybersecurity operations and information technology infrastructure as exemplified by the August 2024 layoffs; and (3) outsource backend administrative operations to offshore subcontractors as explained in the definitive merger statement filed with the SEC.

163. Bain Capital's interference was neither justified nor privileged. It was done with the improper motive of maximizing its own financial return at the expense of PowerSchool's contractual obligations to Plaintiffs and Class Members.

164. As a direct and proximate result of Bain Capital's intentional interference, PowerSchool breached its contractual duties by failing to provide the promised level of cybersecurity protections, thereby exposing Plaintiffs and Class Members to a Data Breach, increased risk of ransom attacks, lawsuits, and other consequences of cybercrime, and causing them to overpay for services not rendered.

165. Plaintiffs and Class Members have suffered damages as a result of Bain Capital's tortious interference, including overpayments for under-delivered services, loss of contractual value, increased exposure to cybersecurity threats, and related harm.



166. Plaintiffs and Class Members are entitled to compensatory and punitive damages in an amount to be proven at trial.

## COUNT 3
## NEGLIGENCE[53]
### (On behalf of the Nationwide Class against Bain and PowerSchool)

167. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

168. Plaintiffs bring this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence as against Bain and PowerSchool ("Defendants" for the purposes of this Count.

169. Plaintiffs and Class Members were required to provide sensitive Data to use PowerSchool's SIS, and did so pursuant to PowerSchool's agreement to collect, encrypt, de-identify, and safely store their Data. Defendants had full knowledge of the sensitivity of the Data and the types of harm that Plaintiffs and Class Members could and would suffer if the Data were wrongfully disclosed.

170. Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Data in their possession from being compromised, lost, stolen, accessed or misused by unauthorized persons. Defendants also owed a duty to Plaintiffs and Class Members to refrain from accessing, viewing, and/or using unencrypted and identifiable Data. More specifically, this duty included, among other things:

    a. Designing, maintaining, and testing PowerSchool's security systems to ensure that Plaintiffs' and Class Members' Data in their possession was properly secured and protected;

    b. Implementing processes that would detect a breach of PowerSchool's security system in a timely manner;

---

[53] Re-pleaded as to PowerSchool solely to preserve the record.

c.     Timely acting upon warnings and alerts, including those generated by PowerSchool's security systems regarding intrusion to its networks;

d.     Maintaining security measures consistent with industry standards discussed herein; and

e.     Deleting Data that PowerSchool no longer reasonably has a legitimate business purpose in retaining.

171.   Defendants' duty to use reasonable care arose from several sources, including but not limited, to the following:

a.     PowerSchool holds itself out as a protector of consumer data even previously advertising its privacy and cybersecurity pledges and accolades on its website. PowerSchool, along with Bain Capital, thereby assumed a duty to reasonably protect the Data entrusted to them. Because of PowerSchool's role as one of the largest EdTech companies, Defendants were in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach;

b.     Defendants' duty also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect Data by companies, such as PowerSchool;

c.     Defendants' duty also arose from state law in jurisdictions that have enacted statutes either based upon the FTC Act to create a duty or that incorporate similar duties (*see, e.g.,* Cal Civ. Code § 1798.100; Cal. Civ. Code § 1798.80);

d.     Defendants violated Section 5 of the FTC Act and similar state consumer protection statutes by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards;

e.     PowerSchool had a duty under HIPAA as a business associate to implement reasonable safeguards to prevent unauthorized access to the Data in its possession;



  f.  PowerSchool violated HIPAA by failing to use reasonable measures to protect the Data and not complying with applicable industry standards;

  g.  Both Section 5 of the FTC Act and HIPAA are statutes designed to protect Plaintiffs and Class Members from the injuries complained of herein; and

  h.  Defendants also had a duty to safeguard the Data of Plaintiffs and Class Members and to promptly notify them of a breach pursuant to state statutes that require PowerSchool to reasonably safeguard sensitive Data.

172. Defendants' actions and the resulting Data Breach constitute negligence *per se* by violating these laws and standards.

173. Defendants also had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiffs and Class Members would be harmed by PowerSchool's failure to protect their Data.

174. PowerSchool voluntarily solicited and accepted Plaintiffs' and/or Class Members' Data, even offering to host the Data with its business associates. Plaintiffs and Class Members relied upon PowerSchool, who held itself out as possessing expertise in data security and was in a unique position to guard against the Data Breach, to exercise its professional judgment to safeguard that Data from unauthorized access. Plaintiffs and Class Members relied on PowerSchool's misrepresentations as to information uniquely in the possession of Defendants. Defendants failed to correct such statements despite knowing of their falsity.

175. Defendants' duty to implement and maintain reasonable security measures also arose as a result of the special relationship that existed between PowerSchool, Plaintiffs, and Class Members. This special relationship arose because Plaintiffs and Class Members entrusted PowerSchool with their Data as part of the purchase of and subsequent use of services that PowerSchool offers as a major EdTech company. Defendants alone could have ensured that its security systems and data storage architecture was sufficient to



prevent or minimize the Data Breach. The public interest will be furthered by imposing liability here as it will encourage similarly situated companies to implement reasonable and sufficient data security practices to ensure the protection of information entrusted to them. Public policy also recognizes that companies and agencies have legal and moral obligations to protect personal information with reasonable and appropriate safeguards.

176.   The Data Breach would not have occurred in the absence of negligence, and under the doctrine of *res ipsa loquitur*, it gives rise to an inference that PowerSchool acted negligently and failed to perform its duties to Plaintiffs and Class Members – particularly in ensuring reasonable security and privacy measures were taken by its employees, agents, vendors, contractors, and subprocessors.

177.   Defendants were required to provide timely, adequate, and appropriate notification of the Data Breach to Plaintiffs and Class Members. As discussed above, Plaintiffs and Class Members needed timely and effective notice so they could take appropriate measures to prevent, mitigate, or ameliorate the damage caused by Defendants' misconduct.

