Anne Johnson Palmer (SBN 302235)
**ROPES & GRAY LLP**
One Maritime Plaza, Suite 1800
300 Clay Street
San Francisco, CA 94111
Tel: (415) 315-6300
Fax: (415) 315-6350
anne.johnsonpalmer@ropesgray.com

James R. Drabick (MA BBO No. 667460)*
Monica Mleczko (MA BBO No. 696607)*
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000
Fax: (617) 235-0337
james.drabick@ropesgray.com
monica.mleczko@ropesgray.com

Christopher M. Young (SBN 163319)
Justin Van Ligten (SBN 353587)
**DLA PIPER LLP (US)**
4365 Executive Drive Suite 1100
San Diego, CA 92121
Tel: (619) 699-4748
Fax: (619) 764-6748
christopher.young@us.dlapiper.com
justin.vanligten@us.dlapiper.com

*Attorneys for Defendants PowerSchool Corporation and PowerSchool Group, LLC.*
[Additional counsel listed on signature block below]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| **IN RE: POWERSCHOOL HOLDINGS, INC. AND POWERSCHOOL GROUP, LLC CUSTOMER SECURITY BREACH LITIGATION**<br><br>This Document Relates To:<br>Track Two Class Action | ) | Case No. 25-MD-03149-AJB-MSB<br><br>**POWERSCHOOL'S ANSWER TO TRACK TWO CLASS PLAINTIFFS' SECOND AMENDED COMPLAINT** |

## ANSWER

Defendants PowerSchool Corporation (f/k/a PowerSchool Holdings, Inc.) and PowerSchool Group LLC (together, "PowerSchool"), through its undersigned counsel, states as follows as its Answer to the Track Two Class Plaintiffs' Second Amended Complaint ("SAC").

## INTRODUCTION

1. This class action arises out of PowerSchool's material uniform breach of its contracts with thousands of School Districts across the United States. Specifically, when the School Districts contracted to utilize PowerSchool's Student Information System ("SIS") – a database which houses highly sensitive data relating to students, school teachers, and administrative matters – PowerSchool committed to securing that data with industry standard cybersecurity protocols, including multi-factor authentication and password rotation for its contractors, endpoint protection for suspicious network activity, and encryption of identifiable data-in-motion. Unfortunately, PowerSchool failed to honor these critical and essential elements of its contracts. As a result, on December 19, 2024, hackers gained access to the SIS and exfiltrated unencrypted data belonging to the School Districts ("Data Breach" or "Breach"). The data concerned highly sensitive personally identifiable information ("PII") and protected health information ("PHI"), including confidential records containing full names, addresses, Social Security Numbers, medical information, disability status, criminal records, and other unspecified PII and PHI (collectively, "Data" or "Protected Data").

**ANSWER:** PowerSchool admits that it became aware of an attack by cybercriminals (the "Cybersecurity Incident" or "Incident") on its Student Information System ("SIS") platform on or about December 28, 2024; that School Districts contract with PowerSchool for use of the SIS; and that the SIS is a database that can be used to manage educational data, with School Districts

deciding which data are stored in the SIS. PowerSchool admits that its contracts contain provisions regarding data security. PowerSchool refers the Court to its website at https://www.powerschool.com/security/sis-incident/notice-of-united-states-data-breach/ for details concerning the data involved in the Incident. PowerSchool denies the remaining allegations in this paragraph.

2. Instead of immediately notifying the School Districts of the Data Breach, PowerSchool attempted to conceal it by negotiating with the hackers. A subsequent indictment by the Department of Justice revealed the identity of one of the hackers to be Matthew Lane, a nineteen-year-old college student, who worked with his accomplices (collectively, "Threat Actors"), to demand a ransom from PowerSchool in exchange for the return and/or destruction of the stolen Data. PowerSchool eventually paid the ransom and was promised by the Threat Actors that the School Districts' Data would be deleted.

**ANSWER:** PowerSchool admits that an individual named Matthew Lane was charged with, and pleaded guilty to, federal charges in July 2025 for his involvement in the Incident. PowerSchool admits that it paid a ransom to the Threat Actor(s) who attacked it in an effort to prevent dissemination of the data the Threat Actor(s) had obtained. PowerSchool denies the remaining allegations in this paragraph.

3. Unsurprisingly, the Threat Actors behind the theft did not destroy the Data, and there is every indication that it remains in the hands of bad actors, including the notorious cybercriminal collective, ShinyHunters. Specifically, even though law enforcement arrested and prosecuted Matthew Lane, at least one of his alleged accomplices remains unidentified and able to perpetrate additional ransom attacks on the School Districts. And, several of the School Districts have

subsequently been extorted by ShinyHunters, whose affiliation to the Threat Actors is unknown, despite PowerSchool paying the ransom.

**ANSWER:** PowerSchool denies the allegations in this paragraph, except to admit that certain school districts received communications purportedly from the Threat Actor(s) in May 2025 threatening release of the data (which did not occur).

4. The Data Breach resulted from an obvious vulnerability in PowerSchool's cybersecurity. In particular, it is believed that the Threat Actors obtained a single login credential that had been assigned to a contractor who worked for PowerSchool. The compromised credential was utilized from a server based in Ukraine. This should not have been possible because, had PowerSchool acted reasonably, it could have implemented a security feature called endpoint protection, which would have detected and blocked suspicious activity. But it did not, and as a result, this compromised credential enabled the Threat Actors to download all the Data without triggering a red flag in PowerSchool's cybersecurity system.

**ANSWER:** This paragraph contains Plaintiffs' characterization of PowerSchool's alleged conduct, which requires no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

5. To make matters worse, PowerSchool should never have had access to this information in the first place. The stolen Data was both unencrypted and identifiable in violation of PowerSchool's representations and contractual obligations, making it immensely more valuable, and its exfiltration was only possible because PowerSchool provided its personnel with access to the School Districts' restricted digital environments in the SIS. When PowerSchool's personnel log into the SIS with support credentials, the School Districts' Data is processed and decrypted, thus making it accessible, viewable, and downloadable. Despite contractual obligations to limit PowerSchool's access to only encrypted, anonymized, or de-identified data – and to obtain consent from the School Districts

before accessing unencrypted or identifiable information – PowerSchool failed to uphold these obligations. As a result, the School Districts' highly sensitive information was left vulnerable and exposed, directly resulting in the exfiltration of the Data and subsequent ransom attacks.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

6. The need for these basic security features was well known to PowerSchool. PowerSchool's Chief Executive Officer, Hardeep Gulati, has publicly acknowledged that school records are extremely valuable to cybercriminals. Yet, despite this awareness and its contractual obligations, PowerSchool failed to implement appropriate cybersecurity protocols to protect the Data.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

7. PowerSchool's failure to detect or contain the Breach followed a series of cost-cutting measures, including reductions to its internal security team and the outsourcing of backend operations at the direction of Bain Capital, who initiated its acquisition of PowerSchool on June 26, 2024. Full administrative backdoor access was granted to personnel without adequate oversight or enforcement of necessary security protocols. These financially-driven decisions compromised PowerSchool's cybersecurity and were undertaken to enhance PowerSchool's cash flow with little concern for the direct impact these decisions had on the School Districts.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

8. Through this action, Plaintiffs seek to recover economic damages as well as injunctive relief compelling PowerSchool to upgrade, enhance, and improve its cybersecurity and to maintain such improvements. The economic relief sought includes all damages naturally flowing from PowerSchool's breach of contract and Defendants' negligence, including, *inter alia*, overpayment and benefit of the

bargain damages, and compensation for time and resources the School Districts were required to divert responding to the Data Breach.

**ANSWER:** PowerSchool admits that Plaintiffs purport to seek damages as described in this paragraph, denies that Plaintiffs are entitled to the damages being sought, and otherwise denies the allegations in this paragraph.

## JURISDICTION & VENUE

9. This Court has subject matter jurisdiction under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, et seq., thus implicating federal question jurisdiction pursuant to 28 U.S.C. § 1331.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool responds that it does not dispute that the Court has subject matter jurisdiction over this action.

10. This Court also has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action in which the matter in controversy exceeds the sum of $5,000,000, there are more than 100 proposed Class Members, and minimal diversity exists, as Defendants are citizens of states different from that of at least one Class Member. This Court also has supplemental jurisdiction under 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool responds that it does not dispute that the Court has subject matter jurisdiction over this action.

11. This Court has personal jurisdiction over PowerSchool because it regularly conducts business in California and its headquarters is located in California.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool responds that it does

not dispute that it is subject to personal jurisdiction in California for purposes of this action.

12. This Court also has personal jurisdiction over Bain Capital. As discussed below, Bain Capital purposefully directed its activities toward California and availed itself of the benefits and protections of California law, based on its merger-related contacts with California and operational control over a California company. Specifically, Bain Capital approached PowerSchool—a California-headquartered company—about a business merger in August 2022. Further, Plaintiffs' claims arise out of Bain Capital's activities related to California.

**ANSWER:** The allegations in this paragraph are not alleged against PowerSchool, and therefore no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

13. This Court's exercise of jurisdiction over Bain Capital is reasonable and comports with fair play and substantial justice. First, Bain Capital's interjection into California is extensive: it negotiated a multi-billion-dollar acquisition of a California- headquartered company over two years, obtained contractual control rights during the interim period, and directed that company's operations after closing. Second, Bain Capital will not be burdened by defending itself in this forum because it is a sophisticated investment firm managing $185 billion in assets with counsel admitted in this district. Third, litigating in California will not conflict with the sovereignty of Massachusetts or Delaware, Bain Capital's state of incorporation. Fourth, California's interest in this litigation is substantial: PowerSchool is headquartered here, California residents' data was compromised, and California Plaintiffs seek relief under California law. Fifth, the JPML's consolidation of this MDL in this Court confirms that centralizing the litigation in California promotes efficient judicial resolution. Sixth, California is important to Plaintiffs' interests because PowerSchool is headquartered here and relevant documents and witnesses

are likely located here. Finally, while Massachusetts or Delaware might serve as alternative forums, the existence of an alternative forum does not render California unreasonable when all other factors support jurisdiction.

**ANSWER:** The allegations in this paragraph are not alleged against PowerSchool, and therefore no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

14. As also admitted by PowerSchool and Bain Capital, many of the relevant witnesses and evidence related to the Data Breach incident are located in California. *See In Re: PowerSchool Holdings, Inc., and PowerSchool Group, LLC Customer Data Sec. Breach Litig.*, MDL No. 3149, Docket No. 97 at 8, 10 (J.P.M.L. Feb. 20, 2025). Accordingly, the tortious conduct by Defendants giving rise to Plaintiffs' and Class Members' injuries and claims was conducted in and emanated from California.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

15. Moreover, this Court has personal jurisdiction over Defendants pursuant to 28 U.S.C. §1407, Rule 7.1 of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation ("JPML"), and the Transfer Order of the JPML in MDL 3149, ECF No. 152 ("Transfer Order"), transferring any actions related to this matter to this Court, as well as any future transfer orders the JPML may enter.

**ANSWER:** PowerSchool admits that this Court has jurisdiction over Defendants pursuant to 28 U.S.C. §1407, Rule 7.1 of the Rules of Procedure of the JPML, and the Transfer Order of the JPML in MDL 3149. PowerSchool denies the remaining allegations in this paragraph to the extent they assert independent bases for personal jurisdiction.

16. This Court has personal jurisdiction over Defendant Movate because this action arises from Movate's continuous and systematic contacts with California. Movate exercised control over the data Plaintiffs entrusted to PowerSchool, a California company. Movate intentionally directed contacts to California through technical support for PowerSchool customers and through its decision to conduct continuous business with PowerSchool.

**ANSWER:** The allegations in this paragraph are not alleged against PowerSchool, and therefore no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

17. Venue is proper in this District under 28 U.S.C. §1407 and Rule 7.1 of the Rules of Procedure of the JPML. Venue is also proper in this District pursuant to 28 U.S.C. § 1391, because PowerSchool's principal place of business is in California.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool responds that it does not dispute that venue is proper in this District insofar as the underlying actions in this multi-district litigation have been transferred to this Court pursuant to 28 U.S.C. § 1407 for centralized pre-trial proceedings.

## PARTIES[1]

18. Defendant PowerSchool Group LLC is a Delaware company based in Folsom, California. Defendant PowerSchool Group LLC is the operating company for PowerSchool. PowerSchool provides a suite of solutions, which includes a software suite for records used by state departments of education, school districts, charter schools, and public and private schools. As of June 30, 2024, PowerSchool

[1] On April 30, 2026, Track Two Class Plaintiffs notified PowerSchool that Track Two Class Plaintiff Brooklyn Laboratory Charter School is no longer pursuing its claims in this action.

served more than 18,000 customers, including over 90 of the 100 largest school districts by student enrollment in the United States. PowerSchool also has over 30 state-, province-, and territory-wide contracts in North America, and sold solutions in over 90 countries globally. PowerSchool's principal executive offices are located at 150 Parkshore Drive, Folsom, California 95630. Defendant PowerSchool Group LLC is, and was at all relevant times, a wholly owned subsidiary of Defendant PowerSchool Corporation, formerly known as PowerSchool Holdings, Inc.

**ANSWER:** PowerSchool admits that PowerSchool Corporation (formerly known as PowerSchool Holdings, Inc.) is a Delaware corporation headquartered at 150 Parkshore Drive, Folsom, California 95630. PowerSchool admits that PowerSchool Group, LLC is an operating company for PowerSchool Corporation. PowerSchool admits that it provides educational software for data management and admits that its customers include private and public schools and school districts. PowerSchool denies that it served more than 18,000 customers, admits that it has international customers, and denies the remaining allegations in this paragraph.

19. Defendant PowerSchool Corporation is a Delaware corporation headquartered at 150 Parkshore Drive, Folsom, California 95630. On October 1, 2024, PowerSchool Holdings, Inc. merged with and into BCPE Polymath Merger Sub, Inc., and became a wholly owned subsidiary of Defendant Bain Capital, L.P. Until October 1, 2024, PowerSchool was a publicly-traded company legally distinct from Defendant Bain Capital, L.P., including when the first known incident of unauthorized access occurred on August 16, 2024, and on September 17, 2024, the earliest known date of unauthorized access attributable to the Threat Actors.

**ANSWER:** PowerSchool admits that PowerSchool Corporation (formerly known as PowerSchool Holdings, Inc.) is a Delaware corporation headquartered at 150 Parkshore Drive, Folsom, California 95630. PowerSchool admits that on October 1, 2024, it was a publicly traded company. PowerSchool admits that on

October 1, 2024, it merged with BCPE Polymath Merger Sub, Inc., a wholly owned subsidiary of BCPE Polymath Buyer, Inc., with PowerSchool being the surviving entity of the merger. BCPE Polymath Merger Sub, Inc. and BCPE Polymath Buyer, Inc. are affiliates of investment funds advised by Bain Capital Private Equity, LP. PowerSchool denies the remaining allegations in this paragraph.

20. Defendant Bain Capital, L.P. is a Delaware limited partnership, which maintains its headquarters at 200 Clarendon St., Boston, Massachusetts. Bain Capital is one of the world's leading private multi-asset alternative investment firms. Since 1984, it has expanded into numerous asset classes, including private equity, credit, public equity, venture capital, real estate, life sciences, insurance, and other strategic areas of focus. It has offices on four continents, more than 1,800 employees, and approximately $185 billion in assets under management. Bain Capital, through its agents/alter egos, consummated the acquisition of PowerSchool in October 2024. Bain Capital dictates PowerSchool's strategic directives and uses PowerSchool's operations to further its private investment purposes.

**ANSWER:** The allegations in this paragraph are not alleged against PowerSchool, and therefore no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

21. In addition, Defendant Bain Capital, L.P. is the appropriate party named in this action because it serves as the corporate parent and ultimate controlling entity for all Bain Capital operations, exercised pervasive domination over its affiliated entities, and used them as mere instrumentalities to consummate its acquisition of PowerSchool. Defendant Bain Capital, L.P. dominated and controlled the following affiliates: Bain Capital Private Equity, L.P., Bain Capital Investors, LLC, Bain Capital Fund XIII General Partner, LLC, Bain Capital Fund XIII, L.P., Bain Capital Fund (Lux) XIII, SCSp, BCPE Polymath Topco GP, LLC, BCPE Polymath Topco, L.P., BCPE Polymath Intermediate, LLC, BCPE Polymath Buyer, Inc., and BCPE

Polymath Merger Sub, Inc. These entities were undercapitalized, had no meaningful independent operations, shared offices and personnel, and existed solely to carry out Defendant Bain Capital, L.P.'s private equity deals. For example, the boards of BCPE Polymath Buyer, Inc. and BCPE Polymath Merger Sub, Inc. consisted entirely of Bain Capital executives, including Dave Humphrey, Max de Groen, Valentin Fernandez, Krista Snow, and Bryan Curran, all of whom served in senior roles within Bain Capital's private equity business. At all relevant times there was a unity of interest and ownership between Defendant Bain Capital, L.P. and these entities such that separate personalities did not exist, and treating them as distinct would allow Defendant Bain Capital, L.P. to evade liability for its conduct.

**ANSWER:** The allegations in this paragraph are not alleged against PowerSchool, and therefore no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

22. Defendant Movate is a Delaware corporation headquartered at 600 Tennyson Parkway, Suite 255, Plano, Texas 75024. Movate is a technology services company that PowerSchool engaged as a subcontractor to provide technical support and network operations services for PowerSchool's Student Information System ("SIS"). Throughout the time period alleged herein, Movate had a continuous business relationship with Defendant PowerSchool. Upon information and belief, Movate failed to ensure that it and its employees had adequate protections in place to prevent unauthorized access to PowerSchool's systems, including SIS.

