James P. Frantz, Esq. (State Bar No. 87492)
jpf@frantzlawgroup.com
William B. Shinoff, Esq. (State Bar No. 280020)
wshinoff@frantzlawgroup.com
**FRANTZ LAW GROUP, APLC**
402 W. Broadway, Suite 860
San Diego, CA 92101
Telephone: (619) 233-5945
Fax: (619) 525-7672

*Co-Lead Counsel for the School District Direct Action Plaintiffs*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: POWERSCHOOL HOLDINGS, INC. AND POWERSCHOOL GROUP, LLC CUSTOMER SECURITY BREACH LITIGATION<br><br>*This Document Relates To: School District Direct Action Track*<br>. | Case No. 3:25-md-3149AJB-BEN-MSBDDL<br><br>MDL NO. 3149<br><br>SCHOOL DISTRICT DIRECT ACTIONS SECOND AMENDED CONSOLIDATED MASTER COMPLAINT AND JURY TRIAL DEMAND |

TABLE OF CONTENTS

I. INTRODUCTION .......... 1

II. PARTIES .......... 5

III. JURISDICTION AND VENUE .......... 7

IV. FACTUAL BACKGROUND .......... 8

A. THE DATA BREACH .......... 9

B. POWERSCHOOL'S FAILURES TO PROTECT PRIVATE INFORMATION .......... 11

C. POWERSCHOOL'S FAILURES TO FULFILL EXPRESS AND IMPLIED PROMISES .......... 18

D. BAIN CAPITAL'S PIVOTAL ROLE AS POWERSCHOOL'S CONTROLLING ALTER EGO. 24

E. THE FRAUDULENT SALE OF STUDENT DATA TO THIRD PARTIES .......... 38

F. THE SCHOOL DISTRICTS' INJURIES .......... 45

V. CLAIMS FOR RELIEF .......... 49

COMMON CLAIMS .......... 49

COUNT 1 .......... 50

Negligence .......... 50

COUNT 2 .......... 58

Negligence Per Se .......... 58

COUNT 3 .......... 62

Unjust Enrichment .......... 62

COUNT 4 .......... 64

Violation of the Computer Fraud and Abuse Act .......... 64

COUNT 5 .......... 64

Fraudulent Concealment .......... 67

COUNT 6 .......... 72

Express Indemnity .......... 72

COUNT 7 .......... 73

Intentional Interference With Contractual Relations .......... 73
COUNT 8 .......... 74
Negligence .......... 74
COUNT 9 .......... 81
Negligent Hiring, Training, Supervision, and Retention .......... 81
COUNT 10 .......... 83
Breach of Contract .......... 83
STATE-SPECIFIC CLAIMS .......... 87
(i) Utah School Districts .......... 87
COUNT 11 .......... 87
Breach of Contract .......... 87
COUNT 12 .......... 99
Violation of the Utah Consumer Sales Practices Act .......... 99
(ii) Wisconsin School Districts .......... 103
COUNT 13 .......... 99
Breach of Contract .......... 103
COUNT 14 .......... 108
Violation of Wisconsin's Deceptive Trade Practices Act .......... 108
(iii) Illinois School Districts .......... 111
COUNT 15 .......... 111
Breach of Contract .......... 111
COUNT 16 .......... 118
Violation of the Illinois Deceptive Trade Practices Act .......... 118
COUNT 17 .......... 122
Violation of the Illinois Biometric Information Privacy Act .......... 122
(iv) South Carolina School Districts .......... 124
COUNT 18 .......... 118
Breach of Contract .......... 125

COUNT 19 .......... 129
Violation of South Carolina's Unfair Trade Practices Act .......... 129
(v) New York School Districts .......... 134
COUNT 20 .......... 129
Breach of Contract .......... 134
COUNT 21 .......... 139
Violation of New York General Business Law § 349 et seq. .......... 139
COUNT 22 .......... 143
Violation of the New York Deceptive Sales Practices Act .......... 143
COUNT 23 .......... 147
Violation of the New York Education Law .......... 147
(vi) Vermont School Districts .......... 149
COUNT 24 .......... 147
Breach of Contract .......... 149
COUNT 25 .......... 156
Violation of the Vermont Consumer Protection Act .......... 156
(vii) Idaho School Districts .......... 161
COUNT 26 .......... 161
Breach of Contract .......... 161
COUNT 27 .......... 170
Violation of the Idaho Consumer Protection Act .......... 170
(viii) Tennessee School Districts .......... 172
COUNT 28 .......... 172
Breach of Contract .......... 172
COUNT 29 .......... 179
Violation of the Tennessee Consumer Protection Act of 1977 .......... 179
(ix) New Hampshire School Districts .......... 184
COUNT 30 .......... 184

Breach of Contract ..... 184
COUNT 31 ..... 194
Violation of the New Hampshire Consumer Protection Act ..... 194
COUNT 32 ..... 196
Violation of the New Hampshire Right to Privacy Act ..... 196
(x) Rhode Island School Districts ..... 198
COUNT 33 ..... 198
Breach of Contract ..... 198
COUNT 34 ..... 203
Violation of Rhode Island's Unfair Trade Practices and Consumer Protection Act ..... 203
(xi) Pennsylvania School Districts ..... 206
COUNT 35 ..... 203
Breach of Contract ..... 206
COUNT 36 ..... 214
Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ..... 214
(xii) Virginia School Districts ..... 216
COUNT 37 ..... 214
Breach of Contract ..... 216
COUNT 38 ..... 223
Violation of the Virginia Consumer Protection Act ..... 223
COUNT 39 ..... 223
Violation of the Virginia Data Breach Notification Law ..... 227
(xiii) Arizona School Districts ..... 229
COUNT 40 ..... 229
Breach of Contract ..... 229
COUNT 41 ..... 236

Violation of the Arizona Consumer Fraud Act ........ 236
(xiv) Oklahoma School Districts ........ 240
COUNT 42 ........ 240
Breach of Contract ........ 240
COUNT 43 ........ 250
Violation of the Oklahoma Consumer Protection Act ........ 250
(xv) Washington School Districts ........ 255
COUNT 44 ........ 255
Breach of Contract ........ 255
COUNT 45 ........ 265
Violation of the Washington Consumer Protection Act ........ 265
COUNT 46 ........ 270
Violation of the Washington Data Breach Notification Statute ........ 270
VI. PRAYER FOR RELIEF ........ 271

Plaintiffs, members of the School District Direct Action Track of MDL No. 3149 ("Plaintiffs" or "School Districts"), hereby allege the following against the Defendants, PowerSchool Holdings, Inc.PowerSchool Corporation, PowerSchool Group, LLC, Bain Capital, L.P., and Movate, Inc.:[1]

## I. INTRODUCTION

1. PowerSchool is a leading provider of cloud-based software for K–12 education in the U.S. PowerSchool collects, hosts, and maintains highly sensitive personal identifiable information ("PII") for more than 60 million students, parents, and school faculty worldwide.

2. The private information collected by PowerSchool includes names, addresses, dates of birth, phone numbers, email addresses, Social Security numbers, medical information, grades and grade point averages, bus stops for students, passwords for student portals, and other information that PowerSchool deems represented it could keep secure. necessary to conduct its business.

2.3. Given the highly sensitive nature of the data, particularly because it concerns minors, PowerSchool had both a special duty and expressly represented that it would adhere to the highest security standards to safeguard that information. It did not.

3. Plaintiffs are School Districts—divisions of public entities that exist for the benefit of public school students and the local communities they serve. Each These School Districts entered into one or more individual contracts with PowerSchool for products such as its Student Information System ("SIS") and/or its additional suite of educational products and services such as Naviance (PowerSchool's college and career readiness platform), Power School Enrollment, and communication, learning management, special programs analytics and finance applications. in which PowerSchool agreed to collect,

---

[1] All Plaintiffs allege the factual allegations herein. Plaintiffs will individually file short form complaints or amended short form complaints which will identify the claims for relief they assert that are stated below.

maintain, and secure the highly sensitive information of students, parents, and faculty in their respective communities.

4. Several Plaintiff School Districts contpplications.racted with PowerSchool for its Student Information System ("SIS"). Others contracted for suite of additional educational software products and services, including Naviance, PowerSchool's college and career readiness platform, as well as enrollment management, communication, learning management, analytics, and finance applications.

5. Each of these PowerSchool products purchased by for which Plaintiff School Districts purchased involves the collection, storage, and maintenance of processing of PII belonging to students', parents', and school faculty's PII and in some cases the sensitive information of the Plaintiff School Districts.

4.6. The contracts between PowerSchool and the School Districts include a data privacy agreement ("DPA"), a document that defines PowerSchool's obligations with respect to how it must store, process, maintain, collect, and/or delete data containing PII. PowerSchool's obligations vary on a statewide basis in that each U.S. state has a separate DPA that imposes different contractual duties on PowerSchool.[2]

5.7. On or about December 28, 2024, PowerSchool became aware of a cybersecurity incident (the "Data Breach") involving the unauthorized access of personal information through its PowerSource customer support platform that occurred on or about December 20, 2024 and resulted in the exfiltration of.studentsof students' and teachers' database tables to a .CSV file.

6.8. The Data Breach constitutes the largest known unauthorized disclosure of minor children's personally identifiable information in the history of educational technology. The Data Breach affected not only this school year's records but also the

[2] A copy of each statewide DPA is available at https://www.powerschool.com/wp-content/uploads/PowerSchool-Service-Agreements/Customer_State_DPA_List_March_2024.pdf.

School Districts' historical records.

~~7. According to PowerSchool, PowerSource contains a maintenance access tool that allows PowerSchool engineers to access the Student Information System ("SIS"), a cloud based software platform intended for school districts to safely and efficiently manage and store student data. Using the PowerSource tool, hackers exported PowerSchool's students' and teachers' database tables to a .CSV file.~~

~~8. The hackers who committed the Data Breach claimed to be in possession of the PII of 62.4 million students and 9.5 million teachers. The Data Breach affected not only this school year's records but also the School Districts' historical records.~~

9. Although hackers notified PowerSchool of the Data Breach on December 28, 2024, PowerSchool did not begin notifying customers until at least January 7, 2025. Most School Districts were unaware that students' and teachers' private information had been compromised until receiving direct notice from PowerSchool; some received no notice at all and had to inquire themselves. Even then, PowerSchool provided inconsistent and confusing information regarding whether and how each School District was affected. ~~PowerSchool did not begin to notify customers about the Data Breach until at least January 7, 2025. Most if not all School Districts were not aware of the Data Breach~~ ~~that resulted in the theft of students' and teachers' private information until they received a direct notification from PowerSchool alerting them to the Data Breach. Some School Districts never received a notification of the Breach from PowerSchool and had to reach out to PowerSchool themselves to confirm whether they were affected by the Data Breach. Even then, PowerSchool provided confusing and often conflicting information regarding whether and how School Districts had been affected.~~

10. PowerSchool still has not directly communicated with many of the victims of the Data Breach to notify them of the attack, nor has PowerSchool informed many victims about what PII was stolen.

11. In collecting and maintaining this PII, PowerSchool represented and agreed in its contracts with School Districts that it would safeguard the data ~~that PowerSchool~~

~~collected~~ in accordance with internal policies, industry standards, state law, and federal law.

12. PowerSchool's own website touted its products as a solution to protect student information, stating: "PowerSchool invests in updated security technology and adheres to strict security regulations. To keep your data secure." PowerSchool bolstered its platform's security reputation by claiming that it was an "industry leader for protected private data." On its website, PowerSchool assures parents that they can "trust" PowerSchool to safeguard and protect their children's personal information.

13. Despite these representations, affirmations, promises, and contractual undertakings, and the foreseeable risk that inadequate safeguards would expose the data to unauthorized access, the Data Breach revealed that PowerSchool did not uphold its end of the bargain. PowerSchool's failure to abide by the security promises it made created the opportunity for hackers to easily access the trove of personal private information that PowerSchool collects, stores, and maintains for school districts throughout the United States.[3]

14. PowerSchool ~~acknowledged that it~~ paid a ransom to the hackers, assuring school districts and parents that the private information comprised in the Data Breach was now safe because the hackers promised not to use the information they obtained through the Data Breach. This promise was accompanied by a video of the hackers purporting to delete the compromised data.[4]

---

[3] Tyler Dukes, *A Hacker's Ransom: Inside the Cyberattack That Compromised NC Student and Teacher Records*, WRAL (Apr. 29, 2024), https://www.wral.com/story/a-hacker-s-ransom-inside-the-cyberattack-that-compromised-nc-student-and-teacher-records/21989281/.

[4] Emily Walkenhorst & Destinee Patterson, *A Hacker's Ransom: Inside the Cyberattack That Compromised NC Student and Teacher Records*, WRAL (May 2, 2025), https://www.wral.com/story/a-hacker-s-ransom-inside-the-cyberattack-that-compromised-nc-student-and-teacher-records/21989281/.

15. The assurances PowerSchool received from the Data Breach cybercriminals ~~who accomplished the Data Breach~~ proved illusory. In May 2025, PowerSchool revealed that a threat actor contacted several PowerSchool customers in an attempt to extort them by exposing private information compromised in the Data Breach. The original hackers evidently either kept the data PowerSchool claimed was deleted or made it accessible to others.[5]

~~15.~~16. PowerSchool's data security failures and data monetization misconduct alleged herein are not confined to the SIS. As set forth more fully below, PowerSchool has established a documented and persistent pattern of failing to protect data across its full suite of products, including through ~~the unauthorized disclosure of student academic records through the Naviance platform and through~~ the commercialization of student data collected across all PowerSchool products without the knowledge or consent of School Districts. ~~It has further failed to consistently to adhere to its contractual obligations relative to the data across all of its products.~~

~~16.~~17. As a result of the misconduct alleged herein, including conduct amounting to gross negligence in reckless disregard of known foreseeable risks, PowerSchool breached numerous contractual, statutory, and ~~legal~~ common law duties it owed to Plaintiffs.

## II. PARTIES

~~17.~~18. Plaintiffs are School Districts located in communities throughout the United States. They serve tens of millions of students between grades pre-kindergarten and high school. Each and every Plaintiff that adopts the allegations herein has suffered divisible injuries and damages based on various differentiating factors.

~~18.~~19. Defendant ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation

[5] Kevin Collier, *School Districts Hit with Extortion Attempts After PowerSchool Breach*, NBC News (May 7, 2025), https://www.nbcnews.com/tech/security/school-districts-hit-extortion-attempts-powerschool-breach-rcna205429.

Corporation, is a Delaware corporation headquartered at 150 Parkshore Drive, Folsom, California 95630.

19. 20. Defendant PowerSchool Group LLC is a Delaware Limited Liability Company with its principal place of business at 150 Parkshore Dr., Folsom, California 95630.

Defendant Bain Capital, L.P. ("Bain Capital" or "Bain") is a Massachusetts based limited partnership.

21. Defendant Bain Capital, LP ("Bain Capital" or "Bain") is a Delaware limited liability company headquartered at 200 Clarendon St., Boston, Massachusetts 02116. Bain, through its agents, fully acquired PowerSchool on or around October 1, 2024, prior to the Data Breach in December 2024.

22. Throughout the events at issue, Defendants PowerSchool Group, LLC, PowerSchool Holdings, Inc.PowerSchool Corporation and Bain Capital, LP have operated as one entity with fully coordinated and shared operations. Resources are cross-applied and management decisions for PowerSchool are made by and through the management of Bain. The directors and officers of Bain were and are directly involved in the events at issue in this litigation, including PowerSchool's cybersecurity procedures (or lack thereof), PowerSchool's employees, the Data Breach itself, and PowerSchool's response to the Data Breach. Despite being its parent company, and in a position to do so, Bain not only failed to direct PowerSchool to ensure its cybersecurity was up-to-date, but also engaged in conduct that undermined that cybersecurity. Based upon information and belief, and at least by the October 2024 merger, PowerSchool was controlled by Bain, which influenced and controlled the security standards PowerSchool adopted and represented that it made.

23. Based on the facts alleged herein and in accord with theories of agency, Bain is liable for the acts of PowerSchool because: (a) it was PowerSchool's parent; and (b) had dominant control over and was involved in PowerSchool's misconduct. As alleged, PowerSchool's misconduct can be traced to Bain, its parent, through pre- and post-merger

initiatives and the conduct of overlapping officers and directors who were directly responsible for PowerSchool's activities, including its cybersecurity protections or lack thereof. Bain dominates and controls PowerSchool's internal affairs and daily operations. Bain obtained strategic control through the agreement under which it overtook PowerSchool ("Merger Agreement") and directed the actions, which led to the Data bBreach, such as layoffs and offshoring. With respect to the breached data of PowerSchool's customers and individual users, the responses to the Ddata Bbreach, and the conduct giving rise to this litigation, Bain had the right to control PowerSchool, and PowerSchool acted as Bain's agent, and was authorized and acted within the scope of authority as dictated by Bain. PowerSchool's activities, which included collecting, obtaining, storing, maintaining, sharing, and making available the sensitive PII and Protected Health Information ("PHI"). At all times, the injuries caused by PowerSchool's actions and inactions were foreseeable.

20.24. Accordingly, for all purposes hereafter and except where otherwise specified, when Plaintiffs allege ' "PowerSchool" as the actor or responsible party, they are alleging the participation of all three Defendants, PowerSchool Holdings, Inc.PowerSchool Corporation, PowerSchool Group, LLC, and Bain Capital, LP, collectively.

21.25. Defendant Movate, Inc. ("Movate") is a Delaware corporation headquartered at 600 Tennyson Parkway, Suite 255, Plano, Texas 75024.

## III. JURISDICTION AND VENUE

22.26. This Court has subject matter jurisdiction over this proceeding under 28 U.S.C. §§ 1331 and 1367(a), as this Complaint asserts claims arising under the laws of the United States and the remaining claims asserted by Plaintiffs form part of the same case or controversy under Article III of the United States Constitution. Alternatively, this Court has subject matter jurisdiction over the claims asserted by Plaintiffs pursuant to 28 U.S.C. § 1332(a), as there is complete diversity between the Parties and the amount in controversy exceeds $75,000.

23.27.This Court has personal jurisdiction over Defendants PowerSchool Holdings, Inc.PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P., because these Defendants conduct substantial business in this judicial district, have purposefully availed themselves of the benefits and privileges of conducting business in this judicial district, and have caused harm to Plaintiffs as a direct result of actions that these Defendants take or have taken in this judicial district.

24.28.This Court has personal jurisdiction over Defendant Movate, Inc. because this action arises from Movate's continuous and systematic contacts with California. Movate exercised control over the data Plaintiffs entrusted to PowerSchool, a California company. Movate intentionally directed contacts to California through technical support for PowerSchool customers and through its decision to conduct business with PowerSchool.

25.29.Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district. Venue is also proper in this Court under 28 U.S.C. § 1407, as Plaintiffs allege claims that share certain common questions of fact and law such that they should be consolidated for inclusion in *In re: PowerSchool Holdings, Inc. and PowerSchool Group, LLC Customer Security Breach Litigation*, MDL 3149, Case No. 3:25–md–03149–AJBBEN–MSB (Hon. Roger Anthony JT. Battagliaenitez).

## IV. FACTUAL BACKGROUND

26.30.PowerSchool is the largest provider of cloud-based K–12 education software for K-12 education in the U.S., Its products serve more than 16,000 customers and over 50 million students, serving which is more than 75% of K–12 students in North America. PowerSchool's software is used by over 16,000 customers to support more than 50 million students in the United States. PowerSchool offers a full range of services to help school districts operate, including platforms for enrollment, communication, attendance, staff management, learning systems, analytics, and finance.

27.31.PowerSchool receives and maintains PII for millions of students, parents,

and school faculty across the country. Under federal law, PowerSchool had a duty to protect the PII of current and former students and school faculty members, including under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. In addition, PowerSchool had a duty to alert students, parents, and school faculty that their PII was accessed by an unauthorized third party, and to inform these individuals about which PII had been stolen. PowerSchool indisputably breached these duties.

~~28.~~32. For years, PowerSchool knowingly and intentionally misled School Districts about the protections it had in place to ensure that ~~students'~~ data~~–~~ entrusted to PowerSchool would remain safe in its possession~~.~~

~~29.~~33. As explained below, despite maintaining a vast repository of highly sensitive data and knowing this made it a prime target for cybercriminals, PowerSchool~~'s~~ failed~~ure~~ to act reasonably and that failure was ~~given its massive collection of highly sensitive data was~~ preceded and driven ~~caused~~ by a pattern of reckless behavior by the Defendants.

~~30.~~34. To make matters worse, Plaintiffs only learned after the Data Breach that PowerSchool had been engaged in an unauthorized scheme of collecting students' data and building virtual profiles on students. PowerSchool sold this data to third parties, using the School Districts as a vehicle to line PowerSchool's pocketbooks.

~~31.~~35. School Districts were harmed not only by PowerSchool's failure to protect data, but also by its intentional ~~misrepresenttions~~misrepresentations that it protected students' privacy, which induced their reliance. These acts constitute fraud and related tortious conduct, far exceeding a~~in that they were also defrauded because of PowerSchool's intentional deception that it safeguarded students' privacy. PowerSchool's civil wrongs far exceed a~~ mere breach of contract.

**A. The Data Breach**

~~32.~~36. On or about December 28, 2024, after several prior undetected intrusions, hackers used a compromised credential for subcontractor Movate to successfully breach~~ed~~ the PowerSchool~~'s~~ PowerSource customer support portal. Gaining access to the PowerSource portal, which did not have basic industry standard security, ~~using a~~

compromised credential, allowed ing the hackers to access the PowerSchool SIS, which housed the most sensitive student data.includes student records, grades, attendance, and enrollment. Hackers were able to access the PIIis information and bulk export by exporting the PowerSchool SIS 'Students' and 'Teachers' database tables to a .CSV file, which was then stolen.

33.37. PowerSchool was not even aware of the breach and its supposed top tier security failed to detect or flag the activity as unusual or suspicious until the hackers demanded payment. PowerSchool did not alert its customers until at least ten days later on January 7, 2025, despite being contractually obligated in some cases to provide notification within 72 hours of the discovery of a cybersecurity incident. Even then, PowerSchool's notification was inconsistent, lacked detail, inaccurate, and in some cases non-existantexistent, causing Plaintiff School Districts to determine on their own if they had been affected.did not begin to alert its customers until at least January 7, 2025, which was ten days after it detected the Data Breach. Even then, many School Districts had to contact PowerSchool on their own to determine if they had been affected, as PowerSchool failed to directly alert all School Districts about the Data Breach.

34.38. The hackers were able to access at least the following PII from PowerSchool, all of which PowerSchool represented it would safeguard and protect:

a. names;
b. addresses;
c. social security numbers;
d. phone numbers;
e. email addresses;
f. medical information;
g. grades and grade point averages;
h. bus stops for students;
i. passwords for student portals;
j. notes and alerts concerning students;

k. student IDs; and

l. PII of parents or guardians of students.

~~35.~~39. Beyond this personal information, PowerSchool's data collection goes so far as to include the biometric information of students, such as their handprints or facial features:




~~36.~~40. The hackers have exploited or will exploit the data obtained in the Data Breach for profit. The hackers would not have incurred the time and effort to breach PowerSchool's systems to access users' PII and risk significant criminal prosecution if the information was not valuable. It is likely that the PII of students and parents has already been or will imminently be published and sold on the Dark Web, as evidenced by the extortion threats to school districts made several months after the Data Breach occurred.

**B. PowerSchool's Failures to Protect Private Information**

~~37.~~41. PowerSchool did not adopt reasonable data systems and protections to safeguard the PII of students and faculty, to prevent and detect unauthorized access to this highly sensitive and valuable data, or to identify users impacted by the Data Breach.

~~38.~~42. In January 2025, an audit by cybersecurity company CrowdStrike revealed that PowerSchool failed to take basic precautions to protect data that contained students'

private information.[6] The attack vector used by the hackers in the Data Breach was a known vulnerability to PowerSchool, whoas PowerSchool failed to implement even basic precautions to remedy the vulnerability and in fact deliberately hid its existence from industry auditors in order to receive the certifications School Districts relied on to support PowerSchool security claims.

39.43. As an education technology ("EdTech") provider, a central feature of PowerSchool's business is the collection and storage of highly sensitive data for tens of millions of students, parents, and school faculty. It generates hundreds of millions of dollars annually by collecting, storing, and using this information, while promoting its security protocols as key selling point to customers. PowerSchool therefore had ample resources and a strong motive to adopt reasonable protections but failed to do so.

40.44. PowerSchool also knew that such protections were necessary given the highly personal nature and value of the information it stores. PowerSchool's platform requires PowerSchool to handle sensitive information that often pertains to young users, making it a prime target for cybercriminals seeking to gain access to the data containing this information.[7]

41.45. PowerSchool knew or should have known that it would be the target of hackers. Similar education technology providers have been subject to data breaches in recent years, and 55% of the K–12 school data breaches between 2016 and 2021 were carried out on EdTech vendors.[8]

---

[6] Kevin Collier, *Children's Data Hacked After School Software Firm Missed Basic Security Step, Internal Report Says*, NBC News (May 7, 2025), https://www.nbcnews.com/tech/security/powerschool-hack-data-breach-protect-student-school-teacher-safe-rcna189029.

[7] Eli Chachak, *Understanding Cyber Threats in EdTech: How Educational Platforms Can Stay Ahead*, CyberDB (Nov. 7, 2024), https://www.cyberdb.co/understanding-cyber-threats-in-edtech-how-educational-platforms-can-stay-ahead/.

[8] Alyson Klein, *Ed-Tech Companies Are Vulnerable to Cyberattacks. A New Federal Effort Wants to Help*, EDUC. WEEK (May 2, 2024), https://www.edweek.org/technology/ed-

46. PowerSchool did in fact know that it was a target because it informed the FBI that it was the subject of a campaign to obtain the data that it stored before the Data Breach occurred. Still, PowerSchool did nothing to strengthen its facially weak security systems after learning this information and recognizing the imminent threat it faced.

47. PowerSchool's awareness of the security risks posed by Movate contractor accounts was not limited to general industry knowledge but includes the specific account that ultimately enabled the Data Breach. As early as April 2023, PowerSchool's own IT Security team flagged the account of Rayson Cruz, a Movate subcontractor in the Philippines, after detecting geographically improbable logins from Germany and Southwest Russia. The suspicious activity included a login from a German IP address on April 10, 2023, and from a Volgograd, Russia IP address on April 12, 2023. The login was on a device running Windows 7, an operating system that had been officially unsupported and unpatched since January 2020.

48. When confronted with this suspicious activity, Cruz denied any unauthorized access and confirmed he had never left the Philippines and was not using a VPN. This response, combined with the geographically impossible login pattern, should have prompted PowerSchool and Movate to take immediate remedial action, including revoking Cruz's credentials, requiring a password reset, implementing multifactor authentication on Cruz's account, or removing the account's administrative access to the entirety of PowerSchool's SIS database. Neither PowerSchool nor Movate did any ~~none~~ of these things.

49. Instead, PowerSchool allowed Cruz's account to retain unfettered administrative access to the SIS database containing the PII of tens of millions of students and teachers for another twenty months, without multi-factor authentication ("MFA") or any other compensating security control. When the December 2024 Data Breach occurred,

---

tech-companies-are-vulnerable-to-cyberattacks-a-new-federal-effort-wants-to-help/2024/05.

the compromised credentials exploited by the hackers were associated with the same account that PowerSchool's own security team had flagged in April 2023.

~~42.~~50. PowerSchool's decision to ignore the 2023 security alert for Rayson Cruz's account and permit continued unprotected access to sensitive student data constitutes a conscious and reckless disregard for the security of the PII in its custody, rising well above ordinary negligence. PowerSchool's IT Security team identified a specific, credible threat to a specific account with access to the full extent of the most sensitive data in its systems, and PowerSchool deliberately chose to do nothing.

~~43.~~51. Despite PowerSchool's knowledge of not only the heightened but actual risk involved in collecting, storing, and maintaining students' PII, Plaintiffs are informed and believe that PowerSchool failed to:

a. adequately train its employees on cybersecurity protocols;
b. implement reasonable security measures to prevent data breaches;
c. implement reasonable security measures to detect data breaches;
d. implement reasonable security measures to comprehend the scope of data breaches; and
e. implement reasonable security measures to timely determine who was impacted by data breaches.

~~44.~~52. Following the Data Breach, PowerSchool has indicated that it is attempting to adopt and implement reasonable data systems and procedures. As it explained following the Data Breach, PowerSchool is now "Securing the Portal" that was used to access the data and "Strengthening Security" for its systems. But these measures are too late for School Districts, who entered into contracts with PowerSchool in reliance on its representations that these measures were already adequately implemented and maintained. PowerSchool should have implemented these reasonable security measures well before the Data Breach and should have kept them in place for as long as PowerSchool reaped the benefits of the hundreds of millions of dollars Plaintiffs paid to PowerSchool over the years based on the belief that the data was secure

~~45.~~53. PowerSchool has done little to help either School Districts or the students, parents, and faculty who were affected by the Data Breach. PowerSchool appears to have offered limited credit monitoring services to some of the victims but has failed to explain how it will identify the millions of individuals whose personal information was compromised in the Data Breach.

~~46.~~54. According to guidance from the FTC, businesses that collect consumer data should factor in the need for adequate data security with all business decision-making. The FTC has also identified practices to guide companies like PowerSchool in protecting themselves against a data breach, i.e., established industry standards for adequate protection against data incidents.

~~47.~~55. As part of its 2016 guidelines, the FTC explained that, in order to adequately protect user data, a company should, among other things:

a. encrypt information stored on computer networks;
b. understand its network's vulnerabilities;
c. implement policies to correct security problems;
d. have response plans in place to ensure an adequate and timely response to a data breach;
e. require complex passwords to navigate internal systems;
f. use industry-tested security methods;
g. have monitoring systems in place to detect suspicious activity; and
h. verify that third-party service providers have reasonable security systems in place.

~~48.~~56. When they entered into contracts with PowerSchool, School Districts believed that PowerSchool had already implemented all of these basic security measures, given the nature of PowerSchool's business, the fact that these guidelines were issued before their contracts were made, and because of representations made in PowerSchool's marketing materials touting the security of it products and services and in its contracts.

~~49.~~57. Companies that fail to employ reasonable security systems and procedures

may face an enforcement action from the FTC, as it often interprets such failures as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

~~50.~~58. Several established security practices provide baseline industry standards for businesses. These practices include:

a. educating all employees;

b. strong passwords;

c. multi-layer security, including firewalls, anti-virus, and anti-malware software;

d. encryption (making data unreadable without a key);

e. multi-factor authentication;

f. backup data; and

g. limiting which employees can access sensitive data.

~~51.~~59. Other industry standard practices include:

a. installing appropriate malware detection software;

b. monitoring and limiting network ports;

c. protecting web browsers and email management systems;

d. setting up network systems such as firewalls, switches, and routers;

e. monitoring and protection of physical security systems;

f. protection against any possible communication system; and

g. training staff regarding critical points.

~~52.~~60. PowerSchool failed to implement several of these industry standards and best practices, which directly and proximately caused the Data Breach and resulted in Plaintiffs' injuries.

61. PowerSchool's failures to protect student data are not limited to the December 2024 Data Breach of its SIS. PowerSchool has established a pattern of disregard for student data privacy that extends across its full suite of products~~, including Naviance, PowerSchool's college and career readiness platform used by students throughout the country to apply to colleges and universities.~~.

In or around February and March 2026—approximately one year after the December 2024 Data Breach—PowerSchool notified certain school districts of a technical error in Naviance in which student mid-year academic transcripts, containing grades, course history, and grade point averages, were attached to the college applications of entirely different students and transmitted to the colleges and universities where those students had applied.

In other words, Student A's confidential transcript was submitted as part of Student B's college applications and sent to every institution to which Student B applied.

This error jeopardized college admissions decisions and merit scholarship eligibility for the affected students and constitutes an unauthorized disclosure of education records in violation of the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, and the implementing regulations at 34 C.F.R. Part 99.

The misdirection arose from a fundamentally inadequate student matching methodology: PowerSchool's system relied, in whole or in part, on student dates of birth as a matching criterion. Given that it is inevitable that a school will have students with identical birthdates, such a criterion was insufficient.

Rather than promptly notifying district-level administrators of this FERPA violation, PowerSchool again employed suppression tactics consistent with its post-breach conduct following the December 2024 Data Breach: it staggered notifications across weeks, with some districts receiving notice as early as February 26, 2026, while others were not informed until late March 2026; it directed notifications solely to individual school counselors rather than to the designated district-level administrators and billing contacts with authority and responsibility for FERPA compliance; and it falsely represented to at least one district that its system had automatically removed the misdirected transcripts when, in fact, the incorrect transcripts remained attached and visible when district administrators subsequently logged into Naviance.

The December 2024 Data Breach and the Naviance incident confirm that PowerSchool has established a persistent and documented pattern of failing to safeguard

~~student privacy across its product lines.~~

~~Additionally, in or around March 2026, PowerSchool supplied contact information for students and families to a third party settlement administrator, without providing prior notice to school districts of the disclosure. This disclosure directly violates PowerSchool's contractual obligations to provide notice to school districts prior to complying with an order to disclose Student Data.~~

**C. PowerSchool's Failures to Fulfill Express and Implied Promises**

~~53.~~62. PowerSchool provides products and services to Plaintiffs pursuant to the terms of written contracts with School Districts. These contracts create mandatory obligations on the part of PowerSchool.

63. The School Districts' contracts with PowerSchool are not limited to the SIS. School Districts contract with PowerSchool for a broad suite of educational software products and services, including, without limitation, Naviance; enrollment management tools; communication platforms; learning management systems; analytics and reporting applications; and finance management software.

64. Each of these products and services involves the collection, storage, maintenance, and processing of PII belonging to students, parents, and school faculty.

65. The contractual protections afforded under the Main Service Agreement ("MSA") and the applicable Data Privacy Agreement ("DPA") extend to all PowerSchool products and services for which each School District contracted, and the data security obligations PowerSchool undertook apply equally to the PII processed in connection with each such product.

66. The MSA is a non-negotiable, standardized form contract that PowerSchool presents to all School District customers without opportunity for meaningful negotiation.

67. Stated differently, the MSA is an adhesion contract.

68. The DPA is a companion agreement that may be negotiated at the state or district level. Certain state education offices have negotiated with PowerSchool to modify particular DPA terms.

69. The MSA and applicable DPA also establish unambiguously that the data collected and processed by PowerSchool belongs to and remains under the control of the School Districts, not PowerSchool.

70. Specifically, Section 3.1 of the MSA, captioned Rights in Customer Data, expressly addresses ownership of the data provided to ~~Powerschool~~PowerSchool: "Customer is and will remain the sole and exclusive owner of all right, title and interest in and to all Customer Data, including all Intellectual Property Rights relating thereto, subject to the rights and permissions granted in this Section 3 (Customer Data)."

71. This provision unambiguously vests ownership of all Customer Data—which is defined in Section 1.3 of the MSA to mean "all data (including Personal Data), files, documents and records uploaded to a Subscription Service or transmitted to PowerSchool under this Agreement by or on behalf of Customer."

72. Section 3.2 of the MSA further provides that PowerSchool "will not rent or sell Customer Data and will treat such data as Confidential Information." Disclosure of data to third parties is prohibited absent the Customer's express consent, with the limited exception of compelled disclosure addressed in Section 5.3 of the MSA.

73. Likewise, the DPA provides that education records are "presumed to be owned and under the control of PowerSchool's Customer(s)," *i.e.*, the School Districts. DPA § 1.5.

74. The DPA further provides that PowerSchool will "only for the purpose of fulfilling its duties under the Agreement for PowerSchool Customer's and its Users' benefit." DPA § 5.5.

75. These DPA provisions confirm that any use of School District data for purposes other than fulfilling contractual service obligations to the School Districts—including, without limitation, PowerSchool's data monetization and commercial partner data-sharing scheme alleged herein—constitutes a direct breach of the DPA and an unauthorized appropriation of data that, by contract, belongs to the School Districts.

76. The specific contractual obligations concerning data security PowerSchool

undertook in favor of School Districts include, without limitation, the following express provisions of the MSA and DPA.

77. Section 3.1 of the MSA provides that "PowerSchool will ensure that its use of the Customer Data always complies with this Agreement, PowerSchool's privacy statement, and all applicable laws, regulations, and conventions."

78. Section 3.3 of the MSA requires the parties to comply with a state-specific data privacy agreement (the State DPA), incorporated by reference via an external URL. That DPA is stated to supplement the MSA.

79. If the parties separately negotiated a DPA, that instrument governs in lieu of the standard State DPA and governs the processing of Customer Data.

80. Plaintiffs did not receive a discounted rate for PowerSchool's products or services as a result of being forced into adhering to PowerSchool's MSA.

~~54.~~81. Through the DPA's, PowerSchool binds itself to the express promises it makes to School Districts. These include promises by PowerSchool to:

a. implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk;

b. refrain from using, selling, renting, transferring, distributing, altering, or disclosing PII to any third party without the prior written consent of school districts, except as required by law or as otherwise agreed;

c. notify school districts without undue delay, and within the time period required by law, if a data breach occurs;

d. abide by the Family Educational Rights and Privacy Act ("FERPA"), which restricts the unauthorized sharing of student education records; and

e. review its own data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws.

82. Specifically, Article 5, Section 3 of the DPA requires PowerSchool to "utilize administrative, physical, and technical safeguards designed to protect Student Data from unauthorized access, disclosure, acquisition, destruction, use or modification."

83. Article 7, Section 3 of the DPA requires PowerSchool to abide by FERPA.

84. Article 2, Section 5 of the DPA (Subprocessors) provides that PowerSchool "shall enter into a written agreement with all Subprocessors performing functions for the Provider in order for the Provider to provide Services pursuant to the Service Agreement, whereby the Subprocessors agrees to protect Student Data in a manner no less stringent than the terms of this DPA."

85. Article 5, Section 4 of the DPA requires that breach notification be sent to the District within 72 hours of confirmation of the incident and must include, among other things, the date of the breach and a list of the types of personal information that were the subject of the breach.

86. In addition, the DPA required PowerSchool to adhere to the requirements of the International Standard Organization ("ISO") Cybersecurity Framework 27001 ("ISO 27001"), which is the recognized international standard for cybersecurity and is closely related to the National Institute of Standards and Technology ("NIST") Cybersecurity Framework.

87. PowerSchool violated each of these express contractual provisions.

88. Section 11 of the MSA provides an exclusion of damages (MSA § 11.1) and cap on monetary, which states in relevant part as follows: "IN NO EVENT SHALL THE AGGREGATE LIABILITY OF EACH PARTY TOGETHER WITH ALL OF ITS AFFILIATES ARISING OUT OF OR RELATED TO THE EXCLUDED CLAIMS EXCEED TWO TIMES (2X) THE TOTAL AMOUNT PAID BY CUSTOMER AND ITS AFFILIATES HEREUNDER FOR THE SERVICES GIVING RISE TO THE LIABILITY IN THE TWELVE (12) MONTHS PRECEDING THE FIRST INCIDENT OUT OF WHICH THE LIABILITY AROSE. THE FOREGOING LIMITATION WILL APPLY WHETHER AN ACTION IS IN CONTRACT OR TORT AND REGARDLESS OF THE THEORY OF LIABILITY BUT WILL NOT LIMIT CUSTOMER'S AND ITS AFFILIATES' PAYMENT OBLIGATIONS UNDER THE 'FEES AND PAYMENT' SECTION ABOVE." MSA § 11.2

89. Contractual agreements, such as the MSA, that purport to exculpate a party for future violations of the law should be and are looked at with disfavor.

90. The exculpatory provisions set forth in Sections 11.1 and 11.2 of the MSA are unenforceable for the following:

a. PowerSchool's business is heavily subject to public regulation, including under the Federal Trade Commission Act, the Health Insurance Portability and Accountability Act, the Family Educational Rights and Privacy Act, and the Children's Online Privacy Protection Act, as well as extensive state-level data privacy statutes.

b. PowerSchool provides services of great public importance and practical necessity—its software is used by more than 75% of students in North America across more than 16,000 customers—and K–12 educational institutions have few practical alternatives for core administrative and data management functions.

c. PowerSchool holds itself out as willing to provide its services to any K–12 school district meeting its standard enrollment and contracting criteria.

d. PowerSchool possesses a decisive bargaining advantage, controlling more than one-third of the U.S. K–12 EdTech marketplace, leaving School Districts with no meaningful ability to reject its standard contract terms or to obtain comparable services elsewhere on materially different conditions.

e. The MSA is a non-negotiable standardized adhesion contract. No opt-out from PowerSchool's limitation of liability exists in the standardized MSA form itself. While certain states and school districts could negotiate with PowerSchool to exclude the exculpatory language from their statewide DPA, others do not have the same resources at their disposal.

f. School Districts have no option to pay additional fees and obtain protection against PowerSchool's negligence.

g. As a direct result of their contracts with PowerSchool, the School Districts

placed the highly sensitive personally identifiable information of millions of students, parents, and faculty members entirely under PowerSchool's custody and control, subject to the risk of PowerSchool's carelessness and that of its agents.

91. Even in the event the limitation clause in Section 11 of the MSA were otherwise enforceable (which it is not), PowerSchool's remains liableility for gross negligence, willful misconduct, and fraud.

92. Indeed, Section 11.3 of the MSA expressly provides that the provisions in Sections 11.1 and 11.2 of the MSA shall "NOT APPLY TO LIABILITY ARISING OUT OF A PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD." MSA § 11.3.

55.93. PowerSchool's marketing and advertising techniques position PowerSchool as a "leader" in protecting student data. In a marketspace dominated by only a handful of companies, PowerSchool put security guarantees at the top of its list for what set PowerSchool apart from others. By 2022, PowerSchool's marketing strategies were so effective that it was estimated to control over one-third of the U.S. EdTech marketplace for K–12 schools.[9]

[9] *See* Justin Ménard, *PowerSchool: The Path to Dominate the K-12 Market*, listedtech (Feb. 23, 2022), https://listedtech.com/blog/powerschool-the-path-to-dominate-the-k-12-market/.




~~56.~~94. Despite having represented it would do all the above in addition to what its commercial advertisements state or imply, PowerSchool failed to fulfill its promises.

### D. Bain Capital's ~~Pivotal Role~~Liability as Agent, Direct Tortfeasor, Alter Ego, and Aider and Abettor of PowerSchool's ~~Controlling Alter Ego~~Misconduct

~~57.~~95. Bain Capital, a multi-billion-dollar private equity firm, acquired PowerSchool in a leveraged buyout in October 2024, valuing the company at approximately $5.6 billion. Bain Capital consummated this acquisition through entities acting as its agents, immediately placing PowerSchool under Bain Capitals's complete domination and control.

~~58.~~96. In the process, Bain Capital saddled PowerSchool with substantial debt that was used to finance the buyout, imposing significant financial pressures on the company's operations.[10] By design, Bain Capital's financial engineering prioritized extracting short-term profits from PowerSchool—for example, by burdening the company with loans and demanding aggressive cost reductions—at the expense of investments in cybersecurity and stability.

97. Bain Capital's role was not that of a passive investor. Rather, Bain Capital

[10] Paula Seligson, *Private Credit Provides Debt for Bain's PowerSchool Buyout*, Bloomberg Law (June 7, 2024), https://news.bloomberglaw.com/bankruptcy-law/private-credit-provides-debt-for-bains-powerschool-buyout.

exercised direct control over PowerSchool's decision-making, treating PowerSchool as a mere instrumentality of its own financial interests. Indeed, Bain Capital's representatives and executives dictated many of the policies and business decisions that ultimately gave rise to the Data Breach, blurring any separation between Bain and PowerSchool.

98. In August 2022, representatives of Bain Capital approached PowerSchool through PowerSchool's co-chairperson of the board, who was also the representative of Onex, a significant shareholder of PowerSchool, to express interest in a potential business combination or acquisition.

99. For more than two years, Bain maintained an active dialogue with PowerSchool's Chief Executive Officer, Hardeep Gulati, and with the company's principal shareholders.

100. During this period, Bain gained comprehensive visibility into PowerSchool's operations, including privileged, non-public insight into PowerSchool's internal financials, cybersecurity and technology operations, human resources, product road maps, and cost-structure data.

101. Bain was thus fully aware, well before any formal bid, that data security was a material and important aspect of PowerSchool's business and that a breach of data security was a key enterprise risk for PowerSchool.

102. In January 2024, under Bain's direction, PowerSchool expanded its cybersecurity operations to India.

103. Bain's strategic discussions and business planning with PowerSchool culminated in a Merger Agreement signed June 6, 2024,[11] which was just sixthree months before the Data Breach.

[11] PowerSchool Holdings, Inc.PowerSchool Corporation, Schedule 14C Information Statement relating to Merger or Acquisition at 21 (Sept. 4, 2024), available at https://www.sec.gov/Archives/edgar/data/1835681/000119312524212624/d836904ddefm14c.htm.

104. From that date forward, PowerSchool was required to consult Bain Capital prior to making any changes to operational, cybersecurity, and financial decisions.

105. Specifically, Section 6.1 of the Merger Agreement barred PowerSchool from making any capital expenditure over $5 million, entering or amending material vendor contracts, or implementing any material changes in compensation or headcount without Bain's written consent between signing on June 6, 2024, and closing on October 1, 2024. This gave Bain *de facto* operational control over PowerSchool four months before legal ownership formally transferred.

106. Further, Bain secured veto rights well before the merger officially closed, granting Bain strategic control over PowerSchool's key decisions months in advance of formal acquisition. As a result, Bain began shaping PowerSchool's operations long before the December 2024 Data Breach, through the control it exercised during merger negotiations and after the Merger Agreement was signed.

107. Bain's knowledge of data security risks was expressly acknowledged and memorialized in the Merger Agreement itself. Such knowledge is evident in Article 1.1 and 3.17 of the June 6, 2024 Merger Agreement.

108. Article 1.1 of the Merger Agreement defined "Data Protection Obligations" to encompass all applicable federal, state, and foreign laws, contractual obligations, and public representations relating to privacy, information security, data protection, data breach notification, and the processing of personal information.

109. Article 3.17 of the Merger Agreement further required PowerSchool to warrant, among other things, that it had materially complied with all applicable Data Protection Obligations during the preceding three years; that it had implemented and maintained a written information security program comprising commercially reasonable administrative, technical, and physical safeguards; that it had not experienced any security incident; and that it had not sold personal information of students or children under age thirteen in contravention of applicable law.

~~59.~~110. By obtaining and reviewing these representations and warranties

before the merger closed, Bain had direct contractual knowledge of PowerSchool's data protection obligations and the precise scope of the data security risks inherent in PowerSchool's business.

~~60.~~111. Then, ~~From the moment~~when Bain took over, PowerSchool was operating under Bain Capital's thumb, with Bain Capital's profit-driven mandates superseding all else when it came to budget allocations and risk management.

112. One of Bain Capital's first acts as PowerSchool's new owner was to impose aggressive cost-cutting measures, including a sudden mass layoff of approximately 5% of PowerSchool's workforce. Bain Capital's mandate eliminated around 175 critical staff within weeks of the acquisition. Many of those terminated were long-term employees with valuable institutional knowledge, including some employees with over twenty years of experience as PowerSchool employees.

113. Critically, these workforce reductions began well before the October 1, 2024 formal closing. In March 2024, shortly after PowerSchool announced its India expansion, PowerSchool initiated the first wave of layoffs affecting approximately 5% of its workforce, including many U.S.-based employees with over twenty years of experience. Further layoffs followed in August 2024, during which time Bain oversaw all major decisions and directed the reductions.

~~61.~~114. Employee accounts on social media, including LinkedIn, Reddit, X, and job review sites such as Indeed and Glassdoor, linked the layoffs directly to Bain Capital's financial expectations in the wake of the acquisition. One former Product Engineer at PowerSchool posted on Glassdoor regarding a large-scale layoff and warned that the company was shifting toward outsourcing, stating that it was a general trend to outsource all jobs offshore and that the shift was moving into support and product management. Another former employee wrote that the company was clearly shifting to an India-based workforce at the expense of U.S.-based employees. Post-merger, of experience as PowerSchool employees. An inside source reported that entire departments

were "basically gutted" by these layoffs.[12]

~~62.~~115. The purported justification for this drastic reduction was pretextual—PowerSchool had missed an earnings-per-share target by a mere $0.01—revealing that Bain was willing to sacrifice personnel, including IT and security staff, to appease Bain's short-term financial goals.

~~63.~~116. By stripping PowerSchool of its domestic employees, Bain Capital knowingly weakened PowerSchool's already-weak internal cybersecurity defenses. The timing of events underscores how foreseeably damaging this was: just three days after Bain's layoff order, on August 16, 2024, the first incident of unauthorized access by a third-party threat actor occurred. In other words, almost immediately after Bain's cost-cutting purge, PowerSchool's systems were breached. This was a consequence of the company's diminished security monitoring and staff oversight.

~~64.~~117. Bain's slash-and-burn approach to staffing left PowerSchool's remaining IT and security teams under-resourced, creating obvious vulnerabilities. Basic cybersecurity tasks such as monitoring for intrusions, promptly installing patches, and controlling privileged access became harder to fulfill after the layoffs. By compelling such cuts, Bain Capital effectively traded away cybersecurity safeguards for cost savings, and did so despite industry warnings that understaffing and high turnover undermine data security.

~~65.~~118. Bain ~~Capitals's~~Capital's layoff directive directly and recklessly ~~directly hampered~~impaired PowerSchool's ability to protect the massive amount of sensitive student data in its custody. This made a damaging breach not only foreseeable, but virtually inevitable.

119. At the same time it was systematically gutting PowerSchool's U.S. workforce, Bain Capital also pursued an aggressive offshoring strategy that exposed

---

[12] Wyatt Gaylor (@wyattg), X (Aug. 14, 2024, 11:09 AM EST), https://x.com/wyattg/status/1823738764730229073.

School District data to under-secured overseas access. Bain's post-acquisition plan for PowerSchool called for rapidly expanding cheaper overseas operations while shrinking domestic infrastructure. In fact, during the merger negotiations, Bain and PowerSchool's leadership explicitly discussed boosting PowerSchool's headcount in India and other low-cost locations as a cost-saving measure.

120. The unauthorized access that began on August 16, 2024 was not an isolated intrusion. On September 4, 2024—more than three months before PowerSchool publicly announced the Data Breach—an unknown individual also gained unauthorized access to PowerSchool's network and obtained student and teacher data belonging to at least one of PowerSchool's customers.

121. At no point during the period from August 16 through December 28, 2024 did PowerSchool's monitoring systems detect or alert anyone to the ongoing unauthorized access. This failure of detection was itself a direct consequence of the understaffing, cost-cutting, and erosion of security oversight that Bain directed and compelled.

122. Bain holds itself out as a sophisticated, technology-focused investor with the expertise to guide companies through digital transformation. Bain manages approximately $185 billion in assets and specifically touted its technology expertise and digital transformation capabilities as value-add contributions to the PowerSchool acquisition. Bain therefore had the responsibility, the authority, and the demonstrated expertise to ensure that PowerSchool implemented basic, industry-standard cybersecurity safeguards—including, at minimum, requiring all vendors and employees with access to sensitive databases to use multi-factor authentication.

~~66.~~123. Having studied PowerSchool's operations for over two years before the merger, having obtained representations from PowerSchool in the Merger Agreement about its data protection compliance, and having assumed formal operational control following the October 1, 2024 closing, Bain knew that failing to implement these elementary precautions would leave tens of millions of students and teachers vulnerable to exactly the kind of breach that occurred here.

~~67.~~124. ~~By~~Consistent with these pre-closing directives, on January ~~2025—barely three months after Bain took control~~8, 2024—well before the merger formally closed—PowerSchool announced ~~it would nearly double~~plans to expand its India-based workforce from 1,300 to 2,000 employees within 3– to 5 years. The timing and scale of this announcement, made during the period of active merger negotiations, matched Bain's established investment playbook and confirmed that Bain's strategic priorities were already shaping PowerSchool's operational decisions before the acquisition was formally consummated.[13]

~~68.~~125. This expansion in offshore personnel was coupled with Bain's broader initiatives: at the same time it acquired PowerSchool, Bain Capital also acquired a Japan-based outsourcing conglomerate, Outsourcing, Inc., to integrate and consolidate global back-office operations across its portfolio. Bain publicly endorsed Outsourcing Inc.'s "VISION 2025" plan, which emphasized moving operations overseas and increasing profit margins through remote digital workforce solutions.[14]

126. A significant portion of Bain's outsourcing initiative was executed through Movate, Inc., an offshore outsourcing company that Bain directed PowerSchool to engage. After Bain's signing of the Merger Agreement on June 6, 2024, Movate began advertising in July 2024 for additional staff in the Philippines specifically to service PowerSchool's account. Consistent with Bain's contractual veto rights under Section 6.1 of the Merger Agreement and its well-documented strategy of cost-reduction through

---

[13] EdTech Leader PowerSchool Makes Substantial Infrastructure Investment in India & Aims to Expand the India Employee Base to 2000 in 3–5 Years, ANI/Business Standard-style press release, Jan. 8, 2024, https://www.aninews.in/news/business/business/edtech-leader-powerschool-makes-substantial-infrastructure-investment-in-india-amp-aims-to-expand-the-india-employee-base-to-2000-in-3-5-years20240108124645/ (last visited Aug. 7, 2025).

[14] Statement from Bain Capital Private Equity regarding Outsourcing Inc., Bain Capital, Dec. 8, 2023, https://www.Bain Capitalcapital.com/news/statement-Bain Capital-capital-private-equity-regarding-outsourcing-inc (last visited Aug. 7, 2025).

offshoring, this expansion of Movate's Philippines workforce to service PowerSchool proceeded only with Bain's knowledge, approval, and direction.

127. At the time Movate's Philippines-based employees—including the employee whose compromised credentials ultimately enabled the December 2024 Data Breach—were being engaged to access PowerSchool's systems, no multi-factor authentication or equivalent credential-security measure was required for those offshore accounts.

128. Despite having the contractual authority and operational leverage to require such protections, Bain did not direct PowerSchool or Movate to implement them.

129. At the time of the merger's formal closing on October 1, 2024, PowerSchool's Chief Executive Officer, Hardeep Gulati, made clear that he intended to work closely with Bain's management in the management and expansion of PowerSchool.

130. In the merger announcement, Gulati cited Bain's capacity to support AI integration as a motivation, stating: "With Bain Capital's support, PowerSchool will have access to additional resources and the flexibility to deliver even more growth and innovation, particularly with PowerBuddy, our generative AI platform, and scale our global reach in helping schools personalize education for every student journey." This statement, made by PowerSchool's own CEO, confirms that PowerSchool was not operating at arm's length from Bain but was actively managed and directed in close coordination with Bain's leadership.

~~69.~~131. Bain further demonstrated the depth of its operational control by immediately replacing the entire PowerSchool board of directors upon closing, handing every board seat to individuals tied to Bain-controlled entities. In effect, Bain's message was clear: PowerSchool's future growth and profitability were to be achieved by shifting as much labor as possible to offshore "centers of excellence" under Bain's control, where labor is cheaper and regulations may be looser.

~~70.~~132. This offshoring strategy was not a mere side effect of the acquisition; it was a driving rationale for it. Bain's own financial models for the PowerSchool deal

assumed massive cost savings from offshore operations. The Definitive Merger Statement that Bain relied upon projected significant boosts in profit margins precisely by increasing the use of PowerSchool's offshore support and development centers. For example, Bain's bankers (Goldman Sachs and Centerview) were told to assume that by moving more of PowerSchool's customer support and product development to low-cost offshore "centers of excellence," gross profit margins would grow substantially and R&D expenses would shrink as a percentage of revenue.

~~71.~~133. In line with these projections, Bain took the helm and moved swiftly to execute on offshoring. Bain prioritized speed and cost-cutting over any meaningful data protection considerations. PowerSchool's critical support functions and infrastructure were increasingly handled by third-party contractors overseas. This meant that the sensitive information of individuals was now being protected by people who were not PowerSchool employees, but were employed by outsourcing vendors engaged by Bain.

~~72.~~134. Bain's offshoring mandate directly undermined cybersecurity. By shifting core operations to external contractors abroad, Bain opened the door to serious security lapses. Unauthorized individuals were able to access to highly sensitive student information because PowerSchool failed to implement the safeguards it promised School Districts in its contracts and advertisements. Offshore contractors were given broad credentials and access rights into PowerSchool's systems, operating outside the direct supervision of PowerSchool's domestic IT department and lacking sufficient security training or controls.

~~73.~~135. Plaintiffs are informed and believe that the Data Breach was ultimately enabled by a compromised login belonging to one of these very offshore contractors. Specifically, the credentials that hackers exploited in the December 2024 breach belonged to a subcontractor account in the Philippines (identified as "Rayson Cruz") working for an outsourcing vendor, Movate Inc. That foreign subcontractor's account had access to PowerSchool's internal PowerSource support system, which in turn

had maintenance access into the student information database. This subcontractor account was not protected by multi-factor authentication or other basic security measures.

~~74.~~136. In other words, Bain's decision to replace U.S. staff with offshore contractors led to a situation where only a single username-password combination (assigned to a third-party in another country) stood between cybercriminals and the private data of millions of American students and teachers. Once hackers obtained those credentials (whether via phishing, purchase on the dark web, or an insider leak), they were able to log into PowerSchool systems without any secondary verification and export the entire database of student data.

~~75.~~137. By entrusting critical systems access to an overseas contractor without requiring industry-standard safeguards like multi-factor authentication, Defendants practically handed the keys to the kingdom to potential attackers. This arrangement gave an outside foreign national full access to millions of student records, resulting in an enormous exposure of confidential data to an environment with weaker controls. The foreseeability of this disaster was obvious—and indeed, the very scenario that any prudent cybersecurity program operator would fear was exactly what occurred.

~~76.~~138. Bain Capital's conduct with PowerSchool was not an isolated incident. It was part of a long, well-documented pattern of Bain prioritizing cost savings and offshoring at the expense of employees and security.

~~77.~~139. For decades, Bain Capital has repeatedly acquired companies and then slashed domestic jobs, outsourced operations, and squeezed budgets to maximize short-term profits. As early as the 1990s, Bain-backed firms like Stream International and Modus Media began relocating call centers and other functions to lower-wage countries.[15]

---

[15] Tom Hamburger, *Romney's Bain Capital Invested in Companies That Moved Jobs Overseas*, Wash. Post (June 21, 2012), https://www.washingtonpost.com/business/economy/romneys-Bain Capital-capital-invested-in-companies-that-moved-jobs-overseas/2012/06/21/gJQAsD9ptV_story.html (last visited Aug. 8, 2025).

~~78.~~140. This trend has only accelerated in recent years, as Bain has actively sought out investments in the outsourcing sector itself.

~~79.~~141. In 2021, Bain tried to purchase VXI Global Solutions, a business process outsourcing (BPO) provider operating in China and the Philippines. Also, in 2023, Bain acquired Outsourcing Inc., a conglomerate specializing in offshore labor, expressly to capitalize on the "rapidly increasing use of technology" to shift work overseas under its VISION2025 plan.[16]

~~80.~~142. Time and again, Bain's strategy for its portfolio companies has been to cut costs by shifting labor overseas, even when doing so undermines the companies' core services or obligations. Bain makes no secret that offshoring is central to its playbook: it profits from moving jobs offshore, indifferent to the collateral damage that results.

~~81.~~143. In PowerSchool's case, the collateral damage was the gutting of its cybersecurity just as the company was stewarding an unprecedented quantity of sensitive student data. Bain's insistence on offloading work to cheaper contractors meant that PowerSchool's data security was underfunded, under-resourced, and entrusted to entities that Bain could more easily control but could not adequately supervise.

~~82.~~144. Bain's own expansion plans for PowerSchool touted improved earnings through labor cost reductions, implicitly accepting a trade-off that less money would be spent on robust security personnel, training, and technology.

~~83.~~145. Bain knew or should have known that its drastic cost-cutting and offshoring measures posed serious risks to PowerSchool's data integrity. By stripping away safeguards that were already deficient, Bain created the conditions that allowed

[16] VISION2025: Building a New Stage—FY2023–25 Medium-Term Management Plan, Outsourcing Inc., Feb. 2023, https://www.outsourcing.co.jp/-/media/outsourcing/en/top/ir/irlibrary/midiplan/VISION2025_eng.ashx (last visited Aug. 7, 2025).

hackers to infiltrate PowerSchool's systems with incredible ease. Such a massive breach was not a random stroke of bad luck, but the predictable outcome of Bain's decisions.

~~84.~~146. The Data Breach that occurred in December 2024 was exactly the kind of catastrophe one would expect when a company holding millions of children's personal information is forced to "do more with less" for the sake of a private equity's profits. The foreseeability of the Breach was well known and long recognized, as shown by the fact that PowerSchool warned of the need for strong access controls and diligent monitoring. These warnings went unheeded once Bain's cost-cutting directives took priority.

~~85.~~147. In sum, Bain Capital exercised such pervasive control over PowerSchool that PowerSchool became Bain's alter ego, carrying out Bain's directives to reduce costs regardless of the known dangerous consequences.

~~86.~~148. Bain's financial engineering and debt-loading of PowerSchool drained resources that should have been used to fortify cybersecurity. Bain's layoffs decimated the human defenses and institutional knowledge needed to prevent or promptly detect intrusions. Worst of all, Bain's outsourcing and offshoring thrust sensitive data into environments with lax security, culminating in an outsourced contractor's credentials being the weak link that hackers exploited.

~~87.~~149. Bain Capital reaped financial benefits from its reckless action as it extracted substantial value from PowerSchool. Meanwhile, School Districts paid the price. Had Bain Capital prioritized bare minimum data security measures over short-term profit, the Data Breach could have been prevented. Instead, Bain's deliberate actions and inaction caused the conditions that made the breach possible.

~~88.~~150. Thus, Bain Capital is directly responsible for all of Plaintiffs' alleged damages, as Bain is the controlling alter ego of PowerSchool.

~~89.~~151. The law does not permit Bain to hide behind PowerSchool's corporate form in these circumstances. An unconscionable and grossly inequitable result would follow if Bain were permitted to use PowerSchool's separate corporate form to avoid liability.

~~90.~~152. Bain has reaped substantial benefits from PowerSchool's operations while simultaneously exposing it to liability and financial vulnerability. As Bain continues to capitalize on its investment, it has left PowerSchool severely undercapitalized and underinsured in the face of the massive Data Breach, despite Bain's knowledge of PowerSchool's existing vulnerabilities when the merger occurred and Bain's direct contributions to the Breach itself. To treat Bain as separate from PowerSchool would permit Bain to unjustly insulate itself from the obligations and harms arising from its ownership and control of PowerSchool.

~~91.~~153. Bain's pervasive control and self-interested decision-making render it liable for PowerSchool's misconduct as if Bain itself committed the wrongful acts that caused School Districts' injuries.

154. While Plaintiffs assert liability against Bain Capital on the independent theories of agency, direct liability, and aiding and abetting as set forth herein and in the Counts below, the factual allegations in this Section are also consistent with, and sufficient to support, a theory of alter ego liability.[17]

155. Bain Capital is liable as a principal whose agent, PowerSchool, acted at Bain's direction and for Bain's benefit before the merger through the Merger Agreement and after the m~~M~~erger. Because Bain controlled PowerSchool's key operational decisions—including the cybersecurity decisions that enabled the Data Breach—Bain is liable as principal for PowerSchool's negligent and wrongful acts.

156. Bain manifested that PowerSchool should act on its behalf by conditioning

[17] Plaintiffs do not seek to challenge the Court's prior ruling on Bain's liability as an alter ego of PowerSchool. However, the preceding allegations regarding Bain Capital's unity of interest and operational control over PowerSchool are preserved as potential predicate facts for an alter ego claim following the completion of discovery. Plaintiffs do not abandon the alter ego theory; they expressly preserve all alter ego allegations and reserve the right to pursue this theory as a formal basis upon which relief may be granted following the close of fact discovery, when the full scope of Bain Capital's control over PowerSchool's operations can be established through the evidentiary record.

the June 6, 2024 Merger Agreement on PowerSchool's implementation of cost-reduction measures, offshoring directives, and workforce changes. PowerSchool accepted this undertaking by implementing those measures—including expanding its India-based workforce, executing the Movate engagement, and conducting the August 2024 layoffs—in direct response to Bain's directives. The Merger Agreement's provisions granting Bain veto rights over capital expenditures, material vendor contracts, and headcount changes reflect a clear understanding that Bain would be in control of the undertaking. This agency relationship was confirmed when, upon closing, Bain immediately replaced PowerSchool's entire board with Bain-affiliated personnel, cementing Bain's operational control.

157. Bain Capital is also directly liable for its own conduct, which went far beyond that of an ordinary investor. Before the merger closed, Bain exercised control through contractual veto rights and workforce directives. After the merger closed on October 1, 2024, Bain assumed formal operational control and immediately replaced PowerSchool's entire board of directors.

158. Through this control, Bain dictated PowerSchool's daily operations, including the cost-cutting measures that dismantled the company's cybersecurity infrastructure and led to the Data Breach. Bain directed layoffs of approximately 5% of PowerSchool's workforce, including critical domestic IT security staff, and shifted those functions offshore to Movate—at the direct expense of adequate staffing and funding for data security. These acts and omissions constitute direct tortious conduct by Bain, not merely the conduct of an investor passively holding equity.

159. Bain Capital is further liable as an aider and abettor of PowerSchool's tortious conduct. Bain studied and became involved with PowerSchool for over two years before the merger closed, during which time it gained detailed knowledge of PowerSchool's data-security practices and obligations. As a sophisticated, technology-focused investor managing billions in assets, Bain understood that offshoring cybersecurity functions on an accelerated timeline created significant data security risks.

Bain nevertheless directed PowerSchool to eliminate critical U.S.-based IT workforce and to outsource those responsibilities offshore to Movate for its own financial gain. This direction constituted substantial assistance to PowerSchool in committing the tortious acts that harmed School Districts.

**E. The Fraudulent Sale of Student Data to Third Parties**

~~92.~~160. Throughout its relationship with School Districts, PowerSchool repeatedly represented that it would safeguard student information and use it only for authorized educational purposes. In contracts and public-facing privacy policies, PowerSchool assured School Districts that it would not use or disclose student data without consent and that student information remained under the districts' control.

~~93.~~161. PowerSchool cultivated an image of a trusted steward of student records: its website and marketing materials proclaimed that protecting student privacy was a core value. For example, PowerSchool touted itself as "an industry leader for protected private data," bragging that it "invests in updated security technology and adheres to strict security regulations to keep your data secure." PowerSchool expressly told School Districts that they could "trust PowerSchool to safeguard and protect their children's personal information."

~~94.~~162. In line with these assurances, PowerSchool promised School Districts that it would comply with privacy laws and not misuse or improperly share the data of students and others. These agreements typically forbade PowerSchool from mining student data for unrelated purposes or sharing it with third parties except as needed to provide the educational services.

~~95.~~163. PowerSchool's outward stance was thus one of strict compliance and minimal use. It affirmatively represented that it would honor consent requirements and not treat students' personal information as a commodity.

~~96.~~164. In reality, PowerSchool intentionally concealed that it was engaging in a widespread data-harvesting and monetization scheme. PowerSchool has amassed a vast trove of personal data on millions of K–12 students, not only from the records

provided by School Districts but also through acquisitions and integration of other education platforms (such as the Naviance college/career planning tool).

~~97.~~165. Rather than confining its use of this data to student report cards or school administration, PowerSchool leveraged the data for commercial gain. It built an entire business around analyzing and selling insights drawn from student information.

~~98.~~166. Far from limiting itself to educational support, PowerSchool treated the data School Districts entrusted to it as a gold mine. This data was used as a means of developing derivative products to strike lucrative deals with a network of corporate partners.

~~99.~~167. By exploiting the data of students and others, PowerSchool maintained an extensive "Partner Ecosystem" of over 100 commercial third parties that received or had access to student and teacher data. These partners spanned numerous industries touching on education.

~~100.~~168. PowerSchool's more than 100 partners include companies in fields such as student health services, behavioral assessment and management, student risk assessment, and college or career readiness services. PowerSchool openly advertised the "seamless integration" of third-party applications with its platform as a feature of its Student Information System, boasting that this connectivity creates a "holistic" view of students and a strong "data culture" in schools.

~~101.~~169. In truth, what this meant was that PowerSchool was sharing student data in real-time with a web of for-profit entities and allowing those partners to plug into the PowerSchool system to extract data as they wished.

~~102.~~170. PowerSchool's value proposition to its partners was explicit, as PowerSchool boasted that it provided access to critical data. And the more data that could be collected and shared, the more valuable PowerSchool's platform became to third parties. PowerSchool knew that student data was a highly valuable asset and quietly transformed itself into a data broker under the guise of an education service provider, deceiving thousands of School District customers all along the way.

~~103.~~171. PowerSchool did not merely share data incidentally. It sold data-derived products and analytics based on the information it was tasked with protecting. The company aggregated students' personal and academic records and analyzed them to create detailed profiles, predictions, and insights about each student. These data-derived dossiers were then used by PowerSchool and its partners to make decisions or target interventions about the students, without the knowledge of School Districts.

~~104.~~172. For example, PowerSchool developed predictive algorithms to identify students at risk of certain outcomes (dropping out, needing particular educational programs, etc.), and those predictions became product offerings marketed to schools or even external entities.

~~105.~~173. PowerSchool also packaged de-identified (and sometimes re-identifiable) datasets for research or product development by third parties. PowerSchool essentially built dossiers on children which PowerSchool and third parties seeking to exploit minor consumers could use to manipulate or make decisions about the children's futures.

~~106.~~174. PowerSchool also fed the vast data it collected into proprietary artificial intelligence systems, such as its "PowerBuddy" AI platform, to develop and improve AI-driven educational tools. These AI tools were developed using student information as fuel. They eventually became part of PowerSchool's product suite, which it could license or sell, effectively deriving additional commercial value from the original data.

~~107.~~175. All of this was done without informing School Districts or obtaining consent from the families of the children PowerSchool claimed to protect. In essence, PowerSchool was exploiting the trust and access given to it by School Districts to turn children's data into profit, all while telling those same School Districts that students' privacy came before all else.

~~108.~~176. PowerSchool intentionally misled School Districts to believe that student data remained safe in its hands while concealing from them that PowerSchool was

using their students to build a hidden marketplace for student data.

~~109.~~177. PowerSchool collected highly sensitive information and made that information available to a vast network of for-profit entities to advance PowerSchool's business interests. These practices directly contradict PowerSchool's promises that it would not share data without consent and would use it only for the benefit of the School Districts and those the School Districts are duty-bound to protect.

~~110.~~178. Images like the one below demonstrate the kinds of commercial methods by which PowerSchool actively misled School Districts into believing that it was taking steps to safeguard student data—not steal it.




~~111.~~179. Crucially, School Districts were never able to inform parents or students information about these concealed data sales practices. PowerSchool continually engaged in this data sharing and selling without the informed consent of parents and students while School Districts remained in the dark and were continuously led astray by PowerSchool.

~~112.~~180. School Districts were never told that PowerSchool would siphon off data for its own profit. There was no pop-up notification seeking permission to aggregate a child's data for analytics, no opt-in for sharing data with third-party partners, and no disclosure that using PowerSchool meant that School Districts would enable students and parents to surrender their personal information to a commercial data ecosystem. To the contrary, PowerSchool buried any references to data sharing in dense terms-of-service

and privacy policy documents that were intentionally opaque. This opacity was by design: PowerSchool's business model depended on keeping parents and students in the dark so that it could continue harvesting information without pushback.

~~113.~~181. Another key to PowerSchool's business strategy was in how it strategically misled the School Districts themselves. School Districts expected that PowerSchool would abide by student privacy laws like FERPA and state student data protection statutes, which prohibit a school vendor from disclosing student information without consent or authorization.

~~114.~~182. PowerSchool provided School Districts with Privacy Center dashboards and compliance paperwork suggesting that it was only collecting data for legitimate educational uses. All the while, PowerSchool was surreptitiously repurposing the data for its own gain, in ways that school officials did not and know about and could not have discovered. PowerSchool affirmatively misrepresented and actively concealed these activities from School Districts.

~~115.~~183. PowerSchool did not attach or disclose its third-party partner agreements to the schools, nor did it list the dozens upon dozens of entities with which student data was being shared. PowerSchool treated the data as an asset to be monetized as PowerSchool externally portrayed itself as a mere service provider. This deceit extended to how PowerSchool handled inquiries: if a School District asked about data usage, PowerSchool would point to its privacy statements that make generic references to "service providers" or "improving our services," never revealing the true extent of its data-sharing network.

~~116.~~184. The result of PowerSchool's conduct was that no School District could reasonably discover what was really happening. School Districts entrusted children's personal information to PowerSchool under the impression that it was safe and used only for school-related purposes.

~~117.~~185. PowerSchool had a legal duty of transparency. As an entity entrusted with minors' sensitive data, it was obligated to fully disclose what data it tracked, how

that data was stored, how long it was retained, with whom it was shared, how it was manipulated, and how it was monetized. PowerSchool knowingly breached this duty continuously by providing none of this crucial information to School Districts.

~~118.~~186. PowerSchool purposely misled School Districts about how data and other sensitive information was being collected and used. These were not mere oversights or technical violations. They were forms of deliberate concealment.

~~119.~~187. PowerSchool knew that if it was forthright about its practices, School Districts would cancel their contracts or even sue PowerSchool, which would jeopardize PowerSchool's lucrative deals. Accordingly, PowerSchool chose to deceive School District customers in order to protect its illicit data business.

~~120.~~188. PowerSchool's false representations and concealment of its data-sharing practices amount to fraudulent conduct. PowerSchool made specific, material representations to the School Districts in advertisements, contracts, communications, and policy documents that student data would be handled in accordance with privacy laws and not exploited. Those representations were knowingly false.

~~121.~~189. PowerSchool's executives and engineers were fully aware that the company was aggregating data for analytics, sharing information with over a hundred partners, and developing AI products using student information, none of which was disclosed or consented to. Internally, PowerSchool even acknowledged that data "interconnectivity" was a key to its business growth, and that "data privacy concerns" were merely an obstacle to be navigated or a "lengthy legal obstacle" to work around.[18]

~~122.~~190. PowerSchool viewed privacy laws as hurdles to its data monetization, not boundaries that it respected. This cynical attitude translated into a pattern of overt misrepresentations. For example, PowerSchool's Privacy Center webpage created a misleading impression that PowerSchool was transparent and compliant. It listed various

[18] Stumpf, *The Ultimate Guide to P20W Cradle-to-Career State Data Systems*, PowerSchool (2023) at 6, https://www.powerschool.com/connected-intelligence-p20w/.

third-party privacy certifications and described how it supposedly limited data uses. But PowerSchool failed to mention the myriad of its commercial partnerships through which it was siphoning data out the back door.

~~123.~~191. PowerSchool also misled districts by omission, never volunteering the existence of its "partner ecosystem" in any discussions or trainings with School Districts.

~~124.~~192. By engaging in this conduct, PowerSchool violated the trust of customers and broke the law. Various state student privacy statutes prohibit school service providers from using student data for commercial purposes beyond the authorized educational function. PowerSchool's secret data-sharing ran afoul of these statutes.

~~125.~~193. PowerSchool cannot credibly claim that it ever obtained consent for what it did. No School District would knowingly consent to permitting children's personal data to be sold to third-party marketers or fed into AI algorithms, and PowerSchool was well aware of this. By using deceptive fine print, PowerSchool skirted the need to ask for permission and let School Districts believe that it was at all times fulfilling the promises that PowerSchool made.

~~126.~~194. PowerSchool's public posture of protecting student privacy was a façade that concealed a grave betrayal. PowerSchool falsely assured School Districts that it would not use or share data without consent as it funneled student data to over 100 commercial partners and developing AI-driven predictive tools. All of these actions were taken without the consent or knowledge of School Districts.

~~127.~~195. PowerSchool's conduct was intentionally misleading. PowerSchool knew that its statements to School Districts were untrue and that its customers were operating under a false impression. By the time the truth came to light through investigative efforts and legal action, PowerSchool had amassed huge profits from the massive amount of data it housed through years of covert data trafficking.

~~128.~~196. PowerSchool actively hid the full nature and scope of its data exploitation behind contractual and technical smoke screens, demonstrating a willful intent to deceive School Districts. PowerSchool made material misrepresentations and

omissions intending for the School Districts to rely on them. And School Districts reasonably relied on what PowerSchool said time and time again, as they continued to use PowerSchool's services under the false belief that their data was safe and private.

~~129.~~197. Had the true facts been known, the School Districts certainly would not have contracted with PowerSchool, nor would they have allowed PowerSchool to collect this data without strict limitations and giving parents the opportunity to provide their informed consent. But PowerSchool gave School Districts no such opportunity.

~~130.~~198. As a result of these dishonest and deceptive acts, PowerSchool defrauded School Districts.

**F. The School Districts' Injuries**

~~131.~~199. Plaintiffs believed PowerSchool would use reasonable security protocols and procedures to protect the PII of Plaintiffs' employees, faculty, students, and parents of students. At a minimum, Plaintiffs reasonably believed that PowerSchool would implement practices and procedures that were consistent with its stated privacy policies, the contracts that explicitly defined PowerSchool's data protection obligations, and applicable state and federal laws and regulations.

~~132.~~200. A cornerstone of the commercial relationship between Plaintiffs and PowerSchool was Plaintiffs' reliance on PowerSchool's representation that it would adequately protect the PII of students and employees who Plaintiffs serve. PowerSchool has a continuing contractual and legal duty to protect this data from unauthorized access and disclosure.

~~133.~~201. PowerSchool has done little to help Plaintiffs or the individuals whose PII was stolen. The contracts exist for the benefit of Plaintiffs and, by extension, those who Plaintiffs serve who were affected by the Data Breach~~ and PowerSchool's other breaches~~.

~~134.~~202. Plaintiffs have spent and will continue to spend time and effort monitoring the comprised data containing PII and addressing issues caused by the Data Breach~~ as well as PowerSchool's other breaches~~. To address the ongoing issues caused

by the Data Breach, Plaintiffs must now bear the tangible burdens of informing those affected about credit monitoring, identifying data protection services, and staying updated by continuing to remain adequately informed about ongoing new information regarding the details of the Data Breach and its implications for affected persons. This will require ongoing communication with ~~Data Breach~~ victims to ensure Plaintiffs' faculty, students, and their parents or guardians have access to all necessary information.

~~135.~~203. Plaintiffs serve the individual victims who now fear for the security of their PII and worry about information that was exposed, a problem created by PowerSchool despite its various representations about prioritizing data security. Although PowerSchool initially made assurances that the compromised data was no longer in the possession of cybercriminal hackers, subsequent extortion threats made several months after these assurances revealed that those assurances were effectively meaningless.

~~136.~~204. Plaintiffs have a continuing interest in ensuring that the PII—which appears to remain in PowerSchool's possession—will be secure from future hacking attempts and is properly secured.

~~137.~~205. Plaintiffs suffered and will continue to suffer significant economic injuries as the result of the Data Breach ~~as well as the other breaches outlined related to Naviance~~. These economic injuries include various out-of-pocket expenses, which include (but are not limited to):

a. additional wages paid to staff members to address the Data Breach;
b. increased workload on administrative staff for managing affected data and addressing concerns from parents, students, and faculty;
c. expenses for hiring cybersecurity experts to investigate the breach;
d. costs for cybersecurity experts to assess potential risks to students, parents, and staff;
e. fees for cybersecurity experts to provide recommendations on securing the schools' data;
f. legal consultation costs to determine potential liability;

g. legal expenses to understand regulatory compliance obligations;

h. legal fees to prepare for potential lawsuits from affected individuals;

i. expenses to transition data from PowerSchool to a different, more secure platform;

j. technical support costs associated with data transfer;

k. costs for staff training on the new system;

l. expenses for implementing improved security measures;

m. lost opportunity costs from redirecting school staff to mitigate the breach's impact;

n. wages lost due to time spent monitoring and responding to identity theft risks;

o. costs for providing credit monitoring services to affected students, parents, and faculty;

p. expenses for identity theft protection services for those impacted by the Data Breach;

q. ongoing monitoring costs due to delayed or hidden fraudulent activity;

r. future legal and expert consultation expenses to manage ongoing risks of PII exposure;

s. expenses for drafting and sending notification letters/emails to affected individuals;

t. costs for setting up support hotlines or response teams for inquiries;

u. administrative expenses for responding to concerns from students, parents, and faculty about potential identity theft; and

v. loss of public funding correlating with declining student enrollment.

~~138.~~206. Plaintiffs also suffered lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach ~~and PowerSchool's other breaches~~ by, inter alia, preventing, detecting, contesting, and recovering from identify theft and fraud.

~~139.~~207. Plaintiffs must now spend significant time and resources to assist victims of the Data Breach ~~and PowerSchool's other breaches~~. According to the Department of Justice's Bureau of Justice Statistics ("BJS"), nearly one-third of "victims who had personal information used for fraudulent purposes . . . spent a month or more resolving problems." In fact, for some victims, the BJS found that it took more than a year for them to resolve these issues.

~~140.~~208. Compounding these problems, the full scope of fraudulent activity stemming from the Data Breach and Defendants' fraudulent acts committed in the course of providing Plaintiffs services may not come to light for several years. Plaintiffs will have to incur these costs over the course of years during which the individual victims will face constant surveillance of their financial and personal records.

~~141.~~209. Plaintiffs entered into their contracts with PowerSchool with the expectation that PowerSchool's performance would be at least commensurate with industry standards. As a result of PowerSchool's failure to adopt these standards, Plaintiffs were deprived of the full benefit of the bargain.

~~142.~~210. Plaintiffs' payments to PowerSchool were expressly made contingent upon PowerSchool's adoption and implementation of reasonable data security measures, as well as PowerSchool's promises not to share data with unauthorized third parties. Plaintiffs conferred a benefit on PowerSchool which PowerSchool retained with the knowledge that it was not providing the services it promised to perform. PowerSchool was accordingly unjustly enriched at Plaintiffs' expense.

~~143.~~211. PowerSchool's fraudulent concealment of both its data practices and its deficient security protocols, practices, and procedures tolls any statute of limitations and gives rise to independent claims for relief. PowerSchool's conduct violated common-law fraud principles and consumer protection statutes that seek to guard against the kind of despicable and deceitful conduct PowerSchool engaged in.

~~144.~~212. PowerSchool cannot escape liability by contending that no one "caught it" sooner. The reason the full scope of PowerSchool's data-sharing scheme

remained hidden was because PowerSchool purposefully kept it concealed from Plaintiffs and the public.

~~145.~~213. School Districts, who are charged with safeguarding their students' privacy, were themselves deceived by PowerSchool's false promises. They have suffered harm to their missions and reputations, in addition to the direct harm to students and parents whose privacy was invaded. This is a compensable harm because of the special relationship between Plaintiffs and PowerSchool

~~146.~~214. Through this action, Plaintiffs seek to hold PowerSchool accountable for this egregious breach of trust and to ensure that such fraudulent exploitation of student data is brought to an end once and for all.

~~147.~~215. Any applicable statute of limitations has been tolled by PowerSchool's knowledge and concealment of the unlawful conduct and misrepresentations alleged throughout this Complaint. Plaintiffs could not have discovered PowerSchool's unlawful conduct through reasonable diligence.

~~148.~~216. PowerSchool knowingly, actively, affirmatively, and/or negligently concealed the facts alleged herein. School Districts reasonably and actually relied on PowerSchool's concealment.

## V. CLAIMS FOR RELIEF

~~149.~~217. As explained above, each School District's contract with PowerSchool varies based upon the specific state in which a~~a~~ School District is located. The DPA imposes varying contractual duties from state-to-state, as shaped by each agreement's choice-of-law provision and the applicable law.

~~150.~~218. Plaintiffs' claims for relief are thus divided between (a) claims common to all Plaintiffs and (b) claims specific to school districts based on their states of citizenship. The state-specific claims vary based on the applicable contractual provisions Defendants breached and other state statutory and common law claims.

## COMMON CLAIMS

## COUNT 1

## Negligence

## (On Behalf of All School Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)

~~151.~~219. Plaintiffs reallege and incorporate the paragraphs above as if fully set forth herein.

~~152.~~220. Plaintiffs entrusted the storage, retention, and maintenance of the PII belonging to students, parents, and faculty to PowerSchool based on assurances that PowerSchool would take reasonable steps to safeguard the data containing this PII.

~~153.~~221. PowerSchool owed a duty of care to Plaintiffs to reasonably safeguard this PII because it was foreseeable that any failure by PowerSchool to adopt adequate security systems consistent with industry standards would substantially increase the risk this PII would be accessed by cybercriminals in a data breach.

~~154.~~222. As the nation's leading provider of cloud-based software for K-12 education, PowerSchool has full knowledge of the sensitivity of the PII at issue in this case and the harm that unauthorized access can cause to Plaintiffs.

~~155.~~223. PowerSchool owed these duties to Plaintiffs because Plaintiffs are customers to whom PowerSchool markets, and because Plaintiffs are foreseeable and probable entities that PowerSchool knew or should have known would suffer injury in fact from PowerSchool's inadequate security practices.

~~156.~~224. PowerSchool owed Plaintiffs duties to:

a. exercise reasonable care in handling and using the PII in its care and custody, which Plaintiffs entrusted to PowerSchool;
b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized access;
c. notify Plaintiffs within a reasonable timeframe of any breach to the security of this PII;
d. exercise appropriate clearinghouse practices to remove PII when it was no

longer necessary to retain under applicable regulations; and

e. timely and accurately disclose to Plaintiffs the scope, nature, and occurrence of the Data Breach. and PowerSchool's other breaches.

e.225. The foregoing legal duties that PowerSchool owed to Plaintiffs are independent from the contracts between Plaintiffs and PowerSchool. These duties are recognized by, and arise from, federal and state statutory law, common law, and regulations.

157.226. Plaintiffs needed PowerSchool to take appropriate measures to timely protect this PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach. and its other breaches.

158.227. PowerSchool knew or reasonably should have known that the failure to exercise due care in the collection, storage, and use of the PII involved an unreasonable risk of harm to Plaintiffs and those who Plaintiffs is tasked with protecting, even if the harm occurred through the criminal acts of third parties.

228. PowerSchool's duty to safeguard the data it collected and maintained arose independently of and existed separately from any contractual obligation. PowerSchool holds itself out to the public as a secure steward of student data, collecting and storing that data as the core function of its business. The risk that School Districts—as the parties responsible for student data and accountable to students, parents, and state and federal regulators—would suffer direct, concrete harm in the event of a security failure was well known and foreseeable to PowerSchool when it marketed and sold its products.

159.229. PowerSchool's duty to use reasonable security measures arose because of the special relationship that existed between PowerSchool, on the one hand, and Plaintiff, on the other hand. That special relationship arose because Plaintiffs entrusted PowerSchool with the confidential PII of its students and faculty members, which is a necessary component of PowerSchool's products and services as they are marketed and sold to school districts.

160.230. Under the FTC Act, PowerSchool had a duty to use fair and adequate

computer systems and data security practices to safeguard the PII.

~~161.~~231. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as PowerSchool, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of PowerSchool's duty to protect this PII.

~~162.~~232. PowerSchool violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. PowerSchool's conduct was particularly unreasonable given the nature and amount of PII that PowerSchool had collected and stored and the foreseeable consequences of a data breach, including, the damages that would result to individuals in the event of a breach, which ultimately came to pass.

~~163.~~233. The risk that unauthorized persons would attempt to gain access to the PII at issue here made this Data Breach and Plaintiffs' resulting injuries foreseeable. PowerSchool holds vast amounts of valuable data for students, parents, and school faculty. Similar education technology providers had been subject to data breaches in previous years. PowerSchool also alerted the FBI that it was the target of a data theft campaign in the period before the Data Breach. Therefore, it was inevitable that unauthorized individuals would attempt to access PowerSchool's databases-whether by malware or otherwise.

~~164.~~234. The PII at issue is highly valuable, and PowerSchool knew, or should have known, the risk in obtaining, using, handling, collecting, and storing the PII that Plaintiffs entrusted to PowerSchool. PowerSchool also knew, or should have known, the importance of exercising reasonable care in handling the PII.

~~165.~~235. PowerSchool improperly and inadequately safeguarded the PII in deviating from industry standards, regulations, and practices at the time of the Data Breach.

236. PowerSchool permitted Movate's employees unfettered administrative

access to the entire SIS database containing the PII of tens of millions of students and teachers with no MFA protection.

237. PowerSchool breached these duties as evidenced by the Data Breach.

~~166.~~238. PowerSchool's breach of its duties of care included, without limitation, the following specific failures: (a) failing to require multi-factor authentication for accounts—including Movate contractor accounts—with access to the SIS and other platforms; (b) failing to require Users to change their passwords at regular intervals; (c) permitting Movate's employees to access vast quantities of PII far exceeding what was necessary for their assigned functions, in violation of the principle of least privilege; and (d) failing to encrypt PII within its systems. Had PowerSchool taken any one of these basic, industry-standard security measures, the Data Breach could have been averted entirely.

239. PowerSchool acted with wanton and reckless disregard for the security and confidentiality of the PII by enabling access to this information by third parties through negligent website design; and failing to properly supervise the manner in which the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

~~167.~~

~~168.~~240. PowerSchool breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the PII. This actually and proximately caused the Data Breach~~, other breaches,~~ and Plaintiffs' resulting injury.

~~169.~~241. PowerSchool further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiffs and the victims alike, which actually and proximately caused and exacerbated the harm from the Data Breach.

242. Some School Districts did not receive any notification until as late as August 2025. During the months in which School Districts were not notified, they were unable to provide timely notification to students, parents, and faculty members as required by

applicable state data breach notification statutes, exposing Plaintiffs to regulatory risk and causing them to incur legal and compliance costs they would not otherwise have faced. School Districts that were not timely notified were also unable to take prompt protective action for their communities, exacerbating the harm to the students and faculty whose PII was compromised.

~~170.~~243. PowerSchool's failure to notify certain School District Plaintiffs for months after it discovered the Data Breach directly and proximately caused concrete, particularized harm, including: (a) School Districts that were not timely notified were unable to provide required notifications to students, parents, and faculty under applicable state data breach notification statutes, exposing Plaintiffs to regulatory sanctions and attendant legal costs; (b) the notification gap prevented School Districts from activating incident response protocols, engaging cybersecurity vendors, or providing credit monitoring services to affected individuals in a timely fashion; and (c) School Districts that ultimately provided their own notifications without PowerSchool's assistance incurred out-of-pocket expenses for communications, credit monitoring, and community outreach.

244. PowerSchool's conduct demonstrates a level of conscious disregard that goes beyond ordinary negligence. Considered as a whole, several factors demonstrate that PowerSchool acted with gross negligence.

245. First, as the operator of the PowerSource support portal and the SIS database, PowerSchool bore exclusive responsibility for monitoring, maintaining, and securing the credentials of all users, including those with administrative access to its systems. PowerSchool's own IT Security team was specifically tasked with detecting and responding to anomalous account activity, as evidenced by the April 2023 security alert PowerSchool issued to Rayson Cruz. PowerSchool thus had awareness of and responsibility for the account-level security failures that preceded and enabled the Data Breach.

246. Second, PowerSchool was aware of the heightened threat environment faced

by EdTech service providers as well as the heightened threat specifically aimed at PowerSchool's SIS database. Well before the Data Breach, PowerSchool was aware that its systems and those of similar EdTech vendors were under active and escalating attack. PowerSchool itself informed the FBI that it was the subject of an ongoing threat campaign targeting the sensitive data PowerSchool stored. PowerSchool therefore operated its systems with actual knowledge that it was a high-value target and that contractor accounts with broad database access were precisely the kind of vector attackers would exploit.

247. Third, PowerSchool failed to take precautions in the face of multiple warning signs that obviated the impending threat to its security systems. In April 2023, PowerSchool's own security software detected geographically improbable logins on the Rayson Cruz account from two foreign locations. The device used in connection with these logins was identified as running Windows 7, an operating system that Microsoft officially discontinued and ceased patching in January 2020. These simultaneous warning signs—foreign IP access, geographically impossible login patterns for a Philippines-based contractor, and use of an end-of-life operating system—collectively constituted unmistakable indicators of account compromise that any reasonable cybersecurity program would have treated as requiring immediate remediation.

248. Fourth, PowerSchool was provided with explicit notification of the potential comprise of Cruz's account when Cruz responded directly to PowerSchool's IT Security team and confirmed that he had never left his country, was using only his company-provided device, and had not used any VPN or third-party software. Cruz's own denial of the flagged activity constituted an explicit, first-hand notification to PowerSchool that his account had likely been accessed by an unauthorized party. At that moment, PowerSchool possessed, from a subcontractor's employee with access to the entire SIS database and its own security software, direct and concurrent confirmation that Cruz's account had been compromised.

249. Fifth, PowerSchool's response to the warning signs and notifications of unauthorized access was woefully inadequate and practically nonexistent. PowerSchool

did not revoke or suspend Cruz's log-in credentials following the confirmed unauthorized access to Cruz's account. PowerSchool did not require Cruz to reset his password or undergo re-authentication. PowerSchool did not implement multi-factor authentication on Cruz's account. PowerSchool did not remove or restrict Cruz's administrative-level access to the SIS database, which contained the PII of tens of millions of students and teachers. PowerSchool's response to was, in effect, no response at all.

250. Sixth, PowerSchool failed to act for an extended period of time while the harm was ongoing. PowerSchool allowed Cruz's unprotected credentials to remain active and in use for approximately twenty months following April 2023. During this entire period, Cruz's account retained unfettered administrative access to the SIS database with no multi-factor authentication, no enhanced monitoring, and no credential rotation. When hackers ultimately exploited the compromised credentials in December 2024, they were doing precisely what the April 2023 security event had warned was possible. The twenty-month gap between PowerSchool's confirmed knowledge of the account compromise and the Data Breach that later occurred show that PowerSchool carried on its cybersecurity obligations with conscious inaction in the face of known, specific, and unresolved risk.

251. Therefore, taken together, these facts demonstrate conduct that goes far beyond a mere failure to adequately secure or monitor PowerSchool's platform. PowerSchool was solely responsible to Plaintiffs' for account security; operated with awareness of an active threat environment targeting exactly its type of systems; received multiple simultaneous warning signs on the specific account later exploited; received direct, explicit confirmation of a likely compromise from the account holder himself; responded to that confirmation with complete inaction; and permitted the compromised account to retain full administrative database access for twenty months while the threat remained unaddressed. This conduct evinces a reckless disregard for the rights of the School Districts and the millions of students whose data PowerSchool was entrusted to protect, and smacks of the kind of intentional indifference to known risk that rises to the level of gross negligence.

~~171.~~252. PowerSchool has admitted that PII was wrongfully lost, accessed, and/or disclosed to unauthorized third persons because of the Data Breach.

~~172.~~253. As a direct and proximate result of PowerSchool's negligence and/or negligent supervision, Plaintiffs have suffered and will suffer damages, including monetary damages and an increased risk of future harm.

~~173.~~254. PowerSchool's negligence and failure to exercise reasonable care directly and proximately caused Plaintiffs to sustain actual, tangible, compensable damages. These damages include, inter alia, the additional expenses associated with handling the concerns of students and members who have suffered the theft of their PII by criminals, lost benefit of the bargain, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by PowerSchool's negligence.

~~174.~~255. Plaintiffs have also suffered reputational harm in that the parents and community members within their jurisdictions have lost confidence in Plaintiffs' ability to safeguard their children's private information. The reputational harm suffered by Plaintiffs is ascertainable and continues to affect Plaintiffs, with many seeing a resulting decrease in enrollment. This has led or will lead to decreases in funding for these School Districts. These damages are recoverable not only because they were foreseeable to PowerSchool, but because School Districts were uniquely targeted as PowerSchool's consumer base and were in a particularly sensitive position insofar as being the immediate targets of blame for PowerSchool's negligent acts.[19]

~~175.~~256. PowerSchool deliberately and intentionally disregarded the effect that its negligent conduct would have on School Districts, who now face substantial costs not contemplated by Plaintiffs who do not have the luxury of resorting to private capital to make up for budget shortfalls. As PowerSchool was at all relevant times aware, Plaintiffs

---

[19] *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 660–661 (N.D. Cal. 2020).

are subject to the restraints of being reliant on public funding.

~~176.~~257. All of Plaintiffs' damages resulting from PowerSchool's negligence are ongoing, immediate, and will continue to accrue.

**COUNT 2**

**Negligence Per Se**

**(On Behalf of All School Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~177.~~258. Plaintiffs reallege and incorporate the above paragraphs as if fully set forth herein.

~~178.~~259. Under the FTC Act, 15 U.S.C. § 45, PowerSchool had a duty to provide fair and adequate computer systems and data security practices to safeguard the PII that Plaintiffs entrusted to PowerSchool.

~~179.~~260. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as PowerSchool, of failing to use reasonable measures to protect customers or, in this case, consumers' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of PowerSchool's duty to protect the PII of Plaintiffs' students and faculty.

~~180.~~261. PowerSchool breached its duties to Plaintiffs under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

~~181.~~262. PowerSchool's duty of care to use reasonable security measures arose out of the special relationship between PowerSchool and Plaintiff, a consumer of PowerSchool's products, which is recognized by laws and regulations including but not limited to the Health Insurance Portability and Accountability Act ("HIPAA") and common law. PowerSchool was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs from the Data Breach.

~~182.~~263. PowerSchool's duty to use reasonable security measures under

HIPAA required PowerSchool to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information."[20] The healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

~~183.~~264. PowerSchool's duty to use reasonable care in protecting confidential data arose out of both the statutes and regulations described above and industry standards applicable to the protection of PII.

~~184.~~265. PowerSchool violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect the PII and not complying with applicable industry standards as described in detail herein. PowerSchool's conduct was particularly unreasonable given the nature and amount of PII PowerSchool collected and stored and the foreseeable consequences of a data breach.

~~185.~~266. The harm resulting from the Data Breach is the type of harm the FTC Act is intended to protect against. The FTC has pursued numerous enforcement actions against businesses that caused the same harm as that suffered by Plaintiffs due to the failure to use reasonable data security measures.

~~186.~~267. PowerSchool violated its duty under HIPAA by failing to use reasonable measures to protect the health information of Plaintiffs' students and faculty, which was disclosed in the Data Breach, and by not complying with applicable regulations.

~~187.~~268. Plaintiff, as a school district, is a member of the class of persons that these statutes, regulations, orders, and/or standards seek to protect because Plaintiffs is a public entity that must entrust businesses like that of PowerSchool with managing and storing private information so that Plaintiffs is able to efficiently and effectively provide

[20] 45 C.F.R. § 164.530(c)(l).

services to students and the public. Thus, PowerSchool owed Plaintiffs a duty under these statutes, regulations, orders, and/or standards.

~~188.~~269. Plaintiffs would not have suffered the injuries alleged herein but for PowerSchool's wrongful and negligent breach of these duties owed to Plaintiffs and those who Plaintiffs are tasked with protecting.

~~189.~~270. The injuries suffered by Plaintiffs were the reasonably foreseeable result of PowerSchool's breach of PowerSchool's duties. PowerSchool knew or should have known that it was breaching its duties and that this breach would cause the injuries suffered by Plaintiffs as alleged herein.

~~190.~~271. If Plaintiffs knew that PowerSchool did not adequately protect the PII, then Plaintiffs would not have entrusted PowerSchool with this PII.

~~191.~~272. PowerSchool's various violations and their failure to comply with applicable laws and regulations constitute negligence per se.

~~192.~~273. As a direct and proximate result of PowerSchool's negligence per se, Plaintiffs were injured, including through the loss of time spent attempting to mitigate the victims' harms and money resolving fraudulent charges; loss of time and money obtaining and furnishing to victims information about protections against future identity theft; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen PII, entitling Plaintiffs  to damages in an amount to be proven at trial.

~~193.~~274. Additionally, as a direct and proximate result of PowerSchool's negligence per se, Plaintiffs suffered and will suffer the continued risks of exposure to liability for the loss of students' and faculty members' PII, which remains in PowerSchool's possession and is subject to further unauthorized disclosures so long as PowerSchool remains in breach of its duty to implement appropriate and adequate measures to protect this PII.

~~194.~~275. Plaintiffs' damages and injuries were the natural, probable, and reasonably foreseeable result of PowerSchool's breach of PowerSchool's duties. PowerSchool knew or should have known that it was breaching these duties and that this

breach would cause the injuries suffered by Plaintiffs as alleged herein and still failed to act to protect the Plaintiffs from harm.

~~195.~~276. PowerSchool did not act reasonably under the circumstances in breaching the legal duties that PowerSchool owed to Plaintiffs.

**COUNT 3**

**Declaratory Judgment: Unenforceability of Damages Limitation Clause**

**(On Behalf of All School Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

277. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

278. The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a).

279. An actual, present controversy exists between the parties regarding the enforceability of the damages limitation clause contained in Sections 11.1 and 11.2 of the Master Service Agreement ("MSA") governing the relationship between PowerSchool and each School District.

280. The exclusion of damages is contained in Section 11.1 of the MSA, which purports to limit PowerSchool's liability for a variety of damages.

281. The damages limitation clause contained in Section 11.2 of the MSA purports to limit PowerSchool's aggregate liability to two times the amount of fees paid by each School District in the preceding twelve months—an amount that bears no rational relationship to the scope of harm PowerSchool's data security failures and data monetization misconduct have caused.

282. Sections 11.1 and 11.2 of the MSA were not negotiated as the clauses appear in a standardized, non-negotiable form agreement presented to all customers on a take-it-or-leave-it basis.

283. Independently, and in the alternative, even if the MSA's exculpatory clauses were otherwise enforceable, it expressly does not apply to claims arising from a party's gross negligence, willful misconduct, or fraud. *See* MSA § 11.3. To the extent PowerSchool disputes the applicability of this exception, an actual controversy exists warranting declaratory resolution.

284. As alleged throughout this Complaint, PowerSchool's conduct—including its sustained failure to implement basic cybersecurity measures despite known threats and regulatory obligations, its deliberate concealment of security deficiencies from School Districts, its covert monetization of student data, and its inadequate and delayed breach notification—constitutes gross negligence and willful misconduct within the meaning of MSA § 11.3.

285. Plaintiffs therefore seek a declaration that: (a) Sections 11.1 and 11.2 of the MSA damages limitation clause are unenforceable as a matter of law; and (b) in the alternative, the MSA's limitation of liability expressly does not apply to PowerSchool's liability arising out of its gross negligence, willful misconduct, and fraud as alleged herein, pursuant to the express terms of MSA § 11.3.

**~~COUNT~~ 4~~3~~**

**~~Unjust Enrichment~~**

**~~(On Behalf of All School Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)~~**

~~196. Plaintiffs reallege and incorporate the above paragraphs as if fully set forth herein.~~

~~197. PowerSchool was the recipient of funds from Plaintiffs that Plaintiffs continuously expended under the reasonable belief that PowerSchool was providing the data security services it promised to provide.~~

~~198. PowerSchool received funds from Plaintiffs with actual knowledge that PowerSchool had no legitimate claim to a substantial portion of those funds. At all relevant times, PowerSchool knew that Plaintiffs were continuing to pay for services that~~

PowerSchool was not providing.

199. Despite this knowledge, PowerSchool maintained possession of the ill-gotten funds or otherwise used the funds for PowerSchool's own benefit.

200. As a result of PowerSchool continuing to receive and use these funds with the knowledge that PowerSchool was actively failing to perform its obligations under the Contract, PowerSchool received and unjustly retained a benefit at Plaintiffs' expense.

PowerSchool has been unjustly enriched by its covert scheme of monetizing the student data that School Districts contractually entrusted to PowerSchool for the sole purpose of providing educational software services.

PowerSchool secretly harvested, aggregated, and commercialized student data by: (a) sharing student data in real time with a network of more than one hundred commercial third-party partners without the knowledge or consent of the School Districts or the students and families whose information was disclosed; (b) building and selling predictive analytics products, behavioral profiles, and data derived dossiers based on student records entrusted to PowerSchool for educational purposes; and (c) feeding student data into proprietary artificial intelligence systems, including the "PowerBuddy" AI platform, to develop and improve commercial AI products.

PowerSchool received substantial financial benefits from these activities — including licensing revenue, data partnership fees, and the enhanced commercial value of its platform — while simultaneously collecting fees from School Districts on the representation that their data would be used solely for the contracted educational services.

Under the plain terms of the DPA, the data stored within PowerSchool's databases are "owned and under the control" the School Districts (DPA § 1.5), and PowerSchool is contractually required to use that data "only for the purpose of fulfilling its duties under the Agreement for PowerSchool Customer's and its Users' benefit." DPA § 5.5.

By monetizing data it did not own and was contractually prohibited from commercializing, PowerSchool obtained a benefit — commercial revenue from student

data owned by School Districts to which it had no legitimate contractual or legal entitlement.

Under these circumstances, it would be inequitable to permit PowerSchool to retain the financial benefits derived from its unauthorized use of School District data.

Plaintiffs are entitled to restitution of the revenues and other financial benefits PowerSchool obtained through its data monetization scheme, in addition to the fees paid by School Districts for services PowerSchool was not actually providing as represented.

There is no adequate remedy at law for the full measure of this unjust enrichment, because the precise scope of the commercial benefits PowerSchool derived from student data cannot be fully captured through contract damages alone, and equitable restitution is necessary to disgorge all profits obtained through PowerSchool's unauthorized appropriation of data that contractually belonged to the School Districts.

201. Plaintiffs, as a matter of law and in equity and good conscience, are therefore entitled to restitution from PowerSchool commensurate with the value of the unjustly retained obtained funds in an ascertainable amount to be proven at trial.

**COUNT 4**

**Violation of the Computer Fraud and Abuse Act**

**(On Behalf of All School Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)**

202. Plaintiffs reallege and incorporate the above paragraphs as if fully set forth herein.

203. The CFAA establishes a private right of action against anyone who "knowingly accessed a computer without authorization or exceeding authorized access," and whose prohibited access results in damage or loss in excess of $5,000 in any one year

~~period.~~[21]

~~204. The CFAA also establishes liability against whomever "intentionally accesses a protected computer without authorization, as a result of such conduct, recklessly causes damage."~~[22]

~~205. PowerSchool explicitly agreed that it may access and use Customer Data solely on a "need to know" basis and strictly limited access to purposes expressly authorized by School Districts when it was necessary for the fulfillment of obligations under their contracts.~~

~~206. Despite clear contractual limitations, PowerSchool exceeded authorized access, or otherwise permitted, enabled, or allowed unauthorized third party access, to the protected computer systems of Plaintiffs, which house and manage federally protected and legally confidential student and employee data. PowerSchool exceeded its authorized access when it:~~

~~a. enabled subcontractors to access Plaintiffs' Protected Information without Plaintiffs' consent;~~

~~b. enabled third parties to have back office administrator functionality over all PowerSchool systems, as well as student, parent and faculty facing functionality to manage key organizational information assets, including demographic data, enrollment, grades, transcripts, and other governmental agency reporting capabilities;~~

~~c. failed to implement reasonable security and monitoring protocols to detect if an employee or agent was exceeding authorized access to Plaintiffs' Computer Systems;~~

~~d. knowingly allowed Technical Support employees to access data stored in the School Districts' PowerSchool SIS that contained school and student data~~

---

~~[21] 18 U.S.C. § 1030(a)(4).~~

~~[22] 18 U.S.C. § 1030(a)(5)(B).~~

~~despite their express representations that this data was inaccessible to PowerSchool and secured;~~

~~e. intentionally accessed the School Districts' PowerSchool SIS in a manner that exceeded authorization and recklessly caused damage to the School Districts;~~

~~f. negligently allowed a third party threat Actor to steal all Plaintiffs' student, teacher, and School District information;~~

~~g. shared data with third parties for the purpose of exploiting student data for commercial gain; and~~

~~h. exceeded authorized access by failing to restrict access to student and teacher data only to the "minimum extent necessary."~~

~~207. PowerSchool enabled contractors to access Plaintiffs' Computer Systems and the PII that Plaintiffs entrusted to PowerSchool without informing Plaintiffs of the lack of security controls and the risks of a data breach. PowerSchool did this despite explicitly issuing informative guides on its website warning Plaintiffs to implement these measures at their schools.~~

~~208. Plaintiffs did not give PowerSchool permission to allow contractors to access their data without their consent, and PowerSchool was not authorized to do. As a result, Plaintiffs had their aggregated, identifiable, COPPA and HIPAA Protected Information exposed to third parties and to a threat actor.~~

~~209. PowerSchool violated 18 U.S.C. § 1030(a) by knowingly providing access to Plaintiffs' Computer Systems and allowing its backend administrators to access, collect, and transmit information concerning their Protected Information, which are protected computers as defined above.~~

~~210. By failing to de aggregate data and providing administrative level access without multi factor authentication security, PowerSchool intentionally caused damage without authorization.~~

~~211. At the very least, PowerSchool exceeded the authorized access to Plaintiffs'~~

Computer Systems by failing to de-aggregate, de-identify, or otherwise encrypt data, and then making it accessible through a single vector of attack without proper protections in place despite the security measures PowerSchool warranted, represented, and advertised

212. Plaintiffs did not authorize PowerSchool to access school or student records that were de-anonymized and/or unencrypted.

213. PowerSchool exceeded its authorized access and failed to inform Plaintiffs of the security vulnerabilities and broad administrative access privileges to student data. PowerSchool did so with an intent to defraud Plaintiffs and furthered the fraudulent intent to avoid its duties and legal obligations to provide Plaintiffs with adequate data monitoring and protection services.

214. The cost of the Data Breach exceeds $5,000. As such, PowerSchool's fraudulent intent and conduct as alleged herein constitutes a violation of 18 U.S.C. § 1030(a)(4).

215. PowerSchool's acts have also caused actual monetary loss in terms of overpayment for services. Plaintiffs did not receive the benefit of their bargain.

216. As alleged above and herein, PowerSchool knowingly caused the transmission of "a program, information, code, or command . . . to a protected computer" and thereby intentionally caused damage to Plaintiffs.[23]

217. Unless PowerSchool is retrained and enjoined, PowerSchool will continue to commit such acts. Plaintiffs' remedies at law are inadequate to compensate for these intentionally inflicted and threatened injuries, therefore entitling Plaintiffs to remedies including injunctive relief as provided for by § 1030(g).

**COUNT 5**

**Fraudulent Concealment**

**(On Behalf of All School Districts Against Defendants PowerSchool Holdings,**

---

[23] *See* 18 U.S.C. § 1030(a)(5)(A).

**~~Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~218.~~286. Plaintiffs reallege and incorporate the above paragraphs above as if fully set forth herein.

287. PowerSchool made specific fraudulent misrepresentations during the procurement process by which School Districts selected PowerSchool as their student information system and educational technology provider.

~~219.~~288. PowerSchool promised to provide Plaintiffs a range of products and services designed to help schools, teachers, students, and parents manage various aspects of education. Included among these services was the Student Information Systems ("SIS"). The provision of SIS by necessity included the storage and custody of PII.

289. PowerSchool's website advertised its products, including SIS, as a solution to protect student information, stating: "PowerSchool invests in updated security technology and adheres to strict security regulations. To keep your data secure." PowerSchool further advertised its platform as secure, claiming itself to be an "industry leader for protected private data."

290. In evaluating competing vendors, School Districts were acutely focused on data security, often in the aftermath of high-profile breaches affecting neighboring districts.

291. PowerSchool affirmatively represented to prospective customers that it maintained robust cybersecurity protections, including that it supported Multi-Factor Authentication through Single Sign-On ("SSO") functionality.

292. School Districts relied on these representations in selecting PowerSchool.

293. At no time prior to or during the procurement process did PowerSchool disclose that PowerSchool itself did not maintain a uniform MFA policy—particularly with respect to its subprocessors and offshore contractors who had administrative access to the SIS database, such as Movate.

294. Had School Districts been informed of this fact, they would not have selected PowerSchool as their vendor.

~~220.~~295. PowerSchool committed further fraudulent misrepresentations in its post-breach communications with School Districts. Following the December 2024 Data Breach, PowerSchool initially represented to numerous School Districts that their data had not been compromised. When School Districts independently investigated and returned with evidence from their own databases demonstrating that their data had in fact been exposed, PowerSchool reversed course and acknowledged the breach only after being confronted with the Districts' own evidence. This pattern of initial denial followed by forced acknowledgment demonstrates a conscious strategy of minimizing School Districts' awareness of the full scope of the breach and their resulting rights.

~~221.~~296. PowerSchool, by virtue of the business in which it is engaged, knew that PowerSchool woefully failed to adhere to regulations and implement basic security measures in light of the sensitive nature of the PII Plaintiffs paid PowerSchool to store, secure, and protect.

~~222.~~297. As alleged throughout this Complaint, PowerSchool failed to implement the bare minimum-security measures that are commonly utilized by similarly situated companies. Something as simple as providing for a multi-factor authentication log-in method would have been easily accomplished and would have prevented the Data Breach altogether.

~~223.~~298. Despite having actual knowledge that its security measures and data protection methods fell well short of what would be expected from an "industry leader for protected private data," PowerSchool continued and continues to peddle these false and misleading claims to induce purchases of its products and services.

~~224.~~299. In addition, PowerSchool misled School districts about how data was being collected and used, fostering the false impression that it was only using student information for benign, educational purposes.

~~225.~~300. PowerSchool failed to disclose to School Districts the fact that PowerSchool embedded tracking cookies, pixels, and similar technologies into its platforms that monitored students' online activities even after they navigated away from

PowerSchool's websites or applications. These technologies captured information unrelated to legitimate educational functions.

~~226.~~301. This fact was material because School Districts had a legal and contractual obligation to safeguard student privacy and prevent unauthorized third-party tracking. Knowledge of these tracking tools would have directly impacted School Districts' decisions to adopt or continue using PowerSchool products.

~~227.~~302. As the vendor entrusted with operating School Districts' student information systems, PowerSchool had an affirmative duty to disclose any surveillance or data collection practices that exceeded the scope of educational purposes or authorized use.

~~228.~~303. PowerSchool failed to disclose the fact that PowerSchool collected PII and behavioral data outside the scope of any legitimate educational purpose, including students' internet browsing history, search activity, and patterns of online interaction.

~~229.~~304. This was a material fact because School Districts would not have permitted the installation of software that harvested student data unrelated to the delivery of educational services. This data collection posed compliance risks under FERPA, state privacy statutes, and School Districts' internal policies.

~~230.~~305. PowerSchool had a duty to disclose all categories of data it collected, particularly where the collection fell outside the "school official" exception under FERPA and similar state law provisions.

~~231.~~306. PowerSchool failed to disclose the fact that PowerSchool aggregated internal and external data to create detailed digital profiles ("dossiers") of students containing academic, behavioral, personal, and predictive analytics information.

~~232.~~307. This was a material fact because the dossiers posed significant privacy risks and could be misused for non-educational purposes. School Districts would not have chosen PowerSchool as its EdTech provider had these facts been made known to them and would not have entrusted PowerSchool with any student data.

~~233.~~308. As the entity compiling these dossiers, PowerSchool was uniquely

aware of their existence. PowerSchool accordingly had an affirmative duty to inform districts of the scope and content of the profiles being created.

~~234.~~309. PowerSchool failed to disclose the fact that PowerSchool intended to and did share student dossiers enabled third parties to identify, target, and influence individual students with tailored content or advertisements based on predictive analytics.

~~235.~~310. This was a material fact because School Districts would have considered such targeting an unacceptable exploitation of student information, incompatible with the educational mission and their legal obligations. Had Plaintiffs known this fact, they would not have purchased products or services from PowerSchool.

~~236.~~311. Given its superior knowledge of how shared data could be used by third parties, PowerSchool had a duty to disclose this fact to School Districts.

~~237.~~312. PowerSchool failed to disclose the fact that PowerSchool monetized student data by selling derivative insights to commercial partners.

~~238.~~313. This was a material fact because School Districts reasonably expected that student data would not be treated as a commercial asset. If School Districts had known this fact, it would have fundamentally changed their assessment of PowerSchool as a service provider, and School Districts would not have purchased PowerSchool's services.

~~239.~~314. PowerSchool had a duty to disclose this fact because of PowerSchool's fiduciary-like role as a custodian of sensitive student data, which required PowerSchool to inform School Districts if that data was being used as a revenue source.

~~240.~~315. PowerSchool intentionally concealed these facts from School Districts with the intent to ensure that School Districts would not discover their existence. That way, PowerSchool could continue to derive profits from its data monetization scheme and use School Districts as a vehicle for the advancement of their financial interests.

~~241.~~316. School Districts were unaware of these facts and could not have discovered them with reasonable diligence.

~~242.~~317. School Districts would have acted differently if they had known of

these facts in that School Districts would not have purchased products and services from PowerSchool, and would not have entrusted PowerSchool with individuals' data.

~~243.~~318. Plaintiffs sustained damages as a direct result of the concealment of these material facts in that Plaintiffs:

a. surrendered more to PowerSchool than Plaintiffs otherwise would have;

b. acquired less from PowerSchool than Plaintiffs would have if PowerSchool had safeguarded—not sold—the data that Plaintiffs entrusted to PowerSchool's, per PowerSchool's affirmative statements; and

c. entered into transactions costing money that Plaintiffs otherwise would not have entered into.

~~244.~~319. As a result of PowerSchool's fraudulent concealment, Plaintiffs seek all available compensatory, punitive, and other damages as allowable by law.

**COUNT 6**

**Express Indemnity**

**(On Behalf of All School Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~245.~~320. Plaintiffs reallege and incorporate the above paragraphs as if fully set forth herein.

~~246.~~321. Plaintiffs and PowerSchool entered into written contracts under the terms of which PowerSchool, in consideration of payment by Plaintiffs, agreed to provide the services to Plaintiffs which included carrying out the necessary measures to secure and protect the PII that Plaintiffs entrusted to Defendants.

~~247.~~322. All of the contracts provide, in substantial part, that PowerSchool agrees to defend, indemnify, and hold harmless Plaintiffs from and against any liabilities to the extent arising out of or relating to any claim brought by a third party against Plaintiffs alleging a confirmed data breach (as defined by the applicable state law) to the extent attributable to PowerSchool and resulting from PowerSchool's violation of the data security provisions expressly set forth in the MSA, DPA, or any other agreement forming

part of the contracts executed between PowerSchool and Plaintiffs.

~~248.~~323. PowerSchool had a duty to exercise due care in the performance of its obligations under the contracts. PowerSchool breached this duty. As a proximate result of PowerSchool's breach, Plaintiffs now face the imminent possibility that Plaintiffs will be sued by any of the individuals whose PII was stolen in the Data Breach.

~~249.~~324. Accordingly, Plaintiffs seek declaratory relief from this Court whereby this Court will use its authority under 28 U.S.C. §§ 2201, *et seq*. to issue a declaration that, in the event that Plaintiffs are sued as the result of PowerSchool's failure to adequately secure the PII at issue, Plaintiffs will be indemnified in an amount equal to any judgment or settlement of claims arising out of the Data Breach.

**COUNT 7**

**Intentional Interference With Contractual Relations**

**(On Behalf of All School Districts Against Defendant Bain Capital)**

~~250.~~325. Plaintiffs reallege and incorporate the paragraphs above as if fully set forth herein.

~~251.~~326. Plaintiffs entered into valid and enforceable contracts with PowerSchool for educational software and related services, which included contractual obligations for cybersecurity protections.

~~252.~~327. Defendant Bain Capital had actual knowledge of these contracts and their terms, including PowerSchool's cybersecurity obligations to Plaintiffs, by virtue of its ownership interest, board-level oversight, and direct involvement in operational decisions at PowerSchool, including during the background of the merger.

~~253.~~328. Despite this knowledge, Bain Capital intentionally and improperly interfered with PowerSchool's performance under those contracts by directing, encouraging, or pressuring PowerSchool to (1) reduce spending on cybersecurity infrastructure and compliance in order to increase profitability; (2) lay off employees involved in cybersecurity operations and information technology infrastructure; and (3) outsource backend administrative operations to subcontractors.

~~254.~~329. Bain Capital's interference was neither justified nor privileged. Bain Capital interfered with the improper motive of maximizing its own financial return at the expense of PowerSchool's contractual obligations to Plaintiffs.

~~255.~~330. As a direct and proximate result of Bain Capital's intentional interference, PowerSchool breached its contractual duties by failing to provide the promised level of cybersecurity protections, and Plaintiffs were exposed to the Data Breach. As a result, Plaintiffs now face an increased risk of ransom attacks, lawsuits, and other consequences of cybercrime, and Bain Capital caused Plaintiffs to overpay for services not rendered.

~~256.~~331. Plaintiffs have suffered damages as a result of Bain Capital's tortious interference, including overpayments for under-delivered services, loss of contractual value, increased exposure to cybersecurity threats, and the many damages sustained as a foreseeable consequence of Bain Capital's reckless interference.

~~257.~~332. Plaintiffs are entitled to compensatory and punitive damages in an amount to be proven at trial.

**COUNT 8**

**Negligence**

**(On Behalf of All School Districts Against Defendant Movate, Inc.)**

~~258.~~333. Plaintiffs reallege and incorporate the paragraphs above as if fully set forth herein.

~~259.~~334. Defendant Movate is a technology services company that PowerSchool engaged as a subcontractor to provide technical support and network operations services for PowerSchool's Student Information System ("SIS").

~~260.~~335. As part of its subcontractor relationship, PowerSchool provided Movate employees, including Rayson Cruz and others, with unfettered access to PowerSchool's PowerSource customer support portal and SIS containing highly sensitive PII of School District students, parents, and faculty.

~~261.~~336. Movate held itself out as certified compliant under the International

Standards Organization ("ISO") 27000 series cybersecurity framework, representing to consumers that it maintained appropriate security standards for handling sensitive data.

~~262.~~337. Movate knew that School Districts were legally required under federal and state law to protect student PII and that PowerSchool was contractually bound by Data Privacy Agreements ("DPA's") to implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk.

~~263.~~338. Cybercriminals successfully breached PowerSchool's systems using compromised credentials belonging to Rayson Cruz, a Movate employee assigned to provide PowerSchool technical support to School District Clients. Cruz's Movate employee account, which Movate failed to adequately secure, provided the entry point for hackers to access PowerSchool's PowerSource customer support portal.

~~264.~~339. Through this compromised Movate employee account, hackers obtained "maintenance access" to PowerSchool's SIS database and exported entire "Students" and "Teachers" database tables to .CSV files.

~~265.~~340. The Movate employee account used to execute the Data Breach was not protected by multi-factor authentication or other basic cybersecurity measures, despite industry standards requiring such protection for accounts with administrative access to sensitive databases.

~~266.~~341. Movate violated multiple industry standards including failing to apply ~~the~~ the principle of least privilege by allowing its employees to have broad administrative access far exceeding what was necessary for their assigned technical support functions.

~~267.~~342. Despite representing ISO 27000 series compliance, Movate's actual security practices fell far short of industry standards for protecting sensitive PII in educational technology environments.

~~268.~~343. Movate owed Plaintiffs a duty to exercise reasonable care in handling, securing, and preventing unauthorized access to student and faculty PII. This duty arose from multiple sources.

~~269.~~344. First, Plaintiffs' specific harm was entirely foreseeable to Movate.

Movate knew or should have known that failing to secure employee credentials with administrative access to educational databases would create a foreseeable and substantial risk of a breach to sensitive data security systems and significant harm to School Districts.

~~270.~~345. Second, by accepting PowerSchool's engagement as a subcontractor with administrative access to School Districts' sensitive PII, Movate assumed a position of trust and became an integral component of the data security framework that School Districts relied upon. Thus, a special relationship existed between School Districts and Movate which gave rise to Movate's duty to Plaintiffs.

~~271.~~346. Third, industry standards and the applicable regulatory framework under which Movate operated gave rise to the duty Movate owed to School Districts. Educational technology providers and their subcontractors operate under heightened duties due to legal obligations to: (i) protect student records as required under FERPA; and (ii) not engage in unfair data security practices under Section 5 of the FTC Act. Movate also failed to adhere to the data security industry's "best practices" by granting a single employee access to an unreasonably broad range of private, sensitive data. As a data vendor responsible for storing and protecting School Districts' information, Movate owed a duty inherent to its role as a data vendor.

~~272.~~347. Fourth, the contracts between School Districts and PowerSchool are an additional source of the duty Movate owed to Plaintiffs. These contracts all contained specific security obligations, including requirements to:

a. implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk;
b. take reasonable measures to ensure the reliability of employees, agents, and contractors;
c. limit data access to the minimum extent necessary; and
d. comply with federal, state, and local data protection laws

~~273.~~348. Movate, as PowerSchool's key subcontractor for technical operations, had a duty to perform its services in a manner that enabled PowerSchool to fulfill these

contractual obligations to School Districts.

~~274.~~349. Fifth, the FTC's 2016 guidelines require companies to verify that third-party service providers have reasonable security systems in place. As such, Movate was required to maintain reasonable security systems as a third-party provider in the educational technology ecosystem.

~~275.~~350. Movate breached its duty of care to Plaintiffs through multiple negligent acts and omissions, including Movate's total failure to implement multi-factor authentication.

~~276.~~351. Despite industry standards and the highly sensitive nature of the data accessible through Rayson Cruz's account, Movate negligently failed to implement multi-factor authentication or any reasonable authentication security measures.

~~277.~~352. Movate also breached its duty to Plaintiffs due to Movate's inadequate credential security management. Movate failed to implement adequate policies and procedures for securing, monitoring, and rotating employee credentials with administrative database access. As a direct and proximate result of this failure, Movate did not detect the compromise of Cruz's credentials in time to prevent unauthorized system access.

~~278.~~353. Movate's security failures violated fundamental cybersecurity principles established by:

a. ISO 27000 series standards;
b. NIST Cybersecurity Framework; and
c. Center for Internet Security Controls.

~~279.~~354. Movate's breaches were particularly egregious given:

a. the volume and sensitivity of PII potentially accessible through its systems (over 70 million individuals);
b. the heightened regulatory environment governing educational data;
c. known and increasing threats to educational technology providers; and
d. PowerSchool's prior notification to the FBI regarding targeting by threat

actors.

~~280.~~355. But for Movate's negligent security practices, the December 2024 Data Breach would not have occurred.

~~281.~~356. Movate's failure to implement multi-factor authentication on Cruz's account enabled hackers to exploit the compromised credentials to gain system access and carry out the Data Breach.

~~282.~~357. But for Movate's failure to limit Cruz's access privileges to the minimum necessary, hackers could not have obtained "maintenance access" to the SIS database.

~~283.~~358. But for Movate's inadequate credential security management, the compromise of Cruz's credentials would have been detected and remediated before the Data Breach occurred.

~~284.~~359. The Data Breach and resulting harms to School District Plaintiffs were foreseeable and natural consequences of Movate's negligent conduct in that:

a. educational technology systems are known high-value targets for cybercriminals due to the sensitive PII they contain;
b. accounts with administrative database access are recognized as particularly attractive and dangerous attack vectors; and
c. the lack of multi-factor authentication on privileged accounts is a well-known critical security vulnerability.

~~285.~~360. Movate, as a technology services provider, knew or should have known these risks and the likely consequences of its security failures.

~~286.~~361. No intervening cause breaks the chain of causation between Movate's negligence and School Districts' injuries. The hackers' criminal conduct was the precise type of harm that Movate's security measures were supposed to prevent.

~~287.~~362. As a direct and proximate result of Movate's negligence, School District Plaintiffs have suffered and continue to suffer substantial damages, including but not limited to:

a. additional wages and overtime for staff diverted to breach response activities;
b. costs for hiring cybersecurity experts for incident investigation and risk assessment;
c. legal consultation and representation expenses;
d. expenses for implementing enhanced security measures and system modifications;
e. costs for providing credit monitoring and identity theft protection services to affected individuals;
f. administrative costs for breach notification and student support operations;
g. loss of public confidence in School Districts' ability to protect sensitive student and family information;
h. declines in student enrollment and corresponding loss of public funding;
i. damage to School Districts' relationships with students, parents, and the broader community;
j. increased risk of liability from lawsuits by affected students, parents, and faculty members;
k. regulatory sanctions and compliance costs;
l. expenses for monitoring misuse of stolen PII;
m. future costs for enhanced security measures and third-party vendor oversight; and
n. ongoing legal and expert consultation expenses.

~~288.~~363. All of Plaintiffs' injuries and damages were within the foreseeable zone of risk that Movate created because:

a. Movate deliberately and intentionally failed to take reasonable steps to secure the data Plaintiffs entrusted to PowerSchool with the knowledge that doing so would affect Plaintiffs by depriving them of the benefits they reasonably expected to receive under their contracts with PowerSchool, in

addition to the millions of students whose private and sensitive data Plaintiffs expected Movate to protect;

b. Movate intentionally held itself out as a company that could be trusted to take adequate measures to secure and protect sensitive personal data with the knowledge that it was in fact in possession of such data while having failed to implement the most basic security measures per industry standards, regulations, and the very set of standards by which Movate claimed to abide;

c. Movate, as a technology services company that purposefully contracted with PowerSchool, knew that the failure to uphold its duties would foreseeably cause a multitude of problems for School Districts, including, but not limited to, the need to devote substantial staff time to addressing the Data Breach, financial costs from needing to consult with lawyers and experts, and responding to the inquiries of the millions of parents, students, and faculty whose PII was compromised;

d. Plaintiffs' injuries to date are certain and can be certain to continually accrue, while Plaintiffs' future damages are ascertainable and can be established through reliable expert testimony;

e. there is a close connection between Movate's failure to take any meaningful steps to secure the data which contained the PII of students, parents, and faculty and the harms that School Districts have suffered and will suffer;

f. there is a strong moral blame attached to Movate's conduct in that Movate held itself out as a company that specialized in protecting highly sensitive data while simultaneously taking deliberate steps in contradiction of the image it sought to project, all with the intent of minimizing costs and maximizing profits with a callous disregard for the effects of a breach of its easily penetrable security systems that allowed for one low-level employee to hold access to the PII of millions of people, most of whom were minors; and

g. there is a strong policy in favor of imposing this legal duty on Movate, as evidenced by the dozens of federal regulations and state laws that impose special obligations on private entities in the business of storing and possessing PII that belongs to students and minors, the unreasonable risk of harm that exists when basic steps are not taken to secure sensitive data containing minors' PII by businesses in Movate's position, and the fact that taxpayers are ultimately forced to bear the costs when these businesses recklessly endanger the security of students and others with full knowledge of the grave implications for these failures.

~~289.~~364. As a result of Movate's negligence and the despicable conduct in which Movate engaged while deliberately and consciously disregarding School Districts' rights, Plaintiffs seek all available general, special, punitive, and other damages allowed under law.

**COUNT 9**

**Negligent ~~Hiring,~~ Training, Supervision, and Retention**

**(On Behalf of All School Districts Against Defendant Movate, Inc.)**

~~290.~~365. Plaintiffs reallege and incorporate the allegations above as if fully set forth herein.

~~291.~~366. At all relevant times, Movate owed a duty to Plaintiffs to hire competent employees and agents, and to train and supervise them to ensure recognition of an compliance with its obligations to Plaintiffs.

~~292.~~367. As a subcontractor of PowerSchool, Movate's employees and agents have access to highly sensitive and confidential data stored on PowerSchool's SIS, including the PII of Plaintiffs' students, parents of students, and faculty. Moreover, many of these same employees and agents were employed and working off-shore, outside of the United States.

~~293.~~368. Movate, acting as PowerSchool's agent, owed non-delegable duties to Plaintiffs to hire competent employees and agents and to train and supervise them to

ensure they would recognize the duties owed to Plaintiffs. Further, having been granted unfettered access to millions of students' and teachers' sensitive data, Movate had a duty to take reasonable steps to ensure adequate data security procedures and practices sufficient to maintain the confidentiality of the data containing PII.

294.369. Movate had a duty to prevent foreseeable harm to Plaintiffs, who would foreseeably and probably suffer harm as the direct and proximate result of Movate's inadequate security practices. Movate knew that failing to safeguard the data containing the PII of Plaintiffs' students, parents of students, and faculty created a substantial risk of harm, as such data is routinely targeted and exploited by hackers.

295.370. Movate was on notice of the importance of data security due to the abundance of information about the serious risks of inadequate security, including highly publicized breaches of data security systems that were carried out against educational institutions similarly situated to Plaintiffs.

296.371. It was reasonably foreseeable that Movate's failure to train employees and agents about the importance of protecting their passwords, failure to require credential changes at regular intervals, and not providing restricted access would lead to a compromise of the security of the data containing the PII that Plaintiffs entrusted to PowerSchool and relied on Movate to protect.

297.372. Movate's inadequate data security, training, procedures, and network infrastructures, along with its failures in hiring and training employees and agents, substantially caused the Data Breach and the damages Plaintiffs sustained, all of which are alleged herein.

298.373. Movate hired Rayson Cruz, the employee who negligently allowed for the disclosure of the PII that was compromised in the Data Breach.

299.374. Movate was negligent and failed to exercise the requisite standard of care in hiring, supervising, retaining, and training of its employees and agents, including, but not limited to, Rayson Cruz.

300.375. Rayson Cruz was hired, trained, and retained as a Movate Team

Leader who was assigned to provide technical support on behalf of PowerSchool and had access to the PowerSchool SIS and the massive trove of PII the system stored. As a result, his compromised credentials allowed the Data Breach threat actor to exfiltrate the PII that Movate possessed and purported to safeguard for Plaintiffs' benefit.

~~301.~~376. At the least, Movate breached its duty to Plaintiffs by failing to (1) appropriately train its employees to secure their credentials; (2) rotate its employees' credentials; (3) and implement the principle of least privileges, which would have forbade Rayson Cruz from having a level of access far beyond what was necessary to perform his job functions.

~~302.~~377. Movate knew or should have known that Rayson Cruz was, or became, unfit or incompetent in his abilities to adequately and reasonably implement measures to secure the data that was compromised in the Data Breach. Rayson Cruz's unfitness and incompetence directly, proximately, and substantially caused Plaintiffs' harms.

~~303.~~378. Movate's negligence in ~~hiring,~~ supervising, training, and retaining Rayson Cruz was a substantial factor in causing Plaintiffs' harms, and Movate is accordingly liable for the injuries Plaintiffs suffered as a result of the Data Breach.

**COUNT 10**

**Breach of Contract (Third Party Beneficiary)**

**(On Behalf of All School Districts Against Defendant Movate, Inc.)**

~~304.~~379. Plaintiffs reallege and incorporate the allegations above as if fully set forth herein.

~~305.~~380. Plaintiffs are informed and believe that Movate and PowerSchool were parties to a contract under which Movate agreed to process, store, collect, and safeguard the sensitive and private data that Plaintiffs entrusted to PowerSchool.

~~306.~~381. At the time this contract was made, Movate and PowerSchool mutually intended that Plaintiffs would be beneficiaries under their contract. Even if it was not expressly stated that the contract was intended to benefit Plaintiffs, this intent

was apparent through ordinary means of contract interpretation and in light of surrounding circumstances. Any other interpretation of the contract would lead to an absurd result.

~~307.~~382. As intended third-party beneficiaries of the contract between Movate and PowerSchool, Plaintiffs have standing to sue to enforce the terms of the contract, including for a breach that deprived Plaintiffs of a benefit they reasonably expected to receive.

~~308.~~383. In failing to adequately safeguard the data in its possession and allowing the Data Breach to occur, Movate committed a material breach of the contract between Movate and PowerSchool.

~~309.~~384. As a direct, natural, and probable consequence of Movate's breach of contract, Plaintiffs were deprived of benefits they reasonably expected to receive as third-party beneficiaries of a contract PowerSchool made with a vendor.

~~310.~~385. As a direct, natural, and probable result of Movate's breach of contract, Plaintiff sustained damages, including all of the damages alleged in paragraph ~~136 above~~205 above. All of these damages were the foreseeable result of the breach at the time Movate entered into its contract with PowerSchool.

~~311.~~386. Based upon Movate's breach of the contract intended to benefit Plaintiffs, Plaintiffs seek to recover all available general damages, special damages, expectation damages, consequential damages, incidental damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other available damages sufficient to compensate Plaintiffs for their injuries.

## COUNT 11

## Aiding and Abetting

## CAL. BUS. & PROF. CODE §§17200, ET SEQ

## (On Behalf of All School Districts Against Defendant Bain Capital)

387. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

388. PowerSchool's failure to securely maintain PII was "unfair," "unlawful,"

and "fraudulent" within the meaning of the Cal. Bus. & Prof. Code §§ 17200 et. seq. such that School District Plaintiffs have suffered harm and damages as a result of PowerSchool's conduct in violation of the UCL.

389. At all relevant times, Bain purposefully directed business and operational activities toward the State of California by engaging in and exercising control over the operations of PowerSchool, a California-headquartered company, including decisions central to cybersecurity, workforce structure, and information-technology operations.

390. Bain initiated and conducted merger and acquisition negotiations with PowerSchool, a California-based enterprise, through repeated communications and meetings, including meetings that occurred in California, culminating in the execution of a Merger Agreement on June 6, 2024.

391. While exercising this operational control, Bain directed and approved cost-cutting and restructuring measures affecting PowerSchool's California-based operations, including decisions to reduce domestic information-technology and cybersecurity staffing and to offshore those functions to third-party contractors.

392. In or around January 2024, under Bain's direction, PowerSchool expanded its cybersecurity and information-technology operations offshore, a decision made in the context of Bain's strategic planning and control over PowerSchool's California-centered business operations.

393. Bain's California-directed decisions included authorizing and requiring operational changes that permitted offshore contractors to access PowerSchool systems and data, including systems maintained and managed from California, without implementing adequate safeguards to protect sensitive student and school-district information.

394. Following the October 1, 2024 closing of the acquisition, Bain replaced PowerSchool's board of directors and assumed formal control of the company, continuing to direct PowerSchool's operations from and toward California, including cybersecurity governance and vendor management.

395. Bain's California-directed operational decisions—including directing layoffs of U.S.-based cybersecurity personnel, authorizing offshore access to PowerSchool systems, and failing to assess or mitigate data-security risks—created and exacerbated vulnerabilities in PowerSchool's information systems that were exploited in the Data Breach.

396. These California-directed acts and omissions were a substantial factor in enabling the unauthorized access to PowerSchool's systems and the resulting exposure of sensitive data belonging to School District Plaintiffs.

397. Bain's post-acquisition conduct constituted ongoing California-directed operational decision-making, as Bain exercised control over a California-headquartered company's day-to-day business functions and failed to remediate known cybersecurity risks associated with the previously directed offshoring and workforce reductions.

398. Bain's conduct therefore constitutes unlawful and unfair business practices under California Business and Professions Code section 17200, as those practices were conceived, authorized, and implemented through California-directed operational control over a California-based company.

399. By eliminating PowerSchool's critical workforce and contracting with third-party Movate for their own financial gain, Defendants acted with knowledge that PowerSchool's misrepresentations and/or omissions regarding the security of user PII would be (a) unlawful under current state or federal law; (b) "unfair," in that Defendants' business practice was immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers; and/or (c) fraudulent in that members of the public were likely to be deceived by PowerSchool's misrepresentations and/or omissions.

400. Bain provided substantial assistance and encouragement to PowerSchool's unlawful, unfair, and fraudulent business practices by requiring PowerSchool to cut its critical workforce and move essential operations offshore to be hosted by third parties, authorizing offshore contractor access to PowerSchool's SIS without requiring implementation of MFA, and replacing PowerSchool's entire board with Bain-affiliated

personnel while continuing to direct cost-cutting measures that left PowerSchool's cybersecurity infrastructure under-resourced.

401. As a direct and proximate result of Bain's aiding and abetting of PowerSchool's tortious conduct, the School Districts have suffered the injuries and damages described herein, for which Bain is jointly and severally liable.

## STATE-SPECIFIC CLAIMS

312.402. The following claims for relief are asserted on behalf of certain Plaintiffs according to their state of citizenship and the corresponding statewide DPA between each Plaintiffs and PowerSchool, which delineates the choice of law applicable to the claims each Plaintiff pursues in thisis proceeding.

**(i) UTAH SCHOOL DISTRICTS**

### COUNT 11 12

### Breach of Contract

**(On Behalf of the Utah Districts Against Defendants PowerSchool Holdings, Inc.PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

313.403. The Utah School District Plaintiffs (the "Utah Districts") reallege and incorporate paragraphs 1 through 309401 above as if fully set forth herein.

314.404. The Utah Districts and PowerSchool are parties to contracts which incorporate the Utah DPA.

315.405. At all relevant times, the Utah Districts fully performed their obligations under their contracts with PowerSchool.

316.406. The Utah DPA sets forth "the terms and conditions pursuant to which any Customer Data will be handled by PowerSchool and permitted third parties during the term of the MSA and after its termination." This Customer Data includes the PII of the Utah Districts' employees, students, and parents of students, all of which was compromised and stolen while in the care, custody, and control of PowerSchool.

317.407. The purpose of the Utah DPA, by its own terms as stated in Section 2, is to "describe PowerSchool's responsibilities and solutions as a Processor for handling

and protecting Customer Data."

~~318.~~408. The Utah DPA provides in Section 6.1 that "PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained from Customer."

~~319.~~409. PowerSchool failed to perform its obligation under Section 6.1 because PowerSchool failed to safeguard the private and sensitive data it obtained from the Utah Districts. This was a material term of the contract because a major factor in the decision to entrust PowerSchool with the handling of sensitive PII and to pay PowerSchool for such entrustment was PowerSchool's reciprocal promise to safeguard the data containing the PII of the Utah Districts' students, parents of students, and faculty members.

~~320.~~410. An essential purpose for which the contracts were entered into was to safeguard the PII of students and employees within the Utah Districts' jurisdiction while providing an adequate system for organizing and carrying out their operations. The Utah Districts have been deprived of a benefit that they reasonably expected to receive at the time the Utah Districts entered into their contracts with PowerSchool. Therefore, PowerSchool's failure to substantially perform its obligation under Section 6.1 was a material breach of contract.

~~321.~~411. Section 6.4 of the Utah DPA provides that: "PowerSchool shall not . . . [u]se, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

~~322.~~412. The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures, constituting an unauthorized transfer of the PII that created the opportunity for the potential sale of students', parents', and faculty members' PII on the Dark Web.

~~323.~~413. Hackers exported entire student and teacher databases without authorization. PowerSchool thus allowed for the disclosure of data to which the Utah Districts did not consent, and neither applicable law nor any ~~Master Service Agreement~~

(“MSA”) allowed for this disclosure.

324.414. Ensuring that the PII that the Utah Districts entrusted to PowerSchool was not used, sold, transferred, or disclosed without the consent of the Utah Districts was an essential purpose of their contracts with PowerSchool. The Utah Districts sought to effectively and efficiently provide services to students, parents, and employees in agreeing to purchase PowerSchool’s products and services, and the Utah Districts reasonably believed that PowerSchool would not allow for the disclosure of these individuals’ Private Information without their consent or as authorized by law.

325.415. Accordingly, PowerSchool violated Section 6.4 of the DPA and materially breached their contracts with the Utah Districts.

326.416. Section 7 of the Utah DPA states, in relevant part, that “PowerSchool shall take reasonable measures to ensure the reliability of employees, agents, and contractors of PowerSchool . . . who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the MSA or this DPA. . . ”

327.417. PowerSchool failed to ensure the reliability of its employees, agents, vendors, and contactors as it agreed to in Section 7. These employees, agents, vendors, and contractors would have implemented basic procedures and practices such as multi-factor authentication and data encryption if they could reasonably be called reliable for purposes of ensuring that access to PII was limited to individuals authorized to access the PII under the terms of the Utah DPA and the MSA of any Utah District. The Data Breach is itself evidence of PowerSchool’s failure to perform its obligations under Section 7, and PowerSchool has offered no explanation for how PowerSchool took reasonable measures to ensure such reliability as promised in Section 7.

328.418. When entering into their contracts with PowerSchool, the Utah Districts reasonably expected that PowerSchool would take reasonable measures to ensure the reliability of PowerSchool’s agents, employees, and contractors in limiting the accessibility of PII. The Utah Districts performed their contractual obligations under the

reasonable belief that PowerSchool was adequately performing its reciprocal promise to take reasonable measures to ensure the reliability of PowerSchool employees, agents, and contractors in ensuring limited access to the PII of students and employees.

~~329.~~419. Therefore, PowerSchool committed a material breach of contract by violating Section 7 of the Utah DPA.

~~330.~~420. With respect to the processing of data in PowerSchool's possession, the Utah DPA states in Section 8 that " . . . PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk."

~~331.~~421. PowerSchool failed to perform its obligation under Section 8 because PowerSchool failed to encrypt data containing sensitive PII that PowerSchool processed, and this PII was the subject of the Data Breach. PowerSchool committed this failure despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term of the contracts between PowerSchool's contracts with the Utah Districts because the Utah Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. The Utah Districts reasonably believed that PowerSchool would implement these reasonable and appropriate measures at the time they entered into their contracts with PowerSchool.

~~332.~~422. Therefore, in failing to perform its obligations under Section 8 of the Utah DPA, PowerSchool committed a material breach of contract.

~~333.~~423. Section 11 of the Utah DPA sets forth various obligations on the part of PowerSchool in the event of a breach of the security of personal data that the Utah Districts entrusted to PowerSchool. Among these obligations, Section 11 obligates PowerSchool to:

a. take steps to mitigate and remediate a data breach;
b. notify the Utah Districts without undue delay;
c. provide the Utah Districts with sufficient information to permit the Utah

Districts to make a determination as to any notification obligations under federal, state, or local laws and regulations; and

d. cooperate with the Utah Districts and take commercially reasonable steps to assist the Utah Districts in an investigation of the breach.

~~334.~~424. Upon learning of the Data Breach, PowerSchool was obligated to perform its obligations as stated in Section 11 of the Utah DPA. PowerSchool substantially or entirely failed to do so, as PowerSchool instead:

a. took no steps in furtherance of mitigation or remediation of the Data Breach, beyond receiving purported assurances that the PII would not be sold or used from the hackers who risked criminal prosecution in accessing and acquiring the PII;

b. notified the Utah Districts of the Data Breach at least ten days after learning that the Data Breach had occurred, an undue delay that diminished, constrained, and limited the Utah Districts' ability to learn who possessed the PII and which PII had been compromised;

c. failed to provide information to the Utah Districts that would be sufficient for them to readily and adequately determine the scope of their legal obligations to notify students, parents, and employees; and

d. failed to take commercially reasonable steps to assist the Utah Districts in an investigation of the Data Breach by keeping the Utah Districts in the dark about the Data Breach for such a time that any investigation would be fruitless.

~~335.~~425. The Utah Districts reasonably expected PowerSchool to perform its duties under Section 11 of the Utah DPA when they entered into contracts with PowerSchool. Understanding that there is always some risk involved in storing sensitive data even when adequate security measures are implemented, the Utah Districts were assured that they could react in a timely and organized fashion to address the negative implications should a data breach occur. The Utah Districts continued to perform their

obligations under this reasonable belief and have now been prejudiced by PowerSchool's undue delay that has lessened the Utah Districts' ability to proactively notify affected individuals, determine their legal obligations, and investigate the potential exposure of PII. PowerSchool has failed to mitigate or remedy the consequences of the Data Breach and has instead acted in a commercially unreasonable manner by paying a ransom to the cybercriminals who compromised the PII when the Utah Districts had no way of knowing the Data Breach had even occurred.

~~336.~~426. Therefore, the actions and omissions of PowerSchool after the Data Breach were violations of Section 11 of the Utah DPA which constitute material breaches of contract.

~~337.~~427. Schedule 1-C of the Utah DPA addresses the subject of data security. Section A.1 states: "PowerSchool agrees to abide by and maintain adequate data security measures, consistent with industry standards for digital storage of Customer Data, to protect Customer Data from unauthorized disclosure or acquisition by an unauthorized person." Following this statement, the Utah DPA imposes several obligations on PowerSchool with respect to data security measures, including obligations to:

a. secure usernames, passwords, and any other means of gaining access to the services or to PII, at a level meeting or exceeding the applicable standards;
b. maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so;
c. employ industry standard measures to protect data from unauthorized access; and
d. conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner.

~~338.~~428. PowerSchool failed to perform its data security obligations that are stated above in that PowerSchool did not:

a. secure means of gaining access to usernames and passwords, because PowerSchool did not implement multi-factor authentication or any other available measure consistent with industry standards that would be considered sufficient to meet this obligation;

b. maintain security protocols that met industry standards for monitoring and preventing the unauthorized access, transfer, or transmission of data, as PowerSchool failed to implement end-to-end encryption of data at rest and in transit to prevent unauthorized access, which proximately and directly allowed for the unauthorized viewing, transfer, and transmission of the data containing PII;

c. conduct periodic risk assessments to detect system vulnerabilities before the Data Breach, as such assessments would have led PowerSchool to implement stronger security measures before the Data Breach occurred;

d. conduct security audits or penetration testing that would have allowed PowerSchool to identify and address vulnerabilities to its data security systems before the Data Breach occurred; and

e. have in place a remediation plan, despite being aware of prior cybersecurity threats but still failing to act to strengthen its defenses.

~~339.~~429. Schedule 1-C of the Utah DPA also created obligations of PowerSchool in the event of a breach of data security. Sections B.1 and B.2 of Schedule C-1 obligated PowerSchool to do all the following when data was accessed or obtained by an unauthorized individual or third party:

a. provide notification to the Utah Districts within a reasonable amount of time of confirmation of the Data Breach, not exceeding seventy-two (72) hours;

b. take reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use, or disclosure of data;

c. provide a security incident notification written in plain language after confirmation of the incident; and

d. provide a list of the types of data that were or are reasonably believed to have been the subject of the Data Breach.

~~340.~~430. PowerSchool failed to perform any of its obligations identified above and stated in Sections B.1 and B.2. PowerSchool detected the Data Breach on December 28, 2024, but did not notify customers until January 7, 2025—a delay of ten days. This undue delay was a material breach of contract that has left the Utah Districts scrambling to determine the potential exposure of PII.

~~341.~~431. The Utah DPA also includes and incorporates Schedule 2-C, which purports to be a data security and privacy plan. Schedule 2-C obligated PowerSchool to:

a. review its data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws and the terms of the Utah DPA;

b. implement commercially reasonable efforts to ensure compliance with applicable laws and the terms of the Utah DPA in the event that PowerSchool's policy and practices were found to not conform with said laws and terms;

c. encrypt data-at-rest and data-in-transit;

d. implement data leak protections and information protection processes and procedures;

e. perform data destruction according to the Utah Districts' contracts with PowerSchool;

f. develop and implement a plan for vulnerability management;

g. ascertain, document, and review log and audit records according to policy; and

h. issue, verify, manage, audit, and revoke, as applicable, authentication and access control for authorized devices, processes, and users.

~~342.~~432. Schedule 2-C further obligated PowerSchool to manage data security and privacy incidents that implicate PII, including identifying breaches and unauthorized

disclosures, and providing prompt notification of any breaches or unauthorized disclosures of PII.

~~343.~~433. Both before the Data Breach and after it occurred, PowerSchool failed to perform each and every obligation identified above and thereby violated Schedule 2-C of the Utah DPA.

~~344.~~434. At the time the Utah Districts entered into their contracts with PowerSchool, the Utah Districts reasonably expected PowerSchool to perform these obligations in the interest of the students, parents, and employees who the Utah Districts serve and seek to protect. The failure to perform these obligations constitutes a material breach of contract.

~~345.~~435. PowerSchool failed to take steps to mitigate and remediate the Data Breach, as the Utah Districts have yet to understand the full extent and scope of the impact of the Data Breach. PowerSchool has failed to take commercially reasonable steps to assist the Utah Districts by providing them with necessary information sought by faculty, students, and parents of students to whom the Utah Districts are accountable.

~~346.~~436. In the Utah DPA, PowerSchool made representations that its protocols and procedures for data security and protection would "conform" to the standards set forth in the International Standards Organization ("ISO") 27000 series, a publication that addresses data security management systems.

~~347.~~437. In rendering services to the Utah Districts, PowerSchool failed to abide by numerous standards set forth in the ISO 27000 series, including:

a. using data encryption to protect the confidentiality and integrity of private data;
b. implementing secure authentication mechanisms such as multi-factor authentication;
c. promptly detecting, reporting, and responding to incidents involving a security compromise;
d. ensuring all employees receive appropriate security training;

e. conducting regular risk assessments and reviews of data security measures; and

f. aligning public claims and policy statements regarding data security with practices and procedures that are actually implemented.

~~348.~~438. When entering into their contracts with PowerSchool, the Utah Districts reasonably expected that PowerSchool would implement and maintain the ISO 27000 series standards in the interest of protecting the privacy of students, parents, and teachers. The Utah Districts' agreement to pay PowerSchool all amounts due under their contracts and subsequent performance of that obligation was substantially based on PowerSchool's reciprocal promise to implement these standards, and the Utah Districts reasonably believed that PowerSchool had done so and would continue to do so.

~~349.~~439. Thus, the failure by PowerSchool to abide by ISO 27000 series standards was a material breach of contract.

~~350.~~440. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the Utah Districts have suffered monetary and other damages. These include out-of-pocket costs and expenses incurred for:

a. additional wages paid to staff members to address the Data Breach;

b. increased workload on administrative staff for managing affected data and addressing concerns from parents, students, and faculty;

c. expenses for hiring cybersecurity experts to investigate the breach;

d. costs for cybersecurity experts to assess potential risks to students, parents, and staff;

e. fees for cybersecurity experts to provide recommendations on securing the schools' data;

f. legal consultation costs to determine potential liability;

g. legal expenses to understand regulatory compliance obligations;

h. legal fees to prepare for potential lawsuits from affected individuals;

i. expenses to transition data from PowerSchool to a different, more secure

platform;

j. technical support costs associated with data transfer;

k. costs for staff training on the new system;

l. expenses for implementing improved security measures;

m. lost opportunity costs from redirecting school staff to mitigate the breach's impact;

n. wages lost due to time spent monitoring and responding to identity theft risks;

o. costs for providing credit monitoring services to affected students, parents, and faculty;

p. expenses for identity theft protection services for those impacted by the Data Breach;

q. ongoing monitoring costs due to delayed or hidden fraudulent activity;

r. future legal and expert consultation expenses to manage ongoing risks of PII exposure;

s. expenses for drafting and sending notification letters/emails to affected individuals;

t. costs for setting up support hotlines or response teams for inquiries; and

u. administrative expenses for responding to concerns from students, parents, and faculty about potential identity theft.

~~351.~~441. All of these out-of-pocket losses were foreseeable to PowerSchool it entered into contracts with the Utah Districts given PowerSchool's familiarity with the Utah Districts' status as public School Districts and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool committed material breaches of contract.

~~352.~~442. In committing the acts and omissions that have directly and proximately caused the Utah Districts' out-of-pocket losses, PowerSchool intentionally

failed to perform acts which constitute PowerSchool's duties under the Utah DPA. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Utah Districts and to those whose PII the Utah Districts entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to the Utah Districts flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing these breaches of contract and causing the Utah Districts' substantial monetary losses.

~~353.~~443. As a direct and proximate result of PowerSchool's breaches of contract, the Utah Districts were deprived of the full benefit of data security protection that they were promised under their contracts with PowerSchool. The Utah Districts still have not received the benefit that the Utah Districts bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~354.~~444. The Utah Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~355.~~445. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Utah Districts seek to recover all available general damages, special damages, expectation damages, consequential damages, incidental damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other available damages sufficient to compensate the Utah Districts for their injuries.

**COUNT 12**

**Violation of the Utah Consumer Sales Practices Act**

**(On Behalf of the Utah Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)**

356. The Utah Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.

357. The Utah Consumer Sales Practices Act ("UCSPA"), Utah Code Ann. § 13-11-1 *et seq.*, protects consumers against false, misleading, and deceptive business practices by prohibiting certain acts and practices that tend to deceive and mislead consumers in the conduct of any trade or commerce.

358. The Utah Districts are and were at all relevant times herein "persons" within the meaning of Utah Code Ann. § 13-11-3(5).

359. PowerSchool is and was at all relevant times a "person" and "supplier" within the meaning of Utah Code Ann. § 13-11-3(5), (6).

360. All of the relevant offers, solicitations, agreements, or acts or omissions made in the performance of agreements were connected to the sale of PowerSchool's products and services and were "consumer transactions" within the meaning of Utah Code Ann. § 13-11-3(2)(a)-(b).

361. PowerSchool knowingly and intentionally engaged in false, misleading, and deceptive business practices in connection with the sale of PowerSchool's products and services and committed multiple violations of Utah Code Ann. § 13-11-4(2).

362. PowerSchool published on its website the statement that PowerSchool "invests in updated security technology and adheres to strict security regulations" while representing on its website that it supposedly did these acts to "keep your data secure." Also through its website, PowerSchool represented itself as an "industry leader for protected private data." PowerSchool made representations to members of the public that they could "trust" PowerSchool to safeguard and protect children's personal information.

363. The representation that PowerSchool invests in updated security technology

and adheres to strict security regulations was false, deceptive, and misleading. PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi factor authentication method to gain access to this highly sensitive personal information.

364. The representation that PowerSchool was an industry leader for protected privacy data was false, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.

365. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. These failures included, at a minimum, the failure to:

a. properly encrypt data;
b. implement multi factor authentication;
c. monitor for unauthorized access;
d. ensure that its staff was adequately trained to recognize and respond to cyber threats;
e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and
f. properly isolate sensitive student and teacher data from other less secure systems.

366. As such, the representation that PowerSchool could be trusted to secure data was misleading and deceptive because PowerSchool's security measures fell short of what is customarily considered sufficient in terms of data privacy protection, especially considering the data that was compromised and stolen in the Data Breach.

367. All of the above alleged assertions, representations, or statements caused the

~~Utah Districts to reasonably believe that:~~

~~a. PowerSchool was an industry leader in data privacy protection;~~

~~b. PowerSchool made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure; and~~

~~c. PowerSchool could be trusted with handling, storing, and securing the sensitive personal information of children contained within the data that PowerSchool obtained as the result of PowerSchool's services.~~

~~368. All of the above alleged assertions, representations, or statements were knowingly made by PowerSchool with the intent to sell its product and services, or with the intent to induce a purchase of PowerSchool's product and services.~~

~~369. By making the above alleged assertions, representations, or statements, PowerSchool engaged in false, misleading, and deceptive business practices in violation of Utah Code Ann. § 13-11-4(2)(a), (b), and (j)(i) in that PowerSchool:~~

~~a. indicated that the subject of a consumer transaction had performance characteristics and/or benefits that it did not have;~~

~~b. indicated that the subject of a consumer transaction was of a particular standard or quality when it was not; and~~

~~c. indicated that a consumer transaction involved rights or remedies that it did not involve by making false representations in advertising and promotional materials.~~

~~370. PowerSchool's false, misleading, and deceptive business practices injuriously affected the people of Utah whose children attend public schools, and whose tax payments fund public school districts that ultimately act as consumers in the marketplace for PowerSchool's products and services.~~

~~371. Under Utah Code Ann. § 13-11-5, "[a]n unconscionable act or practice by a supplier in connection with a consumer transaction" also violates the UCSPA.~~

~~372. The false, deceptive, and misleading business practices in which~~

PowerSchool engaged in violation of the UCSPA were procedurally unconscionable because PowerSchool:

a. possessed exclusive knowledge of the deficiencies of its data protection policies and practices;

b. intentionally concealed these deficiencies while simultaneously representing that its data protection policies were implemented in a way that met or exceeded industry standards; and/or

c. continuously accepted payments from the Utah Districts while knowing that the Utah Districts were not receiving the quality or kind of products that PowerSchool directly and intentionally represented it was providing.

373. PowerSchool knew that its products and services were being provided in a manner that does not meet ordinary and reasonable consumer expectations and were unfit for use considering the sensitive and highly personal of the PII contained in the data PowerSchool was hired to maintain, store, and protect.

374. As a result of these knowing and intentional false, misleading, and deceptive representations, the Utah Districts sustained monetary losses. In addition to being forced to expend substantial sums to properly and adequately address the Data Breach in its wake, the Utah Districts were deprived of the full benefit of the bargain they reasonably believed they would receive and were receiving under their contracts. PowerSchool's false, misleading, and deceptive representations were a material and significant factor that contributed to the Utah Districts' decision to purchase PowerSchool's products and services.

375. As a direct and proximate result of the above violations of the UCSPA, the Utah Districts have suffered actual damages and injury in fact, including but not limited to: (i) additional wages paid to the Utah Districts' staff members; (ii) expert expenses to understand the nature of the Data Breach's consequences; (iii) legal expenses related to potential liabilities; (iv) future expenses to migrate data to a new vendor; and (v) notification costs to ensure that affected employees, students, and parents are made aware

~~of the Data Breach and subsequent developments related to information about the potential consequences of the Data Breach.~~

~~376. The result of PowerSchool's false, misleading, and deceptive business practices is substantively unconscionable in that the Utah Districts not only lost out on receiving the full benefit of what they bargained for but must now continually and persistently expend the public funds that the Utah Districts rely on to address a situation that was proximately and actually caused by PowerSchool's grossly negligent data security systems. The Utah Districts would not have had to bear these costs if PowerSchool had not knowingly and intentionally deceived the Utah Districts as an inducement for the purchase of PowerSchool's products and service.~~

~~377. Pursuant to Utah Code Ann. § 13-11-4, the Utah Districts seek and are entitled to an award of monetary relief against PowerSchool to include: (i) the greater of (a) actual damages in an amount to be determined at trial, or (b) statutory damages in the amount of $2,000; (ii) reasonable attorneys' fees; and (iii) any other just and proper relief available under the UCSPA.~~

**(ii) Wisconsin School Districts**

**COUNT 13**

**Breach of Contract**

**(On Behalf of the Wisconsin Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~378.~~446. The Wisconsin School District Plaintiffs (the "Wisconsin Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~379.~~447. The Wisconsin Districts and PowerSchool are parties to contracts which incorporate the Wisconsin DPA.

~~380.~~448. At all relevant times, the Wisconsin Districts fully performed their obligations under their contracts with PowerSchool.

~~381.~~449. The Wisconsin DPA provides in Section 4 that: " . . . PowerSchool shall implement appropriate technical and organizational measures to ensure a level of

security appropriate to the risk."

450. PowerSchool failed to perform its obligation under Section 4 because PowerSchool failed to encrypt sensitive PII that was the subject of the Data Breach, despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term of the contracts because the Wisconsin Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. By virtue of this failure, PowerSchool committed a material breach of contract.

382.

383.451. Section 3.3.1 of the Wisconsin DPA provides that: "PowerSchool shall not . . . [u]se sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

384.452. The Data Breach provided hackers with unauthorized access and has created the opportunity for the potential sale of students', parents', and faculty members' PII on the Dark Web. PowerSchool's provision of transcripts for students to the wrong college also provided third parties access to records to which they were not entitled.

385.453. Hackers exported entire student and teacher databases without authorization. Therefore, PowerSchool allowed for the disclosure of data to which the Wisconsin Districts did not consent. The applicable law and Master Service Agreement ("MSA") did not allow for this disclosure. Accordingly, PowerSchool violated Section 3.3.1 of the Wisconsin DPA and committed a material breach of contract.

386.454. Section B.1 of the Wisconsin DPA, entitled "Personal Data Breach," provides that in the course of the investigation of a data breach, "PowerSchool shall take steps to mitigate and remediate the Personal Data Breach." Section B.1 also provides that in such an event, PowerSchool is required to notify the Wisconsin Districts "without undue delay" and "take commercially reasonable steps to assist" the Wisconsin Districts

"in an investigation of the Data Breach."

~~387.~~455. PowerSchool detected the Data Breach on December 28, 2024, but did not notify customers until at least January 7, 2025—a delay of ten days. ~~Relative to transcripts, PowerSchool did not notify any school districts within seventy two hours.~~ This undue delay was a material breach of contract that has left the Wisconsin Districts scrambling to determine the potential exposure of PII.

~~388.~~456. PowerSchool failed to take steps to mitigate and remediate the Data Breach ~~and its other breaches~~, as the Wisconsin Districts have yet to understand the full extent and scope of the impact of the Data Breach ~~and its other breaches~~. PowerSchool has failed to take commercially reasonable steps to assist the Wisconsin Districts by providing them with necessary information sought by the Wisconsin Districts' faculty, students, and parents of students.

~~389.~~457. Accordingly, PowerSchool violated Section B.1 of the Wisconsin DPA which has materially frustrated the benefit the Wisconsin Districts reasonably expected to receive under their contracts.

~~390.~~458. As a direct and proximate result of PowerSchool's breaches of contract, the Wisconsin Districts have suffered monetary and other damages. These include out-of-pocket costs and expenses incurred for:

a. additional wages paid to staff members to address the Data Breach ~~and other breaches~~;
b. increased workload on administrative staff for managing affected data and addressing concerns from parents, students, and faculty;
c. expenses for hiring cybersecurity experts to investigate the breach;
d. costs for cybersecurity experts to assess potential risks to students, parents, and staff;
e. fees for cybersecurity experts to provide recommendations on securing the schools' data;
f. legal consultation costs to determine potential liability;

g. legal expenses to understand regulatory compliance obligations;

h. legal fees to prepare for potential lawsuits from affected individuals;

i. expenses to transition data from PowerSchool to a different, more secure platform;

j. technical support costs associated with data transfer;

k. costs for staff training on the new system;

l. expenses for implementing improved security measures;

m. lost opportunity costs from redirecting school staff to mitigate the breach's impact;

n. wages lost due to time spent monitoring and responding to identity theft risks;

o. costs for providing credit monitoring services to affected students, parents, and faculty;

p. expenses for identity theft protection services for those impacted by the Data Breach;

q. ongoing monitoring costs due to delayed or hidden fraudulent activity;

r. future legal and expert consultation expenses to manage ongoing risks of PII exposure;

s. expenses for drafting and sending notification letters/emails to affected individuals;

t. costs for setting up support hotlines or response teams for inquiries; and

u. administrative expenses for responding to concerns from students, parents, and faculty about potential identity theft.

~~391.~~459. All of these out-of-pocket losses were foreseeable to PowerSchool when it entered into contracts with the Wisconsin Districts given PowerSchool's familiarity with the Wisconsin Districts' status as public School Districts and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and

omissions through which PowerSchool committed material breaches of contract.

~~392.~~460. In committing the acts and omissions that have directly and proximately caused the Wisconsin Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under the Wisconsin DPA. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Wisconsin Districts and to those whose PII the Wisconsin Districts entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to the Wisconsin Districts flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing these breaches of contract and causing the Wisconsin Districts' substantial monetary losses.

~~393.~~461. As a direct and proximate result of PowerSchool's breaches of contract, the Wisconsin Districts were deprived of the full benefit of data security protection that they were promised under their contracts with PowerSchool. The Wisconsin Districts still have not received the benefit that the Wisconsin Districts bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~394.~~462. The Wisconsin Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~395.~~463. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Wisconsin Districts seek to recover all available general damages, special damages, expectation damages, consequential damages, incidental damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other available damages sufficient to compensate the Wisconsin Districts for their

individual injuries.

## COUNT 14

## Violation of Wisconsin's Deceptive Trade Practices Act

## (On Behalf of the Wisconsin Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)

~~396.~~464. The Wisconsin Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~397.~~465. Wisconsin Stat. § 100.18, which is often referred to as the Wisconsin Deceptive Trade Practices Act ("DTPA"), provides in relevant part that "no person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of … anything … shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated or placed before the public, in this state, …. an advertisement, announcement, statement or representation of any kind … which … contains any assertion, representation or statement of fact which is untrue, deceptive or misleading."

~~398.~~466. The Wisconsin DTPA provides that any person suffering pecuniary loss because of a violation of the statute may sue for damages therefor in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees.

~~399.~~467. Before entering into contracts with the Wisconsin Districts, PowerSchool published on its website the statement that PowerSchool "invests in updated security technology and adheres to strict security regulations" while representing on its website that it supposedly did these acts to "keep your data secure." Also through its website, PowerSchool represented itself as an "industry leader for protected private data." PowerSchool made representations to members of the public that they could "trust" PowerSchool to safeguard and protect children's personal information.

~~400.~~468. The representation that PowerSchool invests in updated security technology and adheres to strict security regulations was untrue, deceptive, and

misleading. PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi-factor authentication method to gain access to this highly sensitive personal information.

~~401.~~469. The representation that PowerSchool was an industry leader for protected private data was untrue, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII, but led consumers to reasonably believe that PowerSchool went above and beyond these standards with respect to protecting children's private information.

~~402.~~470. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. These included failures to:

a. properly encrypt data;
b. implement multi-factor authentication;
c. monitor for unauthorized access;
d. ensure that its staff was adequately trained to recognize and respond to cyber threats;
e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and
f. isolate sensitive student and teacher data from other less secure systems.

~~403.~~471. As such, the representation that PowerSchool could be trusted to secure data was misleading and deceptive because PowerSchool's security measures fell short of what is customarily considered sufficient in terms of data privacy protection.

~~404.~~472. All of the above alleged assertions, representations, or statements caused the Wisconsin Districts to believe that PowerSchool:

a. was an industry leader in data privacy protection;

b. made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure;

c. could be trusted with handling, storing, and securing the sensitive personal information of children contained within the data that PowerSchool obtained as part of the services PowerSchool provided.

~~405.~~473. All of the above alleged assertions, representations, or statements were made by PowerSchool with the intent to sell its product and services, or with the intent to induce a purchase of PowerSchool's product and services.

~~406.~~474. As a result of these false, misleading, and deceptive representations, the Wisconsin Districts sustained monetary losses because these representations were a material and significant factor that contributed to the Wisconsin Districts' decision to purchase PowerSchool's product and services.

~~407.~~475. Because of the direct causal connection between PowerSchool's false, misleading, and deceptive statements and the Wisconsin Districts' resulting pecuniary loss, PowerSchool is statutorily liable to the Wisconsin Districts for fraudulent representation under Wis. Stat. Ann. § 100.18.

~~408.~~476. PowerSchool was unjustly enriched as the result of the fraudulent representations PowerSchool made to the Wisconsin Districts before the Wisconsin Districts and PowerSchool entered into contractual relationships.

~~409.~~477. PowerSchool made these fraudulent representations with reckless and wanton disregard of the rights and safety of members of the public. Therefore, any applicable contractual limitation on the Wisconsin Districts' damages is null and void.

~~410.~~478. In addition to all other damages alleged throughout this Complaint, the Wisconsin Districts are entitled to a full refund of the purchase price for all transactions entered into with PowerSchool from the time that the Wisconsin Districts initially relied on PowerSchool's fraudulent representations. The conduct for which PowerSchool is liable under the DTPA is the kind of conduct that the Wisconsin Legislature sought to deter when it enacted the DTPA, and awarding the Wisconsin

Districts the full purchase price for all monies paid to PowerSchool will further this underlying legislative purpose.

~~411.~~479. As an alternative to the full purchase price of all services the Wisconsin Districts purchased as the result of the false, misleading, and deceptive statements, the Wisconsin Districts are entitled to benefit-of-the-bargain damages in an amount consistent with the diminution in value of the services the Wisconsin Districts believed they were purchasing less the fair value of the product and services that were actually purchased.

~~412.~~480. The Wisconsin Districts have suffered and are suffering pecuniary loss because of PowerSchool's violations of the DTPA, thus entitling the Wisconsin Districts to recover from PowerSchool an amount commensurate with the attorneys' fees, costs, and expenses they have incurred in filing and prosecuting this action.

**(iii) ILLINOIS SCHOOL DISTRICTS**

**COUNT 15**

**Breach of Contract**

**(On Behalf of the Illinois Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~413.~~481. The Illinois School District Plaintiffs (the "Illinois Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~414.~~482. The Illinois Districts and PowerSchool are parties to contracts which incorporate the Illinois DPA.

~~415.~~483. At all relevant times, the Illinois Districts fully performed their obligations under their contracts with PowerSchool.

~~416.~~484. The Illinois DPA states in Article IV, Section 1 that PowerSchool "shall comply with all applicable federal, state, and local laws, rules, and regulations pertaining to Student Data privacy and security, all as may be amended from time to time."

~~417.~~485. In rendering services to the Illinois Districts, PowerSchool did not

comply with several federal and state laws, rules, and regulations. Through PowerSchool's unreasonable conduct with respect to its data security practices and procedures, PowerSchool violated at least:

a. Section 5 of the FTC Act;

b. the Illinois Personal Information Protections Act;

c. the Illinois Student Online Personal Protection Act; and

d. the Illinois Biometric Information Privacy Act.

418.486. When their contracts were made, the Illinois Districts reasonably expected PowerSchool to comply with state and federal laws and regulations that address storing, collecting, and protecting data containing the PII that the Illinois Districts entrusted to PowerSchool. The Illinois Districts would not have entered into contracts with PowerSchool if they knew that PowerSchool was continuously operating its business in an unlawful manner, especially given the highly sensitive nature of the PII PowerSchool represented it would protect from disclosure.

419.487. Therefore, PowerSchool's failure to perform its obligation under Article IV, Section 1 of the Illinois DPA constitutes a material breach of contract.

420.488. The Illinois DPA incorporates Exhibit "F" which delineates PowerSchool's Data Security Requirements. Exhibit F states:

> The Education Security and Privacy Exchange ("Edspex") works in partnership with the Student Data Privacy Consortium and industry leaders to maintain a list of known and credible cybersecurity frameworks which can protect digital learning ecosystems chosen based on a set of guiding cybersecurity principles* ("Cybersecurity Frameworks") that may be utilized by Provider.

421.489. Following this statement, Exhibit F identifies the Cybersecurity Framework "Information technology - Security techniques - Information security management systems (ISO 27000 series)," published and maintained by the International Standards Organization, as the set of guiding cybersecurity principles that PowerSchool promises to utilize. In rendering services to the Illinois Districts pursuant to contract,

PowerSchool failed to abide by numerous standards set forth in the ISO 27000 series, including:

a. using data encryption to protect the confidentiality and integrity of private data;

b. implementing secure authentication mechanisms such as multi-factor authentication;

c. promptly detecting, reporting, and responding to incidents involving a security compromise;

d. ensuring all employees receive appropriate security training;

e. conducting regular risk assessments and reviews of data security measures; and

f. aligning public claims and policy statements consistent with the data security practices actually implemented.

~~422.~~490. When their contracts were made, the Illinois Districts reasonably expected that PowerSchool would implement and maintain the ISO 27000 series standards in the interest of protecting the privacy of students, parents, and teachers. The Illinois Districts' agreement to pay PowerSchool all amounts due under contract and subsequent performance of that obligation was substantially based on PowerSchool's reciprocal promise to implement these standards, and the Illinois Districts reasonably believed that PowerSchool had done so and would continue to do so.

~~423.~~491. Thus, the failure by PowerSchool to abide by ISO 27000 series standards was a material breach of contract.

~~424.~~492. In Article V, Section 3 of the Illinois DPA, PowerSchool agrees "to utilize commercially reasonable administrative, physical, and technical safeguards designed to protect Student Data from unauthorized access, disclosure, acquisition, destruction, use, or modification."

~~425.~~493. PowerSchool failed to perform its obligations under Article V, Section 3 of the Illinois DPA in that PowerSchool:

a. failed to implement multi-factor authentication to protect against unauthorized access;

b. stored sensitive student data without encryption at rest;

c. maintained inadequate internal access controls within its PowerSource support tool, allowing unauthorized database access;

d. utilized the PowerSource tool, which lacked appropriate segmentation or isolation from core student information system databases;

e. failed to maintain or activate a written incident response plan prior to or during the Breach;

f. failed to adequately train its employees on data security protocols and breach prevention;

g. retained outdated and unnecessary student data, including historical records from prior school years, without applying data minimization or destruction protocols;

h. failed to provide timely and direct notice of the Data Breach to affected students, parents, and faculty members;

i. failed to conduct or document independent security audits or vulnerability assessments prior to the breach; and

j. only began implementing stronger security controls after the Data Breach occurred, indicating its prior safeguards were commercially unreasonable.

~~426.~~494. The Illinois Districts reasonably believed that PowerSchool was utilizing commercially reasonable standards to protect students' data when their contracts were made and reasonably relied on PowerSchool's representation that it was doing so throughout the parties' contractual relationship. The Illinois Districts would not have purchased PowerSchool's products and services if they knew PowerSchool was in fact acting in a commercially unreasonable manner that would foreseeably allow for the unauthorized disclosure of students' PII that occurred in the Data Breach. Thus, PowerSchool committed a material breach of contract through the failure to perform

PowerSchool's obligations under Article 5, Section 3.

~~427.~~495. Article V, Section 4 of the Illinois DPA states that in the event of a data breach, PowerSchool will notify the Illinois Districts "within the most expedient time possible and without unreasonable delay, but no later than five (5) calendar days after the determination that a breach has occurred."

~~428.~~496. PowerSchool notified the Illinois Districts of the Data Breach at least ten days after learning that the Data Breach occurred, an unreasonable delay that diminished, constrained, and limited the Illinois Districts' ability to learn who possessed the PII and which PII had been compromised.

~~429.~~497. The Illinois Districts reasonably believed that PowerSchool would perform its obligation as it promised in the event of a breach of security to this highly sensitive data that was in PowerSchool's care, custody, and control pursuant to contract. PowerSchool's failure to do so has been to the Illinois Districts' detriment and deprived them of the benefits of early notification. These lost benefits and detriments include, but are not limited to:

a. missed opportunity to shut down unauthorized access or secure exposed systems sooner;
b. delay in alerting students, parents, and staff, leaving them vulnerable to identity theft or fraud;
c. critical evidence being lost or overwritten, making it more difficult to determine how the Data Breach occurred;
d. difficulty understanding what data was compromised, such as Social Security numbers, addresses, grades, or health records;
e. increased risk of non-compliance with data protection laws like FERPA or state data breach notification laws;
f. inability to activate internal response teams or involve law enforcement in a timely manner;
g. lack of control over messaging, damaging trust with parents, staff, and the

community;

h. lost time to update passwords, secure systems, and educate users on phishing risks stemming from the Data Breach; and

i. higher costs for credit monitoring, legal support, and cybersecurity consulting due to expanded damage given the length of exposure.

~~430.~~498. As such, the Illinois Districts have lost benefits that they reasonably believed they would receive when they entered into contracts with PowerSchool. PowerSchool committed a material breach of contract through its failure to perform in accordance with its notification obligation under the Illinois DPA.

~~431.~~499. As a direct and proximate consequence of PowerSchool's breaches of contract identified herein, the Illinois Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for:

a. additional wages paid to staff members to address the breach wages paid to staff members to address the Data Breach~~ and PowerSchool' other breaches~~;

b. increased workload on administrative staff for managing affected data and addressing concerns from parents, students, and faculty;

c. expenses for hiring cybersecurity experts to investigate the breach;

d. costs for cybersecurity experts to assess potential risks to students, parents, and staff;

e. fees for cybersecurity experts to provide recommendations on securing the schools' data;

f. legal consultation costs to determine potential liability;

g. legal expenses to understand regulatory compliance obligations;

h. legal fees to prepare for potential lawsuits from affected individuals;

i. expenses to transition data from PowerSchool to a different, more secure platform;

j. technical support costs associated with data transfer;

k. costs for staff training on the new system;

l. expenses for implementing improved security measures;

m. lost opportunity costs from redirecting school staff to mitigate the breach's impact;

n. wages lost due to time spent monitoring and responding to identity theft risks;

o. costs for providing credit monitoring services to affected students, parents, and faculty;

p. expenses for identity theft protection services for those impacted by the Data Breach;

q. ongoing monitoring costs due to delayed or hidden fraudulent activity;

r. future legal and expert consultation expenses to manage ongoing risks of PII exposure;

s. expenses for drafting and sending notification letters/emails to affected individuals;

t. costs for setting up support hotlines or response teams for inquiries; and

u. administrative expenses for responding to concerns from students, parents, and faculty about potential identity theft.

~~432.~~500. All of these out-of-pocket losses were foreseeable to PowerSchool when it entered into contracts with the Illinois Districts made given PowerSchool's familiarity with the Illinois Districts' status as public School Districts and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of the acts and omissions through which PowerSchool committed material breaches of contract.

~~433.~~501. In committing the acts and omissions that have directly and proximately caused the Illinois Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm

to the Illinois Districts and those whose PII the Illinois Districts entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to the Illinois Districts flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing breaches of contract and causing the Illinois Districts' substantial monetary losses.

~~434.~~502. As a direct and proximate result of PowerSchool's breaches of contract, the Illinois Districts were deprived of the full benefit of data security protection that was promised under contract. The Illinois Districts have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~435.~~503. The Illinois Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof of these damages at the time of trial.

~~436.~~504. Based upon all of PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Illinois Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other available damages sufficient to compensate the Illinois Districts for their injuries as allowable by law.

**~~COUNT 16~~**

**~~Violation of the Illinois Deceptive Trade Practices Act~~**

**~~(On Behalf of the Illinois Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)~~**

~~437. The Illinois Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.~~

~~438. The Illinois Uniform Deceptive Trade Practices Act provides that a "person~~

engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation," the person does any of the following: "(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; ... (5) represents that goods or services have sponsorship, approval, characteristics ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; ... (7) represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another; ... (9) advertises goods or services with intent not to sell them as advertised; ... [and] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding."[24]

439. The Illinois Districts and PowerSchool are both "persons" within the meaning of 815 Ill. Comp. Stat. 510/1(5).

440. The PowerSchool products and services sold to the Illinois Districts were not of the particular sponsorship, approval, characteristics, ingredients, uses benefits, or qualities represented by PowerSchool.

441. The PowerSchool products and services sold to the Illinois Districts were not of the particular standard, quality, and/or grade represented by PowerSchool.

442. PowerSchool caused to be made or disseminated through Illinois and the United States, through advertising, marketing, and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care PowerSchool should have known to be untrue and misleading to consumers, including the Illinois Districts.

443. PowerSchool is in violation of the Illinois Uniform Deceptive Trade Practices Act because its misrepresentations and omissions regarding the trustworthiness, reliability, and security of the PII entrusted to it were material and likely to deceive a

---

[24] 815 Ill. Comp. Stat. 510/2.

reasonable consumer.

444. The Illinois Districts have suffered injuries in fact, including the loss of money or property, resulting from PowerSchool's unfair, unlawful, and/or deceptive practices. In purchasing PowerSchool's products and services, the Illinois Districts relied on PowerSchool's misrepresentations and/or omissions with respect to the safeguards PowerSchool implemented to protect the PII of students, parents, and faculty from unauthorized disclosure.

445. PowerSchool's representation that PowerSchool invests in updated security technology and adheres to strict security regulations was untrue, deceptive, and misleading. PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi-factor authentication method to gain access to this highly sensitive personal information.

446. The representation that PowerSchool was an industry leader for protected privacy data was untrue, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.

447. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. These included failures by PowerSchool to:

a. properly encrypt data;

b. implement multi-factor authentication;

c. monitor for unauthorized access;

d. ensure that its staff was adequately trained to recognize and respond to cyber threats;

e. regularly and proactively patch vulnerabilities that could be exploited by

hackers; and

f. properly isolate sensitive student and teacher data from other less secure systems.

448. As such, the representation that PowerSchool could be trusted to secure data was misleading and deceptive because PowerSchool's security measures fell short of what is customarily considered sufficient in terms of data privacy protection.

449. All of the above alleged assertions, representations, or statements caused the Illinois Districts to believe that PowerSchool:

a. was an industry leader in data privacy protection;

b. made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure; and

c. could be trusted with handling, storing, and securing the sensitive personal information of children contained within the data that PowerSchool obtained as the result of PowerSchool's services.

450. All of these assertions, representations, or statements were made by PowerSchool with the intent to sell its product and services, or with the intent to induce a purchase of PowerSchool's product and services.

451. Had the Illinois Districts known that these representations were untrue or that PowerSchool's data protection practices and procedures fell well below what is considered adequate in this industry, the Illinois Districts would not have purchased PowerSchool's products and services or would not have paid as much for them. Accordingly, the Illinois Districts did not receive the benefit of their bargain.

452. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of PowerSchool's business. PowerSchool's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the state of Illinois and nationwide.

453. PowerSchool's conduct was committed knowingly, intentionally, recklessly,

~~with malice, and/or in wanton disregard of the rights and safety of members of the public.~~

~~454. As a result of the foregoing wrongful conduct of PowerSchool, the Illinois Districts seek and are entitled to:~~

~~a. permanent and preliminary injunctive relief upon terms that the Court considers reasonable;~~

~~b. costs of suit;~~

~~c. attorneys' fees; and~~

~~d. all such further relief as the Court deems just and proper.~~

**~~COUNT 17~~**

**~~Violation of the Illinois Biometric Information Privacy Act~~**

**~~(On Behalf of the Illinois Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)~~**

~~455. The Illinois Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.~~

~~456. Under the Illinois Biometric Information Privacy Act ("BIPA"), PowerSchool is and at all relevant times was a "private entity" as that term is defined in 740 Ill. Comp. Stat. Ann. 14/10.~~

~~457. The BIPA places obligations on private entities that store, transmit, collect, or otherwise handle individuals' biometric information. On information and belief, PowerSchool was in possession of biometric identifiers and biometric information belonging to students in the Illinois Districts through its collection of Application Technology Meta Data. This included the collection and storage of data containing students' fingerprints, voiceprints, and/or scans of hands or facial geometry.~~

~~458. PowerSchool enables students and others to log in to its smartphone application, PowerSchool Mobile, by using biometric identifiers including Face ID, Touch ID, or Secure PIN.~~

~~459. As a private entity in possession of this data containing biometric identifiers and biometric information, PowerSchool was required to do the following pursuant to 740~~

~~Ill. Comp. Stat. Ann. 14/15(e):~~

~~a. store, transmit, and protect from disclosure all biometric identifiers and biometric information using the reasonable standard of care within the private entity's industry; and~~

~~b. store, transmit, and protect from disclosure all biometric identifiers and biometric information in a manner that is the same as or more protective than the manner in which the private entity stores, transmits, and protects other confidential and sensitive information.~~

~~460. PowerSchool's conduct in storing and being required to protect from disclosure the biometric identifiers and information of students and others in the Illinois Districts fell woefully below the reasonable standard of care, as the data containing this information was as easily accessible and susceptible to theft as the other PII that was compromised in the Data Breach.~~

~~461. In failing to exercise reasonable care with respect to the collection and protection of this biometric information, PowerSchool violated 740 Ill. Comp. Stat. Ann. 14/15(e).~~

~~462. The BIPA further provides, in relevant part, that "[a]ny person aggrieved by a violation of this Act shall have a right of action in a State circuit court or as a supplemental claim in federal district court against an offending party."[25] The Act is construed to confer broad standing in furtherance of its preventative and deterrent purposes, and to advance the public welfare, security, and safety as the sole enforcement mechanism to ensure that private entities comply with their legal obligations to properly secure and protect biometric information.[26]~~

~~463. As a result of PowerSchool's violations of the BIPA, the Illinois Districts~~

---

~~[25] 740 Ill. Comp. Stat. Ann. 14/20(a).~~

~~[26] *See Rosenbach v. Six Flags Ent. Corp.*, 129 N.E.3d 1197, 1207 (Ill. 2019); 740 Ill. Comp. Stat. Ann. 14/5.~~

were and are aggrieved. Biometric information is contained within the data that was compromised, which the Illinois Districts must monitor to keep students, parents, and faculty informed about the implications of the Data Breach. This highly sensitive and personal information holds substantial monetary value and there is a present and ongoing security risk that this biometric information can be purchased on the Dark Web and used to gain access to the private accounts of students and others whose PII was stolen. The Illinois Districts have incurred and/or will incur significant costs in connection with notifying affected individuals, providing credit monitoring or identity protection services, legal consultation, and internal investigations and audits, all of which are directly attributable to PowerSchool's failure to reasonably store and protect the biometric information in its possession.

464. Therefore, the Illinois Districts have been aggrieved as the direct, proximate, and legal result of PowerSchool's violations of the BIPA.

465. PowerSchool's conduct in violation of the BIPA was intentional and/or reckless. The BIPA has been the law in Illinois since 2008 and Defendant violated the statute continuously and knowingly while engaged in business in the State of Illinois by continuously failing to take any reasonable steps in protecting the biometric information that PowerSchool stored and needed to protect from disclosure.

466. On account of PowerSchool's intentional and/or reckless violations of BIPA, the Illinois Districts seek and are entitled to:

a. liquidated damages of $5,000 or actual damages, whichever is greater;
b. reasonable attorneys' fees and costs, including expert witness fees and other litigation expenses;
c. other relief, including but not limited to an injunction ordering PowerSchool to immediately cease and desist its collection of biometric information, as the Court may deem appropriate; and
d. all such further relief as the Court may deem just and proper.

**(iv) SOUTH CAROLINA SCHOOL DISTRICTS**

## COUNT 18

## Breach of Contract

## (On Behalf of the South Carolina Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)

~~467.~~505. The South Carolina School District Plaintiffs (the "South Carolina Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~468.~~506. The South Carolina Districts and PowerSchool are parties to contracts which incorporate the South Carolina DPA.

~~469.~~507. At all relevant times, the South Carolina Districts fully performed their obligations under their contracts with PowerSchool.

~~470.~~508. The South Carolina DPA provides in Section 4 that: " . . . PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk."

~~471.~~509. PowerSchool failed to perform its obligation under Section 4 because PowerSchool failed to encrypt sensitive PII that was the subject of the Data Breach, despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term because the South Carolina Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. By virtue of this failure, PowerSchool committed a material breach of contract.

~~472.~~510. Section 3.3.1 of the South Carolina DPA provides that: "PowerSchool shall not . . . [u]se sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

~~473.~~511. The Data Breach provided hackers with unauthorized access and has

created the opportunity for the potential sale of students', parents', and faculty members' PII on the Dark Web. PowerSchool further disclosed transcripts of students to unauthorized parties and student and parent emails.

474.512. Hackers exported entire student and teacher databases without authorization. Therefore, PowerSchool allowed for the disclosure of data to which the South Carolina Districts did not consent. The applicable law and Master Service Agreement ("MSA") did not allow for this disclosure. Accordingly, PowerSchool violated Section 3.3.1 of the South Carolina DPA and committed a material breach of contract.

475.513. Section B.1 of the South Carolina DPA, entitled "Personal Data Breach," provides that in the course of the investigation of a data breach, "PowerSchool shall take steps to mitigate and remediate the Personal Data Breach." Section B.1 also provides that in such an event, PowerSchool is required to notify the South Carolina Districts "without undue delay" and "take commercially reasonable steps to assist" the South Carolina Districts "in an investigation of the Data Breach."

476.514. PowerSchool detected the Data Breach on December 28, 2024, but did not notify customers until at least January 7, 2025—a delay of ten days. This undue delay was a material breach of contract that has left the South Carolina Districts scrambling to determine the potential exposure of PII. PowerSchool failed to notify school districts of the other breaches in a timely manner.

477.515. PowerSchool failed to take steps to mitigate and remediate the Data Breach, as the South Carolina Districts have yet to understand the full extent and scope of the impact of the Data Breach. PowerSchool has failed to take commercially reasonable steps to assist the South Carolina Districts by providing them with necessary information sought by the South Carolina Districts' faculty, students, and parents of students.

478.516. Accordingly, PowerSchool violated Section B.1 of the South Carolina DPA which has materially frustrated the benefit the South Carolina Districts reasonably expected to receive under contract.

479.517. As a direct and proximate consequence of PowerSchool's breaches of

contract identified herein, the South Carolina Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for:

a. additional wages paid to staff members to address the breach wages paid to staff members to address the Data Breach ~~and other breaches~~;
b. increased workload on administrative staff for managing affected data and addressing concerns from parents, students, and faculty;
c. expenses for hiring cybersecurity experts to investigate the breach;
d. costs for cybersecurity experts to assess potential risks to students, parents, and staff;
e. fees for cybersecurity experts to provide recommendations on securing the schools' data;
f. legal consultation costs to determine potential liability;
g. legal expenses to understand regulatory compliance obligations;
h. legal fees to prepare for potential lawsuits from affected individuals;
i. expenses to transition data from PowerSchool to a different, more secure platform;
j. technical support costs associated with data transfer;
k. costs for staff training on the new system;
l. expenses for implementing improved security measures;
m. lost opportunity costs from redirecting school staff to mitigate the breach's impact;
n. wages lost due to time spent monitoring and responding to identity theft risks;
o. costs for providing credit monitoring services to affected students, parents, and faculty;
p. expenses for identity theft protection services for those impacted by the Data Breach;
q. ongoing monitoring costs due to delayed or hidden fraudulent activity;

r. future legal and expert consultation expenses to manage ongoing risks of PII exposure;

s. expenses for drafting and sending notification letters/emails to affected individuals;

t. costs for setting up support hotlines or response teams for inquiries;

u. administrative expenses for responding to concerns from students, parents, and faculty about potential identity theft; and

v. loss of public funding correlating with declining enrollment and increased private school voucher opt-ins by parents.

~~480.~~518. All of these out-of-pocket losses were foreseeable to PowerSchool when it entered into contracts with the South Carolina Districts made given PowerSchool's familiarity with the South Carolina Districts' status as public School Districts and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of the acts and omissions through which PowerSchool committed material breaches of contract.

~~481.~~519. In committing the acts and omissions that have directly and proximately caused the South Carolina Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's contractual duties. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the South Carolina Districts and those whose PII the South Carolina Districts entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to the South Carolina Districts flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing these breaches of contract and causing the South Carolina Districts' substantial monetary losses.

~~482.~~520. As a direct and proximate result of PowerSchool's breaches of

contract, the South Carolina Districts were deprived of the full benefit of data security protection that was promised under their contracts with PowerSchool. The South Carolina Districts have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~483.~~521. The South Carolina Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof of these damages at the time of trial.

~~484.~~522. Based upon all of PowerSchool's various failures to perform obligations that amount to material breaches of contract, the South Carolina Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other available damages sufficient to compensate the South Carolina Districts for their injuries as allowable by law.

**~~COUNT 19~~**

**~~Violation of South Carolina's Unfair Trade Practices Act~~**

**~~(On Behalf of the South Carolina Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)~~**

~~485. The South Carolina Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.~~

~~486. The South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-20 *et seq.*, prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."~~

~~487. The South Carolina Districts and PowerSchool are "persons" as defined by S.C. Code Ann. § 39-5-10(a).~~

~~488. The South Carolina Districts are and were at all relevant times residents of South Carolina who purchased PowerSchool's products and services in South Carolina.~~

489. PowerSchool, at all times mentioned herein, engaged in "trade" or "commerce" in South Carolina, as defined by S.C. Code Ann. § 39-5-10(b), in that PowerSchool advertised, offered for sale, sold, and distributed Defendant's products in South Carolina.

490. The SCUTPA further provides, in relevant part, that "[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by Section 39 5 20 may bring an action individually, but not in a representative capacity, to recover actual damages."[27]

491. For all the reasons set forth in the foregoing allegations, PowerSchool violated and continues to violate the SCUTPA by engaging in the deceptive and unfair acts or practices proscribed by S.C. Code Ann. §§ 39-5-10 *et seq*. PowerSchool's acts and practices, including its material omissions and concealment, described herein, were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

492. PowerSchool repeatedly advertised on its website that PowerSchool "invests in updated security technology and adheres to strict security regulations" while representing that it did so to "keep your data secure." Also through its website, PowerSchool advertised itself as an "industry leader for protected private data." PowerSchool continually used advertisements and promotions of its services to make representations to members of the public that they could "trust" PowerSchool to safeguard and protect children's personal and private information.

493. The representation that PowerSchool was an industry leader for protecting private data was unfair, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII,

[27] S.C. Code Ann. § 39 5 140(a).

but one that went above and beyond these standards with respect to protecting children's private information.

494. PowerSchool's advertisements wherein PowerSchool represented that members of the public could "trust" PowerSchool when it came to protecting the personal information of children was unfair, deceptive, and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. These included PowerSchool's failures to:

a. properly encrypt data;

b. implement multi-factor authentication;

c. monitor for unauthorized access;

d. ensure that its staff was adequately trained to recognize and respond to cyber threats;

e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and

f. properly isolate sensitive student and teacher data from other less secure systems.

495. PowerSchool concealed and failed to disclose these failures, all of which was material information that exposed its woefully deficient practices and procedures in place for the protection of data containing children's PII, while PowerSchool simultaneously represented itself to be an industry leader for data protection that could be trusted to secure this data.

496. PowerSchool's representations and omissions were material because they were likely to deceive reasonable consumers to induce them to purchase PowerSchool's products and services without being aware that PowerSchool's data security systems or practices were actually deficient and substandard, and that these deficiencies placed the private information of children and others at an elevated risk of being compromised and stolen when in the custody, care, and possession of PowerSchool.

497. PowerSchool induced School District consumers, including the South

~~Carolina Districts, to enter into transactions with PowerSchool by taking advantage of School Districts' limited financial resources and their need for a comprehensive online system to organize the personal information of students and employees. PowerSchool at all relevant times knew that the South Carolina Districts relied on PowerSchool for the protection and security of this private, personal, and highly sensitive data, which predominately contained the PII of children. Therefore, PowerSchool's unfair and deceptive acts were offensive to public policy, and were immoral, unethical, and oppressive.~~

~~498. PowerSchool continuously accepted payments from school district consumers while at all relevant times knowing that PowerSchool was not providing the services it continuously advertised and represented it was providing. PowerSchool also knew that school districts, reliant on public funding, reasonably believed that PowerSchool was providing the quality of data protection and security services that PowerSchool advertised itself to be providing, both before and during the course of PowerSchool's contractual relationship with the South Carolina Districts and other school districts. These unfair and deceptive acts were offensive to public policy, and were immoral, unethical, and oppressive.~~

~~499. PowerSchool's unfair acts and practices affected the public interest because PowerSchool sought to and did take advantage of the South Carolina Districts' need for services of the kind PowerSchool provided. PowerSchool continually accepted payments from the South Carolina Districts and other school districts with the knowledge that these payments were substantially comprised of public funds, all the while knowing that PowerSchool's procedures, systems, and practices with respect to data protection and security did not conform to what PowerSchool had advertised and represented.~~

~~500. PowerSchool's unfair and deceptive conduct in trade or commerce injuriously affected the people of South Carolina whose children attend public schools, and whose tax payments fund public school districts that ultimately act as consumers in the market for PowerSchool's products and services.~~

~~501. PowerSchool's deceptive and unfair trade practices caused injury in fact and actual damages to the South Carolina Districts in the form of the loss or diminishment of value of PowerSchool's products and services that the South Carolina Districts purchased, which allowed PowerSchool to profit at the expense of the South Carolina Districts. PowerSchool's deceptive and unfair trade practices further caused injury in fact and actual damages to the South Carolina Districts in the form of costs and expenses the South Carolina Districts have incurred resulting from the Data Breach, including, but not limited to: (i) additional wages paid to the South Carolina Districts' staff members; (ii) expert expenses to understand the nature of the Data Breach's consequences; (iii) legal expenses related to potential liabilities; (iv) future expenses to migrate data to a new vendor; and (v) notification costs to ensure that affected employees, students, and parents are made aware of the Data Breach and subsequent developments related to information about the many potential consequences of the Data Breach.~~

~~502. The injuries to the South Carolina Districts were to their legally protected interests. The gravity of the harm of PowerSchool's actions is significant and there is no corresponding benefit to consumers. PowerSchool's unfair and deceptive conduct was not permitted under laws administered by any regulatory body or officer acting under statutory authority of South Carolina or the United States, and PowerSchool's unfair and deceptive actions were not permitted by South Carolina law.~~

~~503. PowerSchool's unlawful conduct is continuing, with no indication of PowerSchool's intent to cease this fraudulent, deceptive, and unfair course of conduct, posing a threat of future harm to the South Carolina Districts and the individuals whose PII the South Carolina Districts entrusted to PowerSchool, such that prospective injunctive relief is necessary.~~

~~504. PowerSchool's use or employment of the unfair and deceptive methods of trade or commerce described herein was committed in willful and knowing violation of the SCUTPA.~~

~~505. The South Carolina Districts seek relief for the injuries they have suffered as~~

a result of PowerSchool's unfair and deceptive acts and practices, including, but not limited to, actual damages, restitution, penalties, injunctive and declaratory relief, attorneys' fees and/or costs, as well as any other just and proper relief, as provided by S.C. Code Ann. § 39-5-140(a) and applicable law. In light of PowerSchool's willful and knowing violation of the SCUTPA, the South Carolina Districts seek an award of monetary damages in an amount that is no less than three times the actual damages sustained, in addition to all other relief they seek herein.

**(v) NEW YORK SCHOOL DISTRICTS**

**COUNT 20**

**Breach of Contract**

**(On Behalf of the New York Districts Against Defendants PowerSchool Holdings, Inc.PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

506.523. The New York School District Plaintiffs (the "New York Districts") reallege and incorporate paragraphs 1 through 309401 above as if fully set forth herein.

507.524. The New York Districts and PowerSchool are parties to contracts which incorporate the New York DPA.

508.525. At all relevant times, the New York Districts fully performed their obligations under their contracts with PowerSchool.

509.526. In Section 5(d) of the New York DPA, PowerSchool agreed "to maintain appropriate administrative, technical and physical safeguards in accordance with industry standard practices and applicable law to protect the security, confidentiality and integrity of Protected Information in its custody."

510.527. At a minimum, PowerSchool failed to adhere to industry standard practices and applicable law by failing to use encryption that would have made the stolen data unreadable without a key, and by failing to implement multi-factor authentication which would have avoided the Data Breach altogether.

511.528. The failure to adhere to industry standards was a violation of the FTC Act, 15 U.S.C. § 45. As alleged above, PowerSchool's security and protection protocols

fell short of the appropriate administrative, technical, and physical safeguards that were necessary to protect the security, confidentiality, and integrity of the PII in PowerSchool's custody.

~~512.~~529. This was a material term because the New York Districts relied on PowerSchool's promise to perform its lawful obligations with respect to the security of students' and employees' PII. The New York Districts relied on this promise when they entered into contracts with PowerSchool and throughout the duration of their contractual relationship with PowerSchool.

~~513.~~530. Therefore, PowerSchool's violation of Section 5(d) of the New York DPA constitutes a material breach of contract. The New York Districts are entitled to all damages that they have sustained in consequence of this breach, all of which were foreseeable to PowerSchool at the time it entered into contracts with the New York Districts.

~~514.~~531. In Section 10 of the New York DPA, entitled "Data Security and Privacy Plan," PowerSchool agreed "[t]o implement all state, federal, and local data security and privacy requirements . . . "

~~515.~~532. Among the promises made in Section 10, PowerSchool agreed that in order "to protect the security, confidentiality and integrity of the Customer Data that it receives under the MSA," PowerSchool would have "reasonable physical, administrative, and technical safeguards and practices in place" throughout the term of its contracts with the New York Districts. To accomplish these aims, PowerSchool purported to assure the New York Districts that PowerSchool:

a. would ensure that both data-at-rest and data-in-transit (motion) is encrypted, and data leak protections are implemented;
b. possessed a vulnerability management plan that will be developed and implemented; and
c. manages remote access through credentials and identities that are issued, verified, managed, audited, and revoked, as applicable, for authorized

devices, processes, and users.

~~516.~~533. In Section 11 of the New York DPA, PowerSchool agreed "that PII will be encrypted using industry standard data encryption technology while Protected Information is in motion and at rest."

~~517.~~534. PowerSchool failed to perform its obligations under Sections 10 and 11 the New York DPA because PowerSchool failed to encrypt sensitive PII that was the subject of the Data Breach, despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term because the New York Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. By virtue of this failure, PowerSchool committed a material breach of contract.

~~518.~~535. Section 5(f) of the New York DPA required PowerSchool to "promptly notify" the New York Districts "without unreasonable delay" of "(i) any unauthorized release or unauthorized Processing of Confidential Information . . . ; or (ii) any other breach of contractual obligations relating to data privacy and security under this Agreement or any other applicable Agreement." Section 5(f) further provides that "[i]n no event shall such notification occur more than forty-eight (48) hours after confirmation of an event described in clause (i) of the previous sentence, or more than seven (7) calendar days after confirmation of an event described in clause (ii) of the previous sentence."

~~519.~~536. PowerSchool detected and confirmed the Data Breach on December 28, 2024, but did not notify customers, including the New York Districts, until January 7, 2025—a delay of ten days. This was an undue delay that exceeded the acceptable length of time under contract and constitutes a material breach of contract that has left the New York Districts scrambling to determine the potential exposure of PII.

~~520.~~537. Accordingly, PowerSchool violated Section 5(f) of the New York DPA which has materially frustrated the benefit the New York Districts reasonably

expected to receive under contract.

~~521.~~538. As a direct and proximate result of PowerSchool's various breaches of contract identified above, the New York Districts have suffered monetary and other damages. These include the additional out-of-pocket costs for wages and expenses related to the handling of the Data Breach ~~and other breaches~~ which are comprised of, but are not limited to:

a. additional wages paid to staff members to address the breach wages paid to staff members to address the Data Breach ~~and other breaches~~;
b. increased workload on administrative staff for managing affected data and addressing concerns from parents, students, and faculty;
c. expenses for hiring cybersecurity experts to investigate the breach;
d. costs for cybersecurity experts to assess potential risks to students, parents, and staff;
e. fees for cybersecurity experts to provide recommendations on securing the schools' data;
f. legal consultation costs to determine potential liability;
g. legal expenses to understand regulatory compliance obligations;
h. legal fees to prepare for potential lawsuits from affected individuals;
i. expenses to transition data from PowerSchool to a different, more secure platform;
j. technical support costs associated with data transfer;
k. costs for staff training on the new system;
l. expenses for implementing improved security measures;
m. lost opportunity costs from redirecting school staff to mitigate the breach's impact;
n. wages lost due to time spent monitoring and responding to identity theft risks;
o. costs for providing credit monitoring services to affected students, parents,

and faculty;

p. expenses for identity theft protection services for those impacted by the Data Breach;

q. ongoing monitoring costs due to delayed or hidden fraudulent activity;

r. future legal and expert consultation expenses to manage ongoing risks of PII exposure;

s. expenses for drafting and sending notification letters/emails to affected individuals;

t. costs for setting up support hotlines or response teams for inquiries; and

u. administrative expenses for responding to concerns from students, parents, and faculty about potential identity theft.

~~522.~~539. All of these out-of-pocket losses were foreseeable to PowerSchool when it entered into contracts with the New York Districts given PowerSchool's familiarity with the New York Districts' status as public School Districts and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of the acts and omissions through which PowerSchool committed material breaches of contract.

~~523.~~540. In committing the acts and omissions that have directly and proximately caused the New York Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's contractual duties. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the New York Districts and those whose PII the New York Districts entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to the New York Districts flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing these breaches of contract and causing the New York Districts' substantial monetary losses.

~~524.~~541. As a direct and proximate result of PowerSchool's breaches of contract, the New York Districts were deprived of the full benefit of data security protection that was promised under their contracts with PowerSchool. The New York Districts have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach~~ and other breaches~~.

~~525.~~542. The New York Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach~~ and other breaches~~. The total amount of these losses will be determined subject to proof of these damages at the time of trial.

~~526.~~543. Based upon all of PowerSchool's various failures to perform obligations that amount to material breaches of contract, the New York Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other available damages sufficient to compensate the New York Districts for their injuries as allowable by law.

**COUNT 21**

**Violation of New York General Business Law § 349 *et seq*.**

**(On Behalf of the New York Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~527.~~544. The New York Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~528.~~545. New York General Business Law Section 349(a) ("Gen. Bus. Law § 349") declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

~~529.~~546. The New York Districts are "persons" within the meaning of N.Y. Gen. Bus. Law § 349(h) because they are consumers who seek remedies for the injury or harm to the public interest caused by PowerSchool.

~~530.~~547. Defendants are "person[s], firm[s], corporation[s] or association[s]" within the meaning of Gen. Bus. Law § 349(b).

~~531.~~548. PowerSchool engaged in deceptive acts and practices in the conduct of its business, trade, and commerce, in violation of N.Y. Gen. Bus. Law § 349, including: (i) failing to develop, implement, and maintain reasonable security and privacy measures to protect the PII of the New York Districts' students and employees from unauthorized disclosure; (ii) failing to implement sufficient risk management protocols to mitigate the foreseeable security or privacy risks to the PII the New York Districts relied on PowerSchool to protect and secure; (iii) failing to reasonably or sufficiently its security or privacy measures or systems to reasonably safeguard the PII of the New York Districts' students and employees from unauthorized disclosure; (iv) failing to comply with legal duties requiring PowerSchool to reasonably secure and safeguard the PII of students, which includes highly sensitive student records; (v) misleading the New York Districts to believe that PowerSchool would secure and safeguard the PII that the New York Districts entrusted to PowerSchool by, among other things, misrepresenting the security or privacy measures or systems PowerSchool put in place; and (vi) failing to timely or sufficiently disclose the material fact that, because of PowerSchool's misconduct, the PII of the New York Districts' students and employees was compromised, subject to the Data Breach, and viewed, accessed, downloaded, misused, or stolen by third parties without the New York Districts' knowledge or consent.

~~532.~~549. PowerSchool's deceptive acts and practices, including but not limited to those stated herein, were a direct and proximate cause of the Data Breach.

~~533.~~550. PowerSchool's concealment of the true timing and scope of the Data Breach was material to the New York Districts.

~~534.~~551. The conduct alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of Gen. Bus. Law § 349. As such, the New York Districts seek monetary damages and the entry of preliminary and permanent injunctive relief against PowerSchool, requiring PowerSchool to implement reasonable and

sufficient safeguards over user data to prevent further unauthorized disclosure.

~~535.~~552. PowerSchool made affirmative misrepresentations to the New York Districts that PowerSchool was securely collecting, maintaining, and safeguarding the highly sensitive PII from unauthorized disclosure. PowerSchool, however, concealed, and suppressed material facts concerning its unreasonable security and privacy measures, the unauthorized disclosure of PII in the Data Breach, and the full scope of the data that was compromised in the Data Breach.

~~536.~~553. PowerSchool had an ongoing duty to the New York Districts to refrain from unfair and deceptive practices. Specifically, PowerSchool owed the New York Districts a duty to disclose all the material facts regarding the unauthorized disclosure of the highly sensitive PII of their faculty, employees, students, parents and guardians of students, and others, including without limitation student records protected by FERPA.

~~537.~~554. The New York Districts had no way of discerning that PowerSchool's representations were false and misleading because they did not have access to PowerSchool's internal technology, data storage, or privacy systems and software.

~~538.~~555. PowerSchool thus violated Gen. Bus. Law § 349 by making statements that, when considered from the perspective of the reasonable consumer, conveyed that PowerSchool users' highly sensitive PII was secure and safeguarded from unauthorized disclosure.

~~539.~~556. PowerSchool intentionally and knowingly made affirmative misrepresentations and failed to disclose material facts regarding PowerSchool's failure to safeguard PII after discovering the Data Breach. PowerSchool knew or should have known that its conduct violated Gen. Bus. Law § 349.

~~540.~~557. PowerSchool owed the New York Districts a duty to safeguard the highly sensitive PII that they entrusted to PowerSchool, and to alert them of any unauthorized disclosure in a timely manner with specificity.

~~541.~~558. The New York Districts suffered ascertainable losses and actual damages as a direct and proximate result of PowerSchool's misrepresentations, and

PowerSchool's concurrent concealment of and failure to disclose material information. PowerSchool had an ongoing duty to all its customers and the public to refrain from unfair and deceptive practices. The New York Districts incurred and/or will continue to incur costs, including for, among other things, additional wages paid to their staff members, expert expenses to understand the nature of the breach's consequences, legal expenses related to potential liabilities, and future expenses to migrate data to a new vendor.

~~542.~~559. Moreover, the New York Districts were injured by PowerSchool because, among other things, PowerSchool's actions caused them to not receive the full value of the services that they reasonably expected to receive when they purchased PowerSchool's products and services.

~~543.~~560. As a direct and proximate result of PowerSchool's deceptive acts and practices, the New York Districts are now injured in fact and will continue to be injured because they must continually provide information to students, parents, and employees about: (i) the implications of the theft of these individuals' PII, which includes highly sensitive medical information; (ii) imminent injury from identity theft; (iii) inability to mitigate the risks of identity theft and fraud due to PowerSchool's untimely notifications of the Data Breach; and (iv) loss of privacy. The New York Districts will also be responsible, at least in part, for the payment of costs to remedy or mitigate the effects of the Data Breach. These costs include, but are not limited to, payment for credit monitoring services.

~~544.~~561. PowerSchool's deceptive and unlawful practices affected the public interest and consumers generally, including hundreds (if not thousands) of New Yorkers affected by the Data Breach.

~~545.~~562. PowerSchool's deceptive and unlawful practices present a continuing risk to the New York Districts as well as to the general public. PowerSchool's unlawful acts and practices complained of herein affect the public interest because of, among other things, the substantial number of citizens whose highly sensitive PII data remains at risk while in PowerSchool's possession.

~~546.~~563. The New York Districts seek monetary relief against PowerSchool in an amount up to three times the amount of actual damages they have sustained, to be determined at trial, because PowerSchool willfully or knowingly committed these deceptive and unlawful acts and practices in violation of Gen. Bus. Law § 349. The New York Districts also seek an order enjoining PowerSchool's deceptive acts and practices, attorneys' fees, and any other just and proper relief under Gen. Bus. Law § 349.

**COUNT 22**

**Violation of the New York Deceptive Sales Practices Act**

**(On Behalf of the New York Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~547.~~564. The New York Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~548.~~565. New York General Business Law § 350 ("Gen. Bus. Law § 350") provides, in part, that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

~~549.~~566. Gen. Bus. Law § 350(a)(1) provides, in part, the following:

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual.

~~550.~~567. PowerSchool made statements and omissions that were untrue or misleading and disseminated the misleading statements in New York. PowerSchool disseminated such statements and omissions through advertising, marketing, policies, and other publications. PowerSchool knew or through the exercise of reasonable care should

have known that such statements and omissions were untrue and misleading.

~~551.~~568. PowerSchool's security and privacy representations contain untrue and materially misleading statements and omissions regarding the adequacy of PowerSchool's security and privacy measures. PowerSchool made numerous material and affirmative misrepresentations and omissions of fact with intent to mislead and deceive concerning PowerSchool's systems to safeguard the PII belonging to the New York Districts' employees, students, parents and guardians of students, and others. Specifically, before entering into contracts with the New York Districts, PowerSchool published on its website the statement that PowerSchool "invests in updated security technology and adheres to strict security regulations" while representing on its website that it did so to "keep your data secure." Also through its website, PowerSchool represented itself as an "industry leader for protected private data." PowerSchool made representations to members of the public that they could "trust" PowerSchool to safeguard and protect children's personal information.

~~552.~~569. The representation that PowerSchool invests in updated security technology and adheres to strict security regulations was untrue, deceptive, and misleading. PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi-factor authentication method to gain access to this highly sensitive personal information.

~~553.~~570. The representation that PowerSchool was an industry leader for protected privacy data was untrue, deceptive, and misleading because it characterized PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.

~~554.~~571. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic

measures to ensure that this personal information was protected. Among these were PowerSchool's failures to:

a. properly encrypt data;
b. implement multi-factor authentication;
c. monitor for unauthorized access;
d. ensure that its staff was adequately trained to recognize and respond to cyber threats;
e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and
f. properly isolate sensitive student and teacher data from other less secure systems.

~~555.~~572. As such, the representation that PowerSchool could be trusted to secure data was misleading and deceptive because PowerSchool's security measures fell short of what is customarily considered sufficient in terms of data privacy protection.

~~556.~~573. All of the above alleged assertions, representations, or statements caused the New York Districts to believe that PowerSchool:

a. was an industry leader in data privacy protection;
b. made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure; and
c. could be trusted with handling, storing, and securing the sensitive personal information of children contained within the data that PowerSchool obtained as the result of PowerSchool's services.

~~557.~~574. All of the above alleged assertions, representations, or statements were made by PowerSchool with the intent to sell its product and services, or with the intent to induce a purchase of PowerSchool's product and services.

~~558.~~575. As a result of these false, misleading, and deceptive representations, the New York Districts sustained monetary losses because they were induced to purchase

PowerSchool's product and services.

~~559.~~576. PowerSchool intentionally concealed and suppressed material facts concerning the identification of the Data Breach, the disclosure of the PII that the New York Districts entrusted to PowerSchool, the scope of the Data Breach, and the reasons for the Data Breach. PowerSchool knew, based on its own investigations, that the Data Breach occurred and impacted the PII of thousands of individuals. PowerSchool intentionally and grossly defrauded the New York Districts about the security of the PII in PowerSchool's systems.

~~560.~~577. PowerSchool's advertisements contain untrue and materially misleading statements regarding the nature and quality of the products and services that PowerSchool advertises, markets, and sells.

~~561.~~578. The New York Districts have been injured inasmuch as they relied upon the advertising and paid for a product that did not conform to PowerSchool's representations. Accordingly, the New York Districts received less than what they bargained for.

~~562.~~579. PowerSchool's advertising with respect to its security and protection of PII induced the New York Districts to buy PowerSchool's products and services.

~~563.~~580. PowerSchool knew, or by exercising reasonable care should have known, that these statements and representations were untrue and/or misleading.

~~564.~~581. PowerSchool made these material misrepresentations on its website and in other promotional materials that it disseminated throughout New York.

~~565.~~582. PowerSchool's unlawful acts and practices complained of herein affect the public interest because of, among other things, the substantial number of citizens whose highly sensitive PII data remains at risk while in PowerSchool's possession.

~~566.~~583. PowerSchool's material misrepresentations were substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all individuals seeking educational services were exposed, and continue to be exposed, to

PowerSchool's material misrepresentations and omissions.

~~567.~~584. As a result of PowerSchool's false or misleading advertising, the New York Districts are entitled to monetary damages, statutory damages, injunctive relief, restitution, disgorgement of all monies obtained by means of PowerSchool's unlawful conduct, interest, and attorneys' fees and costs.

~~568.~~585. As a direct and proximate result of PowerSchool's violation of New York General Business Law § 350, the New York Districts also suffered an ascertainable loss of monies. By reason of the foregoing, the New York Districts also seek actual damages or statutory damages of $500 per violation, whichever is greater, as well as punitive damages.[28]

~~569.~~586. PowerSchool made these untrue and misleading statements and representations willfully, wantonly, and with reckless disregard for the truth. Because PowerSchool's conduct was committed willingly and knowingly, the New York Districts seek and are entitled to three times the amount of their actual damages, up to $10,000. The New York Districts also seek an order enjoining PowerSchool's false advertising, attorneys' fees, and any other just and proper relief under Gen. Bus. Law § 350.

**~~COUNT 23~~**

**~~Violation of the New York Education Law~~**

**~~(On Behalf of the New York Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)~~**

~~570. The New York Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.~~

~~571. Under New York Education Law § 2-d ("Educ. Law § 2-d"), third party contractors are subject to requirements with respect to the storage and protection of students' PII. PowerSchool is a third party contractor pursuant to Educ. Law § 2-d(1)(d)~~

[28] *See* N.Y. Gen. Bus. Law § 350-e.

because PowerSchool is an "entity, other than an educational agency, that receives student data or teacher or principal data from an educational agency pursuant to a contract or other written agreement for purposes of providing services to such educational agency, including but not limited to data management or storage services . . . ."

572. Subsection 6(a) of Educ. Law § 2-d requires that any third-party contractor notify the educational agency immediately in the event of a security breach that results in an unauthorized release of student data.

573. Subsection 5(b)(3) of Educ. Law § 2-d specifies that third party contractors must implement safeguards such as data encryption and incident response plans, and limit access to PII to authorized individuals. PowerSchool failed to implement these safeguards, resulting in the unauthorized release of PII that the New York Districts, as educational agencies, provided and entrusted to PowerSchool.

574. Subsection 5(b)(2) of Educ. Law § 2-d mandates data security protections, including data encryption, monitoring, and incident response plans. PowerSchool failed to use data encryption or establish proper monitoring systems to prevent the Data Breach.

575. Subsection 5(c) of Educ. Law § 2-d requires that third party contractors adhere to the educational agency's data security and privacy policies. PowerSchool did not ensure adequate compliance with these standards and policies in possessing and purportedly protecting the PII of students, faculty, and parents.

576. Subsection 6(c) of Educ. Law § 2-d provides that the third party contractor must reimburse the educational agency for the full cost of notification in the event of a breach involving the unauthorized release of student data. Since PowerSchool failed to comply with notification requirements in a timely manner, it is obligated to cover these costs, which it has not done.

577. As a result of all the aforementioned actions and omissions of PowerSchool in violation of Educ. Law § 2-d, the New York Districts seek damages for the full amount of costs incurred in connection with notification to affected individuals whose PII was compromised in the Data Breach.

578. In addition, Educ. Law § 2-d provides that each of the violations above "shall be punishable by a civil penalty of the greater of five thousand dollars or up to ten dollars per student," not to exceed two hundred fifty thousand dollars.[29] This remedy is not limited to New York public officials responsible for enforcing the law.

579. PowerSchool knowingly and/or recklessly committed all of the above acts and omissions in violation of Educ. Law § 2-d.

580. Therefore, the New York Districts seek statutory damages in amount that is the greater of five thousand dollars or up to ten dollars per student, in addition to all other damages the New York Districts are entitled to recover under applicable law.

**(vi)-VERMONT SCHOOL DISTRICTS**

**COUNT 24**

**Breach of Contract**

**(On Behalf of the Vermont Districts Against Defendants PowerSchool Holdings, Inc.PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

581.587. The Vermont School District Plaintiffs (the "Vermont Districts") reallege and incorporate paragraphs 1 through 309401 above as if fully set forth herein.

582.588. The Vermont Districts and PowerSchool are parties to contracts which incorporate the Vermont DPA.

583.589. At all relevant times, the Vermont Districts fully performed their obligations under their contracts with PowerSchool.

584.590. The Vermont DPA provides in Article V, Section 3 that PowerSchool "agrees to utilize commercially reasonable administrative, physical, and technical safeguards designed to protect Student Data from unauthorized access, disclosure, acquisition, destruction, use, or modification." This Section also provides that PowerSchool "shall adhere to any applicable law relating to data security."

[29] N.Y. Educ. Law § 2-d(6)(d).

~~585.~~591. PowerSchool substantially failed to perform its promises under Article V, Section 3 because PowerSchool failed to utilize commercially reasonable administrative, physical, and technical safeguards to protect the PII of students that the Vermont Districts entrusted to PowerSchool from unauthorized access, disclosure, and acquisition. Commercially reasonable safeguards would have included, at a minimum, the utilization of end-to-end encryption to make stolen data unreadable without a key and the implementation of multi-factor authentication that likely would have prevented the Data Breach altogether.

~~586.~~592. PowerSchool also failed to perform under Article V, Section 3 of the Vermont DPA in that PowerSchool did not adhere to applicable law relating to data security. In storing, collecting, and maintaining the data containing PII, PowerSchool violated:

a. Section 5 of the FTC Act (15 U.S.C. § 45);
b. HIPAA (45 C.F.R. § 164.530(c)(l));
c. Vermont's Document Safe Destruction Act;[30] and
d. Vermont statutes that impose specific requirements on operators of online services used primarily for PreK-12 school purposes pertaining to the protection of students' private information.[31]

~~587.~~593. The Vermont Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to utilize commercially reasonable safeguards to protect students' PII from unauthorized disclosure and/or access, and the Vermont Districts reasonably believed that PowerSchool would utilize such safeguards when their contracts were made.

~~588.~~594. The Vermont Districts reasonably expected PowerSchool to comply with state and federal laws and regulations that address storing, collecting, and protecting

---

[30] *See* Vt. Stat. Ann. tit. 9, § 2445 *et seq*.
[31] *See* Vt. Stat. Ann. tit. 9, §§ 2443–2443f.

data containing the PII that they entrusted to PowerSchool when their contracts were made. The Vermont Districts would not have entered into contracts with PowerSchool if they knew that PowerSchool was continuously operating its business in an unlawful manner, especially given the highly sensitive nature of the PII that PowerSchool represented it would protect from disclosure.

~~589.~~595. Thus, PowerSchool breached Article V, Section 3 of the Vermont DPA and thereby committed a material breach of contract through PowerSchool's nonperformance of its obligations to utilize commercially reasonable administrative, physical, and technical safeguards to protect the PII of students and to adhere to applicable law in storing, collecting, and maintaining data that contained this PII.

~~590.~~596. Also in Article V, Section 3 of the Vermont DPA, PowerSchool promises that its "Cybersecurity Framework is aligned with the nationally recognized standard selected in Exhibit 'F', subject to appropriate exclusions, variations, or exemptions as determined by [PowerSchool]." Incorporated in the Vermont DPA, Exhibit F states:

> The Education Security and Privacy Exchange ("Edspex") works in partnership with the Student Data Privacy Consortium and industry leaders to maintain a list of known and credible cybersecurity frameworks which can protect digital learning ecosystems chosen based on a set of guiding cybersecurity principles* ("Cybersecurity Frameworks") that may be utilized by Provider.

~~591.~~597. Following this statement, Exhibit F identifies the Cybersecurity Framework "Information technology - Security techniques - Information security management systems (ISO 27000 series)," published and maintained by the International Standards Organization, as the set of guiding cybersecurity principles that PowerSchool promises to utilize. In rendering services to the Vermont Districts, PowerSchool failed to abide by ISO 27000 series because PowerSchool failed to:

a. use data encryption to protect the confidentiality and integrity of private data;

b. implement secure authentication mechanisms such as multi-factor

authentication;

c. promptly detect, report, and respond to incidents involving a security compromise;

d. ensure that all employees received appropriate security training;

e. conduct regular risk assessments and reviews of data security measures; and

f. align public claims and policy statements regarding data security with the practices and procedures that PowerSchool actually implemented.

~~592.~~598. When their contracts were made, the Vermont Districts reasonably expected that PowerSchool would implement and maintain the ISO 27000 series standards in the interest of protecting the privacy of students, parents, and teachers. The Vermont Districts' agreement to pay PowerSchool all amounts due under their contracts and subsequent performance of their obligations was substantially based on PowerSchool's reciprocal promise to implement these standards, and the Vermont Districts reasonably believed that PowerSchool had implemented these standards and would keep them in place.

~~593.~~599. Thus, the failure by PowerSchool to abide by ISO 27000 series standards was a material breach of contract.

~~594.~~600. Article V, Section 4 of the Vermont DPA, entitled "Data Breach," states that in the event of a data breach, PowerSchool will notify the Vermont Districts "within the most expedient time possible and without unreasonable delay, but no later than five (5) calendar days, unless specified differently in Exhibit G, after the determination that a breach has occurred, unless notification within this time limit would disrupt investigation of the incident by law enforcement."

~~595.~~601. PowerSchool notified the Vermont Districts of the Data Breach at least ten days after learning that the Data Breach had occurred, an unreasonable delay that diminished, constrained, and limited the Vermont Districts' ability to learn who possessed the PII and which PII had been compromised.

~~596.~~602. Exhibit G does not specify PowerSchool's notification obligations

differently from what is stated in Article V, Section 4. There has been no indication that notification within five days of the time that PowerSchool became aware of the Data Breach would have disrupted investigation of the incident by law enforcement, as PowerSchool unilaterally investigated the Data Breach and paid the ransom to the cybercriminals involved in gaining unauthorized access to the data containing PII without assistance or input from law enforcement agencies or personnel.

~~597.~~603. The Vermont Districts reasonably believed that PowerSchool would perform its obligation in the event of a breach of security to this highly sensitive data that was in PowerSchool's care, custody, and control. PowerSchool's failure to do so has been to the Vermont Districts' detriment and deprived them of the benefits of timely notification. These lost benefits and detriments include, but are not limited to:

a. missed opportunity to shut down unauthorized access or secure exposed systems sooner;
b. delay in alerting students, parents, and staff, leaving them vulnerable to identity theft or fraud;
c. critical evidence being lost or overwritten, making it more difficult to determine how the Data Breach occurred;
d. difficulty understanding what data was compromised, such as Social Security numbers, addresses, grades, or health records;
e. increased risk of non-compliance with data protection laws like FERPA or state data breach notification laws;
f. inability to activate internal response teams or involve law enforcement in a timely manner;
g. lack of control over messaging, damaging trust with parents, staff, and the community;
h. lost time to update passwords, secure systems, and educate users on phishing risks stemming from the Data Breach; and
i. higher costs for credit monitoring, legal support, and cybersecurity

consulting due to expanded damage given the length of exposure.

~~598.~~604. As such, the Vermont Districts have lost benefits that they reasonably believed they would receive when they entered into contracts with PowerSchool. PowerSchool breached Article V, Section 4 of the Vermont DPA and thereby committed a material breach of contract through its failure to perform in accordance with its notification obligation under the Vermont DPA.

~~599.~~605. Article V, Section 4 of the Vermont DPA further provides that PowerSchool "agrees to adhere to all applicable federal and state requirements with respect to a data breach related to the Student Data, including, when appropriate or required, the required responsibilities and procedures for notification and mitigation of any such data breach." Likewise, Section 4 requires PowerSchool "to have a written incident response plan that reflects reasonable best practices and is consistent with industry standards and federal and state law for responding to a data breach, breach of security, privacy incident or unauthorized acquisition or use of Student Data or any portion thereof, including personally identifiable information."

~~600.~~606. Under Vermont's Security Breach Notice Act ("SBNA"), PowerSchool was required to provide notification of the Data Breach to affected individuals "in the most expedient time possible and without unreasonable delay … "[32]

~~601.~~607. The SBNA further specifies that with respect to "computerized data containing personally identifiable information or login credentials," PowerSchool was required to notify the Vermont Districts, as licensees responsible for entrusting PowerSchool with this PII, of the "security breach immediately following discovery of the breach … "[33]

~~602.~~608. PowerSchool detected the Data Breach on December 28, 2024, but did not notify customers until at least January 7, 2025—a delay of ten days. This unreasonable

[32] Vt. Stat. Ann. tit. 9, § 2435(b)(1).
[33] Vt. Stat. Ann. tit. 9, § 2435(b)(2).

delay was a violation the Vermont DPA and Vermont law that has left the Vermont Districts scrambling to determine the potential exposure of PII. This delay departed from industry standards and violated these provisions of the SBNA.

~~603.~~609. The Vermont Districts reasonably expected that PowerSchool would comply with its lawful obligations following any compromise of the security of students' PII at the time their contracts were made. The Vermont Districts would not have entered into contracts with PowerSchool if they had known that PowerSchool would fail to provide timely notice of a breach to the security of this data if and when such a breach occurred.

~~604.~~610. In light of this unreasonable delay in providing notification of the Data Breach that constituted a violation of the SBNA, PowerSchool breached Article V, Section 4 of the Vermont DPA and thereby committed a material breach of contract.

~~605.~~611. As a direct and proximate consequence of PowerSchool's breaches of contract identified herein, the Vermont Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the items listed in paragraph ~~136 above~~205 above.

~~606.~~612. All of these out-of-pocket losses were foreseeable to PowerSchool when the contracts with the Vermont Districts were made given PowerSchool's familiarity with the Vermont Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of the acts and omissions through which PowerSchool committed material breaches of contract.

~~607.~~613. In committing the acts and omissions that have directly and proximately caused the Vermont Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Vermont Districts and those whose PII the Vermont

Districts entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to the Vermont Districts flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing breaches of contract and causing the Vermont Districts' substantial monetary losses.

~~608.~~614. As a direct and proximate result of PowerSchool's breaches of contract, the Vermont Districts were deprived of the full benefit of data security protection that was promised under their contracts. The Vermont Districts have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~609.~~615. The Vermont Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof of these damages at the time of trial.

~~610.~~616. Based upon all of PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Vermont Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other available damages sufficient to compensate the Vermont Districts for their injuries.

**~~COUNT 25~~**

**~~Violation of the Vermont Consumer Protection Act~~**

**~~(On Behalf of the Vermont Districts Against Defendants PowerSchool Holdings, Inc.PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)~~**

~~611. The Vermont Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.~~

~~612. The Vermont Consumer Protection Act ("VCPA"), Vt. Stat. Ann. tit. 9, § 2453 et seq., provides that "unfair or deceptive acts or practices in commerce are hereby~~

declared unlawful."

613. The Vermont Districts are and were at all relevant times herein "consumers" of PowerSchool's products and services as defined under Vt. Stat. Ann. tit. 9, § 2451a(1).

614. PowerSchool is and was at all relevant times a "seller" of PowerSchool's products and services as defined under Vt. Stat. Ann. tit. 9, § 2451a(3).

615. For all the reasons set forth in the foregoing allegations, PowerSchool engaged in unfair, deceptive, or fraudulent acts or practices with respect to PowerSchool's representations about PowerSchool's data security practices and procedures in connection with the sale of PowerSchool's products and services.

616. PowerSchool also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of PowerSchool's products and services.

617. PowerSchool repeatedly represented on its website that PowerSchool "invests in updated security technology and adheres to strict security regulations" while representing that it did so to "keep your data secure." Also through its website, PowerSchool represented that it was an "industry leader for protected private data." PowerSchool continually made representations to members of the public that they could "trust" PowerSchool to safeguard and protect children's personal and private information.

618. The representation that PowerSchool was an industry leader for protecting private data was unfair, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.

619. PowerSchool's representation that members of the public could "trust" PowerSchool when it came to protecting the personal information of children was unfair, deceptive, and misleading. In fact, PowerSchool failed to implement the most basic

~~measures to ensure that this personal information was protected. At a minimum, these includes PowerSchool's failure to: included, at a minimum~~

~~a. properly encrypt data;~~

~~b. implement multi-factor authentication;~~

~~c. monitor for unauthorized access;~~

~~d. ensure that its staff was adequately trained to recognize and respond to cyber threats;~~

~~e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and~~

~~f. properly isolate sensitive student and teacher data from other less secure systems.~~

~~620. PowerSchool omitted, concealed, and failed to disclose these deficiencies. These omissions were material as they exposed PowerSchool's woefully deficient practices and procedures in place for the protection of data containing children's PII. All the while, PowerSchool simultaneously represented itself to be an industry leader for data protection that could be trusted to secure this data.~~

~~621. All of PowerSchool's representations and omissions mentioned herein were likely to mislead consumers.~~

~~622. The Vermont Districts' interpretation of PowerSchool's representations was reasonable under the circumstances given the nature of PowerSchool's business and the fact that PowerSchool held a position of market dominance in terms of the services it provided to schools and school districts throughout the United States.~~

~~623. The misleading effects of PowerSchool's representations, omissions, and practices were material because they were likely to deceive reasonable consumers to induce them to purchase PowerSchool's products and services without being aware that PowerSchool's data security systems or practices were actually deficient and substandard, and that these deficiencies placed the private information of children and others at an elevated risk of being compromised and stolen when in the custody, care, and possession~~

of PowerSchool.

624. PowerSchool induced school district consumers, including the Vermont Districts, to enter into transactions with PowerSchool by taking advantage of school districts' limited financial resources and their need for a comprehensive online system to organize the personal information of students and employees. PowerSchool at all relevant times knew that the Vermont Districts relied on PowerSchool for the protection and security of this private, personal, and highly sensitive data, which predominately contained the PII of children. Therefore, PowerSchool's unfair and deceptive acts were offensive to public policy, and were immoral, unethical, and oppressive.

625. PowerSchool continuously accepted payments from school district consumers while at all relevant times knowing that PowerSchool was not providing the services it continuously advertised and represented it was providing. PowerSchool also knew that school districts, reliant on public funding, reasonably believed that PowerSchool was providing the quality of data protection and security services that PowerSchool advertised itself to be providing, both before contracts were made and during the course of PowerSchool's contractual relationship with the Vermont Districts and other school districts. These unfair and deceptive acts were offensive to public policy and were immoral, unethical, and oppressive.

626. PowerSchool's unfair acts and practices affected the public interest because PowerSchool sought to and did take advantage of the Vermont Districts' need for services of the kind PowerSchool provided. PowerSchool continually accepted payments from the Vermont Districts and other school districts with the knowledge that these payments were substantially comprised of public funds, all the while knowing that PowerSchool's procedures, systems, and practices with respect to data protection and security did not conform to what PowerSchool had advertised and represented.

627. PowerSchool's unfair and deceptive conduct in trade or commerce injuriously affected the people of Vermont whose children attend public schools, and whose tax payments fund public school districts that ultimately act as consumers in the

marketplace for PowerSchool's products and services.

628. PowerSchool's deceptive and unfair trade practices directly, substantially, and proximately caused the Vermont Districts to rely on PowerSchool and to contract for PowerSchool's products and services.

629. In addition, Vt. Stat. Ann. tit. 9, § 2443f provides that "[a] person who violates a provision of this chapter commits an unfair and deceptive act in commerce in violation of section 2453 of this title."

630. PowerSchool violated every provision of Vt. Stat. Ann. tit. 9, § 2443b(1)-(3), as alleged in the preceding paragraphs, all of which are part of Subchapter 3A delineating operator duties with respect to protection and security requirements for students' private information.

631. PowerSchool's violations of Vt. Stat. Ann. tit. 9, §§ 2443-2443f were committed within the course and scope of providing services to the Vermont Districts in exchange for payments and resulted as a consequence of the commercial relationship between PowerSchool and the Vermont Districts.

632. Therefore, PowerSchool's violations of Vt. Stat. Ann. tit. 9, § 2443b(1)-(3) were unfair and deceptive acts in commerce and trade as defined under the VCPA.

633. PowerSchool's deceptive and unfair trade practices directly, substantially, and proximately caused injury in fact and actual damages to the Vermont Districts in the form of the loss or diminishment of value of PowerSchool's products and services that the Vermont Districts purchased, which allowed PowerSchool to profit at the expense of the Vermont Districts. PowerSchool's deceptive and unfair trade practices further caused injury in fact and actual damages to the Vermont Districts in the form of costs and expenses the Vermont Districts have incurred or will incur resulting from the Data Breach, including, but not limited to: (i) additional wages paid to the Vermont Districts' staff members; (ii) expert expenses to understand the nature of the Data Breach's consequences; (iii) legal expenses related to potential liabilities; (iv) future expenses to migrate data to a new vendor; and (v) notification costs to ensure that affected employees,

~~students, and parents are made aware of the Data Breach and subsequent developments related to information about the many potential consequences of the Data Breach.~~

~~634. The injuries to the Vermont Districts were to their legally protected interests. The gravity of the harm of PowerSchool's actions is significant and there is no corresponding benefit to consumers. PowerSchool's unfair and deceptive conduct was unlawful and in direct violation of Section 5 of the FTC Act.~~

~~635. PowerSchool's unlawful conduct is continuing, with no indication of PowerSchool's intent to cease this fraudulent, deceptive, and unfair course of conduct, posing a threat of future harm to the Vermont Districts and the individuals whose PII the Vermont Districts entrusted to PowerSchool, such that prospective injunctive relief is necessary.~~

~~636. PowerSchool's use or employment of the unfair and deceptive methods of trade or commerce described herein was committed in willful and knowing violation of the VCPA.~~

~~637. The Vermont Districts seek relief for the injuries they have suffered as a result of PowerSchool's unfair and deceptive acts and practices, including, but not limited to, all appropriate equitable relief, the full amount of their actual damages, the consideration or the value of the consideration given by the Vermont Districts to PowerSchool in reliance on the false, deceptive, and misleading representations and/or material omissions by PowerSchool, reasonable attorney's fees, exemplary damages up to three times the value of the consideration given by the Vermont Districts to PowerSchool, and all such further relief as the Court may deem just and proper.~~

**(vii) IDAHO SCHOOL DISTRICTS**

**COUNT 26**

**Breach of Contract**

**(On Behalf of the Idaho Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~638.~~617. The Idaho School District Plaintiffs (the "Idaho Districts") reallege

and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~639.~~618. The Idaho Districts and PowerSchool are parties to contracts which incorporate the Idaho DPA.

~~640.~~619. At all relevant times, the Idaho Districts fully performed their obligations under their contracts with PowerSchool.

~~641.~~620. The Idaho DPA sets forth "the terms and conditions pursuant to which any Customer Data will be handled by PowerSchool and permitted third parties during the term of the MSA and after its termination." This Customer Data includes the PII of the Idaho Districts' employees, students, and parents of students, which was compromised and stolen while in the care, custody, and control of PowerSchool.

~~642.~~621. The purpose of the Idaho DPA, by its own terms as stated in Section 2, is to "describe PowerSchool's responsibilities and solutions as a Processor for handling and protecting Customer Data."

~~643.~~622. The Idaho DPA provides in Section 6.1 that "PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained from Customer."

~~644.~~623. PowerSchool failed to perform its obligation under Section 6.1 because PowerSchool failed to safeguard the Data it obtained from the Idaho Districts. This was a material term of contract because a major factor in the decision to entrust PowerSchool with the handling of sensitive PII and to pay PowerSchool for such entrustment was PowerSchool's reciprocal promise to safeguard the PII.

~~645.~~624. Therefore, PowerSchool breached Section 6.1 of the Idaho DPA and thereby committed a material breach of contract. An essential purpose for which contracts were entered into was to safeguard the PII of students and employees within the Idaho Districts while providing an adequate system for organizing and carrying out their operations. This breach has deprived the Idaho Districts of a benefit that they reasonably expected to receive at the time their contracts were made.

~~646.~~625. Section 6.4 of the Idaho DPA provides that: "PowerSchool shall not . . . [u]se, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party

without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

~~647.~~626. The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures, constituting an unauthorized transfer of the PII that has created the opportunity for the potential sale of students', parents', and faculty members' PII on the Dark Web.

~~648.~~627. Hackers exported entire student and teacher databases without authorization. PowerSchool thus allowed for the disclosure of data to which the Idaho Districts did not consent, and neither applicable law nor the ~~Master Service Agreement~~ ~~("~~MSA~~")~~ allowed for this disclosure. As such, PowerSchool breached Section 6.4 of the Idaho DPA and thereby committed a material breach of contract.

~~649.~~628. Ensuring that the PII the Idaho Districts entrusted to PowerSchool was not used, sold, transferred, or disclosed without their consent was an essential purpose for which contracts were made. The Idaho Districts sought to effectively and efficiently provide services to students, parents, and employees in agreeing to purchase PowerSchool's products and services, and they reasonably believed that PowerSchool would not allow for the disclosure of these individuals' Private Information without their consent or as authorized by law.

~~650.~~629. Accordingly, PowerSchool breached Section 6.4 of the Idaho DPA and thereby committed a material breach of contract.

~~651.~~630. Section 7 of the Idaho DPA states, in relevant part, that "PowerSchool shall take reasonable measures to ensure the reliability of employees, agents, and contractors of PowerSchool . . . who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the MSA or this DPA. . . "

~~652.~~631. PowerSchool failed to ensure the reliability of its employees, agents, and contactors as it agreed to in Section 7. These agents, employees, and contractors would have implemented basic procedures and practices such as multi-factor

authentication and data encryption if they could reasonably be called reliable for purposes of ensuring that access to PII was limited to individuals authorized to access the PII under the terms of the Idaho DPA and MSA. The Data Breach is in and of itself evidence of PowerSchool's failure to perform its obligations under Section 7, and PowerSchool has offered no explanation for how PowerSchool took reasonable measures to ensure such reliability as promised in Section 7.

~~653.~~632. When contracts were made, the Idaho Districts reasonably expected that PowerSchool would take reasonable measures to ensure the reliability of PowerSchool's agents, employees, and contractors in limiting the accessibility of PII. The Idaho Districts performed their obligations under contract under the reasonable belief that PowerSchool was adequately performing its reciprocal promise to take reasonable measures to ensure the reliability of PowerSchool employees, agents, and contractors in ensuring limited access to the PII of their students and employees.

~~654.~~633. Therefore, PowerSchool breached Section 7 of the Idaho DPA and thereby committed a material breach of contract.

~~655.~~634. With respect to the processing of data in PowerSchool's possession, the Idaho DPA states in Section 8 that " . . . PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk."

~~656.~~635. PowerSchool failed to perform its obligation under Section 8 because PowerSchool failed to encrypt data containing sensitive PII that PowerSchool processed, and this PII was the subject of the Data Breach. PowerSchool committed this failure despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term of contract because the Idaho Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. The Idaho Districts reasonably believed that PowerSchool would implement these reasonable and obviously appropriate measures when their contracts were made.

~~657.~~636. Therefore, PowerSchool breached Section 8 of the Idaho DPA and thereby committed a material breach of contract.

~~658.~~637. Section 11 of the Idaho DPA sets forth various obligations on the part of PowerSchool in the event of a breach of the security of personal data entrusted to PowerSchool by the Idaho Districts. Among these obligations, Section 11 obligates PowerSchool to take steps to mitigate and remediate the data breach; notify the Idaho Districts without undue delay; provide the Idaho Districts with sufficient information to permit them to make a determination as to any notification obligations under federal, state, or local laws and regulations; and cooperate with the Idaho Districts and take commercially reasonable steps to assist them in an investigation of the breach.

~~659.~~638. Upon learning of the Data Breach, PowerSchool was obligated to perform its obligations as stated in Section 11 of the Idaho DPA. PowerSchool substantially or entirely failed to do so, as PowerSchool instead took no steps in furtherance of mitigation or remediation of the Data Breach, beyond receiving purported assurances that the PII would not be sold or used from the hackers who risked criminal prosecution in accessing and acquiring the PII; notified the Idaho Districts of the Data Breach at least ten days after learning that the Data Breach had occurred, an undue delay that diminished, constrained, and limited their ability to learn who possessed the PII and which PII had been compromised; failed to provide the Idaho Districts information that would be sufficient for them to readily and adequately determine the scope of their legal obligations to notify students, parents, and employees; and failed to take commercially reasonable steps to assist the Idaho Districts in an investigation of the Data Breach by keeping them in the dark about it for such a time that any investigation would be fruitless.

~~660.~~639. The Idaho Districts reasonably expected PowerSchool to perform its duties under Section 11 when their contracts were made. Understanding that there is always some risk involved in storing sensitive data even when adequate security measures are implemented, the Idaho Districts were assured that they could react in a timely and organized fashion to address the negative implications should a breach occur. The Idaho

Districts continued to perform their obligations under this reasonable belief and have now been prejudiced by PowerSchool's undue delay that has lessened their ability to proactively notify affected individuals, determine their legal obligations, and investigate the potential exposure of PII. PowerSchool has failed to mitigate or remedy the consequences of the Data Breach but has instead acted in a commercially unreasonable manner by paying a ransom to the cybercriminals who compromised the PII when the Idaho Districts had no way of knowing the Data Breach had even occurred.

~~661.~~640. Therefore, the actions and omissions of PowerSchool that occurred after the Data Breach were violations of Section 11 of the Idaho DPA which constitute material breaches of contract.

~~662.~~641. Schedule 1-C of the Idaho DPA addresses the subject of data security. Section A.1 states: "PowerSchool agrees to abide by and maintain adequate data security measures, consistent with industry standards for digital storage of Customer Data, to protect Customer Data from unauthorized disclosure or acquisition by an unauthorized person." Following this statement, the Idaho DPA imposes several obligations of PowerSchool with respect to data security measures, including obligations to:

a. secure usernames, passwords, and any other means of gaining access to the services or to PII, at a level meeting or exceeding the applicable standards;
b. maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so;
c. employ industry standard measures to protect data from unauthorized access; and
d. conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner.

~~663.~~642. PowerSchool failed to perform its data security obligations that are stated above in that PowerSchool did not

a. secure means of gaining access to usernames and passwords, because PowerSchool did not implement multi-factor authentication or any other available measure consistent with industry standards that would be considered sufficient to meet this obligation;

b. maintain security protocols that met industry standards for monitoring and preventing the unauthorized access, transfer, or transmission of data, as PowerSchool failed to implement end-to-end encryption of data at rest and in transit to prevent unauthorized access, which proximately and directly allowed for the unauthorized viewing, transfer, and transmission of the data containing PII;

c. conduct periodic risk assessments to detect system vulnerabilities before the Data Breach, as such assessments would have led PowerSchool to implement stronger security measures before the Data Breach occurred;

d. conduct security audits or penetration testing that would have allowed PowerSchool to identify and address vulnerabilities to its data security systems before the Data Breach occurred; and

e. have in place a remediation plan, despite being aware of prior cybersecurity threats but still failing to act to strengthen its defenses.

~~664.~~643. Schedule 1-C of the Idaho DPA also created obligations of PowerSchool in the event of a breach of data security. Pursuant to Sections B.1 and B.2 of Schedule C-1, PowerSchool was obligated to do all the following when data was accessed or obtained by an unauthorized individual or third party:

a. provide notification to the Idaho Districts within a reasonable amount of time of confirmation of the Data Breach, not exceeding seventy-two (72) hours;

b. take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of data;

c. provide a security incident notification written in plain language after confirmation of the incident; and

d. provide a list of the types of data that were or are reasonably believed to have been the subject of the Data Breach.

~~665.~~644. PowerSchool failed to perform any of its obligations identified above and stated in Sections B.1 and B.2. PowerSchool detected the Data Breach on December 28, 2024, but did not notify customers until at least January 7, 2025—a delay of ten days. This undue delay was a material breach of contract that has left the Idaho Districts scrambling to determine the potential exposure of PII.

~~666.~~645. The Idaho DPA also included and incorporated Schedule 2-C, which purported to be a data security and privacy plan. Schedule 2-C obligated PowerSchool to do all the following:

a. review its data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws and the terms of the Idaho DPA;

b. implement commercially reasonable efforts to ensure compliance with applicable laws and Idaho DPA terms in the event that PowerSchool's policy and practices were found to not conform with said laws and terms;

c. encrypt data-at-rest and data-in-transit;

d. implement data leak protections and information protection processes and procedures;

e. perform periodic data destruction;

f. develop and implement plan for vulnerability management;

g. ascertain, document, review, log, and audit records according to policy; and

h. issue, verify, manage, audit, and revoke, as applicable, authentication and access control for authorized devices, processes, and users.

~~667.~~646. Schedule 2-C further obligated PowerSchool to manage data security and privacy incidents that implicate PII, including identifying breaches and unauthorized disclosures, and to provide prompt notification of any breaches or unauthorized disclosures of PII.

~~668.~~647. Both before the Data Breach and after it occurred, PowerSchool failed to perform each and every obligation identified above and thereby violated Schedule 2-C of the Idaho DPA.

~~669.~~648. At the time their contracts were made, the Idaho Districts reasonably expected PowerSchool to perform these obligations in the interest of the students, parents, and employees who they serve and seek to protect. In failing failure to perform these obligations, PowerSchool committed material breaches of contract.

~~670.~~649. PowerSchool failed to take steps to mitigate and remediate the Data Breach, as the Idaho Districts have yet to understand the full extent and scope of the impact of the Data Breach. PowerSchool has failed to take commercially reasonable steps to assist the Idaho Districts by providing them with necessary information sought by their faculty, students, and parents of students.

~~671.~~650. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the Idaho Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the out-of-pocket expense items listed in paragraph ~~136 above~~205 above.

~~672.~~651. All of these out-of-pocket losses were foreseeable to PowerSchool when contracts were made given PowerSchool's familiarity with the Idaho Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool committed material breaches of contract.

~~673.~~652. In committing the acts and omissions that have directly and proximately caused the Idaho Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Idaho Districts and to those whose PII they entrusted to PowerSchool.

PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to the Idaho Districts flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing breaches of contract and causing the Idaho Districts' substantial monetary losses.

~~674.~~653. As a direct and proximate result of PowerSchool's breaches of contract, the Idaho Districts were deprived of the full benefit of data security protection that was promised under contract. The Idaho Districts have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~675.~~654. The Idaho Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~676.~~655. Based upon all of PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Idaho Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate them for their injuries as allowable by law.

**COUNT 27**

**Violation of the Idaho Consumer Protection Act**

**(On Behalf of the Idaho Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~677.~~656. The Idaho Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~678.~~657. The Idaho Districts are and at all relevant times were legal entities and, as such, constitute "persons" as defined by Idaho Code Ann. § 48-602(1).

~~679.~~658. PowerSchool is engaged in "trade" or "commerce" within the meaning of Idaho Code Ann. § 48-602(2).

~~680.~~659. The Idaho Consumer Protection Act ("Idaho CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."[34]

~~681.~~660. By the conduct described in detail above and incorporated herein, PowerSchool engaged in unfair or deceptive acts in violation of Idaho Code Ann. § 48-603.

~~682.~~661. PowerSchool's false representations about its data security practices and procedures and concurrent omissions regarding the deficiencies of said data security practices and procedures, which result in an abnormally high risk of unauthorized access to the PII of the Idaho Districts' students and employees, are material facts that a reasonable person would have considered important in deciding whether or not to purchase PowerSchool's products and services.

~~683.~~662. PowerSchool intended for the Idaho Districts to rely on PowerSchool's omissions in conjunction with its representations about PowerSchool being an "industry leader" that consumers could "trust" in storing and protecting PII.

~~684.~~663. The Idaho Districts justifiably acted or relied to their detriment upon PowerSchool's omissions of fact concerning the above-described omissions and representations regarding PowerSchool's data security practices and procedures, as evidenced by their purchase of PowerSchool's products and services.

~~685.~~664. Had PowerSchool disclosed all material information regarding its data security practices and procedures to the Idaho Districts, they would not have purchased PowerSchool's products and services, or would have paid less for these services knowing that they were not sufficient to ensure that there were adequate limitations on access to the PII that they entrusted to PowerSchool.

---

[34] Idaho Code Ann. § 48-603.

~~686.~~665. PowerSchool's omissions have deceived the Idaho Districts, and those same business practices have deceived or are likely to deceive members of the consuming public.

~~687.~~666. In addition to being deceptive, the business practices of PowerSchool were unfair because PowerSchool knowingly sold the Idaho Districts products and services that did not conform to the representations made about these products and services, and it was only a matter of time before the PII of their employees, students, and parents of students would be compromised and stolen. The injuries to the Idaho Districts are substantial and are not greatly outweighed by any alleged countervailing benefit to them or to competition under all of the circumstances. Moreover, in light of PowerSchool's exclusive knowledge of the deficiencies of its data protection and security practices and procedures, the injury is not one that the Idaho Districts could have reasonably avoided.

~~688.~~667. As a direct and proximate result of PowerSchool's unfair and deceptive trade practices, the Idaho Districts have suffered ascertainable monetary loss and actual damages. The Idaho Districts would not have purchased or, alternatively, would have paid less for PowerSchool's products and services had the truth about PowerSchool's data security practices and procedures been disclosed. The Idaho Districts also sustained actual damages measured by the diminished value of the products and services they purchased from PowerSchool in relation to what PowerSchool represented it was providing. The Idaho Districts therefore seek and are entitled to recover actual damages, attorneys' fees and costs, and all other relief allowed under the Idaho CPA.

**(viii) TENNESSEE SCHOOL DISTRICTS**

**COUNT 28**

**Breach of Contract**

**(On Behalf of the Tennessee Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~689.~~668. The Tennessee School District Plaintiffs (the "Tennessee Districts")

reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~690.~~669. The Tennessee Districts and PowerSchool are parties to contracts which incorporate the Tennessee Data Privacy Agreement.

~~691.~~670. At all relevant times, the Tennessee Districts fully performed their obligations under their contracts with PowerSchool.

~~692.~~671. In Article V, Section 3 of the Tennessee DPA, PowerSchool agrees "to utilize commercially reasonable administrative, physical, and technical safeguards designed to protect Student Data from unauthorized access, disclosure, acquisition, destruction, use, or modification."

~~693.~~672. PowerSchool failed to perform its obligations under Article V, Section 3 of the Tennessee DPA in that PowerSchool:

a. failed to implement multi-factor authentication to protect against unauthorized access;
b. stored sensitive student data without encryption at rest;
c. maintained inadequate internal access controls within its PowerSource support tool, allowing unauthorized database access;
d. maintained the PowerSource tool such that it lacked appropriate segmentation or isolation from core student information system databases;
e. failed to maintain or activate a written incident response plan prior to or during the Breach;
f. failed to adequately train its employees on data security protocols and breach prevention;
g. retained outdated and unnecessary student data, including historical records from prior school years, without applying data minimization or destruction protocols;
h. failed to provide timely and direct notice of the Data Breach to affected students, parents, and faculty members;
i. failed to conduct or document independent security audits or vulnerability

assessments prior to the Breach; and

j. only began implementing stronger security controls after the Data Breach occurred, indicating its prior safeguards were commercially unreasonable.

~~694.~~673. The Tennessee Districts reasonably believed that PowerSchool was utilizing commercially reasonable standards to protect students' data when their contracts were made and reasonably relied on PowerSchool's representation that it was doing so throughout the parties' contractual relationship. The Tennessee Districts would not have purchased PowerSchool's products and services if they knew PowerSchool was in fact acting in a commercially unreasonable manner that would foreseeably allow for the unauthorized disclosure of students' PII that occurred in the Data Breach. Thus, PowerSchool breached Article V, Section 3 of the Tennessee DPA and thereby committed a material breach of contract through the failure to perform PowerSchool's obligations under Article V, Section 3.

~~695.~~674. PowerSchool also failed to perform under Article V, Section 3 of the Tennessee DPA in that PowerSchool did not "adhere to applicable law relating to data security" as stated in this Section. In storing, collecting, and maintaining the data containing PII, PowerSchool violated:

a. Section 5 of the FTC Act (15 U.S.C. § 45);

b. HIPAA (45 C.F.R. § 164.530(c)(l)); and

c. the Tennessee Data Accessibility, Transparency and Accountability Act.[35]

~~696.~~675. The Tennessee Districts reasonably expected PowerSchool to comply with applicable state and federal laws and regulations that address storing, collecting, and protecting data containing the PII that they entrusted to PowerSchool when their contracts were made. The Tennessee Districts would not have entered into contracts with PowerSchool if they knew that PowerSchool was continuously operating its business in

---

[35] *See* Tenn. Code Ann. § 49-1-701, *et seq*.

an unlawful manner, especially given the highly sensitive nature of the PII PowerSchool represented it would protect from disclosure.

~~697.~~676. Also in Article V, Section 3 of the Tennessee DPA, PowerSchool promises that its "Cybersecurity Framework is aligned with the nationally recognized standard selected in Exhibit 'F', subject to appropriate exclusions, variations, or exemptions as determined by [PowerSchool]." Incorporated in the Tennessee DPA, Exhibit F states the following:

> The Education Security and Privacy Exchange ("Edspex") works in partnership with the Student Data Privacy Consortium and industry leaders to maintain a list of known and credible cybersecurity frameworks which can protect digital learning ecosystems chosen based on a set of guiding cybersecurity principles* ("Cybersecurity Frameworks") that may be utilized by Provider.

~~698.~~677. Following this statement, Exhibit F identifies the Cybersecurity Framework "Information technology - Security techniques - Information security management systems (ISO 27000 series)," published and maintained by the International Standards Organization, as the set of guiding cybersecurity principles that PowerSchool promises to utilize. In rendering services to the Tennessee Districts pursuant to contract, PowerSchool failed to abide by numerous standards set forth in the ISO 27000 series by failing to:

a. use data encryption to protect the confidentiality and integrity of private data;
b. implement secure authentication mechanisms such as multi-factor authentication;
c. promptly detect, report, and respond to incidents involving a security compromise;
d. ensure that all employees received appropriate security training;
e. conduct regular risk assessments and reviews of data security measures; and
f. align public claims and policy statements regarding data security with practices and procedures that were actually implemented.

~~699.~~678. When their contracts were made, the Tennessee Districts reasonably expected that PowerSchool would implement and maintain the ISO 27000 series standards in the interest of protecting the privacy of students, parents, and teachers. The Tennessee Districts' agreement to pay PowerSchool all amounts due under contract and subsequent performance of that obligation was substantially based on PowerSchool's reciprocal promise to implement these standards, and the Tennessee Districts reasonably believed that PowerSchool had done so and would continue to do so.

~~700.~~679. Thus, the failure by PowerSchool to abide by ISO 27000 series standards was a material breach of contract.

~~701.~~680. Article V, Section 4 of the Tennessee DPA, entitled "Data Breach," states that in the event of a data breach, PowerSchool will notify the Tennessee Districts "within the most expedient time possible and without unreasonable delay, but no later than five (5) calendar days after the determination that a breach has occurred."

~~702.~~681. PowerSchool notified the Tennessee Districts of the Data Breach at least ten days after learning that the Data Breach had occurred, an unreasonable delay that diminished, constrained, and limited their ability to learn who possessed the PII and which PII had been compromised.

~~703.~~682. There has been no indication that notifying the Tennessee Districts within five days of the time that PowerSchool became aware of the Data Breach would have disrupted investigation of the incident by law enforcement, as PowerSchool unilaterally investigated the Data Breach and paid the ransom to the cybercriminals involved in gaining unauthorized access to the data containing PII without assistance or input from law enforcement agencies or personnel.

~~704.~~683. The Tennessee Districts reasonably believed that PowerSchool would perform its obligation as it promised in the event of a breach of security to this highly sensitive data that was in PowerSchool's care, custody, and control pursuant to contract. PowerSchool's failure to do so has been to the Tennessee Districts' detriment and deprived them of the benefits of timely notification. These lost benefits and detriments include, but

are not limited to:

a. missed opportunity to shut down unauthorized access or secure exposed systems sooner;

b. delay in alerting students, parents, and staff, leaving them vulnerable to identity theft or fraud;

c. critical evidence being lost or overwritten, making it more difficult to determine how the Data Breach occurred;

d. difficulty understanding what data was compromised, such as Social Security numbers, addresses, grades, or health records;

e. increased risk of non-compliance with data protection laws like FERPA or state data breach notification laws;

f. inability to activate internal response teams or involve law enforcement in a timely manner;

g. lack of control over messaging, damaging trust with parents, staff, and the community;

h. lost time to update passwords, secure systems, and educate users on phishing risks stemming from the Data Breach; and

i. higher costs for credit monitoring, legal support, and cybersecurity consulting due to expanded damage given the length of exposure.

~~705.~~684. As such, the Tennessee Districts have lost material benefits that they reasonably believed they would receive when they entered into contracts with PowerSchool. PowerSchool breached Article V, Section 4 of the Tennessee DPA and thereby committed a material breach of contract through its failure to perform in accordance with its notification obligations under the Tennessee DPA.

~~706.~~685. In light of this unreasonable delay in providing notification of the Data Breach, PowerSchool breached Article V, Section 4 of the Tennessee DPA and thereby committed a material breach of contract per the terms of Article V, Section 4 of the Tennessee DPA.

~~707.~~686. As a direct and proximate consequence of PowerSchool's breaches of contract identified herein, the Tennessee Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses which flow directly from these material breaches, which they have incurred for all of the items listed in paragraph ~~136 above~~205 above.

~~708.~~687. All of these out-of-pocket losses were foreseeable to PowerSchool when contracts were made given PowerSchool's familiarity with the Tennessee Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of the acts and omissions through which PowerSchool committed material breaches of contract.

~~709.~~688. In committing the acts and omissions that have directly and proximately caused the Tennessee Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Tennessee Districts and those whose PII they entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to the Tennessee Districts flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing breaches of contract and causing the Tennessee Districts' substantial monetary losses.

~~710.~~689. As a direct and proximate result of PowerSchool's breaches of contract, the Tennessee Districts were deprived of the full benefit of data security protection that was promised under contract. The Tennessee Districts have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~711.~~690. The Tennessee Districts are informed and believe that the monetary

damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof of these damages at the time of trial.

~~712.~~691. Based upon all of PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Tennessee Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other available damages sufficient to compensate them for their injuries as allowable by law.

## COUNT 29

## Violation of the Tennessee Consumer Protection Act of 1977

**(On Behalf of the Tennessee Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~713.~~692. The Tennessee Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~714.~~693. The Tennessee Consumer Protection Act of 1977 ("TCPA") provides that "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or deceptive act or practice described in § 47-18-104(b) and declared to be unlawful by this part, may bring an action individually to recover actual damages."[36]

~~715.~~694. The Tennessee Districts are and were at all relevant times herein "persons" and "consumers" as those terms are defined under Tenn. Code Ann. §§ 47-18-103(6) and (18). The Tennessee Districts were acting in a consumer-oriented fashion when deciding whether to purchase PowerSchool's products and services.

---

[36] Tenn. Code Ann. § 47–18–109(a)(1).

~~716.~~695. PowerSchool is and was at all relevant times a "person" as the term is defined under Tenn. Code Ann. § 47-18-103(18). PowerSchool was a seller engaged in the business of selling goods and services in the State of Tennessee and throughout the United States.

~~717.~~696. Before entering into contracts with the Tennessee Districts and throughout the duration of the Parties' commercial relationship, PowerSchool published in promotional, marketing, and advertising materials statements wherein PowerSchool represented that: (i) PowerSchool "invests in updated security technology" and "adheres to strict security regulations" to keep the data containing students', parents', and faculty members' PII secure; (ii) PowerSchool was an "industry leader" for protected private data; and (iii) members of the public that could "trust" PowerSchool to safeguard and protect the personal information of children and their family members.

~~718.~~697. The representation that PowerSchool invests in updated security technology and adheres to strict security regulations was untrue, deceptive, and misleading. PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi-factor authentication method to gain access to the highly sensitive personal information the Tennessee Districts entrusted to PowerSchool.

~~719.~~698. The representation that PowerSchool was an "industry leader" for protected privacy data was untrue, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.

~~720.~~699. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. At a minimum, these

included: failures to:

a. properly encrypt data;
b. implement multi-factor authentication;
c. monitor for unauthorized access;
d. ensure that its staff was adequately trained to recognize and respond to cyber threats;
e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and
f. properly isolate sensitive student and teacher data from other less secure systems.

~~721.~~700. As such, the representation that PowerSchool could be trusted to secure data was misleading and deceptive because PowerSchool's security measures fell short of what is customarily considered sufficient in terms of data privacy protection.

~~722.~~701. All of the above alleged assertions, representations, or statements caused the Tennessee Districts to reasonably believe that PowerSchool:

a. was an industry leader in data privacy protection;
b. made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure; and
c. could be trusted with handling, storing, and securing the sensitive personal information of children contained within the data that PowerSchool obtained as the result of PowerSchool's services.

~~723.~~702. All of the above alleged assertions, representations, or statements were likely to mislead a reasonable consumer.

~~724.~~703. All of the above alleged assertions, representations, or statements were made by PowerSchool with the intent that others would rely on them. PowerSchool made these assertions, representations, or statements with the intent to induce purchases of PowerSchool's products and services.

~~725.~~704. By making these false, misleading, and deceptive representations, PowerSchool engaged in unfair or deceptive acts or practices described in Tenn. Code Ann. § 47-18-104(b)(5), (7), (9), (12), and (21) because PowerSchool: (i) represented that PowerSchool's goods or services had characteristics and/or benefits that the goods or services did not have; (ii) represented that PowerSchool's goods or services were of a particular standard, quality, or grade when they were of another; (iii) advertised PowerSchool's goods or services with the intent not to sell them as advertised; (iv) represented that a consumer transaction conferred or involved rights, remedies, or obligations which the transaction did not have or involve; and (v) used statements or illustrations in advertisements which created a false impression of the grade, quality, quantity, and/or value of PowerSchool's products and services, or which otherwise misrepresented the goods or services offered by PowerSchool in such a manner that later, on disclosure of the true facts, there is a great likelihood that the Tennessee Districts may have switched from the advertised goods or services to other goods or services offered by competing companies in PowerSchool's line of business.

~~726.~~705. In addition to these acts or practices, PowerSchool violated the Data Accessibility, Transparency and Accountability Act, as alleged above. Under Tenn. Code Ann. § 49-1-708(g)(1), this violation "constitute[d] an unfair or deceptive act or practice affecting the conduct of trade or commerce under the Tennessee Consumer Protection Act of 1977."

~~727.~~706. As a direct and proximate result of PowerSchool's use or employment of these unfair and/or deceptive trade acts or practices, the Tennessee Districts suffered an ascertainable loss of money or property.

~~728.~~707. PowerSchool used and employed these unfair and/or deceptive trade practices in willful and/or knowing violation of the TCPA.

~~729.~~708. PowerSchool induced School District consumers, including the Tennessee Districts, to enter into transactions with PowerSchool by taking advantage of school districts' limited financial resources and their need for a comprehensive online

system to organize the personal information of students and employees. PowerSchool at all relevant times knew that the Tennessee Districts relied on PowerSchool for the protection and security of this private, personal, and highly sensitive data, which predominately contained the PII of children. Therefore, PowerSchool's unfair and deceptive acts or practices were offensive to public policy, and were immoral, unethical, and oppressive.

~~730.~~709. PowerSchool continuously accepted payments from School District consumers while at all relevant times knowing that PowerSchool was not providing the services it continuously advertised and represented it was providing. PowerSchool also knew that school districts, reliant on public funding, reasonably believed that PowerSchool was providing the quality of data protection and security services that PowerSchool advertised itself to be providing, both before contracts were made and throughout the course of PowerSchool's contractual relationship with the Tennessee Districts. Therefore, PowerSchool's unfair and deceptive acts or practices were coercive and evince a total absence of good faith.

~~731.~~710. PowerSchool engaged in these unfair and deceptive acts or practices with reckless and wanton disregard of the rights and safety of members of the public. Therefore, any potentially applicable contractual limitation on the Tennessee Districts' damages is null and void.

~~732.~~711. As a direct and proximate result of PowerSchool's wrongful conduct in violation of the TCPA, the Tennessee Districts did not receive the benefit of their bargain, or otherwise paid a price premium, for the services that PowerSchool claimed it would provide and was providing because they paid for services that PowerSchool did not provide and was not providing.

~~733.~~712. As a result of PowerSchool's fraudulent and/or deceptive conduct, misrepresentations, and/or knowing omissions, all of which constitute unfair or deceptive acts or practices in violation of the TCPA, the Tennessee Districts are entitled to and seek an award of actual damages, treble damages, costs, attorneys' fees, and other damages to

be determined at trial, in addition to all other appropriate equitable relief and any such further relief as the Court may deem just and proper.

**(ix) New Hampshire School Districts**

**COUNT 30**

**Breach of Contract**

**(On Behalf of the New Hampshire Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~734.~~713. The New Hampshire School District Plaintiffs (the "New Hampshire Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~735.~~714. The New Hampshire Districts and PowerSchool are parties to contracts which incorporate the New Hampshire DPA.

~~736.~~715. At all relevant times, the New Hampshire Districts fully performed their obligations under their contracts with PowerSchool.

~~737.~~716. The New Hampshire DPA sets forth "the terms and conditions pursuant to which any Customer Data will be handled by PowerSchool and permitted third parties during the term of the MSA and after its termination." This Customer Data includes the PII of the New Hampshire Districts' employees, students, and parents of students, all of which was compromised and stolen while in the care, custody, and control of PowerSchool.

~~738.~~717. The purpose of the New Hampshire DPA, by its own terms as stated in Section 2, is to "describe PowerSchool's responsibilities and solutions as a Processor for handling and protecting Customer Data."

~~739.~~718. The New Hampshire DPA provides in Section 6.1 that "PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained from Customer."

~~740.~~719. PowerSchool failed to perform its obligation under Section 6.1

because PowerSchool failed to safeguard the private and sensitive data it obtained from the New Hampshire Districts. This was a material term of contract because a major factor in the decision to entrust PowerSchool with the handling of sensitive PII and to pay PowerSchool for such entrustment was PowerSchool's reciprocal promise to safeguard the data containing this PII.

~~741.~~720. An essential purpose for which contracts were entered into was to safeguard the PII of students and employees within the New Hampshire Districts' jurisdictions while providing an adequate system for organizing and carrying out their operations. This breach has deprived the New Hampshire Districts of a benefit that they reasonably expected to receive at the time contracts were made. Therefore, PowerSchool breached Section 6.1 of the New Hampshire DPA and thereby committed a material breach of contract through PowerSchool's failure to substantially perform its obligation under Section 6.1.

~~742.~~721. Section 6.4 of the New Hampshire DPA provides that: "PowerSchool shall not . . . [u]se, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

~~743.~~722. The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures, constituting an unauthorized transfer of the PII that created the opportunity for the potential sale of students', parents', and faculty members' PII on the Dark Web.

~~744.~~723. Hackers exported entire student and teacher databases without authorization. PowerSchool thus allowed for the disclosure of data to which the New Hampshire Districts did not consent, and neither applicable law nor the ~~Master Service Agreement ("~~MSA~~")~~ allowed for this disclosure.

~~745.~~724. Ensuring that the PII the New Hampshire Districts entrusted to PowerSchool was not used, sold, transferred, or disclosed without their consent was an essential purpose of contract. The New Hampshire Districts sought to effectively and

efficiently provide services to students, parents, and employees in agreeing to purchase PowerSchool's products and services, and they reasonably believed that PowerSchool would not allow for the disclosure of these individuals' Private Information without their consent or as authorized by law.

~~746.~~725. Accordingly, PowerSchool breached Section 6.4 of the New Hampshire DPA and thereby committed a material breach of contract.

~~747.~~726. Section 7 of the New Hampshire DPA states, in relevant part, that "PowerSchool shall take reasonable measures to ensure the reliability of employees, agents, and contractors of PowerSchool . . . who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the MSA or this DPA. . . "

~~748.~~727. PowerSchool failed to ensure the reliability of its employees, agents, vendors and contractors as it agreed to in Section 7. These employees, agents, vendors and contractors would have implemented basic procedures and practices such as multi-factor authentication and data encryption if they could reasonably be called reliable for purposes of ensuring that access to PII was limited to individuals authorized to access the PII under the terms of the New Hampshire DPA and MSA. The Data Breach is itself evidence of PowerSchool's failure to perform its obligations under Section 7, and PowerSchool has offered no explanation for how PowerSchool took reasonable measures to ensure such reliability as promised in Section 7.

~~749.~~728. When contracts were made, the New Hampshire Districts reasonably expected that PowerSchool would take reasonable measures to ensure the reliability of PowerSchool's agents, employees, and contractors in limiting the accessibility of PII. The New Hampshire Districts performed their obligations under contract under the reasonable belief that PowerSchool was adequately performing its reciprocal promise to take reasonable measures to ensure the reliability of PowerSchool employees, agents, and contractors in ensuring limited access to the PII of their students and employees.

~~750.~~729. Therefore, PowerSchool breached Section 7 of the New Hampshire

DPA and thereby committed a material breach of contract by violating Section 7 of the New Hampshire DPA.

~~751.~~730. With respect to the processing of data in PowerSchool's possession, the New Hampshire DPA states in Section 8 that " . . . PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk."

~~752.~~731. PowerSchool failed to perform its obligation under Section 8 because PowerSchool failed to encrypt data containing sensitive PII that PowerSchool processed, and this PII was the subject of the Data Breach. PowerSchool committed this failure despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term of contract because the New Hampshire Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. The New Hampshire Districts reasonably believed that PowerSchool would implement these reasonable and appropriate measures when contracts were made.

~~753.~~732. Therefore, in failing to perform its obligations under Section 8 of the New Hampshire DPA, PowerSchool committed a material breach of contract.

~~754.~~733. Section 11 of the New Hampshire DPA sets forth various obligations on the part of PowerSchool in the event of a breach of the security of personal data entrusted to PowerSchool by the New Hampshire Districts. Among these obligations, Section 11 obligates PowerSchool to:

a. take steps to mitigate and remediate a data breach;
b. notify the New Hampshire Districts without undue delay;
c. provide the New Hampshire Districts with sufficient information to permit them to make a determination as to any notification obligations under federal, state, or local laws and regulations; and
d. cooperate with the New Hampshire Districts and take commercially

reasonable steps to assist them in an investigation of the breach.

~~755.~~734. Upon learning of the Data Breach, PowerSchool was obligated to perform its obligations as stated in Section 11 of the New Hampshire DPA. PowerSchool substantially or entirely failed to do so, as PowerSchool instead:

a. took no steps in furtherance of mitigation or remediation of the Data Breach, beyond receiving purported assurances that the PII would not be sold or used from the hackers who risked criminal prosecution in accessing and acquiring the PII;

b. notified the New Hampshire Districts of the Data Breach at least ten days after learning that the Data Breach had occurred, an undue delay that diminished, constrained, and limited their ability to learn who possessed the PII and which PII had been compromised;

c. failed to provide them information that would be sufficient for them to readily and adequately determine the scope of their legal obligations to notify students, parents, and employees; and

d. failed to take commercially reasonable steps to assist them in an investigation of the Data Breach by keeping them in the dark about it for such a time that any investigation would be fruitless.

~~756.~~735. The New Hampshire Districts reasonably expected PowerSchool to perform its duties under Section 11 when contracts were made. Understanding that there is always some risk involved in storing sensitive data even when adequate security measures are implemented, they were assured that they could react in a timely and organized fashion to address the negative implications should a breach occur. They continued to perform their obligations under this reasonable belief and have now been prejudiced by PowerSchool's undue delay that has lessened their ability to proactively notify affected individuals, determine their legal obligations, and investigate the potential exposure of PII. PowerSchool has failed to mitigate or remedy the consequences of the Data Breach and has instead acted in a commercially unreasonable manner by paying a

ransom to the cybercriminals who compromised the PII when they had no way of knowing the Data Breach had even occurred.

~~757.~~736. Therefore, the actions and omissions of PowerSchool after the Data Breach were violations of Section 11 of the New Hampshire DPA which constitute material breaches of contract.

~~758.~~737. In Schedule 1-C of the New Hampshire DPA, contracts address the subject of data security. Section A.1 states: "PowerSchool agrees to abide by and maintain adequate data security measures, consistent with industry standards for digital storage of Customer Data, to protect Customer Data from unauthorized disclosure or acquisition by an unauthorized person." Following this statement, contracts impose several obligations of PowerSchool with respect to data security measures, including obligations to:

a. secure usernames, passwords, and any other means of gaining access to the services or to PII, at a level meeting or exceeding the applicable standards;
b. maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so;
c. employ industry standard measures to protect data from unauthorized access; and
d. conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner.

~~759.~~738. PowerSchool failed to perform its data security obligations that are stated above in that PowerSchool did not:

a. secure means of gaining access to usernames and passwords, because PowerSchool did not implement multi-factor authentication or any other available measure consistent with industry standards that would be considered sufficient to meet this obligation;
b. maintain security protocols that met industry standards for monitoring and

preventing the unauthorized access, transfer, or transmission of data, as PowerSchool failed to implement end-to-end encryption of data at rest and in transit to prevent unauthorized access, which proximately and directly allowed for the unauthorized viewing, transfer, and transmission of the data containing PII;

c. conduct periodic risk assessments to detect system vulnerabilities before the Data Breach, as such assessments would have led PowerSchool to implement stronger security measures before the Data Breach occurred;

d. conduct security audits or penetration testing that would have allowed PowerSchool to identify and address vulnerabilities to its data security systems before the Data Breach occurred; and

e. have in place a remediation plan, despite being aware of prior cybersecurity threats but still failing to act to strengthen its defenses.

~~760.~~739. Schedule 1-C of the New Hampshire DPA also created obligations of PowerSchool in the event of a breach of data security. Pursuant to Sections B.1 and B.2 of Schedule C-1, PowerSchool was obligated to do all the following when data was accessed or obtained by an unauthorized individual or third party:

a. provide notification to the New Hampshire Districts within a reasonable amount of time of confirmation of the Data Breach, not exceeding seventy-two (72) hours;

b. take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of data;

c. provide a security incident notification written in plain language after confirmation of the incident; and

d. provide a list of the types of data that were or are reasonably believed to have been the subject of the Data Breach.

~~761.~~740. PowerSchool failed to perform any of its obligations identified above and stated in Sections B.1 and B.2. PowerSchool detected the Data Breach on December

28, 2024, but did not notify customers until January 7, 2025—a delay of ten days. This undue delay was a material breach of contract that has left the New Hampshire Districts scrambling to determine the potential exposure of PII.

~~762.~~741. The New Hampshire DPA also includes and incorporates Schedule 2-C, which purports to be a data security and privacy plan. Schedule 2-C obligated PowerSchool to do all the following:

a. review its data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws and the terms of the New Hampshire DPA;

b. implement commercially reasonable efforts to ensure compliance with applicable laws and New Hampshire DPA terms in the event that PowerSchool's policy and practices were found to not conform with said laws and terms;

c. encrypt data-at-rest and data-in-transit;

d. implement data leak protections and information protection processes and procedures;

e. perform data destruction according to contract;

f. develop and implement a plan for vulnerability management;

g. ascertain, document, and review log and audit records according to policy; and

h. issue, verify, manage, audit, and revoke, as applicable, authentication and access control for authorized devices, processes, and users.

~~763.~~742. Schedule 2-C further obligated PowerSchool to manage data security and privacy incidents that implicate PII, including identifying breaches and unauthorized disclosures, and providing prompt notification of any breaches or unauthorized disclosures of PII.

~~764.~~743. Both before the Data Breach and after it occurred, PowerSchool failed to perform each and every obligation identified above and thereby violated Schedule 2-C

of the New Hampshire DPA.

~~765.~~744. At the time contracts were made, the New Hampshire Districts reasonably expected PowerSchool to perform these obligations in the interest of the students, parents, and employees who they serve and seek to protect. The failure to perform these obligations accordingly constitutes material breaches of contract.

~~766.~~745. PowerSchool failed to take steps to mitigate and remediate the Data Breach, as the New Hampshire Districts have yet to understand the full extent and scope of the impact of the Data Breach. PowerSchool has failed to take commercially reasonable steps to assist them by providing them with necessary information sought by their faculty, students, and parents of students.

~~767.~~746. In the New Hampshire DPA, PowerSchool made representations that its protocols and procedures for data security and protection would "conform" to the standards set forth in the International Standards Organization ("ISO") 27000 series, a publication that addresses data security management systems.

~~768.~~747. In rendering services to the New Hampshire Districts pursuant to contract, PowerSchool failed to abide by numerous standards set forth in the ISO 27000 series, including:

a. using data encryption to protect the confidentiality and integrity of private data;
b. implementing secure authentication mechanisms such as multi-factor authentication;
c. promptly detecting, reporting, and responding to incidents involving a security compromise;
d. ensuring all employees receive appropriate security training;
e. conducting regular risk assessments and reviews of data security measures; and
f. aligning public claims and policy statements regarding data security with practices and procedures that are actually implemented.

~~769.~~748. When they contracted with PowerSchool, the New Hampshire Districts reasonably expected that PowerSchool would implement and maintain the ISO 27000 series standards in the interest of protecting the privacy of students, parents, and teachers. Their agreement to pay PowerSchool all amounts due under contract and subsequent performance of that obligation was substantially based on PowerSchool's reciprocal promise to implement these standards, and they reasonably believed that PowerSchool had done so and would continue to do so.

~~770.~~749. Thus, the failure by PowerSchool to abide by ISO 27000 series standards was a material breach of contract.

~~771.~~750. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the New Hampshire Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the items listed in paragraph ~~136 above~~205 above.

~~772.~~751. All of these out-of-pocket losses were foreseeable to PowerSchool when contracts were made given PowerSchool's familiarity with the New Hampshire Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool committed material breaches of contract.

~~773.~~752. In committing the acts and omissions that have directly and proximately caused the New Hampshire Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the New Hampshire Districts and to those whose PII they entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to them flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross

negligence in committing breaches of contract and causing the New Hampshire Districts' substantial monetary losses.

~~774.~~753. As a direct and proximate result of PowerSchool's breaches of contract, the New Hampshire Districts were deprived of the full benefit of data security protection that was promised under contract. They have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~775.~~754. The New Hampshire Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~776.~~755. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the New Hampshire Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate them for their injuries as permitted by law.

**COUNT 31**

**Violation of the New Hampshire Consumer Protection Act**

**(On Behalf of the New Hampshire Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~777.~~756. The New Hampshire Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~778.~~757. The New Hampshire Consumer Protection Act ("NHCPA") makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2.

~~779.~~758. PowerSchool and the New Hampshire Districts are "persons" within the meaning of N.H. Rev. Stat. Ann. § 358-A:1.

~~780.~~759. PowerSchool's actions as set forth herein occurred in the conduct of trade and commerce within the meaning of N.H. Rev. Stat. Ann. § 358-A:1.

~~781.~~760. In purchasing PowerSchool's products and services, the New Hampshire Districts were deceived by PowerSchool's failure to disclose that PowerSchool, contrary to its representations, did not:

a. properly encrypt data;

b. implement multi-factor authentication;

c. monitor for unauthorized access;

d. ensure that its staff was adequately trained to recognize and respond to cyber threats;

e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and

f. properly isolate sensitive student and teacher data from other less secure systems.

~~782.~~761. The New Hampshire Districts reasonably relied on PowerSchool's omissions, and they did not and could not unravel PowerSchool's deception on their own.

~~783.~~762. PowerSchool's concealment, suppression, and omission of material facts were likely to and did in fact deceive reasonable consumers.

~~784.~~763. PowerSchool knew or should have known that their conduct violated the NHCPA.

~~785.~~764. PowerSchool owed the New Hampshire Districts a duty to disclose the truth about PowerSchool's products and services because PowerSchool:

a. possessed superior knowledge that their products and services did not actually conform to their representations about the products and services being purchased by the New Hampshire Districts; and

b. intentionally concealed the foregoing from them.

~~786.~~765. PowerSchool's conduct proximately caused injuries to the New Hampshire Districts.

~~787.~~766. The New Hampshire Districts were injured and suffered ascertainable loss, injury-in-fact, and/or actual damage as a proximate result of PowerSchool's conduct, as a direct and natural consequence of PowerSchool's omissions.

~~788.~~767. PowerSchool's violations present a continuing risk to the New Hampshire Districts and to all other New Hampshire school districts who are PowerSchool customers. PowerSchool's unlawful acts and practices complained of herein affect the public interest.

~~789.~~768. Because PowerSchool's willful conduct caused injury to the New Hampshire Districts through violations of the NHCPA, they seek recovery of actual damages or $1,000, whichever is greater; treble damages; costs and reasonable attorneys' fees; and any other just and proper relief under N.H. Rev. Stat. Ann. § 358-A:10.

**COUNT 32**

**Violation of the New Hampshire Right to Privacy Act**

**(On Behalf of the New Hampshire Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~790.~~769. The New Hampshire Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~791.~~770. The New Hampshire Right to Privacy Act provides, in relevant part, the following:

> Any person or business that maintains computerized data that includes personal information that the person or business does not own shall notify and cooperate with the owner or licensee of the information of any breach of the security of the data immediately following discovery, if the personal information was acquired by an unauthorized person. Cooperation includes sharing with the owner or licensee information relevant to the breach; except that such cooperation shall not be deemed to require the disclosure of

confidential or business information or trade secrets.[37]

~~792.~~771. PowerSchool and the New Hampshire Districts are "persons" as defined in N.H. Rev. Stat. Ann. § 359-C:3(IX.).

~~793.~~772. PowerSchool violated the Act by failing to notify the New Hampshire Districts, the licensees of data containing personal information, of the Data Breach immediately following PowerSchool's discovery that the data was accessed by an unauthorized person, and by failing to cooperate with them by sharing information relevant to the Breach.

~~794.~~773. PowerSchool's unreasonable delay in complying with its notification and cooperation obligations to the New Hampshire Districts was willful and knowing.

~~795.~~774. The New Hampshire Districts suffered injury-in-fact as a result of PowerSchool's failure to timely investigate the Data Breach and failure to immediately notify them that the PII they entrusted to PowerSchool had been compromised and accessed by an unauthorized person.

~~796.~~775. PowerSchool's undue delay in notification directly and proximately caused actual damages to the New Hampshire Districts in that it diminished, constrained, and limited their ability to learn who possessed the PII and which PII had been compromised.

~~797.~~776. In light of PowerSchool's knowing and willful violation of the Act, the New Hampshire Districts seek an award of no less than three times their actual damages in addition to their costs of suit, reasonable attorney's fees, and all such further relief as is just and proper.

---

[37] N.H. Rev. Stat. Ann. § 359-C:20(I.)(c).

(x) RHODE ISLAND SCHOOL DISTRICTS

**COUNT 33**

**Breach of Contract**

**(On Behalf of the Rhode Island Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~798.~~777. The Rhode Island School District Plaintiffs (the "Rhode Island Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~799.~~778. The Rhode Island Districts and PowerSchool are parties to contracts which incorporate the Rhode Island Data Privacy Agreement.

~~800.~~779. At all relevant times, the Rhode Island Districts fully performed their obligations under their contracts with PowerSchool.

~~801.~~780. Article IV, Section 4.4 of the Rhode Island DPA provides that "Provider acknowledges and agrees that it shall not make any re-disclosure of any Student Data or any portion thereof, including without limitation, user content or other non-public information and/or personally identifiable information contained in the Student Data other than as directed or permitted by the LEA or this DPA."

~~802.~~781. PowerSchool failed to perform its obligations under Article IV, Section 4.4 of the Rhode Island DPA through unauthorized disclosure to third parties. The Data Breach resulted in threat actors exporting entire student and teacher databases to unencrypted .CSV files during the December 2024 breach. The stolen data, which included SSNs, medical data, student performance, and parent info, was disclosed to unauthorized threat actors. This disclosure was not directed or permitted by the Rhode Island Districts or the Rhode Island DPA, and it contravenes the prohibition on unauthorized disclosure of Student Data.

~~803.~~782. Therefore, PowerSchool breached Article IV, Section 4.4 of the Rhode Island DPA and thereby committed a material breach of contract through

PowerSchool's failure to prevent unauthorized disclosure of Student Data.

~~804.~~783. Article IV, Section 4.3 of the Rhode Island DPA provides that "Provider shall require all of Provider's employees and agents who have access to Student Data to comply with all applicable provisions of this DPA with respect to the Student Data shared under the Service Agreement. Provider agrees to require and maintain an appropriate confidentiality agreement from each employee or agent with access to Student Data pursuant to the Service Agreement."

~~805.~~784. PowerSchool failed to perform its obligations under Article IV, Section 4.3 regarding insufficient vetting and training of staff with access to student data. PowerSchool failed to prevent internal misuse and unauthorized access, signaling lapses in personnel security training, monitoring, or access restrictions required by the Rhode Island DPA. Staff were inadequately trained to handle sensitive PII or to recognize threat escalation.

~~806.~~785. Therefore, PowerSchool breached Article IV, Section 4.3 of the Rhode Island DPA and thereby committed a material breach of contract.

~~807.~~786. Article V, Section 3 of the Rhode Island DPA provides that "The Provider agrees to utilize commercially reasonable administrative, physical, and technical safeguards designed to protect Student Data from unauthorized access, disclosure, acquisition, destruction, use, or modification. The Provider shall adhere to any applicable law relating to data security."

~~808.~~787. PowerSchool failed to perform its obligations under Article V, Section 3 of the Rhode Island DPA through inadequate technical and organizational security controls. CrowdStrike's audit post-breach revealed failures in implementing multi-factor authentication, access controls, and breach detection systems—basic security expectations for handling sensitive PII. This contradicts PowerSchool's contractual obligation to implement "reasonable" and "industry-standard" security appropriate to the risk.

~~809.~~788. PowerSchool also failed to adhere to applicable law relating to data

security as required under Article V, Section 3. PowerSchool's conduct violated FERPA, state data breach laws, and FTC guidelines on data protection, constituting a breach of its overarching duty to comply with all applicable laws.

~~810.~~789. Therefore, PowerSchool breached Article V, Section 3 of the Rhode Island DPA and thereby committed a material breach of contract.

~~811.~~790. Article V, Section 4 of the Rhode Island DPA states that in the event of a data breach, PowerSchool shall "provide notification to LEA within the most expedient time possible and without unreasonable delay, but no later than five (5) calendar days, unless specified differently in Exhibit G, after the determination that a breach has occurred."

~~812.~~791. PowerSchool failed to perform its notification obligations under Article V, Section 4 of the Rhode Island DPA. Notifications were delayed up to ten days after PowerSchool learned of the breach, and some districts were never directly informed and had to reach out themselves. The notifications lacked detail on which individuals or data types were impacted, impairing legal compliance.

~~813.~~792. Therefore, PowerSchool breached Article V, Section 4 of the Rhode Island DPA and thereby committed a material breach of contract.

~~814.~~793. The Rhode Island DPA incorporates Exhibit "F" which requires PowerSchool's "Cybersecurity Framework is aligned with the nationally recognized standard selected in Exhibit 'F'," specifically identifying the "Information technology — Security techniques — Information security management systems (ISO 27000 series)" published and maintained by the International Standards Organization.

~~815.~~794. In rendering services to the Rhode Island Districts pursuant to contract, PowerSchool failed to abide by numerous standards set forth in the ISO 27000 series, including:

a. using data encryption to protect the confidentiality and integrity of private data, as stolen files were not encrypted at rest;

b. implementing secure authentication mechanisms such as multi-factor

authentication, as no multifactor authentication or proper credential management was implemented;

c. promptly detecting, reporting, and responding to incidents involving a security compromise, as the system lacked adequate logging and monitoring as noted by post-breach assessments;

d. ensuring all employees receive appropriate security training , as staff were inadequately trained to handle sensitive PII;

e. conducting regular risk assessments and reviews of data security measures; and

f. implementing proper incident response procedures.

~~816.~~795. When their contracts were made, the Rhode Island Districts reasonably expected that PowerSchool would implement and maintain the ISO 27000 series standards in the interest of protecting the privacy of students, parents, and teachers. Their agreement to pay PowerSchool all amounts due under contract and subsequent performance of that obligation was substantially based on PowerSchool's reciprocal promise to implement these standards.

~~817.~~796. Thus, the failure by PowerSchool to abide by ISO 27000 series standards was a material breach of contract.

~~818.~~797. Article IV, Section 1 of the Rhode Island DPA provides that PowerSchool "shall comply with all applicable federal, state, and local laws, rules, and regulations pertaining to Student Data privacy and security, all as may be amended from time to time."

~~819.~~798. PowerSchool failed to comply with FERPA requirements incorporated into the Rhode Island DPA. By failing to restrict access to FERPA-protected data and not ensuring appropriate safeguards, PowerSchool exposed education records to hackers and violated its status as a "school official" under FERPA, constituting improper disclosure of education records in violation of FERPA.

~~820.~~799. Therefore, PowerSchool breached Article IV, Section 1 of the Rhode

Island DPA and thereby committed a material breach of contract.

~~821.~~800. Article V, Section 6 of the Rhode Island DPA governs data destruction and disposal, requiring PowerSchool to properly secure and dispose of data when no longer needed.

~~822.~~801. PowerSchool failed to perform its obligations under Article V, Section 6 regarding retention of outdated and excessive student data. Stolen data reportedly included historical student records, which should have been deleted or anonymized. This indicates a failure to follow retention and disposal protocols as required by the Rhode Island DPA.

~~823.~~802. Therefore, PowerSchool breached Article V, Section 6 of the Rhode Island DPA and thereby committed a material breach of contract.

~~824.~~803. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the Rhode Island Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the items listed in paragraph ~~136 above~~205 above.

~~825.~~804. All of these out-of-pocket losses were foreseeable to PowerSchool when contracts were made given PowerSchool's familiarity with the Rhode Island Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool committed material breaches of contract.

~~826.~~805. In committing the acts and omissions that have directly and proximately caused the Rhode Island Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Rhode Island Districts and to those whose PII they entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed

a deliberate indifference to the harmful consequences to them flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing breaches of contract and causing the Rhode Island Districts' substantial monetary losses.

~~827.~~806. As a direct and proximate result of PowerSchool's breaches of contract, the Rhode Island Districts were deprived of the full benefit of data security protection that was promised under contract. They have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~828.~~807. The Rhode Island Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~829.~~808. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Rhode Island Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate them for their injuries as permitted by law.

**~~COUNT 34~~**

**~~Violation of Rhode Island's Unfair Trade Practices and Consumer Protection Act~~**

**~~(On Behalf of the Rhode Island Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)~~**

~~830. The Rhode Island Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.~~

~~831. The Rhode Island Districts and PowerSchool are "persons" within the meaning of the Rhode Island Unfair Trade Practices and Consumer Protection Act~~

("UTPCPA").[38]

832. The UTPCPA provides that "[u]nfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."[39]

833. The UTPCPA makes unlawful the following "unfair or deceptive acts or practices" committed by PowerSchool through the conduct alleged herein:

a. using deceptive representations in connection with goods or services;
b. representing that goods have characteristics and benefits that they do not have;
c. representing that goods are of a particular standard, quality, or grade if they are of another;
d. advertising goods with intent not to sell them as advertised;
e. engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;
f. engaging in any act or practice that is unfair or deceptive to the consumer; and
g. using any other methods, acts, or practices that mislead or deceive members of the public in a material respect.

834. PowerSchool's conduct, as described above, in misrepresenting the features of its security systems and protocols, while omitting the facts that these protocols were not actually implemented and that PowerSchool was in fact collecting student data for its own enrichment, constitutes an unfair and deceptive practice and was likely to mislead a reasonable consumer.

835. A reasonable consumer would consider the quality of PowerSchool's security systems, and deficient nature of the systems PowerSchool actually had in place, to be important when making a decision about which EdTech service provider to use. The

---

[38] 6 R.I. Gen. Laws Ann. § 6-13.1-1(3).
[39] 6 R.I. Gen. Laws Ann. § 6-13.1-2.

~~disclosure of the deficient security systems would have influenced prospective buyers not to enter into transactions with PowerSchool~~

~~836. PowerSchool knew before the time of sales to the Rhode Island Districts that the security protocols and systems it had in place did not conform to its representations.~~

~~837. PowerSchool's conduct in continuously misrepresenting the nature and quality of its security systems and protocols while continually accepting money from the Rhode Island Districts constituted unfair conduct.~~

~~838. PowerSchool's practices offend public policy, are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to consumers.~~

~~839. As a direct and proximate result of PowerSchool's unfair and deceptive conduct, as alleged herein, the Rhode Island Districts have suffered injury in fact, including that the Rhode Island Districts:~~

a. ~~in purchasing PowerSchool's products and services, received less than as represented in that they paid for security guarantees but did not receive that which they paid for; and~~

b. ~~are now faced with the choice of migrating EdTech vendors at substantial cost and inconvenience, or being without any vendor whatsoever at substantial cost and inconvenience.~~

~~840. As a result of PowerSchool's unfair and deceptive conduct, the Rhode Island Districts have suffered actual damages, including diminution in value of the products and services they purchased, out of pocket losses related to handling the Data Breach's aftermath, costs associated with determining their own potential liability, and other incidental and consequential damages recoverable under the law.~~

~~841. Had the Rhode Island Districts been aware of the omitted and misrepresented facts, i.e., that the products and services they purchased were deficient and would cost them substantially when the deficient security systems failed, the Rhode Island Districts would not have purchased PowerSchool's products and services, or would have paid significantly less for them than they actually paid.~~

~~842. As a direct and proximate result of PowerSchool's violations of the Rhode Island UTPCPA, the Rhode Island Districts have been injured.~~

~~843. The Rhode Island Districts have suffered injuries in fact and actual damages, including financial losses, resulting from the deficient security systems due to PowerSchool's violations of the Rhode Island UTPCPA. These injuries are of the type that the UTPCPA was designed to prevent and are the direct and proximate result of PowerSchool's unlawful conduct.~~

~~844. Pursuant to the UTPCPA, the Rhode Island Districts request actual damages or five hundred dollars ($500), whichever is greater; damages equal to three (3) times the amount of actual damages; equitable and declaratory relief; reasonable attorneys' fees; and any other appropriate relief allowed for under the UTPCPA.~~

**(xi) PENNSYLVANIA SCHOOL DISTRICTS**

**COUNT 35**

**Breach of Contract**

**(On Behalf of the Pennsylvania Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~845.~~809. The Pennsylvania School District Plaintiffs (the "Pennsylvania Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~846.~~810. The Pennsylvania Districts and PowerSchool are parties to contracts which incorporate the Pennsylvania Data Privacy Agreement.

~~847.~~811. At all relevant times, the Pennsylvania Districts fully performed their obligations under their contracts with PowerSchool.

~~848.~~812. Section 5.1 of the Pennsylvania DPA provides that "PowerSchool will maintain all Customer Data in strict confidence and will not disclose any such Customer Data, or copies thereof, to any person or entity other than Customer's legal counsel or Customer's designated contact, or pursuant to the MSA."

~~849.~~813. PowerSchool failed to perform its obligation under Section 5.1

because PowerSchool failed to maintain the confidentiality of Customer Data. PowerSchool exposed unencrypted files (.CSV) containing student names, birthdates, SSNs, health records, and more, all of which is classified as restricted data under Section 4.1. This violates Section 5.1, which requires strict confidentiality and forbids disclosure outside of what is allowed under the MSA or with written approval.

~~850.~~814. An essential purpose for which these contracts were entered into was to maintain the strict confidentiality of Customer Data containing PII of students and employees within the Pennsylvania Districts' jurisdictions. This breach has deprived the Pennsylvania Districts of a benefit that they reasonably expected to receive at the time contracts were made. Therefore, PowerSchool breached Section 5.1 of the Pennsylvania DPA and thereby committed a material breach of contract.

~~851.~~815. Section 6.1 of the Pennsylvania DPA provides that "PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained from Customer."

~~852.~~816. Section 6.2 of the Pennsylvania DPA provides that "PowerSchool may access and use Customer Data on a need-to-know basis and only as expressly authorized by Customer for the sole and express purpose of fulfilling its obligations under the MSA and this DPA and any applicable Quote or Statement of Work. Such access or use of Customer Data by PowerSchool shall be to the minimum extent necessary and only for PowerSchool to fulfill its obligations under the MSA and this DPA and any applicable Quote or Statement of Work." Section 6.1 of the Pennsylvania DPA provides that "PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained from Customer."

~~853.~~817. PowerSchool failed to perform its obligations under Sections 6.1 and 6.2 of the Pennsylvania DPA through poor access controls and lack of monitoring that allowed hackers to exfiltrate entire datasets. PowerSchool must safeguard data and limit access to a "need-to-know" basis, yet unauthorized access and exfiltration by third parties not approved by the Pennsylvania Districts occurred.

~~854.~~818. Therefore, PowerSchool breached Sections 6.1 and 6.2 of the

Pennsylvania DPA and thereby committed material breaches of contract.

~~855.~~819. Section 6.4.1 of the Pennsylvania DPA provides that PowerSchool "shall not [u]se, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

~~856.~~820. PowerSchool failed to perform its obligations under Section 6.4.1 because data was accessed and exfiltrated by third parties not approved by the Pennsylvania Districts. PowerSchool allowed for unauthorized disclosure of Customer Data to which the Pennsylvania Districts did not consent, and neither applicable law nor the MSA allowed for this disclosure.

~~857.~~821. Therefore, PowerSchool breached Section 6.4.1 of the Pennsylvania DPA and thereby committed a material breach of contract.

~~858.~~822. Sections 6.4.2 through 6.4.4 of the Pennsylvania DPA prohibit PowerSchool from using Customer Data for commercial benefit, profile creation, or storage outside the U.S. without notice.

~~859.~~823. While no direct marketing occurred, PowerSchool's failure to secure data opened the door for identity theft and ransom threats—harmful commercial consequences that violated the spirit and intent of Sections 6.4.2 through 6.4.4.

~~860.~~824. Therefore, PowerSchool breached Sections 6.4.2 through 6.4.4 of the Pennsylvania DPA and thereby committed material breaches of contract.

~~861.~~825. Section 6.5 of the Pennsylvania DPA provides that PowerSchool "will be designated as a 'school official' with 'legitimate educational interests' in the Customer Education Records, Student Data, and Personal Data disclosed pursuant to the MSA, and PowerSchool agrees to abide by the FERPA limitations and requirements imposed on school officials."

~~862.~~826. PowerSchool failed to perform its obligations under Section 6.5 because unauthorized disclosures of education records violated FERPA obligations imposed by this section. PowerSchool failed to restrict access to FERPA-protected data

and did not ensure appropriate safeguards, thereby exposing education records to hackers and violating its status as a "school official" under FERPA.

~~863.~~827. Therefore, PowerSchool breached Section 6.5 of the Pennsylvania DPA and thereby committed a material breach of contract.

~~864.~~828. Section 7 of the Pennsylvania DPA provides that "PowerSchool shall take reasonable measures to ensure the reliability of employees, agents, and contractors of PowerSchool, and Vendor-Data Subprocessors who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the MSA or this DPA, and to comply with Applicable Law in the context of individual's duties to the Processor and Vendor-Data Subprocessor, ensuring that individuals are subject to confidentiality obligations."

~~865.~~829. PowerSchool failed to perform its obligations under Section 7 because PowerSchool failed to ensure its employees and vendors were properly vetted, trained, and limited in access. The breach involved systems without multi-factor authentication or intrusion detection, indicating widespread internal security weaknesses. The failure to ensure confidentiality training or vetting of system administrators also violated this provision.

~~866.~~830. Therefore, PowerSchool breached Section 7 of the Pennsylvania DPA and thereby committed a material breach of contract.

~~867.~~831. Section 8 of the Pennsylvania DPA provides that "Taking into account the state of the art, the costs of implementation and the nature, scope, context and purposes of Processing as well as the risk of varying likelihood and severity for the rights and freedoms of Data Subjects, PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk."

~~868.~~832. PowerSchool failed to perform its obligations under Section 8 of the Pennsylvania DPA by failing to implement appropriate technical and organizational safeguards. These failures violated the obligation to apply safeguards "appropriate to the risk," including:

a. no encryption for stored data;

b. no multi-factor authentication;

c. no automated alerts for mass data exfiltration; and

d. failure to respond to FBI warnings.

~~869.~~833. Therefore, PowerSchool breached Section 8 of the Pennsylvania DPA and thereby committed a material breach of contract.

~~870.~~834. Section 11.2.2 of the Pennsylvania DPA provides that "PowerSchool shall notify Customer without undue delay, and within the time period required by Applicable Law."

~~871.~~835. Section 11.2.3 of the Pennsylvania DPA provides that "PowerSchool shall provide Customer with sufficient information to permit Customer to make a determination as to any notification obligations under Applicable Law."

~~872.~~836. Section 11.3 of the Pennsylvania DPA provides that "PowerSchool shall cooperate with Customer and take commercially reasonable steps to assist Customer in an investigation of the Data Breach."

~~873.~~837. PowerSchool failed to perform its obligations under Sections 11.2.2, 11.2.3, and 11.3 of the Pennsylvania DPA. PowerSchool waited up to ten days to notify some districts after discovering the breach, constituting an undue delay. Many school districts were left without concrete information on whose data was affected or the full extent of the breach, violating the requirement to provide sufficient details for districts to determine legal notification obligations. PowerSchool relied on hacker-supplied "proof of deletion" instead of independent forensic analysis and failed to assist districts in understanding the full data impact, violating the cooperation clause.

~~874.~~838. Therefore, PowerSchool breached Sections 11.2.2, 11.2.3, and 11.3 of the Pennsylvania DPA and thereby committed material breaches of contract.

~~875.~~839. Section 13.1 of the Pennsylvania DPA provides that "PowerSchool will dispose or delete all Customer Data within a commercially reasonable time period when it is no longer needed for the purpose for which it was obtained."

~~876.~~840. PowerSchool failed to perform its obligations under Section 13.1 because PowerSchool failed to ensure timely deletion of unnecessary records. Many affected records were old or no longer needed but were still stored unencrypted. This contradicts Section 13.1's requirement that Customer Data be disposed of when "no longer needed."

~~877.~~841. Therefore, PowerSchool breached Section 13.1 of the Pennsylvania DPA and thereby committed a material breach of contract.

~~878.~~842. Section 16 of the Pennsylvania DPA acknowledges that "Customer Data may include Personal Data from Education Records that are subject to Applicable Law of the applicable jurisdiction."

~~879.~~843. PowerSchool failed to comply with applicable law as contemplated by Section 16. PowerSchool's actions violated FERPA and likely Pennsylvania's data breach statutes. Disclosure of education records and SSNs to unauthorized actors without district consent constituted a FERPA violation. Delayed breach notifications contravened the Pennsylvania Breach of Personal Information Notification Act.

~~880.~~844. Therefore, PowerSchool breached Section 16 of the Pennsylvania DPA and thereby committed a material breach of contract.

~~881.~~845. In Schedule 1-C of the Pennsylvania DPA, PowerSchool agrees to maintain physical, administrative, and technological safeguards. Section A.1.1 provides that "PowerSchool will secure usernames, passwords, and any other means of gaining access to the Services or to Customer Data, at a level meeting or exceeding the applicable standards."

~~882.~~846. Section A.1.2 provides that "The Parties agree to maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so."

~~883.~~847. Section A.1.4 provides that "PowerSchool will employ industry standard measures to protect data from unauthorized access. The service security

measures will include server authentication and data encryption."

~~884.~~848. Section A.1.5 provides that "PowerSchool will log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability of Customer Data."

~~885.~~849. Section A.1.7 provides that "PowerSchool will enter into written agreements whereby Vendor-Data Subprocessors agree to secure and protect Customer Data in a manner consistent with the terms of this exhibit and the DPA. PowerSchool will periodically conduct or review compliance monitoring and assessments of Vendor-Data Subprocessors to determine their compliance with this exhibit and DPA."

~~886.~~850. PowerSchool failed to perform its obligations under Schedule 1-C, Sections A.1.1, A.1.2, A.1.4, A.1.5, and A.1.7 of the Pennsylvania DPA through:

a. weak or missing password policies and lack of multi-factor authentication;
b. no secure transmission protocols for exposed .CSV files;
c. inadequate encryption and firewall protection;
d. lack of logging or analysis of unusual system behavior; and
e. subprocessors that were not adequately monitored or trained.

~~887.~~851. Therefore, PowerSchool breached Schedule 1-C, Sections A.1.1, A.1.2, A.1.4, A.1.5, and A.1.7 of the Pennsylvania DPA and thereby committed material breaches of contract.

~~888.~~852. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the Pennsylvania Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the items listed in paragraph ~~136 above~~205 above.

~~889.~~853. All of these out-of-pocket losses were foreseeable to PowerSchool when these contracts were made given PowerSchool's familiarity with the Pennsylvania Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool

committed material breaches of contract.

~~890.~~854. In committing the acts and omissions that have directly and proximately caused the Pennsylvania Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Pennsylvania Districts and to those whose PII they entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to them flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing breaches of contract and causing the Pennsylvania Districts' substantial monetary losses.

~~891.~~855. As a direct and proximate result of PowerSchool's breaches of contract, the Pennsylvania Districts were deprived of the full benefit of data security protection that was promised under contract. They have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~892.~~856. The Pennsylvania Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~893.~~857. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Pennsylvania Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate them for their injuries as permitted by law.

## COUNT 36

**Violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law (On Behalf of the Pennsylvania Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~894.~~858. The Pennsylvania Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~895.~~859. The Pennsylvania Districts and PowerSchool are "persons" within the meaning of Pa. Stat. § 201-2(2).

~~896.~~860. PowerSchool is engaged in "trade" or "commerce" within the meaning of 73 Pa. Stat. Ann. § 201-2(3).

~~897.~~861. The Pennsylvania Unfair Trade Practices Act ("Pennsylvania UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."[40]

~~898.~~862. In the course of its business, PowerSchool, through its agents, employees, and/or controlling alter ego, violated the Pennsylvania UTPA. As detailed above, it willfully failed to disclose the truth about the measures and protocols it implemented to protected data containing PII that was entrusted to it, and did so with the intent that consumers rely on that failure to disclose in deciding whether to purchase its EdTech products and services. By failing to disclose the true nature of its security systems while advertising them as having various qualities they did not have, PowerSchool engaged in one or more of the following unfair or deceptive acts or practices in violation of 73 Pa. Stat. Ann. § 201-3:

a. representing that its products and services have approval, characteristics, uses, or benefits that they do not have;

---

[40] 73 Pa. Stat. Ann. § 201 3.

b. representing that its products and services are of a particular standard, quality and grade when they are not;

c. advertising its products and services with the intent not to sell or lease them as advertised; and/or

d. failing to disclose material information concerning the security measures and protocols in place that were known to PowerSchool at the time of advertisement or sale, with the intention of inducing the Pennsylvania District to purchase these products and services.

~~899.~~863. PowerSchool's failure to disclose the true characteristics of the security measures and protocols it had in place were material to the Pennsylvania Districts, as PowerSchool intended. Had they known the truth, the Pennsylvania Districts would not have purchased PowerSchool's products and services, or would have paid significantly less for them.

~~900.~~864. The Pennsylvania Districts had no way of discerning that PowerSchool's representations were false and misleading, or otherwise learning the facts that PowerSchool had failed to disclose, until the deficiencies of these security measures manifested in the Data Breach. The Pennsylvania Districts did not, and could not, unravel PowerSchool's deception on their own.

~~901.~~865. PowerSchool had an ongoing duty to the Pennsylvania Districts to refrain from unfair and deceptive practices under the Pennsylvania UTPA in the course of their business. Specifically, PowerSchool owed the Pennsylvania Districts a duty to disclose all the material facts concerning the security measures and protocols it had in place because PowerSchool possessed exclusive knowledge of these measures and protocols and made misrepresentations that were rendered misleading because they were contradicted by withheld facts

~~902.~~866. The Pennsylvania Districts suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's concealment, misrepresentations, and/or failure to disclose material information.

~~903.~~867. PowerSchool's violations present a continuing risk to the Pennsylvania Districts, as well as to the general public. PowerSchool's unlawful acts and practices complained of herein affect the public interest.

~~904.~~868. Pursuant to 73 Pa. Stat. Ann. § 201-9.2(a), the Pennsylvania Districts seek an order enjoining PowerSchool's unfair and/or deceptive acts or practices, and awarding damages, punitive and/or treble damages, and any other just and proper relief available under the Pennsylvania UTPA.

**(xii) VIRGINIA SCHOOL DISTRICTS**

**COUNT 37**

**Breach of Contract**

**(On Behalf of the Virginia Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~905.~~869. The Virginia School District Plaintiffs (the "Virginia Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~906.~~870. The Virginia Districts and PowerSchool are parties to contracts which incorporate the Virginia Data Privacy Agreement.

~~907.~~871. At all relevant times, the Virginia Districts fully performed their obligations under their contracts with PowerSchool.

~~908.~~872. Section 5.1 of the Virginia DPA provides that "PowerSchool will maintain all Customer Data in strict confidence and will not disclose any such Customer Data, or copies thereof, to any person or entity other than Customer's legal counsel or Customer's designated contact, or pursuant to the MSA."

~~909.~~873. Section 6.1 of the Virginia DPA provides that "PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained from Customer."

~~910.~~874. PowerSchool failed to perform its obligations under Sections 5.1 and 6.1 of the Virginia DPA because PowerSchool failed to safeguard and maintain the confidentiality of Customer Data. The December 2024 Data Breach involved the unauthorized export of highly sensitive student records, such as Social Security numbers,

medical data, and academic performance, due to lax internal controls and absence of key safeguards. This was a direct violation of PowerSchool's duty to maintain confidentiality and strict confidence of Customer Data.

~~911.~~875. An essential purpose for which contracts were entered into was to maintain the strict confidentiality of Customer Data containing PII of students and employees within the Virginia Districts' jurisdictions. This breach has deprived the Virginia Districts of a benefit that they reasonably expected to receive at the time contracts were made. Therefore, PowerSchool breached Sections 5.1 and 6.1 of the Virginia DPA and thereby committed material breaches of contract.

~~912.~~876. Section 6.4.1 of the Virginia DPA provides that PowerSchool "shall not [u]se, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

~~913.~~877. PowerSchool failed to perform its obligations under Section 6.4.1 because unauthorized use and disclosure of Customer Data occurred. Hackers exploited the system and exported raw .CSV files containing unencrypted PII—disclosing Customer Data to unauthorized third parties without the Virginia Districts' consent, violating the Virginia DPA's ban on selling, disclosing, or altering Customer Data unless authorized or required by law.

~~914.~~878. Therefore, PowerSchool breached Section 6.4.1 of the Virginia DPA and thereby committed a material breach of contract.

~~915.~~879. Section 8 of the Virginia DPA provides that "PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk."

~~916.~~880. PowerSchool failed to perform its obligations under Section 8 because PowerSchool failed to implement appropriate technical and organizational measures. PowerSchool's security posture fell significantly short of "industry standards." According to internal audits and the Weber complaint, routine security controls like intrusion

detection, timely patching, and endpoint protection were missing or poorly managed. This violates PowerSchool's obligation to ensure security "appropriate to the risk."

~~917.~~881. Therefore, PowerSchool breached Section 8 of the Virginia DPA and thereby committed a material breach of contract.

~~918.~~882. Section 7 of the Virginia DPA provides that "PowerSchool shall take reasonable measures to ensure the reliability of employees, agents, and contractors of PowerSchool, and Vendor-Data Subprocessors who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the MSA or this DPA."

~~919.~~883. PowerSchool failed to perform its obligations under Section 7 because PowerSchool provided inadequate vetting and monitoring of individuals with access to Customer Data. The system allowed internal actors and attackers to exfiltrate sensitive student records without detection, implying poor access control, training, or oversight. This fails the requirement to ensure access is granted only to vetted and trustworthy individuals bound by confidentiality.

~~920.~~884. Therefore, PowerSchool breached Section 7 of the Virginia DPA and thereby committed a material breach of contract.

~~921.~~885. Section 11.2.2 of the Virginia DPA provides that "PowerSchool shall notify Customer without undue delay, and within the time period required by Applicable Law."

~~922.~~886. Section 11.2.3 of the Virginia DPA provides that "PowerSchool shall provide Customer with sufficient information to permit Customer to make a determination as to any notification obligations under Applicable Law."

~~923.~~887. Section 11.3 of the Virginia DPA provides that "PowerSchool shall cooperate with Customer and take commercially reasonable steps to assist Customer in an investigation of the Data Breach."

~~924.~~888. PowerSchool failed to perform its obligations under Sections 11.2.2, 11.2.3, and 11.3 of the Virginia DPA through its failures in Personal Data Breach

Response. Some districts were not notified until 10+ days after PowerSchool became aware of the breach, despite active threat actor communications. PowerSchool's notification reportedly lacked enough specificity about what data was stolen and which individuals were affected. The company leaned on a threat actor's "proof of deletion" video as a rationale to downplay response urgency, undermining trust and cooperation.

~~925.~~889. Therefore, PowerSchool breached Sections 11.2.2, 11.2.3, and 11.3 of the Virginia DPA and thereby committed material breaches of contract.

~~926.~~890. In Schedule 1-C of the Virginia DPA, PowerSchool agrees to maintain Physical, Administrative and Technological Safeguards. Section A.1.1 provides that "PowerSchool will secure usernames, passwords, and any other means of gaining access to the Services or to Customer Data, at a level meeting or exceeding the applicable standards."

~~927.~~891. Section A.1.2 provides that "The Parties agree to maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so."

~~928.~~892. Section A.1.3 provides that "PowerSchool will provide periodic security training to those employees who operate or have access to the system."

~~929.~~893. Section A.1.4 provides that "PowerSchool will employ industry standard measures to protect data from unauthorized access. The service security measures will include server authentication and data encryption."

~~930.~~894. Section A.1.5 provides that "PowerSchool will log and analyze events across critical systems to identify potential threats to confidentiality, integrity, and availability of Customer Data."

~~931.~~895. Section A.1.6 provides that "PowerSchool will provide the name and contact information of PowerSchool's security coordinator for the Customer Data received pursuant to the MSA and this DPA upon written request."

~~932.~~896. PowerSchool failed to perform its obligations under Schedule 1-C,

Sections A.1.1, A.1.2, A.1.3, A.1.4, A.1.5, and A.1.6 of the Virginia DPA. The complaint describes a failure to implement and monitor even basic defenses, which contradicts the Virginia DPA's requirement for "industry standard" safeguards across physical, technological, and administrative domains, including:

a. weak or absent password and access controls;
b. lack of secure protocols during data transmission;
c. lack of employee training and security leadership response mechanisms;
d. failure to use encryption and firewall protections appropriately;
e. poor system logging and threat monitoring; and
f. inadequate security coordination and response.

~~933.~~897. Therefore, PowerSchool breached Schedule 1-C, Sections A.1.1, A.1.2, A.1.3, A.1.4, A.1.5, and A.1.6 of the Virginia DPA and thereby committed material breaches of contract.

~~934.~~898. Section 6.5 of the Virginia DPA provides that PowerSchool "will be designated as a 'school official' with 'legitimate educational interests' in the Customer Education Records, Student Data, and Personal Data disclosed pursuant to the MSA, and PowerSchool agrees to abide by the FERPA limitations and requirements imposed on school officials."

~~935.~~899. PowerSchool failed to perform its obligations under Section 6.5 because PowerSchool breached its duties under FERPA as a designated "school official". The exposure of protected Education Records (as defined in FERPA) to unauthorized parties and the misuse or insecure handling of that data constitute violations of PowerSchool's role as a FERPA-compliant school official.

~~936.~~900. Therefore, PowerSchool breached Section 6.5 of the Virginia DPA and thereby committed a material breach of contract.

~~937.~~901. Section 13.1 of the Virginia DPA provides that "PowerSchool will dispose or delete all Customer Data within a commercially reasonable time period when it is no longer needed for the purpose for which it was obtained."

~~938.~~902. PowerSchool failed to perform its obligations under Section 13.1 because PowerSchool potentially retained and failed to securely dispose of outdated or unneeded data. The exposed data included older records not relevant to active student populations, suggesting PowerSchool failed to conduct timely data disposition or assess ongoing retention risks as required under this section.

~~939.~~903. Therefore, PowerSchool breached Section 13.1 of the Virginia DPA and thereby committed a material breach of contract.

~~940.~~904. Section 15.2 of the Virginia DPA provides that "PowerSchool will not disclose (and will not instruct any of its employees or Vendor-Data Subprocessors to disclose) in any manner whatsoever any Customer Data to any third party unless" specific conditions are met.

~~941.~~905. PowerSchool failed to perform its obligations under Section 15.2 because disclosure of Customer Data was not compelled by legal order. Data was leaked due to PowerSchool's own security failures—not by subpoena or lawful request—undermining the intent of Section 15 which governs lawful compelled disclosures only.

~~942.~~906. Therefore, PowerSchool breached Section 15.2 of the Virginia DPA and thereby committed a material breach of contract.

~~943.~~907. Section 16.1 of the Virginia DPA acknowledges that "Customer Data may include Personal Data from Education Records that are subject to Applicable Law of the applicable jurisdiction."

~~944.~~908. PowerSchool failed to comply with applicable law as contemplated by Section 16.1. PowerSchool's actions constituted a breach of multiple state and federal data protection laws (FERPA, state student privacy laws).

~~945.~~909. Therefore, PowerSchool breached Section 16.1 of the Virginia DPA and thereby committed a material breach of contract.

~~946.~~910. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the Virginia Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the items listed

in paragraph ~~136 above~~205 above.

~~947.~~911. All of these out-of-pocket losses were foreseeable to PowerSchool when contracts were made given PowerSchool's familiarity with the Virginia Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool committed material breaches of contract.

~~948.~~912. In committing the acts and omissions that have directly and proximately caused the Virginia Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under contract. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Virginia Districts and to those whose PII they entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to them flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing these breaches of contract and causing the Virginia Districts' substantial monetary losses.

~~949.~~913. As a direct and proximate result of PowerSchool's breaches of contract, the Virginia Districts were deprived of the full benefit of data security protection that was promised under contract. They have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~950.~~914. The Virginia Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~951.~~915. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Virginia Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate them for their injuries as permitted by law.

~~**COUNT 38**~~

~~**Violation of the Virginia Consumer Protection Act**~~

~~**(On Behalf of the Virginia Districts Against Defendants PowerSchool Holdings, Inc., PowerSchool Group LLC, and Bain Capital, L.P.)**~~

~~952. The Virginia Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.~~

~~953. The Virginia Districts and PowerSchool are "persons" as defined in Va. Code Ann. § 59.1-198.~~

~~954. The transactions between the Virginia Districts and PowerSchool are "consumer transactions" as defined in Va. Code Ann. § 59.1-198, because the EdTech services and products that were purchased were used primarily for students' and parents' personal, family, or household purposes.~~

~~955. The Virginia Consumer Protection Act ("VCPA") prohibits "(5) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (6) misrepresenting that goods or services are of a particular standard, quality, grade, style, or model; . . . (8) advertising goods or services with intent not to sell them as advertised; . . . [and] (14) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction[.]"~~[41]

~~956. Both before entering into contracts with the Virginia Districts and throughout the duration of the Parties' commercial relationship, PowerSchool published~~

[41] ~~Va. Code Ann. § 59.1-200(A).~~

in promotional, marketing, and advertising materials statements wherein PowerSchool represented that: (i) PowerSchool "invests in updated security technology" and "adheres to strict security regulations" to keep the data containing students', parents', and faculty members' PII secure; (ii) PowerSchool was an "industry leader" for protected private data; and (iii) members of the public that could "trust" PowerSchool to safeguard and protect the personal information of children and their family members.

957. The representation that PowerSchool invests in updated security technology and adheres to strict security regulations was untrue, deceptive, and misleading. PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi factor authentication method to gain access to the highly sensitive personal information the Virginia Districts entrusted to PowerSchool.

958. The representation that PowerSchool was an "industry leader" for protected privacy data was untrue, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.

959. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. At a minimum, these included: failures to:

a. properly encrypt data;

b. implement multi-factor authentication;

c. monitor for unauthorized access;

d. ensure that its staff was adequately trained to recognize and respond to cyber threats;

e. regularly and proactively patch vulnerabilities that could be exploited by

hackers; and

f. properly isolate sensitive student and teacher data from other less secure systems.

960. As such, the representation that PowerSchool could be trusted to secure data was misleading and deceptive because PowerSchool's security measures fell short of what is customarily considered sufficient in terms of data privacy protection.

961. All of the above alleged assertions, representations, or statements caused the Virginia Districts to reasonably believe that PowerSchool:

a. was an industry leader in data privacy protection;

b. made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure; and

c. could be trusted with handling, storing, and securing the sensitive personal information of children contained within the data that PowerSchool obtained as the result of PowerSchool's services.

962. All of the above alleged assertions, representations, or statements were likely to mislead a reasonable consumer.

963. All of the above alleged assertions, representations, or statements were made by PowerSchool with the intent that others would rely on them. PowerSchool made these assertions, representations, or statements with the intent to induce purchases of PowerSchool's products and services.

964. By making these false, misleading, and deceptive representations, PowerSchool engaged in unfair or deceptive acts or practices described in Va. Code Ann. § 59.1-200(A)(5), (6), (8), and (14) because PowerSchool: (i) represented that PowerSchool's goods or services had characteristics and/or benefits that the goods or services did not have; (ii) represented that PowerSchool's goods or services were of a particular standard, quality, or grade when they were of another; (iii) advertised PowerSchool's goods or services with the intent not to sell them as advertised; and (iv)

used deceptive, fraudulent, and false misrepresentations in connections with the sale of its products and services.

965. As a direct and proximate result of PowerSchool's use or employment of these unfair and/or deceptive trade acts or practices, the Virginia Districts suffered an ascertainable loss of money or property.

966. PowerSchool used and employed these unfair and/or deceptive trade practices in willful and/or knowing violation of the VCPA.

967. PowerSchool induced School District consumers, including the Virginia Districts, to enter into transactions with PowerSchool by taking advantage of consumers' limited financial resources and their need for a comprehensive online system to organize the personal information of students and employees. PowerSchool at all relevant times knew that the Virginia Districts relied on PowerSchool for the protection and security of this private, personal, and highly sensitive data, which predominately contained the PII of children. Therefore, PowerSchool's unfair and deceptive acts or practices were offensive to public policy, and were immoral, unethical, and oppressive.

968. PowerSchool continuously accepted payments from School District consumers while at all relevant times knowing that PowerSchool was not providing the services it continuously advertised and represented it was providing. PowerSchool also knew that school districts, reliant on public funding, reasonably believed that PowerSchool was providing the quality of data protection and security services that PowerSchool advertised it was providing, both before contracts were made and throughout the course of PowerSchool's contractual relationship with the Virginia Districts. Therefore, PowerSchool's unfair and deceptive acts or practices were coercive and evince a total absence of good faith.

969. PowerSchool engaged in these unfair and deceptive acts or practices with reckless and wanton disregard of the rights and safety of members of the public. Therefore, any potentially applicable contractual limitation on the Virginia Districts' damages is null and void.

~~970. As a direct and proximate result of PowerSchool's wrongful conduct in violation of the VCPA, the Virginia Districts did not receive the benefit of their bargain, or otherwise paid a price premium, for the services that PowerSchool claimed it would provide and was providing because they paid for services that PowerSchool did not provide and was not providing.~~

~~971. Pursuant to Va. Code Ann. § 59.1-204, the Virginia Districts seek monetary relief against PowerSchool measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Virginia District. Because PowerSchool's conduct was committed willfully and knowingly, each Virginia is entitled to recoverthe greater of (a) three times actual damages or (b) $1,000.~~

~~972. The Virginia Districts also seeks punitive damages, attorneys' fees, and any other just and proper relief available under General Business Law a result of PowerSchool's fraudulent and/or deceptive conduct, misrepresentations, and/or knowing omissions, all of which constitute unfair or deceptive acts or practices in violation of the TCPA, the Virginia Districts are entitled to and seek an award of actual damages, treble damages, costs, attorneys' fees, and other damages to be determined at trial, in addition to all other appropriate equitable relief and any such further relief as the Court may deem just and proper.~~

**COUNT 39**

**Violation of the Virginia Data Breach Notification Law**

**(On Behalf of the Virginia Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~973.~~916. ~~Plaintiffs realleges~~The Virginia School District Plaintiffs (the "Virginia Districts") reallege and incorporates paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~974.~~917. Under Virginia's Data Breach Notification Law, PowerSchool was required to accurately notify the Virginia Districts following discovery or notification of a breach of their data security system if unencrypted or unredacted Personal Information

was or is reasonably believed to have been accessed and acquired by an unauthorized person who will, or it is reasonably believed who will, engage in identity theft or another fraud, without unreasonable delay.[42]

~~975.~~918. PowerSchool is an entity that owns, licenses, or maintains computerized data that includes Personal Information as defined by Va. Code Ann. §§ 18.2-186.6(B), (D).

~~976.~~919. The PII that the Virginia Districts entrusted to PowerSchool includes Personal Information as covered under Va. Code. Ann. § 18.2-186.6(A).

~~977.~~920. Because PowerSchool discovered a breach of its security system in which unencrypted or unredacted PII was or is reasonably believed to have been accessed and acquired by an unauthorized person who will, or it is reasonably believed who will, engage in identity theft or another fraud, PowerSchool had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by Va. Code Ann. §§ 18.2-186.6(B), (D).

~~978.~~921. By failing to disclose the Data Breach promptly and accurately, PowerSchool violated Va. Code Ann. §§ 18.2-186.6 (B), (D).

~~979.~~922. As a direct and proximate result of PowerSchool's violations of Va. Code Ann. §§ 18.2-186.6(B), (D), the Virginia Districts suffered damages, including:

a. increased regulatory and statutory compliance costs;
b. increased remediation and mitigation costs;
c. operational disruption;
d. reputational harm with tangible consequences; and
e. costs of strengthening security systems following the Breach.

~~980.~~923. PowerSchool's line of business made it entirely foreseeable that the Virginia Districts would suffer these actual damages in the event that PowerSchool

---

[42] Va. Code Ann. § 18.2-186.6(B).

delayed providing notifications to the Virginia Districts in violation of Virginia law.

~~981.~~924. The Virginia Districts seek relief under Va. Coda Ann. § 18.2-186.6(I), including actual damages.

**(xiii) ARIZONA SCHOOL DISTRICTS**

**COUNT 40**

**Breach of Contract**

**(On Behalf of the Arizona Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~982.~~925. The Arizona School District Plaintiffs (the "Arizona Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~983.~~926. The Arizona Districts and PowerSchool are parties to contracts which incorporate the Arizona Data Privacy Agreement.

~~984.~~927. At all relevant times, the Arizona Districts fully performed their obligations under their contracts with PowerSchool.

~~985.~~928. The Arizona DPA sets forth "the terms and conditions pursuant to which all records, information and data of the Arizona Districts to which PowerSchool has access" (Covered Data and Information or "CDI") "will be handled by PowerSchool and permitted third parties during the term of the MSA and after its termination." This CDI includes PII of the Arizona Districts' employees, students, and parents of students, all of which was compromised and stolen while in the care, custody, and control of PowerSchool.

~~986.~~929. The Arizona DPA provides in Section 11 that as the Service Provider PowerSchool shall "develop, implement, maintain and use appropriate administrative, technical and physical security measures and technical safeguards to preserve the confidentiality, integrity and availability of all electronically maintained or transmitted CDI received from or on behalf of the District or its students or employees."

~~987.~~930. PowerSchool failed to perform its obligation under Section 11 because PowerSchool failed to safeguard the private and sensitive data it obtained from the

Arizona Districts. This was a material term of the contracts because a major factor in the decision to entrust PowerSchool with the handling of sensitive PII and to pay PowerSchool for such entrustment was PowerSchool's reciprocal promise to safeguard the data containing this PII.

~~988.~~931. An essential purpose for which these contracts were entered into was to safeguard the PII of students and employees within the Arizona Districts' jurisdictions while providing an adequate system for organizing and carrying out their operations. This breach has deprived the Arizona Districts of a benefit that they reasonably expected to receive at the time contracts were made. Therefore, PowerSchool breached Section 11 of the Arizona DPA and thereby committed a material breach of contract through PowerSchool's failure to substantially perform its obligation under Section 11.

~~989.~~932. Section 11 of the Arizona DPA states, in relevant part, that PowerSchool "shall store and process CDI in accordance with industry best practices to secure CDI from unauthorized access, disclosure and use." PowerSchool subcontractors were required to "maintain security controls equal or greater to those of Service Provider" and to, at a minimum, "notify the District within two days of discovery if passwords used to access CDI by . . . a subcontractor are lost, stolen or otherwise obtained or partially obtained by unauthorized users."

~~990.~~933. Ensuring that the PII the Arizona Districts entrusted to PowerSchool was not used, sold, transferred, or disclosed without their consent was an essential purpose of these contracts. The Arizona Districts sought to effectively and efficiently provide services to students, parents, and employees in agreeing to purchase PowerSchool's products and services, and they reasonably believed that PowerSchool would not allow for the disclosure of these individuals' private information without their consent or as authorized by law.

~~991.~~934. Accordingly, PowerSchool breached Section 11 of the Arizona DPA and thereby committed a material breach of contract.

~~992.~~935. PowerSchool failed to ensure the reliability of its employees, agents,

vendors and contractors as it agreed to in Section 11. These employees, agents, vendors and contractors would have implemented basic procedures and practices such as multi-factor authentication and data encryption if they could reasonably be called reliable for purposes of ensuring that access to PII was limited to individuals authorized to access the PII under the terms of the Arizona DPA and MSA. The Data Breach is itself evidence of PowerSchool's failure to perform its obligations under Section 11, and PowerSchool has offered no explanation for how PowerSchool took reasonable measures to ensure such reliability as promised in Section 11.

~~993.~~936. When these contracts were made, the Arizona Districts reasonably expected that PowerSchool would take reasonable measures to ensure the reliability of PowerSchool's agents, employees, and contractors in limiting the accessibility of PII. The Arizona Districts performed their obligations under their contracts under the reasonable belief that PowerSchool was adequately performing its reciprocal promise to take reasonable measures to ensure the reliability of PowerSchool employees, agents, and contractors in ensuring limited access to PII of their students and employees.

~~994.~~937. Therefore, PowerSchool breached Section 11 of the Arizona DPA and thereby committed a material breach of contract.

~~995.~~938. Section 7 of the Arizona DPA provides that PowerSchool as the Service Provider "is prohibited from mining CDI for any purposes other than as agreed to in writing between the parties. Data mining or scanning of user content for the purpose of advertising or marketing to anyone is prohibited. Service Provider will not use any CDI to advertise or market to anyone without express written permission of the District."

~~996.~~939. The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures, constituting an unauthorized transfer of the PII that created the opportunity for the potential sale of students', parents', and faculty members' PII on the Dark Web.

~~997.~~940. Hackers exported entire student and teacher databases without authorization. PowerSchool thus allowed for the disclosure of data to which the Arizona

Districts did not consent, and neither applicable law nor the ~~Master Service Agreement~~ ~~("~~MSA~~")~~ allowed for this disclosure. Accordingly, PowerSchool breached Section 7 of the Arizona DPA and thereby committed a material breach of contract.

~~998.~~941. With respect to the confidentiality of the Arizona Districts' CDI, PowerSchool agreed to hold CDI in strict confidence. In Section 8 of the Arizona DPA PowerSchool agreed to "protect CDI it receives from or on behalf of the District according to commercially acceptable standards and not less rigorously than it protects its own confidential information."

~~999.~~942. PowerSchool failed to perform its obligation under Section 8 because PowerSchool failed to encrypt data containing sensitive PII that PowerSchool processed, and this PII was the subject of the Data Breach. PowerSchool committed this failure despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term of these contracts because the Arizona Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. The Arizona Districts reasonably believed that PowerSchool would implement these reasonable and appropriate measures when their contracts were made.

~~1000.~~943. Therefore, PowerSchool breached Section 8 of the Arizona DPA and thereby committed a material breach of contract.

~~1001.~~944. Section 12 of the Arizona DPA sets forth various reporting of disclosure or misuse of CDI obligations on the part of PowerSchool in the event of a breach of the security of personal data entrusted to PowerSchool by the Arizona Districts. Among these obligations, Section 12 obligates PowerSchool to, within 72 hours of discovery, report to the District any and all use or disclosure of CDI not authorized and provide a report that identifies:

a. the nature of the unauthorized use or disclosure;

b. the CDI used or disclosed;

c. what PowerSchool has done or shall do to mitigate any deleterious effect of the unauthorized use or disclosure; and

d. what corrective action PowerSchool has taken or shall take to prevent further similar unauthorized use or disclosure.

~~1002.~~945. PowerSchool was further obligated to "have a plan for responding to a breach of data security developed pursuant to best practices in the industry . . . ."

~~1003.~~946. Upon learning of the Data Breach, PowerSchool was obligated to perform its obligations as stated in Section 12 of the Arizona DPA. PowerSchool substantially or entirely failed to do so, as PowerSchool instead:

a. took no steps in furtherance of mitigation or remediation of the Data Breach, beyond receiving purported assurances that the PII would not be sold or used from the hackers who risked criminal prosecution in accessing and acquiring the PII;

b. notified the Arizona Districts of the Data Breach at least ten days after learning that the Data Breach had occurred, an undue delay that diminished, constrained, and limited their ability to learn who possessed the PII and which PII had been compromised;

c. failed to provide the Arizona Districts with information that would be sufficient for them to readily and adequately determine the scope of their legal obligations to notify students, parents, and employees; and

d. failed to take commercially reasonable steps to assist the Arizona Districts in an investigation of the Data Breach by keeping them in the dark about it for such a time that any investigation would be fruitless.

~~1004.~~947. The Arizona Districts reasonably expected PowerSchool to perform its duties under Section 12 when their contracts were made. Understanding that there is always some risk involved in storing sensitive data even when adequate security measures are implemented, they were assured that they could react in a timely and organized fashion to address the negative implications should a breach occur. They continued to perform

their obligations under this reasonable belief and have now been prejudiced by PowerSchool's undue delay that has lessened their ability to proactively notify affected individuals, determine their legal obligations, and investigate the potential exposure of PII. PowerSchool has failed to mitigate or remedy the consequences of the Data Breach and has instead acted in a commercially unreasonable manner by paying a ransom to the cybercriminals who compromised the PII when they had no way of knowing the Data Breach had even occurred.

~~1005.~~948. Therefore, the actions and omissions of PowerSchool after the Data Breach were violations of Section 12 of the Arizona DPA which constitute material breaches of contract.

~~1006.~~949. At the time these contracts were made, the Arizona Districts reasonably expected PowerSchool to perform these obligations in the interest of the students, parents, and employees who they serve and seek to protect. The failure to perform these obligations accordingly constitutes material breaches of contract.

~~1007.~~950. PowerSchool failed to take steps to mitigate and remediate the Data Breach, as the Arizona Districts have yet to understand the full extent and scope of the impact of the Data Breach. PowerSchool has failed to take commercially reasonable steps to assist them by providing them with necessary information sought by their faculty, students, and parents of students.

~~1008.~~951. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the Arizona Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the items listed in paragraph ~~136 above~~205 above.

~~1009.~~952. All of these out-of-pocket losses were foreseeable to PowerSchool when contracts were made given PowerSchool's familiarity with the Arizona Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool

committed material breaches of contract.

~~1010.~~953. In committing the acts and omissions that have directly and proximately caused the Arizona Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's duties under the contracts. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Arizona Districts and to those whose PII they entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to them flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing these breaches of contract and causing the Arizona Districts' substantial monetary losses.

~~1011.~~954. As a direct and proximate result of PowerSchool's breaches of contract, the Arizona Districts were deprived of the full benefit of data security protection that was promised under the contracts. They have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~1012.~~955. The Arizona Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~1013.~~956. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Arizona Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate them for their injuries as permitted by law.

**COUNT 41**

**Violation of the Arizona Consumer Fraud Act**

**(On Behalf of the Arizona Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~1014.~~957. The Arizona Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~1015.~~958. The Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521–1534, protects consumers against false, deceptive or unfair acts or practices, fraud, false pretenses, false promises, misrepresentations, or concealment, suppression or omission, in connection with the sale or advertisement of merchandise.

~~1016.~~959. The Arizona Districts and PowerSchool are each considered a "person" as defined by Ariz. Rev. Stat. § 44-1521.

~~1017.~~960. All of the relevant offers, solicitations, agreements, or acts or omissions made in the performance of agreements were connected to the sale of PowerSchool's products which are "merchandise" within the meaning of Ariz. Rev. Stat. §§ 44-1521(1).

~~1018.~~961. PowerSchool knowingly and intentionally engaged in false, misleading, and deceptive business practices in connection with the sale of PowerSchool's products and services with the intent that the Arizona Districts would rely on such intentionally false, misleading, deceptive and unfair acts.

~~1019.~~962. PowerSchool published on its website the statement that PowerSchool "invests in updated security technology and adheres to strict security regulations" while representing on its website that it supposedly did these acts to "keep your data secure." Also through its website, PowerSchool represented itself as an "industry leader for protected private data." PowerSchool made representations to members of the public that they could "trust" PowerSchool to safeguard and protect children's personal information.

~~1020.~~963. The representation that PowerSchool invests in updated security technology and adheres to strict security regulations was false, deceptive, and misleading.

PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi-factor authentication method to gain access to this highly sensitive personal information.

~~1021.~~964. The representation that PowerSchool was an industry leader for protected privacy data was false, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.

~~1022.~~965. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. These failures included, at a minimum, the failure to:

a. properly encrypt data;
b. implement multi-factor authentication;
c. monitor for unauthorized access;
d. ensure that its staff was adequately trained to recognize and respond to cyber threats;
e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and
f. properly isolate sensitive student and teacher data from other less secure systems.

~~1023.~~966. PowerSchool intended that the Arizona Districts rely on its false statements, misrepresentations, concealment, suppression or omissions of material facts as set forth in more detail above.

~~1024.~~967. All of the above false statements, misrepresentations, concealments, suppression or omission of material facts were relied on by the Arizona Districts and

caused them to reasonably believe that PowerSchool:

a. was an industry leader in data privacy protection;

b. made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure; and

c. could be trusted with handling, storing, and securing the sensitive personal information of children contained within the data that PowerSchool obtained as the result of PowerSchool's services.

~~1025.~~968. All of the above alleged assertions, representations, or statements were knowingly made by PowerSchool with the intent to sell its product and services, or with the intent to induce a purchase of PowerSchool's product and services.

~~1026.~~969. By making the above alleged assertions, representations, or statements, PowerSchool engaged in false, misleading, and deceptive business practices in violation of Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521–1534 in that PowerSchool:

a. indicated that the subject of a consumer transaction had performance characteristics and/or benefits that it did not have;

b. indicated that the subject of a consumer transaction was of a particular standard or quality when it was not; and

c. indicated that a consumer transaction involved rights or remedies that it did not involve by making false representations in advertising and promotional materials.

~~1027.~~970. PowerSchool's false, misleading, and deceptive business practices were relied on by the Arizona Districts and injuriously affected them and the people of Arizona whose children attend public schools, and whose tax payments fund public school districts that ultimately act as consumers in the marketplace for PowerSchool's products and services.

~~1028.~~971. While engaging in the acts and practices alleged in this Complaint,

PowerSchool knew or should have known that its conduct was of the nature prohibited by Ariz. Rev. Stat. §§ 44-1522, subjecting it to enforcement and penalties as provided by Ariz. Rev. Stat. § 44-1531(A).

~~1029.~~972. PowerSchool's conduct, as described above was willful, wanton, or demonstrated a reckless indifference to the rights and interests of the Arizona Districts because it acted outrageously by consciously deciding to provide its services in a manner that does not meet ordinary and reasonable consumer expectations and were unfit for use considering the sensitive and highly personal PII contained in the data PowerSchool was hired to maintain, store, and protect while knowing that such actions carried a substantial risk of harming them.

~~1030.~~973. As a result of the Arizona Districts' reliance on PowerSchool's knowing and intentionally false, misleading, and deceptive representations, they sustained a monetary loss. In addition to being forced to expend substantial sums to properly and adequately address the Data Breach in its wake, they were deprived of the full benefit of the bargain they reasonably believed they would receive and were receiving under contract. PowerSchool's false, misleading, and deceptive representations were a material and significant factor that contributed to their decision to purchase PowerSchool's products and services.

~~1031.~~974. As a direct and proximate result of the above violations of Ariz. Rev. Stat. §§ 44-1521–1534, the Arizona Districts have suffered actual damages and injury in fact, including but not limited to: (i) additional wages paid to their staff members; (ii) expert expenses to understand the nature of the Data Breach's consequences; (iii) legal expenses related to potential liabilities; (iv) future expenses to migrate data to a new vendor; and (v) notification costs to ensure that affected employees, students, and parents are made aware of the Data Breach and subsequent developments related to information about the many potential consequences of the Data Breach.

~~1032.~~975. Due to PowerSchool's false, misleading, and deceptive business practices, the Arizona Districts not only lost out on receiving the full benefit of what they

bargained for but must now continually and persistently expend the public funds they rely on to address a situation that was proximately and actually caused by PowerSchool's grossly negligent data security systems. They would not have had to bear these costs if PowerSchool had not knowingly and intentionally deceived them as an inducement for payments to PowerSchool.

~~1033.~~976. Pursuant to Ariz. Rev. Stat. §§ 44-1521–1534, the Arizona Districts seek and are entitled to an award of monetary relief against PowerSchool to include: (i) the greater of (a) actual damages in an amount to be determined at trial, or (b) statutory damages in the amount of $10,000 per violation; (ii) reasonable attorneys' fees; (iii) punitive damages; and (iv) any other just and proper relief available under the Arizona Consumer Fraud Act.

**(xiv) Oklahoma School Districts**

**COUNT 42**

**Breach of Contract**

**(On Behalf of the Oklahoma Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~1034.~~977. The Oklahoma School District Plaintiffs (the "Oklahoma Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~1035.~~978. The Oklahoma Districts and PowerSchool are parties to contracts which incorporate the Oklahoma Data Privacy Agreement.

~~1036.~~979. At all relevant times, the Oklahoma Districts fully performed their obligations under their contracts with PowerSchool.

~~1037.~~980. The Oklahoma DPA sets forth "the terms and conditions pursuant to which any Customer Data will be handled by PowerSchool and permitted third parties during the term of the MSA and after its termination." This Customer Data includes the PII of the Oklahoma Districts' employees, students, and parents of students, all of which was compromised and stolen while in the care, custody, and control of PowerSchool.

~~1038.~~981. The purpose of the Oklahoma DPA, by its own terms as stated in

Section 2, is to "describe PowerSchool's responsibilities and solutions as a Processor for handling and protecting Customer Data."

~~1039.~~982. The Oklahoma DPA provides in Section 6.1 that "PowerSchool will safeguard and maintain the confidentiality of Customer Data obtained from Customer."

~~1040.~~983. PowerSchool failed to perform its obligation under Section 6.1 because PowerSchool failed to safeguard the private and sensitive data it obtained from the Oklahoma Districts. This was a material term because a major factor in the decision to entrust PowerSchool with the handling of sensitive PII and to pay PowerSchool for such entrustment was PowerSchool's reciprocal promise to safeguard the data containing this PII.

~~1041.~~984. An essential purpose for which contracts were entered into was to safeguard the PII of students and employees while providing an adequate system for organizing and carrying out their operations. This breach has deprived the Oklahoma Districts of a benefit that they reasonably expected to receive at the time their contracts were made. Therefore, PowerSchool breached Section 6.1 of the Oklahoma DPA and thereby committed a material breach of contract through PowerSchool's failure to substantially perform its obligation under Section 6.1.

~~1042.~~985. Section 6.4 of the Oklahoma DPA provides that: "PowerSchool shall not . . . [u]se, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

~~1043.~~986. The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures, constituting an unauthorized transfer of the PII that created the opportunity for the potential sale of students', parents', and faculty members' PII on the Dark Web.

~~1044.~~987. Hackers exported entire student and teacher databases without authorization. PowerSchool thus allowed for the disclosure of data to which the Oklahoma Districts did not consent, and neither applicable law nor the ~~Master Service~~

~~Agreement ("~~MSA~~")~~ allowed for this disclosure.

~~1045.~~988. Ensuring that the PII the Oklahoma Districts entrusted to PowerSchool was not used, sold, transferred, or disclosed without their consent was an essential purpose of entering into contracts with PowerSchool. The Oklahoma Districts sought to effectively and efficiently provide services to students, parents, and employees in agreeing to purchase PowerSchool's products and services, and they reasonably believed that PowerSchool would not allow for the disclosure of these individuals' private information without their consent or as authorized by law.

~~1046.~~989. Accordingly, PowerSchool breached Section 6.4 of the Oklahoma DPA and thereby committed a material breach of contract.

~~1047.~~990. Section 7 of the Oklahoma DPA states, in relevant part, that "PowerSchool shall take reasonable measures to ensure the reliability of employees, agents, and contractors of PowerSchool . . . who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the MSA or this DPA. . . ."

~~1048.~~991. PowerSchool failed to ensure the reliability of its employees, agents, vendors and contractors as it agreed to in Section 7. These employees, agents, vendors and contractors would have implemented basic procedures and practices such as multi-factor authentication and data encryption if they could reasonably be called reliable for purposes of ensuring that access to PII was limited to individuals authorized to access the PII under the terms of the Oklahoma DPA and MSA. The Data Breach is itself evidence of PowerSchool's failure to perform its obligations under Section 7, and PowerSchool has offered no explanation for how PowerSchool took reasonable measures to ensure such reliability as promised in Section 7.

~~1049.~~992. When their contracts were made, the Oklahoma Districts reasonably expected that PowerSchool would take reasonable measures to ensure the reliability of PowerSchool's agents, employees, and contractors in limiting the accessibility of PII. The Oklahoma Districts performed their obligations under contract under the reasonable belief

that PowerSchool was adequately performing its reciprocal promise to take reasonable measures to ensure the reliability of PowerSchool employees, agents, and contractors in ensuring limited access to the PII of their students and employees.

~~1050.~~993. Therefore, PowerSchool breached Section 7 of the Oklahoma DPA and thereby committed a material breach of contract.

~~1051.~~994. With respect to the processing of data in PowerSchool's possession, the Oklahoma DPA states in Section 8 that " . . . PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk."

~~1052.~~995. PowerSchool failed to perform its obligation under Section 8 because PowerSchool failed to encrypt data containing sensitive PII that PowerSchool processed, and this PII was the subject of the Data Breach. PowerSchool committed this failure despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term of contract because the Oklahoma Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. The Oklahoma Districts reasonably believed that PowerSchool would implement these reasonable and appropriate measures when contracts were made.

~~1053.~~996. Therefore, PowerSchool breached Section 8 of the Oklahoma DPA and thereby committed a material breach of contract.

~~1054.~~997. Section 11 of the Oklahoma DPA sets forth various obligations on the part of PowerSchool in the event of a breach of the security of personal data entrusted to PowerSchool by the Oklahoma Districts. Among these obligations, Section 11 obligates PowerSchool to:

a. take steps to mitigate and remediate a data breach;
b. notify the Oklahoma Districts without undue delay;
c. provide sufficient information to permit the Oklahoma Districts to make a determination as to any notification obligations under federal, state, or local

laws and regulations; and

d. cooperate with the Oklahoma Districts and take commercially reasonable steps to assist them in an investigation of the breach.

~~1055.~~998. Upon learning of the Data Breach, PowerSchool was obligated to perform its obligations as stated in Section 11 of the Oklahoma DPA. PowerSchool substantially or entirely failed to do so, as PowerSchool instead:

a. took no steps in furtherance of mitigation or remediation of the Data Breach, beyond receiving purported assurances that the PII would not be sold or used from the hackers who risked criminal prosecution in accessing and acquiring the PII;

b. notified the Oklahoma Districts of the Data Breach at least ten days after learning that the Data Breach had occurred, an undue delay that diminished, constrained, and limited their ability to learn who possessed the PII and which PII had been compromised;

c. failed to provide the Oklahoma Districts information that would be sufficient for them to readily and adequately determine the scope of their legal obligations to notify students, parents, and employees; and

d. failed to take commercially reasonable steps to assist them in an investigation of the Data Breach by keeping them in the dark about it for such a time that any investigation would be fruitless.

~~1056.~~999. The Oklahoma Districts reasonably expected PowerSchool to perform its duties under Section 11 when their contracts were made. Understanding that there is always some risk involved in storing sensitive data even when adequate security measures are implemented, they were assured that they could react in a timely and organized fashion to address the negative implications should a breach occur. They continued to perform their obligations under this reasonable belief and have now been prejudiced by PowerSchool's undue delay that has lessened their ability to proactively notify affected individuals, determine their legal obligations, and investigate the potential exposure of

PII. PowerSchool has failed to mitigate or remedy the consequences of the Data Breach and has instead acted in a commercially unreasonable manner by paying a ransom to the cybercriminals who compromised the PII when they had no way of knowing the Data Breach had even occurred.

~~1057.~~1000. Therefore, these actions and omissions of PowerSchool after the Data Breach amount to violations of Section 11 of the Oklahoma DPA which constitute material breaches of contract.

~~1058.~~1001. Schedule 1-C of the Oklahoma DPA addresses the subject of data security. Section A.1 states: "PowerSchool agrees to abide by and maintain adequate data security measures, consistent with industry standards for digital storage of Customer Data, to protect Customer Data from unauthorized disclosure or acquisition by an unauthorized person." Following this statement, contracts impose several obligations of PowerSchool with respect to data security measures, including obligations to:

a. secure usernames, passwords, and any other means of gaining access to the services or to PII, at a level meeting or exceeding the applicable standards;
b. maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so;
c. employ industry standard measures to protect data from unauthorized access; and
d. conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner.

~~1059.~~1002. PowerSchool failed to perform its data security obligations that are stated above in that PowerSchool did not:

a. secure means of gaining access to usernames and passwords, because PowerSchool did not implement multi-factor authentication or any other available measure consistent with industry standards that would be

considered sufficient to meet this obligation;

b. maintain security protocols that met industry standards for monitoring and preventing the unauthorized access, transfer, or transmission of data, as PowerSchool failed to implement end-to-end encryption of data at rest and in transit to prevent unauthorized access, which proximately and directly allowed for the unauthorized viewing, transfer, and transmission of the data containing PII;

c. conduct periodic risk assessments to detect system vulnerabilities before the Data Breach, as such assessments would have led PowerSchool to implement stronger security measures before the Data Breach occurred;

d. conduct security audits or penetration testing that would have allowed PowerSchool to identify and address vulnerabilities to its data security systems before the Data Breach occurred; and

e. have in place a remediation plan, despite being aware of prior cybersecurity threats but still failing to act to strengthen its defenses.

~~1060.~~1003. Schedule 1-C of the Oklahoma DPA also created obligations of PowerSchool in the event of a breach of data security. Pursuant to Sections B.1 and B.2 of Schedule C-1, PowerSchool was obligated to do all the following when data was accessed or obtained by an unauthorized individual or third party:

a. provide notification to the Oklahoma Districts within a reasonable amount of time of confirmation of the Data Breach, not exceeding seventy-two (72) hours;

b. take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of data;

c. provide a security incident notification written in plain language after confirmation of the incident; and

d. provide a list of the types of data that were or are reasonably believed to have been the subject of the Data Breach.

~~1061.~~1004. PowerSchool failed to perform any of its obligations identified above and stated in Sections B.1 and B.2. PowerSchool detected the Data Breach on December 28, 2024, but did not notify customers until January 7, 2025—a delay of ten days. This undue delay was a material breach of contract that has left the Oklahoma Districts scrambling to determine the potential exposure of PII.

~~1062.~~1005. The Oklahoma DPA also includes and incorporates Schedule 2-C, which purports to be a data security and privacy plan. Schedule 2-C obligated PowerSchool to do all the following:

a. review its data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws and the terms of the Oklahoma DPA;
b. implement commercially reasonable efforts to ensure compliance with applicable laws and Oklahoma DPA terms in the event that PowerSchool's policy and practices were found to not conform with said laws and terms;
c. encrypt data-at-rest and data-in-transit;
d. implement data leak protections and information protection processes and procedures;
e. perform data destruction;
f. develop and implement a plan for vulnerability management;
g. ascertain, document, and review log and audit records according to policy; and
h. issue, verify, manage, audit, and revoke, as applicable, authentication and access control for authorized devices, processes, and users.

~~1063.~~1006. Schedule 2-C further obligated PowerSchool to manage data security and privacy incidents that implicate PII, including identifying breaches and unauthorized disclosures, and providing prompt notification of any breaches or unauthorized disclosures of PII.

~~1064.~~1007. Both before the Data Breach and after it occurred, PowerSchool failed

to perform each and every obligation identified above and thereby violated Schedule 2-C of the Oklahoma DPA.

~~1065.~~1008. At the time their contracts were made, the Oklahoma Districts reasonably expected PowerSchool to perform these obligations in the interest of the students, parents, and employees who they serve and seek to protect. PowerSchool committed a material breach of contract through its failure to perform these obligations.

~~1066.~~1009. PowerSchool failed to take steps to mitigate and remediate the Data Breach, as the Oklahoma Districts have yet to understand the full extent and scope of the impact of the Data Breach. PowerSchool has failed to take commercially reasonable steps to assist them by providing them with necessary information sought by their faculty, students, and parents of students.

~~1067.~~1010. In the Oklahoma DPA, PowerSchool made representations that its protocols and procedures for data security and protection would "conform" to the standards set forth in the International Standards Organization ("ISO") 27000 series, a publication that addresses data security management systems.

~~1068.~~1011. In rendering services to the Oklahoma Districts pursuant to contract, PowerSchool failed to abide by numerous standards set forth in the ISO 27000 series, including:

a. using data encryption to protect the confidentiality and integrity of private data;
b. implementing secure authentication mechanisms such as multi-factor authentication;
c. promptly detecting, reporting, and responding to incidents involving a security compromise;
d. ensuring all employees receive appropriate security training;
e. conducting regular risk assessments and reviews of data security measures; and
f. aligning public claims and policy statements regarding data security with

practices and procedures that are actually implemented.

~~1069.~~1012. When their contracts were made, the Oklahoma Districts reasonably expected that PowerSchool would implement and maintain the ISO 27000 series standards in the interest of protecting the privacy of students, parents, and teachers. Their agreement to pay PowerSchool all amounts due under contract and subsequent performance of that obligation was substantially based on PowerSchool's reciprocal promise to implement these standards, and they reasonably believed that PowerSchool had done so and would continue to do so.

~~1070.~~1013. Thus, the failure by PowerSchool to abide by ISO 27000 series standards was a material breach of contract.

~~1071.~~1014. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the Oklahoma Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the items listed in paragraph ~~136 above~~205 above.

~~1072.~~1015. All of these out-of-pocket losses were foreseeable to PowerSchool when the contracts were made given PowerSchool's familiarity with the Oklahoma Districts' status as public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool committed material breaches of contract.

~~1073.~~1016. In committing the acts and omissions that have directly and proximately caused the Oklahoma Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's contractual duties. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Oklahoma Districts and to those whose PII they entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to them flowing directly from

PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing breaches of contract and causing the Oklahoma Districts' substantial monetary losses.

~~1074.~~1017. As a direct and proximate result of PowerSchool's breaches of contract, the Oklahoma Districts were deprived of the full benefit of data security protection that was promised under contract. They have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~1075.~~1018. The Oklahoma Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~1076.~~1019. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Oklahoma Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate them for their injuries as permitted by law.

**~~COUNT 43~~**

**~~Violation of the Oklahoma Consumer Protection Act~~**

**~~(On Behalf of the Oklahoma Districts Against Defendants PowerSchool Holdings, Inc.PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)~~**

~~1077. The Oklahoma Districts reallege and incorporate paragraphs 1 through 309 above as if fully set forth herein.~~

~~1078. The Oklahoma Consumer Protection Act ("OCPA"), 15 Oklahoma Statutes Annotated ("O.S.") protects consumers against deceptive trade practices which means a misrepresentation, omission or other practice that has deceived or could reasonably be expected to deceive or mislead a person to the detriment of that person and unfair trade~~

practices which means any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. 15 O.S. section 752 *et seq*.

1079. The Oklahoma Districts are and were at all relevant times herein "persons" as defined by 15 O.S. section 752(1).

1080. PowerSchool is and was at all relevant times a "person" as defined by 15 O.S. section 752(1).

1081. PowerSchool knowingly and intentionally engaged in false, misleading, unfair and deceptive business practices in connection with the sale of PowerSchool's products and services and committed multiple violations of 15 O.S. section 752.

1082. All of the relevant offers, solicitations, agreements, or acts or omissions made in the performance of agreements were connected to the sale of PowerSchool's products and services and were "consumer transactions" within the meaning of 15 O.S. section 752(2).

1083. PowerSchool published on its website the statement that PowerSchool "invests in updated security technology and adheres to strict security regulations" while representing on its website that it supposedly did these acts to "keep your data secure." Also through its website, PowerSchool represented itself as an "industry leader for protected private data." PowerSchool made representations to members of the public that they could "trust" PowerSchool to safeguard and protect children's personal information.

1084. The representation that PowerSchool invests in updated security technology and adheres to strict security regulations was false, deceptive, and misleading. PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi factor authentication method to gain access to this highly sensitive personal information.

1085. The representation that PowerSchool was an industry leader for protected privacy data was false, deceptive, and misleading because it erroneously characterized

~~PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.~~

~~1086. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. These failures included, at a minimum, the failure to:~~

~~a. properly encrypt data;~~

~~b. implement multi-factor authentication;~~

~~c. monitor for unauthorized access;~~

~~d. ensure that its staff was adequately trained to recognize and respond to cyber threats;~~

~~e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and~~

~~f. properly isolate sensitive student and teacher data from other less secure systems.~~

~~1087. As such, the representation that PowerSchool could be trusted to secure data was misleading and deceptive and constitutes an unlawful practice because PowerSchool's security measures fell short of what is customarily considered sufficient in terms of data privacy protection, especially considering the data that was compromised and stolen in the Data Breach.~~

~~1088. All of the above alleged assertions, representations, or statements caused the Oklahoma Districts to reasonably believe that PowerSchool:~~

~~a. was an industry leader in data privacy protection;~~

~~b. made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure; and~~

~~c. could be trusted with handling, storing, and securing the sensitive personal~~

information of children contained within the data that PowerSchool obtained as the result of PowerSchool's services.

1089. All of the above alleged assertions, representations, or statements were made with knowledge of their falsity with the intent to deceive and harm the Oklahoma Districts in order to sell its product and services, or to induce a purchase of PowerSchool's product and services.

1090. By making the above alleged assertions, representations, or statements, PowerSchool engaged in unfair, false, misleading, deceptive and unlawful business practices in violation of 15 O.S. 752 *et seq*. in that PowerSchool:

a. indicated that the subject of a consumer transaction had performance characteristics and/or benefits that it did not have;

b. indicated that the subject of a consumer transaction was of a particular standard or quality when it was not; and

c. indicated that a consumer transaction involved rights or remedies that it did not involve by making false representations in advertising and promotional materials.

1091. PowerSchool's false, misleading, and deceptive business practices injuriously affected the people of Oklahoma whose children attend public schools, and whose tax payments fund public school districts that ultimately act as consumers in the marketplace for PowerSchool's products and services.

1092. The false, deceptive, and misleading business practices in which PowerSchool engaged in violation of the OCPA were procedurally unconscionable because PowerSchool:

a. possessed exclusive knowledge of the deficiencies of its data protection policies and practices;

b. intentionally concealed these deficiencies while simultaneously representing that its data protection policies were implemented in a way that met or exceeded industry standards; and/or

c. continuously accepted payments from the Oklahoma Districts while knowing that they were not receiving the quality or kind of products that PowerSchool directly and intentionally represented it was providing; and

d. knew that its products and services were being provided in a manner that does not meet ordinary and reasonable consumer expectations and were unfit for use considering the sensitive and highly personal nature of the PII contained in the data PowerSchool was hired to maintain, store, and protect.

1093. As a result of these knowing and intentionally false, misleading, deceptive and unlawful representations, the Oklahoma Districts sustained an injury in fact caused directly by PowerSchool's actions as alleged above. In addition to being forced to expend substantial sums to properly and adequately address the Data Breach in its wake, they were deprived of the full benefit of the bargain they reasonably believed they would receive and were receiving under contract. PowerSchool's false, misleading, and deceptive representations were a material and significant factor that contributed to their decision to purchase PowerSchool's products and services.

1094. As a direct and proximate result of the above violations of the OCPA, the Oklahoma Districts have suffered actual damages and injury in fact, including but not limited to: (i) additional wages paid to their staff members; (ii) expert expenses to understand the nature of the Data Breach's consequences; (iii) legal expenses related to potential liabilities; (iv) future expenses to migrate data to a new vendor; and (v) notification costs to ensure that affected employees, students, and parents are made aware of the Data Breach and subsequent developments related to information about the many potential consequences of the Data Breach.

1095. The result of PowerSchool's false, misleading, and deceptive business practices is substantively unconscionable in that the Oklahoma Districts not only lost out on receiving the full benefit of what they bargained for but must now continually and persistently expend the public funds they rely on to address a situation that was proximately and actually caused by PowerSchool's grossly negligent data security

~~systems. They would not have had to bear these costs if PowerSchool had not knowingly and intentionally deceived them as an inducement for payments to PowerSchool.~~

~~1096. Pursuant to 15 O.S. section 751 et seq., the Oklahoma Districts seek and are entitled to an award of monetary relief against PowerSchool to include: (a) damages in an amount to be determined at trial; (b) statutory damages as allowed by law; (c) reasonable attorneys' fees and costs; and (d) any other just and proper relief available under the OCPA.~~

**(xv) WASHINGTON SCHOOL DISTRICTS**

**COUNT 44**

**Breach of Contract**

**(On Behalf of the Washington Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~1097.~~1020. The Washington School District Plaintiffs (the "Washington Districts") reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~1098.~~1021. The Washington Districts and PowerSchool are parties to contracts which incorporate the Washington Data Privacy Agreement.

~~1099.~~1022. At all relevant times, the Washington Districts fully performed their obligations under their contracts with PowerSchool.

~~1100.~~1023. The Washington DPA sets forth "the terms and conditions pursuant to which any Customer Data will be handled by PowerSchool and permitted third parties during the term of the MSA and after its termination." This Customer Data includes the PII of the Washington Districts' employees, students, and parents of students, all of which was compromised and stolen while in the care, custody, and control of PowerSchool.

~~1101.~~1024. The purpose of the Washington DPA, by its own terms as stated in Section 2, is to "describe PowerSchool's responsibilities and solutions as a Processor for handling and protecting Customer Data."

~~1102.~~1025. The Washington DPA provides in Section 6.1 that "PowerSchool will

safeguard and maintain the confidentiality of Customer Data obtained from Customer."

~~1103.~~1026. PowerSchool failed to perform its obligation under Section 6.1 because PowerSchool failed to safeguard the private and sensitive data it obtained from the Washington Districts. This was a material term of contract because a major factor in the decision to entrust PowerSchool with the handling of sensitive PII and to pay PowerSchool for such entrustment was PowerSchool's reciprocal promise to safeguard the data containing this PII.

~~1104.~~1027. An essential purpose for which these contracts were entered into was to safeguard the PII of students and employees within the Washington Districts' jurisdictions while providing an adequate system for organizing and carrying out their operations. This breach has deprived the Washington Districts of a benefit that they reasonably expected to receive at the time contracts were made. Therefore, PowerSchool breached Section 6.1 of the Washington DPA and thereby committed a material breach of contract through PowerSchool's failure to substantially perform its obligation under Section 6.1.

~~1105.~~1028. Section 6.4 of the Washington DPA provides that: "PowerSchool shall not . . . [u]se, sell, rent, transfer, distribute, alter, or disclose Customer Data to any third party without the prior written consent of the Customer, except as required by Applicable Law or contracted for in the MSA."

~~1106.~~1029. The Data Breach was proximately caused by PowerSchool's deficient data protection practices and procedures, constituting an unauthorized transfer of the PII that created the opportunity for the potential sale of students', parents', and faculty members' PII on the Dark Web.

~~1107.~~1030. Hackers exported entire student and teacher databases without authorization. PowerSchool thus allowed for the disclosure of data to which the Washington Districts did not consent, and neither applicable law nor the ~~Master Service Agreement ("~~MSA~~")~~ allowed for this disclosure.

~~1108.~~1031. Ensuring that the PII the Washington Districts entrusted to

PowerSchool was not used, sold, transferred, or disclosed without their consent was an essential purpose behind the decision to contract with PowerSchool. The Washington Districts sought to effectively and efficiently provide services to students, parents, and employees in agreeing to purchase PowerSchool's products and services, and they reasonably believed that PowerSchool would not allow for the disclosure of these individuals' private information without their consent or as authorized by law.

~~1109.~~1032. Accordingly, PowerSchool breached Section 6.4 of the Washington DPA and thereby committed a material breach of contract.

~~1110.~~1033. Section 7 of the Washington DPA states, in relevant part, that "PowerSchool shall take reasonable measures to ensure the reliability of employees, agents, and contractors of PowerSchool . . . who may have access to Customer Data with the goal of ensuring that access to Customer Data is limited to individuals who need to know or access Customer Data under the terms of the MSA or this DPA. . . ."

~~1111.~~1034. PowerSchool failed to ensure the reliability of its employees, agents, vendors and contractors as it agreed to in Section 7. These employees, agents, vendors and contractors would have implemented basic procedures and practices such as multi-factor authentication and data encryption if they could reasonably be called reliable for purposes of ensuring that access to PII was limited to individuals authorized to access the PII under the terms of the Washington DPA and MSA. The Data Breach is itself evidence of PowerSchool's failure to perform its obligations under Section 7, and PowerSchool has offered no explanation for how PowerSchool took reasonable measures to ensure such reliability as promised in Section 7.

~~1112.~~1035. When their contracts were made, the Washington Districts reasonably expected that PowerSchool would take reasonable measures to ensure the reliability of PowerSchool's agents, employees, and contractors in limiting the accessibility of PII. The Washington Districts performed their obligations under their contracts under the reasonable belief that PowerSchool was adequately performing its reciprocal promise to take reasonable measures to ensure the reliability of PowerSchool employees, agents, and

contractors in ensuring limited access to the PII of their students and employees.

~~1113.~~1036. Therefore, PowerSchool breached Section 7 of the Washington DPA and thereby committed a material breach of contract.

~~1114.~~1037. With respect to the processing of data in PowerSchool's possession, the Washington DPA states in Section 8 that " . . . PowerSchool shall implement appropriate technical and organizational measures to ensure a level of security appropriate to the risk."

~~1115.~~1038. PowerSchool failed to perform its obligation under Section 8 because PowerSchool failed to encrypt data containing sensitive PII that PowerSchool processed, and this PII was the subject of the Data Breach. PowerSchool committed this failure despite knowing that this PII holds substantial value and is at great risk of being targeted by hackers. This was a material term of contract because the Washington Districts' performance of their obligations to PowerSchool relied on PowerSchool's reciprocal promise to implement appropriate and reasonable measures that are commonly implemented and should be expected from PowerSchool. The Washington Districts reasonably believed that PowerSchool would implement these reasonable and appropriate measures when their contracts were made.

~~1116.~~1039. Therefore, PowerSchool breached Section 8 of the Washington DPA and thereby committed a material breach of contract.

~~1117.~~1040. Section 11 of the Washington DPA sets forth various obligations on the part of PowerSchool in the event of a breach of the security of personal data entrusted to PowerSchool by the Washington Districts. Among these obligations, Section 11 obligates PowerSchool to:

a. take steps to mitigate and remediate a data breach;

b. notify the Washington Districts without undue delay;

c. provide them with sufficient information to permit the Washington Districts to make a determination as to any notification obligations under federal, state, or local laws and regulations; and

d. cooperate with the Washington Districts and take commercially reasonable steps to assist them in an investigation of the breach.

~~1118.~~1041. Upon learning of the Data Breach, PowerSchool was obligated to perform its obligations as stated in Section 11 of the Washington DPA. PowerSchool substantially or entirely failed to do so, as PowerSchool instead:

a. took no steps in furtherance of mitigation or remediation of the Data Breach, beyond receiving purported assurances that the PII would not be sold or used from the hackers who risked criminal prosecution in accessing and acquiring the PII;

b. notified the Washington Districts of the Data Breach at least ten days after learning that the Data Breach had occurred, an undue delay that diminished, constrained, and limited the Washington Districts' ability to learn who possessed the PII and which PII had been compromised;

c. failed to provide the Washington Districts with information that would be sufficient for them to readily and adequately determine the scope of their legal obligations to notify students, parents, and employees; and

d. failed to take commercially reasonable steps to assist them in an investigation of the Data Breach by keeping them in the dark about it for such a time that any investigation would be fruitless.

~~1119.~~1042. The Washington Districts reasonably expected PowerSchool to perform its duties under Section 11 when their contracts were made. Understanding that there is always some risk involved in storing sensitive data even when adequate security measures are implemented, they were assured that they could react in a timely and organized fashion to address the negative implications should a breach occur. The Washington Districts continued to perform their obligations under this reasonable belief and have now been prejudiced by PowerSchool's undue delay that has lessened their ability to proactively notify affected individuals, determine their legal obligations, and investigate the potential exposure of PII. PowerSchool has failed to mitigate or remedy

the consequences of the Data Breach and has instead acted in a commercially unreasonable manner by paying a ransom to the cybercriminals who compromised the PII when they had no way of knowing the Data Breach had even occurred.

~~1120.~~1043. Therefore, the actions and omissions of PowerSchool after the Data Breach were violations of Section 11 of the Washington DPA which constitute material breaches of contract.

~~1121.~~1044. In Schedule 1-C of the Washington DPA, contracts address the subject of data security. Section A.1 states: "PowerSchool agrees to abide by and maintain adequate data security measures, consistent with industry standards for digital storage of Customer Data, to protect Customer Data from unauthorized disclosure or acquisition by an unauthorized person." Following this statement, contracts impose several obligations of PowerSchool with respect to data security measures, including obligations to:

a. secure usernames, passwords, and any other means of gaining access to the services or to PII, at a level meeting or exceeding the applicable standards;
b. maintain security protocols that meet industry standards in the transfer or transmission of any data, including ensuring that data may only be viewed or accessed by parties legally allowed to do so;
c. employ industry standard measures to protect data from unauthorized access; and
d. conduct digital and physical periodic risk assessments at least annually and take commercially reasonable industry standard steps to remediate identified security and privacy vulnerabilities in a timely manner.

~~1122.~~1045. PowerSchool failed to perform its data security obligations that are stated above in that PowerSchool did not:

a. secure means of gaining access to usernames and passwords, because PowerSchool did not implement multi-factor authentication or any other available measure consistent with industry standards that would be considered sufficient to meet this obligation;

b. maintain security protocols that met industry standards for monitoring and preventing the unauthorized access, transfer, or transmission of data, as PowerSchool failed to implement end-to-end encryption of data at rest and in transit to prevent unauthorized access, which proximately and directly allowed for the unauthorized viewing, transfer, and transmission of the data containing PII;

c. conduct periodic risk assessments to detect system vulnerabilities before the Data Breach, as such assessments would have led PowerSchool to implement stronger security measures before the Data Breach occurred;

d. conduct security audits or penetration testing that would have allowed PowerSchool to identify and address vulnerabilities to its data security systems before the Data Breach occurred; and

e. have in place a remediation plan, despite being aware of prior cybersecurity threats but still failing to act to strengthen its defenses.

~~1123.~~1046. Schedule 1-C of the Washington DPA also created obligations of PowerSchool in the event of a breach of data security. Pursuant to Sections B.1 and B.2 of Schedule C-1, PowerSchool was obligated to do all the following when data was accessed or obtained by an unauthorized individual or third party:

a. provide notification to the Washington Districts within a reasonable amount of time of confirmation of the Data Breach, not exceeding seventy-two (72) hours;

b. take all reasonable steps to mitigate any harmful effect resulting from any such unauthorized access to, use or disclosure of data;

c. provide a security incident notification written in plain language after confirmation of the incident; and

d. provide a list of the types of data that were or are reasonably believed to have been the subject of the Data Breach.

~~1124.~~1047. PowerSchool failed to perform any of its obligations identified above

and stated in Sections B.1 and B.2. PowerSchool detected the Data Breach on December 28, 2024, but did not notify customers until January 7, 2025—a delay of ten days. This undue delay was a material breach of contract that has left the Washington Districts scrambling to determine the potential exposure of PII.

~~1125.~~1048. The Washington DPA also includes and incorporates Schedule 2-C, which purports to be a data security and privacy plan. Schedule 2-C obligated PowerSchool to do all the following:

a. review its data security and privacy policy and practices to ensure that they are in conformance with all applicable federal, state, and local laws and the terms of this DPA;
b. implement commercially reasonable efforts to ensure compliance with applicable laws and DPA terms in the event that PowerSchool's policy and practices were found to not conform with said laws and terms;
c. encrypt data-at-rest and data-in-transit;
d. implement data leak protections and information protection processes and procedures;
e. develop and implement a plan for vulnerability management;
f. ascertain, document, and review log and audit records according to policy; and
g. issue, verify, manage, audit, and revoke, as applicable, authentication and access control for authorized devices, processes, and users.

~~1126.~~1049. Schedule 2-C further obligated PowerSchool to manage data security and privacy incidents that implicate PII, including identifying breaches and unauthorized disclosures, and providing prompt notification of any breaches or unauthorized disclosures of PII.

~~1127.~~1050. Both before the Data Breach and after it occurred, PowerSchool failed to perform each and every obligation identified above and thereby violated Schedule 2-C of the Washington DPA.

~~1128.~~1051. When their contracts were made, the Washington Districts reasonably expected PowerSchool to perform these obligations in the interest of the students, parents, and employees who they serve and seek to protect. PowerSchool committed material breaches of contract through the failure to perform these obligations.

~~1129.~~1052. PowerSchool failed to take steps to mitigate and remediate the Data Breach, as the Washington Districts have yet to understand the full extent and scope of the impact of the Data Breach. PowerSchool has failed to take commercially reasonable steps to assist them by providing them with necessary information sought by their faculty, students, and parents of students.

~~1130.~~1053. In the Washington DPA, PowerSchool made representations that its protocols and procedures for data security and protection would "conform" to the standards set forth in the International Standards Organization ("ISO") 27000 series, a publication that addresses data security management systems.

~~1131.~~1054. In rendering services to the Washington Districts pursuant to these contracts, PowerSchool failed to abide by numerous standards set forth in the ISO 27000 series, including:

a. using data encryption to protect the confidentiality and integrity of private data;
b. implementing secure authentication mechanisms such as multi-factor authentication;
c. promptly detecting, reporting, and responding to incidents involving a security compromise;
d. ensuring all employees receive appropriate security training;
e. conducting regular risk assessments and reviews of data security measures; and
f. aligning public claims and policy statements regarding data security with practices and procedures that are actually implemented.

~~1132.~~1055. When their contracts were made, the Washington Districts reasonably

expected that PowerSchool would implement and maintain the ISO 27000 series standards in the interest of protecting the privacy of students, parents, and teachers. Their agreement to pay PowerSchool all amounts due under their contracts and subsequent performance of that obligation was substantially based on PowerSchool's reciprocal promise to implement these standards, and they reasonably believed that PowerSchool had done so and would continue to do so.

~~1133.~~1056. Thus, the failure by PowerSchool to abide by ISO 27000 series standards was a material breach of contract.

~~1134.~~1057. As a direct and proximate result of PowerSchool's breaches of contract identified herein, the Washington Districts have suffered monetary and other damages. These include the additional out-of-pocket costs and expenses incurred for all of the items listed in paragraph ~~136 above~~205 above

~~1135.~~1058. All of these out-of-pocket losses were foreseeable to PowerSchool when these contracts were made given PowerSchool's familiarity with the Washington Districts' status as divisions of public entities and the nature of PowerSchool's business and clientele. These losses were and are unavoidable as they are a manifestation of the natural and probable consequences of PowerSchool's acts and omissions through which PowerSchool committed material breaches of contract.

~~1136.~~1059. In committing the acts and omissions that have directly and proximately caused the Washington Districts' out-of-pocket losses, PowerSchool intentionally failed to perform acts which constitute PowerSchool's contractual duties. PowerSchool at all relevant times knew or had reason to know of the facts that would lead a reasonable, prudent person to realize that PowerSchool's conduct created an unreasonable risk of harm to the Washington Districts and to those whose PII they entrusted to PowerSchool. PowerSchool's failure to perform its contractual duties showed a deliberate indifference to the harmful consequences to them flowing directly from PowerSchool's conduct. Therefore, PowerSchool at all relevant times acted with gross negligence in committing breaches of contract and causing the Washington Districts'

substantial monetary losses.

~~1137.~~1060. As a direct and proximate result of PowerSchool's breaches of contract, the Washington Districts were deprived of the full benefit of data security protection that was promised under contract. The Washington Districts have still not received the benefit that they bargained for insofar as PowerSchool has substantially failed to perform its contractual obligations in the aftermath of the Data Breach.

~~1138.~~1061. The Washington Districts are informed and believe that the monetary damages caused by PowerSchool's various breaches of contract will only continue to grow given the nature of the personal data involved and the resources that will be necessary to respond to the Data Breach. The total amount of these losses will be determined subject to proof at the time of trial.

~~1139.~~1062. Based upon PowerSchool's various failures to perform obligations that amount to material breaches of contract, the Washington Districts seek to recover all available general damages, special damages, benefit-of-the-bargain damages, attorneys' fees and costs, and all other damages sufficient to compensate them for their injuries as permitted by law.

**COUNT 45**

**Violation of the Washington Consumer Protection Act**

**(On Behalf of the Washington Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~1140.~~1063. The Washington Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~1141.~~1064. The Washington Consumer Protection Act ("CPA") protects consumers against unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce by prohibiting certain acts and practices that tend

to deceive and mislead consumers in the conduct of any trade or commerce.[43]

~~1142.~~1065. The Washington Districts are and were at all relevant times herein "persons" within the meaning of Wash. Rev. Code. ("RCW") 19.86.010(1).

~~1143.~~1066. PowerSchool is and was at all relevant times a "person" within the meaning of RCW 19.86.010(1).

~~1144.~~1067. All of the relevant offers, solicitations, agreements, sale of PowerSchool products or services or acts or omissions made in the performance of agreements constitute "trade" and "commerce" within the meaning of RCW 19.86.010(2-3).

~~1145.~~1068. PowerSchool knowingly and intentionally engaged in false, misleading, and deceptive business practices in connection with the sale of PowerSchool's products and services and committed multiple violations of RCW 19.86 *et seq*.

~~1146.~~1069. PowerSchool published on its website the statement that PowerSchool "invests in updated security technology and adheres to strict security regulations" while representing on its website that it supposedly did these acts to "keep your data secure." Also through its website, PowerSchool represented itself as an "industry leader for protected private data." PowerSchool made representations to members of the public that they could "trust" PowerSchool to safeguard and protect children's personal information.

~~1147.~~1070. The representation that PowerSchool invests in updated security technology and adheres to strict security regulations was false, deceptive, and misleading. PowerSchool did not in fact adhere to strict security regulations because such adherence would have included, at a bare minimum, implementing encryption to make the data unreadable without a key, and ensuring that there was a multi-factor authentication method to gain access to this highly sensitive personal information.

~~1148.~~1071. The representation that PowerSchool was an industry leader for

---

[43] *See* RCW 19.86.20.

protected privacy data was false, deceptive, and misleading because it erroneously characterized PowerSchool as a company that not only met industry standards for the protection of PII, but one that went above and beyond these standards with respect to protecting children's private information.

~~1149.~~1072. The representation that members of the public could trust PowerSchool when it came to protecting the personal information of children was deceptive and misleading. In fact, PowerSchool failed to implement the most basic measures to ensure that this personal information was protected. These failures included, at a minimum, the failure to:

a. properly encrypt data;

b. implement multi-factor authentication;

c. monitor for unauthorized access;

d. ensure that its staff was adequately trained to recognize and respond to cyber threats;

e. regularly and proactively patch vulnerabilities that could be exploited by hackers; and

f. properly isolate sensitive student and teacher data from other less secure systems.

~~1150.~~1073. As such, the representation that PowerSchool could be trusted to secure data was misleading and deceptive because PowerSchool's security measures fell short of what is customarily considered sufficient in terms of data privacy protection, especially considering the data that was compromised and stolen in the Data Breach.

~~1151.~~1074. All of the above alleged assertions, representations, or statements caused the Washington Districts to reasonably believe that PowerSchool:

a. was an industry leader in data privacy protection;

b. made investments in updated security technology and adhered to strict security regulations to keep the sensitive data PowerSchool stored secure; and

c. could be trusted with handling, storing, and securing the sensitive personal information of children contained within the data that PowerSchool obtained as the result of PowerSchool's services.

~~1152.~~1075. All of the above alleged assertions, representations, or statements were knowingly made by PowerSchool with the intent to sell its product and services, or with the intent to induce a purchase of PowerSchool's product and services.

~~1153.~~1076. By making the above alleged assertions, representations, or statements, PowerSchool engaged in false, misleading, and deceptive business practices that were likely to deceive and did deceive the Washington Districts in violation of the CPA in that PowerSchool indicated that:

a. the subject of a consumer transaction had performance characteristics and/or benefits that it did not have;

b. the subject of a consumer transaction was of a particular standard or quality when it was not; and

c. a consumer transaction involved rights or remedies that it did not involve by making false representations in advertising and promotional materials.

~~1154.~~1077. PowerSchool's false, misleading, and deceptive business practices were material and the Washington Districts relied on these misrepresentations in choosing and continuing to use PowerSchool products and services and entrusting the PII to PowerSchool.

~~1155.~~1078. PowerSchool's false, misleading, and deceptive business practices were part of a repeating pattern and general course of conduct that began before the Washington Districts' involvement and injuriously affected and are capable of injuring a substantial part of the public, including the people of Washington whose children attend public schools, and whose tax payments fund public school districts that ultimately act as consumers in the marketplace for PowerSchool's products and services.

~~1156.~~1079. Due to PowerSchool's reach and involvement in providing educational services for School Districts in Washington there is real and substantial potential that

PowerSchool will continue their false, misleading and deceptive business practices that harmed the Washington Districts which will likely affect many consumers.

~~1157.~~1080. PowerSchool knew that its products and services were being provided in a manner that does not meet ordinary and reasonable consumer expectations and were unfit for use considering the sensitive and highly personal nature of the PII contained in the data PowerSchool was hired to maintain, store, and protect.

~~1158.~~1081. As a result of PowerSchool's knowing and intentional false, misleading, and deceptive representations, the Washington Districts sustained actual injury which were caused by and directly resulted from PowerSchool's unfair and deceptive acts and practices.

~~1159.~~1082. The Washington Districts have sustained damages and a monetary loss. In addition to being forced to expend substantial sums to properly and adequately address the Data Breach in its wake, they were deprived of the full benefit of the bargain they reasonably believed they would receive and were receiving under contract. PowerSchool's false, misleading, and deceptive representations were a material and significant factor that contributed to their decision to purchase PowerSchool's products and services.

~~1160.~~1083. As a direct and proximate result of the above violations of the CPA, the Washington Districts have suffered actual damages and injury in fact, including but not limited to: (i) additional wages paid to their staff members; (ii) expert expenses to understand the nature of the Data Breach's consequences; (iii) legal expenses related to potential liabilities; (iv) future expenses to migrate data to a new vendor; and (v) notification costs to ensure that affected employees, students, and parents are made aware of the Data Breach and subsequent developments related to information about the many potential consequences of the Data Breach.

~~1161.~~1084. The result of PowerSchool's false, misleading, and deceptive business practices is substantively unconscionable in that the Washington Districts not only lost out on receiving the full benefit of what they bargained for but must now continually and

persistently expend the public funds they rely on to address a situation that was proximately and actually caused by PowerSchool's grossly negligent data security systems. The Washington Districts would not have had to bear these costs if PowerSchool had not knowingly and intentionally deceived them as an inducement for payments to PowerSchool.

~~1162.~~1085. Pursuant to the CPA, RCW 19.86.090, the Washington Districts seek and are entitled to an award of monetary relief against PowerSchool to include: (a) actual damages in an amount to be determined at trial; (b) treble damages as allowed by the CPA; (c) reasonable attorneys' fees and costs; and (d) any other just and proper relief available under the CPA.

**COUNT 46**

**Violation of the Washington Data Breach Notification Statute**

**(On Behalf of the Washington Districts Against Defendants ~~PowerSchool Holdings, Inc.~~PowerSchool Corporation, PowerSchool Group LLC, and Bain Capital, L.P.)**

~~1163.~~1086. The Washington Districts reallege and incorporate paragraphs 1 through ~~309~~401 above as if fully set forth herein.

~~1164.~~1087. PowerSchool was required to accurately notify the Washington Districts following discovery or notification of the breach of its data security system (if personal information was, or is reasonably believed to have been, acquired by an unauthorized person and the personal information was not secured) "in the most expedient time possible, without unreasonable delay, and no more than thirty calendar days after the breach was discovered" under RCW 19.255.010(8).

~~1165.~~1088. PowerSchool is a business that owns or licenses computerized data that includes personal information as defined by RCW 19.255.005(2)(a).

~~1166.~~1089. The PII that the Washington Districts entrusted to PowerSchool includes personal information as covered under RCW 19.255.005(2)(a).

~~1167.~~1090. Because PowerSchool discovered a breach of its security system (in which personal information was, or is reasonably believed to have been, acquired by an

unauthorized person and the personal information was not secured), PowerSchool had an obligation to disclose the Data Breach in a timely and accurate fashion as mandated by RCW 19.255.010(1). However, PowerSchool breached that obligation.

~~1168.~~1091. As a direct and proximate result of PowerSchool's violations of RCW 19.255.010(1), the Washington Districts suffered actual damages, damages, including:

a. increased regulatory and statutory compliance costs;
b. increased remediation and mitigation costs;
c. operational disruption;
d. reputational harm with tangible consequences; and
e. costs of strengthening security systems following the Breach.

~~1169.~~1092. The Washington Districts seek relief under RCW 19.255.040(3)(a) including, but not limited to, actual damages and injunctive relief.

## VI. PRAYER FOR RELIEF

WHEREFORE, the School Districts, and each of them, respectfully request that the Court enter judgment in favor of Plaintiffs and against Defendants, as follows:

1. That the Court grant permanent injunctive relief to prohibit PowerSchool from continuing to engage in the unlawful acts, omissions, and practices described herein, including:

a. prohibiting PowerSchool from engaging in the wrongful and unlawful acts described herein;
b. requiring PowerSchool to protect all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state, or local laws;
c. requiring PowerSchool to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the Private Information of Plaintiffs' faculty, students, and parents of students;
d. requiring PowerSchool to engage independent third-party security

auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on PowerSchool's systems on a periodic basis, and ordering PowerSchool to promptly correct any problems or issues detected by such third-party security auditors;

e. requiring PowerSchool to engage independent third-party security auditors and internal personnel to run automated security monitoring;

f. requiring PowerSchool to audit, test, and train its security personnel regarding any new or modified procedures;

g. requiring PowerSchool to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon employees' respective responsibilities with handling Private Information;

h. requiring PowerSchool to routinely and continually conduct internal training and education, at least annually, to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

i. requiring PowerSchool to implement a system of testing to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with PowerSchool's policies, programs, and systems for protecting Private Information;

j. requiring PowerSchool to implement, maintain, regularly review and revise as necessary, a threat management program designed to appropriately monitor PowerSchool's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

k. requiring PowerSchool to meaningfully educate all school districts about the

threats faced by victims of the Data Breach as a result of the loss of their Private Information to third parties, as well as the steps affected individuals must take to protect themselves;

l. requiring PowerSchool to implement logging and monitoring programs sufficient to track traffic to and from PowerSchool servers; and

m. appointing a qualified and independent third-party assessor to conduct for a period of 10 years a SOC 2 Type 2 attestation to evaluate on an annual basis PowerSchool's compliance with the terms of the Court's final judgment, to provide such report to the Court, and to report any deficiencies in compliance with the Court's final judgment;

2. That the Court award Plaintiffs compensatory, consequential, general, and nominal damages in an amount to be determined at trial;

3. That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received, retained, or misused by PowerSchool as a result of its unlawful acts, omissions, and practices;

4. That the Court award statutory damages, trebled, and punitive or exemplary damages, to the extent permitted by applicable law, and in accordance with the fraudulent representations made by PowerSchool upon which Plaintiffs relied;

5. That Plaintiffs be granted the declaratory relief sought herein;

6. That the Court award Plaintiffs the costs and disbursements of this action, along with reasonable attorneys' fees, costs, and expense;

7. That the Court award pre-judgment and post-judgment interest at the maximum legal rate; and

8. That the Court grant all such other relief as it deems just and proper.

## **JURY TRIAL DEMANDED**

Under Federal Rule of Civil Procedure 38 and the Seventh Amendment to the United States Constitution, Plaintiffs demand a trial by jury.

DATED: November 6, 2026

Respectfully submitted,

By: */s/ William B. Shinoff*

James P. Frantz (State Bar No. 87492)
William B. Shinoff (State Bar No. 280020)
Kristin J. Westphal (State Bar No. 202046)
Edward M. Burak (State Bar No. 361196)
**FRANTZ LAW GROUP, APLC**
402 W. Broadway, Suite 860
San Diego, CA 92101
(619) 233-5945
jpf@frantzlawgroup.com
wshinoff@frantzlawgroup.com
kwestphal@frantzlawgroup.com
eburak@frantzlawgroup.com

Daniel Shinoff (State Bar No. 99129)
Gil Abed (State Bar No. 195771)
**ARTIANO SHINOFF**
3636 Fourth Avenue, Suite 200
San Diego, CA 92103
(619) 232-3122
dshinoff@as7law.com
gabed@as7law.com

Peter Mello ~~(Pro hac Vice Forthcoming)~~(MA Bar No. 659680)
*Admitted Pro Hac Vice*
Felicia Vasudevan ~~(Pro hac Vice Forthcoming)~~(MA Bar No. 687463)
*Admitted Pro Hac Vice*
**MURPHY, HESSE, TOOMEY & LEHANE LLP**
50 Braintree Hill Office Park, Suite 410
Braintree, MA 02184
(617) 479-5000
pmello@mhtl.com
fvasudevan@mhtl.com

Paul W. Evans (AL Bar No. 9270Z18F)

*Admitted Pro Hac Vice*
**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
24 Commerce Street
Montgomery, AL 36103
(334) 269-2343
paul.evans@beasleyallen.com

*Attorneys for Plaintiffs, Co-Lead Counsel, and Steering Committee for the School District Direct Actions*