178.   Defendants were subject to these "independent duties," untethered to any contract between PowerSchool, Plaintiffs, and Class Members.

179.   Defendants breached these duties owed to Plaintiffs and Class Members, as described above, and thus were negligent.

180.   Defendants knew that their computing systems and data storage were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing the confidential Data, especially in light of the statements by Mr. Gulati that the School Districts' Data is particularly sensitive and highly valuable.

181.   Plaintiffs and Class Members were foreseeable victims of Defendants' inadequate data security practices, and failure to implement agreed upon protections.

182.   Defendants' duty extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third-parties, which has been recognized in situations where the actors' own conduct or misconduct exposes another to risk or defeats



protections put in place to guard against such risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B (1965). Defendants' failure to take proper security measures to protect the sensitive Data for Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional act; namely, the unauthorized access of Plaintiffs' and Class Members' Data.

**COUNT 4**
**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT[54]**
**18 U.S.C. § 1030, *et seq.***
**(On behalf of the Nationwide Class against Bain and PowerSchool)**

183.    Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

184.    The CFAA provides a private cause of action against a person who:

a.    "Intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." 18 U.S.C. § 1030(a)(5)(C);

b.    "Intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer." 18 U.S.C. § 1030(a)(2)(C) (An individual "exceeds authorized access when he accesses a computer with authorization but then obtains information located in particular areas of the computer – such as files, folders, or databases – that are off limits to him." *Van Buren v. U.S.*, 593 U.S. 374, 396 (2021)); or

c.    "Conspires to commit or attempts to commit an offense under subsection (a)," including §§ 1030(a)(2)(C) and (a)(5)(C). 18 U.S.C. § 1030(b).[55]

185.    PowerSchool, Bain Capital, Plaintiffs, and Class Members are "persons" because each is a firm, corporation, educational institution, and/or legal or other entity. 18 U.S.C. § 1030(e)(12).

---

[54] Re-pleaded here solely to preserve the record.

[55] Any person who conspires to access a protected computer without authorization, or in excess of authorization, and thereby causes damage or obtains information, is liable to the same extent as the person who directly committed the act.



186.    Plaintiffs, Class Members, and PowerSchool are parties to the Contracts.

187.    The SIS licensed by Plaintiffs and Class Members is hosted either locally on School District servers or on PowerSchool's optional cloud hosting service with its third-party partners. In either case, the data is stored on a "computer" under the CFAA, defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device[.]" 18 U.S.C. § 1030(e)(1).

188.    These computers qualify as "Protected Computers" under the CFAA, because the computers are "used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2).

189.    PowerSchool informed Plaintiffs and Class Members that it employed physical, administrative, and technological safeguards for unencrypted and/or identifiable data transmitted to the Protected Computers – classifying that data as 'restricted.' PowerSchool promised to maintain all data it obtained or generated pursuant to the Contracts in a 'secure digital environment' that could only be accessed by parties legally allowed to do so.

190.    PowerSchool also represented to Plaintiffs and Class Members that "customers own their student and school data; ***PowerSchool has no rights to access*** or sell ***student or school data***."[56]

191.    PowerSchool's Contracts state that all data, files, documents, and records transmitted to PowerSchool would be held in strict confidence and be restricted. PowerSchool promised that it would not process or use any identifiable and/or unencrypted

---

[56] *See, e.g., Student Data Privacy: Everything You Need to Know* (June 20, 2023), POWERSCHOOL GROUP LLC, https://www.powerschool.com/blog/student-data-privacy-everything-you-need-to-know/ (last accessed: June 18, 2025).



data for purposes not contemplated in the Contracts, and if it wished to do so then it would first obtain written approval from the School Districts. Even for routine processing, PowerSchool agreed to inform the School Districts before accessing restricted information. These controls were necessary because, as PowerSchool explicitly acknowledged in the Contracts, the School Districts retained full ownership and control over their Data. Access to unencrypted data was restricted solely to School District personnel, teachers, parents, and students. All other data access was to occur only in a secured, encrypted, and anonymized form.

192. School Districts shared data with PowerSchool on the understanding, based on both contract and federal regulations, that the Data would be encrypted and de-identified, and thus inaccessible to PowerSchool personnel. These contractual representations functioned as access restrictions within the meaning of the CFAA.

193. PowerSchool promised to restrict access to unencrypted and/or identifiable data, requiring "the highest level of care and security" for the data and promising that it would implement "physical, administrative, and technological" safeguards to prevent access. Reasonable purchasers or licensees may have understood this promise to encrypt and secure their data as similar to end-to-end encryption technology, such as that used by WhatsApp, Signal, and others to secure data in transit and protect that data from being read by third-parties.

194. Plaintiffs and Class Members reasonably believed that their Data was safely secure in the Protected Computers and free from unauthorized access. PowerSchool was explicitly forbidden by its Contracts and applicable law– such as 16 C.F.R. § 312.5 – from accessing the Data without consent. PowerSchool accessed the Data anyways, without authorization and/or in excess of authorization for, among other others, two reasons:

a. PowerSchool stood to directly profit from accessing data stored on the Protected Computers. PowerSchool profited by aggregating and analyzing large-scale student and school data for its latest product offerings, and which also required loosening access restrictions to Protected Data. For example, in 2024 PowerSchool



launched "PowerBuddy," an AI tool offering student tutoring, lesson planning for teachers, and analytics for administrators. PowerBuddy, built on a partnership between Microsoft Azure – the same cloud platform hosting the Protected Data and PowerSchool's third-party partner for optional cloud-based storage services – and OpenAI (called "Microsoft Azure OpenAI"), created a strong incentive for PowerSchool to leverage its access to sensitive customer data. Integrating PowerBuddy with information stored on the Protected Computers provided a powerful conversational AI tool for students and teachers, creating every financial incentive for PowerSchool to loosen access restrictions, improve data aggregation, and reduce privacy protections.