**ANSWER:** The allegations in this paragraph are not alleged against PowerSchool, and therefore no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

23. Plaintiff The Academy Charter School ("Plaintiff," for purposes of this paragraph) operates two tuition-free public charter school districts located in Hempstead, New York and Uniondale, New York, serving approximately 3,600

students. It includes six schools (elementary, middle, and high school), with education spanning from pre-kindergarten through twelfth grade. Plaintiff contracted with PowerSchool to utilize the SIS. As a result of failing to implement adequate cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Data Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and on that basis denies.

24. Plaintiff The Academy Charter School 2 ("Plaintiff," for purposes of this paragraph) is a tuition-free public charter school located in Wyandanch, New York, serving approximately 475 students. It includes one elementary school and one middle school, with education spanning from kindergarten through seventh grade. Plaintiff contracted with PowerSchool to utilize the SIS. As a result of failing to implement adequate cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Data Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and on that basis denies.

25. Plaintiff Our World Neighborhood Charter Schools ("Plaintiff," for purposes of this paragraph) operates three tuition-free public charter schools located in Queens, New York, serving approximately 1,500 students, with education spanning from kindergarten through eighth grade. Plaintiff contracted with PowerSchool to utilize the SIS. As a result of failing to implement adequate

cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and on that basis denies.

26. Plaintiff Irvington Public Schools ("Plaintiff," for purposes of this paragraph) is a school district serving 7,675 students located in Irvington, New Jersey. It includes thirteen schools, with education spanning from pre-kindergarten through twelfth grade. Plaintiff contracted with PowerSchool to utilize the SIS. As a result of failing to implement adequate cybersecurity, Plaintiff did not receive the benefit of its bargain, has lost time and money responding to the Breach, and anticipates spending additional time and money on an ongoing basis to mitigate and address the harms caused by the Breach.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and on that basis denies.

## FACTUAL ALLEGATIONS

### A. POWERSCHOOL COLLECTED AND ENABLED ACCESS TO THE SCHOOL DISTRICTS' PROTECTED DATA

27. PowerSchool is an education technology ("EdTech") company that provides data collection, storage, and analytics tools for K-12 school districts in the United States and abroad. On October 1, 2024, PowerSchool was acquired by Bain Capital in a transaction that valued the company at $5.6 billion. Among other products and services, PowerSchool sells a widely used service called PowerSchool's SIS, with an optional cloud-based storage solution hosted by PowerSchool's technology partner, Microsoft Corporation ("Microsoft Azure"), that

enables school districts to manage student records and provide access to grades, assignments, attendance, and schedules for educators, students, and parents.

**ANSWER:** PowerSchool admits it is an education technology company that provides software tools for K-12 education in the U.S. and abroad. PowerSchool admits that in 2024, it merged with BCPE Polymath Merger Sub, Inc., a wholly owned subsidiary of BCPE Polymath Buyer, Inc., with PowerSchool being the surviving entity of the merger. PowerSchool admits that it sells a product called SIS that is designed for educational data management. PowerSchool denies the remaining allegations in this paragraph.

28. PowerSchool's SIS is marketed as a solution that will "save time, reduce costs, improve student outcomes, and increase security." To enable this service, PowerSchool collects vast amounts of sensitive information from the School Districts, including records containing information about schoolchildren, parents, and teachers. Approximately 75% of the K-12 market in North America use the PowerSchool platform, including 90 of the 100 largest school districts in the United States.

PowerSchool recognizes that: "customers own their student and school data" and promised that it "has no rights to access or sell student or school data. [PowerSchool] does not collect, maintain, use, or share student personal information beyond that needed for authorized educational or school purposes or as authorized by the parent or student." PowerSchool also states that since "threats to student data privacy continue to rise…it's critical to ensure you're partnering with EdTech platform vendors that prioritize student data security" and prominently featured Single Sign-On ("SSO") and Multi-factor Authentication ("MFA") support as one of the "4 Key Features" of its "Student Data Privacy Platform":

**ANSWER:** PowerSchool admits that it markets the SIS and further states that its marketing materials speak for themselves, available here:

https://www.powerschool.com/solutions/. PowerSchool lacks information or knowledge sufficient to form a belief about the truth or falsity of the allegations




regarding the vaguely-defined "K-12 market" and the unspecified "PowerSchool platform," and on that basis denies those allegations. The remaining allegations in this paragraph contain Plaintiffs' characterization of PowerSchool's conduct, which requires no response. To the extent a response is required, PowerSchool denies the remaining allegations.

29. PowerSchool frequently instructed School Districts to implement MFA. PowerSchool represented that it took certain "accessing and credentialing" measures to ensure the data provided by the School Districts was protected, such as:

a. MFA, biometric authentication, role-based access controls, and VPN- secured product portals to ensure only authorized personnel can access customer data.

b. Shared credentials were strictly limited, tightly controlled, and only allowed when technically necessary.

c. Access to customer data as being reviewed monthly, requiring leadership approval, and automatically removed if no valid business need was identified.

d. Access to PowerSchool's SIS required PowerSchool-managed devices, with login sessions and maintenance windows purportedly restricted.

**ANSWER:** This paragraph contains Plaintiffs' characterization of PowerSchool's alleged conduct, which requires no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

30. PowerSchool also created marketing materials that emphasized the value of implementing basic cyber-security measures. For example, in a video uploaded to YouTube on October 5, 2023, titled "What is Multi-Factor Authentication," PowerSchool stated that MFA is "an essential tool in safeguarding your school's information" and "drastically reduces the risk of unauthorized access[,]" explaining that "with MFA in place, sensitive student and staff data remains secure[,]…[e]ven if a password is compromised." For this reason, PowerSchool stated that MFA is "a must-have feature," and that "it's crucial to prioritize [offerings] that include multi-factor authentication[,]" noting that "[i]t's a clear sign that [EdTech companies] take data protection seriously."

**ANSWER:** PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the marketing materials and YouTube video. PowerSchool respectfully refers the Court to the marketing materials and YouTube video for a complete and accurate presentation of their contents, available here: https://www.youtube.com/watch?v=_rQ4qCY1rpc. PowerSchool denies the remaining allegations in this paragraph.

31. On September 10, 2024, PowerSchool published an article on its website, titled the "Top 6 Best Practices for Improving Student Information System (SIS) Cybersecurity" and that included the following infographic:




**ANSWER:** PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the website. PowerSchool respectfully refers the Court to the website for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/blog/best-practices-improving-sis-cybersecurity/. PowerSchool denies the remaining allegations in this paragraph.

32. This article stated that "your SIS requires periodic maintenance to keep it secure" and outlined several measures that should be implemented to protect School Districts against a data breach, including the following:

> **Review and Set Permissions**
>
> Setting appropriate permissions is vital for safeguarding sensitive information. Not everyone in the school needs access to every piece of data. For instance, while teachers need access

to student grades, they shouldn't necessarily have access to payroll information or other sensitive administrative data.

Review the permissions set for all user roles in your system. Make sure students, teachers, and administrative staff have access only to the data and tools they need to perform their tasks. Overly broad permissions increase the risk of data breaches, either through malicious intent or accidental misuse. By tightening up these permissions, you help protect your school's information from falling into the wrong hands.

…

**Enable Single Sign-On (SSO) and Multi-Factor Authentication (MFA)**

Implementing Single Sign-On (SSO) and Multi-Factor Authentication (MFA) is a best practice that significantly boosts your school's cybersecurity. SSO allows users to log in once and gain access to all their necessary applications, reducing the number of passwords they need to remember. This not only makes life easier for users but also reduces the chances of password fatigue, where users might reuse passwords across different platforms.

MFA can be enabled as part of the SSO configuration (SAML or OIDC for those that are technically inclined). It adds an extra layer of security by requiring a second form of verification, such as a text message code or an authentication app, in addition to the password. This ensures that even if a password is compromised, unauthorized access is still prevented. Implementing these technologies helps protect sensitive

information and provides peace of mind that your school's digital assets are secure.

**ANSWER:** PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the website. PowerSchool respectfully refers the Court to the website for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/blog/best-practices-improving-sis-cybersecurity/. PowerSchool denies the remaining allegations in this paragraph.

33. PowerSchool also publicly represented it was implementing these security measures. For example, an article written by PowerSchool Chief Executive Officer, Mr. Gulati, stated that PowerSchool was one of the first software companies to commit to the Voluntary Pledge by the United States Cybersecurity and Infrastructure Security Agency ("CISA") to design products with greater security built-in, stating, "[c]ompanies signing the pledge publicly agree to take ownership of customer security outcomes, embrace radical transparency and accountability, and lead from the top by making secure technology a key priority for leadership."

**ANSWER:** PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the article. PowerSchool respectfully refers the Court to the article for a complete and accurate presentation of its contents, available here: https://web.archive.org/web/20250726031121/https:/www.powerschool.com/blog/powerschool-presents-cybersecurity-commitments-at-white-house-k-12-cybersecurity-data-privacy-event. PowerSchool denies the remaining allegations in this paragraph.

34. The very first rule for the CISA Voluntary Pledge – that Mr. Gulati claimed PowerSchool committed to – is to: "[w]ithin one year of signing the pledge, demonstrate actions taken to measurably increase the use of multi-factor

authentication across the manufacturer's products [as] Multi-factor authentication is the greatest defense against password-based attacks such as credential stuffing and password theft." Mr. Gulati wrote the article nearly two years before the Breach, yet failed to implement MFA for PowerSchool's support personnel.

**ANSWER:** PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the CISA Voluntary Pledge and the website. PowerSchool respectfully refers the Court to the CISA Voluntary Pledge and the website for a complete and accurate presentation of their contents, available here: https://www.cisa.gov/securebydesign/pledge. PowerSchool denies the remaining allegations in this paragraph.

35. PowerSchool also made multiple representations about the privacy and security standards that it implements across its product lines. For example, PowerSchool represents that it uses "industry standards" to "improve data integrity and security." It claims that all products are "[c]ertified to meet the 1EdTech open standard data & privacy rubric," and have received "ISO 27001" certification through "A-LIGN."

**ANSWER:** PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the website. PowerSchool respectfully refers the Court to the website for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/interoperability-overview/. PowerSchool denies the remaining allegations in this paragraph.

36. As another example, its "Cybersecurity, Data Privacy, and Infrastructure" webpage states that "PowerSchool is committed to being a good custodian of student data, taking all reasonable and appropriate countermeasures to ensure data confidentiality, integrity, and availability."

**ANSWER:** PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the website. PowerSchool

respectfully refers the Court to the website for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/blog/student-data-privacy-everything-you-need-to-know/. PowerSchool denies the remaining allegations in this paragraph.

37. The School Districts entrusted PowerSchool with highly sensitive, personal information that reveals extraordinarily granular details, including the innermost thoughts and insecurities of the School Districts' students – the disclosure of which invades and infringes upon their basic privacy rights and norms, as well as the School Districts' ability to protect their students and faculty. In entering into the relevant contracts at issue, it was of utmost importance that PowerSchool do everything it was contractually obligated to do in order to protect this data.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the School Districts in this paragraph, and on that basis denies. PowerSchool denies the remaining allegations in this paragraph.

38. Despite highlighting the security measures above as examples of "how PowerSchool provides superior student data privacy and security," PowerSchool failed to implement MFA and its backend administrators had unfettered access to student and school data. While the School Districts' Data is and was encrypted while at rest, upon logging into the SIS, the Data became fully decrypted and accessible to PowerSchool's personnel, allowing contractors to compromise the Data's integrity and providing those contractors with the capability to collect, obtain, and exfiltrate identifiable and unencrypted school and student records without oversight.

**ANSWER:** PowerSchool admits that the Data is and was encrypted while at rest. PowerSchool denies the remaining allegations in this paragraph.

### B. POWERSCHOOL FAILED TO PROTECT THE SCHOOL DISTRICTS' PROTECTED DATA

39. On January 7, 2025, PowerSchool publicly announced the Data Breach and disclosed that detailed records for tens of millions of schoolchildren, teachers, and administrators had been exposed.

**ANSWER:** PowerSchool admits that it publicly announced the Incident on January 7, 2025. PowerSchool respectfully refers the Court to the announcement for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/security/sis-incident/. PowerSchool denies the remaining allegations in this paragraph.

40. According to PowerSchool, on December 28, 2024, "PowerSchool became aware of a cybersecurity incident involving unauthorized exfiltration of certain personal information from PowerSchool Student Information System (SIS) environments through one of our community-focused customer support portals, PowerSource."

**ANSWER:** PowerSchool admits it became aware of the Incident on or about December 28, 2024. PowerSchool respectfully refers the Court to the announcement for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/security/sis-incident/. PowerSchool denies the remaining allegations in this paragraph.

41. While PowerSchool admitted that "the types of information exfiltrated in the incident included . . . the individual' s name, contact information, date of birth, limited medical alert information, Social Security Number, and other related information."

**ANSWER:** PowerSchool respectfully refers the Court to the announcement for a complete and accurate presentation of its contents, available here:

https://www.powerschool.com/security/sis-incident/. PowerSchool denies the remaining allegations in this paragraph.

42. On or about January 28, 2025, PowerSchool started notifying impacted parties of the Data Breach.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

43. Immediately following the Data Breach announcement, multiple affected School Districts reported that all of their historical data stored in PowerSchool, such as information about custodial rights to their children, had been accessed.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding multiple School Districts in this paragraph and on that basis denies.

44. For example, the Toronto District School Board confirmed that nearly forty years of student data was disclosed – for almost 1.5 million students – and included data on students' genders, grades, medical information, and disability accommodation details. Idaho's West Ada School District stated the stolen personal information from current and former students included "life-safety health and grade information." Alexandria City Public Schools in Virginia confirmed the Data Breach compromised students' personal information, medical data, and free meal statuses. Rochester City School District confirmed the stolen information included students' legal alerts, medical diagnoses, and medical conditions. In an email sent to parents in a School District in Wakefield, Massachusetts, the School District disclosed that custody alerts – including information such as custody agreements, restraining orders, and other legal information – was exposed for current and prior students, and it also reported that Data concerning students with special education plans, consisting of 708 current and former students, and medical alerts for 1,384 current and former students were exposed. Similarly, Adam Larsen, an assistant

superintendent at an Illinois School District, who also works as a data consultant for schools, said several of his clients had sensitive student mental health and special education data exposed.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and on that basis denies.

45. In or about January 2025, PowerSchool contracted with its historical and current cybersecurity vendor, CrowdStrike Holdings, Inc. ("CrowdStrike"), to investigate the Data Breach. CrowdStrike's report of the incident was released on February 28, 2025 ("CrowdStrike Report"). According to the CrowdStrike Report, hackers compromised PowerSchool's PowerSource customer support portal. PowerSource contained a maintenance access tool ("Backdoor Access Tool") that allows PowerSchool's customer support team, including Movate employees, full, direct access to unencrypted customer databases. Between December 19-28, 2024, the Threat Actors specifically performed "Maintenance Remote Support" operations in PowerSource, which, unbeknownst to the School Districts, was installed by default as part of the PowerSchool installation and left on in perpetuity. Once inside the SIS, the Threat Actors extracted and exported the Data from the students' and teachers' database tables in the SIS. It is unknown whether the Backdoor Access Tool was limited to PowerSchool's optional cloud-based storage vendor, Microsoft Azure, or whether the access extended locally to SIS software hosted on servers operated by the School Districts.

**ANSWER:** PowerSchool admits that its counsel engaged CrowdStrike to investigate the Cybersecurity Incident. PowerSchool admits that CrowdStrike delivered the CrowdStrike Report on February 28, 2025. PowerSchool respectfully refers the Court to the CrowdStrike Report for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/wp-

content/uploads/2025/03/PowerSchool-CrowdStrike-Final-Report.pdf. To the extent a response is required, PowerSchool denies the remaining allegations in this paragraph.

46. CrowdStrike found that the earliest unauthorized activity attributable to the Data Breach occurred on December 19, 2024, but its report also provided evidence of unauthorized activity as early as August 16, 2024. This unauthorized activity occurred just three days after PowerSchool laid off approximately 5% of its workforce, including domestic information technology staff, following the Bain Capital acquisition, as described below. Also, the first incident of unauthorized activity by the Threat Actors may have also occurred earlier, on September 17, 2024.

**ANSWER:** PowerSchool respectfully refers the Court to the CrowdStrike Report for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/wp-content/uploads/2025/03/PowerSchool-CrowdStrike-Final-Report.pdf. To the extent a response is required, PowerSchool denies the remaining allegations in this paragraph.

47. According to an indictment from the U.S. Department of Justice, PowerSchool received an extortion demand of approximately $2.85 million payable in Bitcoin on December 28, 2024. This is the first time PowerSchool learned of the Data Breach when the Threat Actors told PowerSchool that the Data was stolen. In that extortion demand, the Threat Actors claimed to have stolen the personal data of 62.4 million students and 9.5 million teachers.

**ANSWER:** PowerSchool admits that it became aware of the Incident on or about December 28, 2024. At this time, PowerSchool also received an extortion demand from the Threat Actor(s) seeking payment of 30 Bitcoin. PowerSchool admits that the Threat Actor(s) claimed to have stolen the personal data of approximately 62.4 million students and 9.5 million teachers, but denies that 62.4 million students and 9.5 million teachers' information was exfiltrated. To the

extent a response is required, PowerSchool denies the remaining allegations in this paragraph.

48. PowerSchool paid the ransom in exchange for a video allegedly showing the Threat Actors deleting the only copy of the Data. However, as recently as May 7, 2025, extortion emails received by schools in Canada and North Carolina included samples of the stolen Data, demonstrating that other copies of the Data were made.

**ANSWER:** PowerSchool admits that it paid a ransom in exchange for a deletion video. PowerSchool lacks knowledge or information sufficient to form a belief about the emails sent to schools in Canada and North Carolina, and on that basis denies the remaining allegations in this paragraph.