b. PowerSchool reduced support costs by minimizing communication with the School Districts and allowing its personnel unfettered access into and out of the Protected Computers. The Data Breach occurred in part because PowerSchool installed – and left on in perpetuity – a Backdoor Access Tool that enabled PowerSchool's personnel to access the Protected Computers without consent by the School Districts. The Backdoor Access Tool allowed PowerSchool personnel to disregard the requirement that PowerSchool obtain informed consent from the School Districts to access the Protected Data; information that was supposed to be encrypted and siloed in a secure digital environment on the Protected Computers. This backdoor access tool saved PowerSchool's technical support significant time by providing access without communicating with the School Districts – it also had potential to enable offshoring efforts by Bain Capital – with non-native English speakers more easily able to provide technical support without engaging directly with customers. Without the benefit of discovery, it is not possible to know whether this access was limited to PowerSchool's optional cloud-based SIS storage option on Microsoft Azure, or whether PowerSchool's unauthorized access extended to Protected Computers hosted and maintained locally on the School Districts' servers.

195. Even if assuming, *arguendo*, that Plaintiffs and Class Members had consented to PowerSchool accessing their SIS on the Protected Computers, that consent was not voluntary because PowerSchool concealed the backdoor access tool and failed to inform Plaintiffs and Class Members that, in spite of its extensive data protection promises, its personnel had the capability to access nearly all of the School Districts' unencrypted and identifiable data, exfiltrate it *en masse*, and download that data without it even triggering a security alert in PowerSchool's systems. If PowerSchool had obtained consent, then it was ill-gotten, and PowerSchool made materially misleading representations regarding the nature of security services it offered to gain access to Plaintiffs' and Class Members' business and highly sensitive information as described above.

196. As a result of PowerSchool's conduct, PowerSchool "accessed a computer and obtained information" and/or negligently "caused damage and loss" as described below, in violation of 18 U.S.C. §§ 1030(a)(2)(C), (5)(C).[57]

197. PowerSchool acted negligently when it:

a. Enabled personnel to access Plaintiffs' and the Class' Protected Data without their consent;

b. Enabled personnel to have back-office administrator functionality over all PowerSchool systems, as well as student-, parent- and faculty-facing functionality to manage key organizational information assets, including demographic data, enrollment, grades, transcripts, and other governmental agency reporting capabilities without authorization;

c. Failed to implement reasonable security and monitoring protocols to detect if an employee or agent was accessing the Protected Computers without authorization;

---

[57] U.S. Dep't of Justice, Criminal Div., *Prosecuting Computer Crimes*, at 3 (Summary of CFAA Penalties) (2d ed. 2021), available at: https://www.justice.gov/criminal/file/442156/dl (last visited July 17, 2025).



d. Knowingly allowed its personnel to access data stored in the Protected Computers that contained school and student data despite PowerSchool's express representations that this data was inaccessible and secured;

e. Intentionally enabled its personnel to access the Protected Computers via backdoor access to the SIS in a manner that was unauthorized in the first instance, and alternatively, exceeded any authorization;

f. Obtained unencrypted and identifiable data transmitted by the School Districts, and collected and/or aggregated that data into an export-ready format; and

g. Negligently allowed a third-party to steal data stored in the Protected Computers and obtained by PowerSchool, which contained all Plaintiffs' and the Class Members' student, teacher, and School District information.

198. Each incident of unauthorized access is an independent violation of the CFAA, and compromised the integrity and security of the School Districts' Data.

199. As a result of PowerSchool's negligence and wrongful conduct, PowerSchool's unauthorized access was exploited and Plaintiffs' and Class Members' highly sensitive information stored in the Protected Computers was left vulnerable and exposed, leading to its eventual exfiltration, and the subsequent ransom attacks against School Districts.

200. Additionally, at all relevant times, Bain Capital controlled, directed, and/or materially influenced PowerSchool's operations, including its data access policies, security practices, and strategic technology decisions. Bain Capital had access to confidential information related to PowerSchool's business operations, customer relationships, contractual data rights, and obligations under its Contracts with the School Districts.

201. Bain Capital was aware, or recklessly disregarded, that PowerSchool was contractually prohibited from accessing unencrypted and identifiable student and teacher data stored on the Protected Computers, unless and until consent was granted by the relevant School District. The data for the School Districts should have resided in access-



restricted environments – encrypted or otherwise siloed – under their Contracts, and this data fell outside PowerSchool's authorization to access.

202. Bain Capital knowingly authorized or ratified PowerSchool's use of a Backdoor Access Tool that bypassed bargained-for consent and access protocols, enabling PowerSchool employees to access the School Districts' unencrypted, identifiable data. Bain Capital also stood to financially gain from outsourcing backend technical operations for PowerSchool and easing bottleneck restrictions. Bain Capital either approved, was informed of, or failed to act upon PowerSchool's failure to obtain consent when using the Backdoor Access Tool, despite representations that data access was limited and secure.

203. Bain Capital stood to gain directly from PowerSchool's ability to aggregate and analyze large-scale student and school data. This capability enhanced PowerSchool's marketability, cost savings, and product development – critical factors in Bain Capital's valuation for PowerSchool – which emphasized the introduction of AI in schools.

204. Bain Capital had control over board-level and executive decisions regarding PowerSchool's personnel policies and compliance with federal and state data protection laws. Bain Capital directed or allowed PowerSchool to engage in conduct that Bain Capital knew would – or was willfully blind to – violate the CFAA. Bain Capital's oversight role extended not only to governance but also to risk mitigation and legal compliance, including information technology security operations.