**1. POWERSCHOOL HAD A DUTY TO FOLLOW REGULATORY GUIDANCE AND INDUSTRY-STANDARD CYBERSECURITY PRACTICES**

49. The Breach and exfiltration were a direct result of PowerSchool's failure to comply with state and federal laws and regulations, as well as basic industry standards governing the protection of Data.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

**I. POWERSCHOOL IS A BUSINESS ASSOCIATE AND MUST COMPLY WITH HIPAA SECURITY STANDARDS**

50. The Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH") and their respective implementing regulations, imposes specific requirements relating to the privacy, security and the transmission of PHI. Among other things, HITECH makes HIPAA's security standards directly applicable to "business associates." As disclosed in its SEC filings, PowerSchool functions "as a business associate for certain of our customers that are HIPAA

covered entities and service providers, and in that context we are regulated as a business associate for the purposes of HIPAA."

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

51. As a business associate, PowerSchool is required by HIPAA to maintain HIPAA-compliant business associate agreements with its customers that are HIPAA covered entities and service providers, as well as its subcontractors that access, maintain, create or transmit individually identifiable health information on its behalf for the rendering of services to its HIPAA covered entity and service provider customers.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

52. Student and teacher medical records, disability status, and other PHI disclosed in the Data Breach violates HIPAA and PowerSchool's business associate agreements.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

53. As a business associate, PowerSchool is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

54. These rules establish national standards for the protection of patient information, including PHI. *See* 45 C.F.R. § 160.103.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

55. HIPAA limits the permissible uses of PHI and prohibits unauthorized disclosures of PHI and requires the implementation of appropriate safeguards for this information.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

56. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." *See* US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology ("NIST"), which OCR says, "represent the industry standard for good business practices with respect to standards for securing e-PHI." *See* US Department of Health & Human Services, Guidance on Risk Analysis.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

57. PowerSchool failed to comply with its duties under HIPAA and its own privacy practices. These failures include, but are not limited to:

a. Maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

b. Adequately protect Plaintiffs' and the Class Members' PHI;

c. Ensure the confidentiality and integrity of electronic PHI created, received, maintained, or transmitted, in violation of 45 C.F.R. § 164.306(a)(1);

d. Implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 C.F.R. § 164.312(a)(1);

e. Implement adequate policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 C.F.R. § 164.308(a)(1)(i);

f. Implement adequate procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports, in violation of 45 C.F.R. § 164.308(a)(1)(ii)(D);

g. Protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under privacy rules regarding PHI, in violation of 45 C.F.R. § 164.306(a)(3);

h. Take safeguards to ensure that PowerSchool's business associates adequately protect PHI;

i. Properly send notice to Plaintiffs and Class Members pursuant to 45 C.F.R. §§ 164.400-414;

j. Ensure compliance with the electronic PHI security standard rules by its workforce, in violation of 45 C.F.R. § 164.306(a)(4); and/or

k. Train all members of its workforce effectively on the policies and procedures with respect to PHI as necessary and appropriate for the members of its workforce to carry out and maintain security of PHI, in violation of 45 C.F.R. § 164.530(b).

**ANSWER:** PowerSchool denies the allegations in this paragraph.

58. PowerSchool failed to comply with its duties under HIPAA despite being aware of the risks associated with the unauthorized access of Plaintiffs' and Class Members' Protected Health Information.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

## II. POWERSCHOOL MUST COMPLY WITH FTC GUIDANCE REGARDING SAFEGUARDING THE SCHOOL DISTRICTS' DATA

59. PowerSchool also failed to comply with Federal Trade Commission ("FTC") guidance on protecting PII and complying with industry-standard cybersecurity practices. Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies, like PowerSchool. Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. To that end, the FTC recommends the following practices:

a. Limit access to customer information to only those employees who have a business reason to see it;

b. Keep customer information encrypted to provide better protection in case of theft;

c. Maintain up-to-date and appropriate programs and controls to prevent unauthorized access to customer information;

d. Use appropriate oversight and/or audit procedures to detect the improper disclosure or theft of customer information;

e. Monitor both in- and out-bound transfers of information for indications of compromise, such as large volumes of data being transmitted unexpectedly; and

f. Monitor activity logs for signs of unauthorized access to customer information.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph, including all subparts.

60. The FTC has also issued numerous guides for businesses highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

**ANSWER**: This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

61. In 2016, the FTC issued a publication, Protecting PII: A Guide for Business, which established guidelines for fundamental data security principles and practices for businesses. The guidelines note that businesses should protect the personal customer information they keep; properly delete PII that is no longer needed; encrypt information stored on computer networks; understand their networks' vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system or accessing from an

unknown location; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations regarding the FTC's publication in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

62. The FTC recommends, among other things, that businesses restrict employee access to sensitive customer information; require that strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third-parties with access to sensitive information use reasonable security measures.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations regarding the FTC's publication in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

63. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures that businesses must take to meet their data security obligations.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

## III. POWERSCHOOL WAS CONTRACTUALLY OBLIGATED TO MEET OR EXCEED INDUSTRY STANDARDS REGARDING ITS NETWORK SECURITY

64. PowerSchool failed to comply with industry standards relating to data security, including those expressly identified in PowerSchool's contracts.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

65. PowerSchool made promises to Plaintiffs and Class Members in its Main Services Agreements ("MSAs"), which incorporate the Data Privacy Agreements ("DPAs" together with the MSAs, the "Contracts").

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

66. PowerSchool's Contracts represent that it will comply with industry data standards including NIST and/or ISO 27001:2103, and that it was Service Organization Control 2 ("SOC 2") certified.

**ANSWER:** PowerSchool respectfully refers the Court to the more than 4,000+ Contracts it has produced in this case for a complete and accurate presentation of their contents. To the extent a response is required, PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the Contracts.

67. The Contracts required that PowerSchool implement, *inter alia*, the following:

a. **Passwords and Employee Access**. PowerSchool must secure usernames, passwords, and any other means of gaining access to the SIS or to customer data, at a level meeting or exceeding the applicable standards. PowerSchool must only provide access to customer data to employees or contractors who require access

pursuant to the Contracts, and only on terms consistent with or exceeding the data security measures required by the DPAs between the School Districts. PowerSchool failed to limit access to only those who explicitly require it, failed to implement a password rotation policy, and failed to silo and segment data.

b. **Security Protocols**. PowerSchool was required to maintain security protocols that met industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so. PowerSchool was required to maintain all data obtained or generated pursuant to the MSA in a secure digital environment. School Districts shared data with PowerSchool on the understanding – based on both contract and federal regulations – that the data would be encrypted, de-identified, and thus inaccessible to PowerSchool personnel.

c. **Security Technology**. PowerSchool must employ industry standard measures to protect data from unauthorized access. The security measures must include server authentication and data encryption. PowerSchool must host data pursuant to the MSA in an environment using firewalls that are updated according to industry standards. PowerSchool failed to implement server authentication, and as result the compromised user's credentials accessed the data from a server hosted in the Ukraine.

d. **Monitoring**. PowerSchool must log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability of customer data. PowerSchool failed

to detect the Data Breach and its endpoint protection failed to detect a download of the Data provided by the School Districts.

e. **Vendor-Data Subprocessors Bound**. PowerSchool must enter into written agreements whereby vendor-data subprocessors agree to secure and protect customer data. PowerSchool must periodically conduct or review compliance monitoring and assessments of vendor-data subprocessors to determine their compliance. PowerSchool failed to monitor its subprocessors and ensure those contractors implemented MFA protection and other industry standard data practices.

f. **Periodic Risk Assessment**. PowerSchool must conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner. Had PowerSchool conducted adequate risk assessments it would have detected the severe risk posed by its lax security standards.

g. **Established Security Policies**. PowerSchool must follow established access security policies to support the confidentiality, integrity, and availability of the Data against risks, including but not limited to unauthorized access, collection, use, disclosure or disposal, loss, or modification. Such security arrangements must include, without limitation, reasonable physical, administrative, and technical safeguards. PowerSchool failed to abide by its own policies and guidance, including providing timely notification to its customers and refusing to engage with threat actors during a ransom attack.

**ANSWER:** PowerSchool respectfully refers the Court to the more than 4,000+ Contracts it has produced in this case for a complete and accurate presentation of their contents. To the extent a response is required, PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the Contracts.

68. As set forth below, regardless of whether ISO 27001, SOC 2, or NIST standards are applied, Defendants' failure to implement MFA, encrypt data in motion and in transit, limit access to sensitive information to only essential employees, monitor its networks for unusual activity or transfer of large volumes of data, and ensure that employees are adequately trained was contrary to Defendants' contractual promises and was noncompliant with ISO 27001, SOC 2, and NIST standards.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

69. Under the NIST cybersecurity framework, PowerSchool was further obligated to have the following reasonable administrative, technical, operational and physical safeguards and practices in place:

a. Data-in-transit (motion) is encrypted;

b. Data destruction is performed according to contract and agreements;

c. A plan for vulnerability management is developed and implemented;

d. Log/audit records are ascertained, implemented, documented, and reviewed according to policy;

e. Credentials and identities are issued, verified, managed, audited, and revoked, as applicable, for authorized devices, processes, and users; and

f. Remote access is managed by PowerSchool and also conforms to the ISO 27001:2013 standard.in-transit (motion) is encrypted;

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of Plaintiffs' legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph, including all subparts.

70. Relevant here, NIST standards require that organizations encrypt data both at rest and while in motion, " implement[] role-based access control and configuring it so that each user can access only the pieces of data necessary for the user's role" and "ensure that users who must access records containing PII only have access to the minimum amount of PII, along with only those privileges (*e.g.,* read, write, execute) that are necessary to perform their job duties."

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of Plaintiffs' legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations of this paragraph.

71. Like the NIST standard, the ISO 27001 standard focuses on establishing, implementing, maintaining, and continually improving an information security management system. Adopting ISO 27001 standards mitigates risk of unauthorized access and data breaches. ISO standards recommend that companies undertake a risk assessment to determine if encryption must be used to protect the confidentiality of sensitive information and ensure that the data is accessible to those who need them when it is required. ISO standards further address limiting access to sensitive data to only essential employees, implementing measures to ensure that

access to data is allowed only after a verified authentication process, and implement a system to alert the organization to unauthorized access to data.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of Plaintiffs' legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations of this paragraph.

72. Similarly, the SOC 2 standard is another widely recognized standard in the United States. SOC 2 compliance ensures that data is managed in a way that protects privacy and security, requiring regular audits and controls over data access. SOC 2 compliance examines whether organizations encrypt data in motion, restrict "access to information assets, including hardware, data (including during processing and in transmission), software, administrative authorities, mobile devices, output, and offline system components," and "identify and authenticate individuals who can access sensitive data and infrastructure, and segment networks and data bases and limit points of access to sensitive network segments."

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of Plaintiffs' legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations of this paragraph.

73. CISA guidance also encourages organizations to prevent unauthorized access by:

a. Conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

b. Regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

c. Ensure devices are properly configured and that security features are enabled;

d. Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

e. Disable operating system network file sharing protocol known as Server Message Block ("SMB"), which is used by threat actors to travel through a network to spread malware or access sensitive data.

CISA guidance further recommends use of the principle of least privilege ("POLP") should be applied to all systems so that users only have the access they need to perform their jobs.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of Plaintiffs' legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations of this paragraph.

74. CISA guidance recommends that using a comprehensive network, in addition to network segregation, will help contain the impact of an intrusion and prevent or limit lateral movement on the part of malicious actors.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of Plaintiffs' legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations of this paragraph.

75. Lastly, various cybersecurity industry best practices also have been published, are readily available, and should be consulted as a go-to source for an entity instituting, developing, maintaining, or enhancing its cybersecurity standards. Additional cybersecurity best practices include, but are not limited to, installing appropriate malware detection software, monitoring and limiting network posts, securing web browsers and email systems, configuring network infrastructure (like firewalls, switches, and routers), safeguarding physical security systems, training

staff on key cybersecurity aspects, monitoring for vulnerability alerts, and promptly detecting and addressing vulnerability alerts before exploitation by cybercriminals.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of Plaintiffs' legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations of this paragraph.

76. Not only should PowerSchool have had measures in place to prevent compromise in the first place, PowerSchool also should have properly siloed its systems. When data is properly siloed rather than maintained in a centralized database, an intruder is only able to access data to which any compromised credentials were allowed access rather than to the entire set of sensitive data. Had PowerSchool limited access to sensitive data sets to only essential employees, the hackers would have only been able to acquire a subset of data and not the entire student and teacher data sets at issue in the Data Breach.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

77. In the event of a breach of customer data, PowerSchool was obligated to notify victims of the security incident within three business days under the Contracts. Specifically, PowerSchool was contractually required to investigate and take reasonable steps to mitigate the breach, provide prompt notice to Plaintiffs and Class Members, and facilitate compliance with applicable laws, including to:

a. Take steps to mitigate and remediate a data breach;

b. Notify Plaintiffs and Class Members without undue delay;

c. Provide Plaintiffs and Class Members with sufficient information to permit Plaintiffs and Class Members to make a determination as to any notification obligations under federal, state, or local laws and regulations; and

d. Cooperate with Plaintiffs and Class Members and take commercially reasonable steps to assist Plaintiffs and Class Members in an investigation of the Data Breach.

**ANSWER**: This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph, including all subparts.

78. Upon learning of the Data Breach, PowerSchool substantially or entirely failed to perform these contractual obligations; rather PowerSchool instead:

a. Notified Plaintiffs and Class Members of the Data Breach ten or more days after learning that the Data Breach had occurred; an undue delay that diminished, constrained, and limited Plaintiffs' and Class Members' ability to learn who possessed the Data and which Data had been compromised;

b. Paid a futile ransom to the hackers before notifying Plaintiffs and Class Members of the Breach, thereby prioritizing PowerSchool's attempt to avoid liability rather than promptly informing the School Districts, which further exacerbated the effects of the Breach;

c. Failed to provide Plaintiffs and Class Members information that would be sufficient for Plaintiffs and Class Members to readily and adequately determine the scope of its legal obligations to notify students, teachers, parents, and employees;

d. Failed to take commercially reasonable steps to assist Plaintiffs and Class Members in an investigation of the Data Breach by keeping Plaintiffs and Class Members in the dark;

e. Failed to take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of data;

f. Failed to provide a security incident notification written in plain language after confirmation of the incident; and

g. Failed to provide a list of the types of data that were or are reasonably believed to have been the subject of the breach.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

79. As a result of failing to meet its obligations under the Contracts, Plaintiffs and/or Class Members suffered actual harm, including but not limited to, the following:

a. Paying inflated prices for services that were not actually provided;

b. Paying additional wages to staff members to address the Breach, such as overtime pay;

c. Increased workload on administrative staff for managing affected Data and addressing concerns from parents, students, and faculty;

d. Expenses for hiring cybersecurity experts to investigate the Breach;

e. Costs for cybersecurity experts to assess potential risks to students, teachers, parents, and staff;

f. Fees for cybersecurity experts to provide recommendations on securing the School Districts' Data;

g. Legal consultation costs to determine potential liability;

h. Legal expenses to understand regulatory compliance obligations;

i. Legal fees to prepare for potential lawsuits from affected individuals;

j. Expenses to transition data from PowerSchool to a different, more secure platform;

k. Technical support costs associated with data transfer;

l. Expenses for implementing improved security measures;

m. Lost opportunity costs from redirecting school staff to mitigate the Data Breach's impact;

n. Costs for providing continued credit monitoring and identity theft services to affected students, parents, and faculty;

o. Ongoing monitoring costs due to delayed or hidden fraudulent activity;

p. Expenses for drafting and sending notification letters/emails to affected individuals;

q. Costs for setting up support hotlines or response teams for inquiries; and

r. Administrative expenses for responding to concerns from students, teachers, parents, and faculty about the Data Breach.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

**2. POWERSCHOOL FAILED TO ENCRYPT DATA IN MOTION OR USE FOR THE SCHOOL DISTRICTS**

80. The CrowdStrike Report states PowerSchool's "systems and data storage were configured with AES-256 encryption for data at rest." Nevertheless, the Threat Actors were able to download the entirety of the affected School Districts' unencrypted Data. When PowerSchool personnel login through the PowerSource

support portal and utilize the Backdoor Access Tool, the Data is no longer at rest and is instead processed and decrypted.

**ANSWER:** PowerSchool respectfully refers the Court to the CrowdStrike Report for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/wp-content/uploads/2025/03/PowerSchool-CrowdStrike-Final-Report.pdf. PowerSchool otherwise denies the allegations in this paragraph.

81. When data is encrypted at rest, it means it's stored in an encrypted format on a device or server, unreadable without the decryption key. If a technical support administrator accesses that data and it becomes unencrypted, the data is no longer considered "at rest." Instead, it is now "in use" or "in process," as it's being actively accessed, processed, or viewed. The encrypted data at rest, stored securely (*e.g.*, on a database or disk), is then decrypted by the SIS when the administrator accesses it, typically using authorized credentials or a decryption key. This decryption happens in memory or within the application the administrator is using, allowing it to be read or manipulated.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which requires no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

82. Failing to implement encryption for data in motion is a critical point of vulnerability, as administrator (or an attacker with admin privileges) could misuse the unencrypted data. This failure directly contributed to the Data Breach.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

83. Any organization that utilizes cloud storage or services should be focused on cloud security. There are specific standards and guidelines readily available to assist any organization in managing cloud security, including:

a. ISO 27017, which provides guidance for cloud security and applies the guidance of ISO 27002 to the cloud with seven additional controls; and

b. ISO 27018, which is closely related to ISO 27017, and defines privacy requirements in a cloud environment, particularly how the customer and cloud provider must protect PII.

**ANSWER**: This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

84. Given that threat actors frequently attack cloud repositories, improved network security can help mitigate attacks. Had PowerSchool implemented sufficient network security protections, such as appropriate encryption Data during processing, then the Data Breach could have been prevented.

**ANSWER:** The first sentence of this paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in that sentence; PowerSchool also denies the remaining allegations in this paragraph.