205. Bain Capital and PowerSchool thus entered into a common scheme to access information stored on Protected Computers without proper authorization or in excess of authorization, to reduce costs and increase data aggregation, in violation of 18 U.S.C. §§ 1030(a)(2)(C), (a)(5)(C), and (b). Bain Capital's role in furthering the scheme constitutes conspiracy under § 1030(b).

206. Plaintiffs and Class Members suffered actual losses, including the cost of responding to the Data Breach, conducting damages assessments, restoring SIS data, programs, systems, or information to its condition prior to the Data Breach, costs incurred from overpayment of PowerSchool's security services, and/or other consequential damages



incurred because of interruption of the SIS during the past one-year period, and those actual losses aggregated at least $5,000 in value. 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), (e)(11).

207. Plaintiffs and Class Members were damaged as the integrity of the School Districts' data, systems, and/or information was impaired. 18 U.S.C. § 1030(e)(8).

208. Under 18 U.S.C. § 1030(g), Plaintiffs may maintain a civil action against Defendants to obtain compensatory damages and injunctive relief or other equitable relief. Defendants' acts have caused actual monetary loss in terms of overpayment for services, as Plaintiffs and Class Members paid for a secure platform. Plaintiffs and Class Members did not receive the benefit of their bargain. Unless Defendants' are also enjoined from foregoing PowerSchool's data security obligations, PowerSchool will continue to fail to take reasonable security measures to protect the School Districts' data, and so injunctive relief is appropriate.

**COUNT 5**
**VIOLATION OF CALIFORNIA'S COMPREHENSIVE**
**DATA ACCESS AND FRAUD ACT**[58]
**Cal. Penal Code § 502, *et seq.***
**(On behalf of the Nationwide Class against Bain and PowerSchool)**

209. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147, and 183 through 208, and incorporate the same as if set forth herein.

210. In enacting the California Comprehensive Data Access and Fraud Act ("CDAFA"), it was the intent of California's Legislature to provide protection from "interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

211. California's Legislature further found "that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

---

[58] Re-pleaded here solely to preserve the record.

212. The CDAFA creates a private right of action against persons who:

a. "Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." Cal. Penal Code § 502(c)(1);

b. "Knowingly and without permission uses or causes to be used computer services." Cal. Penal Code § 502(c)(3);

c. "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section." Cal. Penal Code § 502(c)(6); and/or

d. "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network" Cal. Penal Code § 502(c)(7).

213. The California Legislature enacted the CDAFA as a state law analog to the CFAA, 18 U.S.C. § 1030 *et seq.*, with an important distinction that "access," as used throughout California's section 502(c), does not require "unauthorized" access to a computer, but merely requires knowing access. U.S. v. Christensen, 828 F.3d 763, 789 (9th Cir. 2015).

214. The CDAFA defines "Computer Network" as "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2). At all relevant times, the SIS was hosted on a Computer Network under the CDAFA, with data transmitted through the Computer Network, that was either hosted locally on School Districts' servers or on PowerSchool's optional cloud hosting service with its third-party partner, Microsoft Azure.

215. The CDAFA defines "Computer Services" as "includ[ing], but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail



services, electronic message services, or other uses of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(4). At all relevant times, PowerSchool's SIS constituted a Computer Service licensed to Plaintiffs and Class Members.

216. The CDAFA defines "Computer System" as "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5). At all relevant times, data stored on the SIS was accessed using a Computer System under the CDAFA.

217. The CDAFA defines "Data" as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

218. Plaintiffs' and Class Members' licensed and/or owned "computers, computer systems, and/or computer networks" within the meaning of the CDAFA when licensing the PowerSchool SIS as a Computer Service, accessing the SIS and storing Data on Computer Systems, and transmitting Data using their respective Computer Networks.

219. The CDAFA provides that "a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Cal. Penal Code § 502(j).

220. The CDAFA provides that "in addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." Cal. Penal Code § 502(e)(1).

221. As described in paragraphs 184 through 209, in addition to violating the CFAA, PowerSchool and Bain Capital also violated the CDAFA by knowingly and without



permission accessing, using, or damaging, Plaintiffs' and Class Members' data; using Computer Services; assisting in unauthorized access; and causing unauthorized access to Plaintiffs' and Class Members' Computer Systems, including in furtherance of a scheme to defraud and to wrongfully obtain data and property.

222. Each incident of unauthorized access is an independent violation of the CDAFA, and compromised the integrity and security of the School Districts' Data.

223. As a direct and proximate result of Defendants' unlawful conduct within the meaning of the CDAFA, Defendants have caused loss to Plaintiffs and Class Members and profited at their expense.

224. Plaintiffs and Class Members seek compensatory damages, in an amount to be proven at trial, and injunctive or other equitable relief, including without limitation restitution of the revenue and other benefits accruing to Defendants by virtue of their violations of the CDAFA, as well as to recover reasonable attorneys' fees under Cal. Penal Code § 502(e).

225. Plaintiffs and Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Defendants' violations were willful and, upon information and belief, Defendants are guilty of fraud or malice as defined in Cal. Civil Code § 3294.

226. Plaintiffs and Class Members also have suffered irreparable injury from these unauthorized acts of disclosure, to wit: all of their personal, private, and sensitive data have been viewed, accessed, stored, and disclosed by Defendants, and due to the continuing threat of such injury, have no adequate remedy at law, entitling Plaintiffs and the Class to injunctive relief.



**COUNT 6**
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW[59]**
**Cal. Bus. & Prof. Code § 17200, *et seq.***
**(On behalf of the Nationwide Class against PowerSchool)**

227.   Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 and incorporate the same as if set forth herein.

228.   California's Unfair Competition Law ("UCL") prohibits any (1) unlawful, unfair, or fraudulent business act or practice and (2) unfair, deceptive, untrue, or misleading advertising. Cal. Bus. & Prof. Code § 17200, *et seq.*

229.   PowerSchool is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

230.   PowerSchool maintains its corporate offices and principal place of business in California and the acts and omissions complained of herein were conceived of, designed, implemented, and disseminated from within California.