85. PowerSchool was aware of its obligations to protect its customers' Data before the Data Breach, yet failed to take reasonable steps to protect it from unauthorized access. PowerSchool also was aware of the significant repercussions if it failed to do so because PowerSchool collected Data from millions of students, teachers, and School Districts and it knew that this Data, if hacked, would result in

injury, including to Plaintiffs and Class Members as it disclosed this risk in its Annual Report filed with the SEC.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

### 3. POWERSCHOOL FAILED TO IMPLEMENT BASIC SECURITY CONTROLS TO PROTECT THE SCHOOL DISTRICTS' DATA AND DETECT THE BREACH

86. Due to the lack of MFA protection, PowerSchool failed to prevent the theft of high-level administrative credentials, which should have required multiple security controls to use. As a result, the hackers were able to obtain compromised credentials for a contractor handling backend technical support, and then steal data for thousands of School Districts.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

87. As PowerSchool's CISO, Mishka McCowan, acknowledged in an interview – the PowerSchool Data Breach occurred through the Backdoor Access Tool allowing PowerSchool's support department to access student and school data in violation of its Contracts with the School Districts and representations about the scope of that access. In addition to not following its own advice, PowerSchool failed to comply with industry standards, as set forth above.

**ANSWER:** PowerSchool denies that the allegations regarding Mishka McCowan's interview constitute a complete or accurate characterization of that interview. PowerSchool denies the remaining allegations in this paragraph.

88. According to sources speaking with the news outlet, TechCrunch, PowerSchool told its customers the Threat Actors accessed its SIS using a single

compromised maintenance account associated with a Movate technical support subcontractor to PowerSchool.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding "sources" or TechCrunch, and on that basis denies.

89. As previously mentioned, PowerSchool fully recognized that "Multi-Factor Authentication (MFA) is a best practice that significantly boosts your school's cybersecurity." PowerSchool further recognized that multi-factor authentication, "adds an extra layer of security by requiring a second form of verification, such as a text message code or an authentication app, in addition to the password. This ensures that even if a password is compromised, unauthorized access is still prevented. Implementing these technologies helps protect sensitive information and provides peace of mind that your school's digital assets are secure."

**ANSWER:** PowerSchool denies that the allegations in this paragraph constitute a complete or accurate characterization of the webpage. PowerSchool respectfully refers the Court to the webpage for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/blog/best-practices-improving-sis-cybersecurity/. PowerSchool denies the remaining allegations in this paragraph.

90. Had PowerSchool practiced what it preached and required that all of its employees and contractors with access to sensitive information implement multi-factor authentication, the hackers would have been unable to use the compromised credentials to perpetrate the Data Breach.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

91. In addition to the failure to implement multi-factor authentication, as described above, it appears the subcontractor whose credentials were compromised is affiliated with an IT outsourcing company in the Philippines. By providing

subcontractors spread across the globe with access to the School Districts' data containing the Data of the School Districts, including for tens of millions of American students and teachers (including Social Security numbers, names, addresses, medical information, and more that could subject children to identify theft), PowerSchool further exposed its systems to threats without having sufficient safeguards or proper monitoring systems in place.

**ANSWER:** This paragraph contains Plaintiffs' characterization of PowerSchool's conduct, which requires no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

92. The Movate contractor – offshore or not – had been given back-office administrator functionality, as well as student-, parent- and faculty-facing functionality to manage key organizational information assets, including demographic data, enrollment, grades, transcripts, and other governmental agency reporting capabilities. This full administrative access exceeded the access permitted by the School Districts in their Contracts which allowed access to Protected Data under specific circumstances and with express authorization. Not only were these privileges excessive, but those credentials were not even properly secured by MFA, which PowerSchool frequently advised schools to implement and pledged that it had or would implement itself, but which it did not enforce the use of on Movate.

**ANSWER:** This paragraph contains Plaintiffs' characterization of PowerSchool's conduct, which requires no response. This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

93. To make matters even worse, following the Data Breach, TechCrunch reported that a second – so far undisclosed – data breach occurred. In January 2025, TechCrunch reported a separate security incident, involving a PowerSchool software engineer, whose computer was infected with malware which stole the engineer's

company credentials. The extent of this second breach, and the data that was stolen (if any) has not been disclosed publicly. Regardless of whether any additional data was unlawfully obtained, it reaffirms the inadequacy of data security practices at PowerSchool.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding the TechCrunch report, and on that basis denies. PowerSchool denies the remaining allegations in this paragraph.

94. Plaintiffs and Class Members contracted with PowerSchool on the reasonable expectation that PowerSchool would comply with its obligations to keep such information confidential and secure. PowerSchool failed to comply with these obligations.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief about Plaintiffs and Class Members' expectations. The remaining allegations in this paragraph state a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

95. PowerSchool could have, and should have, taken steps that would have mitigated the risks from the typical and fundamental hacking tactics that resulted in this Data Breach.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

96. The Data Breach was accomplished by using stolen access credentials, which did not require MFA when accessing unencrypted data stored in an internet accessible location. Defendants could have prevented the Data Breach by, *inter alia*, implementing spam filters to prevent phishing messages from reaching its employees, educating employees to detect and report phishing or other attempts to acquire access credentials, employing MFA to prevent stolen credentials from being

misused to gain access to sensitive data, ensuring that Data was properly encrypted or redacted when accessed by contractors, limiting access to Data to only necessary employees, and monitoring the network for instances of unauthorized access or unusual activity, including access to and the transfer of large volumes of the data.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

**4. THE DATA BREACH FOLLOWED SIGNIFICANT LAYOFFS OF POWERSCHOOL'S WORKFORCE AND OUTSOURCING OF ITS BACKEND OPERATIONS**

97. Beginning on August 31, 2022, Bain Capital expressed interest in discussing potential opportunities for a business combination or acquisition of PowerSchool. Over the next two years, representatives of Bain Capital had multiple meetings and communications (at least some of which occurred in California) with principal shareholders and with Mr. Gulati regarding PowerSchool's organic growth potential and strategic merger and acquisition opportunities. On June 6, 2024, these discussions culminated in PowerSchool and Bain Capital executing a merger agreement and, among other things, an equity commitment letter.

**ANSWER:** PowerSchool admits that it signed a merger agreement with BCPE Polymath Buyer, Inc. and BCPE Polymath Merger Sub, Inc. on June 6, 2024. PowerSchool lacks knowledge or information sufficient to admit or deny the remaining allegations as to Bain Capital, L.P., including the location(s) from which representatives of Bain Capital, L.P. joined online meetings or sent communications.

98. A group of private credit lenders provided debt financing for this $5.6 billion acquisition. The PowerSchool transaction is an example of a leveraged buyout, commonly referred to as an "LBO." This debt financing arrangement is secured and backed by substantially all of the assets and capital stock of PowerSchool and its subsidiaries. Accordingly, in order to consummate the merger,

PowerSchool shouldered nearly $3 billion in new debt – subject to an approximate 9.8% interest rate.

**ANSWER:** The allegations in this paragraph are not alleged against PowerSchool, and therefore no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

99. Given the high interest rates associated with acquiring capital for an LBO, the objective for private equity executives is to sell their investment for a short-term profit, not to organically grow the company over the course of decades. To that end, cost-cutting pays off almost instantly. A 2019 paper found that employment shrinks by an average of 4.4% in the two years following an LBO, and 12.6% when the company was previously publicly traded, like PowerSchool.

**ANSWER:** The allegations in this paragraph are not alleged against PowerSchool, and therefore no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

100. Aggressive cost-cutting measures were implemented by Bain Capital almost instantly while PowerSchool was still an independent, public entity. The measures implemented by Defendants not only contributed to the Data Breach, but also expressly breached PowerSchool's contractual and other obligations with the School Districts. At bottom, Defendants' actions to extract value fostered a process where costs were cut and liberties were taken with contractual obligations, with schools, schoolchildren, and teachers ultimately paying the price.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

101. Within three months of announcing the acquisition, on August 13, 2024, reports circulated that PowerSchool laid off 5% of its workforce, some of whom had been with the company for over twenty years.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding unidentified "reports,"

and on that basis denies those allegations. PowerSchool otherwise denies the remaining allegations in this paragraph.

102. An inside source claimed that "some departments were basically gutted." The justification for these layoffs from another source is that PowerSchool reported a quarterly earnings per share of $0.23, missing the consensus estimate by one penny.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations as being made by an "inside source" and on that basis denies those allegations. PowerSchool otherwise denies the allegations of this paragraph.

103. In the wake of the layoffs, former employees took to social media and career sites to voice their frustrations. A former Product Engineer complained of a "[l]arge scale layoff" and stated that it "is a general trend to outsource all the jobs to off shore…now it's shifting to support and product management." Another complained that the "[c]ompany is also clearly shifting to an India-based workforce at the expense of US-based employees." And yet another indicated that if someone works in the United States for PowerSchool, they "will get laid off within 6 months as your job responsibilities get moved [offshore.]"

**ANSWER:** PowerSchool lacks knowledge or information sufficient to admit or deny the allegations as being made by the unspecified former employees and on that basis denies those allegations. PowerSchool otherwise denies the allegations of this paragraph.

104. As noted above, the first incident of unauthorized access by a third-party actor occurred only three days after the mass layoffs, on August 16, 2024.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

105. Just prior to the merger, PowerSchool announced a major change to the company – seeking to nearly double its employees within the next 3 to 5 years by expanding into the Indian labor market. On January 8, 2025, PowerSchool

announced that its India-based workforce would expand from 1,300 to 2,000 personnel.

**ANSWER:** PowerSchool admits that it hired new employees before and after the Incident, which included employees in India, and denies the remaining allegations in this paragraph.

106. Concurrently with acquiring PowerSchool, Bain Capital announced its acquisition of Outsourcing, Inc., and stated that it desired to actualize Outsourcing's "VISION 2025" strategy, which relevantly states that companies offshoring will see reduced costs through offshoring and sharing back-office operations in engineering, as the below slide from a presentation shows:




**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Bain Capital, L.P., and denies the remaining allegations in this paragraph.

107. Likewise, the definitive merger statement relied upon analyses contemplating the efficiencies from offshoring, and those analyses were reviewed and approved by the executives for each Defendant. Indeed, representatives of

Goldman Sachs and Centerview relied upon certain offshoring cost-saving estimates provided by PowerSchool, that were approved by the Board of Directors and PowerSchool's management, for use in connection with Goldman Sachs' and Centerview's financial analyses and fairness opinions. Those assumptions stated: adjusted gross profit margins growing from 71% in 2024 to 74% in 2034, adjusted research and development expenses as a percentage of revenue ranging from 12% in 2024 to 10% in 2034, adjusted EBITDA margins ranging from 35% in 2024 to 48% in 2034, and increased utilization of PowerSchool's offshore centers of excellence.

**ANSWER:** PowerSchool respectfully refers the Court to the definitive merger statement and the referenced analyses for a complete and accurate presentation of their contents, available here: https://www.sec.gov/Archives/edgar/data/1835681/000119312524182995/d836904dprem14c.htm#tx836904_30. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

108. Shortly after Bain Capital's acquisition – and following the mass layoffs in the United States – outsourcing practices began across PowerSchool's lines of business. These actions align with Bain Capital's ambitious expansion plans while concurrently improving Gross Profit, R&D Costs, and Adjusted EBITDA for PowerSchool. The consequences are that Bain Capital has moved to swiftly execute on this offshoring plan while sacrificing data security and integrity in effort to rapidly cut costs.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Bain Capital, L.P., and denies the remaining allegations in this paragraph.

109. Bain Capital has a long and consistent history of investing in companies that offshore jobs to lower-wage countries, prioritizing cost savings over domestic employment. In short, Bain Capital does not just tolerate offshoring – it actively

directs, enables and profits from it. Its investments show a clear pattern: cut costs by shifting labor overseas, even at the expense of properly staffing and funding its target data security obligations.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Bain Capital, L.P., and denies the remaining allegations in this paragraph.

### C. POWERSCHOOL PAID A FUTILE RANSOM IN AN ATTEMPT TO CONTAIN THE EXFILTRATED DATA, WHICH IS STILL CIRCULATING AND BEING USED BY HACKERS

110. Since the Data Breach, multiple security researchers have reported signs of PowerSchool credentials circulating on the Dark Web. For example, a data leak report on the Data Breach provided infostealer statistics indicating a significant increase in the use of PowerSchool credentials, with many of the accounts used recently.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph, including those attributed to unspecified security researchers and the data leak report, and on that basis denies those allegations.

111. PowerSchool has itself acknowledged that paying a ransom does not guarantee the data will be deleted, stating that in the face of a ransom attack: "do not pay the ransom or negotiate with the attackers. Paying the ransom does not guarantee that you will get your data back, or that it will not be leaked or sold. It also encourages the attackers to continue their malicious activities and makes you a more attractive target for future attacks." Yet, PowerSchool failed to heed its own advice in the wake of the Data Breach.

**ANSWER:** PowerSchool respectfully refers the Court to the webpage for a complete and accurate presentation of its contents, available here:

https://go.powerschool.com/rs/861-RMI-846/images/Responsible_AI_Cybersecurity_Report.pdf?version=0. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

112. The CrowdStrike Report indicated that, as of February 28, 2025, the Data had not been sold on the Dark Web – yet stolen data also takes time to be published – as data holds its highest value before it is sold because its utility and exclusivity are intact. In underground markets undisclosed PII and PHI has the greatest potential for profit only when the buyer can be confident they are the sole possessor. Once data is sold – or worse, sold multiple times – it quickly loses value, as competitors race to exploit the same credentials. This degradation in value stems from both diminishing exclusivity and increasing detection risks.

**ANSWER:** PowerSchool respectfully refers the Court to the CrowdStrike Report for a complete and accurate presentation of its contents, available here: https://www.powerschool.com/wp-content/uploads/2025/03/PowerSchool-CrowdStrike-Final-Report.pdf. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

113. Selling data on the Dark Web or elsewhere creates traceability and risk. The act of transferring stolen information introduces exposure to law enforcement or countermeasures (*e.g.,* honeypots or fake buyers). For experienced actors in the "upper tier" of the underground economy, it is more profitable and less risky to exploit the data directly rather than sell it. Hence, raw data's worth lies not just in its market price, but in the potential value it holds before being diluted by risk, competition, or exposure.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which requires no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

114. Additionally, the underground economy operates under extreme uncertainty and dishonesty, often likened to a "market for lemons." Buyers have no way of verifying the quality or exclusivity of data before purchase. It is therefore likely that data leaked onto the Dark Web has already been drained for its resources.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which requires no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

115. It should not be surprising then that the Data has not been reported to have been leaked onto the Dark Web, but is instead being used in ransom attacks against School Districts by, at a minimum, ShinyHunters.

**ANSWER:** PowerSchool admits that the Data has not been reported to have been leaked onto the Dark Web. The remaining allegations in this paragraph contain Plaintiffs' generalized allegations in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

116. Shiny Hunters is a well-known collective of cybercriminals that has been credited with several large scale breaches going back to 2020. Shiny Hunters initially began by exfiltrating and attempting to sell stolen data but has since transitioned to using stolen data for extortion attempts and then, sometimes several years after the fact, publishing the data to anyone with internet access.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which requires no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

117. Months after PowerSchool assured School Districts that the Data Breach was contained, several School Districts were targeted with ransom demands.

Those targeted reported that the "sender has the same data that was hacked, leading state officials to believe the data is now in the hands of bad actors."

**ANSWER:** PowerSchool admits that certain School Districts received communications purportedly from the Threat Actor(s) in May 2025 threatening release of the Data (which did not occur). PowerSchool otherwise lacks knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph and on that basis denies.

118. The Sampson County Public Schools in North Carolina warned students and parents that ShinyHunters was targeting individuals affected by the Data Breach and cautioned them to "not open any suspicious links or emails related to this incident with content referencing in the first line of the email, 'We are ShinyHunters.' It further warned "not [to] engage with anyone claiming to have this data" and reminded affected families that PowerSchool was offering identity protection and two years of credit monitoring to victims of the Data Breach. However, because stolen information does not have a shelf life, Plaintiffs and Class Members will face the threat of extortion for years to come.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations regarding speculative future threat of extortion in support of their legal theories, which require no response. PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph and on that basis denies.

119. Some School Districts have decided not to renew their Contracts with PowerSchool, requiring them to expend time and resources researching and vetting alternative providers, removing their Data from PowerSchool, and providing their data to the new providers. For example, after confirming that "the people who sent the [ransom] texts have access to the same data that was compromised in December," the North Carolina Department of Instruction "said the state will not renew its

contract with PowerSchool, and instead [will] go with a different provider – called Infinite Campus – for its official student information system.” On August 7, 2025, the State Board of Education for North Carolina announced that it would move its student EdTech software solutions to a new company.

**ANSWER:** PowerSchool admits that some School Districts with operative Contracts as of December 28, 2024, chose not to renew their Contracts in 2025. PowerSchool admits that the North Carolina Department of Instruction made public statements regarding its student information system and respectfully refers the Court to those public statements for a complete and accurate presentation of their contents. PowerSchool lacks knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph regarding the School Districts and on that basis denies.

### D. PLAINTIFFS AND CLASS MEMBERS HAVE BEEN HARMED

120. PowerSchool provides subscription-based and support services that Plaintiffs and Class Members overpaid considerably for.

**ANSWER:** PowerSchool admits to providing certain subscription-based and support services to certain Plaintiffs. PowerSchool denies the remaining allegations in this paragraph, and specifically denies that any Plaintiffs or Class Members overpaid for the services.

121. As disclosed in its Annual Report for the fiscal year ending December 31, 2023, revenues from Subscriptions and Support totaled approximately $600,189,000, representing about 86.05% of PowerSchool’s total revenue for that year. Subscription and Support revenues are divided into two revenue recognition categories: Software-as-a-Service (“SaaS”), which accounted for $485,913,000 of

this total and Software Maintenance, which accounted for the remaining $114,276,000.

**ANSWER:** PowerSchool respectfully refers the Court to the Annual Report filed with the SEC for a complete and accurate presentation of its contents, available here: https://www.sec.gov/edgar/browse/?CIK=1835681. PowerSchool denies the remaining allegations in this paragraph.