231.   PowerSchool violated the UCL by engaging in unlawful, unfair, and fraudulent business acts and practices.

232.   PowerSchool's unlawful, unfair, and deceptive acts and practices include:

a.    Failing to implement and maintain reasonable security and privacy measures to protect information entrusted to it;

b.    Failing to identify foreseeable security and privacy risks and/or remediate identified security and privacy risks;

c.    Failing to comply with common law and statutory duties pertaining to the security and privacy of Protected Data;

d.    Misrepresenting that it would protect the privacy and confidentiality of information entrusted to it, including by implementing and maintaining reasonable security measures such as MFA and endpoint protection;

---

[59] Re-plead here solely to preserve the record.

e.    Misrepresenting that it would comply with industry standards and common law and statutory duties pertaining to the security and privacy of Protected Data;

f.    Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Protected Data; and

g.    Omitting, suppressing, and concealing the material fact that it did not comply with industry standards pertaining to the security and privacy of Protected Data.

233.    PowerSchool violated the UCL by engaging in and by deceptive, untrue, or misleading advertising. PowerSchool's representations and omissions were material because they were likely to deceive the School Districts about the adequacy of PowerSchool's data security and ability to protect the confidentiality of Protected Data entrusted to it.

234.    In violation of California Business and Professional Code § 17200, *et seq.*, PowerSchool's conduct cited herein is ongoing and includes, but is not limited to, statements made by PowerSchool in its information privacy and confidentiality practices.

235.    By engaging in the acts and practices described herein, PowerSchool knowingly and/or recklessly allowed access to Protected Data in ways that Plaintiffs and Class Members could not have anticipated. Plaintiffs' and Class Members' interests also were violated through PowerSchool's deceptive acts in that they were induced to do business with PowerSchool based on representations as to data security protections that PowerSchool willfully chose not to implement.

236.    As a result, Plaintiffs and Class Members have suffered injury-in-fact and have lost money and/or property as described herein. Such loss includes, but is not limited to, Plaintiffs' and Class Members' payments for data security services that they were promised but not received.

237.    In reasonable reliance on PowerSchool's misrepresentations and omissions, Plaintiffs and Class Members paid money for PowerSchool's services with the



understanding that a portion of that payment would be applied to data security when in reality Defendants diverted those funds to their own profits.

238. PowerSchool's business acts and practices are unlawful in that they violate:

    a.    Section 5 of the FTC Act, 15 U.S.C. § 45;

    b.    CFAA, 18 U.S.C. § 1030, *et seq.*; and

    c.    California CDAFA, Cal. Penal Code § 502.

239. PowerSchool's conduct violated the spirit and letter of these laws, which are intended to protect personal information from unauthorized access.

240. PowerSchool's conduct is unfair because it violated this public policy by, among other things, intentionally disregarding its duties to safeguard Protected Data in its custody, diverting funds intended to apply to data security to its own profits, failing to inform Plaintiffs and Class Members as to material changes in its data security measures, and disregarding industry standards that it represented that it would comply with.

241. PowerSchool's business acts and practices are unfair because they cause harm and injury in fact to Plaintiffs and Class Members, and for which PowerSchool has no justification other than to increase, beyond what PowerSchool would have otherwise realized, its own profits to justify its market valuation and Bain Capital's investment.

242. PowerSchool's conduct lacks reasonable and legitimate justification in that PowerSchool has benefited from such conduct and practice while Plaintiffs and Class Members have been misled as to the nature and integrity of PowerSchool's services and have, in fact, suffered material disadvantage regarding the integrity of data that they entrusted to PowerSchool.

243. PowerSchool's acts and practices are fraudulent within the meaning of the UCL, because they mislead Plaintiffs and Class Members concerning the safety and security of information stored on PowerSchool's platform.

244. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all payments made to PowerSchool; declaratory



relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

### COUNT 7
### UNJUST ENRICHMENT[60]
### (On behalf of the Nationwide Class against Bain and PowerSchool)

245.    Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

246.    Plaintiffs bring this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.

247.    Plaintiffs bring this claim in the alternative to Count 1, Breach of Express Contract, provided that Plaintiffs and Class Members have no adequate remedy at law.

248.    Defendants Bain Capital and PowerSchool received monetary benefits from Plaintiffs and Class Members in the form of payments made under contracts for software services that were supposed to include adequate cybersecurity protections.

249.    Defendants knowingly accepted and retained those payments while deliberately failing to provide the full scope of services promised – specifically, by under delivering or omitting contractually required cybersecurity measures.

250.    Defendants' retention of these funds was unjust, as it resulted from fraudulent misrepresentations, omissions, and systemic concealment of material facts regarding the actual quality and security of the services provided.

251.    Defendants were aware that part of the money paid to them by Plaintiffs and Class Members was intended to be applied to data security and rather than appropriately fund their data security obligations, Defendants instead directed that money to their own profits.

---

[60] Re-plead here solely to preserve the record.



252. Under principles of equity and good conscience, Defendants should not be permitted to retain the financial benefits wrongfully obtained through their deceptive and wrongful conduct.

253. As a direct and proximate result, Plaintiffs and Class Members have suffered economic harm and are entitled to restitution in an amount to be determined at trial.

**COUNT 8**
**DECLARATORY AND INJUNCTIVE RELIEF**
**28 U.S.C. § 2201, *et seq.***
**(On behalf of the Nationwide Class against Bain and PowerSchool)**

254. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

255. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

256. An actual controversy has arisen in the wake of the Data Breach regarding Defendants Bain and PowerSchool's present and prospective common law and other duties to reasonably safeguard its customers' Data and Defendants' failure to maintain data security measures that effectively protect Plaintiffs and Class Members from further data breaches that compromise their Data. Plaintiffs and the Class continue to suffer injury as a result of the compromise of their Data and remain at imminent risk that further compromises of their Data will occur in the future given the nature and quantity of the Data stored by PowerSchool and Defendants' repeated failure to maintain adequate data security measures at PowerSchool resulting in the Data Breach, as described in detail herein.

257. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure School Districts' Data at PowerSchool and to timely notify School Districts of a data breach under the



common law, their Contracts with the School Districts, and Section 5 of the FTC Act;

b.      Defendants continue to breach this legal duty by failing to employ reasonable measures to secure School Districts' Data at PowerSchool; and

c.      As a result of Defendants' ongoing breach of this legal duty, Plaintiffs and Class Members remain subject to continuing and imminent risk of, among other things, extortion and litigation.

258.   The Court also should issue corresponding prospective injunctive relief requiring PowerSchool to employ proper security protocols consistent with law and industry standards to protect School Districts' Data.

259.   If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at PowerSchool. The risk of another such breach is real, immediate, and substantial. If another breach at PowerSchool occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

260.   The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs at PowerSchool, Plaintiffs and Class Members will likely be subjected to extortion, lawsuits, and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants already have a pre-existing legal and contractual obligation to employ such measures.

261.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at PowerSchool, thus eliminating the additional injuries that would result to Plaintiffs and Class Members.



## COUNT 9
### NEGLIGENCE
**(On behalf of the Nationwide Class against Movate)**

262. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

263. Defendant Movate is a technology services company that PowerSchool engaged as a subcontractor to provide technical support and network operations services for PowerSchool's SIS.

264. As part of its subcontractor relationship, PowerSchool provided Movate employees, including Rayson Cruz and others, with unfettered access to PowerSchool's PowerSource customer support portal and SIS containing highly sensitive Protected Data of School District students, parents, and faculty.

265. Movate held itself out as certified compliant under the International Standards Organization ("ISO") 27000 series cybersecurity framework, representing to consumers that it maintained appropriate security standards for handling sensitive data.

266. Movate knew that School Districts were legally required under federal and state law to protect student PII and that PowerSchool was contractually bound by Data Privacy Agreements to implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk.

267. Cybercriminals successfully breached PowerSchool's systems using compromised credentials belonging to Rayson Cruz, a Movate employee assigned to provide PowerSchool technical support to School District Clients. Cruz's Movate employee account, which Movate failed to adequately secure, provided the entry point for hackers to access PowerSchool's PowerSource customer support portal.

268. Through this compromised Movate employee account, hackers obtained "maintenance access" to PowerSchool's SIS database and exported entire "Students" and "Teachers" database tables to .CSV files.

269. The Movate employee account used to execute the Data Breach was not protected by multi-factor authentication or other basic cybersecurity measures, despite



industry standards requiring such protection for accounts with administrative access to sensitive databases. Movate could also have prevented the Data Breach by, among other things, requiring regular rotation of access credentials, implementing just-in-time access to Protected Data rather than persistent credentials, and requiring second level authorization to access or download sensitive information.

270. Movate violated multiple industry standards including failing to apply the principle of least privilege by allowing its employees to have broad administrative access far exceeding what was necessary for their assigned technical support functions.

271. Despite representing ISO 27000 series compliance, Movate's actual security practices fell far short of industry standards for protecting sensitive PII and PHI in educational technology environments.

272. Movate owed Plaintiffs a duty to exercise reasonable care in handling, securing, and preventing unauthorized access to student and faculty Protected Data. This duty arose from multiple sources.

273. First, Plaintiffs' specific harm was entirely foreseeable to Movate. Movate knew or should have known that failing to secure employee credentials with administrative access to educational databases would create a foreseeable and substantial risk of a breach to sensitive data security systems and significant harm to School Districts.

274. Second, by accepting PowerSchool's engagement as a subcontractor with administrative access to School Districts' sensitive Protected Data, Movate assumed a position of trust and became an integral component of the data security framework that School Districts relied upon. Thus, a special relationship existed between School Districts and Movate which gave rise to Movate's duty to Plaintiffs.

275. Third, industry standards and the applicable regulatory framework under which Movate operated gave rise to the duty Movate owed to School Districts. Educational technology providers and their subcontractors operate under heightened duties due to legal obligations to: (i) protect student records as required under FERPA; and (ii) not engage in unfair data security practices under Section 5 of the FTC Act. Movate also failed to adhere



to the data security industry's "best practices" by granting a single employee access to an unreasonably broad range of private, sensitive data. As a data vendor responsible for storing and protecting School Districts' information, Movate owed a duty inherent to its role as a data vendor.

276. Fourth, the contracts between School Districts and PowerSchool are an additional source of the duty Movate owed to Plaintiffs. These contracts all contained specific security obligations, including requirements to:

    a.    implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk;

    b.    take reasonable measures to ensure the reliability of employees, agents, and contractors;

    c.    limit data access to the minimum extent necessary; and

    d.    comply with federal, state, and local data protection laws.

277. Movate, as PowerSchool's key subcontractor for technical operations, had a duty to perform its services in a manner that enabled PowerSchool to fulfill these contractual obligations to School Districts.

278. Fifth, the FTC's 2016 guidelines require companies to verify that third-party service providers have reasonable security systems in place. As such, Movate was required to maintain reasonable security systems as a third-party provider in the educational technology ecosystem.

279. Movate breached its duty of care to Plaintiffs through multiple negligent acts and omissions, including Movate's total failure to implement multi-factor authentication.

280. Despite industry standards and the highly sensitive nature of the data accessible through Rayson Cruz's account, Movate negligently failed to implement multi-factor authentication or any reasonable authentication security measures.