122. Under its SaaS model, PowerSchool promises customers ongoing access to its application platforms – and this category includes income derived from those services. Meanwhile, the Software Maintenance category includes stand-ready services such as technical support and software updates and upgrades, which are provided on an as- available basis. SaaS and Software Maintenance services constitute the core offerings purchased by school districts from PowerSchool.

**ANSWER:** PowerSchool admits that it offers SaaS-based access to its application platforms and that the Software Maintenance category includes technical support services and software updates and upgrades. PowerSchool denies the remaining allegations in this paragraph, including any characterization of its business model, the nature of its "core offerings," or the scope of services purchased by School Districts that is not supported by the relevant contracts.

123. School Districts that acquired PowerSchool's SaaS services were promised secure, reliable maintenance and data security. However, despite substantial payments, those promises were not fulfilled. Specifically, PowerSchool's SIS platform – the "backbone" of its SaaS offerings – lacked multi-factor authentication and password rotation for contractors, endpoint protection for suspicious network activity, and adequate data encryption implementation, thereby jeopardizing sensitive information stored on the platform.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

124. Similarly, in the case of Software Maintenance, Plaintiffs and Class Members paid for "technical support services and software updates and upgrades," but failed to receive basic, fundamental data security protections – amounting to a fundamental overpayment – as described in this complaint.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

125. Plaintiffs and Class Members paid hundreds of millions of dollars annually for the use of the PowerSchool platform and for the storage and protection of their Data. Part of the price that Plaintiffs and Class Members paid included the funds necessary for the protection of the Data. Had Plaintiffs and Class Members known that Defendants would fail to adequately fund their data security obligations, or would divert those funds for their own profit, Plaintiffs and Class Members would not have paid for PowerSchool's platform or would have paid less for it.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief about the allegations regarding School Districts, and on that basis denies.

126. Defendants' failure to keep Plaintiffs' and Class Members' Data secure has severe ongoing ramifications and has forced the affected School Districts to devote valuable time and resources to understanding the Breach and how its students and teachers are affected, communicating known threats and risks to affected individuals, exploring alternate means of storing and processing their Data, and ensuring that sensitive data is protected against misuse and unauthorized access in the future. Plaintiffs and Class Members also have suffered reputational damage in addition to incurring the costs associated with the Data Breach. Plaintiffs and Class Members have suffered serious injury and face a present and imminent substantial risk of future injury, including extortion attempts and/or dealing with the consequences from the misuse of their Data.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief about the allegations regarding School Districts, and on that basis denies those allegations. PowerSchool denies the remaining allegations in this paragraph.

127. As a direct and proximate result of PowerSchool's known deficient data security practices, as well as Defendants' concealment of the same, Plaintiffs and Class Members have suffered and will continue to suffer injury.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

128. Defendants were required to safeguard Plaintiffs' and Class Members' Data, both by the Contracts, applicable laws, regulations, industry standards, and in equity, but did not. Because data privacy and security are an integral and necessary part of the software product offered by Defendants to Plaintiffs and Class Members. Plaintiffs and Class Members received a product that did not include all the benefits that they were promised, reasonably expected, or to which they were otherwise entitled to under their contracts. Plaintiffs and Class Members suffered an economic loss: the difference in value between the product as received and the product that they should have received.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

129. The difference in value between the product Defendants provided (lacking adequate data security), and the product Plaintiffs and Class Members should have received (with data security) is objective. If there is a difference between the market valuation of the product that should have been provided and the product as received, then all Class Members have suffered the same loss commensurate or proportional to the price paid by them or on their behalf for the SIS.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

130. Data security is obviously material to Plaintiffs and Class Members and they have been damaged whether or not an individual Class Member's data was

actually subject to the Data Breach by overpaying for features that were never implemented.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

131. Even apart from the overpayment for PowerSchool's services, the stolen Data is one of the most valuable commodities on the Dark Web. According to PowerSchool's Chief Executive Officer, ransom attacks can hold a district's data hostage until paying exorbitant sums of money (the average is $268,000). Moreover, there are time lags between when data is stolen, when it is used, and when the discovery occurs that it has been used. In some cases, data is leaked years after the initial exfiltration, demonstrating the ongoing risk that the Data at issue here will be misused.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph. PowerSchool specifically denies that these allegations contain a complete and accurate presentation of PowerSchool's Chief Executive Officer's statements regarding ransom attacks.

132. Plaintiffs and Class Members will need to remain vigilant against unauthorized use of the stolen Data for years to come and must continue to devote school resources to monitoring the Data Breach and communicating with affected individuals.

**ANSWER:** This paragraph contains Plaintiffs' generalized allegations in support of their legal theories, which require no response. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

133. Accordingly, Plaintiffs and Class Members seek full disgorgement of Defendants' ill-gotten gains. The revenues described in the preceding paragraphs are reflective of the dollar amounts that Defendants benefitted from on an annual basis in part due to their cost-cutting and unlawful conduct. Plaintiffs and Class Members allege that their payments to PowerSchool were excessive in light of PowerSchool's failure to deliver the functional data security and contractual support services promised under the Contracts. Plaintiffs and Class Members also seek compensatory damages for the measurable value of their Data, the cost of future protective measures, time spent remedying exposure, injunctive or equitable relief and any other damages, economic or non-economic, arising from Defendants' unlawful conduct.

**ANSWER:** PowerSchool admits that Plaintiffs and Class Members purport to seek disgorgement as described in this paragraph but denies that Plaintiffs are entitled to any such relief.

## CLASS ALLEGATIONS

134. Plaintiffs bring this class action individually on behalf of themselves and on behalf of all similarly situated School Districts, including state departments of education, school districts, charter schools, and public and private schools in a nationwide class and, in the alternative, statewide subclasses, pursuant to Federal Rule of Civil Procedure 23. As described below, this action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23(a), 23(b)(2), and 23(b)(3) (as well as the requirements for certification of one or more issue classes under Rule 23(c)(4)). Accordingly, Plaintiffs seek certification of the following Classes:

**ANSWER**: PowerSchool admits that Plaintiffs purport to bring this class action as described in this paragraph, but denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class

pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this paragraph.

**NATIONWIDE CLASS**

135. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), as applicable, Plaintiffs seek certification of the following nationwide class:

All School Districts in the United States that contracted with PowerSchool to provide a Student Information System ("Nationwide Class").

**ANSWER:** PowerSchool admits that Plaintiffs purport to bring this action on behalf of the class described in this paragraph, but denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this paragraph.

136. The Nationwide Class asserts claims against PowerSchool and/or Bain Capital – as delineated by each Count – for Breach of Express Contract (Count 1), Intentional Tortious Interference with Contract (Count 2), Negligence (Count 3), Violation of the CFAA, 18 U.S.C. § 1030, *et seq.* (Count 4), Violation of California's Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502(a), *et seq.* (Count 5), Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.* (Count 6), Unjust Enrichment (Count 7), and Declaratory Judgment and Injunctive Relief (Count 8).

**ANSWER:** PowerSchool admits that Plaintiffs purport to bring this action as set forth in this paragraph, however, pursuant to this Court's Order (ECF 440), Counts 4, 5, 6, and 7 have been dismissed. PowerSchool denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, with respect to the remaining claims.

137. In the alternative, Plaintiffs repeat and reiterate the Nationwide Class definition and claims on behalf of themselves and subclasses ("Statewide Subclasses" and with the Nationwide Class, the "Classes") consisting of School Districts in New Jersey and New York under the laws of each respective state.

**ANSWER:** PowerSchool admits that Plaintiffs purport to bring this action on behalf of the class described in this paragraph, but denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this paragraph.

138. Excluded from the Classes are Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Classes are any judicial officers presiding over this matter, members of their immediate family, and members of their judicial staff having a financial or other beneficial interest in the outcome of this litigation.

**ANSWER:** PowerSchool admits that Plaintiffs purport to bring this action on behalf of the class described in this paragraph, but denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged class pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this paragraph.

139. **Numerosity: Federal Rule of Civil Procedure 23(a)(1).** The members of the Classes are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, Defendants have acknowledged that thousands of School Districts have been affected. The list of affected School Districts is available from Defendants' records, and Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

140. **Commonality and Predominance: Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves common questions of law and fact, which predominate over any questions affecting individual Class Members. These common questions, among others, include:

a. Whether and to what extent Defendants had a duty to protect the confidentiality of the Data for PowerSchool's customers and former customers;

b. Whether PowerSchool failed to take reasonable and prudent security measures to ensure its systems were protected;

c. Whether Defendants enabled personnel and third-party partners to access unencrypted and identifiable School District records in violation of PowerSchool's DPAs;

d. Whether Bain Capital interfered post-acquisition with Class Members' contracts with PowerSchool and prevented their execution through sudden layoffs and outsourcing;

e. Whether PowerSchool failed to use reasonably available information to monitor its systems and prevent the Data Breach from happening;

f. Whether PowerSchool required its contractors and subcontractors to implement sufficient security measures, including the same security measures that it required for its direct employees;

g. Whether PowerSchool implemented MFA protection for its administrators and technical staff;

h. Whether Defendants knew or should have known that PowerSchool's computer and data storage systems were vulnerable to compromise;

i. Whether Defendants were negligent in failing to implement reasonable and adequate security procedures and practices at PowerSchool;

j. Whether Defendants' security measures for PowerSchool were reasonable in light of applicable legal and regulatory requirements and industry standards, including HIPAA and the FTC Act;

k. Whether the stolen Data was stored solely on PowerSchool's optional, cloud-based storage solution or whether the Threat Actors also gained administrative access to SIS software operating on servers hosted by the School Districts;

l. Whether Defendants exceeded or conspired to exceed authorized access of Plaintiffs' and Class Members' computer systems in violation of the CFAA, 18 U.S.C. § 1030, *et seq.;*

m. Whether Defendants exceeded or conspired to exceed authorized access of Plaintiffs' and Class Members' computer systems in violation of the CDAFA, Cal. Penal Code § 502(a), *et seq.;*

n. Whether Defendants committed unfair or unlawful trade practices in violation of California's UCL, Cal. Bus. & Prof. Code § 17200, *et seq.;*

o. Whether PowerSchool had any contractual obligations to provide for the security of its customers' Data;

p. Whether PowerSchool has complied with any contractual obligations to protect its customers' Data;

q. Whether Defendants failed to notify Plaintiffs and Class Members as soon as practicable and without delay after the Data Breach was discovered;

r. Whether Plaintiffs and Class Members overpaid for PowerSchool's services;

s. Whether Defendants' conduct resulted in or was the proximate cause of Plaintiffs' and Class Members' injuries;

t. Whether Plaintiffs and Class Members suffered damages or other losses because of Defendants' failure to protect their Data;

u. Whether Defendants should retain the money paid by Plaintiffs and Class Members to protect their Data; and

v. Whether Plaintiffs and Class Members are entitled to declaratory and injunctive relief.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph, including all subparts.

141. **Typicality: Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and harmed in the same way. Plaintiffs paid for cybersecurity protection features for the SIS that were not implemented. Plaintiffs' damages and injuries are akin to those of other Class Members, and Plaintiffs seek relief consistent with the relief of the Class.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

142. **Adequacy of Representation. Federal Rule of Civil Procedure 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of

the Classes because Plaintiffs are impacted members of the Classes and are committed to pursuing this matter against Defendants to obtain relief for the Classes. Plaintiffs have no conflicts of interest with the Classes. Plaintiffs' counsel are competent and experienced in litigating class actions, including extensive experience in data breach and data privacy litigation. Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the Classes' interests.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

143. **Predominance & Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Common issues in this litigation also predominate over individual issues because the issues discussed in the above paragraph on commonality are more important to the resolution of this litigation than any individual issues. The purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and Class Members may be relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

144. **Risk of Prosecuting Separate Actions.** This case is appropriate for certification because prosecuting separate actions by individual proposed Class Members creates the risk of inconsistent adjudications and incompatible standards of conduct for Defendants.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

145. **Ascertainability.** The Classes are defined by reference to objective criteria, and there is an administratively feasible mechanism to determine who fits within each Class. The Classes consist of School Districts that contracted for PowerSchool services, and class membership can be determined using PowerSchool's records.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

146. **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendants, through their uniform conduct, acted or refused to act on grounds generally applicable to the Classes as a whole, making injunctive relief appropriate. Injunctive relief is also necessary to uniformly protect the Class Members' Data. Plaintiffs seek prospective injunctive relief as a wholly separate remedy from any monetary relief.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

147. Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

**FIRST CAUSE OF ACTION**

**BREACH OF EXPRESS CONTRACT (ON BEHALF OF THE NATIONWIDE CLASS AGAINST POWERSCHOOL)**

148. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 above.

149. Plaintiffs bring this claim on behalf of the Nationwide Class under California law, or, in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.

**ANSWER:** PowerSchool admits that Plaintiffs purport to bring this action on behalf of the classes described in this paragraph, but denies that Plaintiffs have established or can establish the prerequisites to certification and/or maintenance of the alleged classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, and otherwise denies the allegations in this paragraph.

150. Plaintiffs, Class Members, and PowerSchool are parties to the Contracts. Plaintiffs and Class Members fully performed their obligations under the Contracts.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

151. The Contracts set forth the terms that govern customer data provided to PowerSchool. This customer data includes the Data of Plaintiffs' and Class Members' administration, employees, students, teachers, and/or parents of students, all of which was compromised and stolen while in the care, custody, and control of PowerSchool. The Contracts also describe PowerSchool's duties and responsibilities for handling customer data, requiring PowerSchool to do so in accordance with applicable law and pursuant to the terms of the Contracts.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

152. PowerSchool breached its Contracts by, among other things:

a. Failing to safeguard the confidential, private, and sensitive data it obtained from Plaintiffs and the Class. The Contracts require PowerSchool to maintain the confidentiality, privacy, and security of the customer data. This was a material term and an essential purpose of the Contracts – as well as a major factor for purchasing decisions – because each School District was required to obtain a regulatory-compliant system when entrusting PowerSchool with the handling of sensitive Data. The School Districts' decision to purchase and utilize SIS was conditioned on PowerSchool's reciprocal promise to safeguard the Data. The Data Breach has deprived Plaintiffs and Class Members of a benefit they reasonably expected to receive at the time the Contracts were made.

b. The Contracts impose limits on PowerSchool's access, collection, and processing of the Data, restricting PowerSchool to only those purposes provided for in the Contracts or consented to by Plaintiffs or Class Members. Access to the Data for any other means is limited by the Contracts to de-identified, anonymized, and/or encrypted data. The access restrictions in the Contracts prohibited PowerSchool from processing and using the Data without consent, and formed an essential element of the Contracts. However, PowerSchool personnel had broad, unfettered access to the Data despite these contractual access restrictions. The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures resulting in the unauthorized access, collection, and processing of the Data. Accordingly, PowerSchool violated and materially breached the Contracts by allowing the unauthorized access, collection, and processing of the Data.

c. The DPAs further provide details regarding what PowerSchool must do to ensure its employees, agents, contractors, and subprocessors comply with the terms of the Contracts, including by maintaining the confidentiality, security, and privacy of customer data. PowerSchool failed to ensure the compliance of its employees, agents, vendors and contractors as it agreed to in the Contracts. These employees, agents, vendors, contractors, and subprocessors should have implemented basic procedures and safe data practices - such as MFA, data encryption, password rotation, and endpoint protection - for purposes of ensuring the privacy and security of Data under the terms of the Contracts.

PowerSchool's failure to do so was unreasonable and inexcusable and directly caused the injuries complained of herein. PowerSchool's failure to ensure compliance by its agents, employees, contractors, and subprocessors, to whom PowerSchool provided access to customer data, also materially breached the Contracts.

d. With respect to processing and use of Data in PowerSchool's possession, PowerSchool breached its DPAs. For example, the DPAs require PowerSchool to obtain the School Districts' consent for certain access or use of their Data. PowerSchool was required to inform the School Districts when processing identifiable and/or unencrypted Data, and to obtain written consent if PowerSchool intended to collect or use identifiable and/or unencrypted Data. PowerSchool failed to perform its obligation under the Contracts concerning the processing and use of the Data, because it failed to implement reasonable security safeguards, such as encrypting aggregated data that PowerSchool processed, implementing endpoint protection and password rotation for personnel with access to the Data, and using MFA. Therefore, in failing to perform its obligations identified in the DPAs, PowerSchool materially breached the Contracts.

e. In the event of a breach of customer data, PowerSchool also was obligated to notify victims of the security incident within three business days. Upon learning of the Data Breach, PowerSchool substantially or entirely failed to perform these contractual obligations as PowerSchool.

f. PowerSchool was obligated to, at a minimum, abide by and maintain adequate data security measures, consistent with industry standards, to protect customer data from unauthorized disclosure or acquisition by an unauthorized person. PowerSchool also failed to perform its data security obligations according to industry standards and regulatory guidance, and have in place a Data Security and Privacy Plan. PowerSchool failed to perform its obligations under the Contracts, and the failure by PowerSchool to abide by commercially reasonable, industry security standards was a material breach of the Contracts.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

153. PowerSchool breached the Contracts despite knowing that the Data holds substantial value and is at great risk of being targeted by hackers.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

154. Plaintiffs and Class Members reasonably expected PowerSchool to perform its duties under the Contracts. Plaintiffs and Class Members were assured that PowerSchool could react in a timely and organized fashion to address the negative implications should a data breach occur. Plaintiffs and Class Members continued to perform their obligations and make payments under this reasonable belief.