281. Movate also breached its duty to Plaintiffs due to Movate's inadequate credential security management. Movate failed to implement adequate policies and procedures for securing, monitoring, and rotating employee credentials with



administrative database access. As a direct and proximate result of this failure, Movate did not detect the compromise of Cruz's credentials in time to prevent unauthorized system access.

282. Movate's security failures violated fundamental cybersecurity principles established by:

a.   ISO 27000 series standards;

b.   NIST Cybersecurity Framework; and

c.   Center for Internet Security Controls.

283. Movate's breaches were particularly egregious given:

a.   the volume and sensitivity of PII potentially accessible through its systems (over 70 million individuals);

b.   the heightened regulatory environment governing educational data;

c.   known and increasing threats to educational technology providers; and

d.   PowerSchool's prior notification to the FBI regarding targeting by threat actors.

284. But for Movate's negligent security practices, the December 2024 Data Breach would not have occurred.

285. Movate's failure to implement multi-factor authentication on Cruz's account enabled hackers to exploit the compromised credentials to gain system access and carry out the Data Breach.

286. But for Movate's failure to limit Cruz's access privileges to the minimum necessary, hackers could not have obtained "maintenance access" to the SIS database.

287. But for Movate's inadequate credential security management, the compromise of Cruz's credentials would have been detected and remediated before the Data Breach occurred.

288. The Data Breach and resulting harms to School District Plaintiffs were foreseeable and natural consequences of Movate's negligent conduct in that:



a. Movate was aware that its services pertained to the protection of Data provided by the School Districts to PowerSchool;

b. educational technology systems are known high-value targets for cybercriminals due to the sensitive PII they contain;

c. accounts with administrative database access are recognized as particularly attractive and dangerous attack vectors; and

d. the lack of multi-factor authentication on privileged accounts is a well-known critical security vulnerability.

289. Movate, as a technology services provider, knew or should have known of these risks and the likely consequences of its security failures.

290. No intervening cause breaks the chain of causation between Movate's negligence and School Districts' injuries. The hackers' criminal conduct was the precise type of harm that Movate's security measures were supposed to prevent.

291. As a direct and proximate result of Movate's negligence, School District Plaintiffs have suffered and continue to suffer substantial damages, including but not limited to:

a. additional wages and overtime for staff diverted to breach response activities;

b. costs for hiring cybersecurity experts for incident investigation and risk assessment;

c. legal consultation and representation expenses;

d. expenses for implementing enhanced security measures and system modifications;

e. costs for providing credit monitoring and identity theft protection services to affected individuals;

f. administrative costs for breach notification and student support operations;



g.  loss of public confidence in School Districts' ability to protect sensitive student and family information;

h.  declines in student enrollment and corresponding loss of public funding;

i.  damage to School Districts' relationships with students, parents, and the broader community;

j.  increased risk of liability from lawsuits by affected students, parents, and faculty members;

k.  regulatory sanctions and compliance costs;

l.  expenses for monitoring misuse of stolen PII;

m.  future costs for enhanced security measures and third-party vendor oversight; and

n.  ongoing legal and expert consultation expenses.

292.  All of Plaintiffs' injuries and damages were within the foreseeable zone of risk that Movate created because:

a.  Movate deliberately and intentionally failed to take reasonable steps to secure the Data Plaintiffs entrusted to PowerSchool with the knowledge that doing so would affect Plaintiffs by depriving them of the benefits they reasonably expected to receive under their contracts with PowerSchool, in addition to the millions of students whose private and sensitive data Plaintiffs expected Movate to protect;

b.  Movate intentionally held itself out as a company that could be trusted to take adequate measures to secure and protect sensitive personal data with the knowledge that it was in fact in possession of such data while having failed to implement the most basic security measures per industry standards, regulations, and the very set of standards by which Movate claimed to abide;



c.   Movate, as a technology services company that purposefully contracted with PowerSchool, knew that the failure to uphold its duties would foreseeably cause a multitude of problems for School Districts, including, but not limited to, the need to devote substantial staff time to addressing the Data Breach, financial costs from needing to consult with lawyers and experts, and responding to the inquiries of the millions of parents, students, and faculty whose PII was compromised;

d.   Plaintiffs' injuries to date are certain and can be certain to continually accrue, while Plaintiffs' future damages are ascertainable and can be established through reliable expert testimony;

e.   there is a close connection between Movate's failure to take any meaningful steps to secure the data which contained the Data of students, parents, and faculty and the harms that School Districts have suffered and will suffer;

f.   there is a strong moral blame attached to Movate's conduct in that Movate held itself out as a company that specialized in protecting highly sensitive data while simultaneously taking deliberate steps in contradiction of the image it sought to project, all with the intent of minimizing costs and maximizing profits with a callous disregard for the effects of a breach of its easily penetrable security systems that allowed for one low-level employee to hold access to the PII of millions of people, most of whom were minors; and

g.   there is a strong policy in favor of imposing this legal duty on Movate, as evidenced by the dozens of federal regulations and state laws that impose special obligations on private entities in the business of storing and possessing Data that belongs to students and minors, the unreasonable risk of harm that exists when basic steps



are not taken to secure sensitive data containing minors' PII and PHI by businesses in Movate's position, and the fact that taxpayers are ultimately forced to bear the costs when these businesses recklessly endanger the security of students and others with full knowledge of the grave implications for these failures.

293. As a result of Movate's negligence and the despicable conduct in which Movate engaged while deliberately and consciously disregarding School Districts' rights, Plaintiffs seek all available general, special, punitive, and other damages allowed under law.

**COUNT 10**
**NEGLIGENT HIRING, TRAINING, SUPERVISION, AND RETENTION**
**(On behalf of the Nationwide Class against Movate)**

294. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

295. At all relevant times, Movate owed a duty to Plaintiffs to hire competent employees and agents, and to train and supervise them to ensure recognition of a compliance with its obligations to Plaintiffs.