**ANSWER:** PowerSchool lacks knowledge or information sufficient to form a belief about Plaintiffs and Class Members' expectations. The remaining allegations in this paragraph state a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

155. As a direct and proximate result of PowerSchool's breaches of the Contracts identified herein, Plaintiffs and Class Members have suffered monetary and other damages. This harm was foreseeable to PowerSchool as the Contracts expressly included these protections. These losses were and are unavoidable as they are a natural and probable consequence of PowerSchool's acts and omissions through which PowerSchool materially breached the Contracts.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

156. As a direct and proximate result of PowerSchool's breaches of the Contracts, Plaintiffs and Class Members were deprived of the full benefit of data security protection that was promised under the Contracts.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

157. Based upon PowerSchool's material breaches of the Contracts, Plaintiffs and Class Members seek to recover all available general damages, special damages, benefit-of- the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate Plaintiffs and Class Members for their injuries as permitted by law.

**ANSWER:** PowerSchool admits that Plaintiffs and the Class Members purport to seek the relief described in this paragraph but denies that they are entitled to any such recovery.

**SECOND CAUSE OF ACTION**

**INTENTIONAL TORTIOUS INTERFERENCE WITH CONTRACT (ON BEHALF OF THE NATIONWIDE CLASS AGAINST BAIN CAPITAL)**

158. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in

this paragraph. To the extent a response is required, PowerSchool denies the allegations.

159. Plaintiffs bring this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

160. Plaintiffs and Class Members entered into valid and enforceable Contracts with PowerSchool for EdTech software and related services, including contractual obligations for cybersecurity protections.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

161. Bain Capital had actual knowledge of these Contracts and their terms, including PowerSchool's cybersecurity obligations to Plaintiffs and Class Members, by virtue of its ownership interest, board-level oversight, and direct involvement in operational decisions at PowerSchool, including during the background phase of the merger. PowerSchool and Bain Capital described these cybersecurity obligations in detail in the Proxy statement filed with the SEC in connection with the acquisition, recognizing that the Contracts impose stringent cybersecurity protocols.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

162. Despite this knowledge, Bain Capital intentionally and improperly interfered with PowerSchool's performance under those Contracts by directing, encouraging, and/or pressuring PowerSchool to (1) reduce spending on cybersecurity infrastructure and compliance in order to increase profitability; (2) lay off employees involved in cybersecurity operations and information technology infrastructure as exemplified by the August 2024 layoffs; and (3) outsource backend administrative operations to offshore subcontractors as explained in the definitive merger statement filed with the SEC.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

163. Bain Capital's interference was neither justified nor privileged. It was done with the improper motive of maximizing its own financial return at the expense of PowerSchool's contractual obligations to Plaintiffs and Class Members.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

164. As a direct and proximate result of Bain Capital's intentional interference, PowerSchool breached its contractual duties by failing to provide the promised level of cybersecurity protections, thereby exposing Plaintiffs and Class Members to a Data Breach, increased risk of ransom attacks, lawsuits, and other consequences of cybercrime, and causing them to overpay for services not rendered.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in

this paragraph. To the extent a response is required, PowerSchool denies the allegations.

165. Plaintiffs and Class Members have suffered damages as a result of Bain Capital's tortious interference, including overpayments for under-delivered services, loss of contractual value, increased exposure to cybersecurity threats, and related harm.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

166. Plaintiffs and Class Members are entitled to compensatory and punitive damages in an amount to be proven at trial.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

## THIRD CAUSE OF ACTION

## NEGLIGENCE (ON BEHALF OF THE NATIONWIDE CLASS AGAINST ALL DEFENDANTS)

167. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 above.

168. Plaintiffs bring this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

169. Plaintiffs and Class Members were required to provide sensitive Data to use PowerSchool's SIS, and did so pursuant to PowerSchool's agreement to collect, encrypt, de-identify, and safely store their Data. Defendants had full knowledge of the sensitivity of the Data and the types of harm that Plaintiffs and Class Members could and would suffer if the Data were wrongfully disclosed.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

170. Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting the Data in their possession from being compromised, lost, stolen, accessed or misused by unauthorized persons. Defendants also owed a duty to Plaintiffs and Class Members to refrain from accessing, viewing, and/or using unencrypted and identifiable Data. More specifically, this duty included, among other things:

a. Designing, maintaining, and testing PowerSchool's security systems to ensure that Plaintiffs' and Class Members' Data in their possession was properly secured and protected;

b. Implementing processes that would detect a breach of PowerSchool's security system in a timely manner;

c. Timely acting upon warnings and alerts, including those generated by PowerSchool's security systems regarding intrusion to its networks;

d. Maintaining security measures consistent with industry standards discussed herein; and

e. Deleting Data that PowerSchool no longer reasonably has a legitimate business purpose in retaining.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

171. Defendants' duty to use reasonable care arose from several sources, including but not limited to, the following:

a. PowerSchool holds itself out as a protector of consumer data even previously advertising its privacy and cybersecurity pledges and accolades on its website. PowerSchool, along with Bain Capital, thereby assumed a duty to reasonably protect the Data entrusted to them. Because of PowerSchool's role as one of the largest EdTech companies, Defendants were in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach;

b. Defendants' duty also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC,

the unfair practice of failing to use reasonable measures to protect Data by companies, such as PowerSchool;

c. Defendants' duty also arose from state law in jurisdictions that have enacted statutes either based upon the FTC Act to create a duty or that incorporate similar duties (*see, e.g.,* Cal Civ. Code § 1798.100; Cal. Civ. Code § 1798.80);

d. Defendants violated Section 5 of the FTC Act and similar state consumer protection statutes by failing to use reasonable measures to protect PII/PHI and not complying with applicable industry standards;

e. PowerSchool had a duty under HIPAA as a business associate to implement reasonable safeguards to prevent unauthorized access to the Data in its possession;

f. PowerSchool violated HIPAA by failing to use reasonable measures to protect the Data and not complying with applicable industry standards;

g. Both Section 5 of the FTC Act and HIPAA are statutes designed to protect Plaintiffs and Class Members from the injuries complained of herein; and

h. Defendants also had a duty to safeguard the Data of Plaintiffs and Class Members and to promptly notify them of a breach pursuant to state statutes that require PowerSchool to reasonably safeguard sensitive Data.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

172. Defendants' actions and the resulting Data Breach constitute negligence *per se* by violating these laws and standards.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

173. Defendants also had common law duties to prevent foreseeable harm to Plaintiffs and Class Members. These duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. Not only was it foreseeable that Plaintiffs and Class Members would be harmed by PowerSchool's failure to protect their Data.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

174. PowerSchool voluntarily solicited and accepted Plaintiffs' and/or Class Members' Data, even offering to host the Data with its business associates. Plaintiffs and Class Members relied upon PowerSchool, who held itself out as possessing expertise in data security and was in a unique position to guard against the Data Breach, to exercise its professional judgment to safeguard that Data from unauthorized access. Plaintiffs and Class Members relied on PowerSchool's misrepresentations as to information uniquely in the possession of Defendants. Defendants failed to correct such statements despite knowing of their falsity.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

175. Defendants' duty to implement and maintain reasonable security measures also arose as a result of the special relationship that existed between PowerSchool, Plaintiffs, and Class Members. This special relationship arose because Plaintiffs and Class Members entrusted PowerSchool with their Data as part of the purchase of and subsequent use of services that PowerSchool offers as a major EdTech company. Defendants alone could have ensured that its security systems and data storage architecture was sufficient to prevent or minimize the Data Breach. The public interest will be furthered by imposing liability here as it will encourage similarly situated companies to implement reasonable and sufficient data security practices to ensure the protection of information entrusted to them. Public policy also recognizes that companies and agencies have legal and moral obligations to protect personal information with reasonable and appropriate safeguards.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

176. The Data Breach would not have occurred in the absence of negligence, and under the doctrine of *res ipsa loquitur*, it gives rise to an inference that PowerSchool acted negligently and failed to perform its duties to Plaintiffs and Class Members – particularly in ensuring reasonable security and privacy measures were taken by its employees, agents, vendors, contractors, and subprocessors.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

177. Defendants were required to provide timely, adequate, and appropriate notification of the Data Breach to Plaintiffs and Class Members. As discussed above,

Plaintiffs and Class Members needed timely and effective notice so they could take appropriate measures to prevent, mitigate, or ameliorate the damage caused by Defendants' misconduct.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

178. Defendants were subject to these "independent duties," untethered to any contract between PowerSchool, Plaintiffs, and Class Members.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

179. Defendants breached these duties owed to Plaintiffs and Class Members, as described above, and thus were negligent.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

180. Defendants knew that their computing systems and data storage were vulnerable to unauthorized access and targeting by hackers for the purpose of stealing and misusing the confidential Data, especially in light of the statements by Mr. Gulati that the School Districts' Data is particularly sensitive and highly valuable.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the

allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

181. Plaintiffs and Class Members were foreseeable victims of Defendants' inadequate data security practices, and failure to implement agreed upon protections.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

182. Defendants' duty extended to protecting Plaintiffs and Class Members from the risk of foreseeable criminal conduct of third-parties, which has been recognized in situations where the actors' own conduct or misconduct exposes another to risk or defeats protections put in place to guard against such risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts §302B (1965). Defendants' failure to take proper security measures to protect the sensitive Data for Plaintiffs and Class Members created conditions conducive to a foreseeable, intentional act; namely, the unauthorized access of Plaintiffs' and Class Members' Data.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

**FOURTH CAUSE OF ACTION**

**VIOLATION OF THE COMPUTER FRAUD AND ABUSE ACT 18 U.S.C. § 1030, *ET SEQ.* (ON BEHALF OF THE NATIONWIDE CLASS AGAINST ALL DEFENDANTS)**

183. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 above.

184. The CFAA provides a private cause of action against a person who:

a. "Intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss." 18 U.S.C. § 1030(a)(5)(C);

b. "Intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer." 18 U.S.C. § 1030(a)(2)(C) (An individual "exceeds authorized access when he accesses a computer with authorization but then obtains information located in particular areas of the computer – such as files, folders, or databases – that are off limits to him." *Van Buren v. U.S.*, 593 U.S. 374, 396 (2021)); or

c. "Conspires to commit or attempts to commit an offense under subsection (a)," including §§ 1030(a)(2)(C) and (a)(5)(C). 18 U.S.C. § 1030(b).

**ANSWER**: Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the

allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

185. PowerSchool, Bain Capital, Plaintiffs, and Class Members are "persons" because each is a firm, corporation, educational institution, and/or legal or other entity. 18 U.S.C. § 1030(e)(12).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

186. Plaintiffs, Class Members, and PowerSchool are parties to the Contracts.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

187. The SIS licensed by Plaintiffs and Class Members is hosted either locally on School District servers or on PowerSchool's optional cloud hosting service with its third- party partners. In either case, the data is stored on a "computer" under the CFAA, defined as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device[.]" 18 U.S.C. § 1030(e)(1).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

188. These computers qualify as "Protected Computers" under the CFAA, because the computers are "used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States." 18 U.S.C. § 1030(e)(2).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

189. PowerSchool informed Plaintiffs and Class Members that it employed physical, administrative, and technological safeguards for unencrypted and/or identifiable data transmitted to the Protected Computers – classifying that data as 'restricted.' PowerSchool promised to maintain all data it obtained or generated pursuant to the Contracts in a 'secure digital environment' that could only be accessed by parties legally allowed to do so.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

190. PowerSchool also represented to Plaintiffs and Class Members that "customers own their student and school data; ***PowerSchool has no rights to access or sell student or school data.***"

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

191. PowerSchool's Contracts state that all data, files, documents, and records transmitted to PowerSchool would be held in strict confidence and be restricted. PowerSchool promised that it would not process or use any identifiable and/or unencrypted data for purposes not contemplated in the Contracts, and if it wished to do so then it would first obtain written approval from the School Districts. Even for routine processing, PowerSchool agreed to inform the School Districts before accessing restricted information. These controls were necessary because, as PowerSchool explicitly acknowledged in the Contracts, the School Districts retained full ownership and control over their Data. Access to unencrypted data was restricted solely to School District personnel, teachers, parents, and students. All other data access was to occur only in a secured, encrypted, and anonymized form.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

192. School Districts shared data with PowerSchool on the understanding, based on both contract and federal regulations, that the Data would be encrypted and de-identified, and thus inaccessible to PowerSchool personnel. These contractual representations functioned as access restrictions within the meaning of the CFAA.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

193. PowerSchool promised to restrict access to unencrypted and/or identifiable data, requiring "the highest level of care and security" for the data and promising that it would implement "physical, administrative, and technological" safeguards to prevent access. Reasonable purchasers or licensees may have

understood this promise to encrypt and secure their data as similar to end-to-end encryption technology, such as that used by WhatsApp, Signal, and others to secure data in transit and protect that data from being read by third-parties.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

194. Plaintiffs and Class Members reasonably believed that their Data was safely secure in the Protected Computers and free from unauthorized access. PowerSchool was explicitly forbidden by its Contracts and applicable law– such as 16 C.F.R. § 312.5 – from accessing the Data without consent. PowerSchool accessed the Data anyways, without authorization and/or in excess of authorization for, among other others, two viable reasons:

a. PowerSchool stood to directly profit from accessing data stored on the Protected Computers. PowerSchool profited by aggregating and analyzing large- scale student and school data for its latest product offerings, and which also required loosening access restrictions to Protected Data. For example, in 2024 PowerSchool launched "PowerBuddy," an AI tool offering student tutoring, lesson planning for teachers, and analytics for administrators. PowerBuddy, built on a partnership between Microsoft Azure – the same cloud platform hosting the Protected Data and PowerSchool's third-party partner for optional cloud-based storage services – and OpenAI (called "Microsoft Azure OpenAI"), created a strong incentive for PowerSchool to leverage its access to sensitive customer data. Integrating PowerBuddy with information stored on the Protected

Computers provided a powerful conversational AI tool for students and teachers, creating every financial incentive for PowerSchool to loosen access restrictions, improve data aggregation, and reduce privacy protections.

b. PowerSchool reduced support costs by minimizing communication with the School Districts and allowing its personnel unfettered access into and out of the Protected Computers. The Data Breach occurred in part because PowerSchool installed – and left on in perpetuity – a Backdoor Access Tool that enabled PowerSchool's personnel to access the Protected Computers without consent by the School Districts. The Backdoor Access Tool allowed PowerSchool personnel to disregard the requirement that PowerSchool obtain informed consent from the School Districts to access the Protected Data; information that was supposed to be encrypted and siloed in a secure digital environment on the Protected Computers. This backdoor access tool saved PowerSchool's technical support significant time by providing access without communicating with the School Districts – it also had potential to enable offshoring efforts by Bain Capital – with non-native English speakers more easily able to provide technical support without engaging directly with customers. Without the benefit of discovery, it is not possible to know whether this access was limited to PowerSchool's optional cloud-based SIS storage option on Microsoft Azure, or whether PowerSchool's unauthorized access extended to Protected Computers hosted and maintained locally on the School Districts' servers.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

195. Even if assuming, *arguendo*, that Plaintiffs and Class Members had consented to PowerSchool accessing their SIS on the Protected Computers, that consent was not voluntary because PowerSchool concealed the backdoor access tool and failed to inform Plaintiffs and Class Members that, in spite of its extensive data protection promises, its personnel had the capability to access nearly all of the School Districts' unencrypted and identifiable data, exfiltrate it *en masse*, and download that data without it even triggering a security alert in PowerSchool's systems. If PowerSchool had obtained consent, then it was ill-gotten, and PowerSchool made materially misleading representations regarding the nature of security services it offered to gain access to Plaintiffs' and Class Members' business and highly sensitive information as described above.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

196. As a result of PowerSchool's conduct, PowerSchool "accessed a computer and obtained information" and/or negligently "caused damage and loss" as described below, in violation of 18 U.S.C. §§ 1030(a)(2)(C), (5)(C).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

197. PowerSchool acted negligently when it:

a. Enabled personnel to access Plaintiffs' and the Class' Protected Data without their consent;

b. Enabled personnel to have back-office administrator functionality over all PowerSchool systems, as well as student-, parent- and faculty-facing functionality to manage key organizational information assets, including demographic data, enrollment, grades, transcripts, and other governmental agency reporting capabilities without authorization;

c. Failed to implement reasonable security and monitoring protocols to detect if an employee or agent was accessing the Protected Computers without authorization;

d. Knowingly allowed its personnel to access data stored in the Protected Computers that contained school and student data despite PowerSchool's express representations that this data was inaccessible and secured;

e. Intentionally enabled its personnel to access the Protected Computers via backdoor access to the SIS in a manner that was unauthorized in the first instance, and alternatively, exceeded any authorization;

f. Obtained unencrypted and identifiable data transmitted by the School Districts, and collected and/or aggregated that data into an export-ready format; and

g. Negligently allowed a third-party to steal data stored in the Protected Computers and obtained by PowerSchool, which contained all Plaintiffs' and the Class Members' student, teacher, and School District information.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

198. Each incident of unauthorized access is an independent violation of the CFAA, and compromised the integrity and security of the School Districts' Data.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

199. As a result of PowerSchool's negligence and wrongful conduct, PowerSchool's unauthorized access was exploited and Plaintiffs' and Class Members' highly sensitive information stored in the Protected Computers was left vulnerable and exposed, leading to its eventual exfiltration, and the subsequent ransom attacks against School Districts.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

200. Additionally, at all relevant times, Bain Capital controlled, directed, and/or materially influenced PowerSchool's operations, including its data access policies, security practices, and strategic technology decisions. Bain Capital had access to confidential information related to PowerSchool's business operations, customer relationships, contractual data rights, and obligations under its Contracts with the School Districts.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the

allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

201. Bain Capital was aware, or recklessly disregarded, that PowerSchool was contractually prohibited from accessing unencrypted and identifiable student and teacher data stored on the Protected Computers, unless and until consent was granted by the relevant School District. The data for the School Districts should have resided in access-restricted environments – encrypted or otherwise siloed – under their Contracts, and this data fell outside PowerSchool's authorization to access.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

202. Bain Capital knowingly authorized or ratified PowerSchool's use of a Backdoor Access Tool that bypassed bargained-for consent and access protocols, enabling PowerSchool employees to access the School Districts' unencrypted, identifiable data. Bain Capital also stood to financially gain from outsourcing backend technical operations for PowerSchool and easing bottleneck restrictions. Bain Capital either approved, was informed of, or failed to act upon PowerSchool's failure to obtain consent when using the Backdoor Access Tool, despite representations that data access was limited and secure.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