296. As a subcontractor of PowerSchool, Movate's employees and agents have access to highly sensitive and confidential data stored on PowerSchool's SIS, including the PII of Plaintiffs' students, parents of students, and faculty. Moreover, many of these same employees and agents were employed and working off-shore, outside of the United States.

297. Movate, acting as PowerSchool's agent, owed non-delegable duties to Plaintiffs to hire competent employees and agents and to train and supervise them to ensure they would recognize the duties owed to Plaintiffs. Further, having been granted unfettered access to millions of students' and teachers' sensitive data, Movate had a duty to take reasonable steps to ensure adequate data security procedures and practices sufficient to maintain the confidentiality of the Protected Data.



298.   Movate had a duty to prevent foreseeable harm to Plaintiffs, who would foreseeably and probably suffer harm as the direct and proximate result of Movate's inadequate security practices. Movate knew that failing to safeguard the data containing the PII of Plaintiffs' students, parents of students, and faculty created a substantial risk of harm, as such data is routinely targeted and exploited by hackers.

299.   Movate was on notice of the importance of data security due to the abundance of information about the serious risks of inadequate security, including highly publicized breaches of data security systems that were carried out against educational institutions similarly situated to Plaintiffs.

300.   It was reasonably foreseeable that Movate's failure to train employees and agents about the importance of protecting their passwords, failure to require credential changes at regular intervals, and not providing restricted access would lead to a compromise of the security of the data containing the PII and PHI that Plaintiffs entrusted to PowerSchool and relied on Movate to protect.

301.   Movate's inadequate data security, training, procedures, and network infrastructures, along with its failures in hiring and training employees and agents, substantially caused the Data Breach and the damages Plaintiffs sustained, all of which are alleged herein.

302.   Movate hired Rayson Cruz, the employee who negligently allowed for the disclosure of the PII that was compromised in the Data Breach.

303.   Movate was negligent and failed to exercise the requisite standard of care in hiring, supervising, retaining, and training of its employees and agents, including, but not limited to, Rayson Cruz.

304.   Rayson Cruz was hired, trained, and retained as a Movate Team Leader who was assigned to provide technical support on behalf of PowerSchool and had access to the PowerSchool SIS and the massive trove of PII the system stored. As a result, his compromised credentials allowed the Data Breach threat actor to exfiltrate the Data that Movate possessed and purported to safeguard for Plaintiffs' benefit



305. At the least, Movate breached its duty to Plaintiffs by failing to (1) appropriately train its employees to secure their credentials; (2) rotate its employees' credentials; (3) and implement the principle of least privileges, which would have forbade Rayson Cruz from having a level of access far beyond what was necessary to perform his job functions.

306. Movate knew or should have known that Rayson Cruz was, or became, unfit or incompetent in his abilities to adequately and reasonably implement measures to secure the data that was compromised in the Data Breach. Rayson Cruz's unfitness and incompetence directly, proximately, and substantially caused Plaintiffs' harms.

307. Movate's negligence in hiring, supervising, training, and retaining Rayson Cruz was a substantial factor in causing Plaintiffs' harms, and Movate is accordingly liable for the injuries Plaintiffs suffered as a result of the Data Breach.

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all Class Members of the proposed Nationwide Class and/or Statewide Subclasses, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A. That the Court certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. That the Court grant permanent injunctive relief to protect the highly sensitive information of Plaintiffs and Class Members;

C. That the Court award Plaintiffs and Class Members compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

D. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of their unlawful acts, omissions, and practices;

E. That the Court award statutory damages, treble, and punitive or exemplary damages, to the extent permitted by law;



F.      That Plaintiffs and the Classes be granted the declaratory relief sought herein;

G.      That the Court award to Plaintiffs the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

H.      That the Court award pre- and post-judgment interest at the maximum legal rate; and

I.      That the Court grant all such other relief as it deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury as to all claims.

Dated: April 27, 2026                Respectfully submitted,

            /s/ James E. Cecchi
James E. Cecchi (NJ 030861989)
*Admitted Pro Hac Vice*
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Tel.: (973) 994-1700
Email: jcecchi@carellabyrne.com

Jason H. Alperstein (FL 64205)
*Admitted Pro Hac Vice*
**CARELLA, BYRNE, CECCHI,
BRODY & AGNELLO, P.C.**
2222 Ponce de Leon Blvd.,
Miami, Florida 33134
Tel.: (973) 994-1700
Email: jalperstein@carellabyrne.com

*Lead Counsel for the proposed School
District Class and Counsel for Plaintiffs*

John Nelson (SBN 317598)
**MILBERG, PLLC**
402 W Broadway, Suite 1760
San Diego, California 92101
Tel.: (858) 209-6941
Email: jnelson@milberg.com



Page **88** of **89**
MDL 3149, Case No. 25md3149
Track 2: School District Class Action

M. Anderson Berry (SBN 262879)
**EMERY REDDY, PC**
600 Stewart Street, Suite 1100
Seattle, WA 98101
Tel.: (916) 823-6955
Email: anderson@emeryreddy.com

Kristen Lake Cardoso (SBN 338762)
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel.: (954) 525-4100
Email: cardoso@kolawyers.com

Tyler S. Graden (NJ 028462007)
*Admitted Pro Hac Vice*
**KESSLER TOPAZ
  MELTZER CHECK LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Tel.: (610) 667-7706
Email: tgraden@ktmc.com

*Steering Committee for the proposed
School District Class*

Michael Critchley, Sr. (NJ 251821972)
*Pro Hac Vice Forthcoming*
**CRITCHLEY & LURIA, LLC**
75 Livingston Avenue
Roseland, New Jersey 07068
Tel.: (973) 422-9200
Email: mcritchley@critchleylaw.com

*Additional Counsel for Plaintiffs*