203. Bain Capital stood to gain directly from PowerSchool's ability to aggregate and analyze large-scale student and school data. This capability enhanced PowerSchool's marketability, cost savings, and product development – critical

factors in Bain Capital's valuation for PowerSchool – which emphasized the introduction of AI in schools.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

204. Bain Capital had control over board-level and executive decisions regarding PowerSchool's personnel policies and compliance with federal and state data protection laws. Bain Capital directed or allowed PowerSchool to engage in conduct that Bain Capital knew would – or was willfully blind to – violate the CFAA. Bain Capital's oversight role extended not only to governance but also to risk mitigation and legal compliance, including information technology security operations.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

205. Bain Capital and PowerSchool thus entered into a common scheme to access information stored on Protected Computers without proper authorization or in excess of authorization, to reduce costs and increase data aggregation, in violation of 18 U.S.C. §§ 1030(a)(2)(C), (a)(5)(C), and (b). Bain Capital's role in furthering the scheme constitutes conspiracy under § 1030(b).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

206. Plaintiffs and Class Members suffered actual losses, including the cost of responding to the Data Breach, conducting damages assessments, restoring SIS data, programs, systems, or information to its condition prior to the Data Breach, costs incurred from overpayment of PowerSchool's security services, and/or other consequential damages incurred because of interruption of the SIS during the past one-year period, and those actual losses aggregated at least $5,000 in value. 18 U.S.C. §§ 1030(c)(4)(A)(i)(I), (e)(11).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

207. Plaintiffs and Class Members were damaged as the integrity of the School Districts' data, systems, and/or information was impaired. 18 U.S.C. § 1030(e)(8).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

208. Under 18 U.S.C. § 1030(g), Plaintiffs may maintain a civil action against Defendants to obtain compensatory damages and injunctive relief or other equitable relief. Defendants' acts have caused actual monetary loss in terms of overpayment for services, as Plaintiffs and Class Members paid for a secure platform. Plaintiffs and Class Members did not receive the benefit of their bargain. Unless Defendants' are also enjoined from foregoing PowerSchool's data security

obligations, PowerSchool will continue to fail to take reasonable security measures to protect the School Districts' data, and so injunctive relief is appropriate.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

**FIFTH CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA'S COMPREHENSIVE DATA ACCESS AND FRAUD ACT CAL. PENAL CODE § 502, *ET SEQ.* (ON BEHALF OF THE NATIONWIDE CLASS AGAINST BAIN AND POWERSCHOOL)**

209. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147, and 183 through 208, and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 and 183 through 208 above.

210. In enacting the California Comprehensive Data Access and Fraud Act ("CDAFA"), it was the intent of California's Legislature to provide protection from "interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

211. California's Legislature further found "that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and

others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

212. The CDAFA creates a private right of action against persons who:

a. "Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data." Cal. Penal Code § 502(c)(1);

b. "Knowingly and without permission uses or causes to be used computer services." Cal. Penal Code § 502(c)(3);

c. "Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section." Cal. Penal Code § 502(c)(6); and/or

d. "Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network" Cal. Penal Code § 502(c)(7).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

213. The California Legislature enacted the CDAFA as a state law analog to the CFAA, 18 U.S.C. § 1030 *et seq*., with an important distinction that "access," as used throughout California's section 502(c), does not require "unauthorized" access to a computer, but merely requires knowing access. *U.S. v. Christensen*, 828 F.3d 763, 789 (9th Cir. 2015).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

214. The CDAFA defines "Computer Network" as "any system that provides communications between one or more computer systems and input/output devices, including, but not limited to, display terminals, remote systems, mobile devices, and printers connected by telecommunication facilities." Cal. Penal Code § 502(b)(2). At all relevant times, the SIS was hosted on a Computer Network under the CDAFA, with data transmitted through the Computer Network, that was either hosted locally on School Districts' servers or on PowerSchool's optional cloud hosting service with its third-party partner, Microsoft Azure.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

215. The CDAFA defines "Computer Services" as "includ[ing], but is not limited to, computer time, data processing, or storage functions, internet services, electronic mail services, electronic message services, or other uses of a computer, computer system, or computer network." Cal. Penal Code § 502(b)(4). At all relevant

times, PowerSchool's SIS constituted a Computer Service licensed to Plaintiffs and Class Members.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

216. The CDAFA defines "Computer System" as "a device or collection of devices, including support devices…one or more of which contain computer programs, electronic instructions, input data, and output data, that performs functions, including, but not limited to, logic, arithmetic, data storage and retrieval, communication, and control." Cal. Penal Code § 502(b)(5). At all relevant times, data stored on the SIS was accessed using a Computer System under the CDAFA.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

217. The CDAFA defines "Data" as "a representation of information, knowledge, facts, concepts, computer software, or computer programs or instructions" that "may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device." Cal. Penal Code § 502(b)(8).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

218. Plaintiffs' and Class Members' licensed and/or owned "computers, computer systems, and/or computer networks" within the meaning of the CDAFA

when licensing the PowerSchool SIS as a Computer Service, accessing the SIS and storing Data on Computer Systems, and transmitting Data using their respective Computer Networks.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

219. The CDAFA provides that "a person who causes, by any means, the access of a computer, computer system, or computer network in one jurisdiction from another jurisdiction is deemed to have personally accessed the computer, computer system, or computer network in each jurisdiction." Cal. Penal Code § 502(j).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

220. The CDAFA provides that "in addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief." Cal. Penal Code § 502(e)(1).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

221. As described in paragraphs 184 through 209, in addition to violating the CFAA, PowerSchool and Bain Capital also violated the CDAFA by knowingly and without permission accessing, using, or damaging, Plaintiffs' and Class Members' data; using Computer Services; assisting in unauthorized access; and causing unauthorized access to Plaintiffs' and Class Members' Computer Systems, including in furtherance of a scheme to defraud and to wrongfully obtain data and property.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

222. Each incident of unauthorized access is an independent violation of the CDAFA, and compromised the integrity and security of the School Districts' Data.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

223. As a direct and proximate result of Defendants' unlawful conduct within the meaning of the CDAFA, Defendants have caused loss to Plaintiffs and Class Members and profited at their expense.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

224. Plaintiffs and Class Members seek compensatory damages, in an amount to be proven at trial, and injunctive or other equitable relief, including without limitation restitution of the revenue and other benefits accruing to

Defendants by virtue of their violations of the CDAFA, as well as to recover reasonable attorneys' fees under Cal. Penal Code § 502(e).

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

225. Plaintiffs and Class Members are entitled to punitive or exemplary damages pursuant to Cal. Penal Code § 502(e)(4) because Defendants' violations were willful and, upon information and belief, Defendants are guilty of fraud or malice as defined in Cal. Civil Code § 3294.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

226. Plaintiffs and Class Members also have suffered irreparable injury from these unauthorized acts of disclosure, to wit: all of their personal, private, and sensitive data have been viewed, accessed, stored, and disclosed by Defendants, and due to the continuing threat of such injury, have no adequate remedy at law, entitling Plaintiffs and the Class to injunctive relief.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

**SIXTH CAUSE OF ACTION**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ* (ON BEHALF OF THE NATIONWIDE CLASS AGAINST POWERSCHOOL)**

227. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 above.

228. California's Unfair Competition Law ("UCL") prohibits any (1) unlawful, unfair, or fraudulent business act or practice and (2) unfair, deceptive, untrue, or misleading advertising. Cal. Bus. & Prof. Code § 17200, *et seq.*

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

229. PowerSchool is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

230. PowerSchool maintains its corporate offices and principal place of business in California and the acts and omissions complained of herein were conceived of, designed, implemented, and disseminated from within California.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

231. PowerSchool violated the UCL by engaging in unlawful, unfair, and fraudulent business acts and practices.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

232. PowerSchool's unlawful, unfair, and deceptive acts and practices include:

a. Failing to implement and maintain reasonable security and privacy measures to protect information entrusted to it;

b. Failing to identify foreseeable security and privacy risks and/or remediate identified security and privacy risks;

c. Failing to comply with common law and statutory duties pertaining to the security and privacy of Protected Data;

d. Misrepresenting that it would protect the privacy and confidentiality of information entrusted to it, including by implementing and maintaining reasonable security measures such as MFA and endpoint protection;

e. Misrepresenting that it would comply with industry standards and common law and statutory duties pertaining to the security and privacy of Protected Data;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Protected Data; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with industry standards pertaining to the security and privacy of Protected Data.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the

allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

233. PowerSchool violated the UCL by engaging in and by deceptive, untrue, or misleading advertising. PowerSchool's representations and omissions were material because they were likely to deceive the School Districts about the adequacy of PowerSchool's data security and ability to protect the confidentiality of Protected Data entrusted to it.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

234. In violation of California Business and Professional Code § 17200, *et seq*., PowerSchool's conduct cited herein is ongoing and includes, but is not limited to, statements made by PowerSchool in its information privacy and confidentiality practices.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

235. By engaging in the acts and practices described herein, PowerSchool knowingly and/or recklessly allowed access to Protected Data in ways that Plaintiffs and Class Members could not have anticipated. Plaintiffs' and Class Members' interests also were violated through PowerSchool's deceptive acts in that they were induced to do business with PowerSchool based on representations as to data security protections that PowerSchool willfully chose not to implement.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the

allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

236. As a result, Plaintiffs and Class Members have suffered injury-in-fact and have lost money and/or property as described herein. Such loss includes, but is not limited to, Plaintiffs' and Class Members' payments for data security services that they were promised but not received.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

237. In reasonable reliance on PowerSchool's misrepresentations and omissions, Plaintiffs and Class Members paid money for PowerSchool's services with the understanding that a portion of that payment would be applied to data security when in reality Defendants diverted those funds to their own profits.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

238. PowerSchool's business acts and practices are unlawful in that they violate:

a. Section 5 of the FTC Act, 15 U.S.C. § 45;

b. CFAA, 18 U.S.C. § 1030, *et seq.*; and

c. California CDAFA, Cal. Penal Code § 502.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

239. PowerSchool's conduct violated the spirit and letter of these laws, which are intended to protect personal information from unauthorized access.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

240. PowerSchool's conduct is unfair because it violated this public policy by, among other things, intentionally disregarding its duties to safeguard Protected Data in its custody, diverting funds intended to apply to data security to its own profits, failing to inform Plaintiffs and Class Members as to material changes in its data security measures, and disregarding industry standards that it represented that it would comply with.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

241. PowerSchool's business acts and practices are unfair because they cause harm and injury in fact to Plaintiffs and Class Members, and for which PowerSchool has no justification other than to increase, beyond what PowerSchool would have otherwise realized, its own profits to justify its market valuation and Bain Capital's investment.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

242. PowerSchool's conduct lacks reasonable and legitimate justification in that PowerSchool has benefited from such conduct and practice while Plaintiffs and

Class Members have been misled as to the nature and integrity of PowerSchool's services and have, in fact, suffered material disadvantage regarding the integrity of data that they entrusted to PowerSchool.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

243. PowerSchool's acts and practices are fraudulent within the meaning of the UCL, because they mislead Plaintiffs and Class Members concerning the safety and security of information stored on PowerSchool's platform.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

244. Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law, including restitution of all payments made to PowerSchool; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate equitable relief.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

**SEVENTH CAUSE OF ACTION**

**UNJUST ENRICHMENT (ON BEHALF OF THE NATIONWIDE CLASS AGAINST ALL DEFENDANTS)**

245. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 above.

246. Plaintiffs bring this claim on behalf of the Nationwide Class under California law, or in the alternative, on behalf of the Statewide Subclasses under the laws of their respective states of residence.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

247. Plaintiffs bring this claim in the alternative to Count 1, Breach of Express Contract, provided that Plaintiffs and Class Members have no adequate remedy at law.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

248. Defendants Bain Capital and PowerSchool received monetary benefits from Plaintiffs and Class Members in the form of payments made under contracts for software services that were supposed to include adequate cybersecurity protections.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

249. Defendants knowingly accepted and retained those payments while deliberately failing to provide the full scope of services promised – specifically, by under delivering or omitting contractually required cybersecurity measures.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

250. Defendants' retention of these funds was unjust, as it resulted from fraudulent misrepresentations, omissions, and systemic concealment of material facts regarding the actual quality and security of the services provided.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

251. Defendants were aware that part of the money paid to them by Plaintiffs and Class Members was intended to be applied to data security and rather than appropriately fund their data security obligations, Defendants instead directed that money to their own profits.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

252. Under principles of equity and good conscience, Defendants should not be permitted to retain the financial benefits wrongfully obtained through their deceptive and wrongful conduct.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the

allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

253. As a direct and proximate result, Plaintiffs and Class Members have suffered economic harm and are entitled to restitution in an amount to be determined at trial.

**ANSWER:** Pursuant to this Court's Order (Dkt. 440), this cause of action has been dismissed. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

**EIGHTH CAUSE OF ACTION**

**DECLARATORY AND INJUNCTIVE RELIEF 28 U.S.C. § 2201, *ET SEQ.***

**(ON BEHALF OF THE NATIONWIDE CLASS AGAINST ALL DEFENDANTS)**

254. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 above.

255. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. The Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal statutes described in this Complaint.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

256. An actual controversy has arisen in the wake of the Data Breach regarding Defendants Bain and PowerSchool's present and prospective common law

and other duties to reasonably safeguard its customers' Data and Defendants' failure to maintain data security measures that effectively protect Plaintiffs and Class Members from further data breaches that compromise their Data. Plaintiffs and the Class continue to suffer injury as a result of the compromise of their Data and remain at imminent risk that further compromises of their Data will occur in the future given the nature and quantity of the Data stored by PowerSchool and Defendants' repeated failure to maintain adequate data security measures at PowerSchool resulting in the Data Breach, as described in detail herein.

**ANSWER:** This paragraph states a legal conclusion to which no response is required. To the extent a response is required, PowerSchool denies the allegations in this paragraph.

257. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendants owe a legal duty to secure School Districts' Data at PowerSchool and to timely notify School Districts of a data breach under the common law, their Contracts with the School Districts, and Section 5 of the FTC Act;

b. Defendants continue to breach this legal duty by failing to employ reasonable measures to secure School Districts' Data at PowerSchool; and

c. As a result of Defendants' ongoing breach of this legal duty, Plaintiffs and Class Members remain subject to continuing and imminent risk of, among other things, extortion and litigation.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

258. The Court also should issue corresponding prospective injunctive relief requiring PowerSchool to employ proper security protocols consistent with law and industry standards to protect School Districts' Data.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

259. If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at PowerSchool. The risk of another such breach is real, immediate, and substantial. If another breach at PowerSchool occurs, Plaintiffs and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

260. The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. Among other things, if another massive data breach occurs at PowerSchool, Plaintiffs and Class Members will likely be subjected to extortion, lawsuits, and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants already have a pre-existing legal and contractual obligation to employ such measures.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

261. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at PowerSchool, thus eliminating the additional injuries that would result to Plaintiffs and Class Members.

**ANSWER:** PowerSchool denies the allegations in this paragraph.

**NINTH CAUSE OF ACTION**

**NEGLIGENCE (ON BEHALF OF THE NATIONWIDE CLASS AGAINST MOVATE)**

262. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 above.

263. Defendant Movate is a technology services company that PowerSchool engaged as a subcontractor to provide technical support and network operations services for PowerSchool's SIS.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

264. As part of its subcontractor relationship, PowerSchool provided Movate employees, including Rayson Cruz and others, with unfettered access to PowerSchool's PowerSource customer support portal and SIS containing highly sensitive Protected Data of School District students, parents, and faculty.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

265. Movate held itself out as certified compliant under the International Standards Organization ("ISO") 27000 series cybersecurity framework, representing to consumers that it maintained appropriate security standards for handling sensitive data.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

266. Movate knew that School Districts were legally required under federal and state law to protect student PII and that PowerSchool was contractually bound by Data Privacy Agreements to implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

267. Cybercriminals successfully breached PowerSchool's systems using compromised credentials belonging to Rayson Cruz, a Movate employee assigned to provide PowerSchool technical support to School District Clients. Cruz's Movate employee account, which Movate failed to adequately secure, provided the entry point for hackers to access PowerSchool's PowerSource customer support portal.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

268. Through this compromised Movate employee account, hackers obtained "maintenance access" to PowerSchool's SIS database and exported entire "Students" and "Teachers" database tables to .CSV files.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

269. The Movate employee account used to execute the Data Breach was not protected by multi-factor authentication or other basic cybersecurity measures, despite industry standards requiring such protection for accounts with administrative

access to sensitive databases. Movate could also have prevented the Data Breach by, among other things, requiring regular rotation of access credentials, implementing just-in-time access to Protected Data rather than persistent credentials, and requiring second level authorization to access or download sensitive information.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

270. Movate violated multiple industry standards including failing to apply the principle of least privilege by allowing its employees to have broad administrative access far exceeding what was necessary for their assigned technical support functions.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

271. Despite representing ISO 27000 series compliance, Movate's actual security practices fell far short of industry standards for protecting sensitive PII and PHI in educational technology environments.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

272. Movate owed Plaintiffs a duty to exercise reasonable care in handling, securing, and preventing unauthorized access to student and faculty Protected Data. This duty arose from multiple sources.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

273. First, Plaintiffs' specific harm was entirely foreseeable to Movate. Movate knew or should have known that failing to secure employee credentials with administrative access to educational databases would create a foreseeable and substantial risk of a breach to sensitive data security systems and significant harm to School Districts.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

274. Second, by accepting PowerSchool's engagement as a subcontractor with administrative access to School Districts' sensitive Protected Data, Movate assumed a position of trust and became an integral component of the data security framework that School Districts relied upon. Thus, a special relationship existed between School Districts and Movate which gave rise to Movate's duty to Plaintiffs.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

275. Third, industry standards and the applicable regulatory framework under which Movate operated gave rise to the duty Movate owed to School Districts. Educational technology providers and their subcontractors operate under heightened duties due to legal obligations to: (i) protect student records as required under FERPA; and (ii) not engage in unfair data security practices under Section 5 of the

FTC Act. Movate also failed to adhere to the data security industry's "best practices" by granting a single employee access to an unreasonably broad range of private, sensitive data. As a data vendor responsible for storing and protecting School Districts' information, Movate owed a duty inherent to its role as a data vendor.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

276. Fourth, the contracts between School Districts and PowerSchool are an additional source of the duty Movate owed to Plaintiffs. These contracts all contained specific security obligations, including requirements to:

a. implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk;

b. take reasonable measures to ensure the reliability of employees, agents, and contractors;

c. limit data access to the minimum extent necessary; and

d. comply with federal, state and local data protection laws.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

277. Movate, as PowerSchool's key subcontractor for technical operations, had a duty to perform its services in a manner that enabled PowerSchool to fulfill these contractual obligations to School Districts.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in

this paragraph. To the extent a response is required, PowerSchool denies the allegations.

278. Fifth, the FTC's 2016 guidelines require companies to verify that third-party service providers have reasonable security systems in place. As such, Movate was required to maintain reasonable security systems as a third-party provider in the educational technology ecosystem.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

279. Movate breached its duty of care to Plaintiffs through multiple negligent acts and omissions, including Movate's total failure to implement multi-factor authentication.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

280. Despite industry standards and the highly sensitive nature of the data accessible through Rayson Cruz's account, Movate negligently failed to implement multi-factor authentication or any reasonable authentication security measures.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

281. Movate also breached its duty to Plaintiffs due to Movate's inadequate credential security management. Movate failed to implement adequate policies and procedures for securing, monitoring, and rotating employee credentials with

administrative database access. As a direct and proximate result of this failure, Movate did not detect the compromise of Cruz's credentials in time to prevent unauthorized system access.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

282. Movate's security failures violated fundamental cybersecurity principles established by:

a. ISO 27000 series standards;

b. NIST Cybersecurity Framework; and

c. Center for Internet Security Controls.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

283. Movate's breaches were particularly egregious given:

a. the volume and sensitivity of PII potentially accessible through its systems (over 70 million individuals);

b. the heightened regulatory environment governing educational data;

c. known and increasing threats to educational technology providers; and

d. PowerSchool's prior notification to the FBI regarding targeting by threat actors.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in

this paragraph. To the extent a response is required, PowerSchool denies the allegations.

284. But for Movate's negligent security practices, the December 2024 Data Breach would not have occurred.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

285. Movate's failure to implement multi-factor authentication on Cruz's account enabled hackers to exploit the compromised credentials to gain system access and carry out the Data Breach.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

286. But for Movate's failure to limit Cruz's access privileges to the minimum necessary, hackers could not have obtained "maintenance access" to the SIS database.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

287. But for Movate's inadequate credential security management, the compromise of Cruz's credentials would have been detected and remediated before the Data Breach occurred.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in

this paragraph. To the extent a response is required, PowerSchool denies the allegations.

288. The Data Breach and resulting harms to School District Plaintiffs were foreseeable and natural consequences of Movate's negligent conduct in that:

a. Movate was aware that its services pertained to the protection of Data provided by the School Districts to PowerSchool;

b. educational technology systems are known high-value targets for cybercriminals due to the sensitive PII they contain;

c. accounts with administrative database access are recognized as particularly attractive and dangerous attack vectors; and

d. the lack of multi-factor authentication on privileged accounts is a well-known critical security vulnerability.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

289. Movate, as a technology services provider, knew or should have known of these risks and the likely consequences of its security failures.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

290. No intervening cause breaks the chain of causation between Movate's negligence and School Districts' injuries. The hackers' criminal conduct was the precise type of harm that Movate's security measures were supposed to prevent.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in

this paragraph. To the extent a response is required, PowerSchool denies the allegations.

291. As a direct and proximate result of Movate's negligence, School District Plaintiffs have suffered and continue to suffer substantial damages, including but not limited to:

a. additional wages and overtime for staff diverted to breach response activities;

b. costs for hiring cybersecurity experts for incident investigation and risk assessment;

c. legal consultation and representation expenses;

d. expenses for implementing enhanced security measures and system modifications;

e. costs for providing credit monitoring and identity theft protection services to affected individuals;

f. administrative costs for breach notification and student support operations;

g. loss of public confidence in School Districts' ability to protect sensitive student and family information;

h. declines in student enrollment and corresponding loss of public funding;

i. damage to School Districts' relationships with students, parents, and the broader community;

j. increased risk of liability from lawsuits by affected students, parents, and faculty members;

k. regulatory sanctions and compliance costs;

l. expenses for monitoring misuse of stolen PII;

m. future costs for enhanced security measures and third-party vendor oversight; and

n. ongoing legal and expert consultation expenses.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

292. All of Plaintiffs' injuries and damages were within the foreseeable zone of risk that Movate created because:

a. Movate deliberately and intentionally failed to take reasonable steps to secure the Data Plaintiffs entrusted to PowerSchool with the knowledge that doing so would affect Plaintiffs by depriving them of the benefits they reasonably expected to receive under their contracts with PowerSchool, in addition to the millions of students whose private and sensitive data Plaintiffs expected Movate to protect;

b. Movate intentionally held itself out as a company that could be trusted to take adequate measures to secure and protect sensitive personal data with the knowledge that it was in fact in possession of such data while having failed to implement the most basic security measures per industry standards, regulations, and the very set of standards by which Movate claimed to abide;

c. Movate, as a technology services company that purposefully contracted with PowerSchool, knew that the failure to uphold its duties would foreseeably cause a multitude of problems for School Districts, including, but not limited to, the need to devote substantial staff time to addressing the Data Breach, financial

costs from needing to consult with lawyers and experts, and responding to the inquiries of the millions of parents, students, and faculty whose PII was compromised;

d. Plaintiffs' injuries to date are certain and can be certain to continually accrue, while Plaintiffs' future damages are ascertainable and can be established through reliable expert testimony;

e. there is a close connection between Movate's failure to take any meaningful steps to secure the data which contained the Data of students, parents, and faculty and the harms that School Districts have suffered and will suffer;

f. there is a strong moral blame attached to Movate's conduct in that Movate held itself out as a company that specialized in protecting highly sensitive data while simultaneously taking deliberate steps in contradiction of the image it sought to project, all with the intent of minimizing costs and maximizing profits with a callous disregard for the effects of a breach of its easily penetrable security systems that allowed for one low-level employee to hold access to the PII of millions of people, most of whom were minors; and

g. there is a strong policy in favor of imposing this legal duty on Movate, as evidenced by the dozens of federal regulations and state laws that impose special obligations on private entities in the business of storing and possessing Data that belongs to students and minors, the unreasonable risk of harm that exists when basic steps are not taken to secure sensitive data containing minors' PII and PHI by businesses in Movate's position, and the

fact that taxpayers are ultimately forced to bear the costs when these businesses recklessly endanger the security of students and others with full knowledge of the grave implications for these failures.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

293. As a result of Movate's negligence and the despicable conduct in which Movate engaged while deliberately and consciously disregarding School Districts' rights, Plaintiffs seek all available general, special, punitive, and other damages allowed under law.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

**TENTH CAUSE OF ACTION**

**NEGLIGENCE HIRING, TRAINING, SUPERVISION, AND RETENTION**

**(ON BEHALF OF THE NATIONWIDE CLASS AGAINST MOVATE)**

294. Plaintiffs repeat and re-allege the factual allegations set forth in paragraphs 1 through 147 above and incorporate the same as if set forth herein.

**ANSWER:** PowerSchool incorporates by reference its responses to paragraphs 1 through 147 above.

295. At all relevant times, Movate owed a duty to Plaintiffs to hire competent employees and agents, and to train and supervise them to ensure recognition of a compliance with its obligations to Plaintiffs.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

296. As a subcontractor of PowerSchool, Movate's employees and agents have access to highly sensitive and confidential data stored on PowerSchool's SIS, including the PII of Plaintiffs' students, parents of students, and faculty. Moreover, many of these same employees and agents were employed and working off-shore, outside of the United States.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

297. Movate, acting as PowerSchool's agent, owed non-delegable duties to Plaintiffs to hire competent employees and agents and to train and supervise them to ensure they would recognize the duties owed to Plaintiffs. Further, having been granted unfettered access to millions of students' and teachers' sensitive data, Movate had a duty to take reasonable steps to ensure adequate data security procedures and practices sufficient to maintain the confidentiality of the Protected Data.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

298. Movate had a duty to prevent foreseeable harm to Plaintiffs, who would foreseeably and probably suffer harm as the direct and proximate result of Movate's inadequate security practices. Movate knew that failing to safeguard the data

containing the PII of Plaintiffs' students, parents of students, and faculty created a substantial risk of harm, as such data is routinely targeted and exploited by hackers.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

299. Movate was on notice of the importance of data security due to the abundance of information about the serious risks of inadequate security, including highly publicized breaches of data security systems that were carried out against educational institutions similarly situated to Plaintiffs.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

300. It was reasonably foreseeable that Movate's failure to train employees and agents about the importance of protecting their passwords, failure to require credential changes at regular intervals, and not providing restricted access would lead to a compromise of the security of the data containing the PII and PHI that Plaintiffs entrusted to PowerSchool and relied on Movate to protect.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

301. Movate's inadequate data security, training, procedures, and network infrastructures, along with its failures in hiring and training employees and agents, substantially caused the Data Breach and the damages Plaintiffs sustained, all of which are alleged herein.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

302. Movate hired Rayson Cruz, the employee who negligently allowed for the disclosure of the PII that was compromised in the Data Breach.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

303. Movate was negligent and failed to exercise the requisite standard of care in hiring, supervising, retaining, and training of its employees and agents, including, but not limited to, Rayson Cruz.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

304. Rayson Cruz was hired, trained, and retained as a Movate Team Leader who was assigned to provide technical support on behalf of PowerSchool and had access to the PowerSchool SIS and the massive trove of PII the system stored. As a result, his compromised credentials allowed the Data Breach threat actor to exfiltrate the Data that Movate possessed and purported to safeguard for Plaintiffs' benefit.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

305. At the least, Movate breached its duty to Plaintiffs by failing to (1) appropriately train its employees to secure their credentials; (2) rotate its employees' credentials; (3) and implement the principle of least privileges, which would have forbade Rayson Cruz from having a level of access far beyond what was necessary to perform his job functions.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

306. Movate knew or should have known that Rayson Cruz was, or became, unfit or incompetent in his abilities to adequately and reasonably implement measures to secure the data that was compromised in the Data Breach. Rayson Cruz's unfitness and incompetence directly, proximately, and substantially caused Plaintiffs' harms.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

307. Movate's negligence in hiring, supervising, training, and retaining Rayson Cruz was a substantial factor in causing Plaintiffs' harms, and Movate is accordingly liable for the injuries Plaintiffs suffered as a result of the Data Breach.

**ANSWER:** This cause of action is not brought against PowerSchool. Accordingly, PowerSchool is not required to respond to the allegations set forth in this paragraph. To the extent a response is required, PowerSchool denies the allegations.

## GENERAL DENIAL

PowerSchool further denies each and every allegation contained in Plaintiffs' Complaint except as expressly admitted and qualified above. Where an allegation in the Complaint is directed at another party that is not affiliated with PowerSchool, then, except as otherwise expressly stated, PowerSchool denies the allegations set forth in the Complaint on the basis that it is without knowledge or information sufficient to form a belief concerning the truth of such allegations.

## AFFIRMATIVE DEFENSES

Without assuming any burden of proof that it would not otherwise bear, PowerSchool asserts the following separate and additional defenses, all of which are pleaded in the alternative, and none of which constitute an admission that PowerSchool is in any way liable to Plaintiffs, that Plaintiffs have been or will be injured or damaged in any way, or that Plaintiffs are entitled to any relief whatsoever. PowerSchool reserves the right to amend or supplement its affirmative defenses and raise counterclaims as additional facts concerning its defenses become known to it. As a defense to the SAC and each and every allegation contained therein, PowerSchool alleges:

### First Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, for failure to state a claim upon which relief may be granted. Included in, but not limiting such challenge, PowerSchool reasserts all grounds set forth in its previously filed Omnibus Motion To Dismiss The Track Two Complaints (ECF 302) as if fully reasserted here.

### Second Affirmative Defense

Plaintiffs have express contracts with PowerSchool that bar or otherwise limit their claims and/or damages, including, but not limited to, Sections 11.1 and 11.2 of the Master Service Agreement or equivalent provisions.

### Third Affirmative Defense

Plaintiffs' claims are barred, in whole or in part, because PowerSchool maintained reasonable security measures.

**Fourth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, because PowerSchool at all times acted in good faith, with proper justification, and in compliance with the terms of the applicable contracts, applicable laws, regulations, and industry standards.

**Fifth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, by assumption of risk, in that electronically stored information is at risk for theft by sophisticated cyber-criminals, regardless of what steps any company takes to prevent it.

**Sixth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, because they failed to exercise due care and diligence to avoid or mitigate any damages allegedly sustained, and/or because any steps taken to mitigate damages were not reasonable.

**Seventh Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, because they failed to exercise due care and diligence and contributed to their own damages by their own acts and omissions.

**Eighth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, to the extent any recovery would be contrary to public policy.

**Ninth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, to the extent Plaintiffs have not suffered any actual injury or damage, and/or have not sustained any cognizable injury.

**Tenth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, because the alleged damages, if any, are speculative and impossible to ascertain, and therefore not recoverable.

**Eleventh Affirmative Defense**

PowerSchool may be entitled to a right of contribution from other individuals or entities whose acts or omissions may have contributed to the occurrence of the alleged injury, damages and/or loss, if any, should Plaintiffs prevail on any of their claims.

**Twelfth Affirmative Defense**

Plaintiffs' claims that seek equitable relief are barred, in whole or in part, because Plaintiffs have adequate remedies at law.

**Thirteenth Affirmative Defense**

To the extent Plaintiffs seek exemplary or punitive damages, the SAC is devoid of facts sufficient to constitute a cause of action allowing for such an award.

**Fourteenth Affirmative Defense**

To the extent Plaintiffs seek civil or statutory penalties or punitive damages, such claims are barred, in whole or in part, by the Due Process and Excessive Fines Clauses recited in or incorporated into the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution or the analogous state constitutional provisions.

**Fifteenth Affirmative Defense**

Plaintiffs cannot be certified as a class under Rule 23 of the Federal Rules of Civil Procedure because the purported class, class representative(s), and/or class counsel fail to meet the typicality, adequacy, superiority, ascertainability, commonality and/or predominance requirements for class actions.

**Sixteenth Affirmative Defense**

Plaintiffs' claims are barred because any alleged harm is the result of the intervening and superseding criminal conduct of a third party, not PowerSchool.

**Seventeenth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, because the alleged harm suffered by Plaintiffs, if any, was caused by the superseding and intervening acts of others whose conduct PowerSchool did not control.

**Eighteenth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, by lack of actual or proximate causation.

**Nineteenth Affirmative Defense**

Plaintiffs' claims are barred, in whole or in part, by laws providing safe harbors for organizations who fall victim to data breaches despite adherence to industry standard cybersecurity protocols, including, but not limited to, those safe harbors provided by applicable state statutes.

**Reservation Of Rights**

PowerSchool expressly and specifically reserves the right to amend this answer to add, remove, or modify defenses based on legal theories, facts, and circumstances that have been or will be divulged through discovery and/or further legal analysis of Plaintiffs' positions in this litigation.

**Jury Demand**

Pursuant to Federal Rule of Civil Procedure 38, PowerSchool demands a trial by jury of all claims and defenses upon which it is entitled to a jury trial.

**Prayer For Relief**

PowerSchool requests that Plaintiffs' Complaint be dismissed with prejudice, that the Court find that Plaintiffs are not entitled to any judgment or relief, that the Court enter judgment in favor of PowerSchool, and that the Court award

PowerSchool its attorneys' fees, costs, and expenses, pre-judgment interest, and such other and further relief as the Court deems just and proper.

Dated: May 18, 2026

*/s/ James R. Drabick*
Anne Johnson Palmer (SBN 302235)
**ROPES & GRAY LLP**
One Maritime Plaza, Suite 1800
300 Clay Street
San Francisco, CA 94111
Tel: (415) 315-6300
Fax: (415) 315-6350
anne.johnsonpalmer@ropesgray.com

James Drabick (MA BBO No. 667460)*
Monica Mleczko (MA BBO No. 696607)*
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 235-4136
Fax: (617) 951-7050
james.drabick@ropesgray.com
monica.mleczko@ropesgray.com

Douglas Hallward-Driemeier (MA BBO No. 627643)*
**ROPES & GRAY LLP**
2009 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel: (202) 508-4600
Fax: (202) 508-4650
Douglas.hallward-driemeier@ropesgray.com

Laura G. Hoey (IL Bar No. 650643)*
**ROPES & GRAY LLP**
191 North Wacker Drive, 32nd Floor
Chicago, IL 60606-4302
Tel: (312) 845-1200
Fax: (312) 845-5500
laura.hoey@ropesgray.com

Christopher M. Young (SBN 163319)
Justin Van Ligten (SBN 353587)
DLA PIPER LLP (US)
4365 Executive Drive Suite 1100
San Diego, CA 92121
Tel: (619) 699-4748
Fax: (619) 764-6748
christopher.young@us.dlapiper.com
justin.vanligten@us.dlapiper.com

* Admitted pro hac vice

## CERTIFICATE OF SERVICE

I certify that counsel for the parties have been served with a true and correct copy of the foregoing document via the Court's CM/ECF system on May 18, 2026.

*/s /James R. Drabick*
James R. Drabick
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 235-4136
Fax: (617) 951-7050
james.drabick@ropesgray.